IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE CASSAVA SCIENCES, INC. | § | |
| SECURITIES LITIGATION | § | |
| | § | Master File No. 1:21-cv-00751-DAE |
| | § | |
| | § | CLASS ACTION |
| This Document Relates To: | § | |
| | § | |
| ALL ACTIONS. | § | |
| | § | |
| | § | |

**MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Claudia Wilson Frost
State Bar No. 21671300
ORRICK, HERRINGTON & SUTCLIFFE LLP
609 Main Street, 40th Floor
Houston, Texas 77002-3106
Telephone:  (713) 658-6460
Facsimile:  713.658.6401
cfrost@orrick.com

James N. Kramer (admitted *pro hac vice*)
Alexander Talarides (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, California 94105-2669
Telephone:  (415) 773-5700
Facsimile:  415.773.5759
jkramer@orrick.com
atalarides@orrick.com

William J. Foley (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
Telephone:  (212) 506-5000
Facsimile:  212.506.5151
wfoley@orrick.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    FACTUAL BACKGROUND ............................................................................... 3

    A.     The Parties .............................................................................................. 3

    B.     The Development Of Simufilam ............................................................. 3

    C.     The Short-Seller Attacks ........................................................................ 6

    D.     Government Inquiries ............................................................................. 7

    E.     Media Reporting Concerning The Citizen Petitions .............................. 8

    F.     Journal Findings And Ongoing CUNY Investigation ............................ 8

    G.     The Complaint ...................................................................................... 10

III.   ARGUMENT .................................................................................................... 10

    A.     The Rigorous Pleading Standards Governing This Securities Fraud Action ....... 10

    B.     The Complaint Is A Classic Example Of Improper Puzzle Pleading ................. 12

    C.     Plaintiffs Have Not Alleged An Actionable Misstatement Or Omission ........... 13

        1.     There Is No Duty To Disclose Uncharged, Unadjudicated Wrongdoing, And The PSLRA Prohibits Plaintiffs From Relying On Allegations About *Other* Allegations And Speculative "Expert" Opinions To Plead Securities Fraud ........................... 13

            a.     Allegedly Manipulated Data in Journal Submissions ................ 15

            b.     Alleged "Pattern" Of Data Manipulation ............................. 17

            c.     Allegedly Manipulated Phase 2 Results ............................... 18

        2.     Several Of The Challenged Statements Are Undisputedly True And Not In Any Way False Or Misleading ............................... 19

    D.     Plaintiffs Have Failed To Allege Particularized Facts Demonstrating A Strong Inference Of Scienter ...................... 22

        1.     Plaintiffs Have Not Alleged Specific Facts Creating A Strong Inference Of Conscious Misbehavior Or Recklessness ............ 22

        2.     Plaintiffs' Allegations Regarding Motive Do Not Support An Inference Of Scienter ............................ 24

        3.     Generalized And Group Pleading Provides No Basis For Scienter And Fails To Meet The Fifth Circuit's Rigorous Requirements For Pleading Fraud ...................... 27

    E.     The Complaint Does Not Adequately Allege Loss Causation ........................... 29

**TABLE OF CONTENTS**
(continued)

| | 1. | The Alleged "Corrective Disclosures" Are Merely Accusations; They Do Not Reveal Any "Pertinent Truth" Regarding Defendants' Prior Statements. | 30 |
| | 2. | New Commentary Or Detail On Already Public Information Is Not "Corrective" | 34 |
| F. | | Plaintiffs Have Failed To State A Section 20(a) Violation | 35 |
| IV. | CONCLUSION | | 35 |

## TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*ABC Arbitrage Pls. Grp. v. Tchuruk*,
  291 F.3d 336 (5th Cir. 2002) ................................................11

*Abrams v. Baker Hughes Inc.*,
  292 F.3d 424 (5th Cir. 2002) ...............................22, 25, 26, 28

*In re Alamosa Holdings, Inc. Sec. Litig.*,
  382 F. Supp. 2d 832 (N.D. Tex. 2005) .............................12, 13

*In re All Am. Pipeline, LP Sec. Litig.*,
  245 F. Supp. 3d 870 (S.D. Tex. 2017) ..............................27, 35

*In re AOL Time Warner, Inc. Sec. Litig.*,
  503 F. Supp. 2d 666 (S.D.N.Y. 2007) .....................................35

*Applestein v. Medivation, Inc.*,
  561 F. App'x 598 (9th Cir. 2014) .........................................15

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
  597 F.3d 330 (5th Cir. 2010), *rev'd on other grounds*, 563 U.S. 804 (2011)..............29, 30, 35

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................10

*Carlton v. Cannon*,
  184 F. Supp. 3d 428 (S.D. Tex. 2016) .....................................27

*Catogas v. Cyberonics, Inc.*,
  292 F. App'x 311 (5th Cir. 2008) ......................30, 32, 34, 35

*In re Dell, Inc. Sec. Litig.*,
  591 F. Supp. 2d 877 (W.D. Tex. 2008)...............................24, 32

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005).........................................29, 31, 35

*Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*,
  905 F.3d 892 (5th Cir. 2018) ........................................30, 34

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976)...............................................................11

*Fin. Acquisition Partners LP v. Blackwell*,
  440 F.3d 278 (5th Cir. 2006) .............................14, 23, 24, 28

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
 565 F.3d 200 (5th Cir. 2009) ....................................................................................11, 25, 26

*Heinze v. Tesco Corp.*,
 971 F.3d 475 (5th Cir. 2020) ...................................................................................................11

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
 537 F.3d 527 (5th Cir. 2008) ............................................................................................11, 27

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
 251 F. Supp. 3d 596 (S.D.N.Y. 2017).....................................................................................20

*Janbay v. Canadian Solar, Inc.*,
 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ..................................................................29, 35

*In re KBR, Inc. Sec. Litig.*,
 2018 WL 4208681 (S.D. Tex. Aug. 31, 2018) ...................................................14, 17, 18, 21

*In re Key Energy Services, Inc. Sec. Litig.*,
 166 F. Supp. 3d 822 (S.D. Tex. 2016) ..............................................................................14, 17

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 161 (2d Cir. 2005).....................................................................................................29

*In re Lions Gate Ent. Corp. Sec. Litig.*,
 165 F. Supp. 3d 1 (S.D.N.Y. 2016).........................................................................................21

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
 810 F.3d 951 (5th Cir. 2016) ............................................................................................22, 27

*Lormand v. US Unwired, Inc.*,
 565 F.3d 228 (5th Cir. 2009) ...................................................................................................29

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
 540 F.3d 1049 (9th Cir. 2008) .................................................................................................31

*Meyer v. Greene*,
 710 F. 3d 1189 (11th Cir. 2013) ........................................................................................32, 33

*In re Molycorp, Inc. Sec. Litig.*,
 2015 WL 1540523 (D. Colo. Mar. 31, 2015) .........................................................................15

*Mun. Emps.' Ret. Sys. of Michigan v. Pier 1 Imps., Inc.*,
 935 F.3d 424 (5th Cir. 2019) ...................................................................................................24

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
 720 F. Supp. 2d 517 (D.N.J. 2010) .........................................................................................35

*In re Omnicom Grp., Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008) ........................................................................35

*Parker v. Hyperdynamics Corp.*,
    126 F. Supp. 3d 830 (S.D. Tex. 2015) ............................................................ *passim*

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690 (5th Cir. 2005) ...........................................................................11, 12

*Primo v. Pacific Biosciences of California, Inc.*,
    940 F. Supp. 2d 1105 (N.D. Cal. 2013) ...................................................................13

*Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ..........................................................................30, 33

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ........................................................................ *passim*

*Sgarlata v. PayPal Holdings, Inc.*,
    409 F. Supp. 3d 846 (N.D. Cal. 2019), *aff'd*, 831 F. App'x 366 (9th Cir. 2020) ...................15

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) ....................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................22, 23

*Weiss v. Amkor Tech., Inc.*,
    527 F. Supp. 2d 938 (D. Ariz. 2007) ....................................................................24

## Statutes

15 U.S.C. § 78u–4(b)(1) ...................................................................................11, 12
15 U.S.C. § 78u-4(b)(1) .......................................................................................11
15 U.S.C. § 78u-4(b)(2) .......................................................................................11
15 U.S.C. § 78u-4(b)(4) .......................................................................................29
17 C.F.R. § 240.10b-5 .....................................................................................10, 11
21 C.F.R. § 10.30 ..............................................................................................6

## Rules

Fed. R. Civ. P. Rule 9(b) ..................................................................................10, 25
Fed. R. Civ. P. Rule 10(b) ............................................................................10, 11, 35
Fed. R. Civ. P. Rule 12(b)(6) ................................................................................10

## I.      __INTRODUCTION__

This securities fraud action was filed on the heels of a "Citizen Petition" alleging that Cassava Sciences, Inc. ("Cassava" or the "Company") committed research misconduct and fraud. The Citizen Petition and its subsequently filed supplements (together, "Citizen Petitions") are strategic reports that were authored and widely publicized for the personal financial benefit of "short sellers."[1]  The Citizen Petitions were drafted by two highly conflicted market players with an admitted financial interest in destroying the value of Cassava's stock price and are based on rank speculation, rumors and maliciously false characterizations of Cassava's research.[2] Plaintiffs' Consolidated Complaint ("CC" or "Complaint") uncritically assumes the factual accuracy of these and related accusations to claim that Cassava and its personnel defrauded investors for years by making public statements that concealed "rampant data manipulation and significant anomalies" in Cassava's research.  But the Citizen Petition's allegations are just that— allegations.  They are unproven and remain stoutly contested by Cassava and uncorroborated by even a single witness.  The "facts" underlying Plaintiffs' theory of fraud are not facts at all and cannot be blindly relied on to plead a securities claim.  That, alone, compels dismissal of this action.  But it also must be dismissed for a host of other reasons.

*First*, the Complaint violates basic pleading rules.  Rather than (1) identifying the specific statements Plaintiffs believe were false, and (2) explaining why those statements are misleading, the Complaint includes dozens of confusing paragraphs quoting Cassava's public statements and summarily claims that these statements must have been false by referencing a list of fifteen or

---

[1] "Short sellers" are market participants who have made a financial wager that a company's security price will fall.

[2] The authors of the Citizen Petitions made numerous, wild allegations about Cassava and the U.S. Food and Drug Administration ("FDA") subsequently denied the Petitions in their entirety.

more supposed "facts."  This tactic is known as "puzzle pleading," and it is entirely inadequate under the stringent pleading standards applicable to this case.

***Second***, Plaintiffs have failed to plead an actionable misstatement or omission.  Their theory of fraud runs contrary to the well-settled principle that there is no duty to "confess" to unadjudicated allegations of wrongdoing.  Defendants appropriately disclosed the existence of the Citizen Petitions and related regulatory investigations, but they cannot be liable for failing to issue a public confession to contested and unadjudicated accusations.  Additionally, the balance of the "misstatements" alleged in the Complaint were unambiguously not false when made.

***Third***, Plaintiffs fall far short of pleading the requisite "strong inference" of scienter.  The federal securities laws require Plaintiffs to allege specific facts creating a powerful inference that Defendants acted with, at a minimum, deliberate recklessness—a state of mind that strongly suggests actual intent to mislead.  The Complaint is devoid of factual allegations indicating any individual Defendant's state of mind.  Rather, it relies entirely on the unsubstantiated allegations in the Citizen Petitions to claim that Defendants "must have known" that their positive statements about Cassava's investigational drug, called "simufilam," and the Company's peer-reviewed research were incorrect.  Nor have Plaintiffs adequately alleged a motive to commit fraud.  There is no dispute that the individual Defendants, all significant stockholders in Cassava, did not sell a single share of Cassava stock throughout the class period.  *See, e.g., Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003) (where "there is no allegation that defendants sold their . . . shares," it "call[s] into question the alleged motive to artificially inflate the stock price").

***Fourth***, Plaintiffs have failed to plead loss causation.  The "corrective disclosures" alleged in the Complaint do not, as they must, "reveal the truth" of a previously false or misleading statement.  Rather, these disclosures are nothing more than accusations of unadjudicated

wrongdoing (e.g., the Citizen Petitions), which cannot support loss causation as a matter of law. Additionally, most of the alleged corrective disclosures do not reveal any new information; they only provide additional commentary on the allegations set out in the initial Citizen Petition.

For these and other reasons discussed below, the Complaint should be dismissed.

## II.   FACTUAL BACKGROUND

### A.   The Parties

Cassava is a clinical stage biopharmaceutical company focused on developing medicines for people with debilitating neurodegenerative conditions.  CC ¶¶ 56, 297.  Its investigational drug, simufilam, is a novel treatment for people with Alzheimer's disease and is currently in late-stage Phase 3 clinical testing.  *Id.* ¶¶ 80, 302 n.8.[3]  Cassava is also working to develop SavaDx, an investigational diagnostic to detect Alzheimer's disease from a small sample of blood.  *Id.* ¶ 80.

Defendant Remi Barbier is Cassava's President, Chief Executive Officer and Chairman of the board of directors.  *Id.* ¶ 59.  Defendant Lindsay Burns, Ph.D. serves as Cassava's Senior Vice President of Neuroscience, a leader of Cassava's research team.  *Id.* ¶ 61.  Defendant Nadav Friedmann, Ph.D., M.D., is Cassava's Chief Medical Officer and a member of its board of directors.  *Id.* ¶¶ 64-65.  Defendant Eric Schoen is Cassava's Chief Financial Officer.  *Id.* ¶ 67.

### B.   The Development Of Simufilam

Simufilam uniquely targets an altered form of a scaffolding protein known as filamin A ("FLNA"), which is present in people with Alzheimer's disease.  *Id.* ¶¶ 83-84.  It is believed that simufilam reverts FLNA back to its normal conformation.  *Id.*  Cassava's thesis is that simufilam's action in the brain may slow the course of Alzheimer's disease.  *Id.* ¶ 304.  Over the last ten years,

---

[3] Alzheimer's disease is the sixth leading cause of deaths in adults and afflicts tens of millions of people worldwide.  CC ¶ 81.  There is no cure for Alzheimer's disease and to date almost all investigational drug treatments have failed.  *Id.*

Cassava's development of simufilam has progressed steadily and successfully through preclinical stages and clinical trials. *Id.* ¶¶ 87-89, 95, 297.

In 2008, Dr. Burns and Cassava's academic adviser, Dr. Hoau-Yan Wang, published foundational research on FLNA.[4]  This basic research subsequently led to the discovery of simufilam in approximately 2011. *Id.* ¶ 86.  Between 2011 and 2017, Cassava engaged in pre-clinical testing of simufilam in animal models, which resulted in findings of "dramatic improvements in brain health." *Id.* ¶ 87.  Drs. Burns and Wang's findings were accepted for publication in peer-reviewed scientific journals. *Id.*

In 2017, the FDA accepted Cassava's Investigational New Drug application, which enabled the Company to begin testing simufilam in humans. *Id.* ¶ 88.  From 2017 through 2019, Cassava proceeded through Phase 1 and Phase 2a clinical studies successfully, receiving scientific and financial support from the National Institutes of Health ("NIH"). *Id.*  In late 2019, Cassava initiated a Phase 2b clinical study, a placebo-controlled, blinded trial. *Id.* ¶ 89.  The initial bioanalysis of cerebrospinal fluid ("CSF") for this study was conducted by a lab at Lund University in Sweden in April and May 2020. *Id.* ¶ 94.  Lund University generated an anomalous data set in which, among several other issues, biochemical indicators for the presence of Alzheimer's disease moved in opposite directions over a 30-day period in patients who received placebo, including in the same patients. *Id.* ¶¶ 94, 304.  This anomalous data therefore suggested (implausibly) that Alzheimer's disease in patients who took placebo was both worsening and improving at the same time in the same patient, which is a significant departure from expected clinical patterns. *Id.* ¶¶ 94, 96, 304.  Critically, the initial Phase 2b data did not demonstrate poor results; rather the data

---

[4] Dr. Wang, an Associate Medical Professor at the City University of New York Medical School ("CUNY"), is a co-inventor of simufilam, a science consultant to Cassava, and a member of its scientific advisory board.  CC ¶ 57.

was anomalous and uninterpretable, apparently due to laboratory or human error. *Id.* Accordingly, Cassava timely disclosed the anomalous results from Lund University and notified its shareholders that back-up samples would be analyzed at a different lab. *Id.* ¶¶ 268-70, 304. Cassava later requested that Dr. Wang's lab at CUNY conduct a bioanalysis on the back-up CSF patient samples from the Phase 2b study. *Id.* ¶¶ 95, 304. In order to eliminate bias, at all relevant times, Dr. Wang remained "blinded" to the experiment—i.e., he did not know whether the samples he was analyzing were from patients who took simufilam or who took the placebo, or if the samples were from Day 1 or Day 30. *Id.* ¶ 304.

The final results of the Phase 2b testing were promising. There was no pattern of anomalies in the placebo data and, more importantly, Dr. Wang's bioanalysis demonstrated a significant reduction of indicators of Alzheimer's disease in patients who took simufilam versus placebo, consistent with previous studies of simufilam. *Id.* ¶¶ 97, 304. Additionally, Dr. Wang's bioanalysis of CSF samples was corroborated by a bioanalysis of plasma (blood) samples performed by Quanterix Corporation, an independent external lab. *Id.* ¶ 16, 317. In other words, two separate parties generated matching data from two separate biological indicators (i.e., brain fluid and blood), which is key to the validation of a scientific process. *Id.* ¶¶ 93, 97; *see also id.* ¶¶ 16, 317. On February 2, 2021, these findings were supported by interim results from an open-label extension study.[5] These results showed that the first fifty patients, including patients recruited into the open-label study from the Phase 2b trial, who completed at least six months of simufilam treatment experienced improved cognition scores with no safety issues. *Id.* ¶ 289.

---

[5] An open-label study is one in which both the researchers and the study-participants know which treatment the patient is receiving.

In February 2021, Cassava's successful completion of its Phase 1 and 2 clinical studies resulted in the FDA green-lighting Cassava to conduct randomized, placebo-controlled Phase 3 trials of simufilam in people with Alzheimer's disease. *Id.* ¶ 297. These Phase 3 trials are currently ongoing.

### C.   The Short-Seller Attacks

Following the announcement of the Phase 3 trials, Cassava's stock price rose to a high of $146 per share on July 29, 2021, eclipsing $5 billion in market value. *Id.* ¶ 6. Less than a month later, two highly conflicted individuals anonymously filed a Citizen Petition with the FDA accusing Drs. Burns and Wang of research misconduct and data manipulation. *Id.* ¶ 105.

The Citizen Petition, which was filed on August 18, 2021[6] by an attorney[7] acting on behalf of his anonymous clients, scientist David Bredt and his long-time friend Geoffrey Pitt, requested that the FDA "halt" any future Phase 3 trials of simufilam over allegations that "a series of anomalies" in Cassava's published research "strongly suggests systematic data manipulation." *Id.* ¶¶ 105, 117; Ex. 1 (Citizen Petition) at 1-2. Bredt and Pitt did not disclose in the Citizen Petition, as they were required to do under FDA regulations,[8] their massive conflicts of interest, including that they both held "short" positions in Cassava's stock and thus would reap huge profits if Cassava's stock price declined. *See id.*[9] Instead, they waited eight days to disclose those

---

[6] The Citizen Petition became public on August 24, 2021. CC ¶ 12.

[7] This attorney, Jordan A. Thomas, was a partner at Labaton Sucharow at the time, a law firm that specializes in filing securities lawsuits after stock price drops. *Id.* ¶ 105; *see also generally* Labaton Sucharow, https://www.labaton.com/about-us (last visited Oct. 19, 2022).

[8] *See* 21 C.F.R. 10.30 (requiring petitioner to certify that the "petition . . . includes representative data and information known to the petitioner which are unfavorable to the petition.").

[9] Short selling occurs when a market participant borrows and sells a stock on the market and repurchases the same stock later, hoping to profit from a decline in the price. A short-seller attack, known as a "short and distort" scheme, refers to an unethical and illegal practice that involves investors shorting a stock and then spreading rumors in an attempt to drive down its price.

conflicting interests in a footnote to a press release, and then only after Cassava's stock price dropped from $114 to $71.  Exs. 2 (Press Release) & 3 (Stock Price Chart).[10]  Between August and December 2021, Bredt and Pitt's attorney filed four supplements to the Citizen Petition that restated their allegations of data manipulation and misconduct.  CC ¶¶ 18-19, 31-32, 328, 330, 380-85.  Importantly, none of the allegations in the Citizen Petitions are based on evidence, first-hand knowledge or witnesses; rather, the allegations are baseless, speculative, confusing and often contradictory.[11]

After the initial Citizen Petition was made public, a wave of other financially interested individuals, including other short sellers and a self-proclaimed expert in research misconduct, Elisabeth Bik, began publicly accusing Cassava of having engaged in potential data manipulation.  *See id.* ¶¶ 24, 132, 135, 137-38, 375, 490.  Like the authors of the Citizen Petitions, these additional public critics had no first-hand knowledge regarding the research at issue and thus their criticism was, at best, speculative, purported opinion.  *See, e.g., id.* ¶¶ 24, 124, 135, 137, 321.

### D.   <u>Government Inquiries</u>

After publication of the initial Citizen Petition, the U.S. Securities and Exchange Commission ("SEC") and U.S. Department of Justice ("DOJ") asked Cassava "to provide them corporate information and documents."  *Id.* ¶¶ 5, 26.  Cassava has been fully cooperating with all regulatory inquiries since August 2021.  To date, no government agency has pursued an enforcement action against Cassava or made any determination that the Company or its personnel

---

[10] Bredt and Pitt did not disclose their short-seller status until after market closing on August 26, 2021.  *See* Ex. 2.

[11] The Citizen Petition focuses broadly on two key allegations.  First, it claims that the Western blot analyses published in journal articles used to support simufilam's connection to Alzheimer's disease are "strongly suggestive of systematic data manipulation and misrepresentation."  CC ¶ 107.  Second, it claims that Cassava's presentation of Phase 2b clinical biomarker data shows "signs of data anomalies or manipulation."  *Id.*  Cassava has consistently denied these allegations—as of today, these allegations are unproven and contested.  *Id.* ¶¶ 26, 369, 436.

have engaged in any wrongdoing. *Id.* ¶ 5. On February 10, 2022, the FDA denied the Citizen Petitions, stating that "[r]equests for the [FDA] to initiate enforcement action and related regulatory action are expressly excluded from the scope of FDA's citizen petition procedures." Ex. 4 (FDA Response Letter to Citizen Petition) at 3; *see also* CC ¶ 411.

### E.    Media Reporting Concerning The Citizen Petitions

On November 17, 2021, the *Wall Street Journal* published a story concerning the allegations in the Citizen Petitions (which, for the first time, revealed the identities of Bredt and Pitt) and interviewed several other scientists about the accusations against Cassava. *See* CC ¶¶ 22, 369-70. Later, on April 18, 2022, the *New York Times* published a similar article, interviewing many of the same experts as the *Wall Street Journal*, none of whom had any personal knowledge concerning Cassava's research or data. *Id.* ¶¶ 40, 427. These articles included no new facts, but simply rehashed the allegations from the Citizen Petitions with new commentary. *Id.* ¶¶ 40, 137, 245, 428-30. On July 27, 2022, over eight months after Cassava disclosed that government agencies had requested information as part of ongoing investigations, *Reuters* published an article further detailing that the DOJ had "opened a criminal investigation into Cassava." *Id.* ¶¶ 5, 26, 44.

### F.    Journal Findings And Ongoing CUNY Investigation

Given the allegations in the Citizen Petitions, and in response to further accusations by Elisabeth Bik, several academic journals performed a reassessment of certain peer-reviewed articles previously published by Dr. Wang and/or Dr. Burns. *See, e.g.*, *id.* ¶¶ 22, 37-39, 387-88. While Bik and the petitioners only reviewed the "as published" Western blot images, Drs. Burns and/or Wang provided the journals with the underlying images. *Id.* ¶ 387. No journal has concluded that Dr. Burns or Dr. Wang manipulated data or engaged in any misconduct. *Id.* One online journal (PLOS One) retracted articles because of concerns raised about the published data, *id.* ¶¶ 37, 39, 42, however, none of the papers retracted by PLOS One concerned simufilam or

Alzheimer's disease.  The majority of the journal inquiries have resulted in exonerations for Drs.

Wang and/or Burns, *id.* ¶¶ 22, 38, 453, 387-88.  For example:

- ***Neuroscience***:  After reviewing a 2005 article authored by Drs. Burns and Wang, the journal released an Editorial Note stating:  "After careful examination of these original material, Neuroscience found ***no evidence of manipulation*** of the Western blot data or other figures of this publication."  *Id.* ¶¶ 387-88 (emphasis added).  Then, on March 29, 2022, *Neuroscience* published a Corrigendum to a 2021 *Neuroscience* article authored by Dr. Wang, stating that "two errors pertaining to the visual display of representative western blot images . . . ***have no material impact*** on the findings of the research (the data analyses are correct)."  *Id.* ¶ 420 (emphasis added).

- ***Journal of Neuroscience***:  After review of a 2012 article authored by Drs. Wang and Burns, the journal determined that "***[n]o evidence of data manipulation was found for Western blot data***."  *Id.* ¶ 22 (emphasis added).

- ***Molecular Neurodegeneration***:  In connection with a 2021 paper authored by Dr. Wang and others (which had nothing to do with Cassava or simufilam), the journal disclosed that "[t]he authors have retracted this article because concerns have been raised regarding the data," Ex. 5; *see also* CC ¶ 37.  There were no findings of image manipulation or research misconduct in connection with this article.  *See id.*

- ***Neurobiology of Aging***:  In connection with a 2017 paper authored in part by Drs. Burns and Wang, the journal disclosed that its "editors ***did not find compelling evidence of data manipulation intended to misrepresent the results***" but noted that "errors in the published report were identified" and the "authors have requested a corrigendum to correct these issues." Ex. 6 (*Neurobiology of Aging* Expression of Concern); CC ¶ 38 (emphasis added).

- ***PLOS One***:  On March 30, 2022, the journal retracted five papers authored in part by Dr. Wang (two of which were co-authored by Dr. Burns), stating that: "The data and comments provided to PLOS did not resolve the concerns about the integrity and reliability of the reported data.  In light of these issues, the PLOS ONE Editors retract this article."  CC ¶ 39.  There were no findings of image manipulation or research misconduct in connection with this article (which had nothing to do with simufilam).  *See id.*

- ***Alzheimer's Research & Therapy***:  On June 1, 2022, the journal retracted a 2017 article authored by Dr. Wang and others (which did not concern Cassava or simufilam), stating that "concerns have been raised regarding [] western blot images . . . . The authors have provided the raw data, which have been assessed by independent experts and deemed insufficient to address the concerns."  *Id.* ¶¶ 42, 433.  There were no findings of image manipulation or research misconduct in connection with this article.  *See id.*

- ***Journal of Prevention of Alzheimer's Disease***:  After an inquiry concerning Drs. Burns and Wang's 2020 paper regarding the simufilam Phase 2a studies, the journal disclosed

that:  "We do not find convincing evidence of manipulation of data or intent to mislead, and therefore take no action regarding the published paper."  *Id.* ¶ 453 n.16.[12]

Additionally, CUNY, Dr. Wang's employer, initiated an investigation in 2021, which remains ongoing and has not resulted in any finding of fault with respect to Dr. Wang's research. *Id.* ¶ 28.

## G.    The Complaint

Plaintiff Pierre Brazeau initiated this action on August 27, 2021, three days after the initial Citizen Petition was made public.  Compl., ECF 1.  Three nearly identical actions were filed over the next several weeks, and the Court subsequently consolidated related cases.  Order, ECF 58. Plaintiffs filed the current operative Complaint on August 18, 2022, ECF 68, relying almost exclusively on the unadjudicated accusations in the Citizen Petitions and the speculative, purported opinions of Bik and Mike Rossner, a biomedical image analyst retained by Plaintiffs, to allege that Defendants committed securities fraud by failing to disclose that Cassava's data and research related to simufilam had been manipulated, *see, e.g.*, CC ¶¶ 12-13, 24, 139-42, 143-247, 287.

## III.    ARGUMENT

### A.    The Rigorous Pleading Standards Governing This Securities Fraud Action

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While the Court must accept as true well-pleaded factual allegations, it need not accept as true conclusory allegations, unreasonable inferences or unwarranted deductions of fact, or allegations that contradict documents referred to in the complaint or matters

---

[12]  The additional journals referenced in the Complaint—*Alzheimer's & Dementia*, *Neuroimmunology and Neuroinflammation*, *Biological Psychiatry*, and the *Journal of Biological Chemistry*—have not issued ***any*** public statements regarding the articles published by Dr. Wang or Dr. Burns, and these papers remain published, peer-reviewed research.  *See* CC ¶¶ 79, 87, 207, 289.

subject to judicial notice.  *See Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020).

Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S. Code §

78u, *et seq.*, impose additional, exacting pleading requirements in securities fraud cases like this

one.[13]   Rule 9(b) requires particularized allegations of the circumstances constituting fraud,

including "the statements (or omissions) considered to be fraudulent, the speaker, when and why

the statements were made, and an explanation why they are fraudulent."  *Plotkin v. IP Axess Inc.*,

407 F.3d 690, 696 (5th Cir. 2005).  The PSLRA similarly requires a complaint to specify each

statement alleged to have been misleading and the reasons why it was misleading when made, and

to "state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

The PSLRA further requires a complaint to "state with particularity facts giving rise to a

strong inference that [each] defendant acted with" scienter.  15 U.S.C. § 78u-4(b)(2).  Because the

Supreme Court has defined "scienter" in the context of Section 10(b) and Rule 10b-5 as a "mental

state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S.

185, 193 n.12 (1976), the complaint must plead specific facts giving rise to a strong inference that

the defendant made a false or misleading statement with, at a minimum, "severe recklessness,"

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008)

(citation omitted).  This standard for recklessness is actually much closer to one of intent, and thus

the complaint must plead specific facts indicating a degree of culpability that strongly suggests

actual intent to mislead.  *See Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,

565 F.3d 200, 207 (5th Cir. 2009) ("Severe recklessness is limited to those highly unreasonable

omissions or misrepresentations that involve . . . an extreme departure from the standards of

---

[13] To state a securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, Plaintiffs must plead with particularity: (1) a material misrepresentation or omission; (2) made by a defendant acting with scienter; (3) reliance; (4) damages; and (5) loss causation. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

ordinary care." (citation omitted)); *Plotkin*, 407 F.3d at 697 ("[A] . . . plaintiff must prove that the defendant either consciously misbehaved . . . or was so severely reckless that it demonstrates that the defendant must have been aware of the danger of misleading the investing public.")

### B.    The Complaint Is A Classic Example Of Improper Puzzle Pleading

As an initial matter, the Complaint should be dismissed because it is a paradigm example of impermissible "puzzle pleading."   A puzzle pleading is a complaint that forces Defendants and/or the Court to sort out the alleged misstatements and match them with the corresponding, allegedly omitted "true" facts to solve the puzzle of interpreting Plaintiffs' claims.

The PSLRA, however, requires Plaintiffs to specify with particularity "each statement alleged to have been misleading" ***and*** "the reason or reasons why [***each***] statement is misleading," 15 U.S.C. § 78u-4(b)(1).   Plaintiffs may not, as they do in their Complaint, "recite[] a list of allegedly false and misleading statements extracted from press releases, analysts' reports, and public filings and then follow the list" with "a separately located second list" of reasons "all the cited statements were false."  *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 857 (N.D. Tex. 2005) (citing *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 180 (5th Cir. 1997) (rejecting pleading making "[n]o attempt . . . to isolate statements and particularize their falsity")).

Here, the Complaint alleges a list of almost 50 alleged misstatements followed by a conclusory laundry list of 15 purported reasons why these statements were purportedly misleading, without identifying ***which*** alleged "true fact" from the laundry list renders a particular statement false or misleading when made.  *Compare, e.g.*, CC ¶¶ 268-86, 289, 291-94, 297-304, 306-07, 309-10, 312-14 (identifying 47 alleged misstatements), *with id.* ¶ 287 (identifying 15 separate alleged reasons for why the 47 statements were false and misleading).  Plaintiffs make no effort to tie each of the 47 alleged misstatements to the specific reason or reasons why each statement is false or misleading, leaving the reader to decipher which of the 15 purported reasons apply to each

of the 47 alleged misstatements.  Indeed, given the puzzle-pled nature of the Complaint, many of the alleged 15 reasons that Plaintiffs offer as to why certain statements were allegedly false or misleading bear no connection at all to the substance of the statements themselves.[14]

In short, Plaintiffs have "place[d] 'the burden on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting [their] claims,'" *Primo v. Pacific Biosciences of California, Inc.*, 940 F. Supp. 2d 1105, 1111-12 (N.D. Cal. 2013), and the Complaint should be dismissed on that basis alone, *see, e.g.*, *Alamosa*, 382 F. Supp. 2d at 858 ("[A]ssembling puzzles is not the duty of the Court . . . . The Court will not waste its resources attempting to construe which statements are actionable and why").

### C.   Plaintiffs Have Not Alleged An Actionable Misstatement Or Omission

Puzzle pleading aside, the Complaint should also be dismissed because it fails to adequately plead an actionable misstatement or omission.

#### 1.   There Is No Duty To Disclose Uncharged, Unadjudicated Wrongdoing, And The PSLRA Prohibits Plaintiffs From Relying On Allegations About *Other* Allegations And Speculative "Expert" Opinions To Plead Securities Fraud

The overwhelming majority of Plaintiffs' fraud case is built around the legally invalid premise that Defendants had an obligation to publicly accuse themselves of engaging in misconduct that has never been substantiated—much less formally charged.  Indeed, Plaintiffs begin their narrative with the Citizen Petitions, a collection of smears and accusations published by two financially interested short sellers, and blithely assert that Defendants' statements during the Class Period ***must have been*** false because they failed to "admit" those accusations.

---

[14] For example, one of the reasons that Plaintiffs cite in support of their allegation that a 2020 Cassava statement regarding samples having been sent to "outside labs" for bioanalysis was false is that an entirely unrelated 2008 article by Drs. Burns and Wang supposedly contained manipulated data.  *Compare* CC ¶ 271, *with id.* ¶ 287(a)(i); *compare also id.* ¶¶ 268-86, 289, 291-94, 297-304, 306-07, 309-10, 312-14, *with id.* ¶¶ 287-87(h).

It is well-settled, however, that there is no duty to disclose or confess to "uncharged, unadjudicated wrongdoing." *Parker v. Hyperdynamics Corp.*, 126 F. Supp. 3d 830, 843 (S.D. Tex. 2015) (citation omitted).  Moreover, "[a]n investigation is not a violation," *In re Key Energy Services, Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 863 (S.D. Tex. 2016), and "[t]he mere existence of an [agency] investigation does not suggest that any of the allegedly false statements were actually false," *Parker*, 126 F. Supp. 3d at 843.  Simply put, Defendants are "under no duty to announce publicly . . . uncharged criminal behavior, or to accuse [themselves] of antisocial or illegal policies." *Id.* (citation omitted).

Statements are rendered "misleading" by the omission of alleged wrongdoing only when the wrongdoing "had, ***in fact***," occurred.  *In re KBR, Inc. Sec. Litig.*, 2018 WL 4208681, at *7 (S.D. Tex. Aug. 31, 2018).  Plaintiffs must "establish that [the alleged] violations occurred" using "authoritative evidence in the record," *Parker*, 126 F. Supp. 3d at 843, and—as the Fifth Circuit has made clear—***purported expert***"***opinions cannot substitute for facts under the PSLRA***," *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006) (emphasis added).

This rule largely forecloses Plaintiffs' fraud claim as a matter of law because most of the challenged statements are claimed to be false and misleading by virtue of Defendants' alleged failure to disclose—i.e., their failure to confess or admit to—the uncharged, unadjudicated, and unsubstantiated accusations listed in the Complaint.  ***None*** of these accusations have been—or are even alleged to have been—adopted or advanced, much less substantiated, by any government agency or authority, court, or any person or entity with personal knowledge of the underlying facts (i.e., the original experiments, data, or results).  And as discussed above, none of the allegations in the Citizen Petitions, which form the basis of this lawsuit, are based on first-hand knowledge or observations or facts; rather, the accusations are speculative and often contradictory.  Likewise,

the other purported "experts" who, following the Citizen Petitions, have publicly accused Cassava of having engaged in potential data manipulation, have no first-hand knowledge regarding the research at issue and thus their criticism is, at best, speculative, purported opinion.

In short, the Complaint should be dismissed because it is supported by allegations about other allegations by self-interested parties with no personal knowledge whatsoever of the underlying facts or data. This is the antithesis of the PSLRA's requirement that the Complaint be supported by particularized ***allegations of fact***. *See, e.g.*, *Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846, 861 (N.D. Cal. 2019) (dismissing complaint because its "reliance on [an] expert was 'essentially an allegation made on information and belief . . . i.e., no personal knowledge'"), *aff'd*, 831 F. App'x 366 (9th Cir. 2020); *Applestein v. Medivation, Inc.*, 561 F. App'x 598, 600 (9th Cir. 2014) ("Dr. Schneider's opinion is insufficient to establish falsity adequately because he has no personal knowledge of the facts on which he bases his conclusion."); *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1540523, at *16 (D. Colo. Mar. 31, 2015) (allegations based on expert did not support plaintiffs' claims where "Plaintiffs do not allege that Molycorp employed the industry expert" or that he otherwise had personal knowledge).

### a.    Allegedly Manipulated Data in Journal Submissions

Plaintiffs allege that Cassava's failure to disclose the existence of allegedly manipulated data or images in four papers published in 2008, 2012, 2017, and 2020 renders a litany[15] of statements false. CC ¶¶ 287(a)(i)-(iv). But each of these allegations of data manipulation arises from ***the "findings" of the Citizen Petitions*** and the supposed experts' review of the Citizen Petitions and their sources:

- Regarding the 2008 paper in *PLOS One*, Plaintiffs allege that "[*t*]*he Citizen Petition*

---

[15] As discussed above, Plaintiffs fail to specify which statements are rendered misleading by which omissions.

*found* that Drs. Burns and Wang presented 'a series of overexposed and selectively cropped gels that *appear to show* spliced experiments,'" *Id.* ¶ 149 (emphases added).

- Regarding the 2012 paper in *The Journal of Neuroscience*, Plaintiffs allege that "*the Citizen Petition found* that '[this] *foundational* paper from Drs. Wang and Burns . . . *appears to contain*" manipulated data, *id.* ¶ 155 (first and third emphases added), that Defendants falsely claimed to have submitted "raw data" and "original, uncropped Western blots" to the journal, *id.* ¶ 343, and that Cassava's related press release was misleading because Cassava did not provide "raw data" to the journal, *id.* ¶¶ 339-42.

- Regarding the 2017 paper in *Neurobiology of Aging*, Plaintiffs allege that "[t]he *Citizen Petition identified*" and "*revealed*" various anomalies in the number of and spacing in bands in certain blots, *id.* ¶¶ 179-81 (emphases added).

- Regarding the 2020 paper in *Journal of Prevention of Alzheimer's Disease*, which reported Cassava's Phase 2a clinical trial results, Plaintiffs allege that "[t]he *Citizen Petition questioned*" the cerebrospinal fluid (or 'CSF') analysis . . . in Cassava's Phase 2a study," *id.* ¶ 241 (emphasis added).

- Regarding the 2012 and 2017 papers above, as well as another 2009 paper in *The Journal of Neuroscience*, Plaintiffs allege that "[t]he Citizen Petition concluded [that] . . . there are anomalies in the presentation of the data from this [post-mortem] human [brain] tissue, which again strongly suggest manipulation," *id.* ¶¶ 249-51.

- Regarding the Citizen Petition generally, Plaintiffs allege that Cassava "recklessly" "denied the accusations in the Citizen Petition," *id.* ¶¶ 3, 331-35.

Plaintiffs do not and cannot allege that any government agency or other authority has ever *charged or accused*, much less determined, that Cassava manipulated data or otherwise engaged in intentional wrongdoing. In fact, Plaintiffs concede that "the FDA denied the [Citizen Petition]" and has taken no action regarding Cassava. *Id.* ¶ 413. Likewise, Plaintiffs do not and cannot allege that any scientific publication has accused, much less determined, that Cassava manipulated data or images, submitted doctored data or images as raw data or images, or otherwise engaged in intentional wrongdoing. Instead, Plaintiffs concede that multiple publishers of papers containing allegedly manipulated data or images rejected the findings of the Citizen Petitions and concluded

16

that there was "**no evidence of manipulation**" or "**intent to mislead**."[16]   *Id.* ¶ 387 & n.16 (emphases added).  Without "authoritative evidence" that the alleged uncharged and unadjudicated wrongdoing "had, in fact," occurred, there is no duty to disclose or admit to accusations of wrongdoing.  *Parker*, 126 F. Supp. 3d at 843; *KBR*, 2018 WL 4208681, at *7.[17]

### b.   Alleged "Pattern" Of Data Manipulation

Plaintiffs also allege that Defendants failed to disclose Drs. Burns and Wang's alleged **pattern** of data manipulation.  To support their allegation concerning Drs. Burns and Wang's supposed "longstanding 15-year pattern of extensive data duplication and manipulation," CC ¶ 287(b), Plaintiffs cite alleged data manipulation in the four papers discussed above, as well as four additional papers:

- A 2005 paper published in *Neuroscience*, which included a blot that "[t]he **Citizen Petition revealed**" to "**appear** to have 'spliced together' gels from different experiments," *id.* ¶¶ 200, 287(b)(i) (emphases added), and for which Defendants falsely claimed to have submitted "raw data" and "original, uncropped Western blots" to the journal, *id.* ¶ 389;

- A 2006 paper published in the *Journal of Neurobiology*, which included "cut marks indicative of splicing" according to an **unidentified** "**commenter on** [*a website*]," *id.* ¶¶ 287(b)(ii), 487;

- A 2008 paper published in *The Journal of Pain*, which included "'significant anomalies' in the Western blots" according to an **unidentified** "**commenter on** [*a website*]," *id.* ¶ 487 (emphasis added); *see also id.* ¶¶ 287(b)(iv), 488; and

- A 2009 paper published in *PLOS One*, "which was retracted by the publisher"

---

[16] The Complaint inaccurately claims that the *PLOS One* retractions are evidence of Cassava's wrongdoing—to the contrary, the journal did not find evidence of data manipulation in any of the papers.  *See* CC ¶¶ 39, 287.  Instead, the journal adopted a cautionary approach to retract the articles on the sole basis that "[t]he data and comments provided to PLOS did not resolve the concerns about the integrity and reliability of the reported data."  *Id.* ¶ 39.

[17] Plaintiffs also allege that statements are false because "there was a reasonable likelihood that Cassava would face regulatory scrutiny in connection with the development of simufilam . . . ." *Id.* ¶ 287(g).  But this is simple repackaging of the allegations of uncharged, unadjudicated wrongdoing.  As noted above, an agency "investigation is not a violation," *Key Energy*, 166 F. Supp. 3d at 863, and "[t]he mere existence of an investigation does not suggest that any of the allegedly false statements were actually false," *Parker*, 126 F. Supp. 3d at 843.

because it did "***not resolve*** the concerns about the integrity and reliability of the reported data" raised by the Citizen Petition and/or Bik and Rossner, *id.* ¶¶ 287(b)(v), 423 (emphasis added).

Again, Plaintiffs impermissibly rely on ***other allegations*** to substantiate their own. Plaintiffs present no "authoritative evidence" that any of the alleged data or image manipulation "in fact" occurred or that there was any charge, much less adjudication or determination, finding manipulation. *See Parker*, 126 F. Supp. 3d at 843; *KBR*, 2018 WL 4208681, at *7.[18]

### c.   <u>Allegedly Manipulated Phase 2 Results</u>

Plaintiffs allege that Cassava's Phase 2 testing results contained manipulated images and data regarding biomarkers. CC ¶¶ 241, 312-15. Specifically, Plaintiffs allege that "[t]he Citizen Petition questioned the cerebrospinal fluid (or 'CSF') analysis performed on 13 patients in Cassava's Phase 2a study," which results were subsequently published in *The Journal of Prevention of Alzheimer's Disease* ("JPAD") in 2020, CC ¶ 241,[19] and that Cassava's poster at the Alzheimer's Association International Conference ("AAIC") included inaccurate or incomplete p-tau data "as detailed in the Citizen Petition," which concerns Bik "agree[d] with," *id.* ¶¶ 218, 312-15, 319, 329. Plaintiffs allege further that the Citizen Petition authors, working in concert with

---

[18] Incredibly, with respect to the 2005 paper, Plaintiffs rely on the unsubstantiated allegations of the Citizen Petitions, as well as Bik and Rossner, that ***the publisher rejected*** after finding no issue with the originality of submitted data and images and finding "'no evidence' of manipulation in [the] 2005 paper." CC ¶ 36. Even more egregiously, Plaintiffs' allegations regarding the 2006 and 2008 papers include precisely zero facts regarding the identity or qualifications of the accusers, blithely attributing the allegations to unknown internauts. *Id.* ¶¶ 487-88. Finally, Plaintiffs expressly concede that the publisher did "***not resolve***" the issue, plead no facts regarding any manipulation, and necessarily omit any allegation of a determination that data or images were, in fact, manipulated. *See id.* ¶ 423. This constitutes quintessential uncharged, unadjudicated wrongdoing. *See, e.g.*, *Parker*, 126 F. Supp. 3d at 843 ("The mere existence of an . . . investigation does not suggest that any of the allegedly false statements were actually false") (citation omitted).

[19] Plaintiffs relegate to a footnote the fact that the publisher here, *JPAD*, investigated the allegations of the Citizen Petitions and Bik and Rossner, concluded there was ***no "convincing evidence of manipulation of data or intent to mislead,"*** and ***rejected any "action regarding the published paper."*** *Id.* ¶ 453, n.16 (emphasis added). The FDA likewise declined to take any action against Cassava.

Bik, "expressed major concerns with the integrity of these phase 2a data," raised "manipulation concern[s]," and found what "appear[ed]" to be "wildly anomalous baseline measures" that "suggest lab errors or manipulation." *Id.* ¶¶ 242-45; *see also id.* ¶¶ 218, 222-23, 225, 233-35, 315, 319 and 329.  Again, Plaintiffs cannot allege—much less support with "authoritative evidence"— any actual charge by any government or institutional body, let alone finding, that such manipulation occurred.  They just assume it occurred based on uncharged, unadjudicated, and unsubstantiated accusations by self-interested parties and fault Defendants for not "confessing" to this alleged wrongdoing.  As discussed, such a theory of fraud fails as a matter of law.

### 2.    Several Of The Challenged Statements Are Undisputedly True And Not In Any Way False Or Misleading

Several of the statements that Plaintiffs challenge are also indisputably true, and thus are not actionable.  For example, Plaintiffs allege that the Phase 2b trial was not, as Defendants claimed in a September 14, 2020 press release, "conducted by an 'outside' lab, but rather by Dr. Wang."  CC ¶ 287(f).  But according to Plaintiffs' own pleading, Dr. Wang is "an Associate Medical Professor at CUNY Medical School," *id.* ¶ 57, who **maintained a** "**lab at CUNY**," *id.* ¶¶ 108, 135, 137, 326, 456 (emphasis added).  CUNY is a different institution than Cassava, and its labs are not Cassava labs.  Thus, the statement that Plaintiffs allege to be false is entirely true.

Plaintiffs also allege that Cassava "claim[ed] that the Phase 2b clinical data the Company had recently presented at a July 26, 2021 [AAIC] had been generated by Quanterix Corp."  *Id.* ¶¶ 14, 316-19.  Plaintiffs point to Quanterix's statement that it "'[had] not interpret[ed] the test results or prepare[d] the data' Cassava presented" as evidence that Cassava's initial statement was inaccurate.  *Id.* ¶¶ 14-16, 316-17, 319(a).  Not so.  Cassava's statement is perfectly consistent with Quanterix's statement.  Cassava's release in fact stated that "**plasma p-tau data** from Alzheimer's patients was generated by Quanterix," while Quanterix **confirmed** that it had been "engaged . . .

to perform sample testing [of plasma p-tau] on blinded samples." *Id.* ¶¶ 317, 323.  The clarification from Quanterix that it had "not ***interpret***[***ed***] the test results or prepare[d] ***the data charts***" does not remotely contradict Cassava's prior statement.  *Id.* ¶ 323.

Also true:  Cassava's statement that it was "supported by scientific advisors that share our commitment to advancing new treatments for Alzheimer's disease" and "advised" by "'[l]eading experts in the field.'"  *Id.* ¶ 480.  Plaintiffs allege that this statement is false because one of the Company's scientific advisors wrote on Twitter that she had "not worked with Cassava for years" and another had allegedly attended "only one formal advisory board meeting."  *Id.* ¶¶ 481-82. Even accepting this allegation as true, it does not remotely render Cassava's statements regarding its scientific advisory board false or misleading.

Plaintiffs' allegation that Cassava's statement that "government agencies have asked us to provide them with corporate information and documents" is false, *see id.* ¶¶ 26, 363, likewise fails. Indeed, Plaintiffs do not contest the accuracy of Cassava's statement, which—when read in its entirety—disclosed that Cassava had "been cooperating and will continue to cooperate with government authorities," advised that "no government agency has informed [Cassava] that any wrongdoing has occurred," and cautioned that Cassava "cannot predict the outcome or impact of any [of] these ongoing matters, including whether a government agency may pursue an enforcement action against [Cassava] or others."  Ex. 7 (Cassava 10-Q Report) at 34.  Plaintiffs instead assert—without alleging facts to support Cassava's knowledge—that Cassava was required to guess at whether the investigations were "***into Cassava***," including "a criminal investigation." CC ¶ 365.  But where the public statements "suggest that regulatory investigations [are] live and ongoing . . . . [without] provid[ing] details . . . . these statements are not actionable."  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 617 (S.D.N.Y. 2017) (internal citations omitted);

*see also In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 16 (S.D.N.Y. 2016) ("The [Complaint] at most pleads that the defendants disclosed an investigation was ongoing, but refused to provide details . . . . defendants' statements were not false or misleading."); *KBR*, 2018 WL 4208681, at *8 (same). And as discussed above, there is also "'no duty to announce publicly . . . uncharged criminal behavior,'" *Parker*, 126 F. Supp. 3d at 843 (internal quotation omitted). This statement is thus not actionable.

Finally, Plaintiffs allege that Mr. Barbier's statements that "the FDA denied the [Citizen Petition] because they did not find any evidence of fraud" and that *Neuroscience* "ha[s] cleared us of wrongdoing," are also false. CC ¶¶ 386-88, 412-13. But these statements are true: The FDA did ***not*** find that there was evidence of fraud, *see* Ex. 8, and as the Complaint concedes, "*Neuroscience* found no evidence of manipulation of the Western blot data or other figures of this publication," CC ¶ 387.[20]  Moreover, Plaintiffs blatantly misrepresent Mr. Barbier's words by attributing a quote from "an analyst at Univest Securities" ***who inaccurately paraphrased Mr. Barbier***. *Compare id.* ¶ 413, *with* Ex. 8 (April 27, 2022 B. Riley Securities' 2022 Virtual Neurology & Ophthalmology Conference Transcript) at 4 (Barbier: "[W]hat the FDA says is there is no evidence. FDA works on evidence. By definition FDA is an evidence based organization. . . . So essentially they wrote a response saying, in the absence of evidence this is not an appropriate topic for the FDA to address. So the FDA, the citizens petition was denied."). The transcript of the call directly contradicts the allegation in the Complaint: Mr. Barbier did ***not*** state that "the FDA denied the petition because they did not find any evidence of fraud." CC ¶ 413. Therefore, these statements are plainly inactionable.

---

[20] Nor is the Company's statement misleading for failing to quote the self-evident and immaterial note that "[i]f any subsequent information arises, . . . [it] will be considered when available." CC ¶ 388.

**D.   Plaintiffs Have Failed To Allege Particularized Facts Demonstrating A Strong Inference Of Scienter**

As noted above, under the PSLRA's "exacting pleading requirements," Plaintiffs must "state with particularity" the facts giving rise to a ***strong inference*** that a defendant acted with scienter, i.e., an intent "to deceive, manipulate, or defraud" shareholders. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (citation omitted). That requires a plaintiff to "plead specific facts constituting strong circumstantial evidence of conscious misbehavior or [severe] recklessness." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 429-30 (5th Cir. 2002). Importantly, Plaintiffs must allege scienter "for 'each act or omission alleged' to be false or misleading." *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016) (citation omitted).

A "strong inference" of scienter is necessarily comparative: A complaint will survive "***only*** if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (emphasis added). To find that a strong inference exists, the court must consider "plausible nonculpable explanations for the defendant's conduct," *Parker*, 126 F. Supp. 3d at 840, and conclude that an inference of scienter is "powerful," "cogent," or "strong in light of other explanations," *Tellabs*, 551 U.S. at 323-24. A "reasonable" or "permissible" inference of scienter is not enough to survive dismissal, and "omissions and ambiguities count against inferring scienter." *Id.* at 326.

**1.   Plaintiffs Have Not Alleged Specific Facts Creating A Strong Inference Of Conscious Misbehavior Or Recklessness**

Plaintiffs ask the Court to infer scienter based on the following allegations:

1) "The extensive evidence of data manipulation detailed in the Citizen Petition, and confirmed by [Bik and Rossner], demonstrates a pattern of ***intentional*** scientific misconduct that undermines the foundational science related to simufilam as a treatment for Alzheimer's disease," CC ¶¶ 446-50;

2)      "Defendants' scienter is . . . evidenced by the attempts to cover-up their
        deceptive and fraudulent activities" by "present[ing] manipulated images to
        journals as original data when those journals began investigating the Citizen
        Petition's revelations," *id.* ¶¶ 451-53;

3)      "Cassava's repeated denials regarding the Citizen Petition's claims were
        made recklessly and without a sufficient attempt to verify whether the
        allegations of image manipulation and falsification were true," *id.* ¶¶ 457-
        64;

4)      "Cassava misleadingly described the lab conducting the Phase 2b reanalysis
        as an 'outside' lab," *id.* ¶¶ 454-56;

5)      Cassava falsely claimed "that the Company's management team was
        'supported by scientific advisors'" and "advised" by "'[l]eading experts in
        the field,'" *id.* ¶¶ 480-83; and

6)      Messrs. Barbier and Friedmann and the Company have a "pattern and
        history of making false and misleading statements," *id.* ¶¶ 475-79.

These allegations, whether considered individually or in totality, are insufficient.

In connection with the first three allegations, Plaintiffs continue to rely on accusations from

the Citizen Petitions and the speculative, purported opinions of their experts.  But to plead scienter,

Plaintiffs must "state . . . ***facts***." *Tellabs*, 551 U.S. at 313 (emphasis added).  And as established

above, the Fifth Circuit and its district courts distinguish allegations of fact from *allegations of*

*allegations*, *see, e.g.*, *Parker*, 126 F. Supp. 3d at 843 (rejecting "uncharged, unadjudicated

wrongdoing" to plead securities fraud), and "expert" or speculative opinions, *see, e.g.*, *Blackwell*,

440 F.3d at 285-86 (rejecting expert opinion to plead securities fraud).  Accordingly, unverified

allegations regarding Cassava's alleged manipulation of preclinical and clinical research, pattern

of scientific misconduct, and submission of manipulated original data and images are insufficient

to establish scienter because they do not involve substantiated facts.  *See, e.g.*, *Parker*, 126 F. Supp.

3d at 843 ("uncharged, unadjudicated wrongdoing" is insufficient to plead securities fraud);

*Blackwell*, 440 F.3d at 285-86 (expert opinion "cannot substitute for facts under the PSLRA").[21]

The balance of Plaintiffs' allegations of "conscious misbehavior" are similarly deficient. Plaintiffs again stack accusation on accusation in allegations four through six, which are easily refuted by both Plaintiffs' own pleading and information subject to judicial notice. As already discussed, the Phase 2b reanalysis was conducted at CUNY, an "outside" lab, and Cassava was indeed "supported by" and "advised by" advisors and experts, including as Plaintiffs concede, "Dr. Wang and four others," as well as Sahakian and Arnold. CC ¶ 480. Likewise, no government agency or authority concluded that Defendants made any "false [or] misleading statements" in the referenced matters. *See* Exs. 7 & 8; *see generally* CC. Moreover, with respect to Mr. Barbier and Dr. Friedmann, the other "matters Plaintiffs reference . . . [have] no connection to the present case. It is undisputed [that] none of [the] allegations [in those matters] are in any way related to [the instant matter], and accordingly they are ***not probative*** of whether or not [defendant] acted knowingly or recklessly with regard to the instant matter." *In re Dell, Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 905 (W.D. Tex. 2008) (emphasis added).

Plaintiffs thus fail to plead scienter on these bases.[22]

### 2.   Plaintiffs' Allegations Regarding Motive Do Not Support An Inference Of Scienter

It is well-established that the lack of any motive for Defendants to commit securities fraud seriously undermines any inference of scienter. *Mun. Emps.' Ret. Sys. of Michigan v. Pier 1 Imps.,*

---

[21] On the same authority, Plaintiffs' reliance on unsubstantiated allegations from random, unidentified internet commenters, CC ¶¶ 487-89, and other financially interested short sellers, *id.* ¶¶ 490-93, must likewise be rejected. Attempts to correct such unsubstantiated smears are also not probative of scienter.

[22] Plaintiffs also allege that scienter may be inferred because "Barbier is . . . ***married*** to Dr. Burns." CC ¶ 442. It is not clear whether Plaintiffs here allege such scienter on the part of Mr. Barbier or Dr. Burns, but courts reject such an inference on the basis of marriage. *See, e.g.*, *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 952 (D. Ariz. 2007) ("[Defendant's] personal relationship [marriage] . . . does ***not*** strongly compel an inference of scienter" (emphasis added)).

*Inc.*, 935 F.3d 424, 431 (5th Cir. 2019) ("Motive is a critical—though not essential—aspect of a successful claim for securities fraud. . . . A failure to show motive means that 'the strength of the circumstantial evidence of scienter must be correspondingly greater.'") (citation omitted).[23]  By far, the most common alleged motive in any fraud case is insider stock sales before the alleged corrective disclosures, i.e., when the stock price of the company in question is allegedly inflated.

Here, Plaintiffs have not alleged any stock sales by any Defendant during the putative class period.[24]  Together, the individual Defendants or their family members owned approximately 2.7 million Cassava shares or stock options.  Ex. 9 (2021 Cassava Proxy Statement) at 18.  By the end of the alleged class period, the value of Defendants' stock had declined by approximately $99 per share.  *See* CC ¶¶ 15, 45.  Under Plaintiffs' theory of the case, Defendants orchestrated a scheme to defraud investors in order to collectively lose millions of dollars of their personal wealth.  The absurdity of Plaintiffs' theory negates any inference of scienter.  *See Abrams*, 292 F.3d at 434 ("Absent an allegation that the defendants profited from the inflated stock value or the offerings, such allegations fail" to give rise to a strong inference of scienter); *Rozenweig*, 332 F.3d at 867 (finding where "there is no allegation that defendants sold their . . . shares," such pleading "call[s] into question the alleged motive to artificially inflate the stock price").

In the Complaint, Plaintiffs allege that Defendants' supposed misstatements and omissions were motivated by: (1) an "executive bonus plan"; and (2) the desire to "raise capital to fund

---

[23] "Allegations of motive and opportunity, standing alone" do not suffice to allege scienter. *Abrams*, 292 F.3d at 430.  The Fifth Circuit has specifically held that allegations that defendants "were motivated to commit fraud by the need to raise capital, the desire for enhanced incentive compensation and the desire to sell stock at inflated prices" are "insufficient to [even] **support** an inference of scienter." *Id.* at 434 (emphasis added) (collecting cases).  This insufficiency afflicts all motives "universal to corporations and their officers." *See Flaherty*, 565 F.3d at 213 (applying rule under Rule 9(b) but noting "the PSLRA's stricter scienter requirement").

[24] Given that securities transactions by Company insiders are publicly filed and available, the Court can assume that Plaintiffs' failure to allege insider stock transactions means that there were none.

[Cassava's] operations."   CC ¶¶ 465-74.   But under controlling authority, both bases are "insufficient to [even] **support** an inference of scienter"—as a matter of law.   *Abrams*, 292 F.3d at 434 (emphasis added) (holding "desire for enhanced incentive compensation" and "need to raise capital" do not "support an inference of scienter").   Indeed, if "the opposite [were] true, the executives of virtually every corporation in the United States would be subject to fraud allegations."   *Id.*; *see also Flaherty*, 565 F.3d at 213 (rejecting motives "universal to corporations and their officers").[25]

Nor do Plaintiffs allege that Defendants misrepresented Cassava's capital structure or financial obligations.   *See generally* CC.   Devoid of these necessary contentions, Plaintiffs fail to plead any cognizable motive and, consequently, scienter.   *See Abrams*, 292 F.3d at 434 ("Absent an allegation that the defendants profited from the inflated stock value or the offerings, such allegations fail" to give rise to strong inference of scienter); *see also Rozenweig*, 332 F.3d at 867, 868 ("[N]o allegation that defendants sold their . . . shares [] calls into question the alleged motive to artificially inflate the stock price"; "It is difficult to form a 'strong inference' of scienter from the alleged undercapitalization of a company when plaintiffs appear to concede that the company accurately disclosed its capital structure and financial obligations").

---

[25] Notably, Plaintiffs fail to plead that Defendants have been paid **any** cash bonuses under the 2020 Cash Incentive Bonus Plan.  *See* CC ¶¶ 465-74.  In fact, contrary to Plaintiffs' claims, *see id.* ¶¶ 100-03, Defendants were **ineligible** to be paid these bonuses under the plan throughout the entire alleged class period, *see* Ex. 9 at 20 ("Payment of cash bonuses is contingent on (1) the Company having completed a Merger Transaction, or (2) the Compensation Committee of the Board (the 'Compensation Committee') having determined the Company has sufficient cash on hand, as defined in the Cash Incentive Plan, to render payment, neither of which may ever occur. Accordingly, there can be no assurance that Cash Incentive Plan participants will ever be paid a cash bonus that is awarded under the Cash Incentive Plan, even if the Company's market capitalization increases significantly.").

**3.     Generalized And Group Pleading Provides No Basis For Scienter And Fails To Meet The Fifth Circuit's Rigorous Requirements For Pleading Fraud**

Plaintiffs' pleading is also flawed because scienter may not be alleged "in generalized terms." *Rosenzweig*, 332 F.3d at 868.  Instead, Plaintiffs must allege scienter "for '*each* act or omission alleged' to be false or misleading." *Diodes, Inc.*, 810 F.3d at 956 (emphasis added) (citation omitted).   Likewise, allegations of scienter "must be analyzed individually" and "distinguish among the defendants" by "each one's role, intent, and knowledge." *Carlton v. Cannon*, 184 F. Supp. 3d 428, 459 (S.D. Tex. 2016); *see also Shaw*, 537 F.3d at 532-33 (rejecting "the group pleading approach").   "[A]llegations that 'the defendants' or 'the company' knew something do not meet that standard," *In re All Am. Pipeline, LP Sec. Litig.*, 245 F. Supp. 3d 870, 921 (S.D. Tex. 2017) (citing *Southland*, 365 F.3d at 366), because the inquiry focuses on the "state of mind of the individual . . . corporate officials who make . . . issue. . . or approve" the statement rather than the "collective knowledge of . . . the corporation's officers and employees," *Shaw*, 537 F.3d at 533-34 (internal quotation marks omitted).

In alleging *dozens* of separate instances of purported data manipulation, Plaintiffs rely on a single, generalized, blanket allegation of mental state:  All Defendants knew or should have known that data or images were false or manipulated *because the Citizen Petitions and Plaintiffs' experts say so*.  Referring back to a multitude of paragraphs recounting various alleged errors in selected papers and trials, Plaintiffs allege different roles that different people played in different instances of alleged deception. *See, e.g.*, CC ¶¶ 445, 450-51 (citing *id.* ¶¶ 105-09, 122-28, 137, 140-41, 155-90, 200-16, 237-40, 264, 283-84, 292, 338-62, 386-407, 425-28).  But Plaintiffs' *only* allegation as to any Defendant's intent or knowledge—including how, why, or when any of the Defendants knew or should have known of falsity or manipulation, particularly where government agencies and journals rejected or did not substantiate the allegations—unavoidably refers back the

Citizen Petitions and Bik/Rossner.  *See, e.g.*, *id.* ¶¶ 438-39, 446, 451.

This does not suffice to plead scienter.  Indeed, even if the uncharged and unadjudicated allegations and speculative opinions of the Citizen Petitions and Bik and Rossner were true (and they are not), Plaintiffs still do not plead scienter because the PSLRA requires more than a general allegation that all "defendants . . . knew or had access to information" contradicting public statements.  *Abrams*, 292 F.3d at 433.  Plaintiffs must instead "point[] to . . . ***particular*** . . . ***information*** . . . available to [each] defendant[] ***before***" the alleged misstatements were made, *id.* (emphases added), and, further, "identify exactly who supplied the information or when they knew the information," *Rosenzweig*, 332 F.3d at 868; *see also Blackwell*, 440 F.3d at 288 (requiring plaintiffs "to plead with specificity . . . that [alleged misstatements] were false or misleading when made" and "that a Defendant knew they were false or misleading").  In uniformly relying on the Citizen Petitions and Bik/Rossner to allege the requisite mental state against all Defendants, Plaintiffs do not meet this standard as to any Defendant.

Even where Plaintiffs make specific allegations against particular Defendants, they still fall short.  "A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."  *Abrams*, 292 F.3d at 432.  Nor may Plaintiffs rely on "plainly . . . ***hindsight*** assessment[s]" to plead scienter, *Rosenzweig*, 332 F.3d at 867-68, because Defendants will "not be held responsible for failure to foresee future events," *Abrams*, 292 F.3d at 433.  But here, Plaintiffs do just that.  All allegations of scienter against any Defendant by name expressly rely on their respective corporate roles and the allegations of the Citizen Petition and Bik and Rossner—which post-date most, if not all, of the alleged misstatements.  *See, e.g.*, CC ¶¶ 441-45.  This is insufficient to plead scienter.

### E.  The Complaint Does Not Adequately Allege Loss Causation

Plaintiff's failure to adequately plead an actionable misrepresentation or omission, or to plead scienter, is sufficient to dispose of this case.  Plaintiff's failure to adequately plead loss causation serves as a third, independently dispositive ground for dismissal.

The federal securities laws are not intended to, and do not, "provide investors with broad insurance against market losses"; rather, the securities laws are designed "to protect [investors] against those economic losses that misrepresentations [or omissions] *actually cause*."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (emphasis added).  This is why a plaintiff must plead "loss causation" to state a claim for securities fraud.  *See id.*; 15 U.S.C. § 78u-4(b)(4).[26]

Loss causation is shown by identifying a "corrective disclosure" followed by a drop in the stock price.  *Parker*, 126 F. Supp. 3d at 841-42.  A corrective disclosure is "a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud."  *Id.*  Importantly, to qualify as a corrective disclosure, the disclosure at issue must "reveal the truth of the previously misleading statement" to the market.  *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 336-37 (5th Cir. 2010),  *rev'd on other grounds*, 563 U.S. 804 (2011); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) ("[A]llegations do not amount to a corrective disclosure [if] they do not reveal to the market the falsity of the prior [statements].").  Accordingly, it follows that "[a]n alleged corrective disclosure that does not reveal the falsity of Defendants' challenged public statements cannot establish loss causation."  *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306,

---

[26] Under *Dura,* loss causation relies on notions of proximate cause and loss.  *See* 544 U.S. at 346 (2005).  To establish proximate causation, a plaintiff must "prove that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace[,] it caused the price of the stock to depreciate and thereby proximately cause[d] the plaintiff's economic loss." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 255 (5th Cir. 2009).

at \*14 (S.D.N.Y. Mar. 30, 2012); *see also Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 314-15 (5th Cir. 2008) ("Plaintiff[s] must allege . . . [that the] corrective disclosure[] . . . revealed the falsity of [the company's] previous representations").

Critically, the information disclosed in a corrective disclosure must be new.  *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 904 (5th Cir. 2018) ("the corrective disclosure must reveal some information ***not already known to the market***, otherwise the stock price would have incorporated that information, and its disclosure could not have caused a loss.") (emphasis added) (internal citations omitted)*; Catogas*, 292 F. App'x at 217 (a plaintiff must allege "new facts" that "demonstrate[] that the 'truth became known'") (citation omitted).  Consequently, disclosures revealing "[c]onfirmatory information . . . already known to the market . . . will not affect the stock price."  *Halliburton*, 597 F.3d at 337.

1.    <u>The Alleged "Corrective Disclosures" Are Merely Accusations; They Do Not Reveal Any "Pertinent Truth" Regarding Defendants' Prior Statements.</u>

In the Complaint, Plaintiffs identify the following purported corrective disclosures:

1.    The Citizen Petitions (CC ¶¶ 18-19, 31-32; 328, 330; 380-85);

2.    Elisabeth Bik's Commentary on her blog, Twitter, and PubPeer (*Id.* ¶¶ 24-25; 326-27; 329-30; 336-37; 343-49);

3.    The April 18, 2022 *New York Times* article (*Id.* ¶¶ 40-41);

4.    The *Journal of Neuroscience's* December 17, 2021 Expression of Concern (*Id.* ¶¶ 33-34);

5.    *Alzheimer's Research & Therapy's* June 1, 2021 Retraction (*Id.* ¶¶ 42-43);

6.    Cassava's November 15, 2021 10-Q disclosing "Government Investigations" (*Id.* ¶¶ 26-27);

7.    *Reuters'* July 27, 2022 article disclosing the DOJ investigation (*Id.* ¶¶ 44-45);

8.    Cassava's August 25, 2021 press release responding to the Citizen Petition (*Id.* ¶¶ 316-17);

9.      Quanterix's August 27, 2022 press release regarding its participation in the Phase 2 testing (*Id.* ¶¶ 16-17); and

10.    Cassava's September 3, 2021 press release responding to the Citizen Petition (*Id.* ¶¶ 20-21).

Plaintiffs have failed to establish loss causation because ***none*** of these disclosures reveal a "truth" that was previously misstated or omitted.  The vast majority of the relevant disclosures simply contain uncharged and unadjudicated public accusations of wrongdoing.  Indeed, neither the Citizen Petitions nor the ensuing accusations made by Elisabeth Bik "on Twitter and PubPeer" reveal ***any*** ultimate truth regarding the validity of Cassava's research.  *See id.* ¶¶ 12, 18, 24, 29 and 31.  Rather, they are uncharged, unvetted and unverified accusations, made by individuals with an undisputed financial "axe to grind," that are based entirely on speculation and second-hand observations.[27]  *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008) (*Dura* does not "support the notion that loss causation is pled where a defendant's disclosure" merely reveals the '***potential***' for widespread fraudulent conduct").[28]

Similarly, the public statements by the *Journal of Neuroscience* and *Alzheimer's Research & Therapy* do not "correct [or] reveal the truth" of prior misstatements, CC ¶¶ 33-34, 42-43; they simply note the previously disclosed public allegations against Cassava.  Indeed, on December 17, 2021, following its finding that there was "no evidence of data manipulation" in a 2012 paper on simufilam, the *Journal of Neuroscience* issued a statement that its editors were "aware of concerns

---

[27] The April 18, 2022 *New York Times* article is simply a further collection of the unadjudicated accusations from the Citizen Petitions.  *See* CC ¶ 40.

[28] The Citizen Petitions plainly admitted that they were not, and could not be, the arbiter of whether their allegations and accusations were true.  Indeed, as the FDA acknowledged, the first Citizen Petition asked the FDA to "initiate an investigation and fact-finding process."  Ex. 4 at 2; *see also* Ex. 1 at 2-3 ("Petitioner is therefore requesting the FDA to halt the clinical studies pending a thorough audit of the publications and data relied on by Cassava . . . Petitioner is further requesting that the FDA oversee third party reanalysis of all clinical biomarker studies of simufilam . . . Petitioner has enclosed with this Petition . . . a detailed technical report presenting multiple reasons to question the quality and integrity of [Cassava's] research."

about Western blots in this study," i.e., from the Citizen Petition, and they would "await the outcome" of an "investigation by the academic authorities at [CUNY]." *Id.* ¶¶ 22; 33.[29]  The journal's statements do not reveal any new information, much less the "pertinent truth" about Cassava's allegedly prior statements.[30]  *Parker*, 126 F. Supp. 3d at 841-42; *see also Catogas*, 292 F. App'x at 317 (indicating that a disclosure of "new facts" must "demonstrate that the 'truth became known'") (citation omitted).

Plaintiffs next point to the Company's disclosure in the November 15, 2021 10-Q that "[c]ertain government agencies have asked us to provide them with corporate information and documents" and a July 27, 2022 *Reuters* story concerning the DOJ's ongoing inquiry.  CC ¶¶ 26, 44.  It is well-established, however, that the disclosure of governmental investigations, without "revelations of prior misrepresentations," does not suffice as corrective disclosures.  *In re Dell*, 591 F. Supp. 2d at 909-10.  "[T]he announcement of an investigation reveals just that—an investigation—and nothing more" and although "stock prices may fall upon the announcement of an SEC investigation, . . . that is because the investigation can be seen to portend an added risk of future corrective action." *Meyer v. Greene*, 710 F. 3d 1189, 1201 (11th Cir. 2013).  In other words, "the investigations, in and of themselves, [do not] reveal to the market that a company's previous

---

[29] On June 1, 2022, *Alzheimer's Research and Therapy* retracted a 2017 article unrelated to simufilam authored by Dr. Wang because the Western blot data provided by Dr. Wang was "***deemed insufficient*** to address . . . concerns."  CC ¶ 433.  Neither Dr. Burns nor anyone else associated with Cassava was an author of this piece, and thus the retraction plainly could not "reveal" any alleged misstatement by Cassava personnel.

[30] Notably, most of the journals that have examined the Citizen Petition's allegations found ***no evidence of data manipulation***.  *See* Sect. IIF *supra*.  Only one of the four articles that Plaintiffs cite as related to Cassava's research on simufilam has been retracted; the other three have been investigated and Cassava has been exonerated.  *See id.*; CC ¶ 287(a).  And the other journals referenced in the Complaint and in Cassava's public statements—*Alzheimer's & Dementia, Neuroimmunology and Neuroinflammation, Biological Psychiatry*, and the *Journal of Biological Chemistry*—have not issued any statements regarding the articles published by Dr. Wang or Dr. Burns.  *See e.g.*, CC ¶¶ 79, 87, 207, 289.  These papers remain published, peer-reviewed research.

statements were false or fraudulent." *Id.*[31]

Plaintiffs further allege that Cassava's August 25, 2021 press release, which aggressively denied the allegations in the Citizen Petition and provided additional detail on Cassava's Phase 2b biomarker data, was a corrective disclosure. This is an absurd claim. The Complaint does not even begin to explain how Cassava's robust and detailed ***denials*** of the Citizen Petition's accusations could have "revealed" their supposed "truth." Relatedly, Plaintiffs allege that the August 25 press release itself contained a misrepresentation—that the Phase 2b "plasma p-tau data from Alzheimer's patients was generated by Quanterix Corp." CC ¶¶ 14-15, 316-17. Plaintiffs note that on August 27, Quanterix issued a statement clarifying that it "'did not ***interpret*** the test results or prepare the data' Cassava presented," *Id.* ¶ 16 (emphasis added), and Cassava later confirmed that Quanterix's "sole responsibility with regard to this clinical study was to perform sample testing, specifically, to measure levels of p-tau in plasma samples collected from study subjects," *id.* ¶ 16. As noted above, the statements by Cassava and Quanterix are consistent and nothing in Quanterix's release suggests that Cassava's prior statement was inaccurate.[32]

Plaintiffs also raise a September 3, 2021 public statement from Mr. Barbier in which he opined that "the allegations [in the Citizen Petition] are false" and disclosed that while there had been two "no[n] material" "visual errors" in one Cassava publication and one poster presentation,

---

[31] "We agree . . . that generally, commencement of government investigations on suspected fraud do not, standing alone, amount to a corrective disclosure." *Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (finding that loss causation had been adequately alleged only when disclosure of government investigations was paired with the disclosure of information that "collectively constitute and culminate in a corrective disclosure that adequately pleads loss causation," e.g., resignations by the company's CEO and CIO and a company's disappointing earnings report). Here, Plaintiffs' other supposed corrective disclosures merely concern "allegations of allegations," and do not "collectively . . . culminate" in an adequate corrective disclosure. *See id.*

[32] For example, Cassava never claimed that Quanterix "interpreted" or "prepared the data" the Phase 2b results; it merely claimed that Quanterix "generated," or created the data, which is done by "perform[ing] . . . testing" and "measur[ing] levels of p-tau." CC ¶¶ 14, 16, 317, 323-24.

neither had affected Cassava's findings: "the data analysis [was still] correct." *Id.* ¶¶ 332, 334. None of these clarifying statements "reveal the falsity of [the company's] previous representations," that simufilam appears to be a promising drug candidate based on almost fifteen years of research. *Catogas*, 292 F. App'x at 314-15. They thus fail to qualify as "corrective."

### 2.    New Commentary Or Detail On Already Public Information Is Not "Corrective"

Most of the supposed "corrective disclosures" identified in the Complaint occurred after (in some cases, long after) shareholder plaintiffs initiated this lawsuit.  In other words, these "corrective disclosures" concern misstatements that allegedly occurred ***months*** after shareholders had enough information to commence multiple securities fraud actions, which were eventually consolidated into this action.  The reason that Plaintiffs were able to initiate this action in August 2021 is that the initial Citizen Petition comprehensively (though falsely and maliciously) catalogued the accusations about Cassava's research.  The subsequent disclosures do not provide materially new information, and thus they cannot be "corrective."  *See Whole Foods Mkt.*, 905 F.3d at 904 ("plaintiffs do not allege that any new information about [defendant's] overcharging had come out since the [government agency] released its findings more than a month prior. . . .[t]herefore, the market was well aware."); *Catogas*, 292 F. App'x at 317 ("Although the stock price dropped dramatically on the day of the . . . press release, no new facts concerning [defendant's] stock-option accounting were disclosed in that release which demonstrated that the truth became known.") (internal quotation marks and citation omitted).

Specifically, the Citizen Petitions supplements, Elisabeth Bik's accusations, and the *New York Times* article all provide commentary on the initial Citizen Petition that attempts to "connect the dots" through speculation, opinion, or interpretation.   None of these can establish loss causation.  *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y.

2008) (indicating that "[a] recharacterization of previously disclosed facts cannot qualify as a corrective disclosure"); *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 679-80 (S.D.N.Y. 2007) ("[W]hile each of these alleged partial disclosures, which comprise . . . third-party comments plucked from over a year's worth of news, notes some concern about [defendants'] accounting, none of them amount to a corrective disclosure.") (internal quotations omitted).[33]  And the statements made by the technical journals *at most* establish "confirmatory information"—that there are concerns with certain Western blot data supporting simufilam or otherwise created by Dr. Wang—that was "already known to the market" at the time.  *Halliburton Co.*, 597 F.3d at 337.  None of these disclosures reveal any "new facts," as they merely recharacterize and further speculate about the Citizen Petitions' allegations, so they "may not constitute . . . a corrective disclosure."  *Catogas*, 292 F. App'x at 314, 317.

### F.   Plaintiffs Have Failed To State A Section 20(a) Violation

"Control person" liability under Section 20(a) of the Exchange Act is "derivative, i.e., such liability is predicated on the existence of an independent violation of the securities laws."  *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 893 (S.D. Tex. 2017) (citing 15 U.S.C. § 78t(a)).  The Complaint fails to adequately plead a primary violation of Section 10(b) and, therefore, Plaintiffs' secondary claims under Section 20(a) fail as well.  *Id.*

## IV.   CONCLUSION

For these reasons, the Complaint should be dismissed with prejudice.

---

[33] *See also Janbay*, 2012 WL 1080306, at *16 ("[T]he raising of questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud as required by *Dura*"); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 561 n.34 (D.N.J. 2010) ("To the extent that some of these reports merely provided more details about the public disclosures, they are insufficient to establish loss causation.").

Dated:  October 24, 2022

Respectfully submitted,

/s/  James N. Kramer
James N. Kramer (admitted *pro hac vice*)
Alexander K. Talarides (admitted *pro hac vice*)
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
405 Howard Street
San Francisco, CA 94105
Telephone: 415.773.5700
Facsimile:  415.773.5759
jkramer@orrick.com
atalarides@orrick.com

Claudia Wilson Frost
State Bar No. 21671300
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
609 Main, 40th Floor
Houston, TX 77002
Telephone: 713.658.6400
Facsimile:  713.658.6401
cfrost@orrick.com

William J. Foley (admitted *pro hac vice*)
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
51 West 52nd Street
New York, NY 10019
Telephone: 212.506.5000
Facsimile:  212.506.5151
wfoley@orrick.com

*Attorneys for Cassava Sciences, Inc., Remi Barbier, Lindsay Burns, Nadav Friedmann, and Eric J. Schoen*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 24, 2022, a true and correct copy of this motion was served upon each attorney of record through the Court's CM/ECF system.

*/s/ James N. Kramer*
James N. Kramer