```
1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
2                         AUSTIN DIVISION

3    PIERRE BRAZEAU, ET AL,        :
     Plaintiffs,                   :
4                                  : Case Number:
     vs.                           : AU:21-CV-00751
5                                  :
     CASSAVA SCIENCES, INC., ET AL,: Austin, Texas
6    Defendants.                   : April 26, 2023
     ********************************************************
7
                     TRANSCRIPT OF MOTION HEARING
8              BEFORE THE HONORABLE DAVID A. EZRA
                 SENIOR UNITED STATES DISTRICT JUDGE
9
     APPEARANCES:
10   FOR THE PLAINTIFFS:
       Daniel S. Drosman, Esquire
11     Kevin A. Lavelle, Esquire
       Robbins Geller Rudman & Dowd, LLP
12     655 West Broadway, Suite 1900
       San Diego, California  92101
13     (619)231-1058; dand@rgrdlaw.com

14     Joe Kendall, Esquire
       Kendall Law Group, PLLC
15     3811 Turtle Creek Blvd., Suite 1450
       Dallas, Texas  75219
16     (214)744-3000; jkendall@kendalllawgroup.com

17   FOR THE DEFENDANTS:
       Alexander K. Talarides, Esquire
18     Orrick, Herrington & Sutcliffe, LLP
       405 Howard Street
19     San Francisco, California  94105
       (415)773-5700; atalarides@orrick.com
20   ALSO PRESENT:
       Chris Cook, General Counsel of Cassava Sciences
21

22

23

24

25
```

1  COURT REPORTER:
   Angela M. Hailey, CSR, CRR, RPR, RMR
2  Official Court Reporter, U.S.D.C.
   262 West Nueva Street
3  San Antonio, Texas  78207
   Phone(210)244-5048
4  angela_hailey@txwd.uscourts.gov

5

   Proceedings reported by stenotype, transcript produced by
6  computer-aided transcription.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    *(Wednesday, April 26, 2023, 9:06 a.m.)*

2                              *   *   *

3              COURT SECURITY OFFICER:  All rise.

4              COURTROOM DEPUTY CLERK:  AU:21-CV-00751, Pierre

5    Brazeau, et al versus Cassava Sciences, Inc., et al.

6              THE COURT:  Can we have appearances please.

7              MR. DROSMAN:  Good morning, Your Honor, Daniel Drosman

8    on behalf of plaintiffs from the firm of Robbins Geller Rudman

9    & Dowd.

10             MR. KENDALL:  Joe Kendall, Kendall Law Group in

11   Dallas, on behalf of plaintiffs.

12             MR. LAVELLE:  Good morning, Your Honor.  Kevin

13   Lavelle, also from Robbins Geller Rudman & Dowd, for

14   plaintiffs.

15             THE COURT:  All right.

16             MR. TALARIDES:  Good morning, Your Honor.  Alexander

17   Talarides from Orrick, Herrington & Sutcliffe on behalf of

18   defendants, and with me is the general counsel of Cassava

19   Sciences, Chris Cook.

20             THE COURT:  Very good.  Thank you.  Okay, we have a

21   motion to dismiss that's been filed, so you may proceed.  You

22   should assume that I have carefully gone over all of the

23   papers, all of the submissions.  This case was, of course, not

24   my case, but along with about 350 or 400 others, it's coming my

25   way because my dear friend and colleague, Judge Yeakel, is

1  retiring, fully retiring.  And so I have been asked to take on

2  the more complex cases or at least some of the more complex

3  cases because I've done a lot of complex litigation in my

4  career as a lawyer and as a judge.  All right, you can proceed.

5       MR. DROSMAN:  Would you like to hear from defense

6  counsel first, they filed the motion, I take that, Your Honor?

7       THE COURT:  Yes.  It's their motion to dismiss.

8       MR. TALARIDES:  Good morning, Your Honor.  Thank you.

9  Your Honor, with your permission and understanding that you've

10 read all the papers, I'm just going to briefly summarize what

11 the genesis of this case is and then highlight the key points.

12      THE COURT:  I think I have a pretty good idea.  I went

13 over the material that Judge Yeakel had and the other material

14 and I'm aware of the various circumstances that led to the

15 number of starts and stops and stock ups and downs, and ups and

16 downs with respect to this Alzheimer's drug.  What is the

17 correct pronunciation of this drug?

18      MR. TALARIDES:  Simufilam.  Hard to say that a few

19 times.

20      THE COURT:  It's not the easiest in the world.

21      MR. TALARIDES:  Your Honor, given that you're well

22 aware of the circumstances, I'll just jump right to it, the two

23 main points.

24      THE COURT:  I'd like to hear the legal issues.

25      MR. TALARIDES:  The legal issues here, and as you

 1   know, Your Honor, this is governed by the Private Securities

 2   Litigation Reform Act that Congress passed in the mid '90s --

 3          THE COURT:  I'm familiar with it.

 4          MR. TALARIDES:  -- and which heightens the pleading

 5   burden, so this is not a typical case where the notice pleading

 6   requirements of Rule 8 apply.

 7          THE COURT:  No, that's right.

 8          MR. TALARIDES:  And the two key issues here I think is

 9   what is a factual allegation sufficient under the PSLRA to

10   plead securities fraud and whether a plaintiff in a securities

11   fraud claim can piggyback off allegations from others and

12   assert those allegations which are hotly disputed and

13   contested, unadjudicated and even uncharged and then assert

14   them in a second lawsuit, this lawsuit, as a fact.  And what we

15   have here, the genesis of this lawsuit, as Your Honor knows, is

16   the Citizens' Petition that was submitted to the FDA in August

17   of 2021.

18          THE COURT:  Well, there were several Citizens'

19   Petitions submitted by the same people.  There are various

20   iterations of them submitted one, two, three, I think maybe

21   four.

22          MR. TALARIDES:  There was one and then a few

23   supplements after.  For brevity I'll refer to them all

24   collectively as the citizens at issue.

25          THE COURT:  They were ultimately dismissed, but not

 1  because -- they didn't really get dismissed on the merits.

 2  They were dismissed because they couldn't provide the relief

 3  that was sought.

 4          MR. TALARIDES:  That's part of it, Your Honor, but

 5  importantly in the letter of the FDA, in the FDA's letter

 6  dismissing the petition, the FDA made the important point that

 7  by its own terms, the Citizens' Petition did not provide all

 8  the relevant facts to reach the conclusion that any data

 9  manipulation had occurred.  And in fact, the Citizens' Petition

10  and the authors were asking the FDA to engage in a fact-finding

11  process.  And so by its own terms, there was no finding or

12  even -- the Citizens' Petition was framed and subsequently the

13  authors, and I'll get to that in a minute, they explained that

14  we're not saying that there's a finding of falsity here of a

15  data manipulation.  We've reviewed these published images, the

16  Western blot images, and we think there are anomalies.  We

17  disagree, Cassava disagrees.  But the author said we disagree

18  and we're asking you, the FDA, that is charged with regulating

19  and overseeing the research and development of this drug to

20  engage in fact finding.

21          The FDA, one of the points it made was, well, you

22  haven't provided us all the facts.  In fact, you're admitting

23  that you need more fact finding for us to take the action that

24  you're asking, to which one of the actions was to halt the

25  clinical trials.  To date, the FDA has not taken any action or

1    halted the late-stage, phase three clinical trials of this

2    drug.  And it's interesting because the authors of the

3    Citizens' Petition have -- and I'll just read a few quotes from

4    what they've said since they filed, since they submitted the

5    Citizens' Petition.  They said that the Citizens' Petition does

6    not -- this is, by the way, sorry, Exhibit 10, Defendant's

7    Exhibit 10 which we submitted in our reply brief.  It's

8    judicially noticeable this is an opposition they filed in the

9    Southern District of New York in a lawsuit against them.  And

10   they state that *The Citizens Petition does not declare there*

11   *have been falsified data, but asks the FDA to investigate to*

12   *determine whether there's been falsified data.*"  This is on

13   page 15 of Exhibit 10.  It goes on.  The Citizens Petition

14   defendants', meaning the authors, opinion that these anomalies

15   suggest possible data -- rather, the petition is merely that

16   the authors' opinion that these anomalies suggest possible data

17   manipulation.

18          THE COURT:  Counsel, I want you to remember something,

19   we are not here on a motion for summary judgment.  Okay?  If we

20   were here on a motion for summary judgment, the Court would be

21   in a position to analyze carefully, pursuant to the appropriate

22   rubric, the evidence that is presented by both parties

23   following both Fifth Circuit and Supreme Court law.  This is a

24   motion to dismiss.  This is where the Court looks to the

25   pleadings and certain matters that were appended to the

1    pleadings or a part of the pleadings, essentially.  Okay.  And

2    so I am not in a position nor would it be appropriate for me to

3    start weighing facts to decide who I think has the stronger

4    case.  The question really is did and have the plaintiffs laid

5    out sufficient facts in a cognizable way to state a cause of

6    action or causes of action pursuant to the law?  That's all.

7              MR. TALARIDES:  Your Honor, if I may, so that's

8    correct, with the caveat that the PSLRA requires specific facts

9    to establish --

10             THE COURT:  Counsel, I have been a federal judge now

11   for I think about 35 years and I'm well aware of the PSLRA.  I

12   mean, in addition to being a judge and handling these cases, I

13   actually also teach complex litigation which includes class

14   actions and securities litigation.  So that doesn't make me the

15   great expert in the world, I can assure you, but I do know what

16   the standards are.  Okay?  So I'm well aware of the standards,

17   but the standards are what I will look at in attempting to

18   determine as accurately as I can whether the plaintiffs have

19   set out the appropriate causes of action.

20             MR. TALARIDES:  Then let me apply the facts --

21             THE COURT:  You're suggesting that they've got a bunch

22   of what you call puzzle pleading and so forth, and I understand

23   what you're arguing.  I've read all of this.

24             MR. TALARIDES:  Your Honor, if I may, let me

25   actually -- I'll apply -- with the understanding that let's

 1   apply the factual allegations of the complaint to those legal

 2   standards that Your Honor is aware of.

 3              THE COURT:  All right.

 4              MR. TALARIDES:  So the core allegation here is that a

 5   series of statements about the preclinical and clinical

 6   research and results of Simufilam were false and misleading

 7   because the defendants failed to disclose that the underlying

 8   data supporting the research and the results was manipulated.

 9   And there's a well established --

10              THE COURT:  Well, that isn't all.  They also allege

11   that there were a number of other things that your clients

12   failed to disclose which included the fact that the lab where

13   many of these things were analyzed was the same -- was the lab

14   of the individual who was one of the participants.  What was

15   his name?  Dr. --

16              MR. TALARIDES:  Wang.

17              THE COURT:  Yes, it was a Chinese name, Wang.  So Dr.

18   Wang's lab, and they're alleging that that should have been

19   disclosed and wasn't disclosed and a number of other things.

20   It wasn't just the manipulation of the data.

21              MR. TALARIDES:  And I didn't mean to suggest it was

22   just, I only say that the core.  So there's a litany of

23   statements, the vast majority of them relate to failure to

24   disclose the fact of data manipulation.  And there's four other

25   statements, I believe, maybe five that are, as you point out,

1    one of them is the issue of the lab, four other statements that

2    don't directly tie to the failure -- the alleged failure to

3    disclose data manipulation.  But to start with the core

4    allegation about the failure to disclose data manipulation,

5    there's a whole body of case law both within and without the

6    Fifth Circuit saying that there's no duty to disclose

7    uncharged, unadjudicated allegations of wrongdoing.

8    Essentially that means you can't hold someone liable for

9    failing to publicly confess something that is hotly disputed,

10   has not even been charged, let alone adjudicated.  And so

11   that's what we argue is the case here.

12          The theory here for the vast majority of the

13   statements is that the statements were false because we didn't

14   go out and tell the market that we were potentially

15   manipulating the data.  And the law just doesn't count as that

16   kind of argument.  It's putting the cart before the horse.  You

17   can't hold someone liable for failing to confess to something

18   when no one has even charged them of manipulated data yet.

19   There's no indictment, there's no admission, there's no mea

20   culpa here.  There's investigations, but an investigation is

21   just that, an investigation.  It's not a finding of data

22   manipulation and so to say that they were obligated to come out

23   before any of this has been resolved and they are hotly

24   disputing the fact of any data manipulation and to say that

25   they were obligated to come out and say -- publicly confess we

```
 1   did it, that's not what the law says.
 2           THE COURT:  I don't think -- you know, first of all,
 3   let me explain something.  You've never argued before me in the
 4   past -- and this goes for both sides -- I believe in the
 5   Socratic method.  Maybe that's from my 38 years of teaching.
 6   I'm trying to get to the answer and so I will ask you difficult
 7   questions.
 8           MR. TALARIDES:  Please.
 9           THE COURT:  And it's not an indication of how I'm
10   going to rule.  I once had an unfortunate situation where I did
11   pretty heavily question Kathleen Sullivan, who was a very
12   famous lawyer, used to be dean at --
13           MR. TALARIDES:  Stanford.
14           THE COURT:  Stanford, right.  She was at Harvard
15   before that, and she's now in private practice.  She argued a
16   case before me, I've known her for many years, and I asked her
17   very tough questions and the client got so concerned about it
18   that they settled the case and actually they settled it the day
19   before I was going to rule in their favor in about an 80-page
20   opinion.  So it wasn't nasty questioning at all, it was just
21   asking difficult questions that needed to be answered, and she
22   answered them correctly and provided the information.  So I
23   don't want you to get the impression that because I'm asking
24   you difficult questions that I'm somehow leaning one way or the
25   other.  All right?
```

1           MR. TALARIDES:  I appreciate that, Your Honor.

2           THE COURT:  All the lawyers that appear -- I'm sitting

3    here in Austin for ten years, okay, and I've sat in San Antonio

4    and I've sat all over the country.  The lawyers that know me

5    know that I do this, so they don't worry about it.  But you

6    don't, you haven't, so I wanted to let you know that ahead of

7    time.

8           MR. TALARIDES:  I appreciate that, Your Honor.

9           THE COURT:  I don't want somebody walking out of the

10   place going, *Oh, my God.*

11          MR. TALARIDES:  I have done that and I have lost.

12          THE COURT:  Well, you might lose here, I don't know.

13   You might win.

14          MR. TALARIDES:  So that's -- the one piece is

15   there's --

16          THE COURT:  Let me get back to the point I was going

17   to make before I went off on this explanatory tirade here, that

18   they're not necessarily alleging, although I think they are

19   alleging that it was wrong, what happened was wrong, that they

20   should not have used Wang's lab for these tests.  What they're

21   saying is that the fact that they did use Wang's lab for the

22   test and that Wang was an interested person from their

23   perspective because he was an investor -- I don't know whether

24   he was -- not an investor, he was a participant in the company.

25          MR. TALARIDES:  Consultant.

1          THE COURT:  I think he had a part of the company too

2     and there's some hint somewhere that he was going to get a

3     bonus of some kind at some point.  But in any event, he was an

4     interested party, that that should have been disclosed because

5     it would have provided more information upon which individuals

6     could make a reasoned decision as to whether to invest.  That's

7     their argument, I think.  They'll correct me if I'm wrong.

8          MR. TALARIDES:  That's one of their arguments.  It's

9     one of the litany of alleged statements.  I can answer that on

10    that specific issue, the statement that's being targeted was

11    that the reanalysis of the Phase 2b data was done by an outside

12    lab and the allegation is that you failed to disclose --

13         THE COURT:  That's at Quanterix or whatever it is.

14         MR. TALARIDES:  No, that's another alleged

15    misstatement.  So as I said, there's about a bucket of 15, 20

16    alleged misstatements that deal with this failure to disclose

17    that you manipulated data, that's the core theory.  And then

18    there's another four alleged misstatements, one of them is

19    Quanterix, the other one is regarding Dr. Wang's lab and the

20    other one is a statement by Mr. Barbier, the CEO, about his

21    characterization of the FDA's letter, and the fourth statement

22    is about one of the journals.  Again, Mr. Barbier said that the

23    journal exonerates them.  So there's four separate statements

24    and then the major bucket -- I say bucket as the core theory --

25    is all these other statements during the class period about the

1  research and the results, those were rendered false and

2  misleading by the failure to disclose that the underlying data

3  supporting these results was manipulated.  And on the major,

4  the core bucket here, the core theory, the first legal argument

5  that we make and the standard to be applied is that there's no

6  duty to publicly confess to something that has not even been

7  charged, let alone found.  And by its own terms, the underlying

8  allegations here that support the idea that there's data

9  manipulation are opinions.  They're not facts, right, they're

10 opinions of the authors of the Citizens' Petitions.  They

11 themselves say that these are our opinions and they ask the FDA

12 to conduct fact finding to make that determination.  They did

13 not make a determination themselves.  So how can -- and what

14 the plaintiffs here are essentially asking the Court to do as a

15 pleading matter under the PSLRA is to give more credence to the

16 Citizens' Petition than the authors themselves have given to

17 the Citizens' Petition because they're taking the Citizens'

18 Petition, they, meaning the plaintiffs in this case, saying

19 that's an established fact, there's data manipulation, when the

20 authors of the Citizens' Petition say this is our opinion that

21 there may have been manipulation, FDA, please investigate and

22 look into it.

23         And there's the Fifth Circuit case that we cite in our

24 brief, this is *Financial Acquisition Partners versus Blackwell.*

25 And the Fifth Circuit there said, where the plaintiffs there

1    relied on an expert declaration, the opinions of an expert to

2    support their allegations at the motion to dismiss stage on the

3    12(b)(6) motion, and the Fifth Circuit said that the opinions

4    cannot substitute for facts under the PSLRA.  And if the

5    Citizens' Petition is an opinion, how can it be used as a fact,

6    a fact of manipulation when it's merely an opinion being --

7              THE COURT:  I don't think they're alleging that the

8    Citizens' Petition itself was the manipulation.  They're

9    alleging that there are some, there are many more instances of

10   alleged wrongdoing that they have that didn't come from the

11   Citizens' Petition, but they're saying that the Citizens'

12   Petition highlighted some of these areas.  They're not

13   saying -- your clients didn't prepare the Citizens' Petition,

14   so, I mean, it would not be something that they did wrong.

15   They're alleging that the Citizens' Petition highlighted, among

16   other things, a number of areas which they think are actionable

17   under the law.  That's what they're arguing, not that the

18   Citizens' Petition itself is a basis for their suit.

19             MR. TALARIDES:  Well, they've taken the words and the

20   allegation of the Citizens' Petition and they've put them into

21   their own complaint.

22             THE COURT:  Of course they have.  That's what they've

23   done, obviously, in certain aspects, but it doesn't mean -- the

24   Citizens' Petition is not evidence, okay, it really isn't

25   evidence.  It's evidence that something was done or something

1   was said, and things that they did afterwards might be of

2   concern because it would highlight some areas or issues and so

3   that might be it.  But there's no legal block to somebody

4   taking evidence from a prior lawsuit or taking evidence from

5   somebody -- let's say some reporter did a very thorough

6   investigation and in that situation dug up a lot of evidence.

7   We've seen that, it's going on right now in some of the Trump

8   litigation.  The New York Times did a big expose of former

9   President Trump's company's finances and then people have

10  picked up on that and are using some of that in their lawsuits.

11  Now, maybe it isn't true.  Maybe that isn't true, but there's

12  nothing that prevents them from doing that, as long as they can

13  prove it independently.  They have to be able to prove it

14  independently.  It isn't just because it shows up in an article

15  or it shows up in a Citizens' Petition, doesn't mean it's going

16  to be admitted into evidence.

17            MR. TALARIDES:  Your Honor, here we don't have

18  evidence.  What we have, as you have noted, the Citizens'

19  Petition is not evidence and the subsequent --

20            THE COURT:  At trial, yes.  We're talking here about a

21  12(b)(6) motion, which is a motion to dismiss.

22            MR. TALARIDES:  Correct, Your Honor.  And but you do

23  require factual allegations --

24            THE COURT:  I'm not saying that the Citizens' Petition

25  might not come into evidence at trial.  It may for certain

1    purposes, I don't know.  I'm not there yet.

2            MR. TALARIDES:  Well, so as a legal matter and as we

3    set forth in our briefs, as a legal matter, taking

4    allegations -- alleging based on other allegations is legally

5    insufficient under the authorities we've cited in our brief.

6    We don't think that the PSLRA permits a plaintiff to circumvent

7    the requirements of pleading factual particularity of fraud by

8    taking the allegations of other people that are hotly disputed

9    and dumping them into their own complaint.

10           THE COURT:  I would agree with you that just simply

11   taking bare allegations from some source and attempting to

12   craft those allegations without any support is not sufficient.

13   But that's not sufficient in any complaint, forget the PSLRA.

14           MR. TALARIDES:  And let's talk about source here.

15   Let's not forget, Your Honor, that the source here, the genesis

16   here are two folks who initially did not disclose the fact that

17   they stood to make massive amounts of money by the decline of

18   Cassava's stock price, and they hid that from their initial

19   Citizens' Petition.

20           THE COURT:  I know there were allegations that they

21   short-sold it?

22           MR. TALARIDES:  Not allegations, a fact that they

23   admitted to it.

24           THE COURT:  Okay.

25           MR. TALARIDES:  And initially when they first

1    submitted the Citizens' Petition, they certified, the attorney

2    that submitted it on their behalf certified that they disclosed

3    every fact that could be adverse to their petition itself.

4    They did not disclose that they actually had shorted the stock

5    and stood to make potentially millions of dollars by when the

6    stock price declined.  Only after when they were called out on

7    it did they publicly announce their names and say, yes, we're

8    the authors and they admitted that they actually made money off

9    the decline of the Cassava stock price.  So it's not just -- I

10   mean, the source here and there's a whole body of case law in

11   and outside the Fifth Circuit under the PSLRA that you have to

12   look at the motives of the source, whether it's a short-seller

13   report or an analyst report or in this case a Citizens'

14   Petition, these were people who were financially interested in

15   seeing Cassava being destroyed.

16           THE COURT:  I couldn't agree with you more.

17           MR. TALARIDES:  So the law that I mentioned earlier

18   about no duty to essentially confess or publicly disclose the

19   underlying wrongdoing that you're being accused of, there's --

20   my friends here cited several cases where a motion to dismiss

21   was denied when that argument was made.  And the difference in

22   those cases between those cases and ours is that in each one of

23   those cases, you had an enforcement action filed by the

24   government, you had an admission or a mea culpe from the

25   defendants, you had financial statements, you had a

1  whistleblower within the company actually coming out with

2  percipient knowledge about what happened.

3          THE COURT:  You're not suggesting, are you, that you

4  can't maintain a viable securities fraud action unless the

5  defendants somehow confess their wrongdoing?

6          MR. TALARIDES:  Not at all.

7          THE COURT:  That would sure cut back on the securities

8  fraud actions we have.

9          MR. TALARIDES:  Not at all.  What I'm saying, Your

10  Honor, is the law says that you need something more than just

11  an accusation of wrongdoing in order to hold someone liable for

12  failing to confess to that wrongdoing.

13          THE COURT:  All right.  I understand what you're

14  arguing.

15          MR. TALARIDES:  And again, I would point Your Honor to

16  the Blackwell case about you cannot use the opinions of others

17  as substitutes for facts in the PSLRA.

18          THE COURT:  I've already told you I couldn't agree

19  with you more.  Simple opinions of somebody don't constitute

20  sufficient facts to support a cause of action.

21          MR. TALARIDES:  And to the original point you made,

22  Your Honor --

23          THE COURT:  Opinions.

24          MR. TALARIDES:  -- you said this is not a summary

25  judgment motion, you pointed that out very correct and that you

1    can't make a finding of fact.  But I don't think it's disputed,

2    there is no dispute, it's actually a judicially noticeable fact

3    that the authors of the Citizens' Petition -- and you can take

4    into account in a motion to dismiss judicially noticeable fact,

5    the authors have explicitly stated they are only merely

6    providing their opinion and they are not making a pronouncement

7    of any actual manipulation.  They've said it publicly, it's

8    judicially noticeable.  And so if you line it up with the

9    Blackwell case that you can't substitute opinions with facts, I

10   don't see how you can rely on the Citizens' Petition as a

11   factual matter to come to the conclusion that they adequately

12   pled that there's data manipulation.

13           I'll move on to the four other, as I call them, the

14   remainder of the alleged misstatements as opposed to the core

15   theory of failure to disclose.  On the issue of the outside lab

16   statements, the reanalysis of the Phase 2b was done by an

17   outside lab, it was done at CUNY lab, so it was factually

18   correct and it was not in any way contradicted by the fact that

19   Dr. Wang conducted the analysis.  In fact, it comported with

20   the company's past practice in how it described what --

21           THE COURT:  There was an allegation somewhere,

22   counsel, that the work of one of these outside labs was greatly

23   overstated, that they did a certain amount of work, but did not

24   do what it was implied that they did.

25           MR. TALARIDES:  That's a separate issue from you

1    failed to disclose that it was a -- essentially, the argument

2    is that you failed to disclose that the reanalysis was done by

3    an internal Cassava lab when it wasn't.  The allegation is that

4    you misrepresented which lab or who conducted the reanalysis by

5    merely saying it was conducted by an outside lab, when in fact,

6    it was conducted at an outside lab.  It was conducted at the

7    City University of New York, not at Cassava's labs.

8             With respect to the statement, I believe one of the

9    alleged misstatements is Mr. Barbier had said that the FDA did

10   not find evidence.  The plaintiffs had the words *"did not find*

11   *any evidence of fraud."* He actually didn't say that, he just

12   said the FDA said, *"Where's the evidence?"* And as an initial

13   matter, the notion that Mr. Barbier misrepresented the FDA

14   letter is a bit odd in a securities fraud action based on fraud

15   on the market theory where anything that's said publicly is

16   supposed to be publicly known.  The FDA letter is public,

17   right?  I mean, it speaks for itself.  So you can't be misled

18   by someone characterizing a letter, but fundamentally what Mr.

19   Barbier was saying was it's true, the FDA said in page two of

20   its letter that by its own terms *"The Citizens' Petition did*

21   *not provide all the relevant factual information and was asking*

22   *the FDA to conduct a fact-finding process to make that*

23   *determination."* So that is true, it did not find any evidence

24   of fraud.

25             Thirdly, I think the other alleged misstatement

1   relates to the Quanterix.  It was a lab that generated some

2   data here, and the statement the company said/made was that

3   Quanterix generated the data.  And then Quanterix came out with

4   a clarifying statement saying we did not interpret it nor did

5   we create the charts.

6            THE COURT:  That was the comment I was referring to.

7            MR. TALARIDES:  Yes, and the two statements when you

8   line them up they're not inconsistent.  Cassava didn't say that

9   they interpreted the data.  Cassava didn't say that they took

10  the data, then created the data charts presenting the data.

11  They said they generated the data and that's exactly what

12  Quanterix did, they generated the data.  So there was no

13  inconsistency there, there's no falsity here.

14           I believe one other statement was that Mr. Barbier

15  said that one of the journals, Journal of Neuroscience,

16  exonerated us.  And the plaintiffs allege that that was false.

17  The Journal of Neuroscience said there was no evidence of data

18  manipulation.  It did say that.  Now, Mr. Barbier characterized

19  it the way he did, but that's what the journal said, it did not

20  find any evidence of data manipulation.

21           But let me just shift now to the second prong because

22  we've been talking about falsity.  The major second component

23  of the PSLRA which the plaintiff has to plead specific facts

24  creating a strong inference of scienter or fraudulent intent,

25  and it's not just any inference or even a plausible or even a

1    reasonable inference, it has to be a cogent compelling

2    inference.  And the plaintiffs' theory here is that, well, the

3    company and its executives were motivated to pump up the stock

4    in the short term because there was a cash incentive bonus that

5    provided a payout to these executives if the company for

6    trailing 20-day average reached a certain market

7    capitalization.  And the theory is that, well, you had the

8    incentive to defraud investors, spike up the market cap of the

9    company, get your payout.

10          The first point we make and I will just submit is that

11   there's again a litany of Fifth Circuit case law saying this is

12   an incentive that's routinely alleged in securities fraud

13   cases.  So the Fifth Circuit has said that the fact that the

14   executive is incentivized to earn more compensation or the

15   company wants to raise money in and of itself is not

16   cognizable, is not a cognizable motive to plead fraud with

17   PSLRA.  But even in this instance, it goes beyond just the fact

18   that this is a routine allegation that's been rejected by

19   courts.  The executives here have not been paid a dime under

20   this cash bonus.  And in fact, they couldn't have been paid a

21   dime because the company didn't have the cash to pay it, so

22   there was two components to this cash bonus plan.  One, you hit

23   the trailing average and you hit the market cap requirement,

24   and two, the company has the cash to pay it out.  The company

25   did not have the cash to pay it out and has never paid it out,

 1  which leads me to the second allegation here is that they say,

 2  well, the company was also incentivized to raise money, they

 3  raised over $250 million in an offering.  And the theory,

 4  according to plaintiffs, is you pumped up the stock, collected

 5  $250 million to fill the company's coffers to pay out the

 6  bonuses.  Again, the bonuses have never been paid, not a penny.

 7  That $250 million was all dumped into this drug.

 8          And again, Fifth Circuit case law we cited in our

 9  briefs and elsewhere, the fact that this company stood by its

10  product and poured in tens of millions of dollars into this

11  product is the antithesis of a compelling inference of fraud.

12  Why would you dump all this money into this product if you know

13  it's worthless.  It doesn't make any sense.

14          And thirdly, no one, not a single person during this

15  time sold a single share of stock to profit from its fraud.

16  And again, the Fifth Circuit and many other courts have said

17  the fact that absence of stock sales is highly probative of an

18  absence of an intent to defraud in a securities fraud action

19  with PSLRA.  No one sold at the inflated prices, no one made a

20  profit over this and they're still dumping money into this

21  drug.  And the FDA --

22          THE COURT:  I don't know that you ever want to use the

23  term *"dumping money into this drug."*

24          MR. TALARIDES:  I apologize.

25          THE COURT:  Don't have to apologize to me.  Doesn't

1  sound very attractive.

2          MR. TALARIDES:  My point being, and I think Your Honor

3  knows, is that they raised all this money and rather than do

4  what the plaintiffs allege the purpose for the money, right,

5  they allege the purpose of the money was to fill the company's

6  coffers to pay these bonuses.  They took the money and they

7  invested it into this drug.  They stood by it and they still

8  stand by it.  They're in the late stage of phase three clinical

9  trials.  The FDA has known about these allegations for two

10  years now and has not halted the trials.  Right?  So they are

11  standing behind this drug, they absolutely dispute the

12  allegations.

13          And the last point I'll make on the scienter piece and

14  we'll hear from my friends, they'll say, well, there's a theory

15  under the Fifth Circuit that you can also infer fraudulent

16  intent under the so called special circumstances test where you

17  can take essentially the fact that the executive defendants are

18  insiders of a small company and you can infer that of course

19  they knew and of course they intended to defraud, they must

20  have known because they're insiders, they run the day to day

21  and it's a small company.  But what the Fifth Circuit has said

22  in the one peer case and many others in our brief is one of the

23  components of that doctrine is that the falsity of the

24  statement has to be readily apparent, to the executive.

25          How can you say that -- my argument is how can one say

 1    that this is a readily apparent case of falsity when two years

 2    later and with all these investigations ongoing, if we're so

 3    readily apparent, then we would have heard by now, yeah,

 4    there's been data manipulation.  We don't have that.  No one

 5    has come out and said -- there's been no finding, there's been

 6    no charge, there's no indictment, there's nothing.  All we have

 7    are the opinions of third parties that are financially

 8    motivated to make that allegation.

 9          And so it's not readily apparent and there's four

10    agencies investigating this thing for two years now and they

11    haven't come to that conclusion.  So that in and of itself

12    precludes the application of the special circumstances

13    doctrine.

14          Your Honor, if I may, any other issues you'd like me

15    to address, otherwise, I'd like to reserve a few minutes.

16          THE COURT:  Sure, of course.

17          MR. TALARIDES:  Thank you.

18          THE COURT:  You bet.  By the way, I usually mention

19    this at the beginning and I always do it during a jury trial,

20    you see me sipping something here, I am not up here luxuriating

21    with a gourmet coffee while you're down there working away.

22    Many years ago I had a small vocal cord cancer that I had to

23    have radiation to my vocal cords at the time.  I'm fine, it's

24    been decades, but if I talk too much, I have to keep my vocal

25    cords moistened, otherwise, I'll sound like Bill Clinton, if

1    you have ever heard him, raspy.

2         MR. DROSMAN:  Join the club.  I'm getting over a cold,

3    so I may sound a little like Bill Clinton.

4         THE COURT:  That's all right.

5         MR. DROSMAN:  I want to start with what you had

6    referred to earlier and what defense counsel ended with which

7    is the allegations which do not involve data manipulation

8    because although defense counsel says our core theory is data

9    manipulation, there are a number of statements that have

10   nothing to do with data manipulation which are exceedingly

11   strong and not only are obviously false and misleading -- and

12   by false and misleading, I'm referring to instances where

13   defendants failed to provide the whole truth.

14        The PSLRA, as you know, has sort of grafted in this

15   precept that a half truth is a whole lie.  And by doing that,

16   what they've said is you can't -- we're not looking at little

17   truths.  Sure, it was an outside lab.  That's not the point of

18   the PSLRA.  PSLRA says that when you speak you have to provide

19   all the facts such that your statement is not misleading, and

20   that's what defendants have failed to do in this case.

21        So let's talk about those instances in which they have

22   made false and misleading statements that do not relate to data

23   manipulation and then we'll turn to data manipulation.

24        First, the statement by defendants at the very

25   beginning of the class period regarding the Phase 2b reanalysis

1    that it was performed by an outside lab.  This is an

2    interesting statement, it starts our class period, as you know.

3    Defendants had previously gone to Lund University laboratories

4    in Sweden to have their Phase 2 results analyzed.  And they

5    came back, Lund University, a very prestigious lab, came back

6    and said, you know what, we don't find any efficacy, it's

7    really not any better than a placebo.  So they said it was

8    wrong, that's incorrect, we have to go back and have those

9    results reanalyzed.  So they turned to Dr. Wang to have those

10   results reanalyzed, and he reanalyzed the results.  And what do

11   you know?  He came back and said, Oh, the Phase 2b results do

12   show efficacy, there is an improvement in cognitive

13   functioning.

14          And so that was the big announcement that starts our

15   class period in September of 2020 where they tell investors we

16   had our Phase 2b results analyzed by an outside lab.  Now, when

17   I hear outside lab, I think dependent lab, maybe not.  I

18   certainly don't think that it's analyzed by a researcher who

19   has a financial interest in the company.  And it's not just a

20   financial interest in the company, Wang was a member of the

21   in-house product development team.  He had a financial conflict

22   of interest, he held stock options and participated in a bonus

23   plan.  And those allegations are in 57, 58 paragraphs,

24   paragraphs 80, paragraphs 106 through 111 and 287F.  There's no

25   question that Wang was conflicted.  So that's interesting

1   information that a reasonable investor would want to know.

2   Hey, this reanalysis was performed by a guy who had a financial

3   interest in the company.  Not there.  And what's particularly

4   interesting about this information is sometimes when company

5   executives make false statements, they could say, Well, it's

6   just a mistake, I didn't know, I was wrong.

7        But this particular statement was misleading in a way

8   that leads you to believe that it was made with the requisite

9   mental state with intent to defraud because, think about it, he

10  knew, Barbier knew when he made this statement about an outside

11  lab that Wang would have financial conflicts that he had stock

12  options and was participating in a bonus plan.  He knew that,

13  and he omitted that information.  That is the hallmark of

14  scienter.  So I know that falsity and scienter are often

15  analyzed separately, but there is a significant overlap in

16  several cases, and this is one of those cases.

17       THE COURT:  Are you saying that in every stock

18  offering, in every statement of a company about how the

19  business is going or what they predict is going to happen in

20  the future, they have to talk about every stock option offered

21  to every executive?  I mean, I don't think so.

22       MR. DROSMAN:  No, I agree with Your Honor.  Certainly

23  not, it would not be that broad.  But this particular case

24  where you make an announcement about an important analysis or

25  reanalysis of results which previously found no efficacy and

 1  now all of a sudden there's efficacy and it was performed by an

 2  outside lab, you are obligated to provide the facts such that

 3  that statement is not misleading.  And one of those facts is

 4  that the person who ran that outside lab, Dr. Wang, had major

 5  financial interest in the company, stock options, a bonus plan

 6  participant, member of the scientific advisory.  I mean, this

 7  guy, he might as well have been a member of the Cassava

 8  executive team.  He and Dr. Burns, who was employed by Cassava,

 9  go back 20 years writing articles together.  And this guy had a

10  major, major financial interest in the company.  So that is

11  misleading.  That's what I'm alleging, Your Honor.  Not that in

12  every instance you have to provide all -- and you know, this is

13  material, and that's the test, really, is is this information

14  material.  Is this something a reasonable investor would want

15  to know?  And that's the test.  And certainly this fact about

16  his financial interest is material, and, therefore, it needed

17  to be disclosed.

18          You turn to, you know, Barbier himself had said, well,

19  it's important -- and we allege this in the complaint at

20  paragraph 454.  He says, *Yeah, financial interest is important,*

21  *it needs to be known.*

22          So if somebody has a financial interest, that should

23  be disclosed.  In fact, we have defense counsel criticizing the

24  officers of the Citizens' Petition for failing to disclose

25  their financial interest.  It's obviously an important fact.

1   And when Bob Gussin who is a board member was asked about this

2   and said, you know, asked about Wang's conflicts and his

3   financial involvement with Cassava, he said, *It's not typical*"

4   and he *was "not thrilled with it."*  That's what the board

5   member said at paragraph 104.

6          So then we move to another misleading statement, the

7   defendant's statement that the P-Tau data was generated by

8   Quanterix.  They say, well, that's literally true.  Of course,

9   that's not the test under the applicable laws the Fifth Circuit

10  made very clear in its recent Six Flags opinion.  Literal truth

11  is not the test.  The test is were there sufficient facts to

12  make it not misleading.  And here you have Quanterix two days

13  after that announcement coming out with their own clarification

14  that, hey, we didn't analyze these results, we didn't examine

15  the results.

16         Now, if Quanterix felt it necessary to come out with a

17  clarification two days later, certainly they felt that that

18  statement needed more context and that it was misleading.  And

19  what do you know?  When Quanterix comes out with its

20  clarification, the stock price drops.  So investors obviously

21  felt that it was important as well.

22         And then defendants also falsely stated that the

23  original data was submitted to journals investigating the class

24  period allegations.  This was part of their coverup where a

25  journal would come out and say, hey, look, we're revisiting

1  these articles because of the significant allegations that have

2  been made about data manipulation, about lack of integrity,

3  trustworthiness and so forth.  The journal said, *We want to*

4  *review the original data.*  And Barbier came out and said, *We*

5  *provided the original data to the Journal of Neuroscience, and*

6  *Neuroscience, in order to complete their investigation.*  In

7  fact, as we allege in our complaint, the original data was

8  never provided.  That was just a false statement.  They knew it

9  was false because they had been e-mailing with Wang who in one

10  case said, *Oh, I think it was destroyed, that original data.*

11  In another case, he couldn't find the original data.  And

12  Barbier admits that in order to determine whether there was

13  data manipulation, fabrication, falsification, you need to look

14  at those original x-ray slides.  Not provided to the Journal as

15  they said.  And when it became clear initially the Journal --

16  Neuroscience came back and said, *Well, we didn't find any*

17  *manipulation.*  And then everybody said, *But you didn't have the*

18  *original data.*  So that Neuroscience went back and said, *You're*

19  *right, that wasn't original, we're going to go ahead and change*

20  *that to an expression of concern,* which is very rare in

21  academic literature, means we have a real concern about the

22  integrity of this paper until CUNY, the City University of New

23  York, completes the investigation.  And that's the way it

24  stands right now.

25          And then finally, Barbier said there was no evidence

1   of fraud according to the FDA.  And Your Honor spoke about this

2   earlier.  And that is absolutely false.  The FDA never said

3   there was no evidence of fraud as we allege and, in fact, quote

4   the FDA's letter in paragraph 286, on page 87 of our complaint.

5   What they said was -- sorry, that's the incorrect quote.  But

6   what they said was *The sole reason that we are going to deny*

7   *the Citizens' Petition is because there is no basis for relief*

8   *on the grounds that the Citizens' Petition cites.*"  They said,

9   "*This is not a determination as to the accuracy or reliability*

10  *of the allegations that were made in the Citizens' Petition.*"

11  That's what it says.  So it's absolutely false for Barbier to

12  come out and say that the FDA found that there was no merit to

13  the allegations.  That's not what the FDA said.

14          Let me turn now to this issue of opinion versus facts.

15  We heard quite a bit about that.  We hear quite a bit about

16  that in the briefing as well.  These allegations are not

17  conclusory opinions.  A conclusory opinion, Your Honor, would

18  be defendants engaged in data manipulation.  Defendants engaged

19  in data falsification.  That's a conclusory opinion.  We have

20  something very different here.  As you know, an opinion is

21  something like Mexican food is better than Chinese food.  It's

22  incapable of objective verification.  We have the ability to

23  objectively verify the allegations in this case, and in fact,

24  the complaint is littered with evidence of data falsification

25  and data manipulation.

1            Let me just talk about -- there are so many, but let

2    me talk about a few instances and talk about the evidence that

3    supports them.  We have plaintiffs alleged that defendants

4    manipulated Cassava's preclinical studies by misrepresenting

5    Western blot analyses in a study about Simufilam published in

6    the PLOS One Journal and authored by Burns and Wang.  And here

7    is the evidence supporting it.  First, the authors of the

8    Citizens' Petition provided photographic evidence that images

9    were spliced and that there were identical images for what are

10   reported as different experiments.  And that's in paragraph

11   149.

12           And then you have Dr. Elizabeth Bik, she's an expert

13   in image deduplication and manipulation, and she corroborated

14   this analysis.  And Dr. Bik provided additional photographic

15   evidence that the study contained two blots that look

16   identical, and those blots are in our complaint, and that there

17   are background transitions suggestive of splicing.  This is

18   manipulation.  Splicing is intentional conduct.  It's not a

19   mistake you make.  Notably, Dr. Bik has no financial interest

20   at all in Cassava.  And in a macro analysis of 190 of Dr. Bik's

21   cases, only two journals out of 190 concluded that nothing was

22   missed.  That's a 99 percent accuracy rate that she has.

23           Then we have more.  Dr. Mike Rossner, a Ph.D., a

24   former managing editor of the Journal of Cell Biology and an

25   expert in analyzing biomedical images for data manipulation,

 1   independently corroborated this finding.  Dr. Rossner concluded

 2   that the two samples were, in fact, identical even though they

 3   purportedly came from different experiments and that the images

 4   had been altered from the original.

 5           And then, finally, we have PLOS One, that journal,

 6   retracting its journal article.  So that's the evidence behind

 7   that one allegation.  It is not accurate at all to say that

 8   plaintiffs' allegations are conclusory.  They're not.  They're

 9   based on solid photographic evidence by multiple sources, the

10   vast majority of whom have no financial interest in this case.

11           I'm going to give you one more example.  We've got

12   plaintiffs allege that Cassava manipulated the Phase 2

13   biomarker results at the Alzheimer's Association International

14   Conference, the AAIC.  And hear the evidence supporting that

15   allegation, we have Dr. Aaron Fletcher, he's a Ph.D. of Bios

16   Research, and he identified a missing data point, a missing

17   data point, from a 100 milligram treatment group that was then

18   grafted into the placebo group and determined that missing data

19   point should have reflected a 150 percent change from baseline.

20   If the missing data point, that missing data point is inserted,

21   the treatment groups would not be statistically significant and

22   different from a placebo.  And then in addition to Dr.

23   Fletcher, we have Dr. Bik who also determined independently

24   that there was a missing data point which would have changed

25   the reduction of P-Tau 181 levels -- and remember, the lower

 1    the P-Tau the better when you're researching Alzheimer's --

 2    from negative 17 percent to negative 3 percent.

 3            And ultimately, defendant Barbier himself conceded

 4    that there were errors in the AAIC presentation and that the

 5    graphic that was shown was incorrect.  So that's the evidence

 6    that we have on those two.  I could go on and on, Your Honor,

 7    but I'm not going to.

 8            You know, what other evidence do we have supporting

 9    our allegations?  We've got ten prominent experts in

10    neuroscience, including Dr. Sudhof, a Nobel laureate from

11    Stanford, Dr. Roger Nicoll from U.C. San Francisco, which I

12    understand is one of the preeminent medical schools in the

13    country, that and maybe Johns Hopkins and Harvard.

14            THE COURT:  They're the people that did my throat.

15            MR. DROSMAN:  Is that right?

16            THE COURT:  Yes.

17            MR. DROSMAN:  There you go.  You went to the best.

18    And Dr. Don Cleveland from U.C. San Diego.  They examined

19    Cassava's research papers.  These guys don't have any financial

20    interest in the company.

21            THE COURT:  Can I spin you just a little bit here to

22    the individual -- you have also sued people individually.

23            MR. DROSMAN:  Yes.

24            THE COURT:  I understand what your allegations are

25    against all of them, but I'm having a hard time discerning what

1    you're really arguing Mr. Schoen did.  S-C-H-O-E-N, is that how

2    he pronounces it?

3              MR. DROSMAN:  Correct.

4              THE COURT:  There's not much there.

5              MR. DROSMAN:  I think that's a good point and I want

6    to go ahead and address that, Your Honor.  He started in 2018,

7    okay.  He had been at the company for a couple of years by the

8    time the class period starts.  So let's talk about this

9    announcement, this statement that starts the class period where

10   they announce the reanalysis of the Phase 2 results and they

11   neglect to mention that this outside lab was run by a guy named

12   Dr. Wang who had financial interest in the company.  Now, both

13   Barbier and Schoen signed off on that statement.  That was a

14   statement that both of them made.  Now, there's no question or

15   little question that Schoen knew, had scienter.  We know that's

16   false because it's certainly misleading, and there's no

17   question that Schoen knew about Dr. Wang.  He was their primary

18   independent researcher.  Remember, Cassava had no inside labs,

19   they only used an outside lab and they used Dr. Wang.  So

20   certainly Schoen knew that Dr. Wang was the outside lab

21   referenced in the statement.  His scienter there is pretty

22   unequivocal.  The same thing with that Quanterix statement.  He

23   knew about Quanterix, this is a small company.  In fact, Your

24   Honor, when the class period starts --

25              THE COURT:  You can't just say, well, he must have

1    known about Quanterix.  It's got to be more than that.

2         MR. DROSMAN:  Sure, sure.  What the Fifth Circuit says

3    in that new Six Flags case is they say there's a number of

4    factors that you should look at when you're assessing a

5    scienter and they call it a special circumstances.  It's also

6    referred to as the core operations doctrine.  Basically what

7    they say is you have a very small company, you have a product

8    that is very important to the company, and then you have

9    statements that are made that are internally inconsistent.  And

10   we have those facts in this case such that Schoen would have

11   scienter.  We have a company that started when it had six

12   people at the beginning of the class period, I think it grew to

13   eleven, so essentially half the company is named as a defendant

14   in this case.  We have a one-product company.  This essentially

15   was their only product.  Everything revolved around the success

16   or failure of Simufilam.

17        And finally, you have internally inconsistent

18   statements.  We have them making the statement about Wang,

19   refraining from disclosing his identity and then previously

20   they disclosed his identity when they talked about Wang.  You

21   have the Quanterix statement where they basically say that

22   Quanterix provided the data.  And Quanterix comes out and says,

23   *No, we didn't provide the data -- I mean, we didn't assess the*

24   *data, we didn't examine the data, we just provided it, so let*

25   *me disaffuse you of that.*

1           You have the statements about the FDA's resolution of

2    the Citizens' Petition.  Absolutely false and misleading, no

3    reason to believe that Schoen didn't know that.  I mean, Schoen

4    would have known that as well as anybody by reading the

5    Citizens' Petition that the FDA did not exonerate the company

6    from fraud.

7           So whereas Schoen was not -- you're correct that

8    Schoen was not a medical researcher and he was not involved in

9    authoring the particular papers like Barbier, like Burns.  And

10   as you know, Dr. Friedmann has died, but Friedmann was also a

11   participant in authoring those particular studies.  Schoen

12   certainly is liable for the statements relating to the outside

13   lab and also the other statements, given the fact that he

14   signed these statements and there's the special circumstance

15   doctrine.

16          And then, of course, the motive allegations which, as

17   Your Honor is aware, are not required in a securities fraud

18   case, they're not required in a criminal case, but they

19   certainly support an inference of scienter.  And the fact that

20   they ultimately were not paid their bonuses is certainly not

21   probative because in the Six Flags case, the defendants didn't

22   get their bonuses either.  But the Fifth Circuit found that

23   they didn't get their bonuses because the information about the

24   fraud derailed that.  And that's exactly what happened here.

25   They would have gotten their bonuses if it were not for the

1  fact that the Citizens' Petition came out and then the

2  additional evidence that we've discussed continued to come out

3  and the stock price went from $163 down to $16 a share at the

4  end of the class period, a tremendous collapse.  That's what

5  derailed the bonuses.  They also did these two public

6  offerings.  Remember, there's two of them --

7          THE COURT:  My recollection is it got up to about

8  120-some dollars a share at one point?

9          MR. DROSMAN:  I think it's up to 163.

10          THE COURT:  I remember the 120.  Did it get all the

11  way up to 160?

12          MR. DROSMAN:  Yeah, it did.

13          THE COURT:  And it's now at 16?

14          MR. DROSMAN:  Yeah, I think it went down to around $16

15  at the end of the class period -- $18, sorry.  And Your Honor,

16  it's 146 was the high point, not 163.  I apologize, 146.

17  Sorry.  I think I transposed those two numbers.

18          THE COURT:  I was a little off.  Not too bad.

19          MR. DROSMAN:  You were closer than I was.

20          THE COURT:  There was one point where they were 126

21  and then another statement was made and it dropped.

22          MR. DROSMAN:  Correct.

23          THE COURT:  That's where I got the 126 from.

24          MR. DROSMAN:  So unless Your Honor has any

25  additional --

1            THE COURT:  No, I don't.

2            MR. DROSMAN:  Thank you very much.

3            THE COURT:  Believe me, the Court is going to look not

4    just -- I mean, very few federal courts anymore provide

5    opportunities for oral argument, I'm afraid to say.  It's very

6    difficult to get oral argument.  Because I was a trial lawyer,

7    I believe in oral argument.  Sometimes it can clarify things

8    and bring out issues that are of importance, but that doesn't

9    mean that the written documentation and argument that is

10   supported in the record isn't helpful to the Court and that's

11   what most judges, in fact, rely on.  This is a kind of case

12   where I just absolutely insist on oral argument.

13            MR. DROSMAN:  Well, I appreciate it.

14            THE COURT:  I think that it's helpful to me and it

15   also provides a public forum so that these allegations are

16   publicly heard.  Sir, you wanted a couple minutes?

17            MR. TALARIDES:  Please, if you indulge me.

18            THE COURT:  Of course.

19            MR. TALARIDES:  Thank you, Your Honor.  I'm just going

20   to make a few points addressing some of my friend's points

21   here.  On the motive allegation, I heard that they would have

22   gotten their bonuses but for the fact that the stock price

23   collapse derailed their bonuses.  Their complaint actually

24   contradicts that.  The complaint alleges, as the stock plan

25   states, that if the stock price hits a certain point for 20

1    days, the bonus kicks in and they're entitled to it if the

2    company has the cash.  So the stock price decline did not

3    derail their bonus.  It's not the reason they didn't get their

4    bonus.  The reason they didn't get the bonus is because they

5    were investing the money that they raised with the offering

6    that it's used as a motive for a fraud in the drug that

7    plaintiffs allege is worthless.  So the stock price decline did

8    not derail the bonus.  They haven't taken a single penny from

9    this bonus.

10           The Six Flags case that my friend mentioned, the Fifth

11   Circuit there said that the fact that the bonus was not paid

12   did not negate an inference of scienter in that specific case

13   because the bonus was achievable.  And here, the complaint

14   itself alleges that it was not achievable because they're

15   alleging that the bonus was over a hundred-something million

16   dollars and they allege in their complaint that at the time

17   that it was locked in, they didn't have the cash to pay and it

18   couldn't have been achievable and it couldn't have been paid

19   out.

20           Very quickly, Your Honor, on defendant Schoen, it's a

21   very lengthy complaint.  I think you would be hard pressed to

22   find his name mentioned more than a few times.  He's named

23   merely because he signed a few documents and he's the chief

24   financial officer.  The case law in the Fifth Circuit is pretty

25   well established that the group pleading doctrine where you

1   just lump all the insiders together and assume that they have a

2   fraudulent intent is not enough, and I submit that for any

3   defendant, they haven't -- particularly for Mr. Schoen, other

4   than being the chief financial officer and he signed a few 10Ks

5   or Form 10Qs, there's nothing in the complaint other than

6   naming him.

7          On the Quanterix alleged statement, Cassava never said

8   that Quanterix analyzed the data as the plaintiffs allege.

9   Cassava never said that Quanterix interpreted the data as

10  Quanterix came out with that press release.  Cassava said they

11  generated the data, that's exactly --

12         THE COURT:  Quanterix came out with a clarification

13  for some reason.  Why did they feel the need to come out with a

14  clarification?

15         MR. TALARIDES:  Well, that can't be the reason why --

16  you'd have to ask them, I don't know.  But the statement

17  generated is factually correct.  And there's nothing in the

18  surrounding text of that statement where Cassava said that

19  Quanterix generated data where they said that they interpreted

20  the data or analyzed it.  They never suggested or said that.

21         THE COURT:  I will certainly look at that again.

22         MR. TALARIDES:  And then one point, I think the

23  argument is that the allegations here are not conclusory

24  opinions.  They are opinions, though, and the Fifth Circuit

25  said opinions don't get you to fact.  And --

1          THE COURT:  I don't think that that was the gravamen

2    of what he was suggesting.  I think he was suggesting that they

3    were laying out facts, not conclusory opinions.  Am I right?

4          MR. DROSMAN:  That's correct, Your Honor.

5          THE COURT:  I don't think he was suggesting that he --

6    he wasn't going to acknowledge that his complaint was made up

7    of opinions.

8          MR. TALARIDES:  I'll note that Mr. Rossner, he's a

9    retained expert by the plaintiffs.  Ms. Biks, she's also paid.

10   That's her job is to do this, right, to point --

11         THE COURT:  We have experts in every case.  I'm sure

12   you will have experts if we go forward.

13         MR. TALARIDES:  My point being, though, Your Honor, is

14   is that Fifth Circuit said you can't rely on expert opinions to

15   plead securities fraud.

16         THE COURT:  Of course not.

17         MR. TALARIDES:  Your Honor, thank you.

18         THE COURT:  Thank you very much.  Look, this is not an

19   uncomplicated case and it's a case of some interest and

20   importance, obviously.  Alzheimer's is a devastating disease

21   and every time there is any type of suggested breakthrough in

22   either the treatment or identification of Alzheimer's, it makes

23   the national news.  I don't know whether this drug ever made

24   the national news at all.  I've never seen anything about it,

25   but I know other Alzheimer's potential treatments have made the

1   national news.  And so, yes, I mean, I can understand why

2   there's some interest in this case, but I treat this case like

3   I do any other case.  My work here in this motion is to

4   determine whether the plaintiffs have sufficiently pled,

5   pursuant to the Private Litigation Reform Act and the general

6   standards of the Federal Rules of Civil Procedure which aren't

7   completely abrogated, the causes of action for which they've

8   alleged.

9            And I think we also have to remember that in a motion

10  to dismiss, even though we have the Private Litigation Reform

11  Act, the Court must view facts in a light most favorable to the

12  nonmoving party.  In some ways these two clash to a degree and

13  legal experts have talked about it, talked about that issue and

14  I think even some Supreme Court justices.  I don't know whether

15  in opinions, but I know I did hear a Supreme Court justice,

16  might have been either a -- I don't remember whether he's still

17  there or if it was a former justice talk about the conflict,

18  you know, when you add these very stringent pleading rules, and

19  it happens in fraud also, just general fraud under Rule 9, you

20  add these very stringent pleading rules and yet you also say,

21  well, you have to infer the facts in a light most favorable to

22  the nonmoving party, but also apply these rules and, of course,

23  the Court has got to do that.

24           There have been many instances in my career in both

25  complex cases and noncomplex cases where I have denied motions

 1  to dismiss and ultimately granted the motions for summary

 2  judgment where the facts are able to come in and parties are

 3  able to make an effort to meet that burden, which because of

 4  more recent -- recent enough so that it happened during my

 5  career as a lawyer, change the standards such that the parties

 6  now have to pony up real facts.  They can't just sit back and

 7  say, well, there's genuine issues of material fact here, Judge.

 8  They actually have to show those genuine issues of material

 9  fact.

10           Now, the Fifth Circuit has a kind of a general rule.

11  I don't know whether it's laid down in black and white

12  anywhere, but the general proposition and I think most Circuits

13  do is that when you have a first motion to dismiss, if that

14  motion is granted in whole or in part, generally the Court is

15  advised to give the nonmoving party the opportunity to amend.

16  And we do that always in pro se cases, but we do it also in

17  cases where the parties are well represented.  I just say this

18  because I don't know whether I'm going to grant or deny this

19  motion in whole or in part, but if I do, then you will get 30

20  days to amend.  I always do that, in the interest of justice.

21  I mean, this isn't a game, you know, we're trying to get to the

22  right and just result.  And also, I'm pretty quick in getting

23  these orders out.  A lot of work has been done.  My law clerk

24  has looked at it very carefully and given me some excellent

25  research.  I've looked at it very carefully.  I can get the

 1   documents now myself.  In the old days, you couldn't do that,

 2   but I can actually log in just like the lawyers can and pick up

 3   all the exhibits and all the documents off the Internet.  And

 4   so I look at these things myself as well, of course.  But I'm

 5   hoping to get something out to you in the next couple of weeks,

 6   which is very short for a motion of this kind.  I should be

 7   able to do that.  I want to try to get this case moving.  It's

 8   not a particularly old case.  When was this filed?  In '21?

 9           COURTROOM DEPUTY CLERK:  Yes.

10           MR. DROSMAN:  That's right, Your Honor.

11           THE COURT:  So it's a year old.  By Federal Court

12   standards during the pandemic, this one is not out of diapers

13   yet.  We've got cases where they were stayed, civil cases that

14   were stayed because of the pandemic that are very old.  But

15   we're trying to move those through the system as quickly as we

16   possibly can.  Many of those cases settle, of course, and it

17   makes it much easier for us, but some of them don't and we have

18   to try them and so we're in court all the time.

19           I had to go back to San Antonio, I had hearings here

20   yesterday, I had to go back to San Antonio, I got up at 4:00 in

21   the morning and drove back here so that we could have our

22   argument today.  And I'm going to turn around and go right

23   back.  So even though I have a chambers and courtroom here,

24   obviously, you saw my name on the door, all of the big cases

25   that I'm going to be getting, all of them, some of them have

1    been transferred, but all of them haven't, so I'm still trying

2    to clean up San Antonio, but I'm going to be doing most of my

3    work here.  So thank you all very much.  I try to put out a

4    reasoned order, it's not going to be a hundred pages, doesn't

5    need to be on a motion to dismiss.  Let me say this, I do

6    follow the same practice that Judge Yeakel does.  If I deny the

7    motion to dismiss and the party -- let's say I deny it in part,

8    okay.  The party has the right to file an amended complaint,

9    but that amended complaint will only go to cure those issues

10   where I have denied it.  If the party wishes to file another

11   motion to dismiss, it can only be as to those issues.  Okay?

12   We wouldn't get a full on let's rehash everything we've talked

13   about before, okay.  Frequently what happens is that the

14   parties in a situation like that decide, you know, it really

15   isn't worth it to file another motion to dismiss, let's just

16   get to the meat of this and file a motion, you know, do some

17   discovery and file a motion for summary judgment.  That's

18   frequently where we end up.

19          I have a large case here where there was a lot of

20   crazy pleading here and there and nobody was -- I don't know

21   what happened with this case.  I wiped the slate clean and I

22   ordered cross motions for summary judgment and the lawyers both

23   said yes, that's what we need to do here.  What was the name of

24   that case?

25          COURTROOM DEPUTY CLERK:  The Courthouse case.

1              THE COURT:  Oh, Courthouse News, yes.  It was a press

2    access case, interesting First Amendment case.  But both sides

3    said yes, that's exactly right, this is what we need to do

4    instead of all these bric-a-brac motions, we need to get right

5    to the motions for summary judgment because we really don't

6    dispute the facts, we just think we should win on our facts.

7    And that's where we go.  So I would urge you to think about

8    that if that's where we are.  All right?

9              So we'll try to get this out.  If you don't get it in

10   two weeks, you'll get it in three weeks for sure, but I'm going

11   to try to get it out within three weeks because we have done

12   significant work on this already.  Thank you so very much.  I

13   do appreciate you being here and safe trip back home.

14             MR. DROSMAN:  Likewise to you.

15             *(10:23 a.m.)*

16                            *    *    *

17             *(10:25 a.m.)*

18             THE COURT:  I am going to refer you to Magistrate

19   Judge Hightower.  Magistrate Judge Hightower will give you all

20   the pretrial dates and so forth.  We'll do this even though --

21   I'm not prejudging your motion, but they're going to have an

22   opportunity to amend, and so in any event, we're going to need

23   to set these dates.  And it's better to set them now and get

24   them on my calendar.  Waiting even two or three weeks, in fact,

25   waiting one week or two weeks to get a date with Judge

1   Hightower might be a disaster because Judge Yeakel leaves at

2   the end of April and then several hundred cases come my way

3   from him, and a hundred from Judge Pitman.  It's going to be

4   something.

5           MR. DROSMAN:  We previously filed these joint

6   scheduling recommendations.  Should we refile that with her,

7   Judge Hightower?

8           THE COURT:  No, no, it's in the record.  She'll set

9   the actual dates.  There aren't really any actual dates.  What

10  you've got is kind of -- I've seen that.  What you've got is,

11  well, we want a certain number of days between this and a

12  certain number of days between that.

13          We need actual dates and we need to get those dates in

14  the calendar and get you there before the trains start pulling

15  out.  I use trains because it's one track, you get behind it

16  and you're stuck.  And we don't want you to get stuck.  Thank

17  you so very much.

18          *(10:27 a.m.)*

19                        *   *   *

20

21

22

23

24

25

1                      *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  May 4, 2023

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   262 West Nueva Street
     San Antonio, Texas  78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25