# EXHIBIT A

Securities and Exchange Commission
Division of Enforcement



Enforcement Manual

Office of Chief Counsel

*November 28, 2017*

# Table of Contents

| | | |
|---|---|---|
| 1. | Introduction | 1 |
| 1.1 | Purpose and Scope | 1 |
| 1.2 | Origin | 1 |
| 1.3 | Public Disclosure | 1 |
| 1.4 | Fundamental Considerations | 1 |
| 1.4.1 | Mission Statement | 1 |
| 1.4.2 | Updating Internal Systems | 2 |
| 1.4.3 | Consultation | 2 |
| 1.4.4 | Ethics | 2 |
| 2. | A Guide to Matters Under Inquiry ("MUIs") and the Stages of Investigations | 4 |
| 2.1 | General Policies and Procedures | 4 |
| 2.1.1 | Ranking Investigations and Allocating Resources | 4 |
| 2.1.2 | Quarterly Reviews of Investigations and Status Updates | 6 |
| 2.2 | Tips, Complaints, and Referrals | 7 |
| 2.2.1 | Complaints and Tips from the Public | 7 |
| 2.2.1.1 | Processing Tips and Complaints from the Public | 7 |
| 2.2.1.2 | Whistleblower Award Program | 9 |
| 2.2.2 | Other Referrals | 9 |
| 2.2.2.1 | Referrals Involving Bank Secrecy Act Material | 9 |
| 2.2.2.2 | Referrals from the Public Company Accounting Oversight Board | 10 |
| 2.2.2.3 | Referrals from State Securities Regulators | 10 |
| 2.2.2.4 | Referrals from Congress | 11 |
| 2.2.2.5 | Referrals from Self-Regulatory Organizations | 12 |
| 2.3 | Matters Under Inquiry and Investigations | 12 |
| 2.3.1 | Opening a MUI | 12 |
| 2.3.2 | Opening an Investigation and Converting or Closing a MUI | 15 |
| 2.3.3 | Formal Orders of Investigation | 17 |
| 2.3.4 | Formal Order Process | 17 |
| 2.3.4.1 | Supplementing a Formal Order | 18 |
| 2.3.4.2 | Requests for a Copy of the Formal Order | 18 |
| 2.4 | The Wells Process | 19 |
| 2.5 | Enforcement Recommendations | 22 |
| 2.5.1 | The Action Memo Process | 22 |
| 2.5.2 | Commission Authorization | 23 |
| 2.5.2.1 | Closed Meetings | 23 |
| 2.5.2.2 | Seriatim Consideration | 23 |
| 2.5.2.3 | Duty Officer Consideration | 24 |
| 2.5.3 | Delegations of Commission Authority | 24 |
| 2.6 | Closing an Investigation | 26 |
| 2.6.1 | Policies and Procedures | 26 |
| 2.6.2 | Termination Notices | 27 |
| 3. | A Guide to Investigative Practices | 28 |
| 3.1 | Special Considerations | 28 |

| | | |
|---|---|---|
| 3.1.1 | External Communications Between Senior Enforcement Officials and Persons Outside the SEC Who Are Involved in Investigations | 28 |
| 3.1.2 | Statutes of Limitations and Tolling Agreements | 31 |
| 3.1.3 | Investigations During Ongoing SEC Litigation | 32 |
| 3.1.4 | Parallel Investigations and the State Actor Doctrine | 33 |
| 3.2 | Documents and Other Materials | 34 |
| 3.2.1 | Privileges and Privacy Acts | 34 |
| 3.2.2 | Bluesheets | 34 |
| 3.2.3 | Voluntary Document Requests | 35 |
| 3.2.3.1 | Forms 1661 and 1662 | 36 |
| 3.2.3.2 | White Papers and Other Materials (excluding Wells Submissions) | 37 |
| 3.2.5 | Document Requests to the News Media | 38 |
| 3.2.6 | Subpoenas for Documents | 41 |
| 3.2.6.1 | Service of Subpoenas | 41 |
| 3.2.7 | Form of Production | 43 |
| 3.2.7.1 | Accepting Production of Copies | 45 |
| 3.2.7.2 | Bates Stamping | 46 |
| 3.2.7.3 | Format for Electronic Production of Documents to the SEC | 47 |
| 3.2.7.4 | Privilege Logs | 49 |
| 3.2.7.5 | Business Record Certifications | 49 |
| 3.2.7.6. | Confirming Completeness of Production | 50 |
| 3.2.8 | Forthwith Subpoenas in Investigations | 50 |
| 3.2.9 | Maintaining Investigative Files | 51 |
| 3.2.9.1 | Document Control | 52 |
| 3.2.9.2 | Document Imaging in Investigations | 54 |
| 3.2.9.3 | Electronic Files | 55 |
| 3.2.9.4 | Complying with Federal Rule of Civil Procedure 26(a) Requirements and Preserving Evidence in Anticipation of Litigation | 56 |
| 3.2.9.5 | Iron Mountain | 57 |
| 3.2.9.6 | Preserving Internet Evidence | 58 |
| 3.2.9.7 | Preserving Physical Evidence | 58 |
| 3.2.9.8 | Preserving Audio Recordings | 58 |
| 3.2.9.9 | Preserving Electronic Media | 59 |
| 3.3 | Witness Interviews and Testimony | 60 |
| 3.3.1 | Privileges and Privacy Acts | 60 |
| 3.3.2 | No Targets of Investigations | 60 |
| 3.3.3 | Voluntary Telephone Interviews | 61 |
| 3.3.3.1 | Privacy Act Warnings and Forms 1661 and 1662 | 61 |
| 3.3.3.2 | Documenting the Interview | 61 |
| 3.3.4 | Voluntary On-the-Record Testimony | 62 |
| 3.3.5 | Testimony Under Subpoena | 62 |
| 3.3.5.1 | Authority | 62 |
| 3.3.5.2. | Using a Background Questionnaire | 63 |
| 3.3.5.3 | Witness Right to Counsel | 64 |
| 3.3.5.4 | Going off the Record | 65 |
| 3.3.5.5 | Transcript Availability | 65 |

3.3.6      Special Cases ................................................................................................66
3.3.6.1    Contacting Employees of Issuers and Other Entities................................66
3.3.6.2    Contacting Witnesses Residing Overseas ..................................................66
3.3.7      Proffers and Proffer Agreements ...............................................................68
4.         Privileges and Protections ..........................................................................69
4.1        Assertion of Privileges ...............................................................................69
4.1.1      Attorney-Client Privilege ...........................................................................69
4.1.1.1    Multiple Representations ............................................................................72
4.1.2      Attorney Work Product Doctrine ...............................................................72
4.1.3      The Fifth Amendment Privilege Against Self-Incrimination .....................73
4.2        Inadvertent Production of Privileged or Non-Responsive Documents.........74
4.2.1      Purposeful Production Without Privilege Review ......................................75
4.3        Waiver of Privilege .....................................................................................75
4.3.1      Confidentiality Agreements ........................................................................78
4.4        Compliance with the Privacy Act of 1974 .................................................79
4.5        Compliance with the Right to Financial Privacy Act of 1978 ...................79
4.6        Compliance with the Electronic Communications Privacy Act of 1986 .......80
4.7        Handling Bank Secrecy Act Material ..........................................................81
5.         Working with Other Agencies and Organizations ......................................82
5.1        Disclosure of Information and Access Requests .........................................82
5.2        Cooperation with Criminal Authorities ......................................................84
5.2.1      Parallel Investigations ................................................................................84
5.2.2      Grand Jury Matters .....................................................................................86
5.3        Cooperation with the Food and Drug Administration .................................86
5.4        Cooperation with the Public Company Accounting Oversight Board.........88
5.5        Coordination and Consultation with Banking Agencies..............................88
5.6        Informal Referrals from Enforcement ........................................................89
5.6.1      Informal Referrals to Criminal Authorities.................................................91
5.6.2      Informal Referrals to Self-Regulatory Organizations.................................91
5.6.3      Informal Referrals to the Public Company Accounting Oversight Board....93
5.6.4      Informal Referrals to State Agencies .........................................................94
6.         Cooperation................................................................................................95
6.1        Analytical Frameworks ...............................................................................95
6.1.1      Framework for Evaluating Cooperation by Individuals .............................95
6.1.2      Framework for Evaluating Cooperation by Companies ..............................98
6.2        Cooperation Tools.......................................................................................99
6.2.1      Cooperation Agreements ............................................................................99
6.2.2      Deferred Prosecution Agreements ............................................................101
6.2.3      Non-Prosecution Agreements ..................................................................102
6.2.4      Immunity Requests ...................................................................................103
6.2.5      Oral Assurances ........................................................................................105
6.2.6      Termination Notices..................................................................................106
6.2.7      Settlement Recommendations...................................................................106
6.3        Publicizing the Benefits of Cooperation ..................................................107

# 1.   Introduction

## 1.1   Purpose and Scope

The Enforcement Manual ("Manual") is a reference for staff in the Division of Enforcement ("Division" or "Enforcement") of the U.S. Securities and Exchange Commission ("SEC" or "Commission") in the investigation of potential violations of the federal securities laws.  It contains various general policies and procedures and is intended to provide guidance only to the staff of the Division.  It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal.

## 1.2   Origin

The Manual was prepared under the general supervision of the Division of Enforcement's Office of Chief Counsel ("OCC").  This Manual expresses the views and policies of the Division of Enforcement and does not necessarily reflect the views of the Commission or any of the individual Commissioners.  OCC coordinates periodic revision of the Manual.  The Manual is intended to provide general guidance, but decisions about particular individual investigations, cases, and charges are made based on the specific facts and circumstances presented.

## 1.3   Public Disclosure

The Manual is United States Government property.  It is to be used in conjunction with official SEC duties.  This Manual is publicly available on line at www.sec.gov.

## 1.4   Fundamental Considerations

### 1.4.1   Mission Statement

The Division's mission is to protect investors and the markets by investigating potential violations of the federal securities laws and litigating the SEC's enforcement actions.  Values integral to that mission are:

- Integrity:  acting honestly, forthrightly, and impartially in every aspect of our work.

- Fairness:  assuring that everyone receives fair and respectful treatment, without regard to wealth, social standing, publicity, politics, or personal characteristics.

- Commitment:  recognizing the importance of and caring deeply about our mission of protecting investors and markets.

- Teamwork:  supporting and cooperating with colleagues and other Divisions and Offices at the SEC and fellow law enforcement professionals.

### 1.4.2    Updating Internal Systems

The Division uses several internal systems, including the Hub and the TCR System, to help manage case information.  The reliability and usefulness of each of the Division's internal systems is dependent upon timely and accurate entry of information by the staff.

### 1.4.3    Consultation

Although this Manual is intended to be a reference for the staff in the Division who are responsible for investigations, no set of procedures or policies can replace the need for active and ongoing consultation with colleagues, other Divisions and Offices at the SEC, and internal experts.  Investigations often require careful legal and technical analysis of complicated issues, culminating in difficult decisions that may affect market participants, individuals, and issuers.  Therefore, any time an issue arises for which colleagues or other Divisions or Offices may hold particular expertise, the staff should consider consultation.  In addition, staff should keep other Divisions and Offices informed regarding issues of interest that arise during investigations, and consult with interested Divisions and Offices before making recommendations for action to the Commission.

### 1.4.4    Ethics

Maintaining and fostering a culture of integrity and professionalism is an essential priority for the Division.  The Office of Government Ethics ("OGE") "Standards of Ethical Conduct for Employees of the Executive Branch" lays out the basic obligation of public service: "Each employee has a responsibility to the United States Government and its citizens to place loyalty to the Constitution, laws and ethical principles above private gain.  To ensure that every citizen can have complete confidence in the integrity of the Federal Government, each employee shall respect and adhere to the principles of ethical conduct . . . ."  5 C.F.R. Part 2635.101.  The SEC has a number of resources from which Division staff can obtain guidance on questions regarding ethical conduct.  Prominent among the resources available are the SEC ethics officials.  Staff should not hesitate to consult with the attorney staff in the SEC's Ethics Office on any question of ethics, and may consult the written Ethics Office bulletins and applicable statutes and regulations available from the Ethics Office.  Attorneys can also consult with the Commission's Professional Responsibility Counsel on compliance with applicable bar association rules.

Considerations:

- If staff is uncertain about an ethical issue, staff should seek guidance from an SEC ethics official *before* acting.

- Staff should remain alert to new rules and updates posted by the Ethics Office.

- Staff should be aware of ethical issues that may arise, including policies on:

    o   Confidentiality and the Protection of Nonpublic Information

    o   Attorney Responsibility (under the OGE Standards of Ethical Conduct for Employees of the Executive Branch, the Rules of Professional Responsibility of the state in

2

which the attorney is licensed to practice law, and the Rules of Professional Responsibility of the state in which the attorney is appearing on behalf of the Commission before a tribunal or otherwise engaging in such other behavior as may be considered the practice of law under that state bar's ethical and disciplinary rules).

- o   Securities Transactions by Employees

- o   Conflict of Interest (including Financial and Personal Interests)

- o   Recusals (including the one year recusal policy for Division staff)

- o   Referral of Professional Misconduct

- o   Publication Guidelines

- o   Gifts and Invitations

- o   Outside Employment and Activities

- o   Requirements under the Hatch Act

- o   Misuse of Public Office for Private Gain

- o   Pro Bono Activity

- o   Seeking and Negotiating Employment Outside the SEC

<u>Further Information</u>:

- *See also* OGE Standards of Ethical Conduct for Employees of the Executive Branch, 5 C.F.R. Part 2635, *et seq*.

  - OGE compilation of federal ethics laws available at: https://www.oge.gov/Web/OGE.nsf/0/3D3B3F1EE20BA918852585BA0063A59 2/$FILE/Compilation%20of%20Federal%20Ethics%20Laws%20(2021).pdf.

  - Criminal conflict of interest statutes including 18 U.S.C. §§ 203, 205, 207, 208, 209 and other related statutes available at: https://oge.gov/web/oge.nsf/0/F2ACE8845033A973852585B6005A180F/$FILE/Intro %20to%20Statutes.pdf.

2.      **A Guide to Matters Under Inquiry ("MUIs") and the Stages of Investigations**

2.1      **General Policies and Procedures**

2.1.1      **Ranking Investigations and Allocating Resources**

Introduction:

The Division of Enforcement handles a number of investigations that vary in their size, complexity, and programmatic importance. Devoting appropriate resources to investigations that are more significant will help ensure high quality investigations and maximize desired program outcomes. To make effective decisions regarding resources and priorities, on a quarterly basis the Director of the Division or his or her designees identify matters having potential programmatic significance, which are deemed "National Priority Matters."

Considerations When Ranking an Investigation:

In designating an investigation a National Priority Matter, the Director or his or her designees may consider one or more criteria, including but not limited to the following:

- Whether the matter presents an opportunity to send a particularly strong and effective message of deterrence, including with respect to markets, products and transactions that are newly developing, or that are long established but which by their nature present limited opportunities to detect wrongdoing and thus to deter misconduct.

- Whether the matter involves particularly egregious or extensive misconduct.

- Whether the matter involves potentially widespread and extensive harm to investors.

- Whether the matter involves misconduct by persons occupying positions of substantial authority or responsibility, or who owe fiduciary or other enhanced duties and obligations to a broad group of investors or others.

- Whether the matter involves potential wrongdoing as prohibited under newly-enacted legislation or regulatory rules.

- Whether the potential misconduct occurred in connection with products, markets, transactions or practices that pose particularly significant risks for investors or a systemically important sector of the market.

- Whether the matter involves a substantial number of potential victims and/or particularly vulnerable victims.

- Whether the matter involves products, markets, transactions or practices that the Division has identified as priority areas.

- Whether the matter provides an opportunity to pursue priority interests shared by other law enforcement agencies on a coordinated basis.

Although determining the overall significance of an investigation should take the above factors into consideration, the ranking of an investigation is a judgment to be made based on all of the facts and circumstances known to date.

<u>Considerations When Allocating Resources Among Investigations</u>:

Allocating resources among investigations requires that Associate Directors, Unit Chiefs, and Assistant Directors[1] exercise flexibility and creativity.  Associate and Assistant Directors and Unit Chiefs will normally assign staff to more than one investigation at a time, specifying the priorities of competing investigations so that staff members may plan their work.

Priorities among investigations may change rapidly depending on the stage of the investigation.  For example, two significant investigations may compete for resources, but staff may be assigned to review and analyze evidence in one investigation while waiting for documents to be produced in another investigation.  Therefore, when allocating resources among competing investigations, Associate and Assistant Directors and Unit Chiefs should take into account not only the significance of the investigation, but the phase of the investigation, considering, among other things:

- Whether there is an urgent need to file an enforcement action, such as an investigation into ongoing fraud or conduct that poses a threat of imminent harm to investors.

- The volume of evidence that the staff must collect and review, such as trading records, corporate documents, and e-mail correspondence.

- The level of analysis required for complex data and evidence, such as auditor workpapers, bluesheets, or financial data.

- The number and locations of witnesses and the scheduling of testimony.

- Travel requirements.

- Timelines for preparing internal memoranda, evaluation of the case by pertinent SEC Offices and Divisions, and the Commission's consideration of recommendations from Enforcement.

- Coordination with and timing considerations of other state and federal authorities.

For investigations designated as National Priority Matters, Associate and Assistant Directors and Unit Chiefs should consider assigning a minimum of two permanent staff attorneys to ensure that there is continuity on the investigation in the event of absences or staff transitions.

---

[1]    "Assistant Director" is used to refer both to Assistant Directors in the Home Office and Assistant Regional Directors in the Regional Offices.  Similarly, "Associate Director" is used to refer both to Associate Directors in the Home Office and Associate Regional Directors in the Regional Offices.  The term "Unit Chief" refers to the heads of the Division's five national specialized units: the Asset Management Unit, the Municipal Securities and Public Pension Unit, the Complex Financial Instruments Unit, the Foreign Corrupt Practices Unit and the Market Abuse Unit.

In addition, the assignment of at least two attorneys may contribute to a collaborative approach that improves the quality of the investigation and promotes accountability.  Additional attorneys may be assigned depending on the phase of the investigation.

### 2.1.2   Quarterly Reviews of Investigations and Status Updates

Introduction:

The Division has established a system of quarterly case reviews that are designed to facilitate communication among staff members and enhance the quality and effectiveness of our investigations.  Quarterly reviews are not intended to substitute for the ongoing case meetings and discussions between Associate Directors, Unit Chiefs, Assistant Directors and staff members that take place in the ordinary course of investigations.

Quarterly Case Review Meetings by Assistant Directors

Each Assistant Director will conduct a quarterly case review meeting with each staff member under the Assistant Director's supervision.  As a preliminary matter, unless a decision has been made not to prepare an investigative plan, Assistant Directors should instruct staff members under their supervision to prepare a written investigative plan for each active matter to assist with case tracking and planning.  The investigative plan should be shared with team members and periodically revised, and should provide a vehicle for productive conversations during quarterly reviews.

The purpose of the quarterly review is to ensure that investigations are proceeding on course, to revise investigative plans as appropriate and to provide an opportunity for dialogue on major open issues.  Prior to each quarterly review, the Assistant Director should confirm that staff members under his or her supervision have updated the Hub to reflect the current status of each investigation listed in inventory.  Suggested topics to cover during quarterly case review meetings include:

- Progress in meeting investigative goals and objectives for each investigation assigned to the staff member.

- Identification of major issues in open investigations that need further attention or discussion.

- Whether target deadlines are being met, and identification of causes for any delay and development of a plan to address that delay and move the investigation toward resolution.

- Allocation of staff member's time among assigned investigative matters, matters in litigation, and other responsibilities.

- Any other topics that the Assistant Director or staff member would like to raise for discussion.

<u>Quarterly Case Review Meetings Between Assistant Directors and Associate Directors or Unit Chiefs</u>

In addition, each Associate Director/Unit Chief should conduct a quarterly case review meeting with each Assistant Director under the Associate Director/Unit Chief's direct supervision. These reviews should focus on significant investigations assigned to the Assistant Director.  Suggested topics to cover during these meetings include investigation status, a discussion of any major issues presented, estimated completion time of investigation, and the need for any assistance or additional resources to advance investigations to completion.

<u>Quarterly Case Review Meetings Between Associate Directors/Unit Chiefs and Director/Regional Director</u>

Finally, the Director and/or Deputy Director should conduct a quarterly case review meeting with each Associate Director/Unit Chief.  Regional Directors also should conduct such meetings with Associate Regional Directors in their office.  Topics to be covered may include the status of significant cases, any major issues presented, coordination with other law enforcement agencies, estimated completion time of investigations, and the need for any assistance or resources to advance investigations to completion.

<u>Processes, Confirmation and Reporting</u>

For each quarterly review period, Associate Directors/Unit Chiefs should record the current status of each matter in inventory on a Quarterly Review Check Sheet form that will be generated based on Hub data.  Associate Directors/Unit Chiefs should return completed Quarterly Review Check Sheet forms before the end of each calendar-year quarter to a person designated by the Office of the Director.

<u>Ongoing Updates to Hub System</u>:

- The assigned staff should review the investigation and periodically update in Hub the status of an ongoing investigation.

- The Executive Summary in Hub should summarize what the matter is about, the activity to date, current status, and plans for the upcoming period.  For example, the staff might note that they are taking testimony, that they are conducting settlement negotiations, or that a potential defendant has been indicted.

- Any inaccurate or out-of-date information should be corrected.

## 2.2     Tips, Complaints, and Referrals

### 2.2.1   Complaints and Tips from the Public

#### 2.2.1.1   Processing Tips and Complaints from the Public

Public complaints and tips are primarily received through the SEC's online web form (*http://www.sec.gov/complaint.shtml*) or through contact with staff at any of the SEC's offices.

The vast majority of complaints and tips received by the Division are in electronic form and the Division encourages the public to communicate with it through the online web form.  Every complaint is carefully reviewed by Division staff for apparent reliability, detail and potential violations of the federal securities laws.  After review, the complaint or tip generally is processed according to the guidelines below.

Guidelines for Processing of Public Complaints and Tips:

- Complaints that appear to be serious and substantial are usually forwarded to staff in the Home Office or the appropriate regional office for more detailed review, and may result in the opening of a MUI.

- Complaints that relate to an existing MUI or investigation are generally forwarded to the staff assigned to the existing matter.

- Complaints that involve the specific expertise of another Division or Office within the SEC are typically forwarded to staff in that particular Division or Office for further analysis.

- Complaints that fall within the jurisdiction of another federal or state agency may be referred to the SEC contact at that agency.  Information that may reasonably identify a whistleblower is generally not shared with other agencies, and the staff should consult with the Office of the Whistleblower before sharing any complaint that may contain such information.

- Complaints that relate to the private financial affairs of an investor or a discrete investor group are usually forwarded to the Office of Investor Education and Advocacy ("OIEA").  Comments or questions about agency practice or the federal securities laws are also forwarded to OIEA.

Searching the TCR System

Staff members are required to search the TCR System periodically to ensure that they are aware of tips, complaints and referrals related to their MUIs and investigations.  Staff members should search the system as frequently as needed during an investigation and before making material decisions about a matter, including whether to open a MUI or investigation, or add a related party.  Prior to closing a matter, staff members should use their best judgment in considering whether to search the TCR system, taking into account whether the existence of a related TCR potentially could affect the decision to close the matter.  Staff members may request the assignment of any related tip, complaint or referral discovered as a result of their search.

Further information:

        Staff should address any questions regarding the handling of tips, complaints and referrals to their group's TCR point of contact.

### 2.2.1.2   Whistleblower Award Program

Section 922 of the Dodd-Frank Wall Street Reform and Consumer Protection Act provides that the Commission shall pay awards to eligible whistleblowers who voluntarily provide the SEC with original information that leads to a successful enforcement action yielding monetary sanctions of over $1 million. The award amount is required to be between 10 percent and 30 percent of the total monetary sanctions collected in the Commission's action or any related action such as in a criminal case.  The Dodd-Frank Act also expressly prohibits retaliation by employers against whistleblowers and provides them with a private cause of action in the event that they are discharged or discriminated against by their employers in violation of the Act.

Further information:

For further information on the SEC's whistleblower award program staff should consult the Office of the Whistleblower.

### 2.2.2   Other Referrals

### 2.2.2.1   Referrals Involving Bank Secrecy Act Material

Enacted in 1970 and amended by the USA PATRIOT Act, the Bank Secrecy Act ("BSA") is designed to prevent financial institutions, including broker-dealers, from being used as vehicles through which criminals hide the transfer of illegally obtained funds.  The recordkeeping and reporting requirements of the BSA create a paper trail for federal, state and local law enforcement to investigate the movement of funds in money laundering and other illegal schemes. The BSA is codified at 31 U.S.C. § 5311, *et seq*.  The regulations implementing the BSA are located at 31 C.F.R. Part X.

For the SEC, the primary mechanism for enforcing compliance by brokers and dealers with the requirements of the BSA is Section 17(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 17a-8.  Under Rule 17a-8, every registered broker or dealer must comply with the reporting, recordkeeping and record retention provisions of 31 C.F.R. Part X.  In the investment company context, the registered "funds" must comply with Rule 38a-1 of the Investment Company Act of 1940 ("Investment Company Act").  Rule 38a-1 states that funds must adopt and implement written policies and procedures reasonably designed to prevent violation of the "Federal Securities Laws," which, for purposes of that rule, include the BSA. Rule 38a-1(e)(1), 17 C.F.R. § 270.38a1(e)(1).

BSA information is highly confidential, and subject to the strict limitations set out by the Financial Crimes Enforcement Network ("FinCEN"), a bureau in the Department of the Treasury.  Enforcement staff has access to and reviews certain electronic reports filed under the BSA.

The Division's BSA Review Group handles, evaluates and assigns BSA information for consideration by offices within the Commission.  Enforcement staff may receive information from the BSA Review Group about Suspicious Activity Reports (SARs) or other BSA reports that either relate to open Enforcement matters or warrant further Enforcement consideration.

Handling Referrals Based on Bank Secrecy Act Information

Certain BSA information, particularly SARs and related materials that would reveal the existence of a SAR, is highly sensitive and must be handled with great care.  All SAR materials must be segregated and marked to indicate that they contain sensitive SAR information.

Further Information:

- Staff should contact the Division's BSA Review Group for specific information and guidance about how to handle BSA materials properly.

- *See also* Sections 3.2.9 and 4.7 of the Manual.

### 2.2.2.2   Referrals from the Public Company Accounting Oversight Board

The Basics of Receiving a Tip from the Public Company Accounting Oversight Board:

The enforcement staff of the Public Company Accounting Oversight Board ("PCAOB") may forward tips it receives to the staff of the Division.  This is normally done through the Enforcement Chief Accountant's office, which makes an initial assessment regarding whether future investigation is warranted.  If the staff receives a referral through the Enforcement Chief Accountant's office:

- Staff and their supervisors should notify the Enforcement Chief Accountant's office about obtaining documents and information regarding the tip.

- If appropriate, staff should then get approval to open a MUI on the matter (*see* Section 2.3.1 of the Manual regarding Opening a MUI).

Considerations:

Consider calling the enforcement staff of the PCAOB to discuss the tip with them.

Further Information:

Please refer any questions about receiving a tip from the PCAOB to Enforcement's Chief Accountant.

### 2.2.2.3   Referrals from State Securities Regulators

The Basics of Receiving Referrals from State Securities Regulators:

State securities regulators enforce state-wide securities laws known as "blue sky laws." The Division receives information and referrals from state securities regulators. Most of the state securities regulators have relationships with the SEC regional office which covers the territory in which they are located and the state regulators direct their referrals to that office. Pursuant to Rule 2 of the SEC's Rules Relating to Investigations, the staff at the Assistant Director level or

higher can discuss nonpublic information, including whether the staff has or will commence an investigation, with state regulatory agencies, and can show (but not release) documents.  17 C.F.R. § 203.2.  *See* Section 5.1 of the Manual.

Considerations:

- Staff should discuss the information received from state securities regulators promptly with their supervisors.

- Consider ongoing coordination with the state securities regulator, as appropriate.

Further Information:

If the opening of a MUI is appropriate, *see* Section 2.3.1 of the Manual.

### 2.2.2.4   Referrals from Congress

The Basics of Receiving a Referral from Congress:

The SEC frequently receives complaints and other information from members of Congress on behalf of the constituents whom they represent.  Most of these letters are directed to the Office of Legislative Affairs or the Office of the Chairman and then assigned to the appropriate SEC division or regional office. The Office of the Chairman tracks the responses to congressional letters. As with complaints and other information received from other sources, each complaint and tip received by the Division from Congress and congressional constituents is carefully reviewed by staff.

Considerations:

- Staff should not share nonpublic information, including whether the staff has or will commence an investigation, with the complainants or members of Congress.

- Staff should provide timely responses to congressional letters, using the appropriate format and meeting the deadlines required by the Office of Legislative Affairs or the Office of the Chairman.

- If staff believes the information obtained from the congressional letter warrants the opening of a MUI, staff should follow the instructions for opening a MUI in Section 2.3.1 of the Manual.

Further Information:

Staff should consult the Office of Legislative Affairs and the Office of the Chairman when drafting responses to congressional correspondence.

### 2.2.2.5   Referrals from Self-Regulatory Organizations

The Basics of Receiving Referrals from Self-Regulatory Organizations:

The Division's Office of Market Intelligence ("OMI") is the primary point of contact for trading-related referrals by domestic self-regulatory organizations ("SROs"). Each equity and option exchange is responsible for monitoring its own markets and enforcing exchange rules and regulations and the federal securities laws. If the SRO discovers potentially violative conduct and believes that it has jurisdiction, it will conduct its own investigation. If the SRO determines that it does not have jurisdiction, it will refer the potential violations to the SEC.

Considerations:

Consider ongoing consultation with SROs, as appropriate.

Further Information:

If the referring SRO continues with a parallel investigation, please refer to the policy on parallel investigations in Section 3.1.4 of the Manual.

## 2.3   Matters Under Inquiry and Investigations

### 2.3.1   Opening a MUI

Introduction:

The purpose of the procedures and policies for the review and approval of new MUIs is to help ensure efficient allocation of resources.

Opening a MUI requires that the staff assigned to a MUI (at the Assistant Director level and below) first conduct preliminary analyses to determine: (1) whether the facts underlying the MUI show that there is potential to address conduct that violates the federal securities laws; and (2) whether the assignment of a MUI to a particular office will be the best use of resources for the Division as a whole. If the preliminary analyses indicate that a MUI should be opened, then the staff should follow the procedures below for opening a MUI within the internal system and seeking approval of the assigned Associate Director or Regional Director. Prior to any other considerations, the staff should consult HUB or the Name Relationship Search Index ("NRSI") for related investigations. Staff should also search the TCR System for related TCRs. If a related investigation or TCR is found, the staff assigned to that investigation or TCR should be consulted.

Prior to opening a MUI, the assigned staff (Assistant Director and below) should determine whether the known facts show that an Enforcement investigation would have the potential to address conduct that violates the federal securities laws. The Division receives information from a variety of sources that may warrant the opening of a new MUI, including newspaper articles, complaints from the public, whistleblowers, and referrals from other agencies or SROs. Assigned staff are encouraged to use their discretion and judgment in making the preliminary determination of whether it is appropriate to open a MUI. The considerations

described below are suggestions only and should not discourage the opening of a MUI based on partial information.  MUIs are preliminary in nature and typically involve incomplete information.  The threshold determination for opening a new MUI is low because the purpose of a MUI is to gather additional facts to help evaluate whether an investigation would be an appropriate use of resources.

To determine whether to open a MUI, the staff attorney, in conjunction with the Assistant Director, should consider whether a sufficiently credible source or set of facts suggests that a MUI could lead to an enforcement action that would address a violation of the federal securities laws.  Basic considerations used when making this determination may include, but are not limited to:

- The statutes or rules potentially violated

- The egregiousness of the potential violation

- The potential magnitude of the violation

- The potential losses involved or harm to an investor or investors

- Whether the potentially harmed group is particularly vulnerable or at risk

- Whether the conduct is ongoing

- Whether the conduct can be investigated efficiently and within the statute of limitations period

- Whether other authorities, including federal or state agencies or regulators, might be better suited to investigate the conduct

As always, the presence or absence of US investors should not, in itself, control whether to open a MUI.  After determining that a MUI has the potential to address conduct that violates the federal securities laws, the assigned staff should evaluate whether from a resources standpoint, it is reasonable for their office to handle the investigation.  Basic considerations used when making this determination may include, but are not limited to:

- The location of the wrongful conduct

- The location of the potential wrongdoers

- The location of the issuer's, entity's, or SRO's headquarters

- The location of most witnesses or victims

- The resources and expertise of the office

If an office believes it has compelling reasons to handle a MUI or investigation for which another office may have a substantial nexus, it should consult with the other office to determine

which office should pursue the MUI or investigation.  Exceptions to the general guidance include:

- *Relation to a previous investigation*:  If a MUI is closely related to a previous investigation, a determination should be made whether the office that handled the previous investigation should handle the new MUI, regardless of whether that office has a nexus to the new MUI.

- *Insufficient resources to investigate*:  The Home Office may open a MUI when a regional office has a nexus if that regional office determines that it cannot devote sufficient resources to pursuing the MUI or if the regional office has other concerns that prevent it from pursuing the matter.

If it later becomes clear that the MUI or investigation is centered in a specific region, consideration should be given to referring the investigation to that regional office, depending on available staff in the regional office and the stage of the investigation.  In some situations, such as where witnesses are dispersed or where an office has special expertise, it may make sense for staff from more than one office to work together on a matter.

Procedures for Opening a MUI:

(1) To open a MUI:  Log into Hub and select "Open a MUI/INV."

(2) Fill out the required and other applicable fields to request the opening of a MUI, including a MUI Opening Narrative, primary classification, origin, etc.  Click Submit.

(3) The request will be routed to the designated Associate Director/Regional Director/Unit Chief for consideration.

(4) The Associate Director/Regional Director/Unit Chief should review the request promptly and, if satisfied that the MUI has the potential to address violative conduct, approve the opening of the MUI in Hub.

(5) Senior officers will receive a weekly report of all MUIs opened during the prior week.

Considerations:

As a general matter, MUIs should be closed or converted to an investigation within sixty days.  Staff should follow the policies and procedures for closing a MUI, or converting a MUI, in Section 2.3.2 of this Manual.

Further Information:

For more information on filling out MUI forms, please check for instructions on the internal tracking systems or contact a Case Management Specialist.

### 2.3.2   Opening an Investigation and Converting or Closing a MUI

<u>Introduction</u>:

Investigations are opened in two ways:  (1) the investigation is opened when a MUI is converted to an investigation, or (2) an investigation is opened independent of a MUI.  In both cases, the opening of an investigation requires that the assigned staff (at the Assistant Director level and below) conduct an evaluation of the facts to determine the investigation's potential to address conduct that violates the federal securities laws.  The analysis for whether to convert a MUI to an investigation, or open an investigation, differs from the analysis for whether to open a MUI.  While a MUI can be opened on the basis of very limited information, an investigation generally should be opened after the assigned staff has done some additional information-gathering and analysis.  It may also be appropriate at this time to revisit whether the office has a nexus to the MUI.

<u>Analysis:  Will the Investigation Have the Potential to Substantively and Effectively Address Violative Conduct?</u>

The assigned staff, in consultation with the assigned Associate Director, should evaluate the information gathered to determine whether it is an appropriate use of resources to open an investigation (either through conversion of the MUI or independent of a MUI).  While the threshold analysis for opening a MUI is relatively low, determining whether the MUI should be converted to an investigation or whether to open an investigation is typically a more detailed evaluation that is based on additional information.

The evaluation for whether to convert a MUI to an investigation (or open an investigation) turns on whether, and to what extent, the investigation has the potential to address violative conduct.  Threshold issues to consider when evaluating the facts include:

(1) Do the facts suggest a possible violation of the federal securities laws involving fraud or other serious misconduct?

(2) If yes, is an investment of resources by the staff merited by:

    (a) the magnitude or nature of the violation,

    (b) the size of the victim group,

    (c) the amount of potential or actual losses to investors,

    (d) for potential insider trading, the amount of profits or losses avoided, or

    (e) for potential financial reporting violations, materiality?

(3) If yes, is the conduct:

    (a) ongoing, or

(b) within the statute of limitations period?

In addition to the threshold issues identified above, one way to determine whether the conduct is serious is to consider the following supplemental factors:

- Is there a need for immediate action to protect investors?

- Does the conduct affect the fairness or liquidity of the U.S. securities markets?

- Does the case involve a recidivist?

- Has the SEC or Division designated the subject matter to be a priority?

- Does the case fulfill a programmatic goal of the SEC and the Division?

- Does the case involve a possibly widespread industry practice that should be addressed?

- Does the matter give the SEC an opportunity to be visible in a community that might not otherwise be familiar with the SEC or the protections afforded by the securities laws?

- Does the case present a good opportunity to cooperate with other civil and criminal agencies?

    As always, the presence or absence of US investors should not, in itself, control whether to open an investigation.

<u>Considerations</u>:

    Assigned staff is encouraged to revisit whether the office still has a sufficient nexus under the new facts learned during the period of the MUI.  If the facts have changed, assigned staff should consider whether it is appropriate to contact another office that may be better suited to handle the investigation.

<u>Procedures for Converting a MUI to an Investigation</u>:

    As a general matter, MUIs should be closed or converted to an investigation within sixty days as follows:

(1) The assigned staff, in consultation with an assigned senior officer as necessary, should evaluate the facts gathered during the MUI, using the factors listed above, to determine whether, and to what extent, the investigation will have the potential to address violative conduct.

(2) If it is determined that it is appropriate to proceed with the investigation, then the assigned staff should request approval to convert the MUI to an investigation in Hub by completing an Investigation Opening Narrative and clicking Convert.  The request will be routed to the designated Associate Director/Regional Director/Unit Chief for consideration.

16

(3) The Associate Director/Regional Director/Unit Chief should review the request promptly, and, if satisfied that an investigation has the potential to address violative conduct, approve the conversion of the MUI to an investigation in Hub.

(4) If the assigned staff, in consultation with an assigned Associate Director/Regional Director/Unit Chief, determines that the investigation does not have the potential to address violative conduct, or there is another reason that the investigation would be an inappropriate use of resources, then the assigned staff, in consultation with the assigned Associate Director/Regional Director/Unit Chief, should close the MUI.  To close the MUI, the assigned staff should enter a closing narrative in Hub explaining why the matter is being closed and request that their Case Management Specialist designate the MUI closed in Hub.

Procedures for Opening an Investigation, Independent of a MUI:

In certain circumstances, it is appropriate to open an investigation without having opened a MUI (for example, in a case in which emergency action is necessary).  To do so:

- Log into Hub and select "Open a MUI/INV."

- Fill out the required and other applicable fields to request opening of an Investigation, including an Opening Narrative, primary classification, origin, etc.  Click Submit.

- The request will be routed to the designated Associate Director/Regional Director/Unit Chief for consideration.

- The Associate Director/Regional Director/Unit Chief should review the request promptly, and, if satisfied that the investigation has the potential to address violative conduct, approve the opening of the investigation in Hub.

- Senior officers will receive a weekly report of all investigations opened independent of a MUI during the prior week.

### 2.3.3   Formal Orders of Investigation

The federal securities laws authorize the SEC, or any officer designated by the SEC, to issue subpoenas requiring a witness to provide documents and testimony under oath.  *See,* Section 19(c) of the Securities Act, Section 21(b) of the Securities Exchange Act, Section 209(b) of the Advisers Act, and Section 42(b) of the Investment Company Act.  The Commission designates members of the staff to act as officers of the Commission in an investigation by issuing a Formal Order of Investigation ("formal order").

### 2.3.4   Formal Order Process

Introduction**:**

Pursuant to delegated authority, the Director of the Division may, in his or her discretion, issue a formal order when a formal investigation is appropriate and necessary to determine

whether a violation of the federal securities laws may have occurred or may be occurring. The formal order serves two important functions. First, it generally describes the nature of the investigation that has been authorized, and second, it designates specific staff members to act as officers for the purposes of the investigation and empowers them to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of documents and other materials. Formal investigative proceedings are nonpublic unless otherwise ordered by the Commission.

Basics of the Formal Order Process:

The Commission has delegated authority to issue formal orders to the Director of the Division of Enforcement. To seek a formal order of investigation, staff should draft a memo for review by the Director, as well as a proposed order. If authorized by the Director, the formal order will be issued by the Office of the Secretary. A MUI should be converted to an investigation in HUB before issuance of a formal order.

### 2.3.4.1   Supplementing a Formal Order

Once a formal order has been issued, the Division has delegated authority to issue supplemental orders naming additional staff members as officers empowered to act pursuant to the order or removing previously named staff. 17 C.F.R. § 200.30-4(a)(1) and (4).

### 2.3.4.2   Requests for a Copy of the Formal Order

Basics:

Rule 7(a) of the SEC's Rules Relating to Investigations provides that a person who is compelled or requested to furnish documentary evidence or testimony at a formal investigative proceeding shall, upon request, be shown the Commission's formal order. However, a copy of the formal order shall not be furnished to that person for their retention without the express approval of a Division official at the level of Assistant Director or higher. 17 C.F.R. § 203.7(a).

Procedures for Responding to a Request for a Copy of the Formal Order:

When a member of the staff receives a request for a copy of the formal order, staff should keep in mind the following procedures when determining whether the request should be granted:

- The request must be made by a person or counsel for a person who has been asked to furnish documents or testimony in the formal investigation for which the person is requesting a copy of the formal order.

- The request for a copy of the formal order must be in writing. A copy of the formal order may not be provided on the basis of an oral request. Therefore, staff should advise the person to submit their request in writing to the Assistant Director assigned to the investigation.

- The written request for the formal order must include representations to show that approval of the request is "consistent both with the protection of privacy of persons

involved in the investigation and with the unimpeded conduct of the investigation." 17 C.F.R. § 203.7(a).

- Only an Assistant Director or higher level Division official may approve a written request for a copy of a formal order. There may be circumstances that warrant denial of the request, such as when there is evidence that the requester intends to use the formal order for purposes outside the representation in the matter, or does not intend to keep the formal order confidential.

- Keep in mind that even if a request for a copy of the formal order is denied, a requesting person who is compelled or requested to furnish documentary evidence or testimony at a formal investigative proceeding is still entitled to review the formal order without retaining a copy. 17 C.F.R. § 203.7.

### 2.4    The Wells Process

The Commission's Wells Rule

Rule 5(c) of the SEC's Rules on Informal and Other Procedures states that "[p]ersons who become involved in . . . investigations may . . . submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation." The rule further provides that, "[u]pon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding." 17 C.F.R. § 202.5(c).

The practice reflected in Rule 5(c) evolved from recommendations made by an advisory committee chaired by John Wells. The objective of the practice is, as the Commission stated in the original Wells Release, for the Commission "not only to be informed of the findings made by its staff but also, where practicable and appropriate, to have before it the position of persons under investigation at the time it is asked to consider enforcement action." *See* Securities Act of 1933 Release No. 5310, "Procedures Relating to the Commencement of Enforcement Proceedings and Termination of Staff Investigations." As the Commission stated in the Release, "[t]he Commission, however, is also conscious of its responsibility to protect the public interest. It cannot place itself in a position where, as a result of the establishment of formal procedural requirements, it would lose its ability to respond to violative activities in a timely fashion." The Commission made clear in the Release that the practice is "informal" and involves the exercise of discretion by the staff.

The Wells Notice:

A Wells notice is a communication from the staff to a person involved in an investigation that: (1) informs the person the staff has made a preliminary determination to recommend that the Commission file an action or institute a proceeding against them; (2) identifies the securities law violations that the staff has preliminarily determined to include in the recommendation; and

(3) provides notice that the person may make a submission to the Division and the Commission concerning the proposed recommendation.

<u>Providing a Wells Notice</u>:

The staff is required to obtain an Associate Director or Regional Director's approval before issuing a Wells notice or determining to recommend an enforcement action without issuing a Wells notice.

As the Commission explained in the Wells Release, it has a "responsibility to protect the public interest" and "often is called upon to act under circumstances which require immediate action if the interests of investors or the public interest are to be protected." To determine whether or when to provide a Wells notice, staff should consider all of the relevant facts and circumstances, including but not limited to:

- Whether the investigation is substantially complete as to the recipient of the Wells notice.

- Whether immediate enforcement action is necessary for the protection of investors. If prompt enforcement action is necessary to protect investors, providing a Wells notice and waiting for a submission may not be practical (for example, a recommendation to file an emergency action requesting a temporary restraining order and asset freeze to stop an ongoing fraud).

- Whether providing a Wells notice may alert potential defendants to a possible asset freeze or otherwise put at risk investor funds that the recommendation is intended to protect.

- Whether there is a parallel criminal investigation that may be adversely affected by providing a Wells notice.

<u>The Content of the Wells Notice</u>:

A Wells notice should be in writing when possible. If a Wells notice is given orally, it should be followed promptly by a written confirmation. If the staff intends to provide a written Wells notice, the staff may give advance notice of the intention to the recipient or his or her counsel by telephone. As in a Wells notice, the substance of a Wells call should follow the general guidance below, but the staff also may refer to specific evidence regarding the facts and circumstances that form the basis for the staff's recommendation.

The written Wells notice or written confirmation of an oral Wells notice should:

- Identify the specific charges the staff has made a preliminary determination to recommend to the Commission.

- Accord the recipient of the Wells notice the opportunity to provide a voluntary statement, in writing or on videotape, setting forth the recipient's position with respect to the proposed recommendation, which in the recipient's discretion may include arguments why the Commission should not bring an action or why proposed charges or remedies

should not be pursued, or bring any relevant facts to the Commission's attention in connection with its consideration of the matter.

- Set reasonable limitations on the length of any submission made by the recipient (typically, written submissions should be limited to 40 pages, not including exhibits, and video submissions should not exceed 12 minutes), as well as the time period allowed for the recipient to submit a voluntary statement in response to the Wells notice.

- Advise the recipient that any submission should be addressed to the appropriate Assistant Director.

- Inform the recipient that any Wells submission may be used by the Commission in any action or proceeding that it brings and may be discoverable by third parties in accordance with applicable law.

- Include a link to a copy of the Wells Release, Securities Act Release No. 5310, which is posted on the Commission's website at:  http://www.sec.gov/divisions/enforce/wells-release.pdf.

- Include a link to (or attach a copy of) the SEC's Form 1662 ("Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena"), which is posted on the Commission's website at:  http://www.sec.gov/about/forms/sec1662.pdf.

<u>Acceptance of a Wells Submission</u>:

As discussed above, a Wells notice informs a recipient that they may make a voluntary submission to the Commission regarding the Division's proposed recommendation.  However, there are limited circumstances in which the staff may reject a Wells submission:

- If the Wells submission exceeds the limitations on length specified in the Wells notice, the staff may reject the submission.

- If the Wells submission is submitted after the deadline, including any extensions of time granted by the staff, the staff may reject the submission.  Requests for extensions of time should be made in writing, clearly state the basis for the request, and be directed to the appropriate Assistant Director.  The staff may determine not to grant a Wells notice recipient's request for an extension of time.

- The staff may reject a Wells submission if the person making the submission seeks to limit (including by reserving the right to limit) either its admissibility under Federal Rule of Evidence 408 or the Commission's ability to use the submission for the purposes described in Form 1662.

- The staff may reject a Wells submission if the submission contains or discusses a settlement offer.  Offers of settlement should not be combined with, or included in, Wells submissions, and instead may be made in a separate document.

Wells submissions that are accepted by the staff will be provided to the Commission along with any recommendation from the staff for an enforcement action against the recipient of the Wells notice. Wells submissions that are rejected on one of the bases above generally will not be provided to the Commission

The Post-Notice Wells Process:

- Recipients of Wells notices occasionally request to review portions of the staff's investigative file. On a case-by-case basis, the staff has discretion to allow the recipient of the notice to review portions of the investigative file that are not privileged. In considering a request for access to portions of the staff's investigative file, the staff should keep in mind, among other things:

  - Whether access to portions of the file would be a productive way for both the staff and the recipient of the Wells notice to assess the strength of the evidence that forms the basis for the staff's proposed recommendations.

  - Whether the prospective defendant or respondent failed to cooperate, invoked his or her Fifth Amendment rights, or otherwise refused to provide information during the investigation.

  - The stage of the investigation with regard to other persons or witnesses, including whether certain witnesses have yet to provide testimony, and whether there is a parallel criminal or regulatory investigation or proceeding that may be adversely affected by granting access to the staff's file.

- Recipients of Wells notices may request meetings with the staff to discuss the substance of the staff's proposed recommendation to the Commission. Assigned staff should consult with supervisors if a request is made. A Wells recipient generally will not be accorded more than one post-Wells notice meeting.

- The staff may engage in appropriate settlement discussions with the recipient of the Wells notice. However, the staff may choose to inform the recipient that the staff will not engage in ongoing settlement discussions that would delay timely consideration of the matter by the Commission.

Further Information:

Staff should consult with OCC concerning any questions relating to the Wells process.

## 2.5    Enforcement Recommendations

### 2.5.1    The Action Memo Process

The filing or institution of any enforcement action must be authorized by the Commission. In addition, while the Commission has delegated certain authority to the Division Director or the Secretary, most settlements of previously authorized enforcement actions, as well as certain other aspects of civil litigation, among other things, require Commission authorization.

Staff should consult with senior managers, OCC, and, if appropriate, OGC, before taking action to ensure that proper authorization is requested.

Commission authorization is sought by submitting an action memorandum to the Commission that sets forth a Division recommendation and provides a comprehensive explanation of the recommendation's factual and legal foundation.

Prior to submitting an action memorandum to the Commission, staff should solicit review and comment from OCC, OGC, and other interested Divisions or Offices.

### 2.5.2   Commission Authorization

After the Division presents a recommendation to the Commission, the Commission will consider the recommendation and vote on whether to approve or reject the recommendation. The Commission's consideration of the recommendation takes place in a closed Commission meeting, by seriatim consideration, or by Duty Officer consideration.

Before any recommendation is considered by the Commission, the staff must identify the counsel representing the subjects of the proposed enforcement action, so that the Commissioners may determine whether to recuse themselves from considering the matter.

### 2.5.2.1   Closed Meetings

The Commission considers and votes on some of the Division's recommendations in "closed meetings," which are meetings that the Commission, pursuant to exemptions in the Government in the Sunshine Act ("Sunshine Act"), 5 U.S.C. § 552b, has voted to close to the public.  For each matter which will be considered in a closed meeting, the staff prepares a Sunshine Act certification, to be signed by the General Counsel of the Commission, certifying that the matter falls within one of the exemptions provided by the Sunshine Act and the Commission's Sunshine Act regulations, 17 C.F.R. § 200.402(a).  Generally, recommendations that are eligible to be considered at a closed meeting include recommendations to institute, modify, or settle an enforcement action or to consider an offer of settlement or other proposed disposition of an enforcement action.

At a closed meeting, Division staff orally presents a recommendation to the Commission and answers any questions before the Commission votes on the recommendation.  Except in unusual circumstances, the Commissioners receive a copy of the Division's written recommendation prior to the closed meeting.  Staff should be prepared to answer the questions that are likely to be asked by the Commissioners and should contact the Commissioners' offices prior to the meeting to learn of any particular concerns or questions about the recommendation.

### 2.5.2.2   Seriatim Consideration

If the Chairman or the Duty Officer (*see* Section 2.5.2.3 of the Manual), determines that consideration of a recommendation at a closed meeting is "unnecessary in light of the nature of the matter, impracticable, or contrary to the requirements of agency business," but that the recommendation should be the subject of a vote by the entire Commission, the recommendation

may be acted upon separately by each Commissioner in turn – in other words, by seriatim consideration.  17 C.F.R. § 200.42.

Seriatim consideration is often used when the date of a closed meeting is too distant to meet the timing needs of a particular recommendation, or the matter is routine.  Matters that urgently require action before the next available closed meeting, but raise issues sufficient to warrant consideration by the entire Commission, may circulate on an expedited basis for rapid seriatim consideration.  Staff should consult OCC and OS for the specific procedures required for submitting seriatim items.

Each participating Commissioner will report his or her vote on the recommendation to the Secretary of the Commission, using a seriatim coversheet prepared by the staff and approved by the Secretary.  Even if a majority of the Commission has voted in favor of a seriatim recommendation, the matter is not authorized until each Commissioner has either recorded a vote or indicated that he or she is not participating.  Any member of the Commission may pull a recommendation from seriatim circulation and instead place it on a closed meeting agenda for further consideration.

### 2.5.2.3   Duty Officer Consideration

The Commission delegates one of its members (other than the Chairman) as the Duty Officer on a rotating basis, empowering the Duty Officer to act, in his or her discretion, on behalf of the entire Commission when urgent action is required before a recommendation can be considered at a closed meeting or by seriatim.  17 C.F.R. § 200.43.  All decisions of the Duty Officer subsequently circulate among the other Commissioners for affirmation.

Generally, requests for Duty Officer consideration should result from an unavoidable and pressing external need.  Typically, Duty Officer consideration is sought when the staff has recently become aware of imminent potential harm to investors, and the Division intends to recommend an emergency enforcement action, such as an immediate trading suspension or a civil action for a temporary restraining order.  Duty Officer consideration should, as a general matter, not be sought where an enforcement recommendation presents close legal issues regarding jurisdiction or liability.  Additionally, Duty Officer consideration is generally not an appropriate means to obtain approval of a proposed settlement.  Staff should consult with OCC and OS to determine if Duty Officer consideration might be appropriate.

### 2.5.3   Delegations of Commission Authority

The Commission has delegated certain limited aspects of its authority to the various Divisions and Offices, including delegations to the Director of the Division of Enforcement to issue formal orders of investigation, submit witness immunity order requests and file subpoena enforcement actions, and to the Secretary of the Commission to issue orders instituting or settling certain administrative proceedings.  17 C.F.R. § 200.30, *et seq.*

<u>Formal Orders of Investigation</u>:

To expedite the investigative process, the Commission has delegated authority to the Director of the Division to issue formal orders.  17 C.F.R. § 200.30-4(a)(13).

<u>Witness Immunity Order Requests</u>:

To improve the effectiveness and efficiency of its investigations, the Commission has delegated authority to the Director of the Division to submit witness immunity order requests to the Department of Justice with respect to individuals who have provided or have the potential to provide substantial assistance in the Commission's investigations and related enforcement actions. 17 C.F.R. § 200.30-4(a)(14). This authority was sub-delegated to senior officers in the Division.

<u>Subpoena Enforcement Actions</u>:

If a person or entity refuses to comply with a subpoena issued by the staff pursuant to a formal order of investigation, the Commission may file a subpoena enforcement action in federal district court, seeking an order compelling compliance. *See* Section 21(c) of the Exchange Act. The Commission has delegated the authority to file such an action to the Director of the Division. 17 C.F.R. § 200.30-4(10). This authority was sub-delegated to senior officers in the Division.

<u>Follow-on Administrative Proceedings</u>:

The Commission has delegated authority to the Secretary of the Commission to issue certain orders in administrative proceedings. 17 C.F.R. § 200.30-7. Most significantly, the Secretary may issue orders instituting previously authorized "follow-on" administrative proceedings to determine whether barring a person from association with a broker-dealer or investment adviser is appropriate based on the entry of a civil injunction or criminal conviction against that person. The Secretary may also, pursuant to delegated authority, enter an order imposing an unqualified bar (*i.e.*, a bar that does not provide a right to reapply after a specified period) in such cases, if the respondent consents. 17 C.F.R. § 200.30-7(12).

In practical terms, this means that it is not necessary to prepare an action memorandum recommending that the Commission institute an order to impose follow-on administrative relief under Section 15(b) of the Exchange Act or Section 203(f) of the Investment Advisers Act of 1940 ("Advisers Act") if: (1) the Commission previously authorized a "follow-on" administrative proceeding as part of a prior recommendation, and (2) the injunction or criminal conviction has been entered. Further, the Commission has delegated authority to the Secretary to institute a settled order if the person consents to the full administrative relief authorized by the Commission (an unqualified bar). Because it is critically important to determine that the conditions above have been met and that the order to be issued falls clearly within the Secretary's delegated authority, staff should consult with OCC and OS before submitting an order for issuance pursuant to delegated authority.

### 2.6      Closing an Investigation

### 2.6.1      Policies and Procedures

<u>Basics</u>:

Properly closing an investigation is an important part of managing investigations and making the best use of our resources.  Closing investigations where there has been enforcement action is relatively easy; the staff simply makes sure that it has followed through on every step authorized by the Commission.  Closing investigations where no enforcement action will be recommended can be a harder judgment call.  The staff is encouraged to close an investigation as soon as it becomes apparent that no enforcement action will be recommended.  Staff is encouraged to make this decision when appropriate so that resources can be redirected to investigations that will be more productive.

Generally, factors that should be considered in deciding whether to close an investigation include:

- the seriousness of the conduct and potential violations

- the staff resources available to pursue the investigation

- the sufficiency and strength of the evidence

- the extent of potential investor harm if an action is not commenced

- the age of the conduct underlying the potential violations

As always, the presence or absence of U.S. investors should not, in itself, control whether to close an investigation.

<u>Considerations</u>:

Once a decision has been made to close an investigation, there are several steps that the staff must take.  These steps create the official record and ensure that documents obtained during the investigation are handled properly:

- Check with the Freedom of Information Act ("FOIA") Office.  If the FOIA office determines that records should be retained, they will advise the staff on the proper disposition of the case files.  For example, the staff may be asked to include records subject to a pending FOIA request in the files going to storage even though the records would otherwise not have to be retained after the case is closed.

- Determine whether any current litigation hold notices apply to the case files.

- If the FOIA office does not indicate a need for retention and there are no applicable litigation hold notices, the staff may prepare the files for disposition.

26

- Prepare a closing recommendation.  The closing recommendation is a short memorandum and serves as the basic historical record summarizing what the staff did in the investigation and action.

- Prepare the files for disposition. Remember that electronic records obtained or generated during the investigation will also require proper disposition.

- Prepare and send appropriate termination notices.

An investigation that has resulted in an enforcement action cannot be closed until all enforcement actions in the case are complete.  This requires (1) a final judgment or Commission order and (2) all ordered monetary relief is accounted for, meaning:

- all disgorgement and civil penalties have been paid in full or the Commission has authorized the staff to terminate collection of  any unpaid amounts;

- all funds collected have either been distributed to investors or paid into the Treasury; and

- all money has been properly recorded.

Further, an investigation cannot be closed if any debts of a defendant or respondent are the subject of collection activity by the Commission or on the Commission's behalf (*e.g.*, by the Department of the Treasury's Financial Management Service or the Department of Justice), or if any funds are being held pending final distribution.

<u>Further Information</u>:

Staff should contact OCC with questions about closing a case.

### 2.6.2   Termination Notices

<u>Basics</u>:

The Division's policy is to notify individuals and entities at the earliest opportunity when the staff has determined not to recommend an enforcement action against them to the Commission.  This notification takes the form of a termination letter.  The staff may send termination letters to individuals or entities before the investigation is closed and before a determination has been made as to every potential defendant or respondent. Termination letters should be sent regardless of whether the investigation was pursuant to a formal order.

A termination letter must be sent to anyone who:

- is identified in the caption of the formal order;

- submitted or was solicited to submit a Wells submission;

- asks for such a notice (assuming the staff has decided that no enforcement recommendation will be recommended against that person or entity); or

- to the staff's knowledge, reasonably believes that the staff was considering recommending an enforcement action against them.

The Director, Deputy Director, or appropriate Unit Chief, Deputy Unit Chief (if a Senior Officer), Associate Director, or Associate Regional Director must approve any decision not to send a termination letter to persons or entities that fall into any of the above categories. The termination letter should be signed by staff at the Assistant Director level or above and a copy of the Commission's Wells Release (Securities Act Release No. 5310), which authorized termination notices, should be referenced in each termination letter. As noted in the Commission's Wells Release, the provision of a termination notice "must in no way be construed as indicating that the party has been exonerated or that no action may ultimately result from the staff's investigation of that particular matter. All that such a communication means is that the staff has completed its investigation and that at that time no enforcement action has been recommended to the Commission."

<u>Considerations</u>:

Staff should also consider sending termination letters to companies who provided information concerning their securities in connection with insider trading investigations.

**3.     A Guide to Investigative Practices**

**3.1     Special Considerations**

**3.1.1     External Communications Between Senior Enforcement Officials and Persons Outside the SEC Who Are Involved in Investigations**

<u>Introduction</u>:

The purpose of these best practices is to ensure that external communications between senior enforcement officials (at the Associate Director level and above) and persons outside the SEC are handled with the appropriate care, sensitivity and transparency. These best practices concern only external communications that are: (1) material; (2) relate to ongoing, active investigations; and (3) occur between senior enforcement officials and persons outside the SEC who are involved with investigations (other than persons at agencies or organizations with which the SEC cooperates).

Staff at all levels of the Division of Enforcement play an essential role in seeking and receiving the information required to discharge their investigative and decision-making responsibilities, and it is important that outside persons involved in investigations feel that they may contact the staff in the Division without hesitation, including senior officials. In fact, a senior official may obtain particularly valuable information through material external communications. To present one consistent Division position to persons involved in investigations, and continue to maintain the Division's impartiality and history of handling investigations with integrity, senior officials should take into consideration the best practices described below. Underlying these best practices is the recognition of the importance of the investigative team's responsibility to gather evidence, raise questions, and manage relationships with outside persons during an investigation. The best practices reflect the practical realities of

the teamwork required by all staff involved in an investigation (from staff attorney to the most senior official), while taking into account the flexibility necessary to engage in communications in situations and under circumstances that may present unforeseen variables.

Best Practices:

These best practices should be applied to all situations in which senior officials engage in material communications with persons outside the SEC relating to ongoing, active investigations:

- Generally, senior officials are encouraged to include other staff members on the investigative team when engaging in material external communications, and should try to avoid initiating communications without the knowledge or participation of at least one of the other staff members.  However, "participation" could include either having another staff member present during the communications, or having a staff member involved in preparing the senior official for the communications.  For example, if the investigative team believes that a communication could be more productive as a one-on-one communication between the senior official and the outside person, members of the team could participate by discussing the case with the senior official prior to the meeting, or assisting in preparing talking points for the senior official to use during the communication.

- Although senior officials are encouraged to include other staff members on the investigative team when engaging in a communication, there are circumstances in which none of the staff members are available to participate when an outside person initiates a communication.  Under those circumstances, the senior official may need to balance several factors to determine whether to entertain the communication without the participation of other staff members, including:

    o  Whether the senior official is familiar with the context and facts that are the subject of the communication;

    o  Whether the investigative team is aware that the outside person planned to initiate a communication with the senior official;

    o  Whether the outside person had previously discussed the matter with others on the investigative team (and how the team responded);

    o  Whether the senior official was briefed by the investigative team regarding the communication; and

    o  Whether the communication involves a matter of urgency, a routine issue, or a more complex situation in which the outside person is seeking an agreement or representation regarding a material aspect of the investigation.

- If a senior official entertains a communication without the participation or presence of other staff members, then the senior official should indicate to the outside person that the senior official will be informing other members of the investigative team of the fact of

the communication, along with any pertinent details, for their information and consideration, and should consider:

- o Indicating to the outside person that the fact that the senior official is entertaining the communication does not imply acquiescence or agreement; and

- o Indicating to the outside person that the senior official is not in a position to reach an agreement or make a representation without reviewing the circumstances with other investigative team members (however, the senior official need not avoid reaching an agreement or making representations if any of the staff prepared the senior official for the communication in anticipation that agreements or representations might be discussed).

- Within a reasonable amount of time, the senior official should document <u>material</u> external communications related to the investigation involving, but not limited to, potential settlements, strength of the evidence, and charging decisions.  The official may take contemporaneous notes of the communication, send an e-mail to any of the assigned staff, prepare a memo to the file, or orally report details to any of the assigned staff (who may then take notes or prepare a memo to the file).

- The senior official should at all times keep in mind the need to preserve the impartiality of the Division in conducting its fact-finding and information-gathering functions.  Propriety, fairness, and objectivity in investigations are of the utmost importance, and the investigative team cannot carry out its responsibilities appropriately unless these principles are strictly maintained.  The senior official should be particularly sensitive that an external communication may appear to be or has the potential to be an attempt to supersede the investigative team's judgment and experience.

<u>Considerations</u>:

- There may be circumstances in which a senior official and an outside person find it necessary to discuss the professionalism of assigned staff or allegations regarding questionable conduct by the assigned staff.  Even if the communication could be considered a material communication about the investigation itself, the senior official may choose not to inform any of the assigned staff about the communication.  The senior official, however, should be sensitive to the possibility that allegations about questionable conduct may serve as a pretext to complain about minor events or annoyances during the investigative process, to gain an advantage in the investigation or to undermine the progress of the investigation.  Depending on the apparent motivation of the communication, the senior official should consider whether to inform the staff of the communication, following the best practices above.

- If any of the investigative team members learn that a person outside the SEC might contact a senior official, the staff member should alert the senior official as soon as possible and provide all pertinent details concerning the anticipated subject matter of the communication.

- In addition to the best practices above and the typical considerations that apply when an SEC employee communicates with someone outside the agency involved in an enforcement investigation, senior officials and other investigative team members should recognize the discretion and judgment inherent in balancing all the circumstances of a potential communication with outside persons, including:

- the time, place, and context of the communication;

- the availability and accessibility of any of the assigned staff to participate in the communication;

- the expected or anticipated subject matter of the communication ;

- the priority, phase and sensitivity of the investigation, including the status of the Wells process or any pending settlement discussions;

- the complexity and circumstances of the suspected securities law violations at issue;

- the need to further the Commission's interests in the investigation and in the protection of investors;

- the level of cooperation of witnesses and their counsel; and

- the existence of criminal interest.

Further Information:

    For questions concerning the applicability of these best practices, staff should contact OCC.

### 3.1.2   Statutes of Limitations and Tolling Agreements

Basics:

- 28 U.S.C. § 2462 states that "[e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon."  The statute of limitations is an affirmative defense that is waived if it is not raised in timely fashion.  *See Canady v. SEC*, 230 F.3d 362, 363 (D.C. Cir. 2000).

- If the assigned staff investigating potential violations of the federal securities laws believes that any of the relevant conduct arguably may be outside the five-year limitations period before the SEC would be able to file or institute an enforcement action, the staff may ask the potential defendant or respondent to sign a "tolling agreement." Such requests are occasionally made in the course of settlement negotiations to allow time for sharing of information in furtherance of reaching a settlement.  By signing a

tolling agreement, the potential defendant or respondent agrees not to assert a statute of limitations defense in the enforcement action for a specified time period.  A tolling agreement must be signed by staff at the Assistant Director level or above.  Tolling agreements may not be entered without the approval of the Director of Enforcement.

Considerations:

- Consider the statute of limitations issue early in the investigation.

- Take into account the amount of time needed for third parties to complete Wells submissions, for staff to prepare recommendations to the Commission, for interested Divisions and Offices at the SEC to review recommendations, and for the Commission to consider the recommendation.

- Staff should take care not to delay or slow the pace of an investigation based on the potential availability or existence of a tolling agreement.  Swift investigations generally are most effective and enhance the public interest.

- 28 U.S.C. § 2462 sets forth a five year statute of limitations, but certain conduct or circumstances may have tolled the statute, depending on the common law developed in a particular jurisdiction.  In such situations, staff should contact a member of the Division's trial unit or OCC for further information.

- Keep in mind that certain claims are not subject to the five-year statute of limitations under Section 2462, including claims for injunctive relief.

### 3.1.3   Investigations During Ongoing SEC Litigation

Basics:

The Division may continue to investigate and issue investigative subpoenas pursuant to a formal order of investigation while simultaneously litigating a related civil action if there is an independent, good-faith basis for the continued investigation.  An independent, good-faith basis may include the possible involvement of additional persons or entities in the violations alleged in the complaint, or additional potential violations by one or more of the defendants in the litigation.

Considerations:

While the SEC has broad investigative authority, Division staff should exercise judgment when deciding whether to continue investigating while litigating a related case.  The staff should consider the following:

- In assessing whether to issue subpoenas, the staff should consider all relevant facts and circumstances, including the degree of factual and legal overlap, the prior course of the litigation and investigation, and the likely views of counsel and the judge assigned to the case.

- If the staff obtains testimony or documents in the investigation that are properly discoverable in the litigation, the SEC must produce them in the litigation in accordance with the Federal Rules of Civil Procedure.

- Although there is some case law to support the practice, staff should not use investigative subpoenas solely to conduct discovery with respect to claims alleged in the pending complaint. A court might conclude that the use of investigative subpoenas solely to conduct discovery is a misuse of the SEC's investigative powers and circumvents the court's authority and the limits on discovery in the Federal Rules of Civil Procedure.

- In addition, there are special considerations and restrictions on continuing an investigation following the institution of an administrative proceeding ("AP"). In the AP context, continuing investigations are subject to Rule 230(g) of the SEC's Rules of Practice, which requires the Division to inform the hearing officer and each party promptly if the staff issues any new subpoenas under the same formal order. The rule also directs the hearing officer "to order such steps as [are] necessary and appropriate" to assure that the subpoenas are not issued "for the purpose of obtaining evidence relevant to the proceedings." The hearing officer must ensure that any relevant documents obtained through the use of such subpoenas are produced to each respondent "on a timely basis." 17 C.F.R. § 201.230(g).

<u>Further Information</u>:

Before continuing an investigation while there is related pending litigation, or if the staff is going to recommend simultaneously that the Commission file a civil action and issue a formal order of investigation, the staff should discuss the issue with trial counsel and should revisit the issue whenever contemplating the service of investigative subpoenas that could be seen as relating to pending litigation.

### 3.1.4   Parallel Investigations and the State Actor Doctrine

<u>Basics of the State Actor Doctrine and When It Applies</u>:

The State Actor Doctrine may be implicated when action by a private entity (*e.g*., an SRO) is fairly attributable to a government entity. The action may be fairly attributable if there is a sufficiently close nexus between the state, or government entity, and the challenged action of a private entity.

The State Actor Doctrine may apply to a wide variety of private actions in which government is in some way concerned. It has been analyzed under a two-prong test, and satisfying either prong can result in a finding of state action:

- Under the "joint action" prong, private entities may engage in state action when they are willful participants in joint action with state officials.

- Under the "government compulsion" prong, coercive influence or significant encouragement by the state can convert private conduct into state action.

After a witness asserts the Fifth Amendment privilege during investigative testimony and declines to respond to potentially incriminating questions, the issue may arise if the same witness is then summoned to testify about the same or related conduct by a private entity.  When providing testimony to a private entity, asserting the Fifth Amendment may result in consequences other than the ability to draw an adverse inference at trial.

Basic Guidelines:

When staff is aware that a private entity is investigating conduct that is the same or related to the conduct involved in the staff's investigation, staff should keep the following guidelines in mind:

- In fact and appearance, the SEC and the private entity's investigations should be parallel and should not be conducted jointly.  Staff should make investigative decisions independent of any parallel investigation that is being conducted by a private entity.

- Do not take any investigative step principally for the benefit of the private entity's investigation or suggest investigative steps to the private entity.

- In SEC investigations in which a witness has asserted or indicated an intention to assert the Fifth Amendment in testimony, do not suggest any line of questioning to the private entity conducting a parallel investigation, and do not provide to the private entity any document or other evidence for use in questioning a witness other than pursuant to an approved access request.

Further Information:

Staff should consult with OCC staff concerning any questions relating to the State Actor Doctrine.

### 3.2     Documents and Other Materials

### 3.2.1    Privileges and Privacy Acts

In connection with any request for document production, staff must comply with the Privacy Act of 1974 ("Privacy Act"), the Right to Financial Privacy Act of 1978 ("RFPA"), and the Electronic Communications Privacy Act of 1986 ("ECPA") and the rules regarding the assertion of privileges are discussed in Section 4 of the Manual.  In addition, staff must comply with policies on contacting witness's counsel (*see* Section 3.3.6 of the Manual), parallel proceedings (*see* Section 3.1.4 of the Manual), and ongoing litigation (*see* Section 3.1.3 of the Manual).

### 3.2.2    Bluesheets

Basics:

- Bluesheeting is the process by which the SEC requests and obtains trading data from the broker-dealer community.  Member firms are required to provide trading information

pursuant to Section 17(a) of the Exchange Act and Rule 17a-25 thereunder. Although the process is now handled electronically through the SEC's Bluesheet application, the name derives from the fact that blue paper was once used to make such requests.

- Bluesheet data provides information identifying the account holder for whom specific trades were executed and indicates whether the transaction was a buy or a sell and long or short, among other data elements. The data also identify proprietary and customer trades executed on all domestic or foreign markets, all "in-house cross" transactions, transactions cleared for introducing brokers, and prime broker transactions.

- It may be appropriate to obtain and review Bluesheet data in a variety of investigations, but it is typically obtained in matters involving possible insider trading or market manipulation violations.

Considerations and Mechanics:

- Prior to requesting bluesheet data, the assigned staff must identify which securities they have an interest in reviewing (equities, options, etc.). Staff must also determine the period for which they would like to obtain data. Once these decisions are made, the assigned staff should use the Bluesheet application to obtain Equity Cleared Reports and/or Option Cleared Reports to identify which broker-dealers traded the security at issue.

- Equity and Options Cleared Reports provide essential information such as the clearing firm that reported the trades, volume at each firm, and number of transactions on a daily or specified period. The information can be sorted on a volume basis which allows the staff to quickly determine the largest participants in the marketplace.

  o In a takeover situation, consider organizing the data according to buy volume.

  o If there is suspicious trading before bad news, such as a poor earnings report, it may be appropriate to sort the data by sell volume.

Further Information:

For additional information on bluesheeting, staff should consult with the Market Surveillance Group in OMI.

### 3.2.3   Voluntary Document Requests

Basics:

During an inquiry or investigation, the staff may request the voluntary production of documents. The staff also may request the voluntary creation of documents, such as chronologies of events. In an inquiry or investigation, the staff can also request that witnesses agree to voluntary interviews and testimony (a member of the staff can issue subpoenas only after being designated an officer upon the Commission's issuance of a formal order of investigation, as described in Section 2.3.3 of the Manual).

35

When the staff begins an inquiry, voluntary document requests can be a principal means of gathering documents, data, and other information.  Often the fruits of these requests will help the staff assess the merits of an investigation at its earliest stages before the staff opens an investigation or the Director approves the issuance of a formal order.

Considerations:

- Many issuers, individuals, and other parties are willing to provide significant materials to the staff voluntarily, without a subpoena.  And, as discussed in Section 3.2.4 of the Manual below, regulated entities are required to produce certain records without a subpoena.

- Staff can consider, on a case by case basis, whether and how a voluntary document request as opposed to a subpoena may affect a witness's diligence in his or her search for documents and the witness's responsiveness.

- Staff should also keep in mind that a subpoena is required in some situations, such as when seeking certain information covered by the Electronic Communications Privacy Act or the Right to Financial Privacy Act.

### 3.2.3.1   Forms 1661 and 1662

When requesting documents or information other than pursuant to a subpoena, the staff provides all regulated persons or entities with a copy of Form SEC 1661 (entitled "Supplemental Information for Entities Directed to Supply Information to the Commission Other Than Pursuant to a Commission Subpoena").

When requesting documents or information (including interviews, voluntary or subpoenaed document productions, and testimony) from any witness, the staff provides the witness with a copy of Form SEC 1662 (entitled "Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena").

The Supplemental Information Forms provide information on the following topics:

- False Statements and Documents

- Fifth Amendment

- Right to Counsel

- Going Off the Record

- Consulting with Counsel

- Transcript Availability

- Perjury

- Wells Procedures

- Confidential Treatment Pursuant to the Freedom of Information Act

- Privacy Act Notices:

  - Authority Pursuant to Which Information is Being Solicited

  - Effect of Not Supplying Information

  - Principal Uses of Information

  - Routine Uses of Information

### 3.2.3.2   White Papers and Other Materials (excluding Wells Submissions)

During an investigation, persons may produce to the staff, on a voluntary basis, substantive materials other than in response to Wells notices, including, for example, white papers, PowerPoint decks, legal memos, or letter briefs (collectively "White Papers").  The Commission may use the information contained in a White Paper as an admission, or in any other manner permitted by the Federal Rules of Evidence, or for any of the Routine Uses of Information described in Form 1662, "Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena."  (Form 1662 can be found at http://www.sec.gov/about/forms/sec1662.pdf.)  White Papers also may be discoverable by third parties in accordance with applicable law.

Staff may reject a White Paper if:

- the person producing the White Paper seeks to limit (including by reserving the right to limit) either its admissibility under Federal Rule of Evidence 408 or the Commission's ability to use the White Paper for the purposes described in Form 1662.

- the White Paper contains or discusses a settlement offer.  Offers of settlement should not be included in White Papers that also address other topics, and instead, may be made in a separate document.

Further Information:

- Staff should consult with OCC concerning any questions relating to acceptance of White Papers.

- See Section 2.4 of the Manual for information relating to Wells Submissions.

### 3.2.4   Document Requests to Regulated Entities

Basics:

- The staff may request information from regulated entities, such as registered investment advisers and broker-dealers.  Pursuant to Sections 17(a) and (b) of the Exchange Act and Section 204 of the Advisers Act and the rules thereunder, regulated entities *must* provide certain information to the staff even without a subpoena.

- Records from regulated entities – especially broker-dealers, transfer agents, and investment advisers – are often essential cornerstones of an investigation.  Because regulated entities must produce certain records without a subpoena, the staff can often obtain documents, such as brokerage account statements or account opening documents, which might otherwise require a subpoena to obtain from an individual.

Considerations:

- For reasons of efficiency and strategy, consider what types of records to obtain from a regulated entity.  For example, in addition to customer account statements, a broker-dealer will have documents such as order tickets, order confirmations, trading blotters and transfer records.

- Some regulated entities have specific policies regarding whether (and, if so, when) to notify a client or customer that the staff has requested documents related to their account.  Even if there is no formal policy in place, the customer or client might be provided some informal notice.  Depending on the conduct, potential for investor harm, or other circumstances, consider requesting that a firm not disclose the request for documents, at least for a certain limited period of time.

Further Information:

- *See* Sections 2.2.2.1 and 4.7 of the Manual for information relating to Bank Secrecy Act materials.

- For additional information on documents that may be requested from broker-dealers, and what information such documents can provide, contact the Market Surveillance Group in OMI.

### 3.2.5   Document Requests to the News Media

Basics:

The "Policy statement of the Securities and Exchange Commission concerning subpoenas to members of the news media" can be found in the Commission's "Informal and Other Procedures."  17 C.F.R. § 202.10.

Text of the Policy Statement:

Freedom of the press is of vital importance to the mission of the Securities and Exchange Commission. Effective journalism complements the Commission's efforts to ensure that investors receive the full and fair disclosure that the law requires, and that they deserve. Diligent reporting is an essential means of bringing securities law violations to light and ultimately helps to deter illegal conduct. In this *Policy Statement* the Commission sets forth guidelines for the agency's professional staff to ensure that vigorous enforcement of the federal securities laws is conducted completely consistently with the principles of the First Amendment's guarantee of freedom of the press, and specifically to avoid the issuance of subpoenas to members of the media that might impair the news gathering and reporting functions. These guidelines shall be adhered to by all members of the staff in all cases:

(a) In determining whether to issue a subpoena to a member of the news media, the approach in every case must be to strike the proper balance between the public's interest in the free dissemination of ideas and information and the public's interest in effective enforcement of the federal securities laws.

(b) When the staff investigating a matter determines that a member of the news media may have information relevant to the investigation, the staff should:

(1) Determine whether the information might be obtainable from alternative non-media sources.

(2) Make all reasonable efforts to obtain that information from those alternative sources. Whether all reasonable efforts have been made will depend on the particular circumstances of the investigation, including whether there is an immediate need to preserve assets or protect investors from an ongoing fraud.

(3) Determine whether the information is essential to successful completion of the investigation.

(c) If the information cannot reasonably be obtained from alternative sources and the information is essential to the investigation, then the staff, after seeking approval from the responsible Regional Director or Associate Director, should contact legal counsel for the member of the news media. Staff should contact a member of the news media directly only if the member is not represented by legal counsel. The purpose of this contact is to explore whether the member may have information essential to the investigation, and to determine the interests of the media with respect to the information. If the nature of the investigation permits, the staff should make clear what its needs are as well as its willingness to respond to particular problems of the media. The staff should consult with the Commission's Office of Public Affairs, as appropriate.

(d) The staff should negotiate with news media members or their counsel, consistently with this Policy Statement, to obtain the essential information through informal channels, avoiding the issuance of a subpoena, if the responsible Regional Director or Associate Director determines that such negotiations would not substantially impair the integrity of the investigation. Depending on the circumstances of the investigation, informal channels may include voluntary production, informal interviews, or written summaries.

(e) If negotiations are not successful in achieving a resolution that accommodates the Commission's interest in the information and the media's interests without issuing a subpoena, the staff investigating the matter should then consider whether to seek the issuance of a subpoena for the information. The following principles should guide the determination of whether a subpoena to a member of the news media should be issued:

(1) There should be reasonable grounds to believe that the information sought is essential to successful completion of the investigation. The subpoena should not be used to obtain peripheral or nonessential information.

(2) The staff should have exhausted all reasonable alternative means of obtaining the information from non-media sources. Whether all reasonable efforts have been made to obtain the information from alternative sources will depend on the particular circumstances of the investigation, including whether there is an immediate need to preserve assets or protect investors from an ongoing fraud.

(f) If there are reasonable grounds to believe the information sought is essential to the investigation, all reasonable alternative means of obtaining it have been exhausted, and all efforts at negotiation have failed, then the staff investigating the matter shall seek authorization for the subpoena from the Director of the Division of Enforcement. No subpoena shall be issued unless the Director, in consultation with the General Counsel, has authorized its issuance.

(g) In the event the Director of the Division of Enforcement, after consultation with the General Counsel, authorizes the issuance of a subpoena, notice shall immediately be provided to the Chairman of the Commission.

(h) Counsel (or the member of the news media, if not represented by counsel) shall be given reasonable and timely notice of the determination of the Director of the Division of Enforcement to authorize the subpoena and the Director's intention to issue it.

(i) Subpoenas should be negotiated with counsel for the member of the news media to narrowly tailor the request for only essential information. In negotiations with counsel, the staff should attempt to accommodate the interests of the Commission in the information with the interests of the media.

(j) Subpoenas should, wherever possible, be directed at material information regarding a limited subject matter, should cover a reasonably limited period of time, and should avoid requiring production of a large volume of unpublished material. They should give reasonable and timely notice of their demand for documents.

(k) In the absence of special circumstances, subpoenas to members of the news media should be limited to the verification of published information and to surrounding circumstances relating to the accuracy of published information.

(l) Because the intent of this policy statement is to protect freedom of the press, news gathering functions, and news media sources, this policy statement does not apply to demands for purely commercial or financial information unrelated to the news gathering function.

(m) Failure to follow this policy may constitute grounds for appropriate disciplinary action. The principles set forth in this statement are not intended to create or recognize any legally enforceable rights in any person.

### 3.2.6   Subpoenas for Documents

Basics:

The Commission, or the staff it designates as officers in a formal order of investigation, may issue subpoenas for documents or witnesses, pursuant to Section 19(c) of the Securities Act, Section 21(b) of the Exchange Act, Section 209(b) of the Advisers Act, and Section 42(b) of the Investment Company Act.  The Commission or its designated officers may require the production of any records deemed relevant or material to the inquiry and may require their production from any place in the United States.

- To issue a subpoena for documents, a staff member must be named as an officer for purposes of an investigation in the Commission's formal order.  Once the Commission has issued a formal order, the staff named as officers in the order may issue subpoenas.

- Some documents cannot be obtained without issuing a subpoena, such as records from telephone companies or banks.

- A subpoena for documents should be accompanied by a Form 1662.

- Rule 7(a) of the SEC's Rules Relating to Investigations provides that any person who is compelled or required to furnish documents or testimony at a formal investigative proceeding shall, upon request, be shown the formal order.  Such a person may also obtain a copy of the formal order by submitting a written request to the Assistant Director supervising the investigation.  *See* 17 C.F.R. § 203.7(a).

- A subpoena for documents should include an attachment to the subpoena listing the documents requested (generally by category or type of document).

Further Information:

- Subpoenas to financial institutions such as banks and credit card issuers are subject to the Right to Financial Privacy Act.  For more information on this Act, *see* Section 4.5 of the Manual.

- For procedures on granting a request for a copy of the formal order, *see* Section 2.3.4.2 of the Manual.

- For more information about Forms 1661 and 1662, *see* Section 3.2.3.1 of the Manual.

### 3.2.6.1   Service of Subpoenas

Under Rule 8 of the SEC's Rules Relating to Investigations (17 C.F.R. § 203.8), service of subpoenas issued in formal investigative proceedings shall be effected in the manner

prescribed by Rule 232(c) of the SEC's Rules of Practice (17 C.F.R. § 201.232(c)).  Rule 232(c), in turn, states that service shall be made pursuant to the provisions of Rule 150(b) through (d) of the SEC's Rules of Practice (17 C.F.R. §§ 201.150(b) through (d)).

Rule 150 provides that service of subpoenas may be effected:

(b) *Upon a person represented by counsel*. Whenever service is required to be made upon a person represented by counsel who has filed a notice of appearance pursuant to § 201.102, service shall be made pursuant to paragraph (c) of this section upon counsel, unless service upon the person represented is ordered by the Commission or the hearing officer.

(c) *How made*. Service shall be made by delivering a copy of the filing. Delivery means:

(1) Personal service--handing a copy to the person required to be served; or leaving a copy at the person's office with a clerk or other person in charge thereof, or, if there is no one in charge, leaving it in a conspicuous place therein; or, if the office is closed or the person to be served has no office, leaving it at the person's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein;

(2) Mailing the papers through the U.S. Postal Service by first class, registered, or certified mail or Express Mail delivery addressed to the person;

(3) Sending the papers through a commercial courier service or express delivery service; or

(4) Transmitting the papers by facsimile transmission where the following conditions are met:

(i) The persons so serving each other have provided the Commission and the parties with notice of the facsimile machine telephone number to be used and the hours of facsimile machine operation;

(ii) The transmission is made at such a time that it is received during the Commission's business hours as defined in § 201.104; and

(iii) The sender of the transmission previously has not been served in accordance with § 201.150 with a written notice from the recipient of the transmission declining service by facsimile transmission.

(d) *When service is complete*. Personal service, service by U.S. Postal Service Express Mail or service by a commercial courier or express delivery service is complete upon delivery. Service by mail is complete upon mailing. Service by facsimile is complete upon confirmation of transmission by delivery of a manually signed receipt.

### 3.2.7    Form of Production

Basics:

- The following guidelines for production should be set out in the subpoena or in the cover letter accompanying the subpoena.

- Generally, all documents described in the attachment to the subpoena should be produced by the date listed on the subpoena to the Division's Centralized Processing Unit or to the particular staff member identified in the subpoena.

- The subpoenaed entity or individual is required to produce all subpoenaed items that are in its possession, custody or control.  This includes items under the subpoenaed entity or individual's control or custody, but that are not in its immediate possession.

- The staff is encouraged to request document production in electronic format, in an SEC preferred format, and to include OCR text.  Electronic production is preferable, especially large productions from entities, because it is less costly, the information may be stored more efficiently, it may allow the staff to search for specific terms, and it may provide the ability to tag and review data more easily.  Requesting the production in an SEC preferred format and to include OCR text also reduces costs.

- In an electronic production, the subpoenaed entity or individual must maintain the originals of all documents responsive to the subpoena in the event production of the original documents is required at a later date.

- If the subpoenaed entity or individual produces documents in electronic format, the subpoenaed entity or individual should advise the staff, as soon as possible, of the size of the document production, the software used to store the document, and the medium of production.

- The staff may allow the subpoenaed entity or individual to produce documents in hard paper copies.  In the event that the subpoenaed entity or individual produces documents in hard paper copies, the subpoenaed entity or individual must maintain the originals of all documents responsive to the subpoena in the event production of the original documents is required at a later date.

- If copies of a document differ in any way, they are to be treated as separate documents and the subpoenaed entity or individual must produce each copy.  For example, if the subpoenaed entity or individual has two copies of the same letter, but only one of them is marked with handwritten notes, the subpoenaed entity or individual must send both the clean copy and the copy with notes.

- The subpoenaed entity or individual should produce hard copy documents in a unitized manner (*e.g.*, delineated with staples or paper clips to identify the document boundaries), and electronic documents in accordance with the SEC Data Delivery Standards.

- The subpoenaed entity or individual should enclose a list briefly describing each item it has sent.  The list should include the paragraph(s) in the subpoena attachment to which each item responds.

- The subpoenaed entity or individual should also include a cover letter stating whether it believes it has met its obligations under the subpoena by searching carefully and thoroughly for all documents or materials required by the subpoena, and by producing all of the required documents and materials.

- The term "document" in the context of a production responsive to a subpoena includes, but is not limited to, any written, printed, or typed matter in the possession, custody or control of the subpoenaed entity or individual including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice communications, slips, tickets, records, worksheets, financial records, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, telegrams, facsimiles, messages of any type, telephone messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational indicia, purchase orders, information recorded by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

- The subpoenaed entity or individual must produce all of the materials described in the subpoena.  If, for any reason, the subpoenaed entity or individual does not produce something required by the subpoena, the subpoenaed entity or individual should submit a list of what it is not producing.  The list should describe each item separately, noting: its author(s); its date; its subject matter; the name of the person who has the item now, or the last person known to have it; the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents; and the reason the subpoenaed entity or individual did not produce the item.

- If the subpoenaed entity or individual withholds an item based on a claim of privilege, the list of withheld items should specify the privilege claimed.  If the subpoenaed entity or individual withholds anything on the basis of a claim of attorney-client privilege or attorney work product protection, the subpoenaed entity or individual should identify the attorney and client involved**.**

- If any documents responsive to the subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, the subpoenaed entity or individual should identify such documents and give the date on which they were lost, discarded or destroyed.

- Many larger accounting firms maintain and create their workpapers electronically.  Electronic workpapers are often a rich source of metadata and may be easier to navigate than hard copies.  Firms may raise concerns about producing electronic workpapers and other audit documents, citing to intellectual property rights in what they view as

44

proprietary programs.  The staff does not necessarily agree with the concerns but as an accommodation, may consider alternative approaches such as web-based production and production on a dedicated laptop computer.  These requests may be evaluated on a case-by-case basis to determine whether an alternative approach is appropriate in the investigation.

Further Information:

- Staff should refer any questions about the form of production to the Enforcement Office of Technical Services.

- For more information on privilege logs, *see* Section 3.2.7.4 of the Manual.

- For information on the format for electronic production, *see* Section 3.2.7.3 of the Manual.

- For information on certifications of completeness of production, *see* Section 3.2.7.6 of the Manual.

- For more information about when and how to request electronic workpapers, staff should contact the Enforcement's Chief Accountant.

### 3.2.7.1    Accepting Production of Copies

Basics:

The staff may allow a subpoenaed entity or individual to produce photocopies of the original documents required by a subpoena.  Acceptable productions of photocopied documents should follow these guidelines:

- The copies must be identical to the originals, including even faint marks or print.

- The subpoenaed entity or individual should put an identifying notation on each page of each document to indicate that it was produced by the subpoenaed entity or individual, and number the pages of all the documents submitted.  (For example, if Jane Doe sends documents to the staff, she may number the pages JD-1, JD-2, JD-3, etc., in a blank corner of the documents).  However, if the subpoenaed entity or individual sends the staff original documents, the subpoenaed entity or individual should not add any identifying notations.

- The subpoenaed entity or individual should make sure the notation and number do not conceal any writing or marking on the document.

- In producing a photocopy of an original document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original document, photocopies of the original document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

Considerations:

In producing photocopies of original documents, the subpoenaed entity or individual should be aware that:

- The SEC cannot reimburse the subpoenaed entity or individual for copying costs, except in the case of RFPA subpoenas or certain productions under the ECPA.

- The subpoenaed entity or individual must maintain the originals of all copied documents responsive to the subpoena in a safe place in the event production of the original documents is required at a later date.

- If it appears that a photocopy of an original document may not represent the original document in its entirety, whether by means of post-it(s), notation flag(s), removable markings, erroneous copying, or for any other reason, the staff should request the original document so that the staff can verify that the photocopy represents the original document in its entirety, including all of the markings contained within it.

Further Information:

- Staff should refer any questions about the production of photocopied documents responsive to subpoenas to the Trial Unit.

- For more information concerning Bates stamping of photocopied documents, *see* Section 3.2.7.2 of the Manual.

### 3.2.7.2    Bates Stamping

Introduction:

Bates stamping (also known as Bates numbering or Bates coding) refers to the use of identifying numbers or date and time marks on images and documents as they are scanned or processed.

Bates stamping is commonly used as an organizational method to label and identify documents.  Marking each document with a unique number is a useful tool both at the investigative stage and in litigation and provides an efficient and clear way to identify documents on the record in testimony and depositions.

Basics:

- Original documents should be kept in pristine condition and no documents should be altered for any reason.  Original documents should be copied or imaged and the copies or images (not the originals) should be Bates stamped.

- Bates stamping assigns a unique identifier to each page produced or received during the course of an investigation or discovery.  Such numbering may be solely numeric or may contain a combination of letters and number (alphanumeric).

- Although there is no standard method for numbering documents, the best practice is to place an identifying notation on each page of each document (1) to indicate the source of the production and (2) to number the pages of all the documents submitted.

- In cases of multiple productions by the same source, a production date (mm/dd/yy) may be stamped in addition to the letters used to identify the source of the production. For several productions from the same source, the best practice is to continue the numbering from the previous production.

- The notation and number should not conceal any writing or marking on the document.

- Manual Bates stamping involves the use of a self-inking stamp with six or seven numbered wheels that automatically increment each time the stamp is pressed down on a page. Preprinted, self-adhesive labels can also be used, as well as electronic document discovery (EDD) software that can electronically stamp documents stored as computer files by superimposing numbers on them. If produced documents are imaged, they can be Bates stamped as they are imaged.

- If documents are produced already Bates stamped, there is no need to Bates stamp them a second time, unless the existing Bates stamp is duplicated in other documents. In that case, the best practice is to Bates stamp them with a new sequence.

### 3.2.7.3    Format for Electronic Production of Documents to the SEC

Introduction:

The staff is encouraged to request document production in electronic format. Documents, information, and data produced electronically may be delivered as: (1) scanned collections; (2) e-mail; or (3) native files. The formats for these types of productions should be communicated to parties wishing to produce documents, information, and data electronically. Staff should not accept electronic production of documents and information in any format other than these three formats (including databases) without prior discussions with, and approval from, the Division's IT staff.

Basics:

- Staff should request that each party producing documents and other information electronically organize each submission by custodian. Producing parties should also provide a summary of the number of records, images, e-mails, and attachments in the production so that the staff can confirm that the complete production has been loaded onto the SEC's computer system.

- All electronic productions should conform to the technical requirements of the SEC's Data Delivery Standards.

- Data can be delivered on CD, DVD, or hard drive.  The smallest number of media is preferred.  If the collection is large enough, the SEC can provide a hard drive to the producing party, if needed.

- For scanned collections, each scanned file must contain four components: (a) an image file; (b) a delimited text file; (c) optical character recognition (OCR) text; and (d) an image cross-reference file.  For further explanation and other information about the required four components, staff should contact the Division's IT staff.

- For electronic e-mail productions, there are several formats available, but it is preferable to request the producer of the e-mails to load them into a central repository or database and convert them into a searchable format that is compatible with the SEC's Document Review Platform.  This method allows for the staff to run its own searches using its own search terms on the population of e-mails requested.

    o The preferred format for receiving electronically-produced e-mail is delimited text with images and native attachments**.**

    o The staff may also accept the following formats for electronic production of e-mails:

        ▪ PST – a personal storage file native to Microsoft Office Outlook.

        ▪ NSF – a personal storage file native to Lotus Notes.

    o The staff should include the data standards described above in their document requests to ensure that the format of produced e-mails is loadable into the SEC's Document Review Platform and that the most relevant data fields are captured.  If the producer of the e-mails wishes to negotiate alternative delivery standards, the staff should contact Division IT staff so that they can participate in the related discussions.

- Native files should be produced with an ASCII delimited file containing the media associated with the files, text extracted from the native file, and a directory path to the native file.

- A subpoena or document request should include the standard specific guidelines and instructions containing technical criteria to follow for producing documents electronically to the SEC.

<u>Further Information</u>:

For information on any aspect of electronic production, staff should consult the Division's IT staff and the Data Delivery Standards.

### 3.2.7.4     Privilege Logs

Basics:

      With respect to each document that has been withheld from production on the grounds of any privilege or protection, the staff should request that a detailed privilege log be produced at the same time as the responsive documents.

Considerations:

    Staff should keep in mind the following considerations when requesting and reviewing privilege logs:

- Document requests or subpoena attachments should contain instructions to provide a privilege log for any documents withheld.

- After the initial production is received, the staff should ask for written confirmation that all requested materials have been produced and that any document withheld based upon an assertion of any privilege has been noted in the privilege log.  The privilege log also should note assertions of privilege for any portion of a document that has been redacted.

- The staff should carefully review the privilege log to determine whether the privilege has been properly asserted.  In addition, the staff should compare redacted documents against the privilege log to determine whether a privilege has been properly asserted for each redacted portion.

- The staff should obtain additional information where entries in the privilege log are incomplete or do not otherwise provide sufficient information to determine whether the privilege has been properly asserted.

- If a documentary privilege is asserted during testimony, the staff should stay on the record.  The staff should exercise care when inquiring into potentially privileged matters by making clear on the record that they are not intending to obtain the disclosure of confidential communications between attorney and client.  However, the staff should indicate on the record that they intend to establish whether the predicate facts for the assertion of the privilege are present.

### 3.2.7.5     Business Record Certifications

Basics:

- At the time a company produces business records (*e.g.*, telephone records, bank account statements, brokerage account records), the staff should simultaneously obtain from a custodian of records or other qualified person a declaration certifying that the documents are records of regularly conducted business activities.

- A certification should eliminate the need to have a custodian of records testify at deposition or civil trial because the records can be authenticated by the certification under

Rules 902(11) and 902(12) of the Federal Rules of Evidence.  A certification may also avoid the need for testimony by the custodian in an administrative proceeding.

### 3.2.7.6.    Confirming Completeness of Production

Introduction:

When recommending that the Commission accept a settlement offer from an entity or individual, it is important to obtain an executed Certification as to Completeness of Document Production from the settling party.  In the Certification, the settling party acknowledges that the Commission has relied upon, among other things, the completeness of his or her production.

Basics:

- A settling individual must declare under penalty of perjury that he or she has made a diligent search of all files in his or her possession, custody, or control that are reasonably likely to contain responsive documents and that those documents have either been produced or identified in a privilege log.

- The Certification applies to SEC subpoenas, document requests and requests for voluntary production of documents.

- In the case of an entity, the Certification should contain similar language, but require a representative to declare that the representative has made a diligent inquiry of all persons who reasonably had possession of responsive documents, and that those documents have been produced or identified in a privilege log.

### 3.2.8    Forthwith Subpoenas in Investigations

Basics:

Forthwith subpoenas, which call for the immediate production of information, are one of many tools we can use to compel the production of evidence during an investigation.  However, they should only be used in exigent circumstances.  For example, a forthwith subpoena may be appropriate where records are sought from a witness or custodian who: (i) we have specific reason to believe may destroy or falsify records, (ii) is a flight risk, or (iii) has been uncooperative or obstructive during the investigation.

Also, a forthwith subpoena, as with any of our subpoenas, is not self-enforcing.  Absent a court order, we cannot compel a witness or custodian to comply with any subpoena, including a forthwith subpoena.  Staff should expect courts to scrutinize closely subpoenas that demand immediate production.

Further Information:

If the staff believes there may be a need to issue a forthwith subpoena due to exigent circumstances, the staff should consult with the Trial Unit immediately.

### 3.2.9      Maintaining Investigative Files

Various federal laws, the Commission's internal rules and policies, and the Division's procedures require proper maintenance of investigative files.

Objectives for Maintaining Investigative Files:

- Following procedures to maintain investigative files helps ensure that any loss of or damage to the Division's offices, files, or equipment will cause minimal disruption to the work of the Division.

- Uniformity in document management practices helps facilitate information sharing and limit loss of information associated with staff turnover.

- Maintaining investigative files in a systematic way increases the likelihood of success in litigation. Investigative files need to be properly maintained so they can be shared with other law enforcement agencies.  Rule 30-4(a)(7) of the SEC's Rules of Organization delegates to the Director of the Division of Enforcement authority to grant access requests to the SEC's nonpublic enforcement and regulatory files.  An access grant generally provides authority to disclose both existing information and information acquired in the future to those entities listed in Rule 24c-1(b) of the Exchange Act.

The Basics of Maintaining Original Documents:

- Original documents received by the staff, whether voluntarily or through subpoenas, should be segregated from the staff's personal notes, copies of the staff's e-mails, or any other documents.  "Original" documents received may include copies of documents produced pursuant to subpoena.

- Original documents should be kept in pristine condition and no documents should be altered for any reason.  Original documents should be copied or imaged and the copies or images (not the originals) should be Bates stamped, if not already stamped.

- In the event documents require additional protections (*e.g.*, if they come from a foreign government and are not supposed to be transmitted pursuant to an access request), they should be kept separate and well marked.

The Basics of Maintaining Files:

- When either a MUI or an investigation that was not preceded by a MUI is opened, the staff should implement a system for handling originals and hard copies of documents, including, but not limited to, correspondence, subpoenas, and third-party document productions. (For more information regarding Document Control, *see* Section 3.2.9.1 of the Manual.)

- When either a MUI or an investigation that was not preceded by a MUI is opened, the staff should contact Enforcement IT staff to set up a specific sub-directory on Enforcement's shared drive for the case.  This subdirectory will include automatically-

generated folders labeled with categories of documents typically created or received during investigations and litigation (*e.g.*, Investigative Files/Document Requests & Subpoenas, Investigative Files/Investigative Correspondence, Litigation Files/Discovery, Litigation Files/Experts).   Staff should maintain electronic files in accordance with the folder structure in the case's shared drive sub-directory.

Using Shared Drives:

Staff should maintain work product (e.g., subpoenas, internal memoranda, chronologies, pleadings), transcripts provided in electronic form, and documents produced to the staff in electronic form on shared drives.

Maintaining Internet Documents:

During the course of certain investigations, evidentiary issues may arise concerning authentication and preservation of internet documents, particularly pertaining to pages from the internet.  Website publishers may, at any time and within seconds, edit, alter, or even remove the contents of their websites.  Upon discovering relevant evidence on a website, the staff immediately should take steps to preserve each individual relevant web page.  For information on how to preserve website evidence, *see* Section 3.2.9.6 of the Manual.

Preserving Electronically Stored Information ("ESI"):

Steps should be taken to preserve ESI in enforcement investigations.  For further information on the preservation of ESI, *see* Section 3.2.9.4 of the Manual.

Special Considerations Pertaining to the Bank Secrecy Act:

All Bank Secrecy Act ("BSA") information is sensitive; in particular, Suspicious Activity Reports ("SARs"), and related information that would reveal the existence of a SAR, must be protected from inadvertent disclosure.  SARs and SAR material must be segregated, labeled as sensitive, and stored securely.  Steps must be taken to avoid inadvertent dissemination of these documents or inadvertent disclosure of the existence of these documents.

Further Information on the BSA:

- Staff should contact the BSA Review Group for specific information and guidance about how to handle BSA materials properly.

- *See also* Sections 2.2.2.1 and 4.7 of the Manual.

### 3.2.9.1   Document Control

Basics:

In implementing good document management and control during an investigation or litigation, the staff should have a structured and consistent system for labeling, storing, and keeping track of documents, which should indicate:

- what documents respondents, witnesses, or defendants have produced;

- when they produced the documents;

- which subpoena or voluntary request sought the documents; and

- whether the response to the subpoena or request is complete.

To that end, the staff should follow the procedures below, adjusted as appropriate for the particular circumstances of the production:

Labeling Documents:

- Subject to the considerations discussed below, all hard-copy productions should be Bates stamped, either by the party producing them, or, if not, by the staff.  For more information on Bates stamping, *see* Section 3.2.7.2 of the Manual.

- If it is an electronic production, it is important to address labeling issues up front with the producing party, before the documents are produced.  For more information on the format for the electronic production of documents, *see* Section 3.2.7.3 of the Manual.

Keeping Track of Documents:

- The staff should index all documents after receipt, including those received in production, testimony transcripts, documents sent to off-site storage, etc.  Each index should be saved on the appropriate sub-folder in the investigation's folder on Enforcement's shared drive.

- The staff should maintain logs or indexes of subpoenas issued, documents produced to the staff, testimony transcripts, etc., on the investigation's sub-directory located on the Division's shared drive.

Storage and Maintenance of Documents:

Among other things, staff should clearly label documents, segregate privileged documents from documents produced by third parties, and label and index documents to be stored off-site.

Use of Documents:

Original documents should not be used for any reason except as necessary to present evidence in court or at a hearing.  Therefore:

- Original documents should not be used as working copies. They should not be marked or altered from the state they were in at the time of their original production.

- The staff should make a copy if necessary to work with, mark up, or introduce as an exhibit in testimony.

- Electronic data can be printed out or loaded onto the shared drive, which is a specially created queue to accept larger quantities of documents, with which the staff can work. The staff should keep an original, clearly labeled version of electronic production (CD or otherwise).

Further Information:

The staff should also consult with trial counsel regarding any concerns regarding the future use of documents in litigation.

### 3.2.9.2    Document Imaging in Investigations

Introduction:

The Division, in coordination with the SEC's Office of Information Technology ("OIT"), has implemented a program to image evidentiary documents in investigations.  The SEC's Electronic Documents program consists of two data management projects:  the Electronic Production Project and the National Imaging Project.

The Electronic Production Project involves the loading of evidentiary materials from Division cases into a review platform, which allows authorized staff to retrieve and view the documents.  The National Imaging Project provides data back-up and disaster recovery for the program. It provides for the removal of voluminous evidentiary documents from Division premises in Headquarters and the regional offices.  OIT, in consultation with the Division, manages the Electronic Documents program.

Basics:

- When evidentiary documents need to be imaged, the staff should submit a request to a Document Management Specialist ("DMS"), including the following information:  (1) case name; (2) location of documents; (3) case number; (4) priority; (5) source or producing party; and (6) any instructions or other specifics.

- The DMS will confirm the information, conduct any additional preparation of the documents, and either arrange to have the documents imaged onsite or outsource the imaging to a designated outside contractor.

- The DMS will send e-mail notification to the appropriate staff, which will provide the necessary confirmation information.

- The documents will be scanned by the requested date, and will be hand delivered to the SEC for loading into the SEC's Document Review Platform shortly thereafter.  The staff will receive notice when the imaging process has been completed.

- If the staff requests return of the documents, the imaging processing center will first retain the documents for 45 days after receipt, where they will be stored in a secured, limited access area so that random quality assurance checks can be done.  However, if the

staff requests immediate return of the documents, they will be returned after the scanning has been completed.

- If the staff doesn't request the return of documents, the documents will be shipped to the Iron Mountain storage facility after the 45 day period, and confirmation and tracking information will be sent to the staff.

Further Information:

    Staff should contact the Division's IT staff or OIT for further information on document imaging.

### 3.2.9.3     Electronic Files

Introduction:

    The procedures discussed below provide guidance and suggestions on how the Division staff should maintain files and records produced in electronic formats during the course of their investigations.  The staff should strive to maintain and preserve all electronic files received from outside parties in an orderly manner during the course of their investigations and should not alter the original media and files.

Basics:

    The staff may receive production of information in the form of CDs, DVDs, videotapes, audiotapes, and other electronic media, during the course of its investigations.  Upon receipt of any type of electronic media, staff should follow the below best practices, as appropriate:

- First, have a duplicate made by a qualified technician.  The staff should consult with the Division's IT staff to determine which technician should duplicate a particular medium.

- Next, verify the type of information contained on the electronic medium to determine the best way to work with the files.

  - Text Files:  If the information is in the form of text files, the staff will complete an "Electronic Data Submittal Form" and will submit the form, along with the duplicate medium, to the appropriate technician in OIT at the Home Office, who will load the contents of the duplicate medium onto the Home Office server.  Both the original and duplicate will be returned to the staff.  The information produced as the electronic file will be accessible to the staff via the Home Office server and on the duplicate medium.

  - Audio and Video Files:  If the electronic medium contains audio or video files, the staff may have a transcript prepared of each duplicate recording.  The transcript should identify the source of the recording (*e.g.*, meeting, presentation, news video), each speaker, the speaker's location, and the dates and times the original recording was made.  The transcript should also identify the name of the person who prepared it, the date the transcript was prepared, and any information

sufficient to describe the specific medium (*e.g.*, disc, tape) transcribed.  The original and duplicate will be returned to the staff.

- Maintain all original files in a secure central location within each Assistant Director group.  The Assistant Director assigned to the investigation should be the designated custodian of the original files.  Original files should not be used until necessary at trial or similar proceeding.

- Create and maintain a log for each original file.  In the event an original file is to be removed from its secure central location, the staff member removing the file should sign the log and indicate the date and time the file was removed, as well as the date and time the file was returned to its secure location.

- The staff may access the electronic files on the duplicate copy itself and may also choose to load a copy of the duplicate recording onto the case file on the master drive of its office's computer system.  The staff should use the duplicate files or transcripts, and not the original files or transcripts, during the investigation and discovery phase of litigation.

Considerations:

Staff should keep in mind that original files may ultimately be used at trial or during a similar litigation proceeding.  Thus, the staff should take steps to avoid alteration to original electronic files.

Further Information:

- Staff should refer any questions about receiving, using, storing, and disposing of, electronic files to Enforcement's IT staff or OIT.

- For further information regarding audiotapes, *see* Section 3.2.9.8 of the Manual.

- For further information on the format for electronic productions, *see* Section 3.2.7.3 of the Manual.

### 3.2.9.4    Complying with Federal Rule of Civil Procedure 26(a) Requirements and Preserving Evidence in Anticipation of Litigation

Basics:

Federal Rule of Civil Procedure 26(a)(1) requires the SEC to make certain disclosures at the onset of litigation.  Additionally, the SEC is required to conduct a reasonable search of documents within its possession, custody, or control to respond to discovery requests pursuant to Rule 34 of the FRCP.  Failure to produce documents during discovery can result in sanctions, including an order precluding the SEC from using those documents as evidence.

Creating and maintaining an accurate *contact list* and *document index* will help the investigative staff effectively manage a complex investigation and greatly assist the SEC's trial

attorneys when compiling initial disclosures pursuant to Rule 26(a)(1) and in responding to subsequent discovery requests.

- *Contact list* – The contact list should include the name, address and telephone number of each individual likely to have discoverable information.

- *Document index* - The document list should include all documents, electronically stored information, and tangible things that the staff obtains during its investigation and provide at least the following:

  o A description of the documents by category;

  o Location of the documents;

  o Identity of the party that produced the documents;

  o Identification of the request or subpoena and correspondence relating to the documents; and

  o Bates numbers, if possible.

<u>Considerations</u>:

Since the investigative staff may receive electronic production or scan a paper production into an SEC database, once the documents are uploaded it is particularly important to keep an accurate document index to satisfy the initial disclosure requirement in a timely manner.

<u>Duty to Preserve Evidence</u>:

A duty to preserve ESI and paper records generally arises when litigation is reasonably anticipated or foreseeable, as well as when litigation is pending.  Failure to preserve ESI and paper records can result in Court sanctions.  When there is a duty to preserve, Enforcement staff should make reasonable and good faith efforts to preserve ESI and paper records relevant to an investigation or litigation, including issuing a litigation hold notice to those individuals working for the SEC who are most likely to have relevant information directing them to preserve relevant ESI and paper records.

ESI is a broad term that includes word processing files, spreadsheets, databases, e-mail, and voicemail.

### 3.2.9.5    Iron Mountain

Documents received by the staff in MUIs or investigations must be organized in boxes for transfer to Iron Mountain for storage:

- The boxes should include a detailed description of all contents to facilitate storage and retrieval.

- The staff should maintain tracking logs to include the date and location when boxes are sent to or received from Iron Mountain, and when boxes are destroyed or sent to Records Management.

- Each office should use a database to standardize the tracking process.

### 3.2.9.6     Preserving Internet Evidence

Basics:

The most common form of internet evidence is a website page.  However, website owners may, at any time and within seconds, alter, edit or even remove contents of a website.  Thus, upon discovering relevant evidence on a website, the staff immediately should seek to preserve that website evidence to capture information as it existed at the time the staff discovered the information.

Website downloading and preservation must be completed by Enforcement's IT staff, to help ensure a forensically-preserved copy of the relevant information.

Further information:

The staff should direct any questions about preserving internet evidence to Enforcement's IT staff.

### 3.2.9.7     Preserving Physical Evidence

The two most widespread forms of physical evidence in SEC investigations are audiotapes and electronic media hardware, such as computer hard drives.  Usually, the staff will obtain copies of this data from the producing party in a commonly accessible format, such as cassette tapes for analog audio recordings, WAV files for electronic audio recording, and TIF or PDF files for electronic data stored on a hard drive.

However, there may be circumstances when the staff may need to obtain the original media source or obtain a copy that fully captures all data on the original media source, such as an image of an entire hard drive.  The staff should consider obtaining originals when there is a risk that the original media source may be destroyed or where the producing party cannot be relied upon to produce all relevant data on a media source.  The original hardware also contains residual data, which can include deleted files.

Whether the staff obtains originals or copies, the staff generally should follow the procedures in Sections 3.2.9.8 and 3.2.9.9 of the Manual so that this physical evidence is preserved to ensure its authenticity.

### 3.2.9.8     Preserving Audio Recordings

Audio recordings are usually produced in one of two ways.  For digital recordings, audio recordings are produced as WAV files on CD-ROMs or DVDs.  For analog recordings, the recordings are often produced on audio cassette tapes.  In either format, the staff should be able

to trace the receipt and custody of audio recording data from the time they are received through their use at trial and demonstrate that the audio recordings were securely stored once they came into the staff's possession.  The goal is to ensure the admissibility of the recording by establishing its authenticity and the requisite preservation of its condition.

To maintain authenticity, the staff should follow these procedures:

- When obtained, audio recordings should be affixed with a Bates or control number.

- Testimony of the recording's custodian should establish the producing party's procedures for making and maintaining audio recordings, the procedures used to produce the audio recordings to the SEC and the location of the originals (if copies were produced).  The custodian should also be asked to identify the date and time of the recordings, and the speakers and the source of the recording, such as the telephone numbers associated with the recording.  This information is often available in digital recordings by retrieving data files created at the time the recording was made that capture this information.

- If copies are produced, the staff should ensure the custodian testifies on the record that he or she understands the obligation to maintain the originals in a place and manner sufficient to preserve their authenticity.

- If original recordings are produced, the staff should keep the originals in a safe location and use copies during the course of the investigation.  A log should be created and maintained that requires any individual that retrieves the originals to document the date and time that the originals were checked out and in.

- The staff should have transcripts prepared of all audio recordings with evidentiary value.

### 3.2.9.9    Preserving Electronic Media

<u>Basics</u>:

Electronic media hardware that may be useful during an investigation includes computer hard drives, CDs or DVDs, backup tapes, USB flash drives, smartphones and cellular phones, and personal data assistants.  The staff should establish the authenticity of the hardware and prevent against any alteration or destruction of information as follows:

- When obtained, electronic media hardware should be affixed with a Bates number.

- The staff should store original hardware in a safe location, use only copies of the data during the investigation, and create a log to document all circumstances when the originals are removed from their storage location.

- Through the testimony of the owner of the hardware or the custodian charged with maintaining hardware, the staff should seek to establish the authenticity of the original hardware, including information regarding the procedures utilized for storing and maintaining data on the hardware

Considerations:

The staff may also obtain an image of all data located on the hardware instead of the original.  Imaging is a copying process that produces an exact digital replica of the original data on the hardware and preserves the structure and integrity of the data.  The staff should confer with Enforcement's IT staff to ensure proper imaging of data.  To be deemed reliable, the imaging of electronic media information must meet industry standards for quality and reliability, must ensure that no data is altered during the imaging process, and must be tamper proof.  The Enforcement IT staff has established specific procedures and guidelines for imaging data.  The staff should also ensure that the producing party has stored the originals in a safe location, including by confirming details of such storage through the testimony of a custodian or owner of the hardware.

Further Information:

- Staff should refer any questions about preserving electronic media evidence to the Division's IT staff.

- *See* Section 3.2.9.2 of the Manual for more information on imaging.

- *See* Section 3.2.9.9 of the Manual for more information on electronic files.

### 3.3     Witness Interviews and Testimony

### 3.3.1    Privileges and Privacy Acts

In connection with any witness interviews or testimony, staff must comply with the Privacy Act of 1974 and the Right to Financial Privacy Act of 1978.  These statutes are discussed in Section 4 of the Manual.

### 3.3.2    No Targets of Investigations

Unlike the grand jury process in which targets of an investigation are often identified, the SEC investigative process does not have targets.  Thus, the SEC is not required to provide any type of target notification when it issues subpoenas to third parties or witnesses for testimony or documents in its nonpublic investigations of possible violations of the federal securities laws.  The Supreme Court, in *SEC v. O'Brien*, 467 U.S. 735, 750 (1984), noted that "the imposition of a notice requirement on the SEC would substantially increase the ability of persons who have something to hide to impede legitimate investigations by the Commission." Citing the SEC's broad investigatory responsibility under the federal securities laws, the Court found no statutory, due process, or other standard regarding judicial enforcement of such subpoenas to support the proposition that notice is required.

Although some parties involved in investigations eventually may be named as defendants or respondents in subsequent litigation, the SEC does not have targets of its inquiries or investigations.

### 3.3.3   Voluntary Telephone Interviews

#### 3.3.3.1   Privacy Act Warnings and Forms 1661 and 1662

<u>Basics</u>:

- The Privacy Act, 5 U.S.C. § 552a, requires, among other things, certain disclosures to individuals from whom the SEC's staff solicits information.

- When the staff contacts a person to request a voluntary telephone interview, before asking any substantive questions, the staff should provide an oral summary of at least the required Privacy Act information described below.

- The Privacy Act requires that the staff provide the following information:

  o That the principal purpose in requesting information from the witness is to determine whether there have been violations of the statutes and rules that the SEC enforces.

  o That the information provided by members of the public is routinely used by the SEC and other authorities, to conduct investigative, enforcement, licensing, and disciplinary proceedings, and to fulfill other statutory responsibilities.

  o That the federal securities laws authorize the SEC to conduct investigations and to request information from the witness, but that the witness is not required to respond.

  o That there are no direct sanctions and no direct effects upon the witness for refusing to provide information to the staff.

<u>Considerations</u>:

When appropriate, the staff also sends a Form 1661 or 1662 (along with a cover letter) to the witness after the telephone interview has taken place.  If the staff contacts the witness and the witness asks to delay the interview to a later date, the staff may send Form 1661 or 1662 in advance of the telephone interview.

#### 3.3.3.2   Documenting the Interview

<u>Basics</u>:

While conducting a voluntary telephone interview, the staff may take written notes of the interview.  With the witness's consent, the staff also may make an audio recording of the interview.

<u>Considerations</u>:

A minimum of two staff members are encouraged to be present to conduct a witness interview.  Advantages to having a minimum of two staff members present to conduct a witness interview include having more than one person who can ask questions and later have

recollections and impressions of the interview.  Moreover, one of the staff members may subsequently need to serve as a witness at trial.  Staff also should consider having only one staff member take notes during the interview.  If the staff intends to make an audio recording of the interview, Division policy requires the staff to obtain the witness's consent before initiating the recording.

### 3.3.4   Voluntary On-the-Record Testimony

<u>Basics</u>:

The staff may request voluntary transcribed ("on the record") testimony from witnesses. The staff cannot require and administer oaths or affirmations without a formal order of investigation.  Nevertheless, the staff can conduct voluntary testimony with a court reporter present and a verbatim transcript is produced.  Voluntary testimony may be recorded by audio, audiovisual, and/or stenographic means.  Staff should identify the potential method or methods of recording to be used in writing to the witness prior to the occurrence of the voluntary testimony.

If a witness is voluntarily willing to testify under oath, the staff, after obtaining the witness's consent, will have the court reporter place the witness under oath.  If the witness is placed under oath, false testimony may be subject to punishment under federal perjury laws.  In addition, 18 U.S.C. § 1001, which prohibits false statements to government officials, applies even if a witness is not under oath.

While conducting voluntary on-the-record testimony, the witness may have counsel present.  Also, at the beginning of the testimony, the staff should consider asking the witness questions on the record to reflect that the witness understands:  (1) that the witness is present and is testifying voluntarily; (2) that the witness may decline to answer any question that is asked, and (3) that the witness may leave at any time.

<u>Considerations</u>:

Staff can otherwise conduct the voluntary on-the-record testimony as it would any other testimony, including providing the witness with the Form 1662 prior to testimony.

### 3.3.5   Testimony Under Subpoena

#### 3.3.5.1   Authority

The SEC may require a person to provide documents and testimony under oath upon the issuance of a subpoena.  Prior to issuing any subpoenas in a matter, the staff must obtain a formal order of investigation.  *See* <u>Section 2.3.3</u> of the Manual.

In authorizing the issuance of a formal order, the Commission delegates broad fact-finding and investigative authority to the staff.  Various statutes provide for the designation of officers of the Commission who can administer oaths, subpoena witness, take testimony, and compel production of documents.  *See* Section 19(c) of the Securities Act, Section 21(b) of the Securities Exchange Act, Section 209(b) of the Advisers Act, and Section 42(b) of the

Investment Company Act.  These statutory provisions do not limit the designation of Commission officers to attorneys.  Non-attorneys, such as staff accountants, analysts, and investigators, also may be designated as officers and empowered to take testimony and issue subpoenas.

Testimony may be recorded by audio, audiovisual, and/or stenographic means.  Staff should identify in the subpoena or subpoena cover letter the potential method(s) for recording the testimony.  With reasonable prior notice to the witness, staff may designate another method or methods for recording the testimony in addition to that specified in the subpoena or subpoena cover letter.

Rule 7(a) of the SEC's Rules Relating to Investigations, 17 C.F.R. § 203.7(a), provides that any person who is compelled or required to furnish documents or testimony at a formal investigative proceeding shall, upon request, be shown the formal order of investigation.  A witness also may submit a written request for a copy of the formal order; the request may be granted, at the discretion of Enforcement staff responsible for the investigation at the Assistant Director level or higher, provided there are "reasons consistent both with the protection of privacy of persons involved in the investigation and with the unimpeded conduct of the investigation."  *Id.*

### 3.3.5.2.      Using a Background Questionnaire

Basics:

The background questionnaire is a document that the SEC staff uses to obtain important background information from a witness.  The questionnaire solicits a variety of personal information from the witness, including, among other things, the witness's date and place of birth, the names and account numbers for all securities and brokerage accounts, a list of all educational institutions attended and degrees received, and an employment history.  The information solicited in the background questionnaire is routinely asked for in testimony.

Considerations:

- The witness is not required as a matter of law to comply with the SEC staff's request to complete the written background questionnaire.  Disclosure of the information is entirely voluntary on the witness's part.  There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information, although it should be explained that this information will then be asked for in testimony.

- If the witness chooses to provide a background questionnaire, the witness should be examined about the document.  For example, the witness should be asked to authenticate the document, by requiring the witness to testify about its preparation, the source of information contained in the document and the accuracy of the information.

- Information provided pursuant to a background questionnaire is subject to the SEC's routine uses as listed in Form 1662.  The witness also is liable, under Section 1001 of

Title 18 of the United States Code, if he or she knowingly makes any false statements in the background questionnaire.

- Background questionnaires, as exhibits to testimony transcripts, may become public if they are produced during discovery in a subsequent litigation.  To safeguard sensitive personal information, such as a witness's Social Security number, the staff may consider omitting it from the Background Questionnaire.  Rather than obtaining or confirming a witness's Social Security number in testimony, staff may elect instead to request that it be submitted outside of testimony. *e.g.*, in a letter.

### 3.3.5.3    Witness Right to Counsel

Basics:

- Any person compelled to appear, or who appears by request or permission of the SEC, in person at a formal investigative proceeding may be accompanied, represented and advised by counsel, provided, however, that all witnesses shall be sequestered, and unless permitted in the discretion of the officer conducting the investigation no witness or the counsel accompanying any such witness shall be permitted to be present during the examination of any other witness.  *See* Rule 7(b) of the SEC's Rules Relating to Investigations, 17 C.F.R. § 203.7(b).  Any person appearing with a witness in a formal investigative proceeding may be asked by the officer conducting the examination to confirm on-the-record that he or she is representing the witness as his or her counsel.

- This means that a testifying witness may have an attorney present with him or her during any formal investigative proceeding, and the attorney may (1) advise the witness before, during and after the testimony; (2) question the witness briefly at the conclusion of the testimony to clarify any of the answers the witness gave during testimony; and (3) make summary notes during the witness's testimony solely for the witness's use.  *See* Rule 7(c) of the SEC's Rules Relating to Investigations, 17 C.F.R. § 203.7(c).  If the witness is accompanied by counsel, he or she may consult privately.

- "Counsel" is defined as any attorney representing a party or any other person representing a party pursuant to Rule 102(b) of the SEC's Rules of Practice, 17 C.F.R. § 201.102(b).  *See* Rule 101(a) of the SEC's Rules of Practice, 17 C.F.R. § 201.101(a).

- Rule 102(b) of the SEC's Rules of Practice states that in any proceeding a person may be represented by an attorney at law admitted to practice before the Supreme Court of the United States or the highest court of any State (as defined in Section 3(a)(16) of the Exchange Act, 15 U.S.C. § 78c(a)(16)); a member of a partnership may represent the partnership; a bona fide officer of a corporation, trust or association may represent the corporation, trust, or association; and an officer or employee of a state commission or of a department or political subdivision of a state may represent the state commission or the department or political subdivision of the state.

Considerations:

- If a witness is not accompanied by counsel, the witness may advise the SEC employee taking the testimony at any point during the testimony that he or she desires to be accompanied, represented and advised by counsel.  Testimony will be adjourned once to afford the witness an opportunity to arrange for counsel.

- The witness may be represented by counsel who also represents other persons involved in the SEC's investigation.  For more information on Multiple Representations, *see* Section 4.1.1.1 of the Manual.

### 3.3.5.4      Going off the Record

The SEC employee taking the testimony controls the record.  If a witness desires to go off the record, the witness must indicate this to the SEC employee taking the testimony, who will then determine whether to grant the witness's request.  The reporter will not go off the record at the direction of the witness, or counsel for the witness.  *See* Form SEC 1662 and Rules 6 and 7 of the SEC's Rules Relating to Investigations, 17 C.F.R. §§ 203.6 and 203.7.

### 3.3.5.5      Transcript Availability

Basics:

Rule 6 of the SEC's Rules Relating to Investigations, 17 C.F.R. § 203.6, provides that:

Transcripts, if any, of formal investigative proceedings shall be recorded solely by the official reporter, or by any other person or means designated by the officer conducting the investigation.  A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees:  *Provided, however*, That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request.  In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness's own testimony.

Persons requested to supply information voluntarily are allowed the rights provided by Rule 6.  If a witness wishes to purchase a copy of the transcript of his or her testimony, the reporter will provide the witness with a copy of the appropriate form.  Rule 6 does not permit a witness to obtain or review documentary evidence provided by anyone other than the witness.

Further Information:

Assigned staff should consult with his or her supervisor for the procedures to be followed to make a recommendation that the SEC deny a witness's request for a transcript copy.

### 3.3.6    Special Cases

#### 3.3.6.1    Contacting Employees of Issuers and Other Entities

When communicating with officers, employees and other constituents of issuers and other organizations, staff should follow Rule 4.2 of the ABA Model Rules of Professional Conduct, unless the applicable state version of that Rule is more restrictive or otherwise determined to be more appropriate to the situation.  All states have adopted rules of professional conduct similar to Model Rule 4.2 to govern a lawyer's communications with constituents of represented organizations.  Although the staff's communications in the course of an investigation will be governed by one or more state versions of Model Rule 4.2 (rather than the Model Rule itself), communications that comply with the Model Rule and its commentary usually will comply with applicable state counterparts to  Model Rule 4.2.

Under the ABA Model Rules, contacts with represented persons are addressed by Model Rule 4.2, which states:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

Comment [7] to Rule 4.2 clarifies the rule's applicability to organizations that are represented in the matter:

> In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability. Consent of the organization's lawyer is not required for communication with a former constituent. If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. *See* Rule 4.4.

If staff have questions about application of Model Rule 4.2, or a state's version of that rule, to a particular situation, they should contact OCC or the Professional Responsibility Counsel in OGC.

#### 3.3.6.2    Contacting Witnesses Residing Overseas

<u>Basics</u>:

The staff is encouraged to consult with the SEC's Office of International Affairs ("OIA") as soon as the staff suspects any foreign connection to an investigation.  Because countries have varying requirements for contacting witnesses, staff should contact OIA before attempting to

contact a witness residing overseas.  OIA can provide advice on the existence of any information sharing mechanism in the country in which the witness resides, the uses to which information can be put, and practical considerations, such as likely response time for the assistance needed from a particular country.  OIA also can prepare requests to foreign authorities and review drafts for compliance with the requirements of any information sharing mechanism that exists and or foreign law and practice.  Depending on the needs of a particular case, OIA may arrange conference calls or other meetings with the foreign counterpart, sometimes in advance of sending a formal request for assistance.

<u>Considerations</u>:

As a general matter, the Division is able to obtain testimony from witnesses residing overseas through a variety of mechanisms.  These mechanisms include: information sharing arrangements with foreign counterparts such as memoranda of understanding; mutual legal assistance treaties; letters rogatory; ad hoc arrangements; and voluntary cooperation.  OIA can advise the staff as to which of these mechanisms is available in a particular foreign jurisdiction.

- <u>Memoranda of Understanding ("MOUs")</u>

  MOUs are regulator-to-regulator arrangements regarding information sharing and cooperation in securities matters.  The SEC has entered into over 30 such sharing arrangements with its foreign counterparts.  The SEC is also a signatory to the International Organization of Securities Commissions Multilateral MOU.  This MOU is the first global information sharing arrangement among securities regulators.

  The scope of information that the SEC can obtain pursuant to an MOU varies depending on the legal abilities of the particular foreign authority.  Some, but not all, MOUs allow the SEC to obtain witness statements.

- <u>Mutual Legal Assistance Treaties ("MLATs") (Criminal Matters)</u>

  Generally, MLATs are designed for the exchange of information in criminal matters and are administered by the Department of Justice ("DOJ").  Although MLATs are primarily arrangements to facilitate cross-border criminal investigations and prosecutions, the SEC may be able to use this mechanism in certain cases.  Some jurisdictions permit the SEC to obtain information, including sworn testimony, through MLATs.  U.S. criminal interest in the matter may be a prerequisite to the ability of the SEC to obtain information through MLATs.  DOJ has signed numerous MLATs with foreign criminal authorities.  MLATs may be an effective mechanism to obtain assistance when an MOU with a particular country either does not exist or does not permit the type of information sought from a witness residing overseas.

- <u>Letters Rogatory</u>

  A letter rogatory is a formal request from a court in one country to the appropriate judicial authority in another county.  Generally, a letter rogatory is used in litigation to request compulsion of testimony or other evidence, or to serve process on a person

located abroad.  The execution of a request for judicial assistance by the foreign court is based on comity between nations, absent a specific treaty such as the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters.  Because a letter rogatory generally can only be used to gather evidence in litigation, a letter rogatory may have limited utility where a case is in the investigative stage.

- <u>Ad Hoc Arrangements</u>

  Even if no formal information sharing mechanism exists with respect to a particular jurisdiction, the SEC nevertheless may be able to secure assistance in contacting a witness overseas by working on an *ad hoc* basis with foreign authorities.  Such *ad hoc* arrangements often prove particularly helpful with emerging markets, whose securities legislation continues to develop.

- <u>Voluntary Cooperation</u>

  Depending on the jurisdiction, it may be possible to request information directly from persons located abroad on a voluntary basis.  However, in some countries such efforts may violate local statutes and laws.  In still other jurisdictions, advance notice to the local regulator and relevant authorities may be required.  Division staff should consult OIA even where the staff seeks only voluntary cooperation from a witness.  Where seeking voluntary cooperation, the staff should stress the voluntary nature of the inquiry.

<u>Further Information</u>:

For more information on contacting witnesses residing overseas, staff should contact OIA.

### 3.3.7   Proffers and Proffer Agreements

Proffers of information and evidence by witnesses, including potential cooperating witnesses, are an important method used by the staff to assess the potential value of information and evidence.  A proffer is generally required to evaluate whether to recommend that a cooperation agreement be entered by the Division.  Offering to proffer is often a method for individuals and entities to initiate a discussion concerning the potential benefits of cooperation in connection with an investigation or proceeding.  Proffers are generally made directly by a witness, but at times are preceded by a proffer by an attorney for the witness.

A proffer agreement is a written agreement generally providing that any statements made by a person, on a specific date, may not be used against that individual in subsequent proceedings, except that the Commission may use statements made during the proffer session as a source of leads to discover additional evidence and for impeachment or rebuttal purposes if the person testifies or argues inconsistently in a subsequent proceeding.  The Commission also may share the information provided by the proffering individual with appropriate authorities in a prosecution for perjury, making a false statement or obstruction of justice.

<u>Procedures</u>:

Proffer agreements must be signed by a supervisor at or above the level of Assistant Director.  The staff uses a standard proffer agreement.  Modifications to the standard agreement should not be made without first consulting with OCC.

<u>Considerations</u>:

- In most cases, the staff should require a potential cooperating individual to make a detailed proffer before the use of the cooperation tools discussed in <u>Section 6</u> of the Manual.

- To avoid potential misunderstandings, with few exceptions, proffer sessions with witnesses should be conducted pursuant to written proffer agreements.  Written agreements are not necessary for proffers of information given by counsel to a witness.

- If the staff conducts a joint proffer session with criminal authorities, the staff should address any potential substantive or procedural issues with his or her supervisors, as well as the Assistant United States Attorney or state prosecutor on the case, before the proffer begins.  In cases where the staff participates in a proffer with the criminal authorities and the cooperating individual has not asked for a proffer letter from the Commission, the staff should remind the individual that the proffer agreement with the criminal authorities does not apply to the Commission.

## 4.    **Privileges and Protections**

### 4.1    **Assertion of Privileges**

### 4.1.1   **Attorney-Client Privilege**

<u>Basics</u>:

- The attorney-client privilege protects from disclosure confidential communications between attorney and client made when the client is seeking legal advice.  The purpose of the privilege is to encourage free and candid communication between attorney and client.

- Elements necessary to establish the attorney-client privilege include:

    o  it is a communication

    o  the communication was made in confidence

    o  the communication was to an attorney

    o  the communication was by a client

    o  the communication was for the purpose of seeking or obtaining primarily legal advice

<u>Considerations</u>:

- In order for the staff to credit an advice-of-counsel defense in an investigation, the party asserting the defense must provide evidence sufficient to enable the staff to evaluate the validity of the defense, even if this requires disclosure of privileged information.  To assert a valid advice-of-counsel defense, courts have held that the defendant must establish that he or she (1) made complete disclosure to counsel; (2) requested counsel's advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice.

- Information that typically does not involve a confidential communication and therefore is not privileged includes:

  - identity of the client

  - existence of the attorney-client relationship

  - general reason why the attorney was retained

  - fee arrangement between attorney and client

  - billing statements, unless they include narrative descriptions that satisfy the elements of a privilege

- Crime-fraud exception to attorney-client privilege:  Most courts require the party wishing to invoke the crime-fraud exception to demonstrate that there is a factual basis for a showing of probable cause to believe that a crime or fraud has been committed and the communications in question were in furtherance of the crime or fraud.  This burden is normally not met by showing that the communications in question might provide evidence of a crime or fraud but rather that the communication itself was in furtherance of the crime or fraud and was intended to facilitate or conceal the crime or fraud.

- Corporations asserting the attorney-client privilege:  The attorney-client privilege can be asserted by a corporation to protect communications between corporate employees and in-house or outside counsel.  Courts have held that to assert the attorney-client privilege, a corporation must show that the communication came from a person who was employed with the corporation at the time of the communication, the employee was seeking legal advice from an attorney, and the communication was made within the scope of the employee's duties.

- Questions to consider asking to test the assertion of the attorney-client privilege include:

  - Who prepared the document?

  - Who sent the document?

  - To whom was the document sent?

o   What was the date of the communication?

o   What was the date on the document?  What date was the document prepared, sent, or received?

o   Who are the attorney and client involved?

o   What was the nature of the document (*i.e.*, memorandum, letter, telegram, etc., and generic subject matter)?

o   Who are parties indicated on the document through carbon copy notations or otherwise who were to receive the document, and all parties that in fact received or saw the document?

o   Who was present during the communication?

o   Who are the parties to whom the substance of the communication was conveyed?

o   Would all of the communication, if disclosed to the staff, reveal or tend to reveal a communication from a client (made with the intention of confidentiality) to his or her attorney in connection with clients seeking legal services or legal advice at a time when the attorney was retained by that client?

o   Would any segregable part of that communication not reveal or tend not to reveal such a confidential communication?

o   Did a retention agreement between the attorney and client exist and if so, what is the date of such agreement?

o   During what period of time did the attorney-client relationship exist?

o   Was a legal fee charged the client by the attorney in connection with the matter involving the communication, and if so, how much, and how, when and by whom was it paid?  If no fee was charged, was one discussed?

o   What was the general nature of legal services rendered, and during what time period were they rendered?

o   Did the communication primarily involve a business dealing between the attorney and client?

o   Did the communication involve the client's seeking business advice?

o   Was the communication a grant of authority or instruction for the attorney to act upon?

### 4.1.1.1   Multiple Representations

Basics:

      It is not unusual for counsel to represent more than one party (employees of the same company, for example).  Representing more than one party in an investigation does not necessarily present a conflict of interest, although it may heighten the potential for a conflict of interest.

Considerations:

      When an attorney represents multiple parties, staff in testimony typically informs the party of the following statement in Form 1662:

> You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

Further Information:

      For additional information on representation of more than one party in testimony, *see* Section 3.3.5.3 of the Manual.

### 4.1.2   Attorney Work Product Doctrine

Basics:

- A party or the representing attorney may refuse to provide information on the basis that the information requested is protected by the attorney work product doctrine.  If the documents or information requested were prepared in anticipation of litigation or for trial, or directly related to preparation for trial, then the work product doctrine generally applies and the party seeking discovery has the burden of proving substantial need and undue hardship.  For material to be prepared in "anticipation of litigation," the prospect of litigation must be identifiable, although litigation need not have already commenced.

- Elements of the doctrine as set forth in Federal Rule of Civil Procedure 26(b)(3) are the following:

  o  documents and tangible things

  o  prepared in anticipation of litigation or for trial

  o  by or for another party or by or for that party's representative, including attorney, consultant, surety, indemnitor, insurer, or agent

- Work product may be discovered, however, if "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  Rule 26(b)(3)(A)(ii).

<u>Considerations</u>:

- Voluntary disclosure of work product to the SEC generally constitutes a waiver for all purposes as to the disclosed document or information.

- In order for the staff to credit an advice-of-counsel defense in an investigation, the party asserting the defense must provide evidence sufficient to enable the staff to evaluate the validity of the defense, even if this requires disclosure of attorney work product.  To assert a valid advice-of-counsel defense, courts have held that the defendant must establish that he or she (1) made complete disclosure to counsel; (2) requested counsel's advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice.

### 4.1.3   The Fifth Amendment Privilege Against Self-Incrimination

<u>Basics</u>**:**

- A witness testifying before the SEC may assert his or her Fifth Amendment privilege against self-incrimination.

- If a previous grant of immunity, or the expiration of the time limits for criminal prosecution prescribed by the statute of limitations, eliminates the danger of self-incrimination, the witness may not invoke the privilege.

<u>Considerations</u>**:**

- Staff typically will require testimony by or a declaration from the witness to assert the witness's Fifth Amendment privilege.  Staff typically will not accept a letter from counsel as an alternative to testimony or a declaration.

  o  Reasons for requiring a witness to appear in person to assert the Fifth Amendment privilege include, but are not limited to, obtaining a clear and specific privilege assertion on the record, allowing the staff to probe the scope of the privilege assertion, and allowing the staff to determine whether there are grounds to challenge the assertion.

  o  A witness may not make a blanket assertion of the Fifth Amendment privilege.

  o  In some cases, allowing assertion of the privilege by declaration may be more appropriate, for example, when time is of the essence.

- The Fifth Amendment privilege against self-incrimination protects individuals and sole proprietorships, but does not protect a collective entity, such as a corporation, or papers held by an individual in a representative capacity for a collective entity.

- Under the required records doctrine, the Fifth Amendment privilege against self-incrimination does not apply to records required to be kept by an individual under government regulation, such as tax returns.

- During litigation, the SEC can assert that an adverse inference should be drawn against a defendant who has asserted the Fifth Amendment privilege.

- If a witness testifying before the SEC asserts his or her Fifth Amendment privilege against self-incrimination, the staff should state on the record that the staff member has no authority to confer immunity, that the staff member has no intention of doing so, and that any questions asked from that point on in the testimony will be with the understanding that the witness may decline to answer on the basis that the response may tend to incriminate the witness.  Without compulsion to testify, there can be no claim that immunity was granted.  *U.S. v. Orsinger*, 428 F.2d 1105, 1114 (D.C. Cir.), *cert. denied*, 400 U.S. 831 (1970) (witness who refused to testify under Commission subpoena, and who was not compelled to testify, acquired no immunity from criminal prosecution).  *See also U.S. v. Abrams*, 357 F.2d 539, 549 (2d Cir.), *cert. denied*, 384 U.S. 1001 (1966).

## 4.2    Inadvertent Production of Privileged or Non-Responsive Documents

Basics:

Under Rule 502(b) of the Federal Rules of Evidence,[2] a disclosure to a federal agency of information covered by the attorney-client privilege or work-product protection does not operate as a waiver in a federal (or state) proceeding if:

(1)    the disclosure is inadvertent;

(2)    the holder of the privilege or protection took reasonable steps to prevent disclosure; and

(3)    the holder promptly took reasonable steps to rectify the error.

Whether an inadvertent production is first identified by staff or by the producing party, before determining how to proceed, staff should consult with his or her supervisor(s) and, if appropriate, the Regional Director, Unit Chief, Chief Counsel, Chief Litigation Counsel, and/or the Professional Responsibility Counsel in OGC.  Generally, if an inadvertent production is discovered by staff, staff will notify the party through his or her counsel of its receipt of inadvertently produced documents.

Considerations:

- Whether the staff should return (or sequester) an inadvertently produced document or has a legally sound basis for using it is, in part, a function of applicable state professional responsibility rules, as well as, in many cases, the applicable law of privilege and rules of

---

[2]    Rule 502 became effective on September 19, 2008, and applies in all proceedings commenced after that date and, to the extent just and practicable, in all proceedings that were then pending.

evidence.  Under some states' professional responsibility rules, the staff's options may depend on whether he or she was made aware of the inadvertent production before or after reviewing the document.

- Staff should determine how to proceed in consultation with his or her supervisors and/or the others described above.  Once a determination is made, staff typically informs the party whether the staff intends to return, sequester, or use the document.  Staff also may inform the party whether and to whom staff has provided copies of the document outside the SEC (*e.g.*, a judge).

- If it is determined that, based on a claim of privilege, a document should be returned to the party, staff should require that the party promptly submit a privilege log for the document.

### 4.2.1   Purposeful Production Without Privilege Review

Basics:

      In some instances, a party may seek to produce documents to the staff before reviewing them for privilege, while also seeking to preserve any claims of privilege on the materials.  If it will benefit the investigation, staff can choose to accept such a production by entering a written agreement (the Model Agreement for Purposeful Production without Privilege Review) with the producing party.  Under the agreement, responsibility for identifying any privileged materials resides solely with the party, and acceptance of the production is not an agreement to shift such responsibility to the staff.  Further, under the terms of the written agreement, the party must agree, among other things, not to assert that the staff's investigation has been tainted by the staff's receipt, review, examination, or use of any material later determined to be privileged.

Considerations:

- The Division typically uses a Model Agreement for Purposeful Production without Privilege Review.  Staff should consult with OCC concerning any request to modify the Model Agreement.

- In determining whether to accept such a production and enter a written agreement, staff should consider whether doing so will advance the investigation by expediting production.

Further Information:

      Staff should refer any questions about this issue to their supervisors and to OCC.

### 4.3   Waiver of Privilege

Basics:

      The staff must respect legitimate assertions of the attorney-client privilege and attorney work product protection.  As a matter of public policy, the SEC wants to encourage individuals,

corporate officers and employees to consult counsel about the requirements and potential violations of the securities laws.  Likewise, non-factual or core attorney work product – for example, an attorney's mental impressions or legal theories – lies at the core of the attorney work product doctrine.

A key objective in the staff's investigations is to obtain relevant information, and parties are, in fact, required to provide all relevant, non-privileged information and documents in response to SEC subpoenas. ***The staff should not ask a party to waive the attorney-client privilege or work product protection without prior approval of the Director or Deputy Director.*** A proposed request for a privilege waiver should be reviewed initially with the Assistant Director supervising the matter and that review should involve more senior members of management as appropriate before being presented to the Director or Deputy Director.

Both entities and individuals may provide significant cooperation in investigations by *voluntarily* disclosing relevant information.  Voluntary disclosure of information need not include a waiver of privilege to be an effective form of cooperation and a party's decision to assert a legitimate claim of privilege will not negatively affect their claim to credit for cooperation. However, as discussed below, if a party seeks cooperation credit for timely disclosure of relevant facts, the party must disclose all such facts within the party's knowledge.

Corporations often gather facts through internal investigations regarding the conduct at issue in the staff's investigation.  In corporate internal investigations, employees and other witnesses associated with a corporation are often interviewed by attorneys.  Certain notes and memoranda generated from attorney interviews may be subject, at least in part, to the protections of attorney-client privilege and/or attorney work product protection. To receive cooperation credit for providing factual information obtained from the interviews, the corporation need not necessarily produce, and the staff may not request without approval, protected notes or memoranda generated by the attorneys' interviews. To earn such credit, however, the corporation must produce, and the staff always may request, relevant factual information—including relevant factual information acquired through those interviews.

A party may choose to voluntarily disclose privileged communications or documents.  In this regard, the SEC does not view a party's waiver of privilege as an end in itself, but only as a means (where necessary) to provide relevant and sometimes critical information to the staff.  *See Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 and Commission Statement on the Relationship of Cooperation to Agency Enforcement Decisions*, Securities Exchange Act Rel. No. 44969 n.3 (Oct. 23, 2001) ("Seaboard 21(a) Report").  In the event a party voluntarily waives the attorney-client privilege or work product protection, the staff cannot assure the party that, as a legal matter, the information provided to the staff during the course of the staff's investigation will not be subject to disclosure pursuant to subpoena, other legal process, or the routine uses set forth in the Commission's Forms 1661 and 1662.

Considerations:

- The SEC encourages and rewards cooperation by parties in connection with staff's investigations.  One important measure of cooperation is whether the party has timely disclosed facts relevant to the investigation.  Other measures of cooperation include, for

example, voluntary production of relevant factual information the staff did not directly request and otherwise might not have uncovered; and requesting that corporate employees cooperate with the staff and making all reasonable efforts to secure such cooperation.  The SEC's policies with respect to cooperation are set forth in the Seaboard 21(a) Report, and in the Policy Statement concerning cooperation, 17 C.F.R. § 202.12 (*see* Section 6.1 of the Manual), which outline other factors that may be considered in assessing whether to award credit for cooperation.

- A party's decision to assert a legitimate claim of attorney-client privilege or work product protection will not negatively affect that party's claim to credit for cooperation.  The appropriate inquiry in this regard is whether, notwithstanding a legitimate claim of attorney-client privilege or work product protection, the party has disclosed all relevant underlying facts within its knowledge.

- By timely disclosing the relevant underlying facts, a party may demonstrate cooperation for which the staff may give credit, while simultaneously asserting privilege.  The timely disclosure of relevant facts is considered along with all other cooperative efforts and circumstances in determining whether and the extent to which the party should be awarded credit for cooperation.  *See id.*

- In order for the staff to credit an advice-of-counsel defense in an investigation, the party asserting the defense must provide evidence sufficient to enable the staff to evaluate the validity of the defense, even if this requires disclosure of privileged information.  To assert a valid advice-of-counsel defense, courts have held that the defendant must establish that he or she (1) made complete disclosure to counsel; (2) requested counsel's advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice.  Staff at the Assistant Director level or higher should attempt to explore the possibility of an advice-of-counsel defense with a party's counsel at an early stage in the investigation.  It is important to obtain all relevant documents and testimony at the earliest possible date.

- Staff should consider whether there may be circumstances that negate assertions of privilege, such as the crime-fraud exception and prior non-privileged disclosure.  These and other such circumstances should be considered in analyzing the legitimacy of a party's assertion of privilege.

Further Information:

- For more information on the attorney-client privilege and work product doctrine, and related exceptions, consult Sections 4.1.1 (Attorney-Client Privilege) and 4.1.2 (Attorney Work Product Doctrine) of the Manual.

- For information on the inadvertent production of privileged materials, consult Section 4.2 of the Manual.

- For information on the production of privileged materials pursuant to a Confidentiality Agreement, consult Section 4.3.1 of the Manual.

- For more information on the factors considered by the Commission when crediting cooperation, staff should consult the Seaboard 21(a) Report, with respect to corporations, or Section 6.1 of the Manual with respect to individuals.

### 4.3.1  Confidentiality Agreements

Basics:

　A confidentiality agreement is an agreement between the staff of the Division of Enforcement and, typically, a company subject to investigation pursuant to which the company agrees to produce materials that it considers to be privileged (such as reports of internal investigations, interview memoranda, and investigative working papers).  For its part, the staff agrees not to assert that the entity has waived any privileges or attorney work-product protection as to any third party by producing the documents, and agrees not to assert that production resulted in a subject matter waiver.  The staff also agrees to maintain the confidentiality of the materials, except to the extent that the staff determines that disclosure is required by law or that disclosure would be in furtherance of the SEC's discharge of its duties and responsibilities.  The basis for the agreement is the interest of the staff in determining whether violations of the federal securities laws have occurred, and the company's interest in investigating and analyzing the circumstances and people involved in the events at issue.

Considerations:

- The Division typically uses a Model Confidentiality Agreement.  The staff should not agree to modifications to the Model Confidentiality Agreement without first consulting with OCC and/or the Chief Litigation Counsel.  The agreement must be signed by a supervisor at or above the level of Assistant Director.

- While obtaining materials that are otherwise potentially subject to privilege or the protections of the attorney work-product doctrine can be of substantial assistance in conducting an investigation, the staff should exercise judgment when deciding whether to enter into a confidentiality agreement with a company under investigation. Considerations include the following:

  o Some courts have held that companies that produce otherwise privileged materials to the SEC or the U.S. Department of Justice, even pursuant to a confidentiality agreement, waived privilege in doing so.

  o Some companies have important pertinent operations in one or more foreign jurisdictions, which may have data privacy and other laws that will restrict the staff's ability to obtain evidence.  The company itself may have access to the persons in such jurisdictions (especially if they are still employees) and to other sources of evidence (such as documents and e-mails).  In such instances, the company may be able to convey important information to the staff by producing interview memoranda and through reports of findings derived from otherwise restricted sources.

## 4.4   Compliance with the Privacy Act of 1974

Basics:

- The Privacy Act of 1974, 5 U.S.C. § 552a, establishes requirements for the solicitation and maintenance by agencies of personal information regarding members of the public.

- When obtaining information from the public, the statute generally requires the staff to provide notice with respect to the authority for the solicitation and whether disclosure is voluntary or mandatory; the principal purposes for seeking the information; the effect of refusing to provide the information; and the "routine uses" of the information.  The statute generally prohibits any disclosure of personal information unless the disclosure is within one of the statute's exemptions (including the exemption for "routine uses").

Considerations:

The Privacy Act notice requirement referred to above is generally met by providing a copy of Form 1661 or Form 1662 to the person or entity from which information is sought.  The forms contain the list of uses that may be made of personal information.  Generally, disclosures in aid of the staff's investigations will be covered by one or more of the routine uses.

Further Information:

- For questions relating to the Privacy Act, staff should contact OCC.

- For further information on Forms 1661 and 1662, *see* Section 3.2.3.1 of the Manual.

- For further information on how to meet the Privacy Act requirements when conducting voluntary telephone interviews, *see* Section 3.3.3.1 of the Manual.

## 4.5   Compliance with the Right to Financial Privacy Act of 1978

Basics:

- The Right to Financial Privacy Act of 1978 (12 U.S.C. §§ 3401 to 3422) provides individuals with a privacy interest in their banking records held by a financial institution. Section 21(h) of the Exchange Act contains additional RFPA procedures available only to the SEC.

- The RFPA applies when staff seeks the financial records of a "customer" (*i.e.*, an individual or partnership of five or fewer individuals) from a "financial institution" (*e.g.*, a bank, mortgage lending company or trust company, but not regulated entities, such as broker-dealers or investment advisers).  Generally, the staff may only obtain customer records from a financial institution pursuant to subpoena, after providing the customer with notice of the subpoena and an opportunity to challenge production in court.  Notice must also be provided when the staff discloses information obtained pursuant to the RFPA to another federal agency (absent an exemption, such as that for disclosure to the Department of Justice).

Considerations:

- To avoid inadvertent non-compliance, the staff should be aware of RFPA restrictions whenever seeking banking records, including banking records of corporate entities.

- In certain situations, including where notice to the customer may impede an investigation or result in the movement of funds out of U.S. jurisdiction, staff may consider seeking a court order under Section 21(h) of the Exchange Act to delay notice; the staff may also consider filing an emergency action to obtain a freeze order to protect investor funds.

- The staff should also be aware of RFPA restrictions whenever disclosing information obtained from a financial institution to another federal agency.

Further Information:

For further information about the RFPA and its requirements, staff should contact OCC.

### 4.6    Compliance with the Electronic Communications Privacy Act of 1986

Basics:

- The Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2510 to 2711, expanded the wiretap laws to protect the contents of electronic communications (*e.g*., e-mail) and other subscriber or customer records held by third-party electronic communications service providers.

- The staff can obtain the content of communications either directly from the sender or intended recipient, or from a service provider with subscriber or customer consent.

- The ECPA also authorizes agencies to obtain telephone records and e-mail records (other than content) by subpoena.  This information includes the name, address, local and long distance telephone connection records, or records of session times and durations; length of service (including start date) and types of service utilized; telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and the means and source of payment for such service (including any credit card or bank account number).  No subscriber or customer notice is required when obtaining such records.

Considerations:

- The staff should be aware of ECPA restrictions whenever seeking information or records from persons who provide computerized communication services to the public.  These service providers include online information services, national and local entities that permit customers to gain access to the internet, and any other person that permits customers to communicate via e-mail or bulletin boards.  Access to information and records from any of these entities may be subject to the ECPA.

- The ECPA applies only to records held by third-party service providers, and hence does not apply to e-mail held by the sender or addressee, or held on the servers of a company that provides internal e-mail services for its own employees.

- As a result of changes in the language of Section 2703 of the ECPA, and in telephone billing practices, service providers have increasingly submitted requests for reimbursement for production of transactional records regarding telephone and electronic communication services.  The staff continues to believe that such reimbursement was not contemplated at the time the statute was enacted; however, reasonable invoices submitted after compliance with staff subpoenas may be considered.

Further Information:

     For further information on whether the ECPA may apply and the procedures to follow when it does, staff should consult OCC.

## 4.7    Handling Bank Secrecy Act Material

     Bank Secrecy Act information can provide valuable leads in investigations.  However, BSA information often contains sensitive data or Personally Identifiable Information ("PII").  In addition, Suspicious Activity Reports ("SARs") are protected by the BSA and related regulations that prohibit improper disclosures.[3]  The purpose of a SAR is to report known or suspected violations of law or suspicious activity observed by financial institutions.  Information obtained from SARs provides an additional resource for identifying regulated entities and individuals that may be engaged in conduct that constitutes potential violations of the federal securities laws or poses an increased risk of harm to the investing public.

     Staff generally may share SARs and SAR information with other SEC staff when required in the context of an investigation.  However,

- All SAR materials must be segregated, marked to indicate that they contain sensitive SAR information, and properly secured.

- In investigations and litigation, SEC production of SARs or documents identified by the filer as supporting the filing of a SAR is generally prohibited.

- Staff may share SARs and SAR information with certain other government agencies only under very limited circumstances and after implementing appropriate safeguards.

- SAR materials cannot be shown to witnesses or marked as exhibits in testimony.

- Staff may not disclose SAR information or its existence to persons who may be assisting in a matter, such as an Independent Compliance Consultant or Receiver.

---

[3] 31 U.S.C. 5318(g)(2)(A); *see, e.g.*, 31 C.F.R. § 1023.320 (disclosure of SARs filed by brokers or dealers in securities).

Further Information:

- Staff should contact the Division's BSA Review Group for specific information and guidance about how to properly handle SARs and other materials filed pursuant to the BSA.

- *See also* Sections 2.2.2.1 and 3.2.9 of the Manual.


5.    **Working with Other Agencies and Organizations**

   5.1    **Disclosure of Information and Access Requests**

Basics:

All information obtained or generated by SEC staff during investigations or examinations should be presumed confidential and nonpublic unless disclosure has been specifically authorized.  The SEC's rules permit the staff, by delegated authority, to grant access to nonpublic information to domestic and foreign governmental authorities, SROs, and other persons specified in Section 24(c) of the Exchange Act and Rule 24c-1 thereunder.  Disclosures of such information to members of the general public will normally be made only pursuant to the Freedom of Information Act.

Rule 2:  The Discussion Rule:

Cooperation and coordination with other law enforcement agencies often require the staff to engage in discussions of nonpublic information prior to the grant of a formal access request.  Rule 2 of the SEC's Rules Relating to Investigations was adopted to permit discussions with those persons who may obtain access to nonpublic information through the SEC's access program.  Discussions under Rule 2 must be authorized by officials at or above the level of Assistant Director.  Rule 2 extends only to the conduct of discussions and not to the furnishing of nonpublic documents.  *See* Rule 2 of the SEC's Rules Relating to Investigations, 17 C.F.R. § 203.2.

The Access Program:

Section 24(c) of the Exchange Act and Rule 24c-1 authorize the SEC to grant access to nonpublic information in enforcement files.  Note, however, that work product and other privileged information is rarely disclosed, even when third-parties are granted access to the other materials in nonpublic files, and should not be disclosed without specific supervisory approval.  In addition, information obtained by the SEC from other agencies should be safeguarded, and the staff should comply with all conditions placed on the information by the agency that provided access.

Rule 24c-1 authorizes disclosure to the following classes of requestors:

- Federal, state, local and foreign governmental authorities

82

- self-regulatory and similar organizations

- foreign financial regulatory authorities

- Securities Investor Protection Corporation and its trustees

- trustees in bankruptcy

- trustees, receivers, masters, special counsels, or others court-appointed persons charged with performing functions arising from securities litigation

- professional licensing or oversight authorities that are government-sponsored (*e.g.*, bar associations that are part of a state's court system)

- agents, employees or representatives of the above persons

<u>Access Procedures</u>:

The SEC's rules require that all access requests be in writing and signed by an official who is in a sufficiently senior or supervisory position to make and enforce required representations. Requestors are generally expected to use the Division's template access letters and direct the letter to the assigned Assistant Director.

The access request should be entered into the Hub. The authority to grant access has been sub-delegated to senior officers at or above the level of Associate Director or Associate Regional Director. When an access request has been approved, the staff should prepare an access grant letter for signature by assigned supervisory staff at the Assistant Director level or higher. Staff should retain the original access request and grant letters.

<u>Disclosure of Whistleblower Identifying Information</u>

There are strict limitations on the Commission's authority to disclose information that could reasonably be expected to reveal the identity of a whistleblower ("whistleblower identifying information") to other government agencies, either orally (pursuant to the Discussion Rule) or in response to an Access Request. The Exchange Act expressly provides the Commission with the authority to disclose whistleblower identifying information to certain regulatory and law enforcement authorities when "necessary to accomplish the purposes of [the Exchange Act] and to protect investors." Exchange Act § 21F(h)(2)(D). Making such a disclosure requires Commission authorization, which can be granted by the Division Director exercising delegated authority. Disclosure to an agency not enumerated in Exchange Act Section 21F(h)(2), whether orally or in response to an Access Request, cannot be approved using delegated authority. If staff propose to disclose whistleblower identifying information to an agency not enumerated in Exchange Act Section 21F(h)(2), they should contact OCC or OWB.

Further Information:

      For further information regarding the access program and procedures, staff should consult with OCC.  For further information regarding disclosure of whistleblower identifying information to another regulatory or law enforcement authority, staff should consult with OWB.

## 5.2      Cooperation with Criminal Authorities

      Cooperating with criminal authorities is an important component of the SEC's enforcement mission.  The SEC is an independent federal agency charged by Congress with upholding the federal securities laws.  The SEC has authority to bring civil, but not criminal, actions to enforce those laws.  This authority is not compromised when the Department of Justice or state criminal authorities conduct a criminal investigation and/or make a determination to bring criminal charges concurrent with the SEC's investigation and/or civil action.  Nonetheless, there are certain unique considerations that arise when cooperating with criminal authorities, as discussed in Sections 5.2.1 and 5.2.2 of the Manual.

### 5.2.1   Parallel Investigations

Basics:

      Parallel civil and criminal proceedings are not uncommon.[4]  In furtherance of the SEC's mission and as a matter of public policy, the staff is encouraged to work cooperatively with criminal authorities, to share information, and to coordinate their investigations with parallel criminal investigations when appropriate.  There are, however, a number of considerations the staff should be mindful of when conducting a parallel investigation and when determining whether to seek authorization to bring a case that involves a parallel criminal investigation. Because each case presents a unique set of circumstances, assigned staff should consult with supervisors whenever they are involved in parallel proceedings.

Considerations:

      While every situation is different, the staff typically should keep the following considerations in mind when conducting a parallel investigation and when determining whether to seek authorization to bring a case that involves a parallel criminal investigation:

---

[4]    The Supreme Court recognized in *United States v. Kordel*, 397 U.S. 1, 11 (1970) that parallel civil and criminal proceedings are appropriate and constitutional. As the Court of Appeals for the D.C. Circuit put it in the leading case of *SEC v. Dresser*, 628 F.2d 1368, 1377 (D.C. Cir. 1980), "effective enforcement of the securities laws require that the SEC and [the Department of] Justice be able to investigate possible violations simultaneously." Other courts have issued opinions to the same effect. *E.g., SEC v. First Financial Group of Texas*, 659 F.2d 660, 666-67 (5th Cir. 1981) ("The simultaneous prosecution of civil and criminal actions is generally unobjectionable."); *United States v. Stringer,* 521 F.3d 1189, 1191 (9th Cir. 2008) *(*"There is nothing improper about the government undertaking simultaneous criminal and civil investigations. . ."*).*  Moreover, the federal securities laws themselves expressly provide that the SEC can share information gathered in a civil investigation with other government agencies and provide information to the Department of Justice for a determination whether to institute criminal proceedings. *See* Section 20(b), Securities Act; Section 21(d), Exchange Act; 17 C.F.R. § 240.24c-1 (access to nonpublic information).

- It is important that the civil investigation has its own independent civil investigative purpose and not be initiated to obtain evidence for a criminal prosecution. This does not prevent the staff from taking an action if the action will provide a benefit to both the SEC's case and the parallel criminal matter. It does mean, however, that staff should not take an SEC civil investigative action for which the *sole* aim is to benefit the criminal matter.

- The staff should make its own independent decision about what documents to request, what investigative testimony to take, what questions to ask during testimony, the location of testimony and similar matters.

- If asked by counsel or any individual whether there is a parallel criminal investigation, staff should direct counsel or the individual to the section of Form 1662 dealing with "Routine Uses of Information," [5] and state that it is the general policy of the Commission not to comment on investigations conducted by law enforcement authorities responsible for enforcing criminal laws. Staff should also invite any person who raises such issues to contact criminal authorities if they wish to pursue the question of whether there is a parallel criminal investigation. Should counsel or the individual ask which criminal authorities they should contact, staff should decline to answer unless authorized by the relevant criminal authorities.

- Supervisors must be involved in all significant discussions and written communications with criminal authorities.

- Generally, sharing information with criminal prosecutors is permissible, even though the sharing of information is intended to and does in fact assist criminal prosecutors. (For more information regarding the Discussion Rule and access requests, *see* Section 5.1 of the Manual.) In addition, in certain circumstances it is appropriate for criminal authorities to ask SEC staff to refrain from taking actions that would harm the criminal investigations, and likewise it can be appropriate for SEC staff to ask criminal authorities not to take action that would harm our investigations. Each case is unique and assigned staff should discuss these and other considerations with their supervisors.

Further Information:

- For more information on joint proffer sessions, *see* Section 6.2.1 of the Manual.

---

[5]   This section of Form 1662 states that "The Commission often makes its files available to other government agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other government agencies is, in general, a confidential matter between the Commission and such governmental agencies."

### 5.2.2   Grand Jury Matters

Basics:

The SEC is generally not privy to grand jury matters.  Grand jury matters are subject to the confidentiality restrictions set forth in Federal Rule of Criminal Procedure 6(e) and analogous state rules of criminal procedure.  Rule 6(e) provides for secrecy of all "matter(s) occurring before the grand jury," subject to certain exceptions.

Considerations:

- Subject to the limitations in Rule 6(e) and similar state rules, the staff may receive information from the criminal authorities about the status of the criminal investigation and the future investigative plans of the criminal authorities.

- Before receiving information from the criminal authorities in an investigation, staff should inquire whether any of the information provided comes directly or indirectly from grand jury proceedings, including subpoenas.

- If staff comes into possession of grand jury materials, he or she should immediately inform his or her supervisor to take appropriate steps.

### 5.3   Cooperation with the Food and Drug Administration

Authority:

- Section 331(j) of the Federal Food, Drug and Cosmetic Act prohibits the Food and Drug Administration ("FDA") from disclosing trade secrets, even to other federal agencies such as the SEC.

- The FDA may share other nonpublic records with other federal agencies, but before disclosing such information the FDA must receive a written agreement that the information will not be further disclosed without written permission from the FDA.  *See* 21 C.F.R. § 20.85.

- The FDA will not agree to further disclosure of confidential commercial information without the consent of the owner or submitter of the information.

- Before the FDA will grant permission for any further disclosure, the agency will review each document to identify potentially privileged or otherwise protected information.

- The Commissioner of Food and Drugs must authorize any investigative testimony by FDA employees.  *See* 21 C.F.R. § 20.1(c).

Basics:

Staff may seek information from the FDA in investigations arising from referrals by the FDA, or in which the FDA may have relevant information.  For example, a company's public

statements about the status for FDA approval of its product may cause the staff to seek information from the FDA about its review of the product. Before making any request to the FDA, staff should review the statutes and regulations that govern the FDA's ability to disclose information to SEC staff. Staff should also consult with their supervisors about the scope of the request and the appropriate addressee. The designated Enforcement FDA liaison should be informed of requests.

To obtain nonpublic information or records, staff can prepare a written request, including:

- identification of the type of information requested

- whether the request is the result of an ongoing investigation

- acknowledgement that trade secret information cannot be disclosed

- agreement not to further disclose the nonpublic information without written consent from the FDA, or, in the case of confidential commercial information, the submitter of the information

The written request should be addressed to an appropriate FDA contact person.

To obtain investigative testimony from an FDA employee, staff can prepare a written request, including:

- identification of the employee whose testimony is sought

- the subject matter of the requested testimony and why the testimony is appropriate under 21 C.F.R. § 20.1

- how the testimony would serve the public interest and promote the objectives of the FDA

The written request should be addressed to the Commissioner of Food and Drugs. Before requesting testimony from an FDA employee, staff should contact the appropriate FDA lawyer.

To request FDA permission to make further disclosure of nonpublic records or information that was provided by the FDA, staff should prepare a written request and attach copies of the documents or transcripts it wishes to disclose.

<u>Considerations</u>:

- Documents relating to FDA consideration of applications for new drugs or biologics can be extremely voluminous—sometimes millions of pages—so staff should consider the extent to which they are relevant to its investigation before making broad requests for all documents relating to a product.

- When preparing to litigate a case in which nonpublic FDA documents or testimony transcripts will be part of the SEC's initial disclosure, staff should keep in mind that before the FDA consents to further disclosure, it will conduct a review of each page to

determine whether any of the material is privileged. Because this review can take a very long time, staff should allow ample time for that review before filing a case or in the litigation discovery schedule.

- If staff expects to charge a defendant who is not the owner of the information (for example, a current or former employee of the company), staff should seek consent from the company for the disclosure as early as practical, because the FDA will not agree to further disclosure of confidential commercial information without the consent of the owner or submitter of the information.

Further information:

- Staff should refer any questions about FDA matters to the designated Enforcement Division liaison or OCC.

- For more information on the FDA, *see* Inside the FDA, a manual available on the FDA's public website, www.fda.gov.

### 5.4    Cooperation with the Public Company Accounting Oversight Board

Basics:

The SEC and the PCAOB have a mutual interest in ensuring that investigations relating to the audit profession are properly coordinated. This will help to promote, among other things, consistent regulatory approaches as well as efficient and cost effective investigations and enforcement actions.

Considerations:

- The SEC and PCAOB generally have concurrent jurisdiction over auditors but there may be instances in which it may be preferable for one organization to be principally responsible for investigating an auditor's conduct.

- Some of the factors the staff may wish to evaluate when coordinating investigations with the PCAOB include differences between possible charges and remedies, the nature of the conduct, and the standards involved.

### 5.5    Coordination and Consultation with Banking Agencies

Basics:

Under Section 241 of Subtitle D of Title II of the Gramm-Leach-Bliley Act, the SEC "shall consult and coordinate comments with the appropriate Federal banking agency before taking any action or rendering any opinion with respect to the manner in which any insured depository institution or depository institution holding company reports loan loss reserves in its financial statement, including the amount of any such loan loss reserves." Therefore, staff should contact the relevant banking agency prior to contacting a bank about a loan loss allowance matter:

- For national banks, federal savings associations, and federal branches and agencies of foreign banks, contact the Office of the Comptroller of the Currency.

- For bank holding companies, savings and loan holding companies, or commercial lending companies, contact the Federal Reserve.

- For State savings associations, contact the Federal Deposit Insurance Corporation.

### 5.6     Informal Referrals from Enforcement

Introduction:

The staff may informally refer a matter to federal or state criminal authorities, SROs, the PCAOB, or state agencies.  The decision to make an informal referral should be made in the Home Office by officials at or above the level of Associate Director.  In the regional offices, the decision to make an informal referral should be made by officials at or above the level of Associate Regional Director.

The staff may also determine that it is appropriate to refer a matter or information concerning potential professional misconduct to state bar associations or other state professional associations or licensing boards.  Such referrals, however, are considered Commission actions and the staff must consult with the Office of the General Counsel, to which the Commission has delegated this authority, in order for a referral to be made.

Authority:

A number of SEC rules grant the Commission the authority to make informal referrals, which authority the Commission has delegated to staff.

- **Rule 5(b) of the SEC's Informal and Other Procedures, 17 C.F.R. § 202.5(b):**

  After investigation or otherwise the Commission may in its discretion take one or more of the following actions: Institution of administrative proceedings looking to the imposition of remedial sanctions, initiation of injunctive proceedings in the courts, and, in the case of a willful violation, reference of the matter to the Department of Justice for criminal prosecution. The Commission may also, on some occasions, refer the matter to, or grant requests for access to its files made by, domestic and foreign governmental authorities or foreign securities authorities, SROs such as stock exchanges or the [Financial Industry Regulatory Authority, Inc.], and other persons or entities.

- **Rule 2 of the SEC's Rules Relating to Investigations, 17 C.F.R. § 203.2:**

  Information or documents obtained by the Commission in the course of any investigation or examination, unless made a matter of public record, shall be deemed non-public, but the Commission approves the practice whereby officials of the Divisions of Enforcement, Corporation Finance, [Trading and Markets], and Investment Management and [OIA] at the level of Assistant Director or

higher, and officials in Regional Offices at the level of Assistant Regional Director or higher, may engage in and may authorize members of the Commission's staff to engage in discussions with persons identified in Section 240.24c-1(b) of this chapter concerning information obtained in individual investigations or examinations, including formal investigations conducted pursuant to Commission order.

- **Rule 24c-1(b) of the Exchange Act, 17 C.F.R. § 240.24c-1(b):**

The Commission may, in its discretion and upon a showing that such information is needed, provide nonpublic information in its possession to any of the following persons if the person receiving such nonpublic information provides such assurances of confidentiality as the Commission deems appropriate:

(1) A federal, state, local or foreign government or any political subdivision, authority, agency or instrumentality of such government;

(2) A [SRO] as defined in Section 3(a)(26) of the Act, or any similar organization empowered with self-regulatory responsibilities under the federal securities laws (as defined in Section 3(a)(47) of the Act), the Commodity Exchange Act (7 U.S.C. § 1, *et seq*.), or any substantially equivalent foreign statute or regulation;

(3) A foreign financial regulatory authority as defined in Section 3(a)(51) of the Act;

(4) The Securities Investor Protection Corporation or any trustee or counsel for a trustee appointed pursuant to Section 5(b) of the Securities Investor Protection Act of 1970;

(5) A trustee in bankruptcy;

(6) A trustee, receiver, master, special counsel or other person that is appointed by a court of competent jurisdiction or as a result of an agreement between the parties in connection with litigation or an administrative proceeding involving allegations of violations of the securities laws (as defined in Section 3(a)(47) of the Act) or the Commission's Rules of Practice, 17 C.F.R. Part 201, or otherwise, where such trustee, receiver, master, special counsel or other person is specifically designated to perform particular functions with respect to, or as a result of, the litigation or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice;

(7) A bar association, state accountancy board or other federal, state, local or foreign licensing or oversight authority, or a professional association or self-regulatory authority to the extent that it performs similar functions; or

(8) A duly authorized agent, employee or representative of any of the above persons.

### 5.6.1  Informal Referrals to Criminal Authorities

Basics:

Staff inquiries or investigations may reveal conduct that warrants informal referral to criminal law enforcement authorities – including federal, state or foreign criminal law enforcement authorities.  If there is a matter or conduct that appears to warrant an informal referral, staff generally should follow the procedures below:

- Assigned staff should consult with their direct supervisors and obtain approval at the Associate Director, Unit Chief, or Associate Regional Director level to informally refer the matter or conduct.  Informal referrals to foreign criminal authorities should also first be discussed with OIA so that consideration is given to the policies and procedures of the foreign authorities.

- Once given approval by an Associate Director, Unit Chief, or Associate Regional Director, assigned staff, along with their supervisors, may notify the appropriate criminal authorities.

- Staff then may invite the criminal authorities to make an access request (*see* Section 5.1 regarding access requests).  When the access request has been approved, staff may share documents from the investigative file.  Staff may not forward documents to the criminal authorities prior to the approval of the access request.

- After an informal referral to criminal authorities is made, staff is encouraged and expected to maintain periodic communication with the criminal authorities concerning the status of any criminal investigation.  *See* Section 5.2 of the Manual for information relating to parallel investigations, the grand jury secrecy rule, and other concerns when cooperating with criminal authorities.

Considerations:

- In determining whether to make an informal referral to criminal law enforcement authorities, the staff may consider, among other things, the egregiousness of the conduct, whether recidivism is a factor, and whether the involvement of criminal authorities will provide additional meaningful protection to investors.

- In determining whether to make an informal referral to federal, state, or foreign criminal authorities, the staff may also consider jurisdictional factors, such as where the conduct occurred or the domicile of the possible violators or victims.

### 5.6.2  Informal Referrals to Self-Regulatory Organizations

Basics:

In the course of conducting an inquiry or investigation, the staff may determine that it would be appropriate to refer the matter, or certain conduct, informally to one or more SROs.  In particular, if an inquiry or investigation concerns matters over which SROs have enforcement

authority (*e.g.*, financial industry standards, rules and requirements related to securities trading and brokerage), staff should evaluate whether to contact the SRO about the matter and assess whether it would be appropriate for the SRO to consider investigating the matter in lieu of, or in addition to, an SEC Enforcement investigation.  Because SROs may impose disciplinary or remedial sanctions against their members or associated individuals, staff generally should make an effort to apprise the SRO about conduct that may violate the rules of the SRO.  Internally, staff generally should consult as needed with OMI and/or the Division of Trading and Markets in evaluating potential informal referrals to SROs.

If there is a matter or conduct that appears to warrant an informal referral, staff generally should follow the procedures below:

- Assigned staff should consult initially with their direct supervisors, as well as OMI and/or the Division of Trading and Markets, as appropriate.

- Assigned staff must obtain approval at the Associate Director, Unit Chief, or Associate Regional Director level to refer the matter or conduct informally.

- Once given approval, assigned staff, along with their supervisors, may notify the appropriate liaison at the SRO to discuss the matter or conduct, and a possible informal referral.

- Staff then may invite the SRO to make an access request (*see* Section 5.1 of the Manual regarding access requests).  When the access request has been approved, staff may share documents from the investigative file.  Staff may not forward documents to the SRO prior to the approval of the access request.

- After an informal referral to an SRO is made, staff should maintain periodic communication with the SRO concerning the status of the SRO inquiry or investigation and periodically assess whether any or additional SEC Enforcement measures should be taken.

Considerations:

- Staff should evaluate whether an informal referral is warranted in the early stages of an inquiry or investigation.  As the investigation progresses, the staff should periodically review the record to determine whether a new or additional informal referral may be appropriate.

- Staff should make efforts to continue communicating with SRO staff throughout the SRO's inquiry or investigation to determine whether SEC staff and SRO staff are investigating the same conduct, and so that SEC staff is aware of any determination by the SRO not to pursue an investigation or certain avenues of investigation.

Further information:

- Staff should contact their supervisors and/or OMI with any questions about making an informal referral to an SRO.

- For guidance regarding receiving referrals *from* an SRO, *see* Section 2.2.2.5 of the Manual.

### 5.6.3   Informal Referrals to the Public Company Accounting Oversight Board

Basics:

In certain instances, Enforcement staff may refer matters regarding auditor misconduct informally to the PCAOB, which is authorized, under Section 105 of the Sarbanes-Oxley Act, to conduct investigations, and impose disciplinary or remedial sanctions against registered public accounting firms and their associated persons.  If there is a matter that may be appropriate for referral, assigned staff generally should follow the procedures below:

- Assigned staff should consult initially with their supervisors.

- Assigned staff should then get approval at or above the Associate Director, Unit Chief, or Associate Regional Director level to refer the matter informally.

- Assigned staff then should discuss the matter with the Chief Accountant of Enforcement, and secure his or her approval for making the referral.

- Assigned staff then should, along with their supervisor, or through the office of Enforcement's Chief Accountant, call the head of enforcement, or another designated official, at the PCAOB, and discuss the matter.

- Staff then can invite the PCAOB to make an access request (*see* Section 5.1 of the Manual).  Once the access request has been approved, staff can share documents from the investigative file.  Staff should provide a copy of the access request to the Chief Accountant of Enforcement.

Considerations:

Staff should keep in mind the following considerations when making a referral to the PCAOB:

- Staff should consider evaluating whether to refer a matter as early as the inception of an investigation, and in any event, as the investigation progresses.

- Staff should continue communication with PCAOB staff throughout the PCAOB's investigation, to determine whether SEC staff and PCAOB staff are investigating the same conduct, and so that SEC staff are alerted to any determination by the PCAOB not to pursue its investigation.

93

<u>Further Information</u>:

- Staff should refer any questions about making an informal referral to the PCAOB to the Chief Accountant of Enforcement.

- For guidance regarding receiving tips from the PCAOB, *see* <u>Section 2.2.2.2</u> of the Manual.

### 5.6.4   Informal Referrals to State Agencies

<u>Basics</u>:

Congress created a dual securities regulatory system in which both federal and state agencies serve specific, valuable functions in protecting investors.  In the course of conducting an inquiry or investigation, the staff may determine that it would be appropriate to refer the matter, or certain conduct, informally to state regulators.  It may be appropriate for the state agency to investigate the matter in lieu of, or in addition to, an SEC Enforcement investigation.

If there is a matter or conduct that appears to warrant an informal referral, staff generally should follow the procedures below:

- Assigned staff should consult with their direct supervisors and obtain approval at the Associate Director, Unit Chief, or Associate Regional Director level to refer the matter or conduct informally.

- Once approval has been obtained, assigned staff along with their supervisors may contact the state agency and discuss with them the relevant findings of the inquiry or investigation to date and explain why the staff is referring the matter informally.

- Staff may then invite the state agency to make an access request (*see* <u>Section 5.1</u> of the Manual regarding access requests).  When the access request has been approved, staff may share documents from the investigative file.  Staff may not forward documents to the state agency prior to the approval of the access request.

<u>Considerations</u>:

Assigned staff should discuss with their supervisors whether it may be appropriate to refer a matter or certain conduct to the state informally.  For example, a state may have a particular interest in a case or type of case, the victims or parties may be concentrated in a particular geographic location, the conduct may be limited, though significant, or there may be no federal jurisdiction.  In the early stages of an inquiry or investigation, staff should evaluate whether an informal referral is warranted.  As the investigation progresses, the staff is encouraged to periodically review the record to determine whether a new or additional informal referral may be appropriate.  Staff should continue communicating with the state agency after an informal referral has been made.

6.      **Cooperation**

The staff should carefully consider the use of different tools to encourage and facilitate cooperation by individuals and companies to advance its investigations and related enforcement actions.

### 6.1      Analytical Frameworks

### 6.1.1   Framework for Evaluating Cooperation by Individuals

In January 2010, the Commission issued a policy statement articulating a framework for evaluating cooperation by individuals in the Commission's investigations and actions.  Policy Statement of the Securities and Exchange Commission Concerning Cooperation by Individuals in its Investigations and Related Enforcement Actions, Securities Exchange Act Release No. 61340 (Jan. 13, 2010) (*http://www.sec.gov/rules/policy/2010/34-61340.pdf*).  This policy statement can be found at 17 CFR § 202.12.  The policy statement identified four general considerations to use in assessing cooperation:

(a)     Assistance provided by the individual.  The Commission assesses the assistance provided by the cooperating individual in the Commission's investigation or related enforcement actions ("Investigation") by considering, among other things:

(1)     The value of the individual's cooperation to the Investigation including, but not limited to:

(i)     Whether the individual's cooperation resulted in substantial assistance to the Investigation;

(ii)    The timeliness of the individual's cooperation, including whether the individual was first to report the misconduct to the Commission or to offer his or her cooperation in the Investigation, and whether the cooperation was provided before he or she had any knowledge of a pending investigation or related action;

(iii)   Whether the Investigation was initiated based on information or other cooperation provided by the individual;

(iv)    The quality of cooperation provided by the individual, including whether the cooperation was truthful, complete, and reliable; and

(v)     The time and resources conserved as a result of the individual's cooperation in the Investigation.

(2)     The nature of the individual's cooperation in the Investigation including, but not limited to:

(i)     Whether the individual's cooperation was voluntary or required by the terms of an agreement with another law enforcement or regulatory organization;

(ii)    The types of assistance the individual provided to the Commission;

(ii)    Whether the individual provided non-privileged information, which information was not requested by the staff or otherwise might not have been discovered;

(iv)    Whether the individual encouraged or authorized others to assist the staff who might not have otherwise participated in the Investigation; and

(v)     Any unique circumstances in which the individual provided the cooperation.

(b)    <u>Importance of the underlying matter</u>.  The Commission assesses the importance of the Investigation in which the individual cooperated by considering, among other things:

(1)    The character of the Investigation including, but not limited to:

(i)     Whether the subject matter of the Investigation is a Commission priority;

(ii)    The type of securities violations;

(iii)   The age and duration of the misconduct;

(iv)    The number of violations; and

(v)     The isolated or repetitive nature of the violations.

(2)    The dangers to investors or others presented by the underlying violations involved in the Investigation including, but not limited to:

(i)     The amount of harm or potential harm caused by the underlying violations;

(ii)    The type of harm resulting from or threatened by the underlying violations; and

(iii)   The number of individuals or entities harmed.[6]

---

[6]     Cooperation in Investigations that involve priority matters or serious, ongoing, or widespread violations will be viewed most favorably.

(c)     Interest in holding the individual accountable.  The Commission assesses the
        societal interest in holding the cooperating individual fully accountable for his or
        her misconduct by considering, among other things:

        (1)     The severity of the individual's misconduct assessed by the nature of the
                violations and in the context of the individual's knowledge, education,
                training, experience, and position of responsibility at the time the
                violations occurred;

        (2)     The culpability of the individual, including, but not limited to, whether the
                individual acted with scienter, both generally and in relation to others who
                participated in the misconduct;

        (3)     The degree to which the individual tolerated illegal activity including, but
                not limited to, whether he or she took steps to prevent the violations from
                occurring or continuing, such as notifying the Commission or other
                appropriate law enforcement agency of the misconduct or, in the case of a
                violation involving a business organization, by notifying members of
                management not involved in the misconduct, the board of directors or the
                equivalent body not involved in the misconduct, or the auditors of such
                business organization of the misconduct;

        (4)     The efforts undertaken by the individual to remediate the harm caused by
                the violations including, but not limited to, whether he or she paid or
                agreed to pay disgorgement to injured investors and other victims or
                assisted these victims and the authorities in the recovery of the fruits and
                instrumentalities of the violations; and

        (5)      The sanctions imposed on the individual by other federal or state
                authorities and industry organizations for the violations involved in the
                Investigation.

(d)     Profile of the individual.  The Commission assesses whether, how much, and in
        what manner it is in the public interest to award credit for cooperation, in part,
        based upon the cooperating individual's personal and professional profile by
        considering, among other things:

        (1)     The individual's history of lawfulness, including complying with
                securities laws or regulations;

        (2)     The degree to which the individual has demonstrated an acceptance of
                responsibility for his or her past misconduct; and

        (3)     The degree to which the individual will have an opportunity to commit
                future violations of the federal securities laws in light of his or her
                occupation --  including, but not limited to, whether he or she serves as:  a
                licensed individual, such as an attorney or accountant; an associated
                person of a regulated entity, such as a broker or dealer; a fiduciary for

97

other individuals or entities regarding financial matters; an officer or director of public companies; or a member of senior management -- together with any existing or proposed safeguards based upon the individual's particular circumstances.

The policy statement also noted that these principles are not listed in order of importance; they are not intended to be all-inclusive; and that facts and circumstances of a particular case may render some of the principles inapplicable or worthy of lesser or greater weight.

### 6.1.2   Framework for Evaluating Cooperation by Companies

In October 2001, the Commission issued a Report of Investigation and Statement explaining its decision not to take enforcement action against a public company it had investigated for financial statement irregularities. *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 and Commission Statement on the Relationship of Cooperation to Agency Enforcement Decisions*, Securities Exchange Act Release No. 44969 and AAER-1470 (Oct. 23, 2001) (*http://www.sec.gov/litigation/investreport/34-44969.htm*).  In this report, commonly referred to as the Seaboard Report, the Commission articulated an analytical framework for evaluating cooperation by companies.  The report detailed the many factors the Commission considers in determining whether, and to what extent, it grants leniency to investigated companies for cooperating in its investigations and for related good corporate citizenship.  Specifically, the report identifies four broad measures of a company's cooperation:

- Self-policing prior to the discovery of the misconduct, including establishing effective compliance procedures and an appropriate tone at the top;

- Self-reporting of misconduct when it is discovered, including conducting a thorough review of the nature, extent, origins and consequences of the misconduct, and promptly, completely and effectively disclosing the misconduct to the public, to regulatory agencies, and to self-regulatory organizations;

- Remediation, including dismissing or appropriately disciplining wrongdoers, modifying and improving internal controls and procedures to prevent recurrence of the misconduct, and appropriately compensating those adversely affected; and

- Cooperation with law enforcement authorities, including providing the Commission staff with all information relevant to the underlying violations and the company's remedial efforts.

Since every enforcement matter is different, this analytical framework sets forth general principles but does not limit the Commission's broad discretion to evaluate every case individually, on its own unique facts and circumstances.  Similar to the Commission's treatment of cooperating individuals, credit for cooperation by companies may range from taking no enforcement action to pursuing reduced charges and sanctions in connection with enforcement actions.  For greater detail regarding the analytical framework used by the Commission to evaluate cooperation by companies, the staff should review the Seaboard Report.

### 6.2     Cooperation Tools

There is a wide spectrum of tools available to the staff for facilitating and rewarding cooperation in its investigations and related enforcement actions.  A non-exclusive list of cooperation tools appears below.  Since every enforcement matter is unique, the appropriate use of a cooperation tool invariably depends upon a careful analysis of the facts and circumstances of each case.  In some cases, multiple cooperation tools may be appropriate.

As a preliminary matter, staff should consider the use of proffers of information as a means to obtain cooperation.  Staff should consult the information in Section 3.3.7 of the Manual for information concerning proffers and the use of proffer agreements.

For assistance in drafting agreements discussed in this section, staff should consult OCC.

### 6.2.1   Cooperation Agreements

Basics:

A cooperation agreement is a written agreement between the Division of Enforcement and a potential cooperating individual prepared to provide substantial assistance to the Commission's investigation and related enforcement actions.  Specifically, in a cooperation agreement, the Division agrees to recommend to the Commission that the individual receive credit for cooperating in its investigation and related enforcement actions and, under certain circumstances, to make specific enforcement recommendations if, among other things:  (1) the Division concludes that the individual has provided or is likely to provide substantial assistance to the Commission; (2) the individual agrees to cooperate truthfully and fully in the Commission's investigation and related enforcement actions and waive the applicable statute of limitations; and (3) the individual satisfies his/her/its obligations under the agreement.  If the agreement is violated, the staff may recommend an enforcement action to the Commission against the individual without any limitation.

Procedures:

- Prior to seeking authority to enter into cooperation agreements, the staff should collect sufficient information regarding their ability to provide substantial assistance to the Commission's investigations or related enforcement actions.  Staff are encouraged to use proffer agreements to collect this information.

- The Director and those senior officers designated by the Director have the authority to enter into cooperation agreements on behalf of the Division.

- The staff should retain a copy of each cooperation agreement and the memorandum documenting the basis for entering into the agreement.

Considerations:

- Cooperation agreements are primarily intended to be used with individuals.  In general, staff should use the factors in the Seaboard Report to assess cooperation by public

99

companies or entities regulated by the Commission, rather than seeking to employ cooperation agreements.  (*See* Section 6.1.2 regarding the Framework for Evaluating Cooperation by Companies).

- The staff should advise potential cooperators that cooperation agreements entered into with the Division do not bind the Commission and that the Division cannot, and does not, make any promise or representation as to whether or how the Commission may act on enforcement recommendations made by the Division.

- The Division uses a standard form of cooperation agreement to be adapted to the specific circumstances of the investigation or related enforcement action.

- Cooperation agreements should generally include the following terms:

  o  the cooperating individual agrees to cooperate truthfully and fully, as directed by the Division's staff, in investigations and related enforcement proceedings including, but not limited to, producing all potentially relevant non-privileged documents and materials to the Commission, responding to all inquiries, appearing for interviews, and testifying at trials and other judicial proceedings as requested by the staff, and waiving the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure;

  o  the cooperator agrees to enter a tolling agreement if requested by the staff;

  o  the cooperator agrees not to violate the securities laws;

  o  the cooperator acknowledges that the agreement does not constitute a final disposition of any potential enforcement action;

  o  subject to full, truthful, and continuing cooperation, the Division will bring the assistance provided by the cooperator to the attention of the Commission and other regulatory and law enforcement authorities requested by the cooperator; and

  o  the cooperator acknowledges that, although the Division has discretion to make enforcement recommendations, only the Commission has the authority to approve enforcement dispositions and accept settlement offers.

<u>Related Tool</u>:

- Cooperation Letters—Upon the written request of cooperating individuals and companies, supervisors at or above the level of Associate Director may submit letters describing the fact, manner and extent of assistance provided by such cooperating individuals and companies to the attention of courts, regulatory organizations, or law enforcement authorities.  Requests for cooperation letters and copies of the letters sent by Commission staff should be retained with the case file.

### 6.2.2   Deferred Prosecution Agreements

Basics:

A deferred prosecution agreement is a written agreement between the Commission and a potential cooperating individual or company in which the Commission agrees to forego an enforcement action against the individual or company if the individual or company agrees to, among other things:  (1) cooperate truthfully and fully in the Commission's investigation and related enforcement actions; (2) enter into a long-term tolling agreement; (3) comply with express prohibitions and/or undertakings during a period of deferred prosecution; and (4)in most cases, agree either to admit or not to contest underlying facts that the Commission could assert to establish a violation of the federal securities laws.  If the agreement is violated during the period of deferred prosecution, the staff may recommend an enforcement action to the Commission against the individual or company without limitation for the original misconduct as well as any additional misconduct.  Furthermore, if the Commission authorizes the enforcement action, the staff may use any factual admissions made by the cooperating individual or company to file a motion for summary judgment, while maintaining the ability to bring an enforcement action for any additional misconduct at a later date.

Procedures:

- Deferred prosecution agreements must be approved by the Commission.

- Staff should retain with the case file a copy of each deferred prosecution agreement and the memorandum documenting the basis for entering into the agreement.

- Unless the Commission directs otherwise, deferred prosecution agreements will be made available on the Commission's website.

Considerations:

- To determine whether to recommend that the Commission enter into a deferred prosecution agreement, the staff should use the standard cooperation analysis set forth in Section 6.1 of the Manual.

- An admission or an agreement not to contest the relevant facts underlying the alleged offenses generally is appropriate.

- A deferred prosecution agreement should generally include the following terms:

    o the cooperating individual or company agrees to cooperate truthfully and fully, as directed by the Division's staff, in investigations and related enforcement proceedings including, but not limited to, producing all potentially relevant non-privileged documents and materials to the Commission, responding to all inquiries, appearing for interviews, and testifying at trials and other judicial proceedings as requested by the staff, and waiving the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure;

- o  the cooperating individual or company agrees to toll the applicable statute of limitations period;

- o  the cooperating individual or company agrees not to violate the securities laws;

- o  the cooperating individual or company shall make any agreed upon disgorgement or penalty payments;

- o  if the cooperating individual or company satisfies the terms of the deferred prosecution agreement during the term of the agreement, the Commission will not pursue any further enforcement action concerning the matter referenced in the agreement;

- o  if the individual or company violates the agreement during its term, the Division may recommend and the Commission may pursue an enforcement action against the individual or company without limitation;

- o  the cooperating individual or company agrees that the Commission may use statements, information, and materials provided pursuant to the agreement against him/her/it if the individual or company violates the terms of the agreement; and

- o  additional prohibitions and undertakings designed to protect the investing public.

- •  The term of a deferred prosecution agreement should not exceed five years.  In determining the appropriate term, the staff should consider whether there is sufficient time to ensure that the undertakings in the agreement are fully implemented and the related prohibitions have adequately reduced the likelihood of future securities law violations.

### 6.2.3   Non-Prosecution Agreements

Basics:

A non-prosecution agreement is a written agreement between the Commission and a potential cooperating individual or company, entered in limited and appropriate circumstances, that provides that the Commission will not pursue an enforcement action against the individual or company if the individual or company agrees to, among other things:  (1) cooperate truthfully and fully in the Commission's investigation and related enforcement actions; and (2) comply, under certain circumstances, with express undertakings.  If the agreement is violated, the staff retains its ability to recommend an enforcement action to the Commission against the individual or company without limitation.

Procedures:

- •  Non-prosecution agreements must be approved by the Commission.

- •  Staff should retain with the case file a copy of each non-prosecution agreement and the memorandum documenting the basis for entering into the agreement.

- Unless the Commission directs otherwise, non-prosecution agreements will be made available on the Commission's website.

<u>Considerations</u>:

- In virtually all cases, for individuals who have previously violated the federal securities laws, non-prosecution agreements will not be appropriate and other resolutions should be considered.

- An admission or an agreement not to contest the relevant facts underlying the alleged offenses generally is appropriate.

- A non-prosecution agreement should generally include the following terms:

  o the cooperating individual or company agrees to cooperate truthfully and fully, as directed by the Division's staff, in investigations and related enforcement proceedings including, but not limited to, producing all potentially relevant non-privileged documents and materials to the Commission, responding to all inquiries, appearing for interviews, and testifying at trials and other judicial proceedings as requested by the staff, and waiving the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure;

  o the cooperating individual or company shall make any agreed-upon disgorgement or penalty payments;

  o additional undertakings designed to protect the investing public; and

  o if the individual or company violates the agreement, the Division may recommend and the Commission may pursue an enforcement action against the individual or company without limitation and not subject to the applicable statute of limitations; and

  o the cooperating individual or company agrees that the Commission may use statements, information, and materials provided pursuant to the agreement against him/her/it if the individual or company violates the terms of the agreement.

### 6.2.4   Immunity Requests

<u>Introduction</u>:

In certain circumstances, individuals may not be willing to provide testimony or cooperate without receiving protection against criminal prosecution.  In appropriate circumstances, to obtain testimony and/or facilitate cooperation that will substantially assist in the enforcement of the federal securities laws, the staff may seek immunity orders or letters to obtain testimony and/or witness cooperation.

Basics:

When witnesses assert their Fifth Amendment privilege against self-incrimination in enforcement proceedings, the Commission may seek one of two types of immunity:  statutory immunity or letter immunity.  Statutory immunity permits the Commission, pursuant to 18 U.S.C §§ 6001-6004, to seek a court order compelling the individual to give testimony or provide other information that may be necessary to the public interest, if the request is approved by the U.S. Attorney General.  In contrast, letter immunity is immunity conferred by agreement between the individual and a U.S. Attorney's Office.  Both types of immunity prevent the use of statements or other information provided by the individual, directly or indirectly, against the individual in any criminal case, except for perjury, giving a false statement, or obstruction of justice.  Neither an immunity order nor an immunity letter, however, prevents the Commission from using the testimony or other information provided by the individual in its enforcement actions, including actions against the individual for whom the immunity order or letter was issued.

Procedures:

- Prior to seeking approval to request an  immunity order or letter from the Department of Justice, the staff should preferably receive a proffer of the individual's expected testimony or have significant and reliable evidence regarding his or her ability to provide substantial assistance to the Commission's investigation or related enforcement actions.

- The Commission has delegated authority to the Director and authority has been sub-delegated to senior officers to make immunity requests to the Department of Justice.  17 C.F.R. § 200.30-4(a).

- Prior to requesting authorization to seek an immunity order or letter from the Director of Enforcement or a designated senior officer, unless exigent circumstances exist, the staff should complete the Department of Justice witness immunity request form found at http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/crm00721.pdf.

- This form will be used for three purposes.

  o First, the form will help the staff document its basis for seeking an immunity order or letter.

  o Second, the completed form will assist senior leadership in the Division and the U.S. Department of Justice in evaluating the appropriateness of seeking an immunity order or letter.

  o Finally, if an immunity order is appropriate, the completed form will be submitted by the relevant federal prosecutor's office to the Witness Immunity Unit of the Office of Enforcement Operations at the Department of Justice for approval—expediting the processing of the Commission's witness immunity requests.

- Upon receiving a letter of authority to seek an order to compel the testimony of a witness from the Department of Justice, a motion and proposed immunity order may be filed with

the court *ex parte.* Alternatively, after receiving approval from the Department of Justice, the Commission may issue an order requiring the individual to give testimony or provide other information which he or she has refused to give or provide on the basis of his or her privilege against self incrimination. 18 U.S.C. § 6004.

- A copy of the draft Department of Justice witness immunity request form submitted to the Director of Enforcement or a designated senior officer and a copy of the immunity order or letter should be maintained with the case file.

Considerations:

- As a general rule, immunity orders or letters should not be requested in the early stages of an investigation when the role of the cooperating individuals and the benefits of their cooperation may be unclear.

- Pursuant to 18 U.S.C. §§ 6001-6004, an immunity order should be sought only if:

  o the testimony or other information from the witness may be necessary to the public interest; and

  o the witness has refused, or is likely to refuse, to testify or provide other information on the basis of his or her privilege against self-incrimination.

- When attempting to determine whether to recommend that an immunity order or letter be sought, the staff should conduct the standard analysis set forth in Section 6.1 of the Manual.

- Since the Supreme Court has interpreted the Fifth Amendment privilege against self-incrimination to include the act of producing business records by a sole proprietorship, the Commission may request immunity for the limited purpose of obtaining such documents. *United States v. Doe*, 465 U.S. 605 (1984). However, the witness immunity request form submitted to the Department of Justice should expressly state the purpose of the application.

Further information:

For additional information regarding cooperation with the criminal authorities, please consult Sections 5.2.1 and 5.2.2 of the Manual.

### 6.2.5   Oral Assurances

Basics:

- Where the available evidence indicates that an individual or company has not violated the federal securities laws such as to warrant an enforcement action, the staff may orally inform the individual or company that the Division does not anticipate recommending an enforcement action against the individual or company based upon the evidence currently known to the staff.

<u>Procedures</u>:

- The decision to deliver an oral assurance must be made with the approval of a supervisor at or above the level of Associate Director.

- Oral assurances are only authorized when the investigative record is adequately developed.  Accordingly, prior to providing an oral assurance, the staff should preferably receive proffers from the potential cooperating individuals and companies or have sufficient information regarding the potential cooperators' conduct.

- Whenever oral assurances are provided, the staff should clearly inform the potential cooperating individual or company that oral assurances are based upon the evidence currently known to the staff, the Division's enforcement recommendations may change if new evidence is subsequently discovered and that the Commission has final authority to accept or reject enforcement recommendations.

- After an oral assurance has been provided, the staff should contemporaneously prepare and retain a brief memorandum to file summarizing the assurance provided.

### 6.2.6   Termination Notices

- When an investigation has been completed as to a potential cooperator and the Division has determined, for any reason, not to recommend to the Commission an enforcement action against the potential cooperator, the staff may, and in some cases is required, to send a letter informing the potential cooperator of the determination.  These notices may be provided before the Commission's investigation is closed or before a determination has been made as to every other potential defendant or respondent in the case.

- For additional information about termination notices, *see* <u>Section 2.6.2</u> of the Manual.

### 6.2.7   Settlement Recommendations

Even in the absence of a cooperation agreement, the staff may take into account an individual or company's cooperation in connection with recommending sanctions or charges associated with the alleged misconduct and, under certain circumstances, forgoing enforcement actions against a cooperating individual or company.  In doing so, the staff should consider the settlement terms of other similar cases to identify prior precedent involving similar alleged misconduct and apply the factors outlined in <u>Section 6.1</u> of the Manual.

Where cooperation credit is being recommended to or has been authorized by the Commission in settlements, the staff should include standard language relating to cooperation in the related Offers or Consents, unless such disclosure would not advance the goals of the Commission's cooperation program or would adversely affect related ongoing investigations or proceedings.  Modifications to this standard language should not be made without first consulting with staff in OCC.

### 6.3     Publicizing the Benefits of Cooperation

Basics:

The staff should provide sufficient information to the public about the nature of the Commission's cooperation program and its significant benefits.

Procedures:

Where cooperation credit is being recommended to the Commission in settlements, the staff should include standard language relating to cooperation in Offers, Consents, or other dispositions.  In such cases, the cooperation should be referenced in related litigation and/or press releases, unless such disclosure would not advance the goals of the Commission's cooperation program or would adversely affect related ongoing investigations or proceedings.

Considerations:

- In most cases, the Commission's enforcement program is enhanced by publicizing the benefits associated with cooperating in a Commission investigation or related enforcement actions.  Nevertheless, the staff retains discretion regarding whether and how to disclose the fact, manner, and extent of an individual or company's cooperation in documents filed or issued by the Commission in connection with an enforcement action.

- Since information obtained or generated during Commission investigations is generally confidential, the staff should ensure that its public statements and releases do not inadvertently disclose non-public information.

- The staff should take care to protect the identity of any cooperating individual and company whose identity is not being disclosed elsewhere, such as in an Order, Consent, or Deferred Prosecution Agreement, unless the individual or entity has consented to disclosure by the Commission.

Index of Defined Terms

AP:  Administrative Proceeding

BSA:  Bank Secrecy Act

CTRs:  Currency Transaction Reports

CTRCs:  Currency Transaction Reports by Casinos

CMIRs:  Reports of International Transportation of Currency or Monetary Instruments

Division:  SEC's Division of Enforcement

DMS:  Document Management Specialist

DOJ:  U.S. Department of Justice

ECPA:  Electronic Communications Privacy Act of 1986

Enforcement:  SEC's Division of Enforcement

ESI:  Electronically Stored Information

Exchange Act:  Securities Exchange Act of 1934

FBARs:  Reports of Foreign Bank and Financial Interests

FDA:  Food and Drug Administration

FinCEN:  Financial Crimes Enforcement Network

FOIA:  Freedom of Information Act

Formal Order:  Formal Order of Investigation

Investment Company Act:  Investment Company Act of 1940

Manual:  Enforcement Manual

MLATs:  Mutual Legal Assistance Treaties

Model Rule 4.2:  American Bar Association Model Rule of Professional Conduct 4.2

MOUs:  Memoranda of Understanding

MUIs:  Matters Under Inquiry

NRSI:  Name Relationship Search Index

OCA:  SEC's Office of the Chief Accountant

OCC:  Division of Enforcement's Office of Chief Counsel

OGC:  SEC's Office of the General Counsel

OGE:  Office of Government Ethics

OIA:  SEC's Office of International Affairs

OIEA:  SEC's Office of Investor Education and Advocacy

OIT:  SEC's Office of Information Technology

OMI: Division of Enforcement's Office of Market Intelligence

OS:  SEC's Office of the Secretary

OWB:  Office of the Whistleblower

PCAOB:  Public Company Accounting Oversight Board

Privacy Act:  Privacy Act of 1974

RFPA:  Right to Financial Privacy Act of 1978

SARs:  Suspicious Activity Reports

SEC:  U.S. Securities and Exchange Commission

Securities Act: Securities Act of 1933

SROs:  Self-Regulatory Organizations

Sunshine Act:  Government in the Sunshine Act