# EXHIBIT 4

CONFIDENTIAL

1               UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF TEXAS

3                   AUSTIN DIVISION

4

5    In re CASSAVA SCIENCES, INC.   Master File No. 1:21-cv-00751-DAE

6    SECURITIES LITIGATION

7    ---------------------------------------------x

8    This Document Relates To:

9    ALL ACTIONS

10   ---------------------------------------------x

11

12                   CONFIDENTIAL

13

14           VIDEOTAPED DEPOSITION OF

15              RENE M. STULZ, Ph.D.

16              NEW YORK, NEW YORK

17           THURSDAY, AUGUST 8, 2024

18

19

20

21

22   REPORTED BY:

23   DANIELLE GRANT

24   JOB NO.: 6831748

25

                                              Page 1

```
 1            become too distracting yet, but I
 2            just want to please caution you.
 3                 MS. LOSEMAN:  Counsel, I'll
 4            object when I see fit.
 5                 MS. JENSEN:  And I'm just
 6            saying for the record they have
 7            not been identical questions,
 8            so --
 9                 MS. LOSEMAN:  For the record,
10            they have been.
11                 MS. JENSEN:  We'll agree to
12            disagree.
13            Q    Was every piece of information
14   that you believe supports your opinions
15   identified in your list of materials
16   considered, that being your Appendix C?
17            A    Appendix C includes every
18   materials that I reference in my report on
19   the materials that I rely on for my
20   opinions referenced in my report.  We
21   discussed earlier, two papers that were
22   part of my thinking, and I added those.
23            Q    Okay.  So with the inclusion
24   of the several articles that were added
25   yesterday, with that addition, did you
```

Page 34

CONFIDENTIAL

```
 1    include every piece of information now
 2    that you believe supports your opinions?
 3                    MS. LOSEMAN:  Objection.
 4          Misstates.
 5                    Go ahead.
 6          A    I believe that they included
 7    every materials that supports the basis
 8    for my opinions.
 9          Q    What is the plaintiffs' theory
10    of liability in this case?
11          A    I'm not an attorney.  And so
12    I'm going to convey the understanding that
13    I received.  I discuss in my report that
14    the plaintiffs allege that the stock was
15    inflated because of a number of
16    misstatements, alleged misstatements made
17    by the company.  And I discuss these
18    misstatements early in my report.  I
19    understand that the plaintiffs also allege
20    the existence of a scheme, and I say that
21    in my report as well.
22          Q    You don't state that in your
23    summary of allegations, do you?
24          A    I thought I had somewhere in
25    my report, but I'm aware of that.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1              Q     Just not in the summary of
 2      allegations.
 3                    MS. LOSEMAN:  Object to form.
 4              Q     What is your understanding of
 5      the fraudulent scheme that is alleged?
 6              A     That it was an attempt to
 7      misrepresent the value of simufilam,
 8      S-I-M-U-F-I-L-A-M.
 9              Q     And in brief, what is your
10      understanding of the alleged
11      misrepresentations and omissions in the
12      case?
13              A     In my report, I put them in
14      four bins.  I -- the class cert report,
15      put them in five bins, but they're closely
16      related to the four bins that I use.
17                    There are misstatements
18      concerning the research in the trials.
19      There is misstatement concerning conflicts
20      of interest, misstatements concerning the
21      petition and the response to the petition.
22      There are misstatements concerning alleged
23      investigations by authorities.
24              Q     And your misstatements
25      regarding the research and files, are you
```

1    including the data manipulation in

2    those -- in that bin?

3           A    So that bin includes issues

4    with the papers as well as issues with the

5    trials.  The allegations of that

6    manipulation will be part of those

7    allegations.

8           Q    Did you in drafting your

9    report -- strike that.

10               For purposes of your report,

11   did you assume that the plaintiffs'

12   allegations are true?

13          A    That's correct.

14          Q    Okay.  Earlier we established

15   that all of your opinions are contained in

16   this report, and I would like to confirm

17   that your understanding of those opinions

18   is the same as mine.

19               So you have four -- you have

20   four opinions, correct?

21          A    Correct.

22          Q    First one being that

23   Dr. Feinstein's opinion about market

24   efficiency for Cassava stock is flawed; is

25   that right?

Page 37

1          A     Yes.

2          Q     The second being that

3    Dr. Feinstein's opinion about market

4    efficiency for Cassava options is flawed?

5          A     Correct.

6          Q     That certain -- third, certain

7    alleged corrective disclosure dates were

8    not statistically significant?

9          A     I have that opinion.

10         Q     And you disagree with Dr.

11   Feinstein's damages methodology?

12         A     Correct.

13         Q     Did I miss any?

14         A     No.

15         Q     Okay.  So you critique

16   Dr. Feinstein's market efficiency opinion

17   in your report.

18               You're not offering an

19   affirmative opinion that the market for

20   Cassava stock was inefficient during the

21   class period, are you?

22               MS. LOSEMAN:  Object to form.

23         A     That's correct.

24               THE WITNESS:  Sorry.

25         Q     Okay.  So just so you know --

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    you know this.  Just for a clear record,

2    just make sure you give Ms. Loseman an

3    opportunity to object.

4          A    Right.

5               MS. LOSEMAN:  Thank you.

6          Q    It's not that I welcome the

7    objections, but I just want to make sure

8    that we have a clear record.  Okay.  Thank

9    you.

10              Okay.  I want to make sure

11   that was -- yeah, it came through.

12              Are you offering an

13   affirmative opinion that the Cassava

14   options were inefficient during the class

15   period?

16              MS. LOSEMAN:  Object to form.

17         A    I am not.

18         Q    How would you go about testing

19   empirically whether a stock is efficient?

20         A    It's not a question I would

21   answer in general.  I would have to learn

22   about the stock, and I would have to think

23   about issues that arise with the stock.

24         Q    So there is no --

25         A    I --

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

 1          Q    -- there is no general --
 2    generally accepted methodology in your
 3    mind for how you test for the efficiency
 4    of a stock?
 5          A    Well --
 6               MS. LOSEMAN:  Object to form.
 7          A    -- that's not quite right.
 8    No.  I mean, as I believe I say in my
 9    report, the direct test of market
10    efficiency is how the stock incorporates
11    information.  So I would have to focus on
12    how the stock incorporates information,
13    which typically you would at least start
14    looking at by looking at an event study
15    on -- you would have to think about what
16    kind of events you would want to look at,
17    and that would be dependent on the stock.
18          Q    Typically, what kind of a
19    event study would you want to look at?
20               MS. LOSEMAN:  Object to form.
21          A    It would depend on the stock.
22    I would have to think about the stock.
23          Q    Okay.  Well, okay.  Let's
24    take -- let's take Coca-Cola.
25               How would you go about testing

1    in determining whether a stock trades in

2    an efficient market?

3                    MS. LOSEMAN:   Objection.

4         A     Well, I'm not an attorney.  I

5    have an understanding of some courts

6    looking at some factors.  Some of those

7    would be often the Cammer factors and the

8    Krogman factors that Dr. Feinstein looks

9    at.

10        Q     And yet you call into question

11   Feinstein's analysis of the Cammer factors

12   in this case, correct?

13        A     I have a number of things to

14   say about those factors, you know, some

15   general and some specific to the work he

16   does for some of the factors.

17        Q     You aren't making any

18   affirmative findings that the Cammer

19   factors are not met in this case, correct?

20                    MS. LOSEMAN:   Object to form.

21          Vague.

22        A     I'm here as a rebuttal expert

23   to Dr. Feinstein, and I point out the

24   problems with his analysis.  And so I

25   point out problems with Cammer factors and

```
 1    Krogman factors.
 2           Q     But you're not making an
 3    affirmative finding that any particular
 4    Cammer factor is unmet, correct?
 5                 MS. LOSEMAN:  Object to form.
 6            Vague.
 7           A     I don't have an affirmative
 8    opinion on that factor is unmet.  I
 9    criticize him for the inferences he draws
10    from the factors, on what he looks at with
11    the factors, on the fact that he ignores
12    things related to the factors.  So I
13    clearly have a lot of things to say about
14    that.
15           Q     Likewise, you don't make any
16    affirmative findings that the Krogman
17    factors are unmet, correct?
18                 MS. LOSEMAN:  Objection.
19            Vague.
20           A     So I just want to go back to
21    my answer.  We have to distinguish between
22    stocks and options.  My answer was correct
23    for the stocks.  I mean, in the options,
24    he doesn't look at those factors, and so
25    obviously he can't say that they're met
```

Page 49

1    when he doesn't look at them.

2        Q    Okay.  So let's distinguish

3    here between you and Dr. Feinstein,

4    though.  So I'm just asking about your

5    opinions.  So you don't -- so thank you

6    for clarifying about the stocks.  You did

7    not make any affirmative finding that the

8    Cammer factors were unmet as to stocks.

9    Likewise, as to options -- let's set aside

10   Dr. Feinstein.

11           You don't make any affirmative

12   findings that the Cammer factors are unmet

13   as to options, correct?

14               MS. LOSEMAN:  Objection.

15          Vague.

16        A    Both for stocks and options,

17   my report assesses the work that

18   Dr. Feinstein does on market efficiency.

19   Both for stocks and option, I -- my

20   opinion is that he hasn't shown that the

21   market for the stock or the market for the

22   options is efficient.  That is the opinion

23   in my report.

24        Q    Understood.  You are

25   critiquing Dr. Feinstein's opinions as to

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

```
1              MS. JENSEN:  I'm going to move
2          to strike everything after "I
3          would agree."
4        Q    In the Rocket case, you said:
5    There is no single formal or technical
6    definition of a meme stock.
7              Correct?
8              MS. LOSEMAN:  And we oppose
9          the motion.
10       A    I have a sentence in the
11   Rocket case that says that there is not a
12   consensus definition on -- I agree with
13   that.  But it has been a bit misused.
14   Now, if I had to write it again, I would
15   write it differently in the sense that,
16   you know, when people construct lists of
17   meme stocks, there is a lot of overlap,
18   but it's not all necessarily the same
19   stocks, and that's what I was referring
20   to.
21              But as I just said, you know,
22   people who wrote papers on this all look
23   at common components of meme stocks, and
24   so in that sense, there is quite a bit of
25   consensus.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1        Q     You would say it differently

2   now that you have been the subject of a

3   motion to exclude based on it in that

4   case?

5              MS. LOSEMAN:   Objection.

6              Argumentative.   Misstates.

7        A     No.   I mean, I don't form my

8   opinions based on what people say about

9   them.   I realized that it was a bit

10  misused because it gave the impression

11  that this was a big issue.   But as I say,

12  information on efficiency has less of a

13  consensus then meme stocks have.

14       Q     So I'm reading for your

15  report:   There's no single formal or

16  technical definition of a meme stock.

17             Did you write that or not?

18       A     Yeah.

19       Q     Okay.   Thank you.

20             And that was in December of

21  2023, correct?

22       A     Yeah.   And I -- I mean, agree

23  with that, that there is no -- but, no,

24  there isn't for most things in financial

25  economics.   And so there is some judgment

Page 89

```
 1    involved.  No.  I mentioned informational
 2    efficiency.  But if you talk about a value
 3    stock, there is not a criterion that is
 4    accepted by everybody.  I mean -- so...
 5            Q    Doctor, with respect, I'm not
 6    asking for, you know, any controversy that
 7    may occur anywhere in the discipline or
 8    field.
 9            I'm just -- want to focus your
10    attention on meme stocks because that's
11    what we're talking about right now, okay?
12            MS. LOSEMAN:  Objection to the
13        commentary.  Argumentative.
14            Is there a question?
15            MS. JENSEN:  I'm asking him to
16        focus on my question.
17            Q    What is your definition of a
18    meme stock?
19            A    So I -- I mean, I have a
20    discussion of that in my report.  You
21    know, those are stocks -- and I have a
22    definition from -- I mean, I cite an
23    academic article that is in the Journal of
24    Financial Economics.  You know, meme
25    stocks are stocks that generated a lot
```

Page 90

1   the return of a stock --

2                  (Whereupon, the court reporter

3                  requested clarification.)

4                  THE WITNESS:  Dominating the

5             return of a stock.

6         A    -- then it's a situation where

7   semi-strong form efficiency would not --

8   would not be holding.

9         Q    Anything else?

10        A    Well, it also creates issues

11  with short selling in the sense that it

12  becomes very risky to short sell.  Short

13  selling is an important mechanism that

14  helps with market efficiency, and so that

15  would be an important issue as well.  I

16  mean, meme stock activity is going to

17  affect kind of the ability of investors to

18  incorporate information in the stock.  And

19  so it's not going to incorporate

20  information as well as it would otherwise

21  and so affects directly market efficiency,

22  that one.

23        Q    Anything else?

24        A    I mean, those are the

25  important things that come to mind, that

Page 106

1    the price is going to be distorted, and
2    distorted prices kind of, by itself, is
3    an -- is an issue for market efficiency.
4    He hasn't looked at that.  I mean, he had
5    some statements in his deposition on those
6    issues.
7         Q    Who are we talking about?
8              I'm sorry.
9              Who are we --
10   A    Dr. Feinstein.
11        Q    Okay.  Okay.  I think --
12        A    I'm --
13        Q    -- your -- I think you've gone
14   off in a different direction.  So if
15   you're done with that, I can move to a
16   different question.  Because we weren't
17   talking about Dr. Feinstein.
18        A    Well, my report is about
19   Dr. Feinstein.
20        Q    Okay.  Is it your opinion that
21   a meme stock can never be traded in an
22   efficient market?
23              MS. LOSEMAN:  Object to form.
24        Vague.  Incomplete hypothetical.
25        A    I mean, one big issue with

Page 107

1   market efficiency is that a stock can be

2   trading inefficiently for some period of

3   time, could then trade efficiently, and

4   can become again inefficient.  Now, with a

5   meme stock, you can have periods where

6   meme activity isn't important.  And during

7   that period of time, it could be that the

8   stock is not distorted.  It depends.  So

9   one would have to study in the context of

10  a specific stock.

11          Q     If a stock -- I'm sorry.

12                Strike that.

13                If a meme stock quickly

14  incorporates all public information, would

15  you still say it's inefficient?

16                MS. LOSEMAN:  Object to form.

17           Incomplete hypothetical.

18          A     I think it would depend.

19          Q     And what would --

20          A     I mean, it would depend on the

21  nature of meme activity, and it would

22  depend on kind of the information is a

23  price.  Now, if the price is distorted by

24  that meme activity in ways that affects

25  the ability of investors to rely on the

Page 108

CONFIDENTIAL

```
1    price generally, then that would be a
2    problem.
3         Q    So you're talking about
4    fundamental efficiency, correct?
5         A    I'm talking about market
6    efficiency.
7         Q    What is your definition of
8    market efficiency?
9         A    The ones that I have in my
10   report, which is semi-strong form
11   efficiency.
12        Q    Okay.  But then you said there
13   is -- if the price was -- you're
14   essentially saying if the price isn't the
15   true price, right?
16        A    I'm saying if the price --
17             MS. LOSEMAN:  Object to form.
18        Misstates.
19             THE WITNESS:  I'm sorry.
20             MS. LOSEMAN:  Go ahead.
21        A    If the price is distorted in
22   such a way that you can predict future
23   returns, which is inconsistent with
24   semi-strong form market efficiency, then
25   that's an issue.
```

Page 109

1    the key question is whether information is

2    incorporated in the stock price.

3            Q    No court has found that the

4    market for a meme stock is necessarily

5    inefficient; isn't that true?

6            A    I have no idea.

7                 MS. LOSEMAN:  Objection to the

8             extent --

9            A    I mean, I --

10                MS. LOSEMAN:  -- it calls for

11            a legal conclusion.

12                Hold on.  Let me get my

13            objection.  Thank you.

14           A    I'm not an attorney.  I -- I

15    mean, I focus on the literature in

16    financial economics and what my colleagues

17    in financial economics are looking at.

18           Q    And no peer-reviewed

19    publication says that a meme stock is, per

20    se, inefficient either; isn't that

21    correct?

22                MS. LOSEMAN:  Objection.

23            Vague.

24           A    I'm not sure what you mean by

25    "per se inefficient."

                                        Page 111

CONFIDENTIAL

```
1           Q     That -- by referring to a meme
2     stock -- I'm sorry.
3                 Strike that.
4                 By referring to a stock as a
5     meme stock, that doesn't mean it
6     necessarily is inefficient, correct?
7                 MS. LOSEMAN:  Same objection.
8           A     So I thought I answered that
9     question before, no?
10                I mean, a stock that can have
11    meme-type events at some point in time is
12    not necessarily efficient forever after.
13          Q     And so it's possible that a
14    meme stock can trade efficiently?
15                MS. LOSEMAN:  Objection.
16              Vague.
17          A     I mean, I -- it would depend.
18    I mean, it would depend on what is shown
19    to me.  Now, meme-type activity can create
20    substantial inefficiencies on -- I mean,
21    as I said, it's possible for that activity
22    to go to sleep for a period of time, and
23    then it could be, during that period of
24    time, that the stock is efficient or it
25    might not be.  No.  An important issue is
```

Page 112

1    that meme stock activity can make short

2    selling too risky.

3              And short shelling can be an

4    important mechanism for a stock to be

5    efficient.  So one would have to look.  It

6    would be dependent on the stock.

7        Q    So in answer to my question,

8    then, it is possible that a meme stock

9    could trade efficiently?

10             MS. LOSEMAN:  Objection.

11          Asked and answered.  Vague.

12        A    I think the answer was that I

13   was giving to that question is that there

14   can be period where a stock is still

15   affected -- I mean is still very popular

16   on social media where it could be

17   efficient.  I think one would have to

18   study the stock to see whether that can be

19   the case.  I can't exclude a priori that a

20   stock that at some point was identified as

21   a meme stock is going to stay a meme stock

22   forever.

23             Q    Is it your opinion that the

24   Cammer-Krogman factors don't apply to meme

25   stocks?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1              Vague.
 2         A     What I'm saying in my report
 3    is that Dr. Feinstein now focuses on
 4    GameStop, on AMC, and says that Cassava
 5    didn't have that level of social media
 6    activity, and he provides no basis as to
 7    why that would be a benchmark.  I use a
 8    benchmark that, to me, seems to be
 9    reasonable, which is looking at a study
10    that looks at a sample of meme stocks.
11    And I point out that Cassava has,
12    following -- during periods of time that
13    is similar to those stocks, and that that
14    makes it important for Dr. Feinstein to
15    pay attention to that phenomena.
16         Q     So you sitting here, you
17    don't -- you don't have a threshold amount
18    in mind for how much social media interest
19    is required in -- for a stock to be a meme
20    stock?
21              MS. LOSEMAN:  Objection.
22            Misstates.  And vague.
23         A     I mean, for the opinions that
24    I'm -- I have in my report, I don't need a
25    threshold.  What I need is exactly what I
```

Page 118

1    present, which is a whole bunch of

2    evidence of the markets talking of Cassava

3    as a meme stock, of Cassava being included

4    in an index of meme stocks, and it having

5    some of the features of meme stocks

6    that -- of papers in the literature.

7         Q    No court has determined what

8    minimum threshold of social media interest

9    is required for a stock to be a meme

10   stock; isn't that right?

11             MS. LOSEMAN:   Objection.

12        Calls for a legal conclusion.

13        A    I -- I mean, I don't -- I

14   don't know if courts have even looked at

15   stocks that somebody was calling a meme

16   stock.  So I -- now, as I said, I'm not an

17   attorney.  I mean, it would be interesting

18   to follow the reasoning of the court -- of

19   a court if it decided that a stock that is

20   in a meme stock index is somehow not a

21   meme stock.  But now here, my argument is

22   quite different from what you seem to

23   think it is.  My argument is that the

24   works that Dr. Feinstein did is incomplete

25   and problematic in reaching a -- or a

Page 119

CONFIDENTIAL

```
1    conclusion of market efficiency, because
2    he ignored that there is a lot of evidence
3    that Cassava may have been affected by the
4    meme stock phenomenon, and he doesn't
5    study that in his report.
6               He -- I mean, at his
7    deposition seemed today that he has kind
8    of casually studied it, and -- but I
9    haven't seen any of the work underlying
10   this casual study.
11             MS. JENSEN:  So I'm going to
12             move to strike everything after "I
13             don't know if courts have looked
14             at stocks that someone was calling
15             a meme stock."
16        Q    Again, Doctor, I really
17   encourage you to focus on the question.
18   It's just going to make it very difficult
19   for us to get through this in seven hours
20   on the record if you continually go off
21   into different directions instead of
22   answering the questions that we've got
23   here.
24             MS. LOSEMAN:  And we'll oppose
25             the motion and object to the
```

Page 120

```
 1   offload their positions.
 2        Q    And that is a characteristic
 3   of meme stocks?
 4        A    The short squeeze, to me, is
 5   not a characteristic of meme stock.  But
 6   no, a number of meme stocks ended up
 7   having short squeezes, and those that have
 8   attracted considerable attention.
 9        Q    You mentioned retail ownership
10   in your report.
11             What's the threshold amount of
12   retail ownership in order for a stock to
13   be characterized as a meme stock.
14             MS. LOSEMAN:  Objection.
15         Vague.
16        A    I mean, I don't say that there
17   is a threshold of retail ownership.  I
18   don't think that the definitions that we
19   talked about includes retail ownership.
20   It is striking, in the case of Cassava, as
21   to how low institutional ownership is and
22   that, I mean, creates a number of
23   difficulties.
24        Q    Okay.  So the retail ownership
25   itself isn't cause to call a stock a meme
```

Page 128

1    stock?

2                    MS. LOSEMAN:  Objection.

3            Vague.

4            A    The level of ownership is not

5    a reason but obviously the meme stock

6    phenomenon is being driven by individuals

7    and not by institutions.

8            Q    Are you aware of peer-reviewed

9    literature that social commentary may

10   enhance the efficiency of a stock's market

11   trading?

12           A    I am aware of literature where

13   it says that it can help, and I am aware

14   of literature that says that it can -- it

15   can hurt.  It depends on a number of

16   factors.  On -- now, with -- as a meme

17   stock phenomenon, the view has been more

18   that it is hurting rather than enhancing.

19           Q    So it's your opinion that

20   social commentary hurts market efficiency?

21                   MS. LOSEMAN:  Objection.

22            Misstates.

23           A    I think you're misstating what

24   I said.

25           Q    What is your opinion?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

```
 1           A    My -- I mean, what I said, in
 2    answer, is that it depends.  That, you
 3    know, there are papers that focus on it
 4    helping in some cases, and there are
 5    papers that focus on it hurting.  And it
 6    depends on the circumstances.  It can help
 7    or it can hurt.
 8           Q    And how can it help?
 9           A    I mean, now, I am aware of
10    papers that discusses the fact that
11    information -- public information may be
12    incorporated more quickly for stocks
13    where -- that are located at places that
14    are more central in social networks.  That
15    is a paper that comes to mind.  Now -- and
16    so that would be -- would be an example of
17    how it could help in the sense that people
18    have access to that information in a
19    different ways than people that would be
20    remove from central -- I mean the
21    networks.
22           Q    Do you opine in your report
23    that GameStop traded in an inefficient
24    market?
25           A    I said -- I said Professor
```

Page 130

1    Fama, who says, at that point in time, he
2    traded very inefficiently.
3          Q    Anything else in your report
4    about that?
5          A    I mean, I don't have an
6    analysis of the efficiency of GameStop's
7    market in my report.  I'm not quite sure
8    why you -- I should have such an analysis.
9    It obviously adds -- had lots of episodes
10   that are hard to reconcile with market
11   efficiency.
12         Q    How about AMC?
13              Do you opine in your report
14   that AMC traded in an inefficient market?
15         A    Again, AMC had lots of
16   episodes that are very hard to reconcile
17   with market efficiency, but, I mean, I did
18   not do a specific study for AMC.  I did
19   not do a specific study for GME.  You
20   know, I wasn't retained to assess the
21   market efficiency of those stocks.  Now,
22   there's plenty of reasons in the
23   literature to be concerned about the
24   efficiency of those stocks.
25         Q    But that's not your opinion?

Page 131

1          A     I'm sorry.

2                What?

3                I don't --

4          Q     But -- but --

5          A     -- understand what you're

6     saying.

7          Q     -- you don't have -- you --

8     because you didn't analyze those stocks,

9     you're not opining on the efficiency or

10    inefficiency of GME or AMC?

11         A     As I --

12               MS. LOSEMAN:  Objection.

13           Vague.

14               Go ahead.

15         A     -- as I said, there are lots

16    of episode in those stocks that are hard

17    to reconcile with market efficiency.  And

18    on -- so that's what I would say without

19    doing more.  I mean, I know I reference

20    plenty of papers and plenty of discussions

21    showing that there are episodes that --

22    no.  I would find it very hard to

23    reconcile with efficiency.

24         Q     Did you do any event studies

25    of GameStop?

CONFIDENTIAL

1          A     Not in the context of this
2     report.
3          Q     You haven't done that for this
4     case, right?
5          A     I don't see why I would have
6     done that for this case, yes.
7          Q     So the answer is no?
8          A     As I said.
9          Q     AMC, did you do an event study
10    for AMC?
11         A     Again, I did not.  I mean, I
12    did everything that was required for me to
13    support the opinions that I have, and I'm
14    satisfied that I support my opinion.
15         Q     Is it your opinion that
16    Cassava was a meme stock throughout the
17    class period?
18              MS. LOSEMAN:  Object to form.
19         Vague.
20         A     This misstates what I say in
21    my report.  What I say in my report is
22    that Dr. Feinstein's opinion is
23    problematic because he did not investigate
24    the effects on Cassava, the potential
25    effect of Cassava of the meme stock

                              Page 133

1   phenomenon.

2          Q    So you yourself do not have an

3   affirmative opinion that Cassava was a

4   meme stock throughout the class period?

5              MS. LOSEMAN:  Objection.

6          Vague.

7          A    No.  What I have in my report

8   is what it is.  I mean, I'm not quite sure

9   what you mean by "affirmative opinion."

10  Now, I provide lots of evidence that the

11  market thought of it as a meme stock --

12              (Whereupon, the court reporter

13              requested clarification.)

14              THE WITNESS:  Thought of it as

15          a meme stock?

16         A    And I provide evidence that is

17  consistent.  I don't see why I would have

18  to do more in the context of questioning

19  what Dr. Feinstein did.

20         Q    So I'm going ask it again.

21              Is it your opinion that

22  Cassava was a meme stock throughout the

23  class period?

24              MS. LOSEMAN:  Objection.

25          Asked --

1          Q     Yes or no.

2               MS. LOSEMAN:  -- asked and

3           answered.

4          A     My answer is that there is

5     enough evidence from the markets, from the

6     press, from social media, from the

7     behavior of the stock itself to be

8     concerned that there was an impact from

9     the meme stock phenomenon, and that

10    Dr. Feinstein hasn't taken that into

11    account, hasn't studied that, hasn't paid

12    attention to that --

13         Q     So sitting here --

14         A     -- in his report.

15         Q     -- so was -- was Cassava a

16    meme stock throughout the class period?

17               MS. LOSEMAN:  Objection.

18           Asked and answered.

19         A     I just told you what my

20    opinion is as it is discussed in my

21    report.

22         Q     Well, I don't think I've

23    gotten a yes or no answer.

24               So yes or no, was Cassava a

25    meme stock throughout the class period?

                              Page 135

1          Q     Okay.  And yet -- still, it
2     was only efficient for a couple of days,
3     correct?
4          A     You just mischaracterizes what
5     he said.
6          Q     Okay.  He said for a couple of
7     days, it was very inefficient, right?
8          A     Very inefficient, yeah.
9          Q     Okay.
10          A     That doesn't mean that it was
11     efficient on the other days.
12          Q     But that's all he referred to,
13     wasn't it?
14               MS. LOSEMAN:  Object to form.
15          Document speaks for itself.
16          A     I mean, it -- well, it says
17     very inefficient for a couple of days.  I
18     mean -- I mean, it -- I don't know what he
19     would have said about other days for
20     GameStop.  I don't know what he would have
21     said about what happened to GameStop this
22     year.  I haven't asked him.
23          Q     You haven't spoken to him
24     about this at all, have you?
25          A     About GameStop?

                                        Page 156

CONFIDENTIAL

```
 1              Q     Yeah.
 2              A     I don't believe so.  I mean,
 3     I've communicate with him about other
 4     things.  I haven't asked him.
 5              Q     Okay.  And that couple of days
 6     that he was referring to, that was a short
 7     squeeze that precipitated a trading ban,
 8     correct?
 9              A     That's correct.
10              Q     And that short squeeze was due
11     to coordinated trading by a crowd of
12     retail investors in that case, correct?
13                    MS. LOSEMAN:  Object to form.
14               Vague.
15              A     I mean, some of the papers
16     make that case.  Yes.
17              Q     At no point during this
18     interview did Professor Fama mention
19     caba -- Cassava, right?
20              A     I don't know what questions he
21     was asked, and so I'm sure he didn't
22     mention Cassava.  But no, he responded to
23     the questions that were asked for him.
24              Q     In the --
25              A     -- he wasn't --
```

Page 157

1          Q     -- rock --

2          A     -- he wasn't asked to list the

3    stocks that may have traded inefficiently.

4    That wasn't part of the questions that I

5    remember.

6          Q     That wasn't my question.

7                I was just asking to you

8    confirm that he didn't mention Cassava --

9                MS. LOSEMAN:  Objection.

10            Document speaks for itself.  Asked

11             and answered.

12          Q     -- correct?

13          A     Yeah.  But the way you are

14    framing the question is problematic.  Now,

15    it doesn't -- it doesn't mean that he had

16    an opinion about Cassava.

17          Q     But that's not what I'm asking

18    you.

19                I'm just asking you a very

20    simple question, and that's to confirm

21    that he did not mention Cassava, correct?

22                MS. LOSEMAN:  Objection.

23             Argumentative.  Document speaks

24             for itself.

25          A     I mean, Cassava is not

                                  Page 158

```
 1     time frame?
 2          A    No.  So one of the discussions
 3     in the media that I point out is that a
 4     number of market observers thought that
 5     what was happening to Cassava was a result
 6     of that banning, that the investors that
 7     were active in those stocks and moved on
 8     to stocks like Cassava.
 9          Q    So that's unresponsive to my
10     question.
11          My question was Cassava ever
12     banned by retail broker-dealers in that
13     time frame?
14          MS. LOSEMAN:  Objection.
15          Argumentative.  Asked and
16          answered.
17          A    I thought I answered the
18     question, that it wasn't banned, but that
19     the bans themselves discussed in the media
20     as reason why Cassava attracted attention
21     and attracted trading.
22          Q    The thing you didn't say was
23     that it wasn't banned, or at least I
24     didn't hear it.  So my apologies if you
25     did say that.
```

Page 172

1               Was there ever a cap put on

2    Cassava trading by retail broker-dealers?

3               MS. LOSEMAN:  Objection.

4          Argumentative.

5          A    No.  Again, it's the same

6    thing.  No, I mean, it -- kind of the

7    traders that were in the cap stock seem to

8    have moved to other stocks, and that's one

9    of the issues discussed in the media about

10   Cassava.

11         Q    I want to broaden the time

12   frame now.

13              At any point in time was

14   Cassava trading banned by retail

15   broker-dealers?

16              MS. LOSEMAN:  Objection.

17         Asked and answered.

18         A    I'm not aware of a ban.  I

19   mean, the bans that you are talking about

20   took place over a short period of time and

21   had to do with the level of capital that

22   was available to those dealers to support

23   clearing and so on.

24         Q    Okay.  And same answer as to

25   if I expand the time period on any caps?

Page 173

CONFIDENTIAL

1              Would your answer be the same?

2              MS. LOSEMAN:  Same objection.

3         A    My answer would be -- would be

4    the same.

5         Q    Okay.  Now, did you find any

6    evidence of a coordinated short squeeze

7    amongst traders for Cassava during the

8    class period?

9              MS. LOSEMAN:  Objection.

10        Outside scope.

11        A    I did not go looking for it.

12   I mean, I am explicit about what I looked

13   at, and why what I looked at is important

14   for Dr. Feinstein's report.  No, I'm -- I

15   don't have a report saying that Cassava is

16   a meme stock.  I'm saying that there are a

17   number of indicia that indicates that

18   Cassava may have been influenced by the

19   meme phenomenon and Dr. Feinstein ignores

20   them.

21        Q    Okay.  Turning to another

22   portion of your report, you identify

23   September 20 and 22 of 2021 as dates that

24   are high social media, correct?

25        A    Correct.

Page 174

1          Q     And both sides -- both dates

2     have statistically significant residual

3     price increases, correct?

4          A     Correct.

5          Q     And you do agree there was

6     information that caused the stock price

7     increase on September 20th, right?

8                That was in Footnote 157.

9          A     That's when there was a tweet

10    about information or potential information

11    about the SEC investigation.

12         Q     And you -- do you assert that

13    there is no news that could explain the

14    stock price reaction on September 22nd?

15         A     Well, I discuss that in my

16    report on -- and I point out that the

17    tweet was widely accessible and viewed on

18    September 22nd.  There is an article on

19    Seeking Alpha that kind of reproduces that

20    information that is already public.

21         Q     Do you contend that the

22    information on September 22nd was just

23    repetition of the information on

24    September 20th?

25                MS. LOSEMAN:  Object to form.

                                    Page 175

1    it's not going to be in the long run,

2    because it's not going to be fewer --

3    there's going to be fewer room -- less

4    room to short sell.

5            Q    Okay.  Are you done that with

6    that --

7            A    Yeah.

8            Q    -- answer?

9            Okay.  Do you have in mind the

10   answer I asked after that or should I

11   re-ask it?

12           A    I -- it would be helpful --

13           Q    Okay.

14           A    -- if you could --

15           Q    All right.  So did you draw

16   any conclusion in this case about whether

17   Cassava's stock price was being

18   artificially depressed by the short

19   interest in it?

20           A    Well, it wouldn't be

21   artificially depressed.  Now, if people

22   cannot sell short as much as they would

23   like, the stock is going to be inflated.

24           Q    Did you make any findings one

25   way or the other about that in this case?

Page 203

CONFIDENTIAL

```
 1          A    Well, I provide evidence based
 2    on the current state of the financial
 3    economics literature that Cassava had high
 4    short selling given its low institutional
 5    ownership.  And that as a result, short
 6    selling was constrained using the criteria
 7    of the literature and that that's not
 8    helpful to market efficiency.  Now, we
 9    know, from the financial economics
10    literature, that in those situations
11    information gets incorporated more slowly
12    in a stock price.
13          Q    So I think we're missing each
14    other because that was -- you're answering
15    a different question then I asked.
16              My question was whether you
17    made any findings as to whether Cassava's
18    stock price was artificially depressed by
19    the short interest in it.  That was my
20    question.
21              MS. LOSEMAN:  Objection.
22          Vague.  And I think asked and
23          answered.
24              But go ahead.
25          A    So I thought I answered the
```

Page 204

```
 1   question.  Now, the -- what I point to, in
 2   terms of the limitations of short selling,
 3   would imply that the stock is inflated,
 4   not that is -- that it is depressed.
 5          Q    Did you make any findings
 6   about that?
 7               Did you make any findings
 8   about actual depression or inflation?
 9          A    I did not --
10               MS. LOSEMAN:  Objection.
11          A    I did not make findings about
12   inflation or depression.  I made the
13   finding that, well, Cassava was in a
14   situation where short sales were
15   constrained, and I base this conclusion on
16   the literature.  And I show that the
17   literature implies that, in those
18   situations, public information is
19   incorporated more slowly in a stock.  So I
20   show all this and point out that
21   Dr. Feinstein didn't address this issue.
22   He discusses short selling in his
23   deposition, but in a way that is
24   completely contrary to the existing
25   literature.
```

Page 205

1           MS. JENSEN:  Move to strike
2       everything after "I did not make
3       findings about inflation or
4       depression."
5           MS. LOSEMAN:  Oppose the
6       motion.
7           MS. JENSEN:  Okay.  Let's go
8       ahead and take a quick break.
9           VIDEOGRAPHER:  The time is
10      2:17 p.m.  We're now off the
11      record.
12          (Whereupon, at 2:17 p.m., a
13           recess was taken to 2:44 p.m.)
14          (The proceeding resumed with
15           all parties present.)
16          VIDEOGRAPHER:  The time is
17      2:44 p.m.  We're now on the
18      record.
19   Q    Okay.  Welcome back.
20          All right.  Doctor, Are there
21   any alternatives to shorting a stock?
22          MS. LOSEMAN:  Object to form.
23      Vague.
24   A    It's possible to trade with
25   options.

1          A     I describe it in -- as a

2     report and it's an index that as I look at

3     social media interest as well as short

4     sales.

5          Q     And what are the criteria for

6     inclusion in that index?

7          A     The ones I know are the ones

8     that I discuss in my report, and in that

9     case we know exactly the stocks in the

10    index.  Cassava was in the index.  So we

11    were able to remove Cassava and look at it

12    that way.

13         Q     Okay.  I don't think you

14    answered my question.

15              I said what are the criteria

16    for inclusion in the index?

17              MS. LOSEMAN:  Objection.

18         Asked and answered.

19         Q     It wasn't answered.

20         A     So I said that it looks at

21    stocks that have high social media, I

22    mean, interest and high short sales is my

23    recollection.

24         Q     Okay.  And what level of

25    social media interest did it have to be?

Page 219

```
 1              A      That, I don't remember.

 2              Q      And do you know if there's any

 3      objective criteria?

 4                      MS. LOSEMAN:   Objection.

 5              Vague.

 6              A      That, I don't know.   That's

 7      how they characterize the index.

 8              Q      And what was the criteria for

 9      short sells.

10              A      Same thing.   That's the way

11      they describe the index.

12              Q      So how many days throughout

13      the entire class period did Cassava

14      qualify for inclusion in this index?

15              A      So the stock wasn't -- I mean,

16      I'm sorry.

17                      The index wasn't available

18      during the whole class period.   The index

19      came into being at the end of 2021.   So it

20      really wasn't available in 2021.

21      Afterwards, it was -- Cassava was in the

22      index on, you know, sometimes it dropped

23      out, and sometimes it came back in.

24              Q      And do you know how many days

25      in total it was in there?
```

Page 220

```
 1              A      No.
 2              Q      You have no idea, sitting
 3      there?
 4                     MS. LOSEMAN:  Objection.
 5               Asked and answered.
 6              A      Sitting here, I don't
 7      remember.  I know that -- I knew that at
 8      one point in time.  I'm not sure whether I
 9      put it in the report or not.
10              Q      Do you know what percentage of
11      the total class period it was included in
12      the index?
13              A      Well, given that the index
14      didn't exist for a year and a half in the
15      class period and existed for two years, I
16      mean, I have a sense of an upper bound in
17      the percentage.  You know, the fact that
18      the index didn't exist is quite important
19      to that.
20              Q      Okay.  What percentage once it
21      exists, so for the rest of the remainder
22      of the period?
23              A      So I'm trying to see whether
24      I -- but I -- I don't see the data in my
25      report.  I know that we have it, and I
```

Page 221

1   know that it should be in my backup.

2           Q    How often is that index

3   rebalanced?

4           A    My understanding is every two

5   weeks.

6           Q    And is that how often

7   Solactive modifies the constituents of the

8   index?

9           A    It seems to modify the

10  constituents fairly often.  I don't know

11  if it's every two weeks or not.

12          Q    Would you be surprised to know

13  that the constituents of that index

14  changed 1,153 times from its inception to

15  the end of the class period?

16               MS. LOSEMAN:  Objection.

17          Assume facts.  Vague.

18          A    I would have to check.

19          Q    You have no reason to dispute

20  that?

21               MS. LOSEMAN:  Same objections.

22          A    It's the only number I know.

23  So at this point I would -- I would have

24  to check.

25          Q    Is that a typical turnover for

                                    Page 222

```
 1    an index?

 2                 MS. LOSEMAN:  Objection.

 3          Vague.

 4          A    It depends.

 5          Q    Depends on what?

 6          A    Well, I mean, the kind of

 7    indices that replicate -- I mean, indices

 8    that have a buy and hold.  This is an

 9    index for an ETF on -- so it's an ETF that

10    was constructed out of this index.  There

11    are many ETFs that, you know, have kind of

12    their own indices that they try to track,

13    but the constituents change over time.  So

14    it really depends on the type of index.

15          Q    How many constituents are in

16    this index at any given time?

17          A    Twenty-five is my

18    understanding.

19          Q    And if a company doesn't meet

20    the criteria for the inclusion in the

21    index, does it mean the stock is not a

22    meme stock?

23                 MS. LOSEMAN:  Object to form.

24          Vague.

25          A    I wouldn't reach that
```

Page 223

1    conclusion.  I mean, the point of

2    mentioning that index is that it's an

3    index of meme stocks, and at times, it

4    included Cassava.

5         Q    And so in your mind, whether

6    it's included or not doesn't necessarily

7    mean whether a stock is a meme stock,

8    correct?

9              MS. LOSEMAN:  Objection.

10         Misstates.

11         A    Well, that's correct.  I mean,

12    it's one of the indices that I refer to in

13    my report, and as we keep talking about, I

14    have a number of indices that indicates

15    that -- you know, that indicates that the

16    meme stock phenomenon may have affected

17    Cassava, and Dr. Feinstein doesn't look at

18    that.

19              MS. JENSEN:  The beginning of

20         that answer was "Well, that's

21         correct."

22         Q    Okay.  What is an "option

23    contract"?

24         A    An option contract is a

25    contract that gives you the right to buy

Page 224

1    or sell a stock at a given price, the

2    exercise price.

3            Q    And you'll agree that options

4    are derivative?

5            A    Yeah.

6            Q    Aren't options designed to

7    move with the stock?

8            MS. LOSEMAN:  Object to form.

9            Vague and incomplete.

10           A    Well, options at the times

11   that they can be exercised are not -- I

12   mean, European options at maturity

13   would -- reflects a difference between the

14   stock price and the exercise price.

15           Q    So I think my question is a

16   little different.

17           My question was whether

18   options are designed to move with the

19   stock?

20           MS. LOSEMAN:  Same objection.

21           Asked and answered.

22           A    I thought I gave the answer to

23   your question.  So there must be something

24   about your question I don't understand.

25           Q    Or something about your answer

Page 225

CONFIDENTIAL

1    I don't understand certainly.

2              But the options are

3    derivative.  We have established that.

4              And options are designed to

5    move with the stock; that's the design of

6    the product, correct?

7              MS. LOSEMAN:  Same objections.

8         A    The design of the product is

9    that at the time of exercise, it's going

10   to depend directly on the stock price.

11        Q    Are you familiar with the

12   literature on options pricing?

13        A    I have written papers on

14   option pricing.

15        Q    And you are aware that there's

16   numerous tests of options pricing models?

17        A    I am aware of that, both

18   because I have written about it and

19   because I have taught it.

20        Q    And those tests generally

21   indicate that options pricing conform to

22   fair, fundamental values?

23             MS. LOSEMAN:  Object to form.

24        Vague.

25        A    I'm not sure what this means.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

1          Is that -- let's talk about

2    call options.

3          Now, isn't it -- isn't it true

4    that, according to generally accepted

5    principles of options pricing, that if the

6    stock is inflated, then all the options

7    would also be inflated?

8          MS. LOSEMAN:  Objection.

9        Vague.  Incomplete hypothetical.

10        A    So I'm not sure what you mean.

11   I mean, one -- I only have to qualify my

12   earlier answers.  Now, when you talk about

13   a stock like Cassava, for some investors,

14   it's kind of viewed as a gambling stock on

15   being able to take positions with -- in

16   calls with a high exercise price might be

17   a cheap way to participate in big changes

18   in prices.  So, I mean, you might have

19   actions that is produced in other stocks,

20   say, Apple or something like that.

21        Q    Okay.  And you're speaking

22   hypothetically, right?

23        A    No, I'm speaking from kind of

24   my general understanding of different

25   types of stocks.

Page 232

CONFIDENTIAL

1          Q     Right.  Now, my question about

2     call options, I don't think you answered

3     that question.

4          A     No.  I was going to.

5          Q     Okay.  Go ahead.

6          A     Now, again, the answer depends

7     on frictions to arbitrage.  Now, options

8     can be priced correctly relative to the

9     stock irrespective of whether the stock is

10    overvalued or undervalued.  Because the

11    value of options doesn't depend on whether

12    the stock is overvalued or undervalued, it

13    just depends on the stock price.  But that

14    requires -- not that there are no

15    frictions -- or not material frictions in

16    arbitrage.

17         Q     Wouldn't it be true, also,

18    according to general accepted pricing

19    models, that the stock is inflated

20    regardless of expiration rates and strike

21    prices, then the call prices will also be

22    inflated?

23              MS. LOSEMAN:  Objection.

24         Vague.  Incomplete hypothetical.

25              A     I think it depends on the

Page 233

1    definition of inflations that you have in

2    mind here.  Now, if the stock is inflated

3    and you are able to arbitrage between call

4    options on the stock, and then know the

5    option is going to be priced fairly

6    regardless of whether the stock is priced

7    fairly or not.  I think there is an issue

8    that I need to raise with respect to my

9    earlier answers in terms of arbitraging.

10            Now, you have different types

11   of stocks, and the Black-Scholes types of

12   reasoning is going to work reasonably for

13   stocks whose price evolve smoothly over

14   time, you know, the specific technical

15   requirements for that.  If a stock doesn't

16   evolve smoothly, now it has jumps in its

17   price, then arbitraging between the stock

18   on the option price is going to be much

19   more challenging because you won't be able

20   to kind of construct that with class

21   portfolio between an option on the stock

22   by just hedging the option with a stock.

23            And then the answer to your

24   questions would be a bit different.  Now,

25   when we talk about Cassava, it's precisely

Page 234

```
 1    viewed as material for shareholders.
 2         Q    And are you aware that that's
 3    how the SEC describes 8-K filings?
 4              MS. LOSEMAN:  Objection.
 5         Assumes facts.
 6         A    In the way that I just
 7    described it.
 8              MS. JENSEN:  Okay.  I'm going
 9         to ask that you mark this document
10         as Stulz Exhibit 5, and this is a
11         printout from the SEC website.
12         (Whereupon, a Printout from the
13         SEC was marked as Deposition
14         Exhibit No. 5 for
15         identification, as of this
16         date.)
17         Q    Have you seen this document
18    before?
19         A    I have seen -- yeah, I have
20    seen that.  Not recently.  So I have to --
21         Q    So you can -- just to save a
22    little time, you can confine your review
23    or you can review it all, if you would
24    like, but I wanted to direct your
25    attention to the top of that first page.
```

Page 254

1           And do you recognize the
2    language I just used concerning the
3    purpose of an 8-K?
4              MS. LOSEMAN:  Object to form.
5         Misstates.
6         A    It includes the language of
7    major events that you read?
8         Q    Yes.  Okay.  You can set that
9    aside.  Now, Professor Feinstein's event
10   study established that the frequency of
11   statistically significant residual returns
12   for Cassava were statistically
13   significant -- were statistically
14   significantly greater on 8-K days than on
15   lesser news dates during the class period.
16           You don't dispute that
17   Professor Feinstein's collective study
18   established the frequency of statistically
19   significant residual returns for Cassava
20   stock were statistically greater on these
21   top news article dates during the class
22   period, do you?
23        A    I don't dispute that he found
24   eight out of 45 8-K announcement to be
25   statistically significant, which means 37

                                        Page 255

1    announcements were not statistically

2    significant.

3          Q    I'm sorry.  I just couldn't

4    understand.  Could you say that again.

5          A    Yeah.  My understanding is

6    that he found about 20 percent of the

7    announcement statistically significant;

8    80 percent are not.

9          Q    Okay.  And --

10         A    So if there are truly major

11   events, that would be an issue.

12         Q    Now, is it your opinion that

13   your Exhibit 4A establishes that Cassava

14   traded in a non-efficient or inefficient

15   market?

16         A    I'm sorry.  We're going back

17   to kind of earlier questions?

18         Q    Yeah, we're --

19         A    I mean, if I had an exhibit

20   that establishes that Cassava traded in an

21   inefficient market, I would have an

22   affirmative opinion that it traded in an

23   efficient market.

24         Q    Okay.  So the answer is no.

25              MS. LOSEMAN:  Object to form.

Page 256

1                    Asked and answered.  Misstates.

2          Q      Right?  The answer is no?

3          A      I mean, the answer is that I'm

4    establishing evidence that is problematic

5    for the opinion of Dr. Feinstein's that

6    the market for Cassava is efficient.  I

7    viewed the fact that 80 percent of the 8-K

8    announcements are not accompanied by

9    significant abnormal returns to be one

10   such piece of --

11                  (Whereupon, the court reporter

12                  requested clarification.)

13                  THE WITNESS:  -- significant

14            abnormal returns to be a piece of

15            evidence as well.

16                  MS. JENSEN:  So I'm going to

17            strike that as nonresponsive.

18         Q      The answer to my question is

19   no correct?

20                  MS. LOSEMAN:  Object to the

21            motion.  Asked and answered.

22         Q      No?

23         A      I thought I answered the

24   question.

25                  Q      Okay.  With a no?

Page 257

1    opinion at this time that there is a

2    mismatch between the misrepresentations

3    and the corrective disclosures?

4            MS. LOSEMAN:  Objection to the

5        extent it calls for a legal

6        conclusion.

7        A    I am explaining, in my section

8    on the damages methodologies, that there

9    are a number of issues concerning how

10   Dr. Feinstein would assess the inflation

11   band for specific misstatements giving the

12   alleged curative disclosures.  So I

13   have --

14           (Whereupon, the court reporter

15        requested clarification.)

16           THE WITNESS:  Alleged curative

17        disclosures.

18       A    So I formulate that as an

19   opinion concerning misstatements; I raise

20   questions about how it's going to deal

21   with computing the inflation band for the

22   various types of allegations.

23       Q    Okay.  I just want to make

24   sure that I understand what you are

25   saying.  You're saying that you are -- if

                                    Page 308

```
 1    I'm -- if I'm understanding what you are

 2    saying, your testimony, you're critiquing

 3    Dr. Feinstein on the inflation ribbons,

 4    but you are not providing the affirmative

 5    opinion that there is a mismatch between

 6    the misrepresentations and the corrective

 7    disclosures at this time?

 8              MS. LOSEMAN:  Same objection.

 9         A    In my damages sections, I am

10    raising issues that Dr. Feinstein doesn't

11    address in his report that create issues

12    about computing inflation bands.  I'm not

13    having a statement saying something to the

14    effect that an alleged curative disclosure

15    is unrelated to the misstatements or

16    something like that.

17         Q    Would you agree that

18    out-of-pocket damages methodologies is the

19    damages methodology used in nearly every

20    class action securities case?

21              MS. LOSEMAN:  Objection to the

22              extent it calls for a legal

23              conclusion.

24         A    I don't view it as a

25    methodology; I view it as a definition of
```

Page 309

CONFIDENTIAL

```
 1    damages.
 2            Q    It is called the out-of-pocket
 3    damages methodology.
 4                 And you agree that that's
 5    what's used in nearly every securities
 6    case?
 7                 MS. LOSEMAN:  Objection.
 8            A    I mean, I agree that it's a
 9    definition of damages, looking at the
10    difference between the two prices.  I
11    agree that that's a definition of damages.
12    It's not a -- I mean, it's not a
13    methodology in the sense of telling me how
14    somebody would compute that amount.
15            Q    An event study can be used to
16    measure the amount of artificial inflation
17    in a securities market price; isn't that
18    right?
19                 MS. LOSEMAN:  Objection.
20            Vague.  Incomplete.
21            A    There are cases where an event
22    study can be used, and there are cases
23    where it cannot.  Here, we have the added
24    complication that there may be the impact
25    of the meme activity on abnormal returns
```

Page 310

1   that one would have to figure out what to
2   do with.
3          Q     So are you saying an event
4   study is incapable of measuring damages in
5   this case?
6              Is that your position?
7              MS. LOSEMAN:  Objection.
8           Misstates.
9          A     I am -- didn't say that.  I
10  thought you asked a very general question,
11  and I said sometimes an event study can be
12  used and sometimes it cannot.
13         Q     I understand, but then you
14  pivoted to this case so that's why I did
15  as well.
16         A     Okay.  I just added that this
17  case has a complication that is not
18  typical having to do with the meme
19  activities that may or may not have
20  affected abnormal returns.  And if it did,
21  then that's going to be an issue for what
22  Dr. Feinstein does at the merit stage, if
23  there is a merit stage.
24         Q     So would you agree that --
25  assuming it's handled correctly,

Page 311

1    confounding information can be accounted

2    for in an out-of-pocket methodology?

3              MS. LOSEMAN:  Objection.

4         Vague.  Incomplete.

5         A    I mean, there are cases where

6    confounding information can be taken into

7    account in a reliable way, and there are

8    cases where it cannot.  Now, if there is

9    evidence of meme activity for the abnormal

10   return, not that you normal returns that

11   were influenced by the meme phenomenon.

12   That could be quite challenging for

13   Dr. Feinstein to find a way that is

14   reliable to deal with that.

15        Q    Okay.  And again, confirming

16   that you have not made a finding that

17   the -- that the abnormal returns were

18   influenced by the meme stock phenomena in

19   this case, correct?

20             MS. LOSEMAN:  Object to the

21        extent it misstates.

22             THE WITNESS:  I'm sorry.  I

23        didn't hear.

24             MS. LOSEMAN:  No.  Go ahead.

25        A    Oh, I raise a number of

Page 312

1    make a difference?

2                MS. LOSEMAN:  Objection.

3           Asked and answered.

4           A    As I said, it could make a big

5    difference.  The abnormal return could be

6    quite different, but I mean, I don't know

7    what he's going to do.  I don't know how

8    he's going to address that.

9           Q    And you haven't made the

10   finding that it would be different?

11          A    It's not --

12               MS. LOSEMAN:  Objection.

13          Asked and answered.

14          A    It's not -- it's not my role

15   to address the issue for him.

16          Q    All I'm asking, Doctor, is for

17   you to confirm that you have not made a

18   findings that the stock would have fallen

19   less if the company made the disclosure

20   rather than the Wall Street Journal and

21   New York Times?

22               MS. LOSEMAN:  Objection.

23          Asked and answered.

24          A    I haven't done that type of

25   calculation at this point.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1        Q    Okay.  So you're not saying at

2   this point that because the information

3   came from the Wall Street Journal and the

4   New York Times, investors lost more money?

5              MS. LOSEMAN:   Objection.

6         Misstates.  Asked and answered.

7        A    I thought I had answered the

8   question.  I know, I mean, there are a

9   number of issues here that make it

10   difficult to understand how it would come

11   up with a but-for disclosure on how it

12   would estimate the impact of that but-for

13   disclosure.  That's -- now that's what I'm

14   saying here.

15        Q    Are you aware of what the news

16   about the company was on July 27, 2022?

17        A    July 27, 2022?

18        Q    Uh-huh.

19        A    At this point, I would need my

20   memory to be reflect of --

21        Q    So I can -- I can just help

22   you refresh your recollection.  Reuters

23   published a story revealing that the

24   Department of Justice had opened a

25   criminal investigation into Cassava

Page 318

1    involving whether the biotech company

2    manipulated research results for its

3    experimental Alzheimer's drug?

4         A    So I have read the Reuters

5    article, so I know the article.

6         Q    Is that important news?

7              MS. LOSEMAN:  Objection.

8         Vague.

9         A    Well, I mean, it is -- it is

10   news, and it is potentially important.

11        Q    Was it positive or negative?

12             MS. LOSEMAN:  Objection.

13        Vague.

14        A    I mean, I haven't done the

15   analysis of kind of what was already known

16   on about this --

17             (Whereupon, the court reporter

18             requested clarification.)

19             THE WITNESS:  On what was

20        already known before that.

21        A    An unexpected announcement

22   that there is an investigation by the

23   Justice Department is going to have

24   negative impact on -- it might have a

25   negative impact even if it wasn't true

Page 319

```
 1    that there was a problem.
 2         Q    Would you agree that the stock
 3    price declined by a statistically
 4    significant amount?
 5         A    Let me just check what I'm
 6    saying about the date.  I believe so, but
 7    I just want to be -- yeah, just one thing
 8    that I need to make precise and I haven't.
 9    When I say that something has a
10    significant abnormal return, that's using
11    the models of Dr. Feinstein, and I make it
12    clear that in my reports that I am not
13    saying that I would use those models
14    myself if I had -- were doing an event
15    study myself.
16         Q    Okay.  But you have no reason
17    to dispute that the stock price declined
18    by a statistically significant amount?
19         A    I declined by a -- by a fairly
20    large amount.  So it would be surprising
21    if it were insignificant in an event
22    study.
23         Q    So doesn't that mean that the
24    stock reacted to the information that was
25    released?
```

Page 320

```
1              MS. LOSEMAN:  Object to form.
2         A    As I said, I mean, the stock
3    of a company is likely to react negatively
4    whenever the DOJ starts a criminal
5    investigation, even if at the end of the
6    day nothing criminal was done.
7         Q    Are you aware of what the news
8    was on this company, August 27, 2021?
9              MS. LOSEMAN:  Object to form.
10        Vague.
11        A    I mean, if --
12        Q    I can tell you, if you want.
13        A    That's Quanterix's issued -- I
14   mean, Quanterix's issued statement, yes.
15        Q    And was this important news?
16             MS. LOSEMAN:  Object to form.
17        Vague.
18        A    I mean, it is a statement that
19   may or may not have corrected something
20   that Cassava said.
21        Q    Was it positive or negative
22   news?
23             MS. LOSEMAN:  Object to form.
24        Vague.
25        A    I mean, if it corrected
```

Page 321

1    information that the market had viewed as

2    positive, said by Cassava, then it

3    wouldn't be positive news.

4         Q    And would you agree that the

5    stock price declined by a statistically

6    significant amount?

7         A    In Dr. Feinstein's event

8    study, it declined on those days.  I agree

9    with that.

10        Q    And you don't have any reason

11   to dispute that?

12        A    That I read the numbers

13   correctly in Dr. Feinstein's spreadsheet

14   whenever I looked at a spreadsheet.  It

15   was in a spreadsheet.

16        Q    And so doesn't that also in

17   this instance mean that the stock reacted

18   to the information that was released?

19             MS. LOSEMAN:  Object to form.

20         Vague.

21        A    I would have to look at --

22   now, I also looked at information for

23   confounding information.  At this point in

24   the day, I don't remember in detail what

25   I -- what I found for each date.  So I

Page 322

1    would need to check that.

2         Q    Sitting here now, you're not

3    aware of any?

4              MS. LOSEMAN:  Object to form.

5         A    I'm sorry.  We were talking

6    about August 27th?

7         Q    Yes.

8         A    So it looks like I didn't look

9    at abnormal returns I -- for the days that

10   were significant.  I looked at confounding

11   information for the days that were not

12   significant.

13        Q    So in answer to my question,

14   doesn't that mean that the stock reacted

15   to the information that was released?

16             MS. LOSEMAN:  Object to form.

17         Misstates.

18        A    There is a negative abnormal

19   return on that day.  Not to reach a

20   complete conclusion, one would have to

21   look at whether there is other information

22   on that day.  I don't remember other

23   information at this point in time.

24        Q    And so you are not aware of

25   any reason to dispute that the stock

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1              trying to get him to say he's not
 2              aware of something.  And he --
 3                   MS. JENSEN:  I'm --
 4                   MR. GREENE:  -- may be aware
 5              but doesn't have a recall.
 6                   MS. JENSEN:  Counsel --
 7                   MR. GREENE:  And that's been
 8              his answer.
 9                   MS. JENSEN:  No, Counsel,
10              that's -- we don't need the
11              coaching on the fly here.
12                   MS. LOSEMAN:  That is not
13              coaching.  That is a clear
14              objection to the question you've
15              asked five or six times now when
16              you know the witness is trying to
17              make a flight.  You assured the
18              witness he would be able to make
19              his flight despite counsel having
20              taken nearly three hours of breaks
21              today.
22                   MS. JENSEN:  Now you're
23              misstating the facts.  The witness
24              has been --
25                   MS. LOSEMAN:  Well, the
```

Page 327

1            transcript will record the times

2            that we took breaks.

3                 MS. JENSEN:  -- filibustering

4            all day.  It's a simple question.

5            Q    I'm just asking you to confirm

6       that, sitting here right now, you cannot

7       think of another reason that the stock

8       moved on that day?

9                 MS. LOSEMAN:  That is

10           different than reflection.

11                Objection.  Asked and answered

12           several times.

13                Go ahead.

14           A    Sitting here today, I don't

15       remember what other news was on that day,

16       and I would have to look at that.

17           Q    See, that was easy.  Okay.

18                Are you aware of what the news

19       on the company was on September 14, 2020?

20                MS. LOSEMAN:  Object to the

21           commentary.

22           A    September -- I mean, that's

23       the beginning of the class.  That's

24       information related to the Trial 1 -- 2b.

25           Q    And was this important news?

Page 328

1          MS. LOSEMAN:  Object to form.

2       Vague.

3          A     I'm sorry?

4          Q     Was it important news?

5          A     Well, it was -- well, it

6    certainly was news indicating that the

7    drug was on a trajectory where it could

8    keep moving forward.

9          Q     And so it was important news?

10         MS. LOSEMAN:  Object to form.

11       Vague.  Asked and answered.

12         A     In that sense, it was

13   important news.

14         Q     Thank you.  Was it positive or

15   negative news?

16         MS. LOSEMAN:  Object to form.

17       Vague.

18         A     The stock price increased on

19   that day.  The analysts had positive

20   comments about what was going on.

21         Q     So you agree that the stock

22   price rose by a statistically significant

23   amount on that day?

24         A     I mean, I haven't done the

25   event study myself.  My recollection is

                              Page 329

1    that it rose significantly in

2    Dr. Feinstein's study.

3         Q    And doesn't that mean that the

4    stock reacted to the information that was

5    released on that day?

6              MS. LOSEMAN:  Object to form.

7         Vague.

8         A    What is correct is that

9    Cassava had information on that day on --

10   that was positive about Phase~2b of the

11   development of its drug and that the

12   market reacted to that.

13        Q    Okay.  Okay.  No further

14   questions at this time.

15   BY MS. LOSEMAN:

16        Q    I have one very, very brief

17   question.  If you turn to your report,

18   sir, Plaintiffs' Exhibit 1.

19        A    Uh-huh.

20        Q    Before I get to the report,

21   you were asked questions earlier today

22   about the meaning of Twitter impressions.

23             Do you recall those questions?

24        A    Yes.

25        Q    And you did not have your

Page 330

CONFIDENTIAL

1   report in front of you at the time.  Would

2   you turn to page 22, Footnote 100.

3           A    Yes.

4           Q    And do you see at the end of

5   the footnote, there is a reference to the

6   source social media management --

7           A    Yes.

8           Q    -- and in parens a definition

9   of impressions.

10           Do you see that?

11          A    Yes.

12          Q    Is that the understanding of

13  impressions that you had at the time that

14  you authored this report?

15          A    It is my understanding.

16          Q    And reading it now, does that

17  reflect your recollection as to what

18  "impressions" are?

19          A    Yes.

20          Q    And what are "impressions"?

21          A    So it's a lifetime number of

22  views on the post.

23               MS. LOSEMAN:  No further

24        questions at this time.

25               MS. JENSEN:  Thank you for

Page 331