# EXHIBIT 5

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

In re CASSAVA SCIENCES, INC.
SECURITIES LITIGATION

Master File No. 1:21-cv-00751-DAE

REBUTTAL REPORT OF

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

August 23, 2024

## TABLE OF CONTENTS

I.  SCOPE OF PROJECT AND REPORT ............................................................. 1

II.  HIGHLIGHTS AND OVERVIEW .............................................................. 3

III.  CONCLUSIONS.................................................................................... 9

IV.  CRITIQUE OF THE STULZ REPORT ..................................................... 17

    A.  Areas of Agreement ..................................................................... 17

    B.  Dr. Stulz Has Never Offered an Affirmative Opinion That the Market for a Stock Was Efficient ............................................................ 19

    C.  Dr. Stulz's Meme Stock Argument Is Misguided, Unsupported, and Ultimately Moot........................................................................... 21

        1.  Misguided and Moot ............................................................ 22

        2.  Dr. Stulz's Meme Stock Analysis Is Flawed and Misinterpreted ............. 22

            a.  Dr. Stulz Does Not and Cannot Establish That Cassava Stock Was a So-Called "Meme Stock"................................. 22

            b.  The Cassava Characteristics That Dr. Stulz Associates with Meme Stocks Do Not Establish That Cassava Was a Meme Stock and Do Not Indicate Inefficiency......................... 27

                (i)  Social Media Activity ...................................... 28

                (ii)  Volatility ....................................................... 34

                (iii)  Short Interest ................................................ 37

                (iv)  Solactive Roundhill Meme Stock Index Inclusion ........... 38

                (v)  News Articles ................................................. 39

             c.  Relevance of the Meme Stock Phenomenon to Market Efficiency; Dr. Stulz Focuses Incorrectly on Fundamental Efficiency Rather than Informational Efficiency........................... 42

        3.  Dr. Stulz's High Social Media Event Analysis Is Fatally Flawed ............ 46

            a.  Dr. Stulz's Collective Event Study on High Social Media Days Is Designed to Test Fundamental Efficiency, Not Informational Efficiency ................................................. 46

            b.  Dr. Stulz's High Social Media Event Study Design ...................... 46

            c.  The 10 Purportedly "No Information" Days That Dr. Stulz Finds to Be Statistically Significant................................. 49

                (i)  18 September 2020 ......................................... 49

                (ii)  3-5 February 2021 .......................................... 50

                (iii)  11 June 2021 ................................................. 52

    (iv) 21 July 2021 ...................................................................53

    (v) 30 July 2021 ...................................................................54

    (vi) 2 November 2021 ...........................................................56

    (vii) 20 September 2022 .........................................................56

    (viii) 22 September 2022 .........................................................57

   d. Dr. Stulz's Measures of Mentions and Impressions Are Unreliable for Identifying High Social Media Activity Days and for Ascertaining the Topics of Conversation .........................59

  4. Efficient Stocks May Respond to Factors Other than Fundamental Cash Flow Model Information .................................................................60

  5. Dr. Stulz's Short-Sale Constraint Criticism Comes Up Short ..................61

  6. Goldman Sachs Retail Favorites Index ......................................................64

  7. *Cammer/Krogman* Factor Analysis ...........................................................65

   a. Month-by-Month Examination ......................................................65

   b. Sufficient Analyst Coverage ..........................................................66

   c. In the *Cammer* Factor 5 Collective Event Study Cassava Stock Demonstrated That It Traded Efficiently ..............................68

D. Dr. Stulz Acknowledges that the Market for Cassava Stock Was Informationally Efficient .......................................................................................69

E. Cassava Options Traded in an Efficient Market During the Class Period ............71

  1. Volume and Liquidity ................................................................................71

  2. Bid-Ask Spreads and Liquidity .................................................................73

  3. The Finance Literature on the Efficiency of Options ...............................74

  4. *Cammer/Krogman* Factors ......................................................................76

  5. Homogeneity of Options Contracts ...........................................................78

  6. The Option Event Studies ..........................................................................79

   a. Constructing Synthetic Stocks from Option Combinations is a Necessary and Valid Variable Transformation ......................79

   b. Option Quote Data Is Reliable for Assessing Market Efficiency ........................................................................................81

   c. European and American Style Options ...........................................82

   d. Congruity Between Actual and Synthetic Stock Prices ................85

F. Section 10(b) Damages in This Matter Can Be Computed for All Class Members Using a Common Methodology That Is Consistent with Plaintiffs' Theory of Liability ....................................................................................86

1.     The Out-of-Pocket Damage Methodology Is Fully Articulated in the Feinstein Report ........................................................................87

2.     The Out-of-Pocket Damage Methodology in the Feinstein Report Is Consistent with Plaintiffs' Theory of Liability .....................................91

3.     Dr. Stulz's Criticism of the Out-of-Pocket Damage Methodology Amounts to Baseless Speculation That the Methodology Will Be Executed Incorrectly ...............................................................................92

     a.     Linking Corrective Disclosures to Specific Misrepresentations and Omissions Is Unnecessary and Speculative at This Stage ................................................................93

     b.     Potentially Confounding Information Is Not Unusual and Is Routinely and Commonly Handled by the Out-of-Pocket Damage Methodology..................................................................95

     c.     Time-Varying Inflation..............................................................101

4.     The Out-of-Pocket Damage Methodology Can Be Applied to Compute Damages Sustained by Class Members Who Purchased Cassava Call Options or Wrote Cassava Put Options.............................105

     a.     Options Volatility Estimate Under Full Disclosure ....................105

     b.     Put Price Depression is the Counterpart to Stock and Call Price Inflation............................................................................107

     c.     Appropriateness of Netting is a Legal Question; If Necessary, Netting by Claims Administrators is Straightforward ..........................................................................108

G.     Dr. Stulz Does Not Dispute That Allegation-Related Information Impacted the Price of Cassava Securities ..............................................................108

V.     LIMITING FACTORS AND OTHER ASSUMPTIONS................................................110

## I.  SCOPE OF PROJECT AND REPORT

1.  Plaintiffs' Lead Counsel, Robbins Geller Rudman & Dowd LLP, asked me to determine whether the common stock and exchange-traded options of Cassava Sciences, Inc. ("Cassava" or the "Company") traded in efficient markets during the period from 14 September 2020 through 12 October 2023, inclusive (the "Class Period").[1]

2.  On 13 March 2024, I submitted a report in this matter (the "Feinstein Report").[2] Based on the analyses presented in the Feinstein Report, I concluded that the common stock and options of Cassava traded in efficient markets throughout the Class Period.[3] I further concluded that Section 10(b) damages can be computed for all Class members and for all securities using a common methodology that is consistent with Plaintiffs' theory of liability, and I described that methodology.[4]

3.  In the Feinstein Report, I showed that each of the *Cammer* and *Krogman* factors supports a finding that the market for Cassava stock was efficient over the course of the Class Period.[5] As explained and documented in the Feinstein Report, analysis of the *Cammer* and *Krogman* factors, including empirical event study analysis, is the generally accepted methodology for assessing market efficiency. My analysis included these statistical tests, which compared the price behavior of Cassava stock on high information flow dates to the stock price movements on more ordinary non- or lesser-news dates. The tests proved that Cassava stock responded to new, Company-specific information and thereby demonstrated market efficiency during the Class Period.[6]

---

[1] Plaintiffs' prior Complaint, filed 18 August 2022, lists the class period as 14 September 2020 through 26 July 2022. I understand that Plaintiffs moved to supplement the Complaint and extend the class period. I understand that the Court granted Plaintiffs' order to extend the class period, which now ends on 12 October 2023. (Order Granting Plaintiffs' Motion to Supplement the Consolidated Complaint, filed 12 June 2024).

[2] Unless otherwise indicated, capitalized terms used herein have the same definition and meaning ascribed to them in the Feinstein Report.

[3] Feinstein Report, ¶21.

[4] Feinstein Report, ¶22.

[5] Feinstein Report, ¶¶18-20 and 186.

[6] Feinstein Report, ¶¶174, 178, 181 and 185.

4.    The Feinstein Report also explained that options are designed to respond to movement in the underlying stock's price, such that if the stock price rises, the call option prices will also rise and the put option prices will fall, all else held equal.[7] Similarly, if the stock price falls, the call option prices will fall and the put option prices will rise, all else held equal.

5.    The Feinstein Report noted that the Cassava options were traded on the Chicago Board Options Exchange (CBOE) and benefited from the same information infrastructure that made the Cassava stock market efficient. By virtue of their design and the highly developed information dissemination and option trading infrastructure, because Cassava stock traded in an efficient market, so too did the Cassava options.[8]

6.    I empirically tested whether the Cassava options responded to information as did the Cassava stock. The event study tests examined the price behavior of Cassava options, combined in a way that permitted valid regression estimation and event study $t$-tests. The tests compared option price movements on high information flow dates to the option price movements on the more ordinary non- or lesser-news dates. The Cassava options demonstrated market efficiency during the Class Period, observably reacting to information, and thus satisfied the fifth *Cammer* factor.[9] I therefore concluded that the Cassava options traded in an informationally efficient market over the course of the Class Period.

7.    Following submission of the Feinstein Report, on 14 June 2024, I provided deposition testimony in this case (the "Feinstein Deposition").

8.    Subsequently, Plaintiffs' Lead Counsel asked me to consider and evaluate the arguments and conclusions in the Expert Report of Rene M. Stulz, Ph.D., dated 28 June 2024 (the "Stulz Report"), submitted by Defendants in this matter. I read and analyzed the Stulz Report. I also reviewed the transcript of Dr. Stulz's deposition, dated 8 August 2024 (the "Stulz Deposition").

9.    According to Dr. Stulz, he was asked to (i) "address Dr. Feinstein's analysis and opinions with respect to market efficiency for Cassava's common stock and options;" and (ii)

---

[7] Feinstein Report, ¶188.

[8] Feinstein Report, ¶216.

[9] Feinstein Report, ¶217.

"assess whether Dr. Feinstein has put forth a methodology capable of reliably measuring class-wide damages for Cassava's common stock or options in a manner consistent with Plaintiffs' theory of liability."[10]

10. This rebuttal report presents my analysis and conclusions relating to the Stulz Report and the issues raised therein. As of this juncture, I have not been asked to conduct an analysis of loss causation or to compute damages. I consequently do not offer a loss causation opinion or damage quantification in this report. Should I be asked to do so, I will comprehensively address loss causation and damages at the appropriate stage in this litigation.

11. Documents that I reviewed and relied upon in preparing this report in addition to those already cited in the Feinstein Report are listed in Exhibit-1 of this report. My credentials and compensation are presented in the Feinstein Report, as is a list of testimony I provided during the four years preceding that report. Testimony that I have provided since the Feinstein Report is identified in Exhibit-2 of this report.

## II.   HIGHLIGHTS AND OVERVIEW

12. In his report, Dr. Stulz appears to espouse the following argument with regard to the efficiency of the market for Cassava stock: a) Cassava was a "meme stock";[11] b) meme stocks are inefficient;[12] c) therefore, Cassava stock was inefficient.[13]

---

[10] Stulz Report, ¶7.

[11] Stulz Report, ¶¶17-19, 27-28, 42, 52, 55, 60, 62-63, 65-70, 73, 94, 171-172, 196 and 204; *See, e.g.*, "... market commentators attributed certain large movements in Cassava's price during the Proposed Class Period to 'meme traders' or even characterized Cassava as a 'meme stock.' Moreover, Cassava experienced a large increase in social media attention during the Proposed Class Period, which, during certain portions of the Proposed Class Period, is comparable to meme stocks analyzed in the academic literature; experienced large price movements that significantly exceeded broader market movements; and was classified as a 'meme stock' in a financial index of meme stocks" (Stulz Report, ¶18).

[12] Stulz Report, ¶¶17, 19, 58 and 70; *See, e.g.*, "Accordingly, various academics and market participants have found evidence of, or raised questions regarding, market inefficiency for certain retail-investor-focused stocks in recent years" (Stulz Report, ¶17).

[13] Stulz Report, ¶¶19, 94, 172 and 196; *See, e.g.*, "Contrary to Dr. Feinstein's failure to analyze the meme stock phenomenon's potential impact on Cassava's stock and dismissal of the possibility that meme-related issues might present any evidence inconsistent with the notion of market efficiency for Cassava ..." (Stulz Report, ¶19).

13.     However, upon a careful reading of Dr. Stulz's choice of words in his report, and as he clarified in his deposition, Dr. Stulz disclaimed each element of that argument – the two premises and the conclusion. Instead, Dr. Stulz merely poses questions about whether Cassava *could* have been a meme stock,[14] which potentially *might* have caused it to trade inefficiently.[15] The implication of these possibilities, he explained, is that Cassava stock should be examined empirically to determine whether or not it traded efficiently.

14.     Dr. Stulz's meme stock argument is moot, because his prescribed course of action is exactly what I have already done and presented in the Feinstein Report. I conducted empirical analyses, which proved that Cassava stock reacted to information and therefore traded efficiently throughout the Class Period.

15.     Dr. Stulz also contends that social media activity in the absence of identifiable new Company information may have caused Cassava stock to move, sometimes significantly. He contends that stock price movement in the absence of identifiable new Company information must mean that the market for Cassava stock was not efficient. This argument of Dr. Stulz is fatally flawed.

16.     First, his argument is logically fallacious. An informationally efficient market is one in which value-relevant information is impounded into the security price with reasonable promptness. If a market reacts to new information rather than ignores that information, that market is informationally efficient. Dr. Stulz does not claim or suggest that Cassava stock ignored and did not react to Company information. Even if another factor aside from fundamental Company information did affect the Cassava stock price, which Dr. Stulz

---

[14] *See, e.g.*, "A: No, I'm – I don't have a report saying that Cassava is a meme stock. I'm saying that there are a number of indicia that indicates that Cassava may have been influenced by the meme phenomenon …" (Stulz Deposition at 174:14-19).

[15] *See, e.g.*, "Q: And so it's possible that a meme stock can trade efficiently? … A: I mean, I – it would depend. I mean, it would depend on what is shown to me" (Stulz Deposition at 112: 13-19).

admits is not uncommon among all stocks,[16] that would not make the market inefficient, as long as the Cassava stock price did react to information – which it did.[17]

17.     The second major flaw in Dr. Stulz's argument involves the very empirical evidence he attempts to marshal to support his argument that Cassava stock moved without information. In fact, the test he ran and evidence he gathered undermines his argument and provides additional compelling proof of the informational efficiency of the market for Cassava stock.

18.     Mimicking the collective event studies that I ran, which focused on information events, Dr. Stulz attempted to run a collective event study focused on high social media days. He wished to show that high Cassava social media activity caused significant Cassava stock price movements. Dr. Stulz identified the 34 days from the Class Period (excluding corrective disclosure days and the high information days that I identified) that had the most mentions about Cassava on Reddit and Twitter. He assumed (incorrectly) that because I included those days among the set of more ordinary days in my collective event study, that on those days there was no material information about Cassava released. He claims to have verified that there was no news on these days, but as shown below, he got that wrong. Next, Dr. Stulz tested for statistically significant Cassava stock price movements and found that 9 or 10 of the high social media days had statistically significant Cassava stock price movements.[18] From this result, Dr. Stulz concluded erroneously that Cassava stock often moved significantly on days that had no Cassava news, and that high social media activity caused Cassava stock price movements in the absence of Company news.

19.     But, Dr. Stulz erred. There was identifiable Cassava news released on or just prior to most of the statistically significant high social media days. While Dr. Stulz overlooked that

---

[16] *See, e.g.*, "Q: Are you aware of financial literature that says uncertainty, for example, can breed volatility? … A: Yes. I may have even have a paper on that. That is correct." (Stulz Deposition at 273: 1-7); "Q: So what factors would change the demand for a stock that trades efficiently? … A: One example of a possible change in demand that -- I mean, of factors that could change the demand for a stock could be -- as we discussed previously, you raised that example of a stock joining an index. It may not affect its value, but it could affect the demand" (Stulz Deposition, at 297: 16 – 298:2); and Stulz Report footnote 61, wherein Dr. Stulz cites an academic article that explains that changes in a stock's supply move the supply curve along the demand curve, and thereby impact the stock price independent of the arrival of new information.

[17] Feinstein Report, §VIII.C and §X.C.

[18] Stulz Report, ¶74 and footnote 148.

economically material information was indeed disseminated, market participants did not, and market prices responded appropriately. The evidence indicates that Company information spurred the social media activity that Dr. Stulz identifies. That is, news caused both the social media activity and the stock price movements, as one would expect in an efficient market.

20. One example is Dr. Stulz's treatment of 21 July 2021. He claims there was no new Cassava-specific news that day. He notes that while a press release that day notified the market that the Company would present findings at the Alzheimer's Association International Conference on the week of 26 July 2021, that same information had been announced earlier, on 21 June 2021, making the press release not "new" news.[19]

21. However, Dr. Stulz overlooked that the 21 July 2021 press release also revealed for the first time that the name of the presentation the Company would make at the Alzheimer's Associated International Conference was "SavaDx, a Novel Plasma Biomarker to Detect Alzheimer's Disease, Confirms Mechanism of Action of Simufilam."[20] That is, the Company announced on 21 July 2021 that its clinical testing had confirmed the mechanism underlying Simufilam's purported efficacy worked! For a Company whose stock valuation depended critically on whether or not its therapy in development worked, which Dr. Stulz acknowledges,[21] this was blockbuster news. On this positive news, the stock price rose 29.47% on a percentage basis (equivalent to 25.83% on a logarithmic basis). This significant positive stock price reaction to blockbuster positive news is additional compelling proof of the informational efficiency of the market for Cassava stock.

22. In his effort to support his insinuations about a meme stock phenomenon perhaps making Cassava stock inefficient, Dr. Stulz unwittingly provided compelling proof of efficiency and insight into what drove social media activity about Cassava. Apparently, the economically material news on 21 July 2021 both fueled social media activity and impacted

---

[19] "Cassava Sciences Provides Mid-Year Corporate Update, Clinical Development Progress and Announces Guidance on Clinical Data Release," *GlobeNewswire*, 21 June 2021, 8:30 AM.

[20] "Cassava Sciences to Present New Clinical Dataset at 2021 Alzheimer's Association International Conference," *GlobeNewswire*, 21 July 2021, 8:30 AM.

[21] Stulz Report, ¶198.

the stock price. That there should be a correlation between the two is understandable and to be expected in an efficient market.

23.     Among the other mistakes Dr. Stulz made in his study is how he measured the social media activity that he contends caused Cassava stock to move. For each date, the social media "mentions" he counted included mentions that occurred after the close of trading. Mentions made after a market has closed cannot cause that day's prior stock price movement, because the mentions did not exist until after the stock price moved. If there is a correlation between stock price movements and mentions as Dr. Stulz measured them, the better conclusion is that a large stock price movement elicits social media discussion, not the other way around. In fact, this alternative conclusion is supported by published research, and is perfectly consistent with market efficiency.[22]

24.     As shown below, the rest of Dr. Stulz's analysis and arguments are equally fallacious, relying on misquotes and mischaracterizations of my work in this case and mischaracterizations of the relevant finance literature. For example, Dr. Stulz asserts at least 11 times that I stated I would rely exclusively or primarily on back-casting from corrective disclosure event study results to estimate what would have been the Cassava stock price had there been full disclosure during the Class Period.[23] I never said that. To the contrary, I was clear that but-for stock prices and artificial inflation would be estimated using the event study results in combination with valuation analysis.[24]

25.     Another example is Dr. Stulz's argument that Cassava stock was short-sale constrained, which he says could make the stock trade inefficiently. I explained in my deposition that

---

[22] *See, e.g.*, "News or Noise? Internet Postings and Stock Prices," by Robert Tumarkin and Robert Whitelaw, *Financial Analysts Journal*, Vol. 57, No. 3, 2001, p. 50. ("The event study showed that returns following abnormal Internet message board activity are statistically insignificant and consistent with market efficiency. Statistically significant positive returns did, however, precede the days with strong positive opinions and abnormal message board activity"); and "Granger-Sims Causality," by G. M. Kuersteiner, *Macroeconometrics and Time Series Analysis*, Palgrave Macmillan, 2010, pp. 119-134.

[23] Stulz Report, ¶¶28, 159, 171-172, 187, 189-190, 194, 202-203 and 205.

[24] *See, e.g.*, Feinstein Report ¶229 ("Among the commonly used valuation tools that are available to investors and analysts in real time, and forensic analysts when computing damages, are, for example: valuation multiple models, such as those based on earnings, earnings before interest, tax, depreciation and amortization (EBITDA), revenue, book value, and cash flow; discounted cash flow (DCF) models; scenario analysis; generally accepted option pricing formulas; and the literature regarding valuation effects of various factors such as reputation, transparency, governance, and the quality of internal controls. In addition, forensic analysts have the added advantage of being able to use event study analysis, which quantifies the price effects that occurred when information did reach the market").

even if Cassava's high stock short interest did indicate a short-sale constraint rather than active short-selling facility, the availability of Cassava put options would serve as a substitute for investors who wished to trade on negative information or sentiment.[25] In his published work, Dr. Stulz agrees with me, stating "… derivatives enable investors to trade on information that otherwise might be prohibitively expensive to trade on. … short sales of stocks are often difficult to implement. This slows down the speed with which adverse information is incorporated in stock prices and makes markets less efficient. With puts, investors can more easily take advantage of adverse information about stock prices."[26] As presented below, numerous other peer-reviewed articles in the finance literature explain that the availability of put options serves as a substitute for short selling when short selling is constrained.

26. Dr. Stulz observes that several analysts dropped coverage of Cassava during or near the end of the Class Period, and argues that the thinner analyst coverage could have made the market for Cassava stock inefficient. There were usually at least four analysts covering Cassava stock during the Class Period, and there were always at least two. This number is sufficient to strengthen the presumption of market efficiency according to peer-reviewed research.[27] Interestingly, two analysts explained that they were dropping coverage on account of the Company's diminished prospects and uncertainty stemming from the controversy and misconduct alleged by Plaintiffs and market observers at the time. That is, analyst behavior and commentary support Plaintiffs' allegations and are consistent with a market reacting to information, which allegedly included misrepresentations and corrective disclosures.

27. Ultimately, Dr. Stulz agrees with my conclusion that the market for Cassava stock was informationally efficient. He implicitly admits to this in his deposition, where he acknowledges that the market did react to new information about Cassava, and Cassava stock reacted accordingly.

---

[25] Feinstein Deposition at 134:5-23.

[26] "Should We Fear Derivatives?" by Rene Stulz, *Journal of Economic Perspectives*, Vol. 18, No. 3, 2004, p. 180.

[27] Feinstein Report, ¶¶83-87.

"Q: Are you aware of what the news on the company was on September 14, 2020?

…

A: September -- I mean, that's the beginning of the class. That's information related to the Trial 1 -- 2b.

Q: And was this important news?

…

A: In that sense, it was important news.

…

A: The stock price increased on that day. The analysts had positive comments about what was going on.

Q: So you agree that the stock price rose by a statistically significant amount on that day?

A: I mean, I haven't done the event study myself. My recollection is that it rose significantly in Dr. Feinstein's study.

Q: And doesn't that mean that the stock reacted to the information that was released on that day?

…

A: What is correct is that Cassava had information on that day on -- that was positive about Phase~2b of the development of its drug and that ***the market reacted to that***."

**Stulz Deposition at 328:18 – 330:12 (emphasis added).**

28.     In sum, Dr. Stulz, by his own admission, does not refute the efficiency of Cassava Securities. His report is 89 pages (153 with exhibits) of insinuations, cherry-picked citations from the literature, defective analysis rife with logical and methodological errors, and moot arguments, which amount to no valid criticism.

## III.     CONCLUSIONS

29.     Dr. Stulz provides no reason to revise any of the conclusions or opinions proffered in the Feinstein Report. In fact, Dr. Stulz does not dispute most of my findings. He does not opine that the markets for Cassava stock and options were inefficient, or that damages cannot be computed with a common methodology consistent with Plaintiffs' theory of liability for all Class members. He criticizes the analysis supporting my conclusions and opinions, but none of his criticism is valid.

30.  Dr. Stulz's argument that the market for Cassava stock *might* be inefficient because of a "meme stock phenomenon" is misguided, poorly supported, undercut by his own analysis, and ultimately moot.

31.  Not only does Dr. Stulz not conclude or opine affirmatively that Cassava was a meme stock, but he admits that he knows of no generally accepted objective criteria to establish whether or not any particular stock is a meme stock.[28] Dr. Stulz further acknowledges that not all meme stocks trade inefficiently.[29] So, even if Cassava were a so-called meme stock, that designation would not indicate inefficiency.

32.  Ultimately, Dr. Stulz's opinion that Cassava *might* have been a meme stock is moot, because the implication, as he explained, is that one would then need to conduct empirical tests of efficiency to assess whether or not it traded in an efficient market. I did conduct that analysis. I conducted the generally accepted tests of market efficiency, including empirical event study analysis to assess whether or not Cassava reacted to Company information over the course of the Class Period. The results of those tests were that Cassava stock did react to information and thereby demonstrated that it traded efficiently throughout the Class Period.

33.  Dr. Stulz does not dispute that the event studies I ran show that Cassava stock reacted to the dissemination of Company information over the course of the Class Period. That cause-and-effect relationship establishes that Cassava stock did trade in an informationally efficient market. Whether or not the price of Cassava stock may have also been affected by other factors does not render Cassava stock informationally inefficient. Nonetheless, Dr. Stulz does not prove that it did move in the absence of new information or as a result of non-information factors.

34.  Dr. Stulz references literature explaining that social media activity can cause a security price to deviate from a fundamentally correct value when social media is used to organize an effort to distort a security price. However, he admits that he found no evidence that social media activity about Cassava was used for that purpose.[30] Furthermore, Dr. Stulz

---

[28] Stulz Deposition at 87:6-25, 88:4-13, and 89:14-18.

[29] Stulz Deposition at 111:3 – 113:22.

[30] Stulz Deposition at 174:5-11.

acknowledges that the academic literature finds that social media can actually enhance efficiency, as investors may use the new channels of information dissemination (*e.g.*, X [formerly known as Twitter], YouTube, Reddit, StockTwits, and *Seeking Alpha*) to seek, discuss, and process information.[31]

35.     Dr. Stulz's collective event study focusing on high social media days is fundamentally flawed, executed incorrectly, and misinterpreted. Most of the statistically significant return days which he claims had no Company news did, in fact, have Company news. When counting social media mentions to ascertain which days had high social media activity, he included mentions that occurred after the close of trading. Those after-close mentions could not possibly have caused the statistically significant returns he observes in his study. Dr. Stulz is wrong to interpret from his study that social media activity caused the price of Cassava stock to move in the absence of new information. The better interpretation is that information and the resulting stock price movements elicit social media activity. This behavior is perfectly consistent with an efficient market.

36.     Dr. Stulz conjectures (without proof) that the price of Cassava stock may have deviated from a correct fundamental valuation.[32] This conjecture is at odds with his own understanding of the Company's experience over the course of the Class Period and how the valuation of Cassava stock reflected the Company's wide range of potential future prospects. Dr. Stulz appreciates that "Cassava's valuation depended critically on the likelihood of simufilam's FDA approval, and eventual commercial success."[33] Whether or not Simufilam would be approved and become commercially successful was a matter of great uncertainty and debate among biomedical experts and market participants during the Class Period. The integrity of the research supporting Simufilam's efficacy was questioned

---

[31] Chen, et al. [2014] wrote, "To examine the role of peer-based advice, we extract user-generated opinions from Seeking Alpha (hereafter, SA; http://seekingalpha.com). Our choice of SA as the focus of this study was motivated by its popularity. As of August 2013, SA had 500,000 to 1 million unique visitors per day (comScore - ScorecardResearch) and, as such, was one of the biggest investment-related social media websites in the U.S. The website's goal is to provide 'opinion and analysis rather than news, and [it] is primarily written by investors who describe their personal approach to stock picking and portfolio management, rather than by journalists' (Seeking Alpha 2012)." ("Wisdom of Crowds: The Value of Stock Opinions Transmitted Through Social Media," by Hailiang Chen et al., *The Review of Financial Studies*, Vol. 27, No. 5, 2014); and Stulz Deposition at 129:8 – 130:21.

[32] Stulz Report, ¶¶78 and 113.

[33] Stulz Report, ¶198.

during the Class Period, while the Company fed the market with what Plaintiffs allege were misleading misrepresentations and omissions.

37.   Analysts concurred that if Simufilam failed, the fair value of Cassava stock would be low, but if it succeeded, the drug would be one of the best-selling in history and the value of the stock would reach stratospheric heights.[34] In this environment of great uncertainty and conflictual public debate, it was normal and consistent with market efficiency that Cassava stock would be volatile. Its price varied widely as new information and commentary entered the market.

38.   It is also not surprising that the public debate would stimulate social media activity. Nor is it surprising that the constituent of market participants who expected Simufilam to fail would vote with their dollars and short sell the stock. Neither the volatility, the short-sale interest, nor the social media activity is indicative of or inconsistent with market efficiency.

39.   Dr. Stulz acknowledges that options are designed to move with the price of their underlying stock.[35] He accepts that principles of option valuation dictate that calls rise in value and puts fall when the underlying stock price rises.[36] He also acknowledges that all Cassava options were traded on the CBOE, which provided unsurpassed trading infrastructure.[37] He does not question that collectively, the Cassava options were actively traded, or that options traders were informed by the same information infrastructure and analyst coverage that contributed to the efficiency of the market for Cassava stock. Dr. Stulz's complaint with respect to my options analysis is that I conducted the analysis for all Cassava option contracts collectively, rather than examining each of the 15,016 different specifications individually.

40.   Dr. Stulz is wrong to assert that each option series must be analyzed individually for the purposes of testing market efficiency. As explained in the Feinstein Report and in my deposition, all Cassava options have similar structure and characteristics, are governed by

---

[34] *See, e.g.*, "Final Analysis of Sumifilam Phase 2b Is Transformative; Upgrading to Buy From Neutral With a $20 PT," by Vernon Bernardino, H.C. Wainwright, analyst report, 23 September 2020, p. 2; and "Simufilam + Cog Data + Shifting Alzheimer's Disease Landscape = Growing Opportunity; Raising PT to $80," by Jason McCarthy, Maxim Group, analyst report, 16 February 2021, p. 4.

[35] Stulz Report, ¶119; and Stulz Deposition at 226:4-10.

[36] Stulz Deposition at 239:1 – 240:1.

[37] Stulz Report, ¶123.

the same valuation principles and formulas, and are frequently substituted for one another by investors.[38] A forthcoming article I have authored with Don Chance also establishes that option series need not be analyzed individually.[39] Moreover, Dr. Stulz's insistence that all option contracts need to be studied individually is at odds with generally accepted research presented in peer-reviewed studies, including an article he cites.[40]

41.    Contrary to Dr. Stulz's contention, there are not 15,016 separate Cassava option markets, one for each unique combination of strike price and expiration date.[41] As noted in the finance literature and in the Cassava options data, most option trading takes place in the option contracts that are at or near the money (meaning those option contracts whose strike prices are close to the current stock price at the time of the trade). As the stock price changes, new contracts that are at or near the money are introduced, but the old contracts that used to be at the money are not extinguished. The fact that the market for Cassava options was populated by many contracts with different strike prices is a result of the large sweep of prices covered by Cassava stock over the Class Period. These are not separate markets that each need to be studied individually. They were all listed on the CBOE, sharing the same market makers, were governed by the same rules, and were tied to the same underlying stock (Cassava). The information dissemination infrastructure benefiting the Cassava stock similarly benefited all of the Cassava options collectively. The analysts gathering and processing information about Cassava that helped make the market for the Cassava stock efficient similarly benefited all of the Cassava options collectively. As Dr. Stulz acknowledges, traders often combine multiple linked securities into a single investment position.[42] Traders who construct option combination positions do not have to go to different options markets to execute those trades.[43]

---

[38] Feinstein Report, ¶196; and Feinstein Deposition, 231:1 – 232:5.

[39] "The Class Certification of Exchange-Listed Options in Securities Class-Action Litigation," by Don Chance, Onnig Dombalagian, and Steven Feinstein, forthcoming in *University of Pennsylvania Journal of Business Law*, 2024.

[40] *See, e.g.*, "Option Strategies: Good Deals and Margin Calls," by Pedro Santa-Clara and Alessio Saretto, *Journal of Financial Markets*, Vol. 12, 2009, p. 413.

[41] Stulz Report, ¶152 and Exhibit 14.

[42] Stulz Report, ¶217.

[43] "The Class Certification of Exchange-Listed Options in Securities Class-Action Litigation," by Don Chance, Onnig Dombalagian, and Steven Feinstein, forthcoming in *University of Pennsylvania Journal of Business Law*, 2024.

42. My analysis established that there were no information or trading impediments that could have hampered efficiency in the market for the Cassava options. It is neither practical to run 15,016 separate empirical tests, nor is it necessary. The tests I ran and presented in the Feinstein Report prove that the Cassava options reacted to Company information and thus demonstrated informational efficiency during the Class Period.[44]

43. Dr. Stulz's criticisms of my option event studies are erroneous. As explained in the Feinstein Report, "individual options can be combined into a portfolio that, consistent with option valuation principles, should have stationary price dynamics and behave the same as the underlying stock in an efficient market."[45] The academic literature supports transformations of the data so that price dynamics are stationary, which is necessary for valid regression and event study analysis. My construction of synthetic stock prices is such a data transformation, and is in line with generally accepted methodologies.[46]

44. Dr. Stulz is wrong to suggest that a synthetic stock event study cannot be conducted with American options that allow for early exercise.[47] The synthetic stock event study is valid for both European and American options and demonstrates that Cassava options reacted to information. Not only is the value of the early-exercise feature of American options small when compared to an option's value,[48] but the even smaller difference between the value of the call's early exercise feature and the value of the put's early exercise feature is what is reflected in a synthetic stock price. Additionally, it is not even this small difference between early exercise feature values that is reflected in event study residual returns, but rather the day-to-day changes in this very small difference. Quantitatively, the early exercise feature of American options has no consequential effect on the residual returns of synthetic stock in an event study; this is confirmed by the academic literature, and Dr. Stulz did not present any calculations to suggest otherwise.

---

[44] Feinstein Report, ¶¶20, 207, 210, 213, 215 and 218.

[45] Feinstein Report, ¶195.

[46] "The Class Certification of Exchange-Listed Options in Securities Class-Action Litigation," by Don Chance, Onnig Dombalagian, and Steven Feinstein, forthcoming in *University of Pennsylvania Journal of Business Law*, 2024.

[47] Stulz Report, ¶¶116 and 140.

[48] "Directly Measuring Early Exercise Premiums Using American and European S&P 500 Index Options," by Michael Dueker and Thomas Miller, Jr., *The Journal of Futures Markets*, Vol. 23, No. 3, 2003, pp. 287-288. ("[W]e find average early exercise premiums ranging from 5.04 to 5.90% for calls, and from 7.97 to 10.86% for puts").

45.     Furthermore, any difference in synthetic stock returns due to inclusion or exclusion of the value of the early-exercise feature is so small that it would be accommodated by and incorporated into the noise component of the regression. The proof of this fact is that even with this potential additional noise component, the Cassava synthetic stock exhibited significant returns on many of the same news events during the Class Period. If anything, an additional noise component would have biased the test result away from finding that the synthetic stock observably reacted to information in the same manner as the stock. The fact that the significance result was strong nonetheless proves that quantitatively, the early exercise feature had no consequential effect.

46.     Dr. Stulz provides no reason to revise my conclusion that the market for Cassava options was efficient throughout the Class Period.

47.     Dr. Stulz does not dispute that the generally accepted and widely used out-of-pocket damage methodology exists and is consistent with Plaintiffs' theory of liability. Nor does he dispute that an inflation ribbon can be constructed to determine how much artificial inflation caused by the alleged misrepresentations and omissions was in the price of Cassava stock on each day during the Class Period, if any. Rather, Dr. Stulz's opinions on the damage methodology are limited to the following assertions: (i) that certain difficulties of measuring damages may potentially be encountered; and (ii) that the eventual construction of an inflation ribbon in this case may be computed incorrectly if it does not account for the potential valuation complexities he identifies.[49] None of the potential issues highlighted by Dr. Stulz provides reason to revise my conclusion that damages can be computed using a common methodology that is consistent with Plaintiffs' theory of liability.

48.     First, while a damage methodology can be fully articulated *a priori*, as I did, the degree of specificity Dr. Stulz desires about hypothetical complexities that potentially may be encountered cannot be provided until damages are actually computed. If potential complexities are encountered during the damage computation, the standard valuation tools that I described in the Feinstein Report would accommodate them. Dr. Stulz is wrong to suggest that valuation under the but-for scenario of full disclosure is unusual or might be

---

[49] Stulz Report, ¶¶25-29.

impossible. Dr. Stulz apparently would be unsatisfied with any description of the damage methodology that is unaccompanied by the completed analysis, which is premature at this stage.

49.   Second, none of the potential valuation issues that Dr. Stulz raises are insurmountable, nor does he contend that they are. Dr. Stulz identifies several potential valuation complexities that he believes may complicate the measure of inflation at the loss causation and damages stage, including confounding information,[50] differences in the source of truthful information in the but-for world,[51] and potential time-varying inflation.[52] Dr. Stulz overlooks that these computational issues are common and routinely encountered and addressed in class action securities cases. These computational issues are more about the execution of the common damage methodology rather than the existence of the common damage methodology.

50.   If anything, Dr. Stulz's concerns for the potential adjustments to the inflation ribbon to accommodate valuation complexities acknowledge the existence of the damage methodology and that it would be commonly applied for all Class members. The value computations and adjustments that Dr. Stulz opines may be necessary would not be necessary for just select Class members, but rather would apply to all Class members. Therefore, the damage methodology and the financial and quantitative analysis for implementing it are common for all Class members.

51.   The common damage methodology I presented for the Cassava options is essentially the same as the methodology for the Cassava stock – the holding period decline in artificial inflation precipitated by corrective disclosure, subject to certain statutory and case law prescriptions. Similarly, and apparently recognizing this fact, most of Dr. Stulz's criticisms of my description of the out-of-pocket damage methodology for the Cassava options are the same criticisms he levies against the stock damage methodology. Accordingly, my responses to Dr. Stulz's concerns and criticisms addressed above and detailed later in this

---

[50] Stulz Report, ¶¶179-181.

[51] Stulz Report, ¶¶188-195.

[52] Stulz Report, ¶¶28, 172 and 201-206.

report apply to the option damage methodology as well as the stock damage methodology, the methodologies being essentially the same.

52. Dr. Stulz asserts that full disclosure would impact Cassava stock volatility, which would have an impact on the Cassava option values according to generally accepted option pricing formulas.[53] In raising this concern, Dr. Stulz implicitly accepts the informational efficiency of the Cassava options, acknowledging that option values are governed by generally accepted valuation formulas and positing that the market prices of the Cassava options would indeed react to the information disclosures accordingly. Moreover, this particular criticism is emblematic of all of Dr. Stulz's damage methodology criticisms and highlights the flaw with them. Dr. Stulz speculates about what facts the discovery and the development of the record in this case might reveal, and he surmises that possible facts may have valuation impact. He then wrongly avers that these potential information effects may be incorrectly disregarded when damages are ultimately computed. But he has no valid basis for speculating that information effects compelled by established facts and generally accepted valuation principles will be disregarded in the computation of but-for prices, artificial inflation, and, in turn, damages. If evidence of changing volatility is encountered, for example, standard valuation tools will account for it, and the out-of-pocket damage methodology would neatly and commonly accommodate it.

53. In sum, Dr. Stulz provides no reason to revise my conclusion that damages in this matter can be computed for all Class members and for all securities using a common methodology that is consistent with Plaintiffs' theory of liability.

## IV. CRITIQUE OF THE STULZ REPORT

### A. Areas of Agreement

54. Dr. Stulz does not dispute any of my findings concerning the following *Cammer* and *Krogman* factors, which indicate the market was efficient for Cassava stock during the Class Period:

---

[53] Stulz Report, ¶216.

i.    Market Making Platform: Cassava stock was listed on the Nasdaq.[54]

ii.    Trading Volume: The average weekly trading volume for Cassava stock during the Class Period exceeded the 2% turnover level, which was acknowledged by *Cammer* and numerous courts subsequently to be the threshold for a strong presumption of market efficiency.[55]

iii.    Analyst Coverage: During the Class Period, at least six analyst firms published reports on Cassava, based on reports I was able to obtain.[56] There may be an additional analyst covering, Citi Research, as indicated in a *Barron's* news article provided in the Factiva output submitted in the Feinstein Report, which Dr. Stulz claims to have considered.[57] There were always at least two analysts covering Cassava, a number which published research has found sufficient to strengthen the presumption of market efficiency.

iv.    News Articles: There were at least 1,440 news articles published about the Company during the Class Period.

v.    Institutional Ownership: At least 443 major institutions owned Cassava stock during the Class Period. Dr. Stulz agrees that many of these institutions have their own analysts.[58]

vi.    Form S-3 Registration Eligibility: The Company was eligible for Form S-3 registration throughout the Class Period, and it did file a Form S-3 registration during the Class Period.[59]

vii.    Market Capitalization: The Company's market capitalization averaged $1.43 billion,[60] which size exceeded the respective market

---

[54] Stulz Deposition at 67:10-13.

[55] Stulz Deposition at 58:7 – 59:6.

[56] Stulz Deposition at 61:8 – 62:8.

[57] "What to Know Before Buying Cassava Sciences, the Hot Alzheimer's Stock," by Josh Nathan-Kazis, *Barron's*, 8 February 2021; and Stulz Report, Appendix C.

[58] Stulz Deposition at 63:16-22 and 64:15-22.

[59] Stulz Deposition at 75:4 – 76:4.

[60] Stulz Deposition at 76:5 – 77:20.

capitalizations of 71% of all other U.S. companies.[61] At its lowest point during the Class Period, Cassava's market capitalization was still larger than 37% of all other publicly traded companies in the U.S. Cassava was not a small, obscure company.[62]

viii. Float: Most of Cassava's issued stock was in its public float, available for trading. On average, float accounted for 89.52% of the issued shares. The market value of the Company's float averaged $1.28 billion,[63] making Cassava's average float larger than 69% of all U.S. companies by size.[64]

ix. Bid-Ask Spread: The average bid-ask spread for the Cassava stock during the Class Period was 0.14%, substantially narrower than the 0.58% average bid-ask spread of all U.S. companies.[65]

55. As for the empirical *Cammer* factor, Dr. Stulz does not dispute the results of my collective event study tests. He does not dispute that these tests prove that the Cassava stock price reacted significantly more frequently on news dates than on the set of all other non- or lesser-news dates.[66] In fact, Dr. Stulz relies on my designation of news days and my regression analysis to perform his collective tests.[67]

### B. Dr. Stulz Has Never Offered an Affirmative Opinion That the Market for a Stock Was Efficient

56. Dr. Stulz's critique of the Feinstein Report is unsurprising and his position is unsurprising given that, in all the many times he has served as a testifying expert in securities cases, Dr. Stulz has never offered an opinion that the market for a stock was efficient. It is a generally

---

[61] Stulz Deposition at 77:11-16.

[62] Feinstein Report, ¶¶110-111.

[63] Stulz Deposition at 78:9-20.

[64] Stulz Deposition at 78:21 – 79:9.

[65] Stulz Deposition at 84:22 – 85:8 and 85:19 – 86:23.

[66] Stulz Deposition at 255:8 – 256:2.

[67] Stulz Report, ¶¶43 and 72-74.

accepted principle among financial economists that most stocks trade in informationally efficient markets.[68]

> "There is widespread debate about market efficiency among economists, and the signatories of this brief include participants with varying positions on that debate. It is critical, however, to be clear about what issues are in dispute – and what issues are not. Economists disagree about whether markets *perfectly* process information and how quickly they do so; about whether prices reflect the fundamental value of the underlying stock; … and about whether it is possible to 'beat the market' by pursuing various investment strategies designed to exploit pricing anomalies. Such disagreements existed when *Basic* [*Inc. v. Levinson*, 485 U.S. 224] was decided in 1988, and they exist today. But economists do *not* generally disagree about whether market prices respond to new material information." **Brief of Financial Economists as *Amici Curiae* in Support of Respondents, in *Halliburton Co. v. Erica P. John Fund, Inc.*, Case No. 13-317 (U.S. Supreme Court) dated 5 February 2014, p. 3 (available at 2014 WL 526436) (emphasis in original).**

57.   Published peer-reviewed research finds that stocks that satisfy the *Cammer* and *Krogman* factors are even more likely to trade efficiently.[69] Yet, Dr. Stulz has never encountered a stock in the course of his career as a testifying expert that he could admit traded in an efficient market.

---

[68] Feinstein Report, ¶¶64 and 66.

[69] "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad Barber et al., *The Journal of Corporation Law*, 1994, pp. 285-312; and "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," by Miguel Villanueva and Steven Feinstein, *Review of Quantitative Finance and Accounting*, Vol. 57, No. 1, 2021, pp. 203-234.

"Q: My question was: Have you ever opined that a market for a particular stock was efficient? …

A: Because of the circumstances that I described, I do not have a report where I have an affirmative opinion that the market for a stock is efficient.

Q: So the answer is no? …

A: My answer was that I don't have a report where I have an affirm -- affirmative opinion that the market is efficient for a stock.

Q: Right. But my question was just a yes or no. And the answer is no, correct? …

A: Exactly for the reason that I said, yes."
**Stulz Deposition at 20:22 – 21:19.**

58.     For at least this reason, Dr. Stulz's criticism of my work in this case must be taken with skepticism. Nonetheless, in the sections that follow, I expose and explain why his analysis and conclusions are invalid.

**C.     Dr. Stulz's Meme Stock Argument Is Misguided, Unsupported, and Ultimately Moot**

59.     In his report, Dr. Stulz conjectures that because Cassava might have been a meme stock, and because some meme stocks might trade inefficiently, Cassava too might have traded inefficiently during the Class Period.[70]

60.     It is noteworthy that Dr. Stulz does not prove or even argue that Cassava was indeed a meme stock, or that it did consequently trade inefficiently. He clarified in his deposition that he could not confirm and is not offering an opinion that Cassava was a meme stock.[71] He admitted that there is no generally accepted definition of a meme stock.[72] He admitted that there is also no consensus among financial economists that meme stocks, whatever they are, trade inefficiently.[73] He further declared that he has no affirmative opinion about

---

[70] Stulz Report, ¶¶55-69.

[71] Stulz Deposition at 174:11-20.

[72] Stulz Deposition at 87:6-9.

[73] Stulz Deposition at 112:4 – 113:22.

whether or not Cassava stock traded inefficiently during the Class Period. Essentially, in his deposition, Dr. Stulz disclaimed each element of his meme stock argument.

### 1.    Misguided and Moot

61.    That Dr. Stulz's meme stock argument is misguided and moot is borne out by his prescription for what to do if a meme stock phenomenon is suspected. Dr. Stulz offers that because Cassava might be a meme stock, which might make it trade inefficiently, empirical analysis is required to assess efficiency.[74] This argument is not a valid criticism of my analysis and conclusions, because I did conduct empirical analysis that did prove that Cassava stock traded efficiently throughout the Class Period. The three collective event studies I ran all prove that Cassava stock promptly reacted to and incorporated Company information.

62.    The results of the collective event studies, and the conclusion that during the Class Period Cassava stock reacted to new Company information, is undisputed.

### 2.    Dr. Stulz's Meme Stock Analysis Is Flawed and Misinterpreted

#### a.    Dr. Stulz Does Not and Cannot Establish That Cassava Stock Was a So-Called "Meme Stock"

63.    In order to advance an argument that Cassava stock traded inefficiently because it was a so-called meme stock, one would have to be able to define a meme stock and set out objective criteria thresholds that would identify a stock as a meme stock. Dr. Stulz does neither and he admits he cannot.

64.    In the instant matter and in a prior litigation, Dr. Stulz testified that there is no consensus definition of a meme stock.[75]

---

[74] Stulz Report, ¶¶17-19, 42 and 51-69.

[75] Stulz Deposition at 87:6-9.

"While there does not appear to be a consensus definition of meme stocks, one feature these stocks have in common is that they become hugely popular on social media and investing platforms, often on the basis of a meme, so that they achieve 'viral' status."

**Expert Report of Rene Stulz, Ph.D., *Shupe v. Rocket Companies, Inc. et al.*, United States District Court, Eastern District of Michigan Northern Division, No. 21-cv-11528, 8 December 2023, ¶20.**

65.   When asked during his deposition in the instant matter whether he agreed with the above statement he replied, "yeah," reiterating that there is no generally accepted definition and he has no objective criteria for identifying a meme stock.[76]

---

[76] Stulz Deposition at 88:4-25 and 89:14-18.

"Q: In the Rocket case, you said: There is no single formal or technical definition of a meme stock. Correct?

…

A: I have a sentence in the Rocket case that says that there is not a consensus definition on -- I agree with that. But it has been a bit misused. Now, if I had to write it again, I would write it differently in the sense that, you know, when people construct lists of meme stocks, there is a lot of overlap, but it's not all necessarily the same stocks, and that's what I was referring to. But as I just said, you know, people who wrote papers on this all look at common components of meme stocks, and so in that sense, there is quite a bit of consensus.

Q: You would say it differently now that you have been the subject of a motion to exclude based on it in that case?

…

A: No. I mean, I don't form my opinions based on what people say about them. I realized that it was a bit misused because it gave the impression that this was a big issue. But as I say, information on efficiency has less of a consensus then meme stocks have.

Q: So I'm reading for your report: There's no single formal or technical definition of a meme stock. Did you write that or not?

A: Yeah.

Q: Okay. Thank you. And that was in December of 2023, correct?

A: Yeah. And I -- I mean, agree with that, that there is no -- but, no, there isn't for most things in financial economics. And so there is some judgment involved."

**Stulz Deposition at 88:4 – 90:1.**

66. Dr. Stulz cites a number of academic articles and papers that investigated the meme stock phenomenon. While some of the papers cited by Dr. Stulz list collections of meme stocks,[77] Dr. Stulz did not recall any of them identifying Cassava as a meme stock.

---

[77] Stulz Report, footnotes 102 and 112-113.

"Q: Okay. So sitting here right now, you're not aware of any of these papers that mention Cassava; is that right? …

A: So I don't know which papers on meme stocks include Cassava and which ones don't.

Q: And you can't sit here --sitting here now, you can't identify any of them that mention Cassava; isn't that right? …

A: Well, I have a problem with what you mean by 'mention.' Now, if it's in the sample, does it -- is it mentioned or is not mentioned.

Q: So you can -- you can -- I -- you can interpret this however you would like But if there is any of these papers that mentions Cassava by name, please identify it now. …

A: I mean, I don't remember. I mean, I read the whole paper before I was aware of Cassava. So I'm not – I'm not sure. I mean, I suspect that what I remember from the sample makes it unlikely, but I don't know…"
**Stulz Deposition at 104:15 – 105:3.**

67.    The papers Dr. Stulz cited illustrate that there is no generally accepted definition of meme stock. Moreover, I confirmed that none of the papers Dr. Stulz cited identified Cassava as a meme stock. Further, I found no published academic studies that identified Cassava as a meme stock or even suspected that it might be.

68.    Moreover, I know of no scientific study that has found markets for "meme" stocks are *per se* inefficient, nor has Dr. Stulz identified any such study.

69.    The Franklin Allen [2023] study of meme stocks, which Dr. Stulz highlights, identifies the meme stock phenomena as being composed of thirteen companies: American Airlines, AMC, BlackBerry, Bed Bath & Beyond, Castor Maritime Inc., Express, GameStop, Koss, Naked Brand Group, Nokia, Sundial Growers Inc., Tootsie Roll, and Trivago NV.[78] Cassava is not in Franklin Allen's list.

70.    When asked during his deposition whether Apple Inc. ("Apple") and The Coca-Cola Company ("Coca-Cola") were meme stocks, Dr. Stulz testified that these were not meme stocks because they were not identified as such in the academic and professional papers.

---

[78] "Squeezing Shorts Through Social Media Platforms," by Franklin Allen et al., *SSRN*, Working Paper, 2023, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3823151.

"Q: Okay. Is Apple a meme stock?

…

A: I've never seen it included in meme stock papers nowhere. I mean, so no -- no paper that I know of has included it. I mean, I don't see why it would be included.

Q: How about Coca-Cola, do you have any priors about whether Coca-Cola is a meme stock.

…

A: Again, I don't know of any papers that has included it. I don't know why it would be included on -- so I don't."

**Stulz Deposition at 144:13 – 145:1.**

"Q: Is Apple -- is Apple a meme stock?

…

A: We already discussed that. No."

**Stulz Deposition at 216:23 – 217:3.**

71.   If Apple and Coca-Cola are not meme stocks according to Dr. Stulz, because they were not identified as such in the academic papers, then by the same token Cassava was not a meme stock because it too was not so identified.

72.   The so-called "meme stock phenomenon," as Dr. Stulz described it, is not new. It has been around since at least 1990, when it travelled under the name "Noise Trading."[79] The concept underlying the meme stock phenomenon, née, noise trading, is that the involvement of amateur or retail investors adds volatility to stock returns as stock prices may be influenced by retail investor sentiment and potential differences between how amateurs and professionals process news. Nowhere in the extensive literature studying noise trading, however, has it ever been concluded or proven that noise trading causes the market to ignore important value-relevant company information. Noise trading may add an element to stock prices, but it does not remove information as the primary cause of stock price movement. While there has been retail investing alongside professional money management since time immemorial, and its effects have been studied for decades, as

---

[79] "The Noise Trader Approach to Finance," by Andrei Shleifer and Lawrence Summers, *Journal of Economic Perspectives*, Vol. 4, No. 2, 1990.

surveyed in Shleifer and Summers [1990], this influence did not dissuade Professor Eugene Fama from writing in 2014,

> "Economists disagree about whether markets perfectly process information and how quickly they do so; about whether prices reflect the fundamental value of the underlying stock; … and about whether it is possible to 'beat the market' by pursuing various investment strategies designed to exploit pricing anomalies. Such disagreements existed when Basic [Inc. v. Levinson, 485 U.S. 224] was decided in 1988, and they exist today. _**But economists do not generally disagree about whether market prices respond to new material information**_."
>
> **Brief of Financial Economists as _Amici Curiae_ in Support of Respondents, in _Halliburton Co. v. Erica P. John Fund, Inc._, Case No. 13-1317 (U.S. Supreme Court) dated 5 February 2014, p. 3 (available at 2014 WL 526436) (emphasis in original).**

### b. The Cassava Characteristics That Dr. Stulz Associates with Meme Stocks Do Not Establish That Cassava Was a Meme Stock and Do Not Indicate Inefficiency

73. While Dr. Stulz acknowledges that there is no generally accepted definition of a meme stock, and no objective criteria for designating a stock as being one, he nonetheless speculates that Cassava may have been a meme stock. His reasons are: (i) "Cassava experienced a large increase in social media attention during the Proposed Class Period, which, during certain portions of the Proposed Class Period, is comparable to meme stocks analyzed in the academic literature;"[80] (ii) Cassava "experienced large price movements that significantly exceeded broader market movements;"[81] (iii) Cassava had high short-interest;[82] (iv) during the Class Period, Cassava was occasionally included in the Solactive Roundhill Meme Stock Index ("Solactive Index"), which used volatility, short-interest, and social media activity as inclusion criteria;[83] and (v) in some news articles journalists called Cassava a meme stock.[84]

---

[80] Stulz Report, ¶18.

[81] Stulz Report, ¶18.

[82] Stulz Report, ¶98.

[83] Stulz Report, ¶66.

[84] Stulz Report, ¶18.

27

74.   None of the Cassava stock attributes is a valid reason for designating Cassava a meme stock, and none would make the market for Cassava stock inefficient.

### (i)        Social Media Activity

75.   When asked to specify a threshold for social media activity that would make a stock a meme stock, Dr. Stulz was unable to do so.

> "Q: … [Y]ou don't have a threshold amount in mind for how much social media interest is required in – for a stock to be a meme stock?
> …
> A: I mean, for the opinions that I'm – I have in my report, I don't need a threshold."
> **Stulz Deposition at 118:17 – 118:25.**

76.   Dr. Stulz takes issue with my opinion that Cassava was not mentioned as much in social media as the stocks most often called meme stocks, such as AMC and GameStop. He asserts that the level of social media activity about Cassava was commensurate with the social media activity of various stocks often called meme stocks, such as AMC and GameStop (the "poster child" of the meme stock phenomenon according to Dr. Stulz).[85]

77.   Dr. Stulz is wrong. A comparison of the social media activity about Cassava with another company Dr. Stulz recently analyzed (Rocket Companies, Inc.), and comparisons of reported social media activity for Cassava with reported social media activity for companies most often identified as meme stocks, both dramatically illustrate that Cassava's social media activity was far less than the social media activity of the stocks often identified as meme stocks.

78.   Unlike in the instant case, where Dr. Stulz could not conclude that Cassava was a meme stock, in the Rocket Companies ("Rocket") matter, Dr. Stulz did conclude that Rocket was a meme stock.[86] Dr. Stulz's reluctance to draw a conclusion about Cassava is

---

[85] Stulz Deposition at 155:8-20.

[86] Expert Report of Rene Stulz, Ph.D., *Shupe v. Rocket Companies, Inc. et al.*, United States District Court, Eastern District of Michigan Northern Division, No. 21-cv-11528, 8 December 2023, ¶¶19, §VI.B. ("Specifically, Rocket was a meme stock during the Putative Class Period, and Mr. Coffman does not address the implications of this for market efficiency in his report.")

understandable given the stark difference between the two companies with respect to social media activity.

79. According to Dr. Stulz, based on data obtained from Brandwatch, during the 1,124 calendar days in the Cassava Class Period, there were 33,034 Reddit mentions[87] related to Cassava.[88] By contrast, during the 69 calendar days in the Rocket class period, there were 206,931 mentions on Reddit related to Rocket. Clearly, Cassava is not in that same class with respect to social media activity.

80. On a per day basis, over the course of the respective class periods, there were on average 29 Cassava mentions on Reddit per day,[89] while Rocket had 2,999 Reddit mentions per day on average.[90] Rocket's per day average was 100 times greater than Cassava's.

81. Even on its peak social media activity days, Cassava's Reddit mentions were far less than Rocket's per day average and far less than Rocket's peak days. According to Dr. Stulz's backup data for his Exhibit-1A, which he ostensibly presents to suggest Cassava had high social media activity, Cassava's highest single-day number of Reddit mentions during the Class Period was 1,665, which peak number is less than even Rocket's daily average. Cassava's second highest day had 838 mentions on 3 February 2021.[91] By comparison, Dr. Stulz highlights that Rocket had as many as 59,000 mentions on Reddit on two different days.[92] Cassava's peak was less than 3% of Rocket's peak.

82. The comparison is similar for Twitter mentions. Over the respective class periods, there were on average 131.8 Cassava mentions per day on Twitter.[93] Rocket had 421 mentions

---

[87] A mention for a particular company is an online posting or comment that mentions by name, ticker, or other unique identifier, the company of interest.

[88] Stulz Report, ¶62 and Exhibit 1A.

[89] Stulz production file "brandwatch_class_period.xlsx."

[90] Expert Report of Rene Stulz, Ph.D., *Shupe v. Rocket Companies, Inc. et al*, United States District Court, Eastern District of Michigan Northern Division, No. 21-cv-11528, 8 December 2023, ¶64 and Exhibit 1A.

[91] Stulz production file "brandwatch_class_period.xlsx."

[92] Expert Report of Rene Stulz, Ph.D., *Shupe v. Rocket Companies, Inc. et al*, United States District Court, Eastern District of Michigan Northern Division, No. 21-cv-11528, 8 December 2023, ¶64.

[93] Stulz production file "brandwatch_class_period.xlsx."

on average per day.[94] Rocket's per day average on Twitter was more than three times greater than Cassava's.

83. If the social media activity level of Rocket establishes what is considered high enough to qualify a stock as a meme stock, that fact reinforces that Cassava is not a meme stock.

84. Dr. Stulz fails to consider that to the extent Cassava did attract attention in social media, it reasonably did so because: the Company had claimed its trials supported the efficacy and ultimate commercial success of its Alzheimer's therapy;[95] biomedical experts accused the Company of research improprieties;[96] the Company and outside experts engaged in debate over Simufilam research and efficacy;[97] conflicting information (including alleged misrepresentations and omissions) engendered controversy and uncertainty; given the controversy and uncertainty, the range of reasonable valuations for Cassava stock was extraordinarily wide. It is neither surprising nor inconsistent with market efficiency for these factors to generate social media activity.

85. Not only is social media activity not inconsistent with market efficiency, but it may promote market efficiency. This principle is espoused in the peer-reviewed finance literature, and Dr. Stulz concurs. Investors use the internet to seek information about companies and stocks, reading and sharing information on financial blogs such as X (formerly known as Twitter), YouTube, Reddit, StockTwits, and websites such as *Seeking Alpha*. Published studies in the academic finance literature recognize the importance of financial websites to investors and the market and explain how such platforms may enhance market efficiency. For example:

---

[94] Expert Report of Rene Stulz, Ph.D., *Shupe v. Rocket Companies, Inc. et al*, United States District Court, Eastern District of Michigan Northern Division, No. 21-cv-11528, 8 December 2023, Exhibit 1B.

[95] Complaint, ¶93.

[96] Complaint, ¶¶105-138.

[97] Complaint, ¶¶317-321 and 425-435.

"This study examines how views expressed on a popular social media website for investors pertain to security prices. We find that the opinions revealed on this website strongly predict future stock returns and earnings surprises. The predictability holds even after controlling for the effect of traditional advice sources, such as financial analysts and news media. Together, our findings point to the usefulness of peer-based advice in financial markets."

**"Wisdom of Crowds: The Value of Stock Opinions Transmitted Through Social Media," by Hailiang Chen et al., *The Review of Financial Studies*, Vol. 27, No. 5, 2014, p. 1400.**

"We analyze a broad sample of individual tweets written in the nine-trading-day period leading up to the firms' quarterly earnings announcements, in the four-year period 2009–2012. Two alternative measures of aggregate opinion from individual tweets serve as our test variables. We find that the aggregate Twitter opinion helps predict quarterly earnings, after controlling for other determinants of earnings, including aggregate opinion from traditional media sources. We also find that the aggregate Twitter opinion predicts abnormal returns around earnings announcements. When we decompose our aggregate opinion variables based on whether tweets convey original information or disseminate existing information, we find that both components are important in predicting earnings and announcement returns. **Thus, Twitter plays a dual role in the capital market: it serves as a source of new information, as well as a vehicle for the dissemination of existing information**."

**"Can Twitter Help Predict Firm-Level Earnings and Stock Returns?" by Eli Bartov et al., *The Accounting Review*, Vol. 93, No. 3, May 2018, p. 50 (emphasis added).**

"We examine whether social media enhances the informativeness of retail investor trading. Our empirical strategy exploits the editorial delay between Seeking Alpha report submission and publication to identify the effect of social media on retail trading from the effects of earlier events. We use the intraday window immediately after SA report publication to estimate the level of social-network-induced retail trading and the intraday window prior to publication to estimate the counterfactual level of trading. We find that the level of retail investor trading increases significantly during the intraday post-publication window relative to the pre-publication window, consistent with Seeking Alpha encouraging retail trading. More importantly, we document a substantial increase in the ability of retail order imbalances to predict both future stocks returns and cash flow news, consistent with SA research informing retail trading. The incremental information revealed by post-research retail trading is largely orthogonal to the information revealed by report tone and contributor investment position, consistent with retail investors actively gleaning valuable information from SA research rather than trading quickly on report sentiment. Post-publication trades are especially informative after reports authored by more capable contributors and those that attract more comments, supporting the view of retail investors as capable of sophisticated information processing. These findings suggest that social media can play a positive role in informing retail investors."

**"The Democratization of Investment Research and the Informativeness of Retail Investor Trading," by Michael Farrell et al., _Journal of Financial Economics_, Vol. 145, No. 2, 2022, p. 638.**

86.    The finance practitioner literature also reports that social media activity may enhance market efficiency.

"Twitter has definitely enhanced the trading landscape, said Wachi Bandara, Chief Research Officer at Pluribus Labs. One could even make the argument that Twitter constitutes a new form of market data that traders must incorporate into their information gathering process if they want to understand all facets of information that potentially move stocks."

**"FLASHBACK FRIDAY: Twitter Trading Looks for Action," _Traders Magazine_, 18 August 2017, accessed through https://www.tradersmagazine.com /departments/equities/flashback-friday-twitter-trading-looks-for-action/.**

"Perhaps the largest acknowledgment of the growing significance of social media sentiment analysis came earlier this year when leading market data vendors Bloomberg and Thomson Reuters added Twitter-based analytics to their Bloomberg Professional and Thomson Reuters Eikon terminals, respectively. Market data provider Markit also enhanced its Markit Research Signals suite with 22 new social media signals, including some from analytics firm Social Market Analytics as well as others Markit created based partially on SMA signals."

**"Twitter Trading Looks for Action,"** ***Traders Magazine***, **30 July 2014, accessed through https://www.tradersmagazine.com/departments/technology/twitter-trading-looks-for-action/.**

"Traders, analysts and farmers are using the 140-character online Twitter messages, called 'tweets,' to share information about fundamentals, offer instant reaction to market moves and to publicize their businesses. Twitter users collect 'followers' who receive their updates each time they tweet. Farmers have long used the Internet to share information, starting years ago with bulletin boards and chat rooms. But current tools are more direct and customizable."

**"For Traders, Twitter Is One More Trading Tool," by Ian Berry and Lauren Rees,** ***Wall Street Journal***, **3 August 2009.**

87.    When asked in deposition whether these additional avenues of information dissemination improve efficiency, Dr. Stulz agreed.[98] He noted that there are in fact papers that discuss that information may be incorporated more quickly in stocks when there is heightened attention through social commentary disseminated on the internet.

---

[98] Stulz Deposition at 129:8 – 130:21.

"Q: Are you aware of peer-reviewed literature that social commentary may enhance the efficiency of a stock's market trading?

A: I am aware of literature where it says that it can help, and I am aware of literature that says that it can – it can hurt. It depends on a number of factors. On -- now, with -- as a meme stock phenomenon, the view has been more that it is hurting rather than enhancing.
…
Q: What is your opinion?

A: My -- I mean, what I said, in answer, is that it depends. That, you know, there are papers that focus on it helping in some cases, and there are papers that focus on it hurting. And it depends on the circumstances. It can help it can hurt.

Q: And how can it help?

A: I mean, now, I am aware of papers that discusses the fact that information -- public information may be incorporated more quickly for stocks where -- that are located at places that are more central in social networks. That a paper that comes to mind. Now – and so that would be -- would be an example of how it could help in the sense that people have access to that information in a different ways than people that would be remove from central -- I mean the networks."
**Stulz Deposition at 129:8 – 130:21.**

### (ii)   Volatility

88.   Dr. Stulz conjectures that Cassava was a meme stock because he believes it exhibited high volatility during the Class Period.

89.   However, when asked for a threshold of stock volatility that would identify a stock as a meme stock, Dr. Stulz was unable to provide a threshold.

"Q: What is the threshold of a price change that you would need to see in order to characterize a stock as a meme stock?
…
A: I cite that – the SEC stock and they didn't – they didn't have a threshold for what they did."
**Stulz Deposition at 125:24 – 126:7.**

90.   There are plenty of reasons for Cassava's exhibited volatility during the Class Period other than it potentially being a so-called meme stock. Analyst commentary about Cassava noted that companies operating in the Alzheimer's disease market were volatile during the Class

Period, by virtue of the nature of that market. Analysts pointed to good reasons for why Cassava should be a volatile stock, due to its extraordinary upside potential and downside risk. For example:

> "Everything in AD [Alzheimer's Disease] is changing: volatility is in the AD market and volatility is a signal of change coming. … However, with the aducanumab-driven activity in the space, Lilly coming back (again) and all the activity and increases in valuation in smaller names like **Cassava**, Anavex (AVXL – NR), INmune Bio (INMB – Buy), Annovis Bio (ANVS – Buy), AC Immune (ACIU) and others, we see the market as essentially trying to recalibrate or reprice the AD space. We would note Cassava's simufilam, which other than aducanumab, is the **one of the most, or the most, advanced AD drug in the space and the recent 6-month cognition data** has translated to SAVA's market cap rising to ~$1.8B (up from ~$400M in 4Q20 and <$100M back in the summer prior to the 28-day P2b biomarker data in September). So how should the market value SAVA now? At $1.8B, is there more upside? There are a number of aspects to consider that collectively should point to significantly more upside in SAVA, in our view. From a pure comp perspective and considering that SAVA's drug after aducanumab is the most advanced, or one of the most advanced, AD drug candidates in the space, consider Biogen's partner Eisai (ESALY) and a competitor like Denali Therapeutics (DNLI – NR). The market caps of these companies are $22B and $8B, respectively. Eisai is post-phase 3 and heading towards PDUFA for aducanumab with Biogen and Denali is IND-stage. Sure, Denali has a pipeline and partners, though the most advanced of which (Hunter Syndrome, DNL310) is only in P1/2 study. Simufilam, while the only program for now in Cassava's pipeline, is heading to phase 3 and more P2b extension study data is coming as well. Should SAVA land between ESALT and DNLI. One could make that argument."
> **"Simufilam + Cog Data + Shifting Alzheimer's Disease Landscape = Growing Opportunity; Raising PT to $80," by Jason McCarthy, Maxim Group, analyst report, 16 February 2021, p. 4 (emphasis added).**

91.   As recognized by the finance literature, pharmaceutical development companies in general tend to be volatile due to the nature of their business models.

"The size and diversification factors have an especially relevant effect in a volatility analysis. In general, volatility tends to decrease as diversification and size increase. **A large diversified company in the same sector is likely to have a significantly lower volatility of returns at the enterprise level as compared to an early-stage company that depends on the success and failure of a single product**. In an ESE [early stage enterprise] context, it may be appropriate to select guideline companies that may not be direct competitors but that are more similar to the subject company in size and level of diversification. In some cases, it may be appropriate to segregate a division within a GPC for comparison. Typically, once a GPC (or divisions thereof) has been selected, it continues to be used period over period unless a chance of circumstances has taken place and can be explained in the valuation documentation."

*Early Stage Valuation: A Fair Value Perspective*, **by Antonella Puca, John Wiley & Sons, Inc., 2020, p. 130 (emphasis added).**

"The farther one proceeds through the corporate lifespan the easier it gets to value companies. As a result, publicly traded companies in the early stages of the corporate cycle tend to attract more traders than investors. On the other hand, the pricing dynamics of such companies, which exhibit considerable volatility early on in the corporate cycle, tend to grow less and less volatile as one moves through it. Consequently, while a company's stock may begin its life mostly in the hands of traders, it will eventually find itself largely in those of investors."

**"Damodaran on the Corporate Life Cycle,"** *Medium*, **https://medium.com/@the commonword905/damodaran-on-the-corporate-life-cycle-5fda61f7aa64.**

"As the proportion of value determined by future growth increases, expectations become a more critical determinant of how markets react to new information. In fact, the expectations game largely explains why stock prices change in ways that do not seem consistent with the news being announced (good earnings news leading to stock price drops; bad earnings news resulting in stock price increases) and the volatility in stock prices of young start-up firms in general."

*Investment Valuation*, **by Aswath Damodaran, John Wiley & Sons, 3rd Edition, 2012 p. 663.**

"Small news leads to big price jumps. As noted in the preceding section, you should expect to see what seem like disproportionate stock price responses to relatively small pieces of information. A report from a high-growth firm that earnings in the most recent quarter were a few cents less than expected may lead to a significant drop in the stock price."

*Investment Valuation*, **by Aswath Damodaran, John Wiley & Sons, 3rd Edition, 2012 p. 664.**

92.    As these literature excerpts attest, Cassava Securities would be expected to be volatile, on account of the Company's business and position within the industry and development pipeline. This volatility does not make it a meme stock.

93.    In addition to the nature of its business and the pervasive volatility in its industry sector, Cassava's volatility during the Class Period also stemmed from the same factors that garnered it social media attention, specifically: the Company had claimed its trials supported the efficacy and ultimate commercial success of its Alzheimer's therapy; biomedical experts accused the Company of research improprieties; the Company and outside experts engaged in debate over Simufilam research and efficacy; conflicting information (including alleged misrepresentations and omissions) engendered controversy and uncertainty; and given the controversy and uncertainty, the range of reasonable valuations for Cassava stock was extraordinarily wide. It is neither surprising nor inconsistent with market efficiency for these factors to generate stock price volatility. This volatility is a ***result of market efficiency***, not an indication of inefficiency.

### (iii)    Short Interest

94.    While Dr. Stulz speculates that Cassava may have been a so-called meme stock because it had high short interest, he could not specify a threshold of short interest that would designate a stock as being a meme stock.

> "Q: So do you have a threshold for what it requires to be a meme stock?
>
> A: Again, in this report, given the questions that I am raising, I don't need a threshold."
> **Stulz Deposition at 124:24 – 125:2.**

95.    Moreover, Cassava's short interest reasonably stemmed from the same factors that garnered it social media attention, specifically, throughout the Class Period, the Company was embroiled in controversy. While the Company claimed its trials supported the efficacy and ultimate commercial success of its Alzheimer's therapy, biomedical experts accused the Company of research improprieties that undermined the basis for a high stock price. The Company and outside experts engaged in debate over Simufilam research and efficacy.

96.     With a wide disparity of views in the market, which encompassed investors who accepted the Company's allegedly fraudulent positive misrepresentations and omissions, and also a cohort in disbelief rejecting the positive pronouncements, it is neither surprising nor inconsistent with market efficiency for there to be high short interest. Short selling is one avenue for bearish investors to trade on their negative outlook or sentiment regarding Cassava stock.

97.     Beyond conjecturing that Cassava may have been a so-called meme stock on account of it having high short interest, Dr. Stulz also posits that Cassava may have been short-sale constrained, which could have had negative implications for its market efficiency. I addressed this briefly above and further in the causation argument below.

#### (iv)     Solactive Roundhill Meme Stock Index Inclusion

98.     To support his conjecture that Cassava might have been a meme stock during the Class Period, Dr. Stulz notes that the Company was occasionally included in the Solactive Index, which was an index constructed to comprise 25 U.S. listed securities with a so-called high "meme score" and high short interest percentage.[99] Dr. Stulz confirmed that the criteria for inclusion were high social media activity and high short-sales interest.[100,101]

99.     Dr. Stulz could not quantify the percentage of days in the Class Period that Cassava was a constituent, but he did acknowledge that Cassava was not a constituent of this index for the entire Class Period.[102] In fact, the composition of the Solactive Index changed frequently, sweeping in companies that for whatever reasons occasionally had high social media activity and high short interest. From its inception through the end of the Class Period the constituents of this index changed nearly 1,200 times.

100.    As explained above, Cassava understandably attracted both social media attention and short interest on account of the uncertainty and controversy revolving around its prospects, which were related to the allegations of misconduct in this case. Therefore, for Cassava,

---

[99] "Factsheet – As of 10-Apr-2024 Solactive Roundhill Meme Stock Index TR," *Solactive AG*, 2024, https://www.solactive.com/wp-content/uploads/solactiveip/en/Factsheet_DE000SL0EUV0.pdf.

[100] Stulz Report, ¶¶18, 52, 55 and 66.

[101] Stulz Deposition at 219:13-23.

[102] Stulz Deposition at 218:13 – 219:10; and Stulz Report, footnote 134.

the characteristics that caused it to be included in this index stemmed from conditions other than Cassava being a meme stock.

101.   Dr. Stulz admitted at his deposition that whether or not a stock is a meme stock cannot be determined by its inclusion in the Solactive Index.[103]

> "Q: And if a company doesn't meet the criteria for the inclusion in the index, does it mean the stock is not a meme stock?
> …
> A: I wouldn't reach that conclusion.
> …
> Q: And so in your mind, whether it's included or not doesn't necessarily mean whether a stock is a meme stock, correct?
> …
> A: Well, that's correct."
> **Stulz Deposition at 223:19 – 224:11.**

### (v)   News Articles

102.   Dr. Stulz references a total of five news media articles, one of which was published in the *Financial Times*, two in *Bloomberg*, one in *Business Insider*, and one in *MarketWatch* as the articles which "explicitly characterized Cassava as a 'meme stock.'"[104] He cites this mention by journalists as a reason for intimating that Cassava was a so-called meme stock during the Class Period.[105] This approach and conclusion is misguided.

103.   Because Cassava stock displayed some characteristics that so-called meme stocks also display, albeit for independent reasons, it is not surprising that some journalists might misidentify it as a meme stock or attribute large price movements to so-called (but undefined) meme traders.

104.   In reality, it was rare for journalists to call Cassava a meme stock. According to Factiva, there were 1,440 articles published about Cassava during the Class Period. Of these, Dr. Stulz cites only five that described Cassava as a meme stock, or 0.35%. This small percentage does not establish that Cassava was widely considered to be a meme stock. Not only does Cassava not compare to GameStop and AMC, but it also does not compare to

---

[103] Stulz Deposition at 220:13-25; and 221:20 – 222:2.

[104] Stulz Report, ¶60.

[105] Stulz Report, ¶60.

other stocks called meme stocks, such as Rocket, which in another case Dr. Stulz affirmatively opined was a "meme stock," which he does not do for Cassava.[106]

105.   Extending this analysis, I counted how often news articles that addressed meme stocks identified Cassava as one. I searched *Factiva* for articles from "All Sources" during the Class Period containing the words "meme stock" or "meme stocks." The *Factiva* search returned 25,142 articles containing either of those terms. *Factiva* summarizes the search results under various categories such as the number of articles published by each source, the number of articles published in each year, the top 100 most mentioned companies in the articles, among others. As one would expect, GameStop was the most mentioned company in these articles, mentioned in 3,344 articles. This is followed by AMC Entertainment Holdings, Inc., which is mentioned in 3,105 articles. Cassava did not make the top 100.

106.   I conducted another search on *Factiva* for articles from "All Sources" published during the Class Period where "Cassava Sciences, Inc." was the "Company" search field parameter and the article contained the words "meme stock" or "meme stocks." The *Factiva* search returned only 11 articles (of which two articles were identical duplicates) that contained both Cassava and "meme stock(s)" in the same article. As the Class Period is over three years long, if the media widely believed Cassava to be a so-called meme stock, there reasonably would have been far more articles than 11 saying so over this period. With only a few rare sporadic exceptions, the news media, which functions to facilitate the flow of information to the marketplace, did not deem Cassava to be a meme stock.

107.   The content of the articles Dr. Stulz identified also undermines any suggestion that journalists labeling Cassava a meme stock in five articles is reason to believe Cassava actually was a meme stock. The 8 June 2021 *Bloomberg* article, for instance, reported that analysts were positive on Cassava on account of its pipeline therapy Simufalim and related optimistic updates. The article explains that the market for Cassava stock was attuned to Company information, and the stock's price reflected the views of market participants. This

---

[106] Expert Report of Rene Stulz, Ph.D., *Shupe v. Rocket Companies, Inc. et al.*, United States District Court, Eastern District of Michigan Northern Division, No. 21-cv-11528, 8 December 2023, ¶¶19, §VI.B. ("Specifically, Rocket was a meme stock during the Putative Class Period, and Mr. Coffman does not address the implications of this for market efficiency in his report.")

describes an efficient market, not a market where prices moved irrationally due to so-called meme trading.

> "Wall Street firms covering Cassava are unanimously bullish. Soumit Roy of JonesTrading, who has the highest price target at $110, estimates new medicines to tackle Alzheimer's could generate $200 billion in sales over 15 years.
> ….
> Cassava reached levels not seen in 20 years in February following an update from an ongoing mid-stage trial. Alzheimer's patients getting the company's wholly owned experimental tablet, called simufilam, showed improvement in reasoning and behavior. But the trial was with less than 100 patients and without a control arm to gauge the impact a placebo might have had on patients."
> **"Drugmaker With No Product Gains 911% on Alzheimer's, Meme Hopes," by Cristian Flanagan, *Bloomberg*, 8 June 2021.**

108.   Likewise, the *Business Insider* article cited by Dr. Stulz describes Cassava stock as reacting to and incorporating valuation-relevant news. In this article, it was the negative news that cast doubt on the validity of the Company's clinical studies.

> "Last Wednesday, Cassava plunged as much as 30% in one day after a lawyer disputed the validity of the biotech company's clinical studies results. The lawyer from firm Labaton Sucharow alleges that some of Cassava's results show signs of data manipulation. According to Bloomberg, the lawyer is representing an unnamed short seller, and petitioned the Food and Drug Administration to halt trials of simufilam."
> **"Short Sellers Betting Against Meme Stock Cassava Have Made $100 Million Over The Past Month As The Stock Has Struggled," by Emily Graffeo, *Business Insider*, 31 August 2021.**

109.   In sum, the news articles that Dr. Stulz cites to support his insinuation that Cassava may possibly have been a so-called meme stock, actually attest to the efficiency of the market for Cassava stock. The articles describe the market for Cassava stock as processing, reacting to, and impounding information.

      c.      **Relevance of the Meme Stock Phenomenon to Market Efficiency; Dr. Stulz Focuses Incorrectly on Fundamental Efficiency Rather than Informational Efficiency**

110.    Dr. Stulz inveighs that the price of Cassava stock price might have been impacted by the so-called "meme stock phenomenon." As he articulates it, the meme stock phenomenon is "where certain stocks become popular among retail investors on social media and online forums, and experience extremely large stock price movements, at times resulting from trading frenzies, in the absence of new, value-relevant public information about the stocks (*i.e.,* information that would inform investors about the present value of the company's expected future cash flows) that could justify such movements."[107]

111.    While Dr. Stulz admits in his report that the standard for market efficiency is informational efficiency in securities cases, he still adds that on account of the meme stock phenomenon, a stock price may deviate from what would be its correct price based only on fundamental valuation information.[108] Dr. Stulz compounds his error by asserting that a stock can only be considered efficient if it moves only in response to "information that would inform investors about the present value of the company's expected future cash flows."[109]

112.    Dr. Stulz's thesis thus suffers from a definitional flaw. Conformity of a stock price to the correct price according to a particular valuation model (a discounted cash flow model, for example) is fundamental market efficiency, not informational efficiency. Informational efficiency does not require that a stock be bound to what a particular valuation model deems is the correct price, but rather requires that the stock respond to and impound new information the market deems to be relevant. A stock whose valuation is impacted by changing market sentiment, changes in the supply of shares made available for trading, or its addition to a security market index, for example, will still be informationally efficient, as long as it also reacts to and impounds economically material information.[110]

---

[107] Stulz Report, ¶17.

[108] Stulz Report, ¶17.

[109] Stulz Report, ¶17.

[110] *See, e.g.*, "Risk, Uncertainty, and Divergence of Opinion," by Edward Miller, *The Journal of Finance*, Vol. 32, No. 4, September 1977, pp. 1151-1168; and "Market Efficiency," by Sean Cleary et al., *CFA Corporate Finance and Equity Curriculum*, Vol. 4, 2019, p. 334.

113.    I understand that the type of market efficiency relevant for invoking the fraud-on-the-market principle in securities litigation is informational efficiency, not fundamental efficiency. In its 2014 *Halliburton II* decision, the U.S. Supreme Court clarified definitively that the market efficiency relevant to a securities case under *Basic* is the property that the security at issue reacts to and therefore reflects material public information, not that the price has to conform to some correct valuation model.

> "Even the foremost critics of the efficient-capital-markets hypothesis acknowledge that public information generally affects stock prices. … Debates about the precise *degree* to which stock prices accurately reflect public information are thus largely beside the point. 'That the … price [of a stock] may be inaccurate does not detract from the fact that false statements affect it, and cause loss,' which is 'all that *Basic* requires.'"
> **Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 272 (2014) (emphasis in original; internal citations omitted).**

114.    Nevertheless, Dr. Stulz talks about two mechanisms by which he thinks the meme stock phenomenon might possibly make a market (fundamentally) inefficient. The first is "trading frenzies" fueled by "retail investors on social media and online forums" that push the stock price to make unjustified changes.[111]

115.    The second mechanism is "coordinated trading by a large crowd of retail traders that results in a short squeeze … ."[112] Dr. Stulz cites an unpublished study by Franklin Allen, et al. [2023] that describes a "short squeeze" mechanism. The Allen et al., [2023] paper states "At the end of January 2021, a group of stocks listed on US stock exchanges experienced sudden price increases, which – coupled with high short interest – led to short-squeeze episodes. We find that these events were fueled by retail traders coordinating on social media platforms."

116.    Tellingly, while the period of study in the Allen et al., [2023] paper was contained with the Class Period of the instant case, the authors did not include Cassava among the affected companies or mention Cassava at any time. Nor would there be any reason to do so as

---

[111] Stulz Report, ¶17.

[112] Stulz Report, ¶58; Stulz Deposition at 90:17 – 91:6.

Cassava never experienced a "short squeeze" from coordinated retail traders or any type of short selling ban.

117.   Dr. Stulz also cites a published interview with Professor Eugene Fama, where Professor Fama was asked, "Do you believe in manias or speculation? Would GameStop be one example?" Professor Fama responded, "For a couple of days, the market was very inefficient."

118.   Again, it is noteworthy that neither Professor Fama nor his interviewer mentioned Cassava – which never experienced a "short squeeze." Moreover, while according to Dr. Stulz, GameStop is the "meme stock poster child,"[113] Professor Fama concluded GameStop was only inefficient "for a couple of days."

119.   Essentially, Dr. Stulz explains that the meme stock phenomenon can impact a security price either through retail investor irrationality, evident in a security price being pushed to an unjustified level, or from a coordinated effort to manipulate a security price.

120.   Dr. Stulz's suggestion that the meme stock phenomenon may have possibly made Cassava stock inefficient during the Class Period is untenable. The price of Cassava stock did not move outside of rational bounds. At times Cassava's stock price was elevated to reflect the positive prospects that Simufilam, the Company's drug under development, would prove efficacious, receive FDA approval, and become commercially successful. At other times the stock price fell to low levels, reflecting criticism of the Company's research and alleged wrongdoing, and the prospect that the drug would not prove efficacious, and would consequently fail to receive FDA approval. The range between these two possibilities is dramatic, and therefore so was the range of rational valuation.

121.   Over the course of the Class Period, equity analysts covering Cassava set price targets that ranged between $8 per share and $215 per share.[114] Cassava's highest stock price during the Class Period was $135 per share. Its lowest price was $6.79 per share. Dr. Stulz is

---

[113] Expert Report of Rene Stulz, Ph.D., *Shupe v. Rocket Companies, Inc. et al.*, United States District Court, Eastern District of Michigan Northern Division, No. 21 cv 11528, 8 December 2023, ¶63.

[114] "This Cassava Won't Take Root: Initiating Coverage of SAVA with a SELL, $8 Price Target," by James Jang, Univest Securities, analyst report, 1 April 2022; and "Raising PT to $215/BUY. 9-Month Data De-Risk 12-Month Data in 4Q21; Randomized Trial Data Could be in 1H/mid22.," by Soumit Roy, Jones Research, analyst report, 29 July 2021.

wrong to suggest that Cassava's stock price movements were wild or irrational.[115] Never during the Class Period did Cassava trade at a price above the level equity analysts computed the fair value could be. On the downside, at its lowest, Cassava stock traded near analysts' lowest price target.

122.   It very well might have been representations by the Company rather than social media that fueled optimism for the Company, representations such as the following:

> "Barbier, meanwhile, told *Fortune* that a core group of institutional investors had looked at the preliminary data and concluded that, from an investment perspective, Cassava might be the next 'Google or Tesla.'"
> **"Jordan Thomas's Army of Whistle-Blowers," by Patrick Keefe, *New Yorker*, 17 January 2022.**

123.   Regarding the mechanism of a short squeeze coordinated by social media, as mentioned above, it did not happen to Cassava.

124.   Dr. Stulz confessed that he neither looked for nor found any evidence that Cassava stock experienced a short squeeze at any time during the Class Period.[116]

125.   Indeed, as has been observed and is a generally accepted principle in academic finance, only about a third of stock price variation can be explained with fundamental information. Prominent financial economist Richard Roll expressed this regularity as follows:

> "Even with hindsight, the ability to explain stock price changes is modest. $R^2$s were calculated for the returns of large stocks as explained by systematic economic influences, by the returns on other stocks in the same industry, and by public firm-specific news events. The average adjusted $R^2$ is only about .35 with monthly data and .20 with daily data."
> **"$R^2$," by Richard Roll, *The Journal of Finance*, Vol. 43, No. 2, 1988, p. 541**

126.   As Cassava's stock price ranged within rational bounds during the Class Period, and there was no indication of a short squeeze coordinated by retail investors or social media participants, there is no basis for Dr. Stulz's question as to whether the meme stock

---

[115] Stulz Report, ¶78.

[116] Stulz Deposition at 174:5 – 20.

phenomenon may have made the market for Cassava stock inefficient during the Class Period.

### 3. Dr. Stulz's High Social Media Event Analysis Is Fatally Flawed

#### a. Dr. Stulz's Collective Event Study on High Social Media Days Is Designed to Test Fundamental Efficiency, Not Informational Efficiency

127.  Dr. Stulz suggests that a test of Cassava stock efficiency should include not only if the stock moved with information, but also if the stock moved in response to social media activity in the absence of new information. He attempted to run such a test.

128.  As discussed above, Dr. Stulz's argument that a so-called meme stock phenomenon, or any other non-fundamental factor, may have affected the pricing of Cassava stock is relevant only for fundamental efficiency, but irrelevant for a determination of informational efficiency.

129.  Nonetheless, Dr. Stulz says he set out to test whether Cassava stock moved in reaction to social media activity in the absence of other information. In this misguided pursuit, however, Dr. Stulz made a severe mistake. While he sought to identify days on which there was high social media activity but no new Cassava news, on most of the statistically significant price change days in his collection of dates, there actually was important Cassava news (which Dr. Stulz overlooked) that the stock price was reacting to. Consequently, rather than providing evidence that Cassava may have been fundamentally inefficient, Dr. Stulz's test provides additional compelling evidence that Cassava stock traded in an efficient market throughout the Class Period.

#### b. Dr. Stulz's High Social Media Event Study Design

130.  Dr. Stulz sought to conduct a collective event study focusing on the days with the most Casava social media activity from among the days during the Class Period where he says there was no Casava news.[117]

131.  To identify days that purportedly had no new news, Dr. Stulz started with the set of days that I had designated as the days "deemed only for purposes of this test to be non- or

---

[117] Stulz Report, ¶¶19, 43, 53; and Stulz Deposition at 260:3 – 262:10.

lesser-news days"[118] in my event studies. Dr. Stulz erred, however, as I never stated that these days had no new news, just that they did not satisfy the objective criterion set to identify a collection of high news days. I noted that these "more ordinary"[119] days were deemed to be more ordinary "only for purposes of this test" because "they were not 8-K event days"[120] or "they were not among the top 5% of all days in the Class Period with the highest frequency of Cassava news articles."[121] I never represented that the days designated as "more ordinary days" had no important Cassava news.

132.   From this set of days drawn from my event studies, which Dr. Stulz incorrectly assumed had no news, Dr. Stulz then eliminated all of the days alleged in the Complaint to have been when misrepresentations or corrective disclosures occurred.[122]

133.   From this pared down sample of days, Dr. Stulz identified the 34 days when Cassava had the highest number of mentions on Twitter and Reddit (as identified by ticker symbol).[123] Dr. Stulz designated these days "High Social Media Days." But, Dr. Stulz incorrectly assumed these days had both high social media activity *and* no new Cassava information.

134.   Dr. Stulz tested for statistical significance of the High Social Media Days across the three regressions presented in the Feinstein Report and found that 9 or 10 of his High Social Media Days had statistically significant price movements (9 or 10 depending on which of my regressions he used).[124] As this frequency of Dr. Stulz's significant High Social Media Days was supposedly greater than the frequency of statistically significant days among the rest of the sample of purportedly non-news Class Period days, Dr. Stulz concluded

---

[118] Feinstein Report, ¶¶171 and 179.

[119] Feinstein Report, ¶¶140, 172, 176, 179 and 180.

[120] Feinstein Report, ¶171.

[121] Feinstein Report, ¶179.

[122] In the Feinstein Report, I identified three buckets of objective selection criteria for news events: (i) 8-K filing dates (ii) 8-K filing dates excluding earnings announcements (iii) top 5% of dates with the most published articles according to *Factiva*. Feinstein Report, §VIII.B.3. These selection criteria resulted in 65 unique news dates.

[123] Stulz Report, ¶73.

[124] Stulz Report ¶74.

(erroneously) that he had proved that social media activity caused Cassava stock to move significantly even in the absence of Cassava news.[125]

135.    In his deposition Dr. Stulz expounded upon his rationale for conducting this event study focusing on High Social Media Days.

> "Q: Now, do you contend that high social media activity is coincident with no or low value-relevant information?
>
> A: Well, this exhibit is showing that if instead of using those three days he had used high social media days, he would have found similar results to the one he finds for the days he chooses. And then I discuss high social media days. I show that seven out of ten, there is no news in Dr. Feinstein's backup.
>
> Q: So I'm just asking about your contention here. Do you contend that high social media activity is coincident with low or no value-relevant information?
>
> A: So I discuss this issue in my report, and we looked at each one of the days. We looked at the top 100 posts for both Reddit and Twitter and tried to identify information that would be value relevant, new information that would be value relevant, and I discuss, you know, one case that we have already discussed where there were some things that were value relevant. And, I mean, of seven days, I didn't – didn't find anything."
> **Stulz Deposition at 263:15 – 264:16.**

136.    There is a major error in Dr. Stulz's execution of his "no-news" "High Social Media Days" event study – the event days he chose to test were ***not*** without Cassava information. Most of the days he found to have statistically significant Cassava stock price movements were days on which the market was reacting to Cassava information. Thus, rather than proving that Cassava stock moved significantly in the absence of information, Dr. Stulz unwittingly provided additional compelling proof of the efficiency of the market for Cassava stock.

137.    Despite Dr Stulz's representation that he reviewed "press articles and analyst reports … as well as the most 'influential' social media posts," to verify that his statistically significant High Social Media Days had no value-relevant news,[126] Dr. Stulz seemingly missed or

---

[125] Stulz Report, ¶76.

[126] Stulz Report, ¶54.

overlooked the important Company news the market was reacting to on the majority of his statistically significant High Social Media Days.

### c. The 10 Purportedly "No Information" Days That Dr. Stulz Finds to Be Statistically Significant

138. Dr. Stulz's high social media event study does not provide evidence that the market for Cassava stock was inefficient. In fact, it does quite the opposite, providing additional compelling evidence that the market was efficient.

139. A careful examination of the purportedly "no-news" days on which the stock price moved significantly, reveals that the market was reacting to important Company news on most of those days.

### (i) 18 September 2020

140. After the close of trading on 17 September 2020, Cassava filed a Form 4 with the SEC, which indicated that Cassava executives had bought shares of Cassava stock.[127] News of this insider buying was reported the next morning.[128] According to the finance literature, insider buying is a positive signal to market participants.[129]

141. On 18 September 2020, following this news of insider buying, Cassava stock rose 42.03%. The residual increase – the increase after removing market and sector effects – was a statistically significant logarithmic return of 34.67%.[130]

142. What happened on 18 September 2020 was an example of Cassava stock trading in an efficient market. Important valuation-relevant news broke; the news was distributed broadly by well-developed, information-dissemination infrastructure; investors traded on the information; and the price rose accordingly. This is not an example of Cassava stock moving on no new information.

---

[127] Cassava Sciences, Inc., Form 4, filed 17 September 2020, accepted 5:15 PM; and Cassava Sciences, Inc., Form 4, filed 17 September 2020, accepted 5:25 PM.

[128] "08:05 EDT Cassava Sciences Up 26% In Pre-Market After Insider Purchase," *theflyonthewall.com*, 18 September 2020.

[129] *Investments*, by Zvi Bodie et al., McGraw-Hill/Irwin, 10th Edition, 2014, p. 86; and "Analysis of Dividends and Share Repurchases," by Gregory Noronha and George Troughton, in *Corporate Issuers CFA Curriculum*, Vol. 3, 2019, pp. 105 and 170.

[130] Feinstein Report, Exhibit-16.

143.   Stulz acknowledges that despite his screens to isolate "no-news" days, this particular day did have important Cassava news.[131] That there should be high social media on this day is also consistent with an efficient market, as investors and observers discussed the news.

### (ii)   3-5 February 2021

144.   Dr. Stulz contends that February 3, 4, and 5 were "no-news" days on which the Cassava stock price moved significantly for no reason at all. What he overlooks is that the prior day, 2 February 2021, was a blockbuster day in the life of Cassava. That day, the Company announced positive results from a clinical study of Simufilam. It appeared that Simufilam was on its way to success.

> "Cassava Sciences, Inc. today announced results of an interim analysis from an open-label study of simufilam, its lead drug candidate for the treatment of Alzheimer's disease. Patients' cognition and behavior scores both improved following six months of simufilam treatment, with no safety issues.
> …
> 'Today's data once again suggests simufilam could be a transformative, novel therapeutic,' added Nadav Friedmann, PhD, MD, Chief Medical Officer. 'It appears the drug's unique mechanism of action has potential to provide a treatment benefit following 6 months of dosing.'
> …
> Cassava Sciences believes today's data and prior clinical results support advancing simufilam into a Phase 3 clinical program in Alzheimer's disease. Initiation of a Phase 3 trial remains on schedule for 2nd half 2021."
> **"Cassava Sciences' Simufilam Improves Cognition and Behavior in Alzheimer's Disease in Interim Analysis of Open-label Study," Cassava Sciences, Company press release, accessible at https://www.cassavasciences.com/news-releases/news-release-details/cassava-sciences-simufilam-improves-cognition-and-behavior.**

145.   Cassava stock rose 141.15% on 2 February 2021, with a statistically significant logarithmic residual return of 86.27%. Trading volume was also high, with 75,963,738 shares trading hands, compared to 3,260,821 that traded on 1 February 2021.[132]

146.   The stock price continued to rise on 3 February 2021. Clearly, the stock was continuing to process and react to the February 2nd news. News media attributed the February 3rd stock

---

[131] Stulz Report, footnote 157.

[132] Feinstein Report, Exhibit-4.

price movement to the market continuing to process the implications of the announced clinical trial results.

> "What Happened: The upwards movement was an extension from a day ago when shares rose 150% after the company announced the results of an interim analysis of its lead drug candidate for Alzheimer's disease — simufilam."
> **"Why Cassava Sciences Shot Up 97% Today," by Shivdeep Dhaliwal, Benzinga, 3 February 2021.**

147.  It is not uncommon for complex and surprising news to impact a stock price for longer than one day in an efficient market. Reflecting this fact, numerous peer-reviewed published finance studies use multi-day windows when conducting event study analysis to determine how stocks react to various kinds of information. In a survey of academic studies, Bruner [2002] looked at numerous published peer-reviewed studies that utilized a multiday window event study methodology.[133] In fact, one of the first published event studies, conducted by recognized leaders in academic finance, including Nobel laureate Eugene Fama, was a multiday event study.[134]

148.  The following quotes corroborate that multiday windows are often appropriate and conventionally examined in event studies.

> "In securities fraud cases, many experts have adopted the convention of looking at one-day, two-day, or five-day periods following an announcement."
> **"Materiality and Magnitude: Event Studies in the Courtroom," by David I. Tabak and Frederick C. Dunbar, Chapter 19 of the *Litigation Services Handbook: The Role of the Financial Expert*, 3rd Edition, edited by Roman L. Weil et al., John Wiley & Sons, Inc., 2001, p. 19.4.**

---

[133] "Does M&A Pay? A Survey of Evidence for the Decision-Maker," by Robert Bruner, *Journal of Applied Finance*, 2002.

[134] "The Adjustment of Stock Prices to New Information," by Eugene Fama et al., *International Economic Review*, Vol. 10, 1969.

> "In practice, the period of interest is often expanded to multiple days,
> including at least the day of the announcement and the day after the
> announcement."
> **"Event Studies in Economics and Finance," A. Craig MacKinlay,** *Journal of*
> *Economic Literature,* **Vol. 35, 1997, pp. 14-15.**

149.    News with dramatic implications for a company, such as what Cassava announced on February 2nd, could reasonably take the market more than one day to process. In the case of this particular announcement, the digestion of the news also required examination of complex biomedical test results. Efficient markets are populated by individuals who take time to process new information and to incorporate this information into their valuation models. Such is especially true when the revelation of new information is of novel technological breakthroughs that have little precedence.

150.    As the market grappled with the new information and the new higher valuation of Cassava, the price retreated somewhat on February 4th and 5th. But these movements too reflected the market continuing to process the news about the Company's purported clinical trial success. On February 5th, a Citi Research analyst countervailed against the positive news with a negative caution, writing, "'Though the move clearly corresponds with the unmet need and market opportunity for an effective therapy for [Alzheimer's disease], we continue to express caution on reading too much into the results of small, short-term (<1 year) studies in AD, particularly with no control arm.'"[135] Thus, the Cassava stock price movements on these days reflected the market settling to a consensus valuation in light of the new disruptive positive information released that week and a professional equity analyst's countervailing caution. The market for Cassava stock on these days was ***not*** moving on no information whatsoever.

### (iii)    11 June 2021

151.    On 11 June 2021, Cassava stock rose 16.05%. According to the regression run as part of the collective event study focused on top news articles, wherein the days with top news

---

[135] "What to Know Before Buying Cassava Sciences, the Hot Alzheimer's Stock," by Josh Nathan-Kazis, *Barron's Online*, 8 February 2021, 8:22AM. It is noteworthy that Dr. Stulz made no mention of the Citi Research report that was referenced in this *Barron's* article, even though he claimed to search all news sources for relevant Company information.

articles were excluded with dummy variables, the June 11th residual return was 15.30% (on a logarithmic basis), which is associated with a *t*-statistic of 2.03,[136] which is just over the 1.96 threshold for statistical significance at the 95% confidence level. Using the 8-K event study regression, the June 11th residual return was 14.77% (on a logarithmic basis), which is associated with a *t*-statistic of 1.57 and is not statistically significant at the 95% confidence level.

152.   By test design, a residual return has a 5% chance of appearing to be statistically significant at the 5% significance level (corresponding to the 95% confidence level) on account of random chance alone. Because the Cassava return was found to be statistically significant by one regression and not by the other, this may be an example of spurious significance, which, as mentioned, occurs 5% of the time.

153.   Some news articles stated that Cassava stock may have been moving in sympathy with Biogen, or as a result of the positive news announced earlier that week that Biogen received approval for its Alzheimer's drug, Aduhelm, which like Simufilam, targets amyloid protein.[137] However, it is uncertain whether or not this is why Cassava stock rose on 11 June 2021.

154.   The size of the stock price movement on this day could have been caused by random chance, resulting in spurious significance according to one of the regressions. This explanation is consistent with there being one or two such days out of the 34 purported no-news days tested by Dr. Stulz. Thus, the stock price movement this day is not evidence of market inefficiency or of Cassava stock regularly moving significantly on no news.

### (iv)    21 July 2021

155.   Dr. Stulz claims there was no new Cassava news on 21 July 2021. He notes that a press release that day stated that the Company would present clinical test results at the Alzheimer's Association International Conference ("AAIC") during the week of 26 July 2021. Dr. Stulz observes that the scheduling had been previously announced earlier, on 21

---

[136] Feinstein Report, Exhibit-18.

[137] "Rival Firm's Drug Approval Sparks Lilly Stock Jump," *Indianapolis Business Journal*, 11 June 2021.

June 2021. On this basis, Dr. Stulz contends erroneously that there was no new news in the press release.

156.    However, Dr. Stulz missed something. He overlooked that the 21 July 2021 press release also revealed for the first time that the name of the presentation the Company would make at the AAIC was "SavaDx, a Novel Plasma Biomarker to Detect Alzheimer's Disease, **Confirms Mechanism of Action of Simufilam**." That is, the Company announced on 21 July 2021 that its clinical testing had confirmed that the mechanism underlying Simufilam's purported efficacy was confirmed.

157.    For a Company whose stock valuation depended critically on whether or not its therapy in development worked, which Dr. Stulz acknowledges,[138] this was blockbuster news.

158.    On this positive news, the Cassava stock price rose 29.47%, with a statistically significant residual logarithmic return of 23.63%.[139] This significant stock price reaction to blockbuster positive news is additional compelling proof of the efficiency of the market for Cassava stock.

159.    The test that Dr. Stulz ran to see if Cassava stock moved significantly on no information ended up providing additional compelling evidence of efficiency. It showed that the stock moved in response to information.

160.    Moreover, the results illuminate the relationships between Cassava news, social media activity, and Cassava's stock price movements. Apparently, the momentous positive news on 21 July 2021 both fueled social media activity and impacted the stock price. That there is a correlation between the two in this instance is understandable and to be expected in Cassava's efficient market.

### (v)     30 July 2021

161.    On 30 July 2021, Adam Feuerstein, a prominent biotechnology columnist, published an article on *STAT+ News* reporting that independent scientists reviewed Cassava's reported

---

[138] Stulz Report, ¶198.

[139] Feinstein Report, Exhibit-16.

results.[140] The independent scientists expressed doubts and severely criticized Cassava's tests and reported results.

> "Asked by STAT to examine the simufilam data, Alzheimer' scientists not involved in Cassava's study said the cognitive benefit claim was exaggerated and not supported by the design of the clinical trial. The conclusions reached by Cassava about simufilam's benefit for Alzheimer's patients are 'overblown, inappropriate, and naive,' said Rob Howard, an Alzheimer's researcher and professor of psychiatry at University College London. 'It's the sort of presentation that one might expect an undergraduate to make.' Lon Schneider, a physician and Alzheimer's expert at the Keck School of Medicine of the University of Southern California, described Cassava'sstudy results as 'uninterpretable.'
> …
> Likewise, Schneider cautioned against even believing Cassava's statement characterizing the loss of cognition typically seen by the average patient with Alzheimer's."
> **"Alzheimer's Scientists Critique Cassava Sciences' Study Results – Overblown, Inappropriate, Uninterpretable," by Adam Feuerstein, *STAT+*, 30 July 2021, pp. 2 and 4.**

162.  That day, Casava's stock price declined -32.72%, corresponding to a statistically significant residual logarithmic return of -40.04%.[141] This decline is associated with a *t*-statistic of -4.17,[142] which is statistically significant at the 95% confidence level.[143]

163.  What happened on 30 July 2021 was an example of Cassava stock trading in an efficient market. Important valuation-relevant news broke; the news was distributed broadly by well-developed, information-dissemination infrastructure; investors traded on the information; and the price fell accordingly. This is not an example of Cassava stock moving on no news.

---

[140] "Alzheimer's Scientists Critique Cassava Sciences' Study Results – Overblown, Inappropriate, Uninterpretable," by Adam Feuerstein, *STAT+*, 30 July 2021.

[141] Feinstein Report, Exhibit-16.

[142] Feinstein Report, Exhibit-16.

[143] These results are consistent with the other two regressions presented in the Feinstein Report. *See*, Feinstein Report, Exhibit-17 and Exhibit-18.

164.   Dr. Stulz acknowledges that despite his screens to identify "no-news" days, this particular
day did have important Cassava news.[144] That there was high social media on this day is
also consistent with an efficient market, as investors and observers discussed the news.

### (vi)   2 November 2021

165.   On 2 November 2021, Cassava stock rose 25.94%. According to the regression run as part
of the collective event study focused on top news articles, wherein the days with top news
articles were excluded with dummy variables, the November 2nd residual return was
21.60% (on a logarithmic basis), which exceeds the threshold for statistical significance at
the 95% confidence level. By test design, a residual return has a 5% chance of exceeding
that threshold on account of random chance alone. Similarly, according to the regression
run as part of the collective event study focused on 8-K days, wherein the days with 8-K
filings were excluded with dummy variables, the residual return (21.44% on a logarithmic
basis) exceeds the threshold for statistical significance at the 95% confidence level.

166.   Stock price movements that are statistically significant at the 95% confidence level can
occur by random chance alone 5% of the time. Thus, out of 34 tested days, one would
expect one or two such days, where it appears that the stock is moving by a statistically
significant amount in the absence of news. This should occur even in an efficient market,
as the result stems from the design of the significance test.[145]

### (vii)   20 September 2022

167.   20 September 2022 is another one of the days on which Dr. Stulz admits that despite his
efforts to identify "no-news" days, he failed. This particular day, according to Dr. Stulz,
had important news. Dr, Stulz describes the news as follows:

> "On September 20, 2022, a social media post made public a rumored letter
> from the SEC that referenced a 'case closing recommendation' in response
> to a Freedom of Information Act Request regarding Cassava."
> **Stulz Report, footnote 157.**

---

[144] Stulz Report, footnote 157.

[145] "Sampling and Estimation," by Richard DeFusco, *CFA Quantitative Method Curriculum*, 2019, pp. 589-590.

168. Information that the SEC was may be closing its investigation clearing Cassava of wrongdoing is economically material and positive. That day, Casava's stock price increased 28.42%, corresponding to a statistically significant residual logarithmic return of 26.69%.[146] This increase is associated with a *t*-statistic of 4.00,[147] which is statistically significant at the 95% confidence level.[148]

169. The letter from the SEC with language that suggested the SEC was closing its case investigating Cassava, was obtained by an obscure social media participant pursuant to a Freedom of Information Act ("FOIA") request.[149] The letter was posted to Twitter. This is an example of how social media can productively augment the information infrastructure of a market, enhancing market efficiency.

170. Dr. Stulz acknowledges that despite his screens to identify "no-news" days, this particular day did have important Cassava news.[150] That there was high social media activity on this day is also consistent with an efficient market, as investors and observers discussed the FOIA letter than had not even been published in a traditional news source yet. This is not an example of Cassava stock moving on no news or behaving inefficiently.

### (viii)   22 September 2022

171. On 22 September 2022, *Seeking Alpha* published an equity analysis report about Cassava that included a screenshot of the FOIA letter. The author wrote, "As seen below, the SEC has officially closed its case [against Cassava]." In the same *Seeking Alpha* report, the author issued a "Strong Buy" recommendation, supported with the commentary, "Cassava Sciences is looking to produce what will one day potentially be the best-selling drug of all time."[151]

---

[146] Feinstein Report, Exhibit-16.

[147] Feinstein Report, Exhibit-16.

[148] These results are consistent with the other two regressions presented in the Feinstein Report. *See*, Feinstein Report, Exhibit-17 and Exhibit-18.

[149] As noted in the Stulz Deposition, this poster's account had only 64 followers. *See*, Stulz Deposition at 178:10-15.

[150] Stulz Report, footnote 157.

[151] "The SEC Recommends Closing Cassava Sciences Investigation," by Jacob Braun, *Seeking Alpha*, 22 September 2022.

172. On this positive news, the price of Cassava stock rose 35.65%, corresponding to a statistically significant residual logarithmic return of 31.81%.[152] This increase is associated with a *t*-statistic of 4.63, which is statistically significant at the 95% confidence level.[153]

173. What happened on 22 September 2022 was an example of Cassava stock trading in an efficient market. A market commentator analyzed the news and disseminated the news and analysis widely. Investors traded on the information and commentary, and the price rose accordingly. This is not an example of Cassava stock moving on no news or operating in an inefficient market.

174. It is a generally accepted proposition in finance, that the source of information matters.[154] Even if it seems to be the same information supplied, validation and interpretation by a more prominent venue is economically material. In this case the dissemination and interpretation by an analyst on *Seeking Alpha* added validation to the Twitter post by an unknown user. The author of the *Seeking Alpha* equity analysis report had a track record of 37 prior reports on *Seeking Alpha*. The report comprised detailed original analysis and a "strong buy" recommendation. Thus, the *Seeking Alpha* publication was a new news event, and the market appropriately responded to it being a new news event.

175. After accounting for the news that moved the Cassava stock price, there are two significant days remaining in Dr. Stulz's study with unapparent news out of the 34 days he tested. This result is therefore not evidence of market inefficiency or that Cassava stock regularly moved significantly on no news. If anything, it is evidence that Cassava stock moved as one would expect in an efficient market.

---

[152] Feinstein Report, Exhibit-16.

[153] Feinstein Report, Exhibit-16.

[154] *See, e.g.*, "The Market for Information-Evidence from Finance Directors, Analysts And Fund Managers," by Richard Barker, *Accounting and Business Research*, Vol. 29, No. 1, 1998, pp. 13 and 16; and "When Are Analyst Recommendation Changes Influential?" by Roger Loh and Rene Stulz, *The Review of Financial Studies*, Vol. 24, No. 2, 2011.

> **d.    Dr. Stulz's Measures of Mentions and Impressions Are Unreliable for Identifying High Social Media Activity Days and for Ascertaining the Topics of Conversation**

176.   Dr. Stulz's High Social Media Day event study is also flawed because he did not reliably consider the times that posts on Twitter and Reddit were made. For each day in the Class Period, after eliminating certain days that he determined had news, Dr. Stulz counted and summed the number of Twitter and Reddit posts "containing a mention of 'SAVA" or 'SAVA' followed or preceded by special characters on either side, such as '$SAVA' or 'SAVA's.'"[155] This count served as the basis for his determination that a day either was or was not a "High Social Media Day."

177.   However, this metric devised by Dr. Stulz is faulty, as the mentions reported by Brandwatch (Dr. Stulz's source for his social media data) for any particular day included mentions that occurred after the close of trading. Specifically, 35.83% of the mentions Dr. Stulz provides in his production for the 10 statistically significant High Social Media Days occurred after the market had closed. Mentions made after a market has closed, and after the stock price has already moved, cannot possibly cause that day's prior stock price movement. If there is a correlation between stock price movements and mentions as Dr. Stulz measured them, the better conclusion is that a large stock price movement elicits social media discussion, not the other way around. In fact, this alternative conclusion is supported by published research, and is perfectly consistent with market efficiency.[156]

178.   It is a widely used and generally accepted principle in empirical economic research that the temporal ordering of two variables can be used to assess causation.

---

[155] Stulz Report, Exhibits 1A and 1B.

[156] *See, e.g.*, "News or Noise? Internet Postings and Stock Prices," by Robert Tumarkin and Robert Whitelaw, *Financial Analysts Journal*, Vol. 57, No. 3, 2001, p. 50. ("The event study showed that returns following abnormal Internet message board activity are statistically insignificant and consistent with market efficiency. Statistically significant positive returns did, however, precede the days with strong positive opinions and abnormal message board activity"); and "Granger-Sims Causality," by G. M. Kuersteiner in *Macroeconometrics and Time Series Analysis*, Palgrave Macmillan, 2010, pp. 119-134.

> "The past and present may cause the future, but the future cannot cause the past."
> **"Testing for Causality," by C.W.J. Granger *Journal of Economic Dynamics and Control*, Vol. 2, 1980, p. 330.**

179.    Based on this principle, a more reasonable conclusion from the data is that Cassava news caused both the stock price movement and the social media activity, rather than the social media activity independently causing the stock price movement.

180.    Similar to his mistake of neglecting the time stamps on mentions in his database, each day's "impression" count that Dr. Stulz used to identify the "most influential" Twitter and Reddit posts also included impressions that occurred after the stock market had closed that day. In fact, the impression metric is a ***lifetime count***, and includes views of a post that may have occurred days, weeks, or even years after a post. At least 36.58% of the impressions Dr. Stulz provides in his production for the 10 statistically significant High Social Media Days occurred after the market had closed. Therefore, Dr. Stulz's methodology for determining what participants on social media may have been discussing on a particular day is unreliable.

### 4.    Efficient Stocks May Respond to Factors Other than Fundamental Cash Flow Model Information

181.    In this case, Dr. Stulz opines that if a security price reacts to non-fundamental factors or information he cannot identify, then the security must be inefficient. He is wrong. The fact that a stock price may be impacted by factors that are not components in the fundamental cash flow valuation model does not make a stock inefficient.

182.    In his report, Dr. Stulz cites one such factor, which he apparently concurs has valuation effect. That factor is the quantity of shares made available for trading.[157]

183.    Dr. Stulz quotes from Miller [1977], which explains "The result is that short sales increase the supply of stock on the market by the amount of the outstanding short position. On Figure 1 the effect of short sales is to move the vertical supply curve to the right by the amount of the outstanding short position, lowering the price."

---

[157] Stulz Report, footnote 61.

184.   Another non-fundamental factor observed in the literature to impact stock valuations is inclusion in a security market index, such as the S&P 500 or a sector index. Inclusion in such an index does not change a company's expected future cash flows, but the inclusion has valuation impact, nonetheless.

> "Reconstitution is the process of changing the constituent securities in an index. It is similar to a portfolio manager deciding to change the securities in his or her portfolio. …
> The frequency of reconstitution is a major issue for widely used indexes and their constituent securities. The Russell 2000 Index, for example, reconstitutes annually. It is used as a benchmark by numerous investment funds, and each year, prior to the index's reconstitution, the managers of these funds buy stocks they think will be added to the index – **driving those stocks' prices up** – and sell stocks they think will be deleted from the index – **driving those stocks' prices down**."
> **"Security Market Indexes," by Paul Kaplan and Dorothy Kelly, *CFA Curriculum Equity*, Vol. 4, 2019, p. 294 (internal citations omitted; emphasis added).**

185.   In his deposition, Dr. Stulz agreed that inclusion of a stock in a security market index would not change its expected future cash flows but is generally believed to affect the security's price.[158] While this is a generally accepted impact on all stocks, Dr. Stulz, of course, does not opine that all stocks trade inefficiently.

### 5.   Dr. Stulz's Short-Sale Constraint Criticism Comes Up Short

186.   Dr. Stulz observes that "Cassava's stock indeed experienced consistently high levels of short interest during the Proposed Class Period."[159] Dr. Stulz contends that the elevated short interest may have constrained Cassava stock short selling.[160]

187.   As a preliminary matter, Dr. Stulz's position that short selling may have constrained short selling is a bit like the famous quote attributable to baseball legend Yogi Berra, "Nobody goes there anymore. It's too crowded."[161] 8,952,219 million shares were held short every

---

[158] Stulz Deposition, at 297:16 – 298:2.

[159] Stulz Report, ¶98.

[160] Stulz Report, ¶¶101-108; and Stulz Deposition at 190:16 – 194:18.

[161] "Yogi Berra dies at 90: Here are Some of His Greatest Quotes," by Houston Mitchell, 12 May 2015, *Los Angeles Times*.

day during the Class Period on average. The Cassava short-sale data I examined shows that short interest changed every day, evincing that there was active and continuous short selling and covering. There is no day during the Class Period when short interest did not change from the prior day, underscoring that short sellers came and went continuously. Cassava shares were shorted before and during the Class Period. Short interest at the start of the Class Period was 3,018,212. Short interest generally rose throughout the Class Period, reaching its peak of 14,212,684 on 28 September 2023 – 10 trading days before the end of the Class Period. There certainly was no regulatory or institutionally imposed constraint on short selling of Cassava stock over the course of the Class Period. Exhibit-3a presents daily Cassava short interest. Exhibit-3b presents Cassava short interest on a biweekly basis for the six months preceding the start of the Class Period.

188.   While he asserts (without proof) that elevated short interest could have made it difficult for some investors to open new short positions at times during the Class Period, Dr. Stulz fails to consider that there was an active market for Cassava options during the Class Period, and that options trading provides a substitute for short selling. Investors who wished to short Cassava stock in order to capitalize on a bearish perspective, could have bought put options or sold call options. Dr. Stulz testified that he did not identify any individual who was unable to short Cassava stock.[162] There was never a constraint on Cassava option trading. Numerous peer-reviewed articles in the finance literature explain that the availability of put and call options serves as a substitute for short selling when short selling is constrained. Among these articles is the Franklin Allen et al., [2023] study that Dr. Stulz cites in his report.

> "Absent the options market, investors who hold negative views about the underlying stock may find it difficult to establish 'bearish' positions if the cost of direct short sales is too high. When options are introduced, these pessimistic investors can craft a synthetic short position by buying puts and/or writing calls."
> **"Why Do Option Introductions Depress Stock Prices? A Study of Diminishing Short Sale Constraints," by Bartley Danielsen and Sorin Sorescu, *The Journal of Financial and Quantitative Analysis*, Vol. 36, No. 4, 2001, pp. 451-484.**

---

[162] Stulz Deposition at 198: 14-24.

"The results imply that when short sales are restricted or costly, informed traders resort to the options markets as a substitute for short selling, especially when liquidity of the options is not a concern. … Our findings also suggest that during a less tumultuous sample period, an options trading strategy is a viable substitute for short selling. The overall evidence reveals that options play an important role in circumventing short-sale constraints."
**"Short-Sale Constraints and Options Trading: Evidence from Reg SHO," by Yi-Wen Chen et al., *The Journal of Financial and Quantitative Analysis*, Vol. 55, No. 5, 2020, pp. 1555-1579.**

"In sum, our findings suggest options are a substitute for (rather than complement to) short selling REIT shares, with options more directly substituting for short selling when there is a nontrivial level of activity in the options market."
**"Short Selling and Options Trading: A Tale of Two Markets," by George Cashman et al., *The Journal of Financial Research*, Vol. 45, No. 2, 2022, pp. 313-338.**

"The findings of this section add to the literature that examines whether investors use equity options to circumvent restrictions in the underlying equity market. … We complement these studies by providing evidence that during the January 2021 events market participants used call options to likely circumvent the trading restrictions implemented by retail brokers and bet on increasing prices, and also used put options to likely circumvent the equity short-squeeze events … ."
**"Squeezing Shorts Through Social Media Platforms," by Franklin Allen et al., SSRN, Working Paper, 2023, available at https://papers.ssrn.com/sol3/papers. cfm?abstract_id=3823151.**

189. Dr. Stulz concurs in his published work that options are a substitute for short selling and allow investors to circumvent short-sale constraints.

"In addition, derivatives enable investors to trade on information that otherwise might be prohibitively expensive to trade on. For instance, **short sales of stocks are often difficult to implement**. This slows down the speed with which adverse information is incorporated in stock prices and makes markets less efficient. **With puts, investors can more easily take advantage of adverse information about stock prices**."
**"Should We Fear Derivatives?" by Rene Stulz, *Journal of Economic Perspectives*, Vol. 18, No. 3, 2004, p. 180 (emphasis added).**

### 6.    Goldman Sachs Retail Favorites Index

190.   Dr. Stulz says that "Cassava was also affected by developments that affected other stocks classified as retail-focused stocks or meme stocks."[163] He says this based on adding the Goldman Sachs Retail Favorites Index ("Goldman Index") to the event study regressions I ran and observing that the introduced variable appeared to have explanatory power.

191.   However, there is major flaw in Dr. Stulz's analysis. He admitted that he does not know what stocks were constituents of this index. He therefore is unable to rule out that the index contains stocks that might move on Cassava news.

> "A: The difficulty with the with the Goldman Sachs retail favorites index is that its composition is not public. …
>
> Q: So you don't have any idea what the stocks are in the Goldman stock index?
> …
> A: I know some. As I mentioned, they haven't made the composition public, and we tried to get it and they don't sell it."
> **Stulz Deposition at 212:9 – 213:8.**

192.   It is a generally accepted principle of econometrics that for an Ordinary Least Squares regression to be valid, the dependent left-hand-side variable (in this case, Cassava stock returns) should be a function of the right-hand-side explanatory variables, and not vice versa.[164] An index that includes companies whose stock prices are impacted by Cassava news should not be used as an explanatory variable in the regression. Such inclusion would lead to unreliable results as the explanatory variable would be endogenously impacted by the variable it is trying to explain.

193.   In the recent *Rocket* case, Dr. Stulz did not present a regression with the inclusion of the Goldman Index. It is perplexing that if Dr. Stulz suggests that Cassava stock was impacted by the meme stock phenomenon, why he would insert the Goldman Index into the regression rather than Solactive Index? This anomalous approach raises the specter that insertion of the Goldman Index into the regressions and presenting just those results was

---

[163] Stulz Report, ¶68 and Exhibit 3A.

[164] *A Guide to Econometrics*, by Peter Kennedy, 6th Edition, Blackwell Publishing, pp, 41 and 171.

cherry-picked data mining. There are many indexes available, and it would not be surprising if experimenting with several, one could find one that spuriously appeared to have some ex-post explanatory power.

194.     When asked in his deposition how he could reach his conclusion that Cassava was "affected by developments that affected other stocks classified as retail-focused stocks or meme stocks" based on the collective event study that included in this index, Dr. Stulz replied with "correlation."[165] However, once he was shown some of the constituents of the Goldman Index as of 18 June 2020 with billion dollar and trillion dollar market capitalizations, such as Apple, General Electric, Inc., Ford Motor Company, and Amazon, Inc., Dr. Stulz admitted that these companies, while included in this index, were not meme stocks and were not characterized by market participants and meme stocks.[166] This admission undermines and draws into question the inclusion of the Goldman Index in the event study regressions.

### 7.     *Cammer/Krogman* Factor Analysis

#### a.        Month-by-Month Examination

195.     Dr. Stulz criticized my *Cammer/Krogman* factor analysis as "gloss[ing] over the substantial changes in Cassava's stock over the 37-month Proposed Class Period."[167] Apparently, he suggests that while Cassava stock satisfied all of the factors on an average basis over the course of the Class Period, some factors may not have been satisfied during shorter subintervals.

196.     As shown in Exhibit-4, examination of the *Cammer/Krogman* factors on a month-by-month basis demonstrates that Cassava stock was efficient in every month of the Class Period.

---

[165] Stulz Report, ¶68; and Stulz Deposition at 213:9 – 212:25.

[166] Stulz Deposition at 214:24 – 215:4, 215:15-18, 216:5-7 and 216:13-23.

[167] Stulz Report, ¶20.

b.        **Sufficient Analyst Coverage**

197.    In the Feinstein Report, I noted that there were at least six analyst firms that covered Cassava stock during the Class Period.[168] The presence of analysts, and their function within the marketplace, promotes the efficiency of the market for Cassava's securities.[169] I also noted that Cassava's analyst coverage was more extensive than the coverage by one or two analysts that Barber et al. [1994] found strengthened the presumption of efficiency for a publicly traded stock.

198.    In addition, I noted that at least 443 large investment firms owned Cassava stock during the Class Period[170] and that these large investment firms often employ financial analysts who conduct their own research on the securities they buy, thereby expanding analyst coverage.[171]

199.    Dr. Stulz observes that some analysts dropped coverage of Cassava during or near the end of the Class Period and suggests that the thinner analyst coverage could have made the market for Cassava stock inefficient.[172]

200.    Interestingly, Dr. Stulz suggests that the reasons analysts gave for suspending coverage support his questions about whether the market for Cassava stock may have been inefficient. Quite the opposite is true. The analysts who provided their reasons explained that it was on account of the Company's diminished prospects and increased uncertainty that stemmed from the controversy and misconduct alleged by Plaintiffs and market observers at the time. These reasons reflect Plaintiffs' allegations of misrepresentations, omissions, misconduct, and corrective disclosures in this case.

---

[168] Feinstein Report, ¶86

[169] Feinstein Report, ¶¶84-86.

[170] Feinstein Report, ¶89.

[171] Feinstein Report, ¶88.

[172] Stulz Report, ¶¶109-113.

"We are suspending our Neutral rating and $109 price target on shares of SAVA because of recent developments that we cannot effectively diligence with publicly disclosed documents. Given this new information, and in the absence of additional information that we can effectively diligence, we remain on the sidelines."
**"Simufilam Diligence Challenge Tough to Reconcile; Suspending Rating and PT," by Charles Duncan and Pete Stavropoulos, Cantor Fitzgerald, analyst report, 27 August 2021.**

"At this time, many of our assumptions about simufilam in Alzheimer's disease are awaiting clarifying information and data. As a result, we are suspending our price target."
**"P3 RETHINK-ALZ Enrollment Study Start Calendarizes Time to Data for Symptomatic Benefit Trial," by Charles Duncan and Pete Stavropoulos, Cantor Fitzgerald, analyst report, 6 October 2021.**

"There is continued uncertainty related to the simufilam data with five retracted papers in March 2022 by PLos ONE (author Hoau-Yan Wang, a professor at the City University of New York, Cassava collaborator). In addition, there is uncertainty related to the ongoing SEC investigation. Combined with the impact of the Citizen's Petitions which were initially filed in August 2021 (since denied, as announced by Cassava in February 2022), short reports and other factors, the net result seems to have materially impacted the ability of the ongoing phase 3 program in Alzheimer's disease to enroll patients, with only ~60 patients of the needed 1,750 enrolled as per a company update in March 2022."
**"Suspension of Coverage," by Jason McCarthy, Maxim, analyst report, 26 April 2022, p. 1.**

201.   That is, analyst behavior and commentary reflect Plaintiffs' allegations, and are consistent with a market reacting to disclosive information. Market participants reacting to disclosures is emblematic of an efficient market.

202.   Notwithstanding that some analysts suspended coverage, as I show in Exhibit-4 herein, there were usually at least four analysts covering Cassava stock during the Class Period, and there were always at least two. According to consensus estimates obtained from I/B/E/S for Cassava during the Class Period, there were between three and four analysts contributing to consensus estimates on 67.9% of the trading dates during the Class

Period.[173] As I documented in the Feinstein Report, coverage by two analysts is sufficient to support a conclusion of market efficiency according to peer-reviewed research.[174]

### c. In the *Cammer* Factor 5 Collective Event Study Cassava Stock Demonstrated That It Traded Efficiently

203. In the Feinstein Report, I empirically tested the efficiency of the market for Cassava stock with three collective event studies. In these tests, the stock demonstrated that it traded efficiently throughout the Class Period. The tests proved there was a cause-and-effect relationship between the release of new, value-relevant information and movements in Cassava's stock price. The news events in the event studies were Cassava Form 8-Ks, Cassava Form 8-Ks excluding earnings announcements, and the days with the highest count of news articles mentioning Cassava.[175]

204. In his deposition, Dr. Stulz was asked how a financial economist could establish empirically that a stock was efficient.

> "Q: How would you go about testing empirically whether a stock is efficient?
>
> A: It's not a question I would answer in general. I would have to learn about the stock, and I would have to think about issues that arise with the stock.
> …
> Q: -- there is no general -- generally accepted methodology in your mind for how you test for the efficiency of a stock?
> …
> A: -- that's not quite right. No. I mean, as I believe I say in my report, the direct test of market efficiency is how the stock incorporates information. So I would have to focus on how the stock incorporates information, which typically you would at least start looking at by looking at an event study on -- you would have to think about what kind of events you would want to look at, and that would be dependent on the stock."
> **Stulz Deposition at 39:18 – 40:17.**

---

[173] *See*, Feinstein Report, ¶85, I/B/E/S consensus estimates obtained from Refinitiv Eikon.

[174] Feinstein Report, ¶¶83-87.

[175] Feinstein Report, §VIII.B.3

205.   The empirical event study tests I ran are direct tests of Cassava stock's incorporation of information, and thus conform exactly to how Dr. Stulz states market efficiency should be tested and how market efficiency can be established.[176]

   **D.   Dr. Stulz Acknowledges that the Market for Cassava Stock Was Informationally Efficient**

206.   In his deposition, Dr. Stulz admitted that the market for Cassava stock reacted to new information released about Cassava, and that the Cassava stock price moved accordingly. Reacting to new information is the essence of informational efficiency.

> "Q: Are you aware of what the news on the company was on September 14, 2020?
> …
> A: September -- I mean, that's the beginning of the class. That's information related to the Trial 1 -- 2b.
> Q: And was this important news?
> …
> A: In that sense, it was important news.
> …
> A: The stock price increased on that day. The analysts had positive comments about what was going on.
> Q: So you agree that the stock price rose by a statistically significant amount on that day?
> A: I mean, I haven't done the event study myself. My recollection is that it rose significantly in Dr. Feinstein's study.
> Q: And doesn't that mean that the stock reacted to the information that was released on that day?
> …
> A: What is correct is that Cassava had information on that day on -- that was positive about Phase~2b of the development of its drug and that ***the market reacted to that***."
> **Stulz Deposition at 328:18 – 330:12 (emphasis added).**

207.   Dr. Stulz stated that it was not surprising that Cassava stock would fall on news that the Company was the subject of a criminal investigation. This is an implicit admission that he understands that the market for Cassava news would not ignore important information, but

---

[176] Stulz Deposition at 39:18 – 40:17.

rather would react to it. His expressed understanding of the market for Cassava stock is therefore that it was an informationally efficient market.

> "Q: Are you aware of what the news about the company was on July 27, 2022? … Is that important news?
>
> …
>
> A: Well, I mean, it is -- it is news, and it is potentially important.
>
> …
>
> Q: Okay. But you have no reason to dispute that the stock price declined by a statistically significant amount?
>
> A: I declined by a -- by a fairly large amount. So it would be surprising if it were insignificant in an event study.
>
> Q: So doesn't that mean that the stock reacted to the information that was released?
>
> …
>
> A: As I said, I mean, the stock of a company is likely to react negatively whenever the DOJ starts a criminal investigation, even if at the end of the day nothing criminal was done."
>
> **Stulz Deposition at 318:15 – 321:6.**

208.    In other deposition answers, Dr. Stulz acknowledged that it is a given that Cassava stock reacted to Company information, but that he did not know exactly which Company information the stock was reacting to. Regardless of which Company information Cassava stock was reacting to, Dr. Stulz's answer is another implicit admission that Cassava stock traded in an informationally efficient market.

> "Q: Are you aware of what the news was on this company, August 27, 2021?
>
> …
>
> A: That's Quanterix's issued -- I mean, Quanterix's issued statement, yes.
>
> Q: And was this important news?
>
> …
>
> A: I mean, it is a statement that may or may not have corrected something that Cassava said.
>
> Q: Was it positive or negative news?
>
> …
>
> A: I mean, if it corrected information that the market had viewed as positive, said by Cassava, then it wouldn't be positive news.

Q: And would you agree that the stock price declined by a statistically significant amount?

A: In Dr. Feinstein's event study, it declined on those days. I agree with that.

…

Q: So in answer to my question, doesn't that mean that the stock reacted to the information that was released?

…

A: There is a negative abnormal return on that day. Not to reach a complete conclusion, one would have to look at whether there is other information on that day. I don't remember other information at this point in time."

**Stulz Deposition at 321:7 – 323:23.**

### E.     Cassava Options Traded in an Efficient Market During the Class Period

209.    Dr. Stulz opines that "Dr. Feinstein fails to reliably establish that the Cassava options traded in efficient markets during the Proposed Class Period."[177] Dr. Stulz levies a number of criticisms at my analysis of the Cassava options market and my conclusion that the Cassava options traded in an efficient market over the course of the Class Period. However, none of Dr. Stulz's criticisms is valid. I stand by my conclusion.

210.    As explained in the Feinstein Report, the design of options is derivative and links them structurally to the underlying stock. It is a generally accepted principle of finance that options move with the underlying stock price. My analysis confirmed that this relationship holds for the Cassava options. Therefore, because the Cassava stock traded in an efficient market, with the Cassava stock price reacting to new Company information, the Cassava options also traded efficiently.

### 1.     Volume and Liquidity

211.    I summed up the dollar trading volume for all Cassava options over the course of the Class Period and found that this aggregate dollar trading volume was over $5.15 billion. Clearly, the market for Cassava options was active over the course of the Class Period.

---

[177] Feinstein Report, ¶114.

212.    Dr. Stulz contends that low trading volume may have impaired liquidity and, therefore efficiency for some Cassava option series.[178] But each series of options need not have high trading volume to be efficient. Option prices are linked to the underlying stock price by their design, and if an option price deviates substantially from the correct linked value, the action of arbitrageurs brings the option price back to the correct level. This principle is articulated in authoritative textbooks.

> "Option valuation models, like their counterparts in the forward, futures, and swaps markets, are based on the principle of no arbitrage, meaning that the appropriate price of an option is the one that makes it impossible for any party to earn an arbitrage profit at the expense of any other party. The price that precludes arbitrage profits is the value of the option."
> **"Valuation of Contingent Claims," by Robert Brooks and David Gentle, *CFA Derivatives Curriculum*, Vol. 5, 2019, p. 386.**

> "Out of this process, one and only one price can exist for the derivative. Otherwise, there will be an arbitrage opportunity."
> **"Basics of Derivative Pricing and Valuation," by Don Chance, *CFA Derivatives Curriculum*, Vol. 5, 2019, p. 464.**

> "[W]hen arbitrage opportunities exist, each investors wants to take as large a position as possible; hence, it will not take many investors to bring about the price pressures necessary to restore equilibrium."
> ***Investments*, by Zvi Bodie et al., 10th Edition, 2014, p. 328.**

213.    Even Dr. Stulz acknowledges that high volume is not necessary for arbitrage to enforce a pricing relationship.

> Importantly, for value-relevant information to be incorporated in a security's price, it does not have to be widely known or disseminated. All that is required is that some arbitrageurs have access to that information and are willing to trade on it up to the point where that information is incorporated into the stock price.
> **Stulz Report, ¶33.**

---

[178] Stulz Report, ¶117. An option series is a unique combination of expiration date and strike price.

Competition among investors incentivizes arbitrageurs to search for and trade on value-relevant information.
**Stulz Report, footnote 50.**

214.   In sum, as noted in Chance, et al. [2024], "because option prices are bound to stock prices structurally, and the relationship is enforced by arbitrage, options do not need high trading volume to trade efficiently."[179] Nonetheless, collectively, the market for Cassava's options did have high trading volume over the course of the Class Period.

### 2.      Bid-Ask Spreads and Liquidity

215.   Dr. Stulz contends that some options series had high bid-ask spreads, which made their transactions costs appear high. Dr. Stulz claims that high transaction costs, measured this way, could impair option market liquidity and therefore the efficiency for some Cassava option series.[180]

216.   This criticism is not valid, as by their very design, options are an inexpensive substitute for trading in the underlying stock. As option contracts postpone until exercise the payment for the underlying stock, the per share trading prices of options are much lower than the prices of the underlying stock. Options are therefore an economical substitute for trading in the underlying stock.

217.   Dr. Stulz observes that for some select option series, on some select days, the percentage bid-ask spread as measured relative to the midpoint of the respective bid and ask quotes was high.[181] That these bid-ask spreads appeared to be high is because Dr. Stulz measured them relative to the low option prices rather than relative to the much higher stock price. A $0.50 bid-ask on a $2 option represents a 25% bid-ask spread relative to the option price but would be only 1% if measured relative to the $50 stock the option is linked to. Further, the average option bid-ask spreads Dr. Stulz computed included options that had no trading volume, which is inappropriate as options that were not purchased during the Class Period do not meet the Class member definition. Deep out-of-the money options have low prices

---

[179] "The Class Certification of Exchange-Listed Options in Securities Class-Action Litigation," by Don Chance, Onnig Dombalagian, and Steven Feinstein, forthcoming in *University of Pennsylvania Journal of Business Law*, 2024.

[180] Stulz Report, ¶117.

[181] Stulz Report, ¶¶143-148 and Exhibit 12.

and generally have low or no volume, but they would have high bid-ask spreads if measured relative to the option price rather than the stock price.

218.   Relative to the underlying stock price the Cassava option bid-ask spreads were low. On a volume-weighted basis, which eliminates from the average those option contracts that had no volume, the average bid-ask spread quoted as a percentage of the contemporaneous stock price was 0.16% for the Cassava call options, and 0.72% for the put options. For the call and put options together, this bid-ask spread averaged 0.44%. These figures illustrate that the Cassava options were an inexpensive way for investors to take and trade positions related to Cassava stock – not expensive and not illiquid.

### 3.   The Finance Literature on the Efficiency of Options

219.   Dr. Stulz misrepresents the finance literature on the efficiency of options. He references a smattering of studies that have questioned fundamental efficiency in the options markets.[182] However, Dr. Stulz ignores the vast body of published work on options that has confirmed that option prices generally conform to accepted valuation models, are linked to the underlying stock price, adjust to new information and changes in the underlying stock price rapidly, preclude arbitrage, and even make the market for the underlying stock more efficient. The finance literature supports the conclusion that option valuation models work and that option markets are efficient.

> "Among all theories in finance, the Black-Scholes option pricing model has perhaps had the biggest impact on the real world of securities trading. Virtually all market participants are aware of the model and use it in their decision making. Academics regularly test the model's valuation on actual market prices and typically conclude that, while not every feature is accounted for, the model works very well in explaining observed option prices.
> **"Options Arbitrage in Imperfect Markets," by Stephen Figlewski, *The Journal of Finance*, Vol. 44, No. 5, 1989, pp. 1289-1290 (emphasis added).**

---

[182] Stulz Report, ¶¶132-133.

220. The Black-Scholes option pricing model was published in 1973.[183] Early studies subsequently looked at whether exchange-listed options conformed to pricing rules and models that would prohibit investors from earning easy profits via arbitrage, the existence of which would suggest inefficiency. These studies supported the proposition that option markets are efficient. These articles include Galai [1977],[184] Macbeth and Merville [1979],[185] Klemkosky and Resnick [1979, 1980],[186] Whaley [1982],[187] Bhattarcharya [1983],[188] and Rubinstein [1985].[189]

221. Patell and Wolfson [1981],[190] Manaster and Rendleman [1982],[191] and Anthony [1988][192] examined the speed at which options incorporate new information about the underlying company. Patell-Wolfson [1981] found that options begin to reflect earnings announcements rapidly. Manaster and Rendleman [1982] and Anthony [1988] found that options markets incorporate some information actually faster than the stock market. Chan,

---

[183] "The Pricing of Options and Corporate Liabilities," by Fischer Black and Myron Scholes, *Journal of Political Economy*, Vol. 81, No. 3, May 1973.

[184] "Tests of Market Efficiency of the Chicago Board Options Exchange," by Dan Galai, *The Journal of Business*, Vol. 50, 1977, pp. 167-107.

[185] "An Empirical Examination of the Black-Scholes Call Option Pricing Model," by J. D. Macbeth and L. J. Merville, *The Journal of Finance*, Vol. 34, 1979, pp. 1173-1186.

[186] "Put-Call Parity and Market Efficiency," by R.C. Klemkosky and B.G. Resnick, *The Journal of Finance*, Vol. 34, 1979, pp. 1141-1151; and "An Ex-Ante Analysis of Put-Call Parity," by R.C. Klemkosky and B.G. Resnick, *Journal of Financial Economics*, Vol. 8, 1980, pp. 363-378.

[187] "On the Valuation of American Call Options on Dividend Paying Stocks: Empirical Tests," R.E. Whaley, *Journal of Financial Economics*, Vol. 19, 1982, pp. 29-58.

[188] "Transaction Data Tests of Efficiency of the Chicago Board Options Exchange," by M. Bhattarcharya, *Journal of Financial Economics*, Vol. 12, 1983, pp. 161-185.

[189] "Nonparametric Tests of Alternative Option Pricing Models Using All Reported Trades and Quotes on the 30 Most Active CBOE Option Classes from August 23, 1976 through August 31, 1978," by M. Rubinstein, *The Journal of Finance*, Vol. 40, 1984, pp. 453-480.

[190] "The Ex Ante and Ex Post Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices," by J.M. Patell and M.A. Wolfson, *Journal of Accounting Research*, Vol. 19, 1981, pp. 434-458.

[191] "Option Prices as Predictors of Equilibrium Stock Prices," by S. Manaster and R.J. Rendleman, Jr., *The Journal of Finance*, Vol. 37, 1982, pp. 1043-1057.

[192] "The Interrelation of Stock and Options Market Trading-Volume Data," by J.H. Anthony, *The Journal of Finance*, Vol. 43, 1988, pp. 949-964.

Chung, and Johnson [1993] found that option bid and ask quotes, which are the prices at which market makers stand by to trade, respond rapidly to new information.[193]

222. Several studies found that option markets help make the underlying stock market more efficient. Papers arriving at this conclusion include Jennings and Starks [1986],[194] Bhattacharya [1987],[195] Figlewski and Webb [1993],[196] and Kumar, Sarin, and Shastri [1998].[197]

223. Even Dr. Stulz wrote a paper concluding that options markets improve the efficiency of the market for the underlying stock.

> "A second important benefit from derivatives is that they can make underlying markets more efficient."
> **"Should We Fear Derivatives?" by Rene Stulz, *Journal of Economic Perspectives*, Vol. 18, No. 3, 2004, p. 180.**

### 4.    *Cammer/Krogman* Factors

224. Dr. Stulz objects that I did not do the same *Cammer/Krogman* factor analysis for the Cassava options that I conducted for the Cassava stock.[198] This is not a valid criticism, as most of the *Cammer/Krogman* factors are company-specific characteristics that, if satisfied for the stock, are also satisfied for the options, and because options are linked to their underlying stock price by design and arbitrage activity. Additionally, because of how options are designed as derivative securities, certain *Cammer/Krogman* factors and thresholds do not apply to options. What is more important for options is their link to the

---

[193] "Why Option Prices Lag Stock Prices: A Trading-Based Explanation," by K. Chan et al., *The Journal of Finance*, Vol. 48, No. 5, 1993, pp. 1957-1967.

[194] "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," by Robert Jennings and L. Starks, *The Journal of Finance*, Vol. 41, No. 1, 1986, pp. 107-125.

[195] "Price Changes of Related Securities: The Case of Call Options and Stocks," by M. Bhattacharya, *Journal of Financial and Quantitative Analysis*, Vol. 22, No. 1, 1987, pp. 1-15.

[196] "Options, Short Sales, and Market Completeness," Stephen Figlewski and G. P. Webb, *The Journal of Finance*, Vol. 48, No. 2, 1993, pp. 761-777.

[197] "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," by R. Kumar et al., *The Journal of Finance*, Vol. 53, No. 2, 1998, pp. 717-732.

[198] Stulz Report, ¶117.

underlying stock, and that is what my analysis and generally accepted finance principles establishes.

225.   Nonetheless, the Cassava options do satisfy the *Cammer*/*Krogman* factor tests to the extent those factors are applicable to options. First, it is indisputable that the Cassava option market exhibited active trading with high aggregate trading volume. That some options whose strike prices were far from the current stock price did not have high volume is not evidence of inefficiency, because, even as Dr. Stulz admits, the arbitrage mechanism that enforces the correctness of option trading prices does not require high volume.

226.   The same analyst coverage that gathered, disseminated, and digested information for the Cassava stock market serves that same purpose for the Cassava options.

227.   Regarding the market-making infrastructure, the Cassava options traded on the CBOE, a renown state-of-the-art exchange. The *Cammer* court recognized that securities that traded on the CBOE could be presumed to be trading in an efficient market:

> "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."
> **Cammer, 711 F. Supp. at 1292 (quoting Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, §8.6 (1988)).**

228.   Cassava's S-3 registration eligibility indicates efficiency for all Cassava Securities, because the eligibility criteria ensures that information about the Company was widely available and many market participants review that information.[199] For the same reasons Cassava's S-3 registration eligibility indicates that Cassava stock traded in an efficient market, that eligibility indicates that the options traded in an efficient market.

229.   Cassava's market capitalization and float indicate that it was not a small obscure company ignored by market participants. The same market attention that the Company's market capitalization and float garnered for the stock also garnered attention for the options. Because of the structural link between option prices and the underlying stock price, it is irrelevant that the total outstanding value of the options may not have been as great as the

---

[199] Feinstein Report, ¶105.

total outstanding value of the stock. As long as the stock trades efficiently, arbitrage enforces that so do the options.

230. Examination of the *Cammer*/*Krogman* factors compels the conclusion that the Cassava options traded in an efficient market.

### 5.    Homogeneity of Options Contracts

231. Dr. Stulz criticizes me for examining the various option contracts collectively rather than individually. He maintains that there were 15,016 "unique and separate financial instrument," which each must be evaluated separately for efficiency.[200]

232. Dr. Stulz is wrong for multiple reasons. While he notes that the option series differed in terms of strike prices and expiration dates, he disregards that their common characteristics unite the market for Cassava options. All are tied to the same underlying stock; all have identical functional forms (payoff formulas, for calls and puts respectively); all are tradeable on the CBOE; all are valued using the same pricing model inputs; all benefit from the same Company information sources; all have valuations informed by the same analyst coverage; all have valuations informed by the same Company filings and announcements (including misrepresentations); all are highly visible on account of the Company's market capitalization and float; and all are frequently substituted for one another by investors. The homogeneity among the Cassava option series far exceeds their distinguishing characteristics (which are limited to strike price and expiration date).

233. In paragraph 216 of his report, Dr. Stulz acknowledges that all of Cassava's options can be valued commonly with the "binomial model or Black-Scholes formula," and the valuations depend commonly on, among other things "the expected volatility of the underlying stock."[201]

234. Contrary to Dr. Stulz's contention, there are not 15,016 separate Cassava option markets, one for each unique combination of strike price and expiration date.[202] As noted in the finance literature and in the Cassava options data, most option trading takes place in the

---

[200] Stulz Report, ¶¶151-153.

[201] Stulz Report, ¶216.

[202] Stulz Report, ¶152 and Exhibit 14.

series that are at or near "the money" (meaning the option contracts whose strike prices are close to the current stock price at the time of the trade). As the stock price changes, new series that are at or near the money are introduced, but the old contracts that used to be at the money are not extinguished. The fact that the market for Cassava options was populated by many contracts with different strike prices is a result of the large sweep of prices covered by Cassava stock over the Class Period. These are not separate markets that each need to be studied individually. The options were all listed on the CBOE, shared the same market makers, were governed by the same rules, and were tied to the same underlying stock (Cassava). The information-dissemination infrastructure benefiting the Cassava stock similarly benefited all of the Cassava options collectively. The analysts gathering and processing information about Cassava, which helped make the market for the Cassava stock efficient, similarly promoted the efficiency of all the Cassava options collectively.

235.   As Dr. Stulz acknowledges, traders often combine multiple linked securities into a single investment position.[203] Traders who construct option combination positions transact in a single options market. They do not have to go to different markets to execute the option trades.[204]

### 6.   The Option Event Studies

236.   As reported in the Feinstein Report, I conducted a series of event studies on the Cassava options.[205] The event studies proved that Cassava's option prices reacted to Company news and thereby demonstrated market efficiency.

### a.   Constructing Synthetic Stocks from Option Combinations is a Necessary and Valid Variable Transformation

237.   Dr. Stulz criticizes my event study for using synthetic stocks constructed from options. He disregards that combining options into synthetic stock is both necessary for econometric methodological reasons and is justified by generally accepted option pricing principles.

---

[203] Stulz Report, ¶217.

[204] "The Class Certification of Exchange-Listed Options in Securities Class-Action Litigation," by Don Chance, Onnig Dombalagian, and Steven Feinstein, forthcoming in *University of Pennsylvania Journal of Business Law*, 2024.

[205] Feinstein Report, ¶¶20, 207, 210, 213, 217.

238.    As explained in the Feinstein Report, the statistical dynamic properties of options – their volatility and the magnitude of their linkage to the underlying stock price (known as the option "delta") – change as the stock price changes and as their expiration date approaches.[206] Regression analysis and event study testing require stationary dynamics. Consequently, to run a valid event study on options, one must combine the options in a way to produce a variable that has stationary dynamics.

239.    In his own report, referencing authoritative texts, Dr. Stulz acknowledges and explains the foundational principle that allows options to be combined to form synthetic stock.[207]

> "Specifically, an investor can replicate owning a share of stock by buying a (European) call option, selling a corresponding put, and investing at the risk-free interest rate. An investor can replicate shorting a share of stock by selling a (European) call option, buying a corresponding put, and borrowing the present value of the strike price and expected dividends at the risk-free rate. See Hull (2015), p. 242 ('This relationship is known as put–call parity. It shows that the value of a European call with a certain exercise price and exercise date can be deduced from the value of a European put with the same exercise price and exercise date, and vice versa.'). See also, Ross et al. (2010), p. 684 ('This relationship now states that you can replicate the purchase of a share of stock by buying a call, selling a put, and buying a zero-coupon bond.')."
> **Stulz Report, footnote 246.**

240.    Combining Cassava options to construct synthetic stock, so that the returns have stationary dynamics, is an example of the generally accepted variable transformation technique that is widely used in econometrics to construct variables on which valid regression analysis can be conducted. The following are excerpts from the econometric literature that supports and prescribes variable transformation so that the statistical analysis is valid.

> "If by transforming one or more variables a nonlinear function can be translated into a linear function in the transformed variables, OLS estimation procedures can be applied to the transformed data."
> ***A Guide to Econometrics***, by Peter Kennedy, 6th Edition, Blackwell Publishing, 2008, p. 95.

---

[206] Feinstein Report, ¶¶195-196.

[207] It does not matter that Cassava's options are American-style rather than European-style, as explained below.

"Transformations of variables can be employed frequently to make the data conform to the linear regression model. When the regression relation is not linear, for instance, it is often possible to linearize it by transforming the independent variable. In other cases, lack of linearity and nonconstant error variance are both found to be present. In those cases, a transformation of the dependent variable may be helpful. In still other cases, both the dependent and the independent variables may need to be transformed."
*Applied Statistics*, by John Neter et al., 4th Edition, Simon & Schuster, 1993, p. 586.

"There are data sets that violate one or more of underlying premises 2, 3, and 4 for which a *transformation* of the data from their original values (X) to values (call them X′) that constitute a data set more closely satisfying the assumptions. … Many authors provided early recommendations on the use of data transformations that have become commonly used (*e.g.*, Bartlett, 1947; Box and Cox, 1964; Kendall and Stuart, 1966: 87-96; Thöni, 1967). This chapter will concentrate on three of those transformations."
*Biostatistical Analysis*, by Jerrold Zar, 5th Edition, Prentice Hall, 2010, pp. 286-287.

241. The price dynamics of individual options change from day to day, making it impossible to conduct an event study on the returns of an individual options contract with a valid *t*-test for statistical significance. However, combining the options, as I did, produces a time series of synthetic stock prices that has stationary price dynamics on which one can run valid regressions and a reliable event study.

### b. Option Quote Data Is Reliable for Assessing Market Efficiency

242. Dr. Stulz criticizes my option event study because it employs end-of-day bid and ask quotes rather than transaction prices.[208] This criticism is off base. Market maker quotes are a reliable metric for measuring pricing in the options market. They are especially reliable for assessing market efficiency.

243. Market-maker bid and ask quotes are the prices at which market makers are willing to buy or sell. They are the prices at which traders would transact should they wish to execute a trade. In that sense, they are an excellent gauge of how the option market reacts to new information. Whereas a closing trading price might contain a price established earlier in the day, end-of-day quotes reflect the market's prices and response to that day's news as of the close of trading.

---

[208] Stulz Report, ¶135.

244.    Options quotes are updated quickly and frequently. Automation and computer algorithms employed by option market makers facilitate the rapid updating of option price quotes. A study by Andersen, et al. [2021] found that Apple, Inc's option bid and ask prices are updated 9,000 per second.[209] This frequency of quote updating is itself an indicator option market efficiency. It also exemplifies that option market makers nowadays use sophisticated technology to automatically and rapidly update option prices to adjust to changes in the underlying stock price.

245.    My methodology of employing option market quotes to analyze the Cassava options market is consistent with peer-reviewed methodology. As noted above, the study by Chan, Chung, and Johnson [1993] also used market maker quotes to gauge option market efficiency.

### c.    European and American Style Options

246.    Dr. Stulz attacks my option event-study methodology because Cassava's options are American style, while the put-call parity method I used for constructing synthetic stock prices theoretically holds only for European style options.[210] European style options are those options that can only be exercised on the option expiration date. American options can be exercised any time up to or on the expiration date. American options carry a slight valuation premium on account of this early exercise feature.

247.    Dr. Stulz's criticism could only be valid if I were basing my conclusions on the level of the synthetic stock prices rather than on the changes from day-to-day of the synthetic stock prices, i.e., the synthetic stock returns, which I am not. Any measurement error in the synthetic stock prices due to the options being American style rather than European become inconsequential when the event study focuses on the daily changes in the synthetic stock prices. The measurement error effectively washes out.

---

[209] "A Descriptive Study of High-Frequency Trade and Quote Options Data," by Torben Andersen et al., *Journal of Financial Econometrics*, Vol. 19, 2021, table 3.

[210] Stulz Report, ¶140.

248.   Not only is the value of the early-exercise feature of American options small relative to an option's overall value,[211] but it is only the difference between the call's and put's early exercise feature values that remains in a synthetic stock price constructed from American options. Additionally, not even this lingering remainder is in the event study returns, because returns are the change in price from one day to the next. Thus, the only measurement error caused by using American options is the change in this immaterial remainder from one day to the next. Using American options rather than European options thus has no consequential effect on the returns of synthetic stock in an event study. This is confirmed by the literature on early exercise value and by the mathematics of the return construction. Dr. Stulz did not present any calculations to suggest otherwise.

249.   Furthermore, any measurement error in synthetic stock returns due to the early-exercise feature of American options is so slight that it is accommodated by and incorporated into the noise component of the event study regression. The proof of this fact is that even with this potential noise component, the Cassava synthetic stock exhibited significant returns on virtually all of the same days during the Class Period when the actual stock had a statistically significant return.

250.   Using the regressions run for the 8-K event studies, the Cassava stock return was statistically significant on 36 of all Class Period days. The synthetic stock return was statistically significant on 35 of those 36 days, and statistically significant on three additional ones. Using the regression from the top news article event study, the actual stock was statistically significant on 35 of all Class Period days. The synthetic stock was statistically significant on 34 of those same days. This nearly coextensive result is additional confirmation that the Cassava options did track the Cassava stock and with but one exception, moved significantly when the stock did.

251.   Interestingly, from among the 34 Class Period days designated by Dr. Stulz as high social media days, the actual stock was statistically significant on 9 days according to the 8-K event study regressions, and 10 days according to the top news article regression. The synthetic stock was statistically significant on all of these same days. Because as shown

---

[211] "Directly Measuring Early Exercise Premiums Using American and European S&P 500 Index Options," by Michael Dueker and Thomas Miller, Jr., *The Journal of Futures Markets*, Vol. 23, No. 3, 2003, pp. 287-288. ("[W]e find average early exercise premiums ranging from 5.04 to 5.90% for calls, and from 7.97 to 10.86% for puts").

above, most of the days Dr. Stulz designated as having no news actually did have important Cassava news, the significant reactions of the options (as evident in the significant reactions of the synthetic stock) on these days are additional evidence of the efficiency of the market for Cassava's options.

252.    If anything, an additional noise component in the synthetic stock prices would have biased the event study away from finding that the synthetic stock tracked the common stock and observably reacted to information in the same manner as the common stock. The fact that the significance results were strong nonetheless proves that using American options rather than European options in the construction of synthetic stock prices with the put-call parity formula had no material effect.

253.    Furthermore, in the Feinstein Report, I computed the correlation between Cassava stock returns and Cassava synthetic stock returns during the Class Period. The correlation was 99.77%. This is additional compelling proof that the synthetic stock tracked the actual stock, that options reacted to the same information as the stock, and that any noise introduced into the synthetic stock price from the American-style early exercise feature of Cassava's options, had negligible effect.

254.    These results demonstrate that the Cassava options appropriately tracked the Cassava common stock, and in turn, that the market for the Cassava options was an efficient market throughout the Class Period.[212]

255.    While real world details can diverge somewhat from the theoretical assumptions of option pricing models, it is generally accepted that the pricing consequences of any such deviations are small. The literature on options valuation, including an article by Fisher Black, one of the originators of modern option pricing, makes exactly this point.

> "The Black-Scholes formula is still around, even though it depends on at least 10 unrealistic assumptions. Making the assumptions more realistic hasn't produced a formula that works better across a wide range of circumstances."
> **"How to Use the Holes in Black-Scholes," by Fischer Black, *Journal of Applied Corporate Finance*, Vol. 1, No. 4, 1989, p. 67.**

---

[212] Feinstein Report, ¶215.

256.   If Dr. Stulz's point is alternatively that the value of the early exercise feature in Cassava's options reacted **systematically** to the information content on the news event dates (Form 8-K and top news dates), and thus was **responsible** for the finding that Cassava's options reacted significantly to the same announcements that moved the stock, he necessarily concedes that the option prices promptly reflected available information and were thus efficient.

257.   In sum, the options event study tests presented in the Feinstein Report are valid for both European and American options and demonstrate that Cassava options reacted to information and also tracked the actual stock price. This empirical result establishes that the Cassava options traded in an efficient market throughout the Class Period.

### d.   Congruity Between Actual and Synthetic Stock Prices

258.   Dr. Stulz says that some Cassava options on some days had prices that if transformed into synthetic stock prices individually, would produce synthetic stock prices that differed markedly from the contemporaneous actual stock price.[213] Dr. Stulz suggests that these occasional differences may indicate inefficiency, and thus that all option contracts must be analyzed individually rather than collectively. Even if there are a few anomalous observations among the 492,472 observations in the Class Period database of Cassava option prices, it is inappropriate for Dr. Stulz to fixate on outliers rather than the pervasive norms, especially when the anomalous observations come from option series that are deep in or out of the money.

259.   Further, I have conducted additional analysis to investigate and characterize the norm for Cassava option pricing. As most option trading takes place in at- or near-the-money options, I computed a series of synthetic stock prices from each day's option that had at least 30 days to expiration and was closest to the money (meaning its strike price was closest to the stock price). I then measured how far from the actual stock price was each day's synthetic stock price, thusly computed. The distance was measured as the absolute value of the difference between the actual stock price and the synthetic stock price divided by the actual stock price.

---

[213] Stulz Report, ¶¶118, 156-158 and 214.

260. Exhibit-5 presents the results of my analysis. The median difference was only 1.09%. The average difference was 1.51%. Ninety percent of the daily synthetic stock prices deviated from the corresponding actual stock price by less than 3.60%. These slight differences in price levels are on such a low order of magnitude to conclude they may derive from the early exercise feature or transactions costs. These numbers, not the anomalous outliers Dr. Stulz found, correctly characterize the market for Cassava's options. The put-call parity relationship held reasonably closely.

261. It is noteworthy that these pricing deviations are much smaller than percentage price movements in Cassava stock and synthetic stock on the days when their residual returns were statistically significant. The average of the absolute value of the percentage stock returns on the significant return days during the Class Period was 30.7% for the actual stock and 30.2% for the synthetic stock.[214] This comparison shows that the spreads between the synthetic and actual stock prices were small relative to the price movements caused by impactful information.

### F.   Section 10(b) Damages in This Matter Can Be Computed for All Class Members Using a Common Methodology That Is Consistent with Plaintiffs' Theory of Liability

262. Dr. Stulz does not dispute that the out-of-pocket damage methodology is widely used to compute damages in virtually all class action securities fraud cases, and that it is approved in published legal scholarship.[215] Dr. Stulz even acknowledges that my description of the methodology addresses how it can accommodate and overcome potential complexities of precisely the sort he suggests may theoretically be encountered in this case.[216]

263. Rather, Dr. Stulz's criticism is that my description of the out-of-pocket damage methodology could be more detailed as to how the valuation analysis could address damages associated with different categories of allegations, potentially confounding information, the stock price in the but-for scenario, and time-varying inflation.[217] However,

---

[214] The identification of which days had statistically significant residual returns was based on the regression used in the 8-K event study. The results are similar if the other regressions were used instead.

[215] Feinstein Report, ¶222.

[216] Stulz Report, §IX.A.

[217] Stulz Report, §§IX.A - IX.D.

Dr. Stulz does not identify a single factor that cannot be addressed using one or more of the generally accepted valuation tools, which include those referenced in the Feinstein Report. As stated in the Feinstein Report (and summarized again below), such valuation tools are commonly employed to construct an inflation ribbon in the course of implementing the out-of-pocket damage methodology. Indeed, Dr. Stulz's criticism disregards that market participants routinely arrive at valuations for virtually any type of publicly traded security in real time using the same valuation tools that are readily applicable to estimate but-for prices in a securities class action such as this. I have found no particularly unusual complexities in this case that would cause me to reach a different opinion, and Dr. Stulz identified none.

264.   Dr. Stulz comingles criticism of my description of the out-of-pocket damage methodology for options with his arguments pertaining to market efficiency. Given that my analysis has established that both the market for Cassava's stock and Cassava's options were efficient, none of Dr. Stulz's assertions cause me to alter my conclusion that damages in this matter can be computed on a Class-wide basis for all Class members.

265.   In sum, Dr. Stulz speculates that it may be difficult to construct an inflation ribbon that accurately reflects the difference between the security price that actually prevailed in the marketplace (as impacted by the misrepresentations and omissions) and the but-for price (that would have prevailed in a hypothetical scenario where there were no misrepresentations and omissions, or sufficient transparency such that misrepresentations and omissions were not misleading). But by identifying what a correct analysis should consider, Dr. Stulz provides what he believes are instructions for correct construction of the inflation ribbon, and thusly concedes that such construction is possible in this matter.

### 1.   The Out-of-Pocket Damage Methodology Is Fully Articulated in the Feinstein Report

266.   Dr. Stulz asserts that my description of the out-of-pocket damage methodology is vague and "does not represent a methodology that a financial economist could implement to reliably measure damages."[218] Dr. Stulz's assertions are erroneous. The Feinstein Report fully articulates the out-of-pocket damage methodology in a clear, concise, and detailed

---

[218] *See*, Stulz Report, ¶169 and §IX.A.

manner. In the Feinstein Report, I explained that "out-of-pocket damages are measured as the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale or, if held, at the end of the Class Period, taking into account formulaic prescriptions in relevant case law and statutes."[219] The out-of-pocket damage methodology is the same in virtually all securities fraud class actions alleging misrepresentations and omissions, and fits the facts, circumstances, and liability theory of the instant case. I explained that the calculation of each Class member's damages would be a mechanical arithmetic exercise, conducted the same way for all Class members, applying the results of the Class-wide analyses described in the Feinstein Report (and again below) to each Class member's trading data.[220]

267.   The Feinstein Report detailed the steps of the out-of-pocket damage methodology as follows:

> "First, valuation tools, which would include event study analysis, and potentially other empirical analyses, if necessary, would be used to establish if corrective disclosures caused the price of the Cassava Securities to fall. This analysis, after controlling for potentially non-fraud-related information, would establish whether the fraud had caused the security price to be artificially inflated, and if corrective disclosure caused that artificial inflation to dissipate, in turn causing investor losses. This analysis would apply on a Class-wide basis."

---

[219] Feinstein Report, ¶225.

[220] Feinstein Report, ¶230.

"Second, an inflation ribbon would be constructed, using generally accepted empirical analysis and valuation tools, indicating how much artificial inflation caused by the alleged fraud was in the price of the Cassava Securities on each day during the Class Period, if any. An inflation ribbon is a time series of the difference between a security's actual price observed in the marketplace, and the estimated price that the security would have traded at each day had there been full disclosure. Construction of the inflation ribbon generally employs event study analysis, combined with widely used and generally accepted valuation tools. The inflation ribbon is often constructed by working chronologically backwards from the final corrective disclosure back to the start of the Class Period, accounting for alleged fraud-related residual price declines as they occurred. Inflation prior to a corrective disclosure that dissipated inflation is greater than the inflation afterward by the amount of inflation that dissipated. The corrective disclosure that finally eliminates all remaining artificial inflation may occur at or after the end of the Class Period."

"Supplementing event study results, the full array of generally accepted and widely used valuation tools can be applied, if necessary, to calculate the but-for security prices under the assumption of prior full disclosure. This analysis would also apply on a Class-wide basis."

"This analysis enables computation of the artificial inflation ribbon even in cases where there is confounding information, changes in the concealed information, and changes in the value of the concealed information, among other potential complexities. This analysis would also apply on a Class-wide basis. My reading of the Plaintiffs' allegations and my review of the experience of the Company over the course of the Class Period uncovered no facts or circumstances that are extraordinarily unusual or might make application of this methodology exceptionally difficult."

"Third, the measure of per-security damages generally applied in Section 10(b) cases is the reduction in the inflation ribbon over an investor's holding period (the economic/inflation loss). That is, for each Class member, per-security damages would be calculated as the difference between the inflation on the date the securities were purchased and the inflation on the date those same securities were subsequently sold."

"Per-security damages are limited, however, to be no greater than the decline in the security price over the investor's holding period, which is the investment loss actually sustained."

"Pursuant to the Private Securities Litigation Reform Act of 1995 (15 U.S.C. §78u-4(e)), for purposes of computing the investment loss limitation on damages, for any securities sold during the 90-day period after the final corrective disclosure, the investment loss is computed as if the selling price was the greater of the actual selling price or the average closing price following the final corrective disclosure up to the sale date. For any securities held 90 days or more beyond the final corrective disclosure, the investment loss is computed as if the securities were sold for the average closing price over the 90 days following the final corrective disclosure."

"The calculation of each Class member's per-security damages would be a mechanical arithmetic exercise for all Class members who bought Cassava Securities during the Class Period, conducted the same way for all Class members, applying the results of the Class-wide analyses described above to each Class member's security trading data."
**Feinstein Report, ¶230(i)-(viii).**

268.   The Feinstein Report specifically identifies many of the practical and routinely used valuation tools, in addition to event study analysis, that are available to a financial economist constructing an inflation ribbon when implementing the out-of-pocket damage methodology.

"Valuation analysis is undertaken continuously, every day, for virtually every publicly traded security, and these tools address the very complexities that could potentially be encountered in the course of computing inflation and damages in this case. Valuations assuming alternative scenarios are commonly conducted by analysts and investors."
**Feinstein Report, ¶228.**

"Among the commonly used valuation tools that are available to investors and analysts in real time, and forensic analysts when computing damages, are, for example: valuation multiple models, such as those based on earnings, earnings before interest, tax, depreciation and amortization (EBITDA), revenue, book value, and cash flow; discounted cash flow (DCF) models; scenario analysis; generally accepted option pricing formulas; and the literature regarding valuation effects of various factors such as reputation, transparency, governance, and the quality of internal controls. In addition, forensic analysts have the added advantage of being able to use event study analysis, which quantifies the price effects that occurred when information did reach the market."
**Feinstein Report, ¶229.**

269. Dr. Stulz does not dispute that these valuation tools exist, and that these tools can supplement the event study, if necessary, to construct an artificial inflation ribbon in this case. The degree of granularity in the identification of every valuation tool that may or may not be used in the construction of an inflation ribbon, for which Dr. Stulz advocates, cannot be provided until the damages analysis is actually undertaken. No expert or forensic financial analyst can state with specificity what valuation tools and techniques will definitely be used to accommodate potential valuation complexities until the record is developed and one can see which specific valuation complexities do arise, if any.

270. Nonetheless, the potential valuation complexities that Dr. Stulz identifies, which may or may not be encountered when the inflation ribbon is constructed at the merits stage, can most assuredly be accommodated by standard tools of valuation. Analysts and investors value virtually all publicly traded securities continuously, reacting to changing information and also positing likely future values under a wide variety of alternative possible scenarios. Valuation is rarely impossible.

271. The equity analysts covering Cassava similarly valued Cassava stock under a range of potential alternative scenarios.

### 2.  The Out-of-Pocket Damage Methodology in the Feinstein Report Is Consistent with Plaintiffs' Theory of Liability

272. The out-of-pocket damage methodology, presented in the Feinstein Report (and again here), is consistent with Plaintiffs' theory of liability in the instant matter. Plaintiffs' theory of liability is that Defendants' misconduct artificially inflated the price of Cassava stock, such that investors overpaid for the stock and call options and received depressed prices when writing put options.[221] Plaintiffs further allege that when the truth was revealed, the price of Cassava stock declined as the artificial inflation dissipated from the stock price.[222] The overpayment and subsequent price declines in the stock and call options (and corresponding distortions in the put option prices), caused by Defendants' misconduct, caused Plaintiffs and Class members to sustain losses and thereby suffer damages.[223]

---

[221] *See, e.g.*, Complaint, ¶¶495-496.

[222] *See, e.g.*, Complaint, ¶¶495, 497, 499, 501, 503, 505, 507 and 508.

[223] *See, e.g.*, Complaint, ¶¶495 and 508.

273.   The out-of-pocket damage methodology measures specifically this loss caused by the introduction and subsequent dissipation of artificial inflation in the stock price. This damage methodology is therefore consistent with Plaintiffs' theory of liability. The methodology is applied commonly for all Class members.

### 3.   Dr. Stulz's Criticism of the Out-of-Pocket Damage Methodology Amounts to Baseless Speculation That the Methodology Will Be Executed Incorrectly

274.   Dr. Stulz does not actually criticize the out-of-pocket damage methodology. He does not dispute that the out-of-pocket damage methodology is appropriate in the instant case. In fact, Dr. Stulz implicitly accepts that this damage methodology exists, and can be implemented correctly to compute damages commonly for all Class members, when he points out what must be addressed to implement it.[224] Dr. Stulz's criticism amounts to misdirected, erroneous, and unsupported speculation that this generally accepted and appropriate methodology might not be executed correctly if the but-for security prices and artificial inflation are valued incorrectly.

275.   Specifically, Dr. Stulz contends:

> "Dr. Feinstein Has Not Explained How His Damages Methodology Could Enable Him to Compute Inflation Separately for Each Category of Plaintiffs' Alleged Misrepresentations"
> **Stulz Report, §IX.B.**

> "Dr. Feinstein Has Not Articulated How He Will Isolate Damages Attributable Only to Plaintiffs' Theory of Liability"
> **Stulz Report, §IX.C.**

> "Dr. Feinstein Has Not Articulated How He Will Derive a Reliable Measure of Inflation Throughout the Proposed Class Period Given the Changing Information Mix and Pattern of Price Movements of Cassava's Stock"
> **Stulz Report, §IX.D.**

---

[224] *See, e.g.*, Stulz Report, ¶¶174, 201 and §IX.

276.   These criticisms are erroneous as they are based on premature speculation, as explained next.

### a.   Linking Corrective Disclosures to Specific Misrepresentations and Omissions Is Unnecessary and Speculative at This Stage

277.   Dr. Stulz argues that I have not explained how I would link the corrective disclosures to specific misrepresentations, which Dr. Stulz submits is important given that the finder of fact may "find Cassava liable for only a subset of the categories of alleged misrepresentations."[225] Dr. Stulz goes on to question how the inflation ribbon would reflect Plaintiffs' "four distinct categories" of alleged misrepresentations and the corrective disclosures that corrected those categories of alleged misrepresentations.[226]

278.   First, Dr. Stulz's surmising about what a trier of fact might find is pure speculation.

279.   Second, Dr. Stulz eschews Plaintiffs' factual allegations that Defendants issued a series of materially false and misleading statements and omissions as part of a fraudulent scheme and artificially inflated the Cassava security prices.[227] I explained in my deposition testimony that, while it is premature and even potentially unnecessary to assess which misrepresentations were corrected by which disclosures, Plaintiffs' theory of liability is that Defendants perpetrated a scheme that inflated the Cassava security prices, and had the market learned through corrective disclosures that there was a scheme, artificial inflation would dissipate. A one-for-one linking of misrepresentations and corrective disclosures is unnecessary prior to executing a loss causation and damage analysis, and may not be necessary during a loss causation and damages analysis on account of Plaintiffs' theory of liability.

   "Q: Which alleged misrepresentations caused inflation in the stock price?

---

[225] Stulz Report, §IX.B.

[226] Stulz Report, ¶¶179-186. That there are "four distinct categories" of misrepresentations and omissions is a taxonomy constructed by Dr. Stulz alone. My understanding is that Plaintiffs view all of the misrepresentations and omissions as pertaining to the same fraudulent scheme.

[227] *See, e.g.*, Complaint, ¶¶3, 71, 72, 438, 495 and 508-509.

A: I -- I haven't done the analysis yet. I haven't done the loss causation analysis yet, but that's my understanding of the theory of liability; that if had it not been for the alleged misrepresentations and omissions that perpetrated and concealed a scheme, the stock price would not have been inflated. Therefore, the alleged fraud caused and then -- caused inflation. And as long as that scheme was being perpetrated and concealed, it also maintained the inflation.

Q: What is your understanding as to which alleged misrepresentations caused inflation in the stock price as opposed to maintain inflation in the stock price? …

A: I haven't sorted them out that way. They're – they're spelled out in the complaint. But some caused and some maintained. In the analysis, the loss causation analysis, and the damages analysis, applying the out-of-pocket methodology would make that determination."
**Feinstein Deposition at 239:24 – 240:19.**


"Q: Do you have an understanding as to which bucket, if it's both, that there's – there's a theory of liability that the stock price went up upon dissemination of an alleged misrepresentation and it's also that certain misrepresentations maintained an inflated stock price? Have you divvied them up? Have you put them in those respective buckets?

A: Well, the out-of-pocket damage methodology would handle either -- would handle both of those. I mean, that's – that's what it's designed to do. It would calculate damages attributable to misrepresentations and omissions that caused the stock price to rise or caused inflation to rise. It would also calculate damages for those misrepresentations and omissions that prevented the inflation from dissipating or preventing the stock price from falling. My understanding of the theory of liability is that defendants perpetrated a scheme, and if the market had discovered that scheme, the inflation would have dissipated. If there was a corrective disclosure that proved to the marketplace that there was a scheme, the inflation would have dissipated, so it just doesn't matter for conclusion that the out-of-pocket methodology is feasible and consistent with liability. It doesn't matter at this stage which statements did what."
**Feinstein Deposition at 241:13 – 242:13.**


280.   It is important to note that I have not yet completed a loss causation and damages analysis.[228] In the course of a loss causation and damages analysis, I will carefully examine

---

[228] *See also*, Feinstein Deposition at 243:16-24.

the factual record and the behavior of the Cassava security prices to determine whether subsequent misrepresentations and omissions materially changed the mix of information available to the marketplace such that additional inflation was introduced at later dates. To the extent that my analysis reveals subsequent inflation changes, the inflation ribbon will reflect this.

281.    Computed damages for every Class member derive from Defendants' misconduct, including the alleged misrepresentations and omissions. Computed damages for each security will be based upon a common stock price artificial inflation ribbon that is derived from the observed price reactions to corrective disclosures, adjusted using standard valuation tools if the facts prove such adjustment is necessary. For example, if it is appropriate to disaggregate the causes of a price reaction following a corrective disclosure when calculating damages, that disaggregation will apply commonly to all Class members. If, for example, Plaintiffs fail to prove that a price reaction was caused by Defendants' misrepresentations, as Dr. Stulz speculates, then no inflation will be input into the model corresponding to that disclosure or particular information and the model will return a result of zero damages for that disclosure or information. The Class's proof of loss causation will thus rise and fall together for all Class members. In all cases, the damage methodology I articulated will yield a Class-wide damages solution, regardless of what the trier of fact decides are the appropriate inputs for the construction of the inflation ribbon.

> **b.    Potentially Confounding Information Is Not Unusual and Is Routinely and Commonly Handled by the Out-of-Pocket Damage Methodology**

282.    Dr. Stulz contends that my explanation of the out-of-pocket damage methodology is insufficient because I purportedly did not explain how the methodology would measure only losses caused by the fraudulent misrepresentations and omissions and exclude losses caused by confounding information.[229] Dr. Stulz is wrong because I did explain exactly that.[230]

---

[229] Stulz Report, ¶¶170-171 and §§IX.B- IX.C.

[230] Feinstein Report, ¶¶219-232.

283.    First, only losses precipitated by corrective disclosures would be included in damages, so losses sustained when there was no corrective disclosure would be excluded. Second, event study analysis is a reliable tool for isolating how much loss following each corrective disclosure was caused by company-specific information as opposed to market and sector effects. Third, if there was hypothetically non-fraud-related confounding information disseminated simultaneously with corrective information, the price impact of that non-allegation-related information can be evaluated with standard valuation tools, so that that price impact can be excluded from the measure of damages. Thus, as explained in the Feinstein Report, event study analysis supplemented with valuation tools (such as valuation multiples, discounted cash flow computation, and the effects of certain other information as documented in the finance literature, if needed and appropriate) can detect and accurately measure the losses caused only by the corrective disclosures on corrective disclosure event dates.[231] This is the standard implementation of the out-of-pocket damage methodology, routinely used in virtually all Section 10(b) security cases.

284.    The valuation analysis that would be necessary if there is confounding information accompanying the corrective disclosures is the same valuation analysis that is routinely employed by financial analysts who regularly assess the price impacts of various pieces of information in alternative hypothetical or realized scenarios. Financial analysts routinely produce valuation forecasts contingent on alternative scenarios and performance metrics, concluding, for example that the price of a stock will be X if the company achieves a particular level of earnings, or alternatively Y if the company fails to hit that earnings target. Financial analysts also routinely perform attribution analyses, determining how much of a particular stock price movement was caused by one news item as opposed to another. The widely used and generally accepted valuation tools typically applied for this purpose include valuation multiples, discounted cash flow, and the expansive literature on the studied effects of various relevant factors.

---

[231] Equity analysts covering Cassava used the standard valuation tools referenced in the Feinstein Report to value Cassava stock. *See, e.g.*, "Second Analysis of P2b Data Yields Positive Results; Upgrading Shares to Buy, from Hold; Establishing a $14 Price Target," by Jason McCarthy, Maxim Group, analyst report, 14 September 2020, p. 4; "SPA Granted for Two P3s with Simufilam in Alz Dis is Perhaps an Incremental, but Unsurprising Positive," by Charles Duncan and Pete Stavropoulos, Cantor Fitzgerald, analyst report, 24 August 2021, p. 3; and "Leaked CUNY Report to Put Pressure on SAVA," by Soumit Roy and Danya Ben-Hail, Jones Research, analyst report, 13 October 2023, p. 2.

285.    Dr. Stulz speculates that the residual stock price declines following the alleged corrective disclosures in this case may have been caused in part by confounding information.[232] His concern is not a valid challenge to the existence, applicability, and commonality of the damage methodology. Rather, it is a premature challenge to what might be offered as a particular quantification of damages, even though damages have not yet been quantified. Disagreeing with a particular quantification, which neither he, nor I, nor any damages expert has proffered in the instant matter, is not a legitimate criticism of the methodology. For all Dr. Stulz knows at this juncture, the output from the damage methodology for any particular day may ultimately be acceptable to him.

286.    Whether there was indeed any confounding information accompanying corrective disclosures in this case will be determined in the course of loss causation analysis, which has not yet been conducted. There is no reason to suspect that the generally accepted and widely used valuation tools cannot be applied to disaggregate the effect of confounding information, if any, in this case. Dr. Stulz's concern is premature and unfounded, evinced by his own rhetoric: "Dr. Feinstein fails to explain how his proposed damages methodology could measure Cassava's stock price movement attributable to revelation of the facts allegedly misrepresented, rather than negative impact from other information or discussions that would *potentially* have weighed negatively on the Company's stock price."[233]

287.    Dr. Stulz's demand that he know now, prior to the completion of discovery, how precisely damages will be computed beyond the information provided already constitutes an unreasonable demand beyond what is required about which tools will be applicable and how those tools would be applied to estimate damages.[234] The selection of specific tools that could be brought to bear on the issues hypothesized by Dr. Stulz would be directly informed by the evidence. Disaggregation of simultaneous effects could be handled with the same valuation tools.

---

[232] Stulz Report, ¶171 and §IX.C.

[233] Stulz Report, ¶171 (emphasis added).

[234] *See*, *e.g.*, Stulz Report, ¶¶182 and 197-198.

288. Dr. Stulz observes that analysts did not publish analyst reports on every day of the Class Period, and he asserts that the lack of analyst commentary on any given day may make the potential disaggregation analysis difficult.[235] Dr. Stulz's concern is unwarranted given that disaggregation analysis, if necessary, does not necessarily rely on analyst commentary provided in analyst reports. The forensic analyst assessing damages can utilize analyst communications and analyses produced in discovery or the commonly used valuation tools that are available to investors and analysts in real time (including valuation multiple models, discounted cash flow models, scenario analysis, generally accepted option pricing formulas, and the literature regarding valuation effects of various factors such as reputation, transparency, governance, and the quality of internal controls).

289. The proposition that any proposed damage methodology must identify now, at this pre-close-of-discovery class certification stage, which specific valuation tools would (or would not) be used to accommodate potential valuation complexities when refining the inflation ribbon, is unworkable, imprudent, and unnecessary. First, relevant complexities will often not be adequately identifiable until after discovery is complete. Second, it would be imprudent to commit to any particular valuation tool before the facts establishing potential complexities are known. Third, committing to a specific valuation tool prior to the close of discovery is unnecessary as the field of valuation analysis is rich enough, and the array of valuation tools is broad enough, to conclude confidently that any particular valuation complexity that actually does arise can be handled. Dr. Stulz ignores that one can adequately identify the out-of-pocket damage methodology, as I have described it, without having to identify how each of a wide array of valuation tools would specifically be marshalled to address potential complexities that might arise but have not yet arisen.

290. Dr. Stulz's manufactured requirement that a properly specified but-for world be articulated at this stage is also inappropriate.[236] Development of the record and examination of the evidence regarding what Defendants knew and when they knew it will not only reveal if there is any merit to Dr. Stulz's concerns, but will also facilitate the computations to address that concern. That is, the very evidence that may hypothetically suggest that some

---

[235] Stulz Report, ¶199.

[236] Stulz Report, §IX.C.

of the surprise and price decline elicited by corrective disclosures would also have occurred in a but-for scenario with full and timely disclosure could be evaluated to measure that level of surprise and price decline and factor it out of the damage computation. Among the available tools for this purpose, if necessary, are the body of generally accepted economic principles regarding how securities are valued under uncertainty and information asymmetry, and how market assessments can be recovered from trading prices.[237,238]

291.   In his deposition, Dr. Stulz acknowledged that full development of the record is required in order to assess the but-for world and but-for price.

> "All of that would have to be dealt with by Dr. Feinstein, and so he would have to, well, figure out what is it that the company would have said earlier that would correspond to those alleged curative disclosures."
> **Stulz Deposition at 315:6-11.**

292.   Dr. Stulz contends further that I did not explain how I could estimate the impact of a but-for disclosure by the Company itself given that some allegedly corrective disclosures were commentary made by third parties.[239] First, as explained above, the construction of the but-for world and assessment of the but-for price requires full development of the record. Second, it may be unnecessary to estimate what the Cassava Securities' price reactions would have been had the Company itself disclosed the full truth as opposed to estimating what the but-for prices would have been if alternatively, a third-party disclosed that truth. This aspect of the but-for scenario construction may involve a legal determination. Nonetheless, whatever the legal determination is, the economics is straightforward.

---

[237] The Nobel Prize in Economics was twice awarded for developing the principles about behavior and pricing under conditions of asymmetric information. "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism," by George Akerlof, *The Quarterly Journal of Economics*, Vol. 84, No. 3, 1970; "Markets with Asymmetric Information: The Contributions of George Akerlof, Michael Spence and Joseph Stiglitz," by Karl-Gustaf Lofgren et al., *The Scandinavian Journal of Economics*, Vol. 104, No. 2, 2002; and "Improvements to Auction Theory and Inventions of New Auction Formats," The Committee for the Prize in Economic Sciences in Memory of Alfred Nobel, 12 October 2020, describing the award to Paul Milgrom in 2020 for his work addressing asymmetric information, which cited, among others, "Rational Expectations, Information Acquisition, and Competitive Bidding," by Paul Milgrom, *Econometrica*, Vol. 49, No. 4, 1981.

[238] *See also*, "Recovering Probability Distributions from Option Prices," by Jens Jackwerth and Mark Rubinstein, *The Journal of Finance*, Vol. 51, No. 5, 1996; and "Measuring Stock Market Performance," by Richard Dobbs and Tim Koller, *McKinsey on Finance*, No. 16, 2005.

[239] Stulz Report, ¶¶188-195.

293.   Dr. Stulz admitted in his deposition that he has not studied whether there would be any difference in the stock price drop when a third party discloses corrective information versus when the Company discloses the same information. Consequently, his criticism is baseless.

> "Q: So yes or no, is it your opinion that the stock would have fallen less if the company had made the disclosure rather than the information coming from the Wall Street Journal and the New York Times? …
>
> A: I haven't done the study of this. I'm raising the issue as one that Dr. Feinstein would have to address, that he doesn't tell us anything about. It's quite possible that the abnormal return would be less."
> **Stulz Deposition at 316:5-18.**

294.   Dr. Stulz further hypothesizes that the "meme stock phenomenon" could have possibly impacted the Cassava residual stock price movements during the Class Period, and suggests that the stock price declines following corrective disclosure events may reflect the "abatement of the impact from the meme stock phenomenon."[240] Dr. Stulz's speculation is reliant upon a determination that Cassava stock was a meme stock. As shown above, empirical analysis does not support the contention that the Cassava stock price was driven by a meme stock phenomenon. Dr. Stulz admits in his testimony that his concern is only speculative and has no proven basis.

> "Q: So did you make a finding that the abnormal returns were impacted by so-called meme phenomenon?
> …
> A: I raise the issue that they could be. I pointed out that meeting the Krogman and Cammer factors doesn't necessarily resolve this. But I did say that I raised the issue. I don't – I mean, I don't have an affirmative opinion saying that, yep, normal return on certain days were affected by the meme phenomenon."
> **Stulz Deposition at 314:1 – 314:12.**

295.   In the Feinstein Report, I assessed the efficiency of the markets for the Cassava Securities, and I conducted empirical tests that demonstrated that the Cassava Securities responded to economically material information. The event study analyses presented in the Feinstein Report produce an accurate measure of the Cassava Security price movements that

---

[240] Stulz Report, ¶196.

occurred following the release of Company-specific information, because the markets for the Cassava Securities are efficient, and thus the Cassava Securities' prices reflect investors' and analysts' collective assessment of the value of available information.

296.    The described damage methodology accommodates the potential complexities Dr. Stulz surmises may be encountered. The methodology handles these potential complexities and does so in a common manner for all Class members.

### c.    Time-Varying Inflation

297.    Without completion of discovery and without a complete evidentiary record, Dr. Stulz speculates that inflation may have varied over time and that this time-varying inflation may complicate the computation of damages in this case.[241] Time-varying inflation means that the valuation effect of the alleged misrepresentations and omissions may have changed over the course of the Class Period. Time-varying inflation, however, is a common issue in class action securities cases, and I am confident that it will not pose insurmountable difficulties here.

298.    Dr. Stulz theorizes that the artificial inflation in the Cassava Securities' prices could have changed over the course of the Class Period on account of changes in what Cassava could have disclosed at points during the Class Period.[242] In particular, Dr. Stulz contends that I have not articulated how artificial inflation could be measured given the prospect of changing probabilities related to investigations or changing industry conditions throughout the Class Period.[243]

299.    Dr. Stulz's argument falters because if any documentation and evidence will indicate that relevant information and potential disclosures changed over the course of the Class Period, that same documentation and evidence will be incorporated into the computation of the inflation ribbon. It is premature at this stage to speculate about what that evidence and documentation will indicate.

300.    While Dr. Stulz speculates that time-varying inflation may exist in the instant matter, he did not conduct any quantitative analysis to determine if inflation did vary. Dr. Stulz's

---

[241] Stulz Report, ¶172 and §IX.D.

[242] Stulz Report, ¶¶205-207.

[243] Stulz Report, ¶¶205-207.

criticism is more of an admonition about the importance of further discovery to identify whether perceived risks would have varied in the but-for scenario, rather than evidence of any deficiency in the proposed damage methodology. For the same reasons I have already discussed, detailing precisely what the evidence might show and what valuation tools should be used to evaluate it (*e.g.*, discounted cash flow, valuation multiples, varying inputs in analysts' valuation tools) is premature until the evidentiary record is complete. I conclude with confidence that whatever complexities may ultimately be determined to exist can be dealt with by my previously detailed list of available valuation tools (including event study analysis). The criticism that the description of the methodology is incomplete because it does not detail how currently unavailable documents and information will be evaluated is senseless.

301. In class action securities cases, time-varying inflation is a common issue that in my experience does not pose insurmountable difficulty. Nor does Dr. Stulz contend that the potential presence of time-varying inflation in the instant case would raise insurmountable problems. If it is determined by the factual record that inflation actually varied during the Class Period in this case, that very same evidence would indicate how and why the inflation varied, and in turn, which valuation tools best measure it. In matters where I have served as the damages expert at the merits stage, when the facts indicate artificial inflation varied over time, the same facts that indicated the presence of the issue also facilitated the appropriate measurement and accounting for it in the computation of damages.[244]

302. Presently, however, it is premature to agree or disagree with the conjecture that probabilities related to investigations would have changed substantially over the course of the Class Period in the but-for scenario of full disclosure, and how that but-for assessment compared to the market's actual assessment given the alleged misrepresentations and omissions.[245] If and to what extent the true probability and the market's induced misperception of the probabilities related to investigations changed over the Class Period is the kind of information that discovery will illuminate.

---

[244] *See, e.g.*, Report on Loss Causation and Damages by Professor Steven P. Feinstein, Ph.D., CFA, *Marvin Pearlstein, vs. Blackberry Limited* (formerly known as Research In Motion Limited), No. 1:13-cv-07060-CM-KHP, 29 May 2020, ¶¶341-343; and Report of Professor Steven P. Feinstein, Ph.D., CFA, *Plumbers & Pipefitters National Pension Fund vs. Michael J. Burns and Robert C. Richter*, No. 3:05-cv-07393-JGC, 4 August 2014, ¶¶121-124.

[245] Stulz Report, §IX.D.

303. Dr. Stulz overlooks that computational issues such as time-varying inflation are common and are routinely encountered and addressed in class action securities cases. He certainly identifies no time-varying inflation complexities that are so unusual (let alone unique) as to suggest that the out-of-pocket damage methodology will not work here. The computational issues are more about the execution of the common damage methodology at the loss causation stage rather than the existence of a common damage methodology that needs to be addressed at the class certification stage. In matters where I have served as the damages expert at the merits stage, such complexities were identified, accounted for, and appropriately addressed. One such case that is a matter of public record was *Pearlstein v. Blackberry Limited et al.* ("*Blackberry*").

> "While the misrepresentations and omissions caused and maintained inflation since the start of the Class Period, they also caused an increase in artificial inflation on 12 August 2013. As described in ¶¶96-97 and ¶¶210-211 above, on that date the Company announced that it would explore strategic alternatives. The stock price rose significantly on this news, as an acquisition target typically commands an acquisition premium. However, when the final corrective disclosures on 20 September 2013 revealed the true state and prospects for BlackBerry 10, analysts commented that BlackBerry's attractiveness and value as an acquisition target had waned considerably. … Some of the price decline that occurred on September 20th, therefore, was the reduction in the value accretion that entered the stock price on August 12th. Just as the full truth caused that value reduction on September 20th, the full truth, had it been known, would have prevented the value accretion on August 12th. Therefore, of the $1.75 per share artificial inflation that dissipated on September 20th, $0.94 per share had newly entered the stock price on August 12th. The rest, $0.81 per share, was in the stock price since the beginning of the Class Period."
> **"Report on Loss Causation and Damages by Professor Steven P. Feinstein, Ph.D., CFA, *Pearlstein v. Blackberry Limited et al.,* No. 1:13-cv-07060-CM-KHP, 29 May 2020, ¶¶341-343.**

304. Another example of a case where I constructed a time-varying inflation ribbon is *Plumbers & Pipefitters National Pension Fund et al. v. Burns et al.* case (*Dana Corporation* securities litigation, or "*Dana*"). In that case, I constructed an artificial inflation ribbon that increased in connection with successive earnings overstatements. Specifically, in *Dana*, I determined based on principles espoused in the published peer-reviewed literature that "artificial inflation caused by concealment of the internal control deficiencies and

unreliability of the Company's accounting and reporting grew as the cumulative earnings overstatements accrued. That is, just as the alleged accounting fraud grew in magnitude, so too did the artificial inflation attributable to the reputation effect."[246]

305.  It is noteworthy that the appropriate valuation tool needed to address time-varying inflation in each of those two cases, *Blackberry* and *Dana*, depended on what was the cause of the inflation variation in each case. Different causes dictated the application of different valuation tools. In the *Blackberry* case, it was the changing likelihood that *Blackberry* would be acquired that caused inflation to vary. In the *Dana* case, it was the change in reputation effect stemming from an accumulating earnings overstatement that caused inflation to vary. In the *Blackberry* case, the artificial inflation ribbon was constructed to reflect appropriately the increase and then decrease in the acquisition premium. In the *Dana* case, the artificial inflation ribbon was scaled up over time to reflect the increasing earnings overstatement, consistent with the published peer-reviewed literature linking reputation effect to the magnitude of an earnings overstatement.

306.  Importantly, if the evidence reveals that the probabilities related to investigations or changing industry conditions changed substantially over the Class Period, that same evidence will measure and time that change so that it can be incorporated into the artificial inflation ribbon. Specifically, should the evidentiary record ultimately indicate that artificial inflation did change over the course of the Class Period on account of the change in the market's assessment of the probabilities related to investigations or industry conditions or other matters, or if the probability and changing conditions are even relevant, that very same evidence considered with valuation tools and the event study can be used to assess changing artificial inflation accordingly. Presently, however, Dr. Stulz did not claim in his report that he proved artificial inflation in Cassava's Securities prices varied during the Class Period. Ultimately, the issue he raises is only a hypothetical concern.

307.  In his report, Dr. Stulz attacks a hypothetical inflation ribbon where the amount of artificial inflation in the Cassava stock price exceeds the actual security price.[247] Dr. Stulz's speculation is misleading and unfounded. Neither Dr. Stulz nor I have proffered a

---

[246] Report of Professor Steven P. Feinstein, Ph.D., CFA, *Plumbers & Pipefitters National Pension Fund et al. v. Burns et al.*, No. 3:05-cv-07393-JGC, 4 August 2014, ¶141.

[247] Stulz Report, ¶¶202-204.

quantification of artificial inflation in this matter. The level of artificial inflation in the Cassava Securities' prices will be determined at the merits stage in this litigation following completion of the factual record. Additionally, under the out-of-pocket damage methodology, artificial inflation on a particular day is limited to the price an investor paid for Cassava stock. Given that per-share inflation is equal to the difference between the actual price and the but-for price,[248] it is impossible for inflation to be greater than the price an investor actually paid. The computation of damages will take this principle into account.

308.   Dr. Stulz's discussion of artificial inflation does not refute the existence or feasibility of implementing the out-of-pocket damage methodology. If anything, it acknowledges the existence of the damage methodology and that the methodology can be applied commonly for all Class members.

### 4.    The Out-of-Pocket Damage Methodology Can Be Applied to Compute Damages Sustained by Class Members Who Purchased Cassava Call Options or Wrote Cassava Put Options

#### a.    Options Volatility Estimate Under Full Disclosure

309.   Dr. Stulz speculates that full and timely disclosure in this case would have changed not only the prevailing price of Cassava stock but may also have changed the volatility of Cassava stock, the forecast of which is a determinant of option prices. He criticizes that I did not specify how I would estimate what volatility forecast investors would have used to value Cassava's options in the but-for scenario of full and timely disclosure.[249]

310.   As an initial matter, Dr. Stulz's understanding that investors would take note of disclosed information and change the inputs in their option valuation models, such that the market

---

[248] "Federal Securities Acts and Areas of Expert Analysis," by Kevin Gold et al., Chapter 27 of the *Litigation Services Handbook: The Role of the Financial Expert*, 6th Edition, edited by Roman Weil et al., John Wiley & Sons, Inc., 2017, p. 12 ("For the out-of-pocket measure of damages used in most cases filed under § 10(b) of the Securities Exchange Act of 1934, experts estimate the but-for price: the value of the security absent (i.e., but-for) the fraud. An expert typically estimates the but-for value on a daily basis. The resulting sequence of prices is often called the *but-for price line*, or the *value line*. It represents the value of the security on each day if the market knew the truth that should have been disclosed on that and each previous day. The difference between the actual price and the but-for price is the inflation per share").

[249] Stulz Report, ¶¶215-216.

prices of the options would change accordingly, implicitly acknowledges the efficiency of the market for Cassava options.

> "As discussed in **Section VII.A**, volatility of the underlying stock is one of the inputs in options pricing and valuation. In particular, the expected volatility of the underlying stock price is an important input in the valuation of options (whether using the binomial model or Black-Scholes formula), because underlying stock prices that are more volatile will be more likely to meet the strike price of any options series, increasing the value of the options."
> **Stulz Report, ¶216 (emphasis in original).**

311. He also implicitly acknowledges the applicability of the out-of-pocket damage methodology to options, only questioning certain details of its implementation.

312. Dr. Stulz performs no analysis to confirm that either Cassava's volatility or investors' estimate of it would have been different had full disclosure been made at earlier points in the Class Period. Rather, he only speculates that the volatility input used by investors to price Cassava's options would have changed with full disclosure, or that it would have been different from the volatility input implicit in the option prices when full disclosure did occur. I have not yet confirmed Dr. Stulz's conjecture one way or the other. However, if evidence of changing volatility under full disclosure is encountered during the implementation of the out-of-pocket damage methodology, that evidence would inform what volatility level to use.

313. Dr. Stulz overlooks the fact that the market's estimate of Cassava's volatility that prevailed when there was ultimately full disclosure is observable. For this purpose, one can use the observable implied volatilities. Alternatively, one can apply a volatility forecasting model to replicate what investors would have forecasted. Volatility forecasting models are widely used and presented in authoritative texts.[250] When an option's implied volatility (the market's volatility forecast recoverable from an observed option price) has changed on account of a corrective disclosure, one approach that is certainly feasible is to use either

---

[250] *See, e.g.*, *Options, Futures, and Other Derivatives*, by John Hull, Pearson, 9th Edition, 2015, pp. 325-329, 431-439, 521-540.

the pre-disclosure implied volatility or the post-disclosure implied volatility, depending on which provided the more conservative measure of damages.

### b. Put Price Depression is the Counterpart to Stock and Call Price Inflation

314. In the last paragraph of the Stulz Report, Dr. Stulz contends that I did not articulate how to measure damages for put option investors. However, in the very same paragraph he acknowledges that I did, as he seems to have figured out that price inflation is to stocks and call options as price depression is to put options.[251] Put option writers are harmed when the underlying stock price is inflated because they receive less when they sell the puts. When stock price inflation is dissipated by a corrective disclosure, put option writers realize loss when it becomes more costly for them to close their positions, or when they have to make a payment pursuant to the exercise of an in-the-money put contract.

315. My report addresses these mechanics:

> "Stock options are derivative securities, whose values depend on the value of the underlying stock. If the underlying stock is artificially inflated, the price of call options on the stock will also be artificially inflated, and the price of put options will be artificially depressed. Given the inflation ribbon for the common stock, widely used and generally accepted option pricing formulas, such as the binomial American option pricing formula (the "Binomial model") or the Black-Scholes formula, can be used to determine how much artificial inflation is in each call option on any given day and how much each put option price is artificially depressed. These option pricing formulas can also determine how much artificial inflation or artificial depression dissipated from call options or put options, respectively, on the corrective disclosure date(s). With these results, the out-of-pocket damage methodology can be applied to compute damages sustained by Class members who purchased Cassava call options or wrote Cassava put options during the Class Period."
> **Feinstein Report, ¶226; *See*, Stulz Report, footnote 406.**

---

[251] Stulz Report, ¶217.

c. **Appropriateness of Netting is a Legal Question; If Necessary, Netting by Claims Administrators is Straightforward**

316. Dr. Stulz points out that some investors may have traded in multiple Cassava Securities, with some investors benefiting from the alleged fraud on one instrument while sustaining losses on another.[252] This is no criticism of the out-of-pocket damage methodology. Rather, it simply brings up a legal question that arises in many securities cases – should an investor's profits be netted against losses in the computation of damages. I understand that this is a legal question. Whatever answer the Court delivers, the computation is in the hands of the claims administrators, for whom the computations are a straightforward arithmetic exercise. When asked, I explained this in my deposition:

> "Oh, so we call that 'netting.' It's a legal determination, so I would take guidance from the Court. Some courts have said you should net profits and losses, and others say you don't. Period."
> **Feinstein Deposition at 257:24 – 258:2.**

G. **Dr. Stulz Does Not Dispute That Allegation-Related Information Impacted the Price of Cassava Securities**

317. Neither in the Stulz Report nor in deposition does Dr. Stulz claim that Defendants' alleged fraud, including the alleged misrepresentations, omissions, and corrective disclosures had no price impact. He does not dispute that allegation-related information impacted the price of Cassava Securities during the Class Period.[253]

318. When asked in deposition about the events of 14 September 2020, the Class Period's first day when Cassava released Phase 2b results informing the market that Simufilam "significantly improved an entire panel of validated biomarkers of disease in patients with Alzheimer's disease," Dr. Stulz acknowledged that this was positive news and based on the Feinstein Report's event studies Cassava's stock price increased in a statistically

---

[252] Stulz Report, ¶217.

[253] Stulz Report, Exhibit 17; and Stulz Deposition at 314:18 – 316:18.

significant manner.[254] Also in his report, Dr. Stulz accepts that the Cassava stock return on this day was statistically significant.[255]

319. Another example is 27 August 2021, a corrective disclosure day, when Quanterix issued a statement disputing the Company's representation that Quanterix had interpreted and or prepared the data in Cassava's AAIC poster. Dr. Stulz acknowledged in his deposition and in his report that this was new, valuation-relevant, and negative news that resulted in a statistically significant Cassava stock price decline.[256]

320. During his deposition Dr. Stulz acknowledged that the news that transpired on 27 July 2022, an alleged corrective disclosure pertaining to the Department of Justice's criminal investigation into Cassava, was value-relevant negative news, and that Cassava stock fell a statistically significant amount that day.[257] Dr. Stulz did not dispute that this stock price drop was caused by the disclosure.

321. Nonetheless, in paragraphs 159 through 167 of his report, Dr. Stulz contends that certain alleged corrective disclosure days were not associated with statistically significant stock price declines. If Dr. Stulz or Defendants were to argue that the non-significance of a stock price movement was proof that there was no price impact or loss on those days, they would be wrong. A statistically significant stock price decline following a disclosure provides proof that the disclosure caused a loss, but non-significance of the stock price decline does not prove that the disclosure caused no loss.

322. A price reaction that is not statistically significant at the 95% confidence level does not prove that the disclosed information had no price impact. If a price movement is not statistically significant, one cannot rule out random volatility, but neither can one rule out that company information (a misrepresentation, omission, or a corrective disclosure) was the cause of the price movement or at least a contributing factor.

323. An example illustrates that an event or announcement may cause a stock decline, but the stock decline it caused may not be statistically significant. When this happens, clearly the

---

[254] Stulz Deposition at 328:18 – 330:2.

[255] Stulz Report, Exhibit 11A and Exhibit 11B.

[256] Stulz Report, Exhibit 17; and Stulz Deposition at 321:7 – 322:9.

[257] Stulz Deposition at 318:15 – 319:5; and Stulz Report, Exhibit 17.

statistical result of non-significance does not change the truth that the event or announcement caused the loss.

324. Consider a publicly traded company that has 22 manufacturing plants. Each of these factories has an equal value, such that each factory accounts for 4.5% of the company's total value. Further, suppose that the company's stock price varies over time, so that to be statistically significant at the 95% confidence level, a stock price decline would have to be greater than 5%. Suppose now that one of the company's factories burns down and the market observes this event. The value of the company falls by 4.5%, reflecting that $1/22^{nd}$ of the company has been destroyed. While the underlying truth is that the factory fire did cause the stock price decline, that particular stock price decline would not be statistically significant. The non-significance would not indicate that no loss was suffered, or that the fire had no impact on the value of the company and its stock. Clearly, as this example illustrates, there may be price impact and loss caused even if the stock price decline is not statistically significant.

325. In such a situation, determining whether or not the observed event caused the stock to decline, other analyses, such as a valuation analysis of the effect of a factory fire, could be employed to prove price impact, notwithstanding the statistically nonsignificant stock price movement.

## V.    LIMITING FACTORS AND OTHER ASSUMPTIONS

326. This report is furnished solely for the purpose of court proceedings in the above-referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work in this matter.

Steven P. Feinstein, Ph.D., CFA

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report**


## CASE DOCUMENTS

- Report on Market Efficiency and Damages Methodology by Professor Steven P. Feinstein, Ph.D., CFA, dated 13 March 2024.
- Order Granting Plaintiffs Motion to Supplement the Consolidated Complaint, dated 12 June 2024.
- Videotaped Deposition of Steven Feinstein, Ph.D., CFA, dated 14 June 2024.
- Expert Report of Rene M. Stulz, Ph.D., dated 28 June 2024.
- Defendants' Opposition to Plaintiffs' Motion for Class Certification, dated 28 June 2024.
- Videotaped Deposition of Rene M. Stulz, Ph.D., dated 8 August 2024.


## NEWS ARTICLES AND PRESS RELEASES

- "Alzheimer's Scientists Critique Cassava Sciences' Study Results— Overblown, Inappropriate, Uninterpretable," by Adam Feuerstein, STAT+, 31 July 2021.
- "Cassava Sciences' Simufilam Improves Cognition and Behavior in Alzheimer's Disease in Interim Analysis of Open-label Study," Cassava Sciences, Company press release, accessible at https://www.cassavasciences.com/news-releases/news-release-details/cassava-sciences-simufilam-improves-cognition-and-behavior.
- "Drugmaker With No Product Gains 911% on Alzheimer's, Meme Hopes," by Cristian Flanagan, *Bloomberg*, 8 June 2021.
- "FLASHBACK FRIDAY: Twitter Trading Looks for Action," Traders Magazine, 18 August 2017, accessed through https://www.tradersmagazine.com /departments/equities/flashback-friday-twitter-trading-looks-for-action/.
- "For Traders, Twitter Is One More Trading Tool," by Ian Berry and Lauren Rees, *Wall Street Journal*, 3 August 2009.
- "Jordan Thomas's Army of Whistle-Blowers," by Patrick Keefe, *New Yorker*, 17 January 2022.
- "Rival Firm's Drug Approval Sparks Lilly Stock Jump," *Indianapolis Business Journal*, 11 June 2021.
- "Short Sellers Betting Against Meme Stock Cassava Have Made $100 Million Over The Past Month As The Stock Has Struggled," by Emily Graffeo, *Business Insider*, 31 August 2021.
- "Twitter Trading Looks for Action," by Renee Caruthers, Traders Magazine, August 2014, accessed through https://www.tradersmagazine.com /departments/equities/flashback-friday-twitter-trading-looks-for-action/.
- "Yogi Berra dies at 90: Here are Some of His Greatest Quotes," by Houston Mitchell, 12 May 2015, *Los Angeles Times*.

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report**

## SEC FILINGS

- Cassava Sciences, Inc., Form 4, filed 17 September 2020.
- Cassava Sciences, Inc., Form 4, filed 17 September 2020 (1).

## ACADEMIC AND PROFESSIONAL LITERATURE

- Allen, Franklin, Marlene Haas, Eric Nowak, Matteo Pirovano, and Angel Tengulov, "Squeezing Shorts Through Social Media Platforms," *SSRN*, 11 September 2023.
- Akerlof, George, "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism," *The Quarterly Journal of Economics*, Vol. 84, No. 3, 1970.
- Anthony, J.H, "The Interrelation of Stock and Options Market Trading-Volume Data," *The Journal of Finance*, Vol. 43, 1988.
- Barker, Richard, "The Market for Information-Evidence from Finance Directors, Analysts and Fund Managers," *Accounting and Business Research*, Vol. 29, No. 1, 1998.
- Bartov, Eli, Lucile Faurel, and Partha Mohanram, "Can Twitter Help Predict Firm-Level Earnings and Stock Returns," *The Accounting Review*, Vol. 93, No. 3, 2018.
- Bhattarcharya, M., "Transaction Data Tests of Efficiency of the Chicago Board Options Exchange," *Journal of Financial Economics*, Vol. 12 ,1983.
- Bhattarcharya, M., "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis*, Vol. 22, No. 1, 1987.
- Bodie, Zvi, Alex Kane, Alan Marcus, *Investments*, McGraw-Hill/Irwin, 10th Edition, 2014.
- Black, Fischer, "How to Use the Holes in Black-Scholes," *Journal of Applied Corporate Finance*, Vol. 1, No. 4, 1989.
- Black, Fischer, and Myron Scholes, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy*, Vol. 81, No. 3, May 1973.
- Brooks, Robert and David Gentle, "Valuation of Contingent Claims," in *CFA Derivatives Curriculum*, Vol. 5, 2019.
- Bruner, Robert, "Does M&A Pay? A Survey of Evidence for the Decision-Maker," *Journal of Applied Finance*, 2002.
- Cashman, George, et al., "Short Selling and Options Trading: A Tale of Two Markets," *The Journal of Financial Research*, Vol. 45, No. 2, 2022.
- Chan, K., P. Chung, and H. Johnson, "Prices: A Trading-Based Explanation," *The Journal of Finance*, Vol. 48, No. 5, 1993.
- Chance, Don, "Basics of Derivative Pricing and Valuation," in *CFA Derivatives Curriculum*, Vol. 5, 2019.

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report**

- Chance, Don, Onnig Dombalagian, and Steven Feinstein, "The Class Certification of Exchange-Listed Options in Securities Class-Action Litigation," forthcoming in *University of Pennsylvania Journal of Business Law*, 2024.
- Chen, Yi-Wen, Sheng-Syan Chen, and Robin K. Cho, "Short-Sale Constraints and Options Trading: Evidence from Reg SHO," *The Journal of Financial and Quantitative Analysis*, Vol. 55, No. 5, 2020.
- Chen, Hailing, Prabuddha De, Yu Hu, and Byoung-Hyoun Hwang, "Wisdom of Crowds: The Value of Stock Opinions Transmitted Through Social Media," *The Review of Financial Studies*, Vol. 27, No. 5, 2014.
- Cleary, Sean, Howard Atkinson, and Pamela Drake, "Market Efficiency," *CFA Corporate Finance and Equity Curriculum*, Vol. 4, 2019.
- Damodaran, Aswath, *Investment Valuation*, John Wiley & Sons, Inc., 3rd Edition, 2012.
- Danielsen, Bartley and Sorin Sorescu, "Why Do Option Introductions Depress Stock Prices? A Study of Diminishing Short Sale Constraints," *The Journal of Financial and Quantitative Analysis*, Vol. 36, No. 4, 2001.
- DeFusco, Richard, Dennis McLeavey, Jerald Pinto, and David Runkle, "Sampling Estimation," in *CFA Quantitative Methods Curriculum*, Vol. 1, 2019.
- Dueker, Michael and Thomas Miller, Jr., "Directly Measuring Early Exercise Premiums Using American and European S&P 500 Index Options," *The Journal of Futures Markets*, Vol. 23, No. 3, 2003.
- Dobbs, Richard, and Timothy Koller, "Measuring Stock Market Performance," *McKinsey on Finance*, No. 16, 2005.
- Dueker, Michael and Thomas Miller, Jr. "Directly Measuring Early Exercise Premiums Using American and European S&P 500 Index Options," *The Journal of Futures Markets*, Vol. 23, No. 3, 2003.
- Fama, Eugene, et al., "The Adjustment of Stock Prices to New Information," *International Economic Review*, Vol. 10, 1969.
- Farrell, Michael et al., "The Democratization of Investment Research and the Informativeness of Retail Investor Trading," *Journal of Financial Economics*, Vol. 145, No. 2, 2022.
- Figlewski, Stephen, "Options Arbitrage in Imperfect Markets," *The Journal of Finance*, Vol. 44, No. 5, 1989.
- Figlewski, Stephen and G. P. Webb, "Options, Short Sales, and Market Completeness," *The Journal of Finance*, Vol. 48, No. 2, 1993.
- Galai, Dan, "Tests of Market Efficiency of the Chicago Board Options Exchange," *The Journal of Business*, Vol. 50, 1977.
- Granger, C.W.J, "Testing for Causality," *Journal of Economic Dynamics and Control*, Vol. 2, 1980.

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report**

- Jackwerth, Jens and Mark Rubenstein, "Recovering Probability Distributions from Option Prices," *The Journal of Finance*, Vol. 51, No. 5, 1996.
- Jennings, Robert and L. Starks, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *The Journal of Finance*, Vol. 41, No. 1, 1986.
- Kaplan, Paul and Dorothy Kelly, "Security Market Indexes," in *CFA Equity Curriculum*, Vol. 4, 2019.
- Klemkosky, R.C. and B.G. Resnick, "Put-Call Parity and Market Efficiency," *The Journal of Finance*, Vol. 34, 1979.
- Klemkosky, R.C. and B.G. Resnick, "An Ex-Ante Analysis of Put-Call parity," *Journal of Financial Economics*, Vol. 8, 1980.
- Kuersteiner, G. M., "Granger-Sims Causality," *Macroeconometrics and Time Series Analysis*, Palgrave Macmillan, 2010.
- Kumar, R., A. Sarin, and K. Shastri, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *The Journal of Finance*, Vol. 53, No. 2, 1998.
- Lofgren, Karl-Gustaf, Torsten Persson, and Jorgen Weibull, "Markets with Asymmetric Information: The Contributions of George Akerlof, Michael Spence and Joseph Stiglitz," *The Scandinavian Journal of Economics*, Vol. 104, No. 2, 2002.
- Loh, Roger and Rene Stulz, "When Are Analyst Recommendation Changes Influential?" *The Review of Financial Studies*, Vol. 24, No. 2, 2011.
- Macbeth J.D. and L. J. Merville, "An Empirical Examination of the Black-Scholes Call Option Pricing Model," *The Journal of Finance*, Vol. 34, 1979.
- MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, 1997.
- Manaster S. and R.J. Rendleman, Jr., "Option Prices as Predictors of Equilibrium Stock Prices," *The Journal of Finance*, Vol. 37, 1982.
- Milgrom, Paul, "Rational Expectations, Information Acquisition, and Competitive Bidding," *Econometrica*, Vol. 49, No. 4, 1981.
- Miller, Edward, "Risk, Uncertainty, and Divergence of Opinion," *The Journal of Finance*, Vol. 32, No. 4, September 1977.
- Neter, John, William Wasserman, and G.A. Whitmore, *Applied Statistics*, Simon & Schuster, 4th Edition, 1993.
- Noronha, Gregory and George Troughton, "Analysis of Dividends and Share Repurchases," *CFA Corporate Issuers Curriculum*, Vol. 3, 2019.
- Patell, J.M and M.A. Wolfson, "The Ex Ante and Ex Post Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices," *Journal of Accounting Research*, Vol. 19, 1981.
- Puca, Antonella, *Early Stage Valuation: A Fair Value Perspective*, John Wiley & Sons, Inc., 2020.

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report**

- Roll, Richard, "R$^2$," *The Journal of Finance*, Vol. 43, No. 2, 1988.
- Rubinstein, M., "Nonparametric Tests of Alternative Option Pricing Models Using All Reported Trades and Quotes on the 30 Most Active CBOE Option Classes from August 23, 1976 through August 31, 1978," *The Journal of Finance*, Vol. 40, 1984.
- Santa-Clara, Pedro and Alessio Saretto, "Option Strategies: Good Deals and Margin Calls," *Journal of Financial Markets*, Vol. 12, 2009.
- Shleifer, Andrei and Lawrence Summers, "The Noise Trader Approach to Finance," *Journal of Economic Perspectives*, Vol. 4, No. 2, 1990.
- Stulz, Rene, "Should We Fear Derivatives?" *Journal of Economic Perspectives*, Vol. 18, No. 3, 2004.
- Tumarkin, Robert and Robert Whitelaw, "News or Nosie? Internet Posting and Stock Prices," *Financial Analysts Journal*, Vol. 57, No. 3, 2001.
- Whaley, R.E., "On the Valuation of American Call Options on Dividend Paying Stocks: Empirical Tests," *Journal of Financial Economics*, Vol. 19, 1982.
- Zar, Jerrold, *Biostatistical Analysis*, Prentice Hall, 5th Edition, 2010.

## OTHER LEGAL CASE DOCUMENTS

- Report of Professor Steven P. Feinstein, Ph.D., CFA, *Plumbers & Pipefitters National Pension Fund et al. v. Burns et al.*, No. 3:05-cv-07393-JGC (N.D. Ohio), 4 August 2014.
- Report on Loss Causation and Damages by Steven P. Feinstein, Ph.D., CFA, *Pearlstein v. Blackberry Limited et al.,* No. 1:13-cv-07060-CM-KHP (S.D.N.Y.), 29 May 2020.
- Expert Report of Rene Stulz., Ph.D., *Shupe v. Rocket Companies, Inc., et al.*, Untied States District Court, Eastern District of Michigan Northern Division, No. 21-cv-11528, 8 December 2023.

## OTHER

- "Damodaran on the Corporate Life Cycle," Medium, https://medium.com/@thecommon word905/damodaran-on-the-corporate-life-cycle-5fda61f7aa64.
- "Factsheet – As of 10-Apr-2024 Solactive Roundhill Meme Stock Index TR," Solactive AG, 2024, https://www.solactive.com/wp-content/uploads/solactiveip/en/Fac tsheet_DE000SL0EUV0.pdf.
- "Improvements to Auction Theory and Inventions of New Auction Formats," The Committee for the Prize in Economic Sciences in Memory of Alfred Nobel, 12 October 2020.
- Understanding How Mutual Funds, ETFs, and Stocks Trade," *Fidelity Investments*, https://www.fidelity.com/learning-center/trading-investing/trading/trading-differences-mutual-funds-stocks-etfs.

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report**

- "ETFs vs. Mutual Funds," *Charles Schwab*, https://www.schwab.com/etfs/mutual-funds-vs-etfs.
- "The SEC Recommends Closing Cassava Sciences Investigation," by Jacob Braun, *Seeking Alpha*, 22 September 2022.
- Any other documents cited in the report.

**Exhibit-2**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Subsequent to the Feinstein Report**

In Re Valeant Pharmaceuticals International, Inc. Securities Litigation
Master No. 3:15-cv-07658-MAS-LHG
United States District Court
District of New Jersey
Deposition Testimony
May 2024

In Re Cassava Sciences, Inc. Securities Litigation
Master File No. 1:21-cv-00751-DAE
United States District Court
Western District of Texas
Austin Division
Deposition Testimony
June 2024

In re Vale S.A. Securities Litigation
Case No. 19-cv-526-RJD-SJB
United States District Court
Eastern District of New York
Deposition Testimony
March 2021
Deposition Testimony
October 2023
Testimony at Evidentiary Hearing
August 2024

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|------|---------------|--------|
| 9/14/2020 | 2,784,712 | -- |
| 9/15/2020 | 2,813,105 | 28,393 |
| 9/16/2020 | 2,823,139 | 10,034 |
| 9/17/2020 | 4,215,253 | 1,392,114 |
| 9/18/2020 | 4,332,228 | 116,975 |
| 9/21/2020 | 4,493,883 | 161,655 |
| 9/22/2020 | 4,538,052 | 44,169 |
| 9/23/2020 | 4,610,440 | 72,388 |
| 9/24/2020 | 4,784,420 | 173,980 |
| 9/25/2020 | 4,868,182 | 83,762 |
| 9/28/2020 | 4,953,948 | 85,766 |
| 9/29/2020 | 4,979,708 | 25,760 |
| 9/30/2020 | 4,955,088 | -24,620 |
| 10/1/2020 | 4,902,721 | -52,367 |
| 10/2/2020 | 4,853,902 | -48,819 |
| 10/5/2020 | 4,840,008 | -13,894 |
| 10/6/2020 | 4,789,909 | -50,099 |
| 10/7/2020 | 4,751,644 | -38,265 |
| 10/8/2020 | 4,711,893 | -39,751 |
| 10/9/2020 | 4,677,259 | -34,634 |
| 10/12/2020 | 4,637,677 | -39,582 |
| 10/13/2020 | 4,606,633 | -31,044 |
| 10/14/2020 | 4,643,493 | 36,860 |
| 10/15/2020 | 4,658,290 | 14,797 |
| 10/16/2020 | 4,701,038 | 42,748 |
| 10/19/2020 | 4,734,993 | 33,955 |
| 10/20/2020 | 4,761,172 | 26,179 |
| 10/21/2020 | 4,815,169 | 53,997 |
| 10/22/2020 | 5,092,430 | 277,261 |
| 10/23/2020 | 5,204,434 | 112,004 |
| 10/26/2020 | 5,255,140 | 50,706 |
| 10/27/2020 | 5,288,574 | 33,434 |
| 10/28/2020 | 5,335,007 | 46,433 |
| 10/29/2020 | 5,356,890 | 21,883 |
| 10/30/2020 | 5,388,290 | 31,400 |
| 11/2/2020 | 5,407,019 | 18,729 |
| 11/3/2020 | 5,904,274 | 497,255 |
| 11/4/2020 | 5,972,508 | 68,234 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|---|---|---|
| 11/5/2020 | 6,039,878 | 67,370 |
| 11/6/2020 | 6,092,021 | 52,143 |
| 11/9/2020 | 6,111,351 | 19,330 |
| 11/10/2020 | 6,132,380 | 21,029 |
| 11/11/2020 | 6,173,779 | 41,399 |
| 11/12/2020 | 5,988,193 | -185,586 |
| 11/13/2020 | 5,966,358 | -21,835 |
| 11/16/2020 | 5,933,714 | -32,644 |
| 11/17/2020 | 5,891,101 | -42,613 |
| 11/18/2020 | 5,856,549 | -34,552 |
| 11/19/2020 | 5,888,587 | 32,038 |
| 11/20/2020 | 5,916,647 | 28,060 |
| 11/23/2020 | 5,942,273 | 25,626 |
| 11/24/2020 | 5,976,548 | 34,275 |
| 11/25/2020 | 5,992,099 | 15,551 |
| 11/27/2020 | 5,973,259 | -18,840 |
| 11/30/2020 | 5,900,875 | -72,384 |
| 12/1/2020 | 5,854,615 | -46,260 |
| 12/2/2020 | 5,786,036 | -68,579 |
| 12/3/2020 | 5,698,675 | -87,361 |
| 12/4/2020 | 5,616,521 | -82,154 |
| 12/7/2020 | 5,523,733 | -92,788 |
| 12/8/2020 | 5,384,951 | -138,782 |
| 12/9/2020 | 5,324,438 | -60,513 |
| 12/10/2020 | 5,203,512 | -120,926 |
| 12/11/2020 | 5,140,313 | -63,199 |
| 12/14/2020 | 5,203,134 | 62,821 |
| 12/15/2020 | 5,224,778 | 21,644 |
| 12/16/2020 | 5,261,602 | 36,824 |
| 12/17/2020 | 5,270,057 | 8,455 |
| 12/18/2020 | 5,271,331 | 1,274 |
| 12/21/2020 | 5,284,133 | 12,802 |
| 12/22/2020 | 5,285,024 | 891 |
| 12/23/2020 | 5,285,549 | 525 |
| 12/24/2020 | 5,309,162 | 23,613 |
| 12/28/2020 | 5,345,628 | 36,466 |
| 12/29/2020 | 5,360,312 | 14,684 |
| 12/30/2020 | 5,347,640 | -12,672 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|---|---|---|
| 12/31/2020 | 5,340,796 | -6,844 |
| 1/4/2021 | 5,321,677 | -19,119 |
| 1/5/2021 | 5,303,528 | -18,149 |
| 1/6/2021 | 5,318,469 | 14,941 |
| 1/7/2021 | 5,330,052 | 11,583 |
| 1/8/2021 | 5,343,351 | 13,299 |
| 1/11/2021 | 5,337,222 | -6,129 |
| 1/12/2021 | 5,283,919 | -53,303 |
| 1/13/2021 | 5,309,897 | 25,978 |
| 1/14/2021 | 5,457,797 | 147,900 |
| 1/15/2021 | 5,485,584 | 27,787 |
| 1/19/2021 | 5,545,926 | 60,342 |
| 1/20/2021 | 5,581,394 | 35,468 |
| 1/21/2021 | 5,656,835 | 75,441 |
| 1/22/2021 | 5,678,931 | 22,096 |
| 1/25/2021 | 5,853,627 | 174,696 |
| 1/26/2021 | 5,999,756 | 146,129 |
| 1/27/2021 | 6,016,823 | 17,067 |
| 1/28/2021 | 5,981,141 | -35,682 |
| 1/29/2021 | 5,916,711 | -64,430 |
| 2/1/2021 | 5,192,536 | -724,175 |
| 2/2/2021 | 4,614,458 | -578,078 |
| 2/3/2021 | 3,993,939 | -620,519 |
| 2/4/2021 | 3,587,552 | -406,387 |
| 2/5/2021 | 3,149,809 | -437,743 |
| 2/8/2021 | 3,111,681 | -38,128 |
| 2/9/2021 | 2,870,506 | -241,175 |
| 2/10/2021 | 2,804,225 | -66,281 |
| 2/11/2021 | 2,619,367 | -184,858 |
| 2/12/2021 | 2,578,310 | -41,057 |
| 2/16/2021 | 2,587,302 | 8,992 |
| 2/17/2021 | 2,634,436 | 47,134 |
| 2/18/2021 | 2,651,569 | 17,133 |
| 2/19/2021 | 2,677,702 | 26,133 |
| 2/22/2021 | 2,664,586 | -13,116 |
| 2/23/2021 | 2,656,800 | -7,786 |
| 2/24/2021 | 2,717,737 | 60,937 |
| 2/25/2021 | 2,939,038 | 221,301 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|------|----------------|--------|
| 2/26/2021 | 3,037,007 | 97,969 |
| 3/1/2021 | 3,163,194 | 126,187 |
| 3/2/2021 | 3,202,945 | 39,751 |
| 3/3/2021 | 3,258,338 | 55,393 |
| 3/4/2021 | 3,396,012 | 137,674 |
| 3/5/2021 | 3,455,254 | 59,242 |
| 3/8/2021 | 3,557,692 | 102,438 |
| 3/9/2021 | 3,614,485 | 56,793 |
| 3/10/2021 | 3,648,273 | 33,788 |
| 3/11/2021 | 3,671,515 | 23,242 |
| 3/12/2021 | 3,649,373 | -22,142 |
| 3/15/2021 | 3,622,737 | -26,636 |
| 3/16/2021 | 3,600,911 | -21,826 |
| 3/17/2021 | 3,540,688 | -60,223 |
| 3/18/2021 | 3,547,208 | 6,520 |
| 3/19/2021 | 3,535,858 | -11,350 |
| 3/22/2021 | 3,499,017 | -36,841 |
| 3/23/2021 | 3,472,703 | -26,314 |
| 3/24/2021 | 3,475,187 | 2,484 |
| 3/25/2021 | 3,445,462 | -29,725 |
| 3/26/2021 | 3,448,325 | 2,863 |
| 3/29/2021 | 3,454,218 | 5,893 |
| 3/30/2021 | 3,437,179 | -17,039 |
| 3/31/2021 | 3,467,181 | 30,002 |
| 4/1/2021 | 3,490,326 | 23,145 |
| 4/5/2021 | 3,498,921 | 8,595 |
| 4/6/2021 | 3,506,717 | 7,796 |
| 4/7/2021 | 3,531,649 | 24,932 |
| 4/8/2021 | 3,548,139 | 16,490 |
| 4/9/2021 | 3,598,132 | 49,993 |
| 4/12/2021 | 3,611,559 | 13,427 |
| 4/13/2021 | 3,619,557 | 7,998 |
| 4/14/2021 | 3,631,885 | 12,328 |
| 4/15/2021 | 3,628,454 | -3,431 |
| 4/16/2021 | 3,639,750 | 11,296 |
| 4/19/2021 | 3,636,330 | -3,420 |
| 4/20/2021 | 3,668,907 | 32,577 |
| 4/21/2021 | 3,692,258 | 23,351 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|------|----------------|--------|
| 4/22/2021 | 3,719,142 | 26,884 |
| 4/23/2021 | 3,744,493 | 25,351 |
| 4/26/2021 | 3,809,480 | 64,987 |
| 4/27/2021 | 3,842,512 | 33,032 |
| 4/28/2021 | 3,874,785 | 32,273 |
| 4/29/2021 | 3,755,560 | -119,225 |
| 4/30/2021 | 3,686,955 | -68,605 |
| 5/3/2021 | 3,658,202 | -28,753 |
| 5/4/2021 | 3,628,946 | -29,256 |
| 5/5/2021 | 3,590,846 | -38,100 |
| 5/6/2021 | 3,568,754 | -22,092 |
| 5/7/2021 | 3,536,278 | -32,476 |
| 5/10/2021 | 3,508,823 | -27,455 |
| 5/11/2021 | 3,473,158 | -35,665 |
| 5/12/2021 | 3,454,229 | -18,929 |
| 5/13/2021 | 3,467,907 | 13,678 |
| 5/14/2021 | 3,483,774 | 15,867 |
| 5/17/2021 | 3,528,528 | 44,754 |
| 5/18/2021 | 3,572,994 | 44,466 |
| 5/19/2021 | 3,611,347 | 38,353 |
| 5/20/2021 | 3,644,210 | 32,863 |
| 5/21/2021 | 3,690,282 | 46,072 |
| 5/24/2021 | 3,711,327 | 21,045 |
| 5/25/2021 | 3,754,460 | 43,133 |
| 5/26/2021 | 3,780,537 | 26,077 |
| 5/27/2021 | 3,779,071 | -1,466 |
| 5/28/2021 | 3,765,940 | -13,131 |
| 6/1/2021 | 3,757,016 | -8,924 |
| 6/2/2021 | 3,755,639 | -1,377 |
| 6/3/2021 | 3,750,182 | -5,457 |
| 6/4/2021 | 3,752,695 | 2,513 |
| 6/7/2021 | 3,761,904 | 9,209 |
| 6/8/2021 | 3,753,860 | -8,044 |
| 6/9/2021 | 3,739,971 | -13,889 |
| 6/10/2021 | 3,802,003 | 62,032 |
| 6/11/2021 | 3,777,991 | -24,012 |
| 6/14/2021 | 3,758,841 | -19,150 |
| 6/15/2021 | 3,796,075 | 37,234 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|------|----------------|--------|
| 6/16/2021 | 3,802,491 | 6,416 |
| 6/17/2021 | 3,827,694 | 25,203 |
| 6/18/2021 | 3,828,187 | 493 |
| 6/21/2021 | 3,875,990 | 47,803 |
| 6/22/2021 | 3,884,961 | 8,971 |
| 6/23/2021 | 3,915,981 | 31,020 |
| 6/24/2021 | 3,943,150 | 27,169 |
| 6/25/2021 | 3,932,900 | -10,250 |
| 6/28/2021 | 3,936,935 | 4,035 |
| 6/29/2021 | 3,956,634 | 19,699 |
| 6/30/2021 | 4,000,924 | 44,290 |
| 7/1/2021 | 4,032,312 | 31,388 |
| 7/2/2021 | 4,068,508 | 36,196 |
| 7/6/2021 | 4,089,166 | 20,658 |
| 7/7/2021 | 4,153,964 | 64,798 |
| 7/8/2021 | 4,238,420 | 84,456 |
| 7/9/2021 | 4,260,083 | 21,663 |
| 7/12/2021 | 4,294,353 | 34,270 |
| 7/13/2021 | 4,333,311 | 38,958 |
| 7/14/2021 | 4,421,598 | 88,287 |
| 7/15/2021 | 4,378,787 | -42,811 |
| 7/16/2021 | 4,356,762 | -22,025 |
| 7/19/2021 | 4,353,732 | -3,030 |
| 7/20/2021 | 4,333,649 | -20,083 |
| 7/21/2021 | 4,357,367 | 23,718 |
| 7/22/2021 | 4,369,263 | 11,896 |
| 7/23/2021 | 4,343,929 | -25,334 |
| 7/26/2021 | 4,328,960 | -14,969 |
| 7/27/2021 | 4,320,030 | -8,930 |
| 7/28/2021 | 4,217,277 | -102,753 |
| 7/29/2021 | 3,998,199 | -219,078 |
| 7/30/2021 | 4,315,197 | 316,998 |
| 8/2/2021 | 4,535,435 | 220,238 |
| 8/3/2021 | 4,641,859 | 106,424 |
| 8/4/2021 | 4,811,331 | 169,472 |
| 8/5/2021 | 4,919,877 | 108,546 |
| 8/6/2021 | 5,000,209 | 80,332 |
| 8/9/2021 | 5,081,475 | 81,266 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|------|----------------|--------|
| 8/10/2021 | 5,173,256 | 91,781 |
| 8/11/2021 | 5,365,583 | 192,327 |
| 8/12/2021 | 5,402,461 | 36,878 |
| 8/13/2021 | 5,451,282 | 48,821 |
| 8/16/2021 | 5,518,670 | 67,388 |
| 8/17/2021 | 5,546,404 | 27,734 |
| 8/18/2021 | 5,591,239 | 44,835 |
| 8/19/2021 | 5,614,934 | 23,695 |
| 8/20/2021 | 5,643,886 | 28,952 |
| 8/23/2021 | 5,763,668 | 119,782 |
| 8/24/2021 | 6,326,731 | 563,063 |
| 8/25/2021 | 6,752,790 | 426,059 |
| 8/26/2021 | 7,574,010 | 821,220 |
| 8/27/2021 | 7,867,867 | 293,857 |
| 8/30/2021 | 7,899,035 | 31,168 |
| 8/31/2021 | 8,007,131 | 108,096 |
| 9/1/2021 | 8,059,076 | 51,945 |
| 9/2/2021 | 8,479,726 | 420,650 |
| 9/3/2021 | 8,492,048 | 12,322 |
| 9/7/2021 | 8,634,964 | 142,916 |
| 9/8/2021 | 8,779,264 | 144,300 |
| 9/9/2021 | 8,863,355 | 84,091 |
| 9/10/2021 | 8,938,884 | 75,529 |
| 9/13/2021 | 9,067,535 | 128,651 |
| 9/14/2021 | 8,880,504 | -187,031 |
| 9/15/2021 | 8,843,574 | -36,930 |
| 9/16/2021 | 8,787,099 | -56,475 |
| 9/17/2021 | 8,742,040 | -45,059 |
| 9/20/2021 | 8,793,707 | 51,667 |
| 9/21/2021 | 8,736,017 | -57,690 |
| 9/22/2021 | 8,803,302 | 67,285 |
| 9/23/2021 | 8,820,178 | 16,876 |
| 9/24/2021 | 8,854,128 | 33,950 |
| 9/27/2021 | 8,848,442 | -5,686 |
| 9/28/2021 | 8,843,724 | -4,718 |
| 9/29/2021 | 8,771,177 | -72,547 |
| 9/30/2021 | 8,886,296 | 115,119 |
| 10/1/2021 | 8,982,867 | 96,571 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|------|---------------|--------|
| 10/4/2021 | 9,007,903 | 25,036 |
| 10/5/2021 | 9,174,751 | 166,848 |
| 10/6/2021 | 9,203,930 | 29,179 |
| 10/7/2021 | 9,251,017 | 47,087 |
| 10/8/2021 | 9,315,991 | 64,974 |
| 10/11/2021 | 9,331,632 | 15,641 |
| 10/12/2021 | 9,432,340 | 100,708 |
| 10/13/2021 | 9,514,020 | 81,680 |
| 10/14/2021 | 9,419,326 | -94,694 |
| 10/15/2021 | 9,693,711 | 274,385 |
| 10/18/2021 | 9,979,544 | 285,833 |
| 10/19/2021 | 10,305,756 | 326,212 |
| 10/20/2021 | 10,596,802 | 291,046 |
| 10/21/2021 | 10,779,749 | 182,947 |
| 10/22/2021 | 10,979,251 | 199,502 |
| 10/25/2021 | 11,153,565 | 174,314 |
| 10/26/2021 | 11,296,794 | 143,229 |
| 10/27/2021 | 11,474,248 | 177,454 |
| 10/28/2021 | 11,348,933 | -125,315 |
| 10/29/2021 | 11,295,199 | -53,734 |
| 11/1/2021 | 10,618,924 | -676,275 |
| 11/2/2021 | 10,342,365 | -276,559 |
| 11/3/2021 | 9,337,360 | -1,005,005 |
| 11/4/2021 | 9,117,577 | -219,783 |
| 11/5/2021 | 8,940,103 | -177,474 |
| 11/8/2021 | 8,778,582 | -161,521 |
| 11/9/2021 | 8,671,915 | -106,667 |
| 11/10/2021 | 8,585,257 | -86,658 |
| 11/11/2021 | 8,499,075 | -86,182 |
| 11/12/2021 | 8,384,143 | -114,932 |
| 11/15/2021 | 8,476,925 | 92,782 |
| 11/16/2021 | 8,867,105 | 390,180 |
| 11/17/2021 | 9,209,156 | 342,051 |
| 11/18/2021 | 9,523,652 | 314,496 |
| 11/19/2021 | 9,637,273 | 113,621 |
| 11/22/2021 | 9,747,556 | 110,283 |
| 11/23/2021 | 9,927,972 | 180,416 |
| 11/24/2021 | 9,987,559 | 59,587 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|---|---|---|
| 11/26/2021 | 10,074,482 | 86,923 |
| 11/29/2021 | 10,246,223 | 171,741 |
| 11/30/2021 | 10,440,495 | 194,272 |
| 12/1/2021 | 10,576,488 | 135,993 |
| 12/2/2021 | 10,844,119 | 267,631 |
| 12/3/2021 | 9,565,690 | -1,278,429 |
| 12/6/2021 | 11,185,518 | 1,619,828 |
| 12/7/2021 | 10,333,273 | -852,245 |
| 12/8/2021 | 11,534,404 | 1,201,131 |
| 12/9/2021 | 11,675,307 | 140,903 |
| 12/10/2021 | 11,961,778 | 286,471 |
| 12/13/2021 | 11,600,494 | -361,284 |
| 12/14/2021 | 11,605,580 | 5,086 |
| 12/15/2021 | 11,887,081 | 281,501 |
| 12/16/2021 | 12,418,310 | 531,229 |
| 12/17/2021 | 13,649,782 | 1,231,472 |
| 12/20/2021 | 13,223,125 | -426,657 |
| 12/21/2021 | 13,431,010 | 207,885 |
| 12/22/2021 | 13,508,961 | 77,951 |
| 12/23/2021 | 13,598,203 | 89,242 |
| 12/27/2021 | 13,661,428 | 63,225 |
| 12/28/2021 | 13,715,931 | 54,503 |
| 12/29/2021 | 13,768,994 | 53,063 |
| 12/30/2021 | 13,612,155 | -156,839 |
| 12/31/2021 | 13,549,633 | -62,522 |
| 1/3/2022 | 13,471,557 | -78,076 |
| 1/4/2022 | 13,309,717 | -161,840 |
| 1/5/2022 | 13,215,521 | -94,196 |
| 1/6/2022 | 13,121,186 | -94,335 |
| 1/7/2022 | 13,075,193 | -45,993 |
| 1/10/2022 | 13,042,669 | -32,524 |
| 1/11/2022 | 13,013,655 | -29,014 |
| 1/12/2022 | 12,984,034 | -29,621 |
| 1/13/2022 | 12,987,799 | 3,765 |
| 1/14/2022 | 13,088,929 | 101,130 |
| 1/18/2022 | 13,150,539 | 61,610 |
| 1/19/2022 | 13,267,196 | 116,657 |
| 1/20/2022 | 13,327,186 | 59,990 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|------|---------------|--------|
| 1/21/2022 | 13,395,864 | 68,678 |
| 1/24/2022 | 13,435,715 | 39,851 |
| 1/25/2022 | 13,494,886 | 59,171 |
| 1/26/2022 | 13,768,700 | 273,814 |
| 1/27/2022 | 13,596,613 | -172,087 |
| 1/28/2022 | 13,603,098 | 6,485 |
| 1/31/2022 | 13,375,418 | -227,680 |
| 2/1/2022 | 13,263,763 | -111,655 |
| 2/2/2022 | 13,212,782 | -50,981 |
| 2/3/2022 | 13,076,890 | -135,892 |
| 2/4/2022 | 12,979,086 | -97,804 |
| 2/7/2022 | 12,924,840 | -54,246 |
| 2/8/2022 | 12,844,924 | -79,916 |
| 2/9/2022 | 12,096,136 | -748,788 |
| 2/10/2022 | 11,863,891 | -232,245 |
| 2/11/2022 | 11,792,497 | -71,394 |
| 2/14/2022 | 11,947,022 | 154,525 |
| 2/15/2022 | 11,895,221 | -51,801 |
| 2/16/2022 | 11,836,120 | -59,101 |
| 2/17/2022 | 11,765,654 | -70,466 |
| 2/18/2022 | 11,653,155 | -112,499 |
| 2/22/2022 | 11,552,457 | -100,698 |
| 2/23/2022 | 11,408,217 | -144,240 |
| 2/24/2022 | 11,346,370 | -61,847 |
| 2/25/2022 | 11,301,696 | -44,674 |
| 2/28/2022 | 11,275,749 | -25,947 |
| 3/1/2022 | 11,265,429 | -10,320 |
| 3/2/2022 | 11,235,120 | -30,309 |
| 3/3/2022 | 11,224,311 | -10,809 |
| 3/4/2022 | 11,158,769 | -65,542 |
| 3/7/2022 | 11,145,423 | -13,346 |
| 3/8/2022 | 11,129,544 | -15,879 |
| 3/9/2022 | 11,080,426 | -49,118 |
| 3/10/2022 | 11,067,186 | -13,240 |
| 3/11/2022 | 11,059,706 | -7,480 |
| 3/14/2022 | 10,927,568 | -132,138 |
| 3/15/2022 | 10,899,055 | -28,513 |
| 3/16/2022 | 10,879,032 | -20,023 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|---|---|---|
| 3/17/2022 | 10,857,394 | -21,638 |
| 3/18/2022 | 10,850,703 | -6,691 |
| 3/21/2022 | 10,821,227 | -29,476 |
| 3/22/2022 | 10,802,856 | -18,371 |
| 3/23/2022 | 10,796,838 | -6,018 |
| 3/24/2022 | 10,778,034 | -18,804 |
| 3/25/2022 | 10,750,387 | -27,647 |
| 3/28/2022 | 10,745,048 | -5,339 |
| 3/29/2022 | 10,725,187 | -19,861 |
| 3/30/2022 | 10,674,350 | -50,837 |
| 3/31/2022 | 10,701,541 | 27,191 |
| 4/1/2022 | 10,718,990 | 17,449 |
| 4/4/2022 | 10,749,265 | 30,275 |
| 4/5/2022 | 10,764,203 | 14,938 |
| 4/6/2022 | 10,928,457 | 164,254 |
| 4/7/2022 | 10,975,383 | 46,926 |
| 4/8/2022 | 11,114,195 | 138,812 |
| 4/11/2022 | 11,133,268 | 19,073 |
| 4/12/2022 | 11,175,384 | 42,116 |
| 4/13/2022 | 11,460,377 | 284,993 |
| 4/14/2022 | 11,457,203 | -3,174 |
| 4/18/2022 | 11,455,152 | -2,051 |
| 4/19/2022 | 11,484,452 | 29,300 |
| 4/20/2022 | 11,466,833 | -17,619 |
| 4/21/2022 | 11,506,151 | 39,318 |
| 4/22/2022 | 11,499,145 | -7,006 |
| 4/25/2022 | 11,492,986 | -6,159 |
| 4/26/2022 | 11,488,159 | -4,827 |
| 4/27/2022 | 11,574,675 | 86,516 |
| 4/28/2022 | 11,752,285 | 177,610 |
| 4/29/2022 | 11,773,733 | 21,448 |
| 5/2/2022 | 11,792,426 | 18,693 |
| 5/3/2022 | 11,815,030 | 22,604 |
| 5/4/2022 | 11,827,121 | 12,091 |
| 5/5/2022 | 11,832,108 | 4,987 |
| 5/6/2022 | 11,828,760 | -3,348 |
| 5/9/2022 | 11,844,276 | 15,516 |
| 5/10/2022 | 11,871,239 | 26,963 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
| --- | --- | --- |
| 5/11/2022 | 11,888,851 | 17,612 |
| 5/12/2022 | 11,846,442 | -42,409 |
| 5/13/2022 | 11,812,155 | -34,287 |
| 5/16/2022 | 11,804,442 | -7,713 |
| 5/17/2022 | 11,759,502 | -44,940 |
| 5/18/2022 | 11,751,778 | -7,724 |
| 5/19/2022 | 11,726,099 | -25,679 |
| 5/20/2022 | 11,702,000 | -24,099 |
| 5/23/2022 | 11,688,443 | -13,557 |
| 5/24/2022 | 11,678,640 | -9,803 |
| 5/25/2022 | 11,670,346 | -8,294 |
| 5/26/2022 | 11,653,592 | -16,754 |
| 5/27/2022 | 11,529,999 | -123,593 |
| 5/31/2022 | 11,516,956 | -13,043 |
| 6/1/2022 | 11,310,747 | -206,209 |
| 6/2/2022 | 11,272,916 | -37,831 |
| 6/3/2022 | 11,259,012 | -13,904 |
| 6/6/2022 | 11,197,390 | -61,622 |
| 6/7/2022 | 11,185,778 | -11,612 |
| 6/8/2022 | 11,173,104 | -12,674 |
| 6/9/2022 | 11,161,929 | -11,175 |
| 6/10/2022 | 11,138,970 | -22,959 |
| 6/13/2022 | 11,119,562 | -19,408 |
| 6/14/2022 | 10,969,150 | -150,412 |
| 6/15/2022 | 10,922,642 | -46,508 |
| 6/16/2022 | 10,877,304 | -45,338 |
| 6/17/2022 | 10,858,693 | -18,611 |
| 6/21/2022 | 10,808,084 | -50,609 |
| 6/22/2022 | 10,779,811 | -28,273 |
| 6/23/2022 | 10,699,201 | -80,610 |
| 6/24/2022 | 10,635,043 | -64,158 |
| 6/27/2022 | 10,563,897 | -71,146 |
| 6/28/2022 | 10,531,372 | -32,525 |
| 6/29/2022 | 10,409,439 | -121,933 |
| 6/30/2022 | 10,405,413 | -4,026 |
| 7/1/2022 | 10,377,100 | -28,313 |
| 7/5/2022 | 10,354,213 | -22,887 |
| 7/6/2022 | 10,347,056 | -7,157 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|---|---|---|
| 7/7/2022 | 10,314,805 | -32,251 |
| 7/8/2022 | 10,288,359 | -26,446 |
| 7/11/2022 | 10,265,318 | -23,041 |
| 7/12/2022 | 10,243,567 | -21,751 |
| 7/13/2022 | 10,225,382 | -18,185 |
| 7/14/2022 | 10,179,430 | -45,952 |
| 7/15/2022 | 10,259,917 | 80,487 |
| 7/18/2022 | 10,367,232 | 107,315 |
| 7/19/2022 | 10,429,835 | 62,603 |
| 7/20/2022 | 10,499,128 | 69,293 |
| 7/21/2022 | 10,568,702 | 69,574 |
| 7/22/2022 | 10,682,192 | 113,490 |
| 7/25/2022 | 10,840,788 | 158,596 |
| 7/26/2022 | 10,921,659 | 80,871 |
| 7/27/2022 | 10,983,841 | 62,182 |
| 7/28/2022 | 11,429,729 | 445,888 |
| 7/29/2022 | 11,502,204 | 72,475 |
| 8/1/2022 | 11,536,511 | 34,307 |
| 8/2/2022 | 11,627,967 | 91,456 |
| 8/3/2022 | 11,720,119 | 92,152 |
| 8/4/2022 | 11,783,342 | 63,223 |
| 8/5/2022 | 11,835,913 | 52,571 |
| 8/8/2022 | 11,889,532 | 53,619 |
| 8/9/2022 | 11,974,870 | 85,338 |
| 8/10/2022 | 12,009,339 | 34,469 |
| 8/11/2022 | 12,016,087 | 6,748 |
| 8/12/2022 | 12,051,970 | 35,883 |
| 8/15/2022 | 12,071,378 | 19,408 |
| 8/16/2022 | 12,066,321 | -5,057 |
| 8/17/2022 | 12,096,260 | 29,939 |
| 8/18/2022 | 12,058,195 | -38,065 |
| 8/19/2022 | 12,237,377 | 179,182 |
| 8/22/2022 | 12,275,359 | 37,982 |
| 8/23/2022 | 12,294,626 | 19,267 |
| 8/24/2022 | 12,315,104 | 20,478 |
| 8/25/2022 | 12,360,309 | 45,205 |
| 8/26/2022 | 12,342,703 | -17,606 |
| 8/29/2022 | 12,410,188 | 67,485 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|---|---|---|
| 8/30/2022 | 12,583,958 | 173,770 |
| 8/31/2022 | 12,600,136 | 16,178 |
| 9/1/2022 | 12,586,908 | -13,228 |
| 9/2/2022 | 12,587,872 | 964 |
| 9/6/2022 | 12,595,936 | 8,064 |
| 9/7/2022 | 12,613,645 | 17,709 |
| 9/8/2022 | 12,609,204 | -4,441 |
| 9/9/2022 | 12,620,155 | 10,951 |
| 9/12/2022 | 12,622,362 | 2,207 |
| 9/13/2022 | 12,602,906 | -19,456 |
| 9/14/2022 | 12,553,546 | -49,360 |
| 9/15/2022 | 12,509,607 | -43,939 |
| 9/16/2022 | 12,503,903 | -5,704 |
| 9/19/2022 | 12,472,382 | -31,521 |
| 9/20/2022 | 12,443,553 | -28,829 |
| 9/21/2022 | 12,253,052 | -190,501 |
| 9/22/2022 | 12,216,866 | -36,186 |
| 9/23/2022 | 12,098,110 | -118,756 |
| 9/26/2022 | 11,751,741 | -346,369 |
| 9/27/2022 | 11,562,049 | -189,692 |
| 9/28/2022 | 11,543,851 | -18,198 |
| 9/29/2022 | 10,775,219 | -768,632 |
| 9/30/2022 | 10,703,764 | -71,455 |
| 10/3/2022 | 10,610,843 | -92,921 |
| 10/4/2022 | 10,567,664 | -43,179 |
| 10/5/2022 | 10,536,329 | -31,335 |
| 10/6/2022 | 10,489,686 | -46,643 |
| 10/7/2022 | 10,295,416 | -194,270 |
| 10/10/2022 | 10,204,094 | -91,322 |
| 10/11/2022 | 10,112,947 | -91,147 |
| 10/12/2022 | 10,070,566 | -42,381 |
| 10/13/2022 | 9,634,001 | -436,565 |
| 10/14/2022 | 9,622,633 | -11,368 |
| 10/17/2022 | 9,592,561 | -30,072 |
| 10/18/2022 | 9,581,760 | -10,801 |
| 10/19/2022 | 9,575,121 | -6,639 |
| 10/20/2022 | 9,568,092 | -7,029 |
| 10/21/2022 | 9,546,028 | -22,064 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|---|---|---|
| 10/24/2022 | 9,525,409 | -20,619 |
| 10/25/2022 | 9,520,334 | -5,075 |
| 10/26/2022 | 9,494,125 | -26,209 |
| 10/27/2022 | 9,476,518 | -17,607 |
| 10/28/2022 | 9,373,113 | -103,405 |
| 10/31/2022 | 9,380,056 | 6,943 |
| 11/1/2022 | 9,386,208 | 6,152 |
| 11/2/2022 | 9,375,846 | -10,362 |
| 11/3/2022 | 9,393,850 | 18,004 |
| 11/4/2022 | 9,375,373 | -18,477 |
| 11/7/2022 | 9,366,811 | -8,562 |
| 11/8/2022 | 9,375,539 | 8,728 |
| 11/9/2022 | 9,382,848 | 7,309 |
| 11/10/2022 | 9,376,045 | -6,803 |
| 11/11/2022 | 9,381,666 | 5,621 |
| 11/14/2022 | 9,327,942 | -53,724 |
| 11/15/2022 | 9,363,727 | 35,785 |
| 11/16/2022 | 8,947,363 | -416,364 |
| 11/17/2022 | 9,378,647 | 431,284 |
| 11/18/2022 | 9,366,970 | -11,677 |
| 11/21/2022 | 8,497,593 | -869,377 |
| 11/22/2022 | 8,220,987 | -276,606 |
| 11/23/2022 | 9,330,301 | 1,109,314 |
| 11/25/2022 | 9,337,572 | 7,271 |
| 11/28/2022 | 9,333,243 | -4,329 |
| 11/29/2022 | 7,298,026 | -2,035,217 |
| 11/30/2022 | 9,291,588 | 1,993,562 |
| 12/1/2022 | 9,269,720 | -21,868 |
| 12/2/2022 | 9,241,387 | -28,333 |
| 12/5/2022 | 9,194,305 | -47,082 |
| 12/6/2022 | 9,178,698 | -15,607 |
| 12/7/2022 | 9,139,066 | -39,632 |
| 12/8/2022 | 9,094,102 | -44,964 |
| 12/9/2022 | 9,022,926 | -71,176 |
| 12/12/2022 | 9,000,535 | -22,391 |
| 12/13/2022 | 8,962,661 | -37,874 |
| 12/14/2022 | 8,798,681 | -163,980 |
| 12/15/2022 | 8,804,367 | 5,686 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|------|----------------|--------|
| 12/16/2022 | 8,787,083 | -17,284 |
| 12/19/2022 | 8,770,137 | -16,946 |
| 12/20/2022 | 8,759,715 | -10,422 |
| 12/21/2022 | 8,749,579 | -10,136 |
| 12/22/2022 | 8,754,326 | 4,747 |
| 12/23/2022 | 8,771,988 | 17,662 |
| 12/27/2022 | 8,777,918 | 5,930 |
| 12/28/2022 | 8,785,472 | 7,554 |
| 12/29/2022 | 8,693,277 | -92,195 |
| 12/30/2022 | 8,847,576 | 154,299 |
| 1/3/2023 | 8,962,504 | 114,928 |
| 1/4/2023 | 9,126,723 | 164,219 |
| 1/5/2023 | 9,222,881 | 96,158 |
| 1/6/2023 | 9,294,677 | 71,796 |
| 1/9/2023 | 9,515,315 | 220,638 |
| 1/10/2023 | 9,629,076 | 113,761 |
| 1/11/2023 | 9,751,737 | 122,661 |
| 1/12/2023 | 10,323,596 | 571,859 |
| 1/13/2023 | 10,318,562 | -5,034 |
| 1/17/2023 | 10,296,074 | -22,488 |
| 1/18/2023 | 10,275,169 | -20,905 |
| 1/19/2023 | 10,272,758 | -2,411 |
| 1/20/2023 | 10,270,839 | -1,919 |
| 1/23/2023 | 10,267,705 | -3,134 |
| 1/24/2023 | 10,218,550 | -49,155 |
| 1/25/2023 | 10,186,973 | -31,577 |
| 1/26/2023 | 10,137,976 | -48,997 |
| 1/27/2023 | 10,103,487 | -34,489 |
| 1/30/2023 | 9,854,879 | -248,608 |
| 1/31/2023 | 9,890,012 | 35,133 |
| 2/1/2023 | 9,936,471 | 46,459 |
| 2/2/2023 | 9,965,696 | 29,225 |
| 2/3/2023 | 10,043,743 | 78,047 |
| 2/6/2023 | 10,072,437 | 28,694 |
| 2/7/2023 | 10,100,449 | 28,012 |
| 2/8/2023 | 10,123,677 | 23,228 |
| 2/9/2023 | 10,175,325 | 51,648 |
| 2/10/2023 | 10,200,270 | 24,945 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|------|---------------|--------|
| 2/13/2023 | 10,215,812 | 15,542 |
| 2/14/2023 | 10,601,625 | 385,813 |
| 2/15/2023 | 10,716,877 | 115,252 |
| 2/16/2023 | 10,764,674 | 47,797 |
| 2/17/2023 | 10,789,224 | 24,550 |
| 2/21/2023 | 10,824,855 | 35,631 |
| 2/22/2023 | 10,862,950 | 38,095 |
| 2/23/2023 | 10,878,621 | 15,671 |
| 2/24/2023 | 10,895,189 | 16,568 |
| 2/27/2023 | 11,009,584 | 114,395 |
| 2/28/2023 | 10,990,815 | -18,769 |
| 3/1/2023 | 10,943,977 | -46,838 |
| 3/2/2023 | 10,923,396 | -20,581 |
| 3/3/2023 | 10,908,478 | -14,918 |
| 3/6/2023 | 10,882,746 | -25,732 |
| 3/7/2023 | 10,848,329 | -34,417 |
| 3/8/2023 | 10,828,307 | -20,022 |
| 3/9/2023 | 10,800,455 | -27,852 |
| 3/10/2023 | 10,699,095 | -101,360 |
| 3/13/2023 | 10,671,349 | -27,746 |
| 3/14/2023 | 10,456,726 | -214,623 |
| 3/15/2023 | 10,514,842 | 58,116 |
| 3/16/2023 | 10,564,863 | 50,021 |
| 3/17/2023 | 10,640,358 | 75,495 |
| 3/20/2023 | 10,707,603 | 67,245 |
| 3/21/2023 | 10,749,033 | 41,430 |
| 3/22/2023 | 10,810,579 | 61,546 |
| 3/23/2023 | 10,978,624 | 168,045 |
| 3/24/2023 | 11,051,987 | 73,363 |
| 3/27/2023 | 11,108,382 | 56,395 |
| 3/28/2023 | 11,163,939 | 55,557 |
| 3/29/2023 | 11,206,923 | 42,984 |
| 3/30/2023 | 11,500,599 | 293,676 |
| 3/31/2023 | 11,463,651 | -36,948 |
| 4/3/2023 | 11,410,745 | -52,906 |
| 4/4/2023 | 11,376,679 | -34,066 |
| 4/5/2023 | 11,357,380 | -19,299 |
| 4/6/2023 | 11,334,177 | -23,203 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|---|---|---|
| 4/10/2023 | 11,301,550 | -32,627 |
| 4/11/2023 | 11,233,790 | -67,760 |
| 4/12/2023 | 11,190,061 | -43,729 |
| 4/13/2023 | 11,050,787 | -139,274 |
| 4/14/2023 | 11,039,332 | -11,455 |
| 4/17/2023 | 11,038,804 | -528 |
| 4/18/2023 | 11,025,706 | -13,098 |
| 4/19/2023 | 11,019,836 | -5,870 |
| 4/20/2023 | 11,013,577 | -6,259 |
| 4/21/2023 | 11,013,149 | -428 |
| 4/24/2023 | 11,006,159 | -6,990 |
| 4/25/2023 | 11,005,606 | -553 |
| 4/26/2023 | 11,005,020 | -586 |
| 4/27/2023 | 10,984,305 | -20,715 |
| 4/28/2023 | 10,938,507 | -45,798 |
| 5/1/2023 | 10,897,343 | -41,164 |
| 5/2/2023 | 10,854,431 | -42,912 |
| 5/3/2023 | 10,169,824 | -684,607 |
| 5/4/2023 | 10,772,724 | 602,900 |
| 5/5/2023 | 10,747,570 | -25,154 |
| 5/8/2023 | 9,885,999 | -861,571 |
| 5/9/2023 | 10,625,161 | 739,162 |
| 5/10/2023 | 9,630,662 | -994,499 |
| 5/11/2023 | 10,388,474 | 757,812 |
| 5/12/2023 | 10,162,456 | -226,018 |
| 5/15/2023 | 10,234,287 | 71,831 |
| 5/16/2023 | 10,278,714 | 44,427 |
| 5/17/2023 | 10,308,699 | 29,985 |
| 5/18/2023 | 10,342,345 | 33,646 |
| 5/19/2023 | 10,385,593 | 43,248 |
| 5/22/2023 | 10,424,185 | 38,592 |
| 5/23/2023 | 10,455,394 | 31,209 |
| 5/24/2023 | 10,484,765 | 29,371 |
| 5/25/2023 | 10,501,554 | 16,789 |
| 5/26/2023 | 10,557,142 | 55,588 |
| 5/30/2023 | 10,804,646 | 247,504 |
| 5/31/2023 | 10,682,312 | -122,334 |
| 6/1/2023 | 10,527,835 | -154,477 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|------|----------------|--------|
| 6/2/2023 | 10,453,443 | -74,392 |
| 6/5/2023 | 10,355,150 | -98,293 |
| 6/6/2023 | 10,283,941 | -71,209 |
| 6/7/2023 | 10,194,127 | -89,814 |
| 6/8/2023 | 10,115,847 | -78,280 |
| 6/9/2023 | 10,015,766 | -100,081 |
| 6/12/2023 | 9,918,362 | -97,404 |
| 6/13/2023 | 9,768,238 | -150,124 |
| 6/14/2023 | 9,383,588 | -384,650 |
| 6/15/2023 | 9,437,579 | 53,991 |
| 6/16/2023 | 9,481,858 | 44,279 |
| 6/20/2023 | 9,574,849 | 92,991 |
| 6/21/2023 | 9,619,498 | 44,649 |
| 6/22/2023 | 9,707,045 | 87,547 |
| 6/23/2023 | 9,740,853 | 33,808 |
| 6/26/2023 | 9,813,206 | 72,353 |
| 6/27/2023 | 9,881,628 | 68,422 |
| 6/28/2023 | 9,940,091 | 58,463 |
| 6/29/2023 | 10,144,547 | 204,456 |
| 6/30/2023 | 10,162,137 | 17,590 |
| 7/3/2023 | 10,189,399 | 27,262 |
| 7/5/2023 | 10,206,390 | 16,991 |
| 7/6/2023 | 10,656,200 | 449,810 |
| 7/7/2023 | 10,773,807 | 117,607 |
| 7/10/2023 | 10,883,791 | 109,984 |
| 7/11/2023 | 10,971,308 | 87,517 |
| 7/12/2023 | 11,030,203 | 58,895 |
| 7/13/2023 | 11,200,394 | 170,191 |
| 7/14/2023 | 11,209,200 | 8,806 |
| 7/17/2023 | 11,215,813 | 6,613 |
| 7/18/2023 | 11,233,074 | 17,261 |
| 7/19/2023 | 11,258,065 | 24,991 |
| 7/20/2023 | 11,263,331 | 5,266 |
| 7/21/2023 | 11,278,403 | 15,072 |
| 7/24/2023 | 11,283,008 | 4,605 |
| 7/25/2023 | 11,309,296 | 26,288 |
| 7/26/2023 | 11,334,212 | 24,916 |
| 7/27/2023 | 11,340,812 | 6,600 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|------|----------------|--------|
| 7/28/2023 | 11,425,583 | 84,771 |
| 7/31/2023 | 11,476,065 | 50,482 |
| 8/1/2023 | 11,530,928 | 54,863 |
| 8/2/2023 | 11,578,646 | 47,718 |
| 8/3/2023 | 11,620,887 | 42,241 |
| 8/4/2023 | 11,655,549 | 34,662 |
| 8/7/2023 | 11,707,263 | 51,714 |
| 8/8/2023 | 11,818,078 | 110,815 |
| 8/9/2023 | 11,900,409 | 82,331 |
| 8/10/2023 | 11,981,299 | 80,890 |
| 8/11/2023 | 12,067,945 | 86,646 |
| 8/14/2023 | 12,260,196 | 192,251 |
| 8/15/2023 | 12,356,047 | 95,851 |
| 8/16/2023 | 12,400,122 | 44,075 |
| 8/17/2023 | 12,431,139 | 31,017 |
| 8/18/2023 | 12,468,853 | 37,714 |
| 8/21/2023 | 12,511,235 | 42,382 |
| 8/22/2023 | 12,594,685 | 83,450 |
| 8/23/2023 | 12,648,223 | 53,538 |
| 8/24/2023 | 12,685,756 | 37,533 |
| 8/25/2023 | 12,785,855 | 100,099 |
| 8/28/2023 | 12,910,463 | 124,608 |
| 8/29/2023 | 13,017,563 | 107,100 |
| 8/30/2023 | 13,344,652 | 327,089 |
| 8/31/2023 | 13,399,871 | 55,219 |
| 9/1/2023 | 13,434,628 | 34,757 |
| 9/5/2023 | 13,448,928 | 14,300 |
| 9/6/2023 | 13,469,513 | 20,585 |
| 9/7/2023 | 13,505,670 | 36,157 |
| 9/8/2023 | 13,538,754 | 33,084 |
| 9/11/2023 | 13,557,771 | 19,017 |
| 9/12/2023 | 13,580,577 | 22,806 |
| 9/13/2023 | 13,598,747 | 18,170 |
| 9/14/2023 | 13,703,984 | 105,237 |
| 9/15/2023 | 13,733,459 | 29,475 |
| 9/18/2023 | 13,785,923 | 52,464 |
| 9/19/2023 | 13,880,292 | 94,369 |
| 9/20/2023 | 13,937,584 | 57,292 |

**Exhibit-3a**

**Cassava Daily Short Interest**

14 September 2020 through 12 October 2023

| Date | Short Interest | Change |
|---|---|---|
| 9/21/2023 | 13,984,941 | 47,357 |
| 9/22/2023 | 14,021,997 | 37,056 |
| 9/25/2023 | 14,046,512 | 24,515 |
| 9/26/2023 | 14,064,217 | 17,705 |
| 9/27/2023 | 14,091,911 | 27,694 |
| 9/28/2023 | 14,212,684 | 120,773 |
| 9/29/2023 | 14,196,343 | -16,341 |
| 10/2/2023 | 14,188,403 | -7,940 |
| 10/3/2023 | 14,181,055 | -7,348 |
| 10/4/2023 | 14,172,468 | -8,587 |
| 10/5/2023 | 14,135,722 | -36,746 |
| 10/6/2023 | 14,126,270 | -9,452 |
| 10/9/2023 | 14,120,124 | -6,146 |
| 10/10/2023 | 14,114,115 | -6,009 |
| 10/11/2023 | 14,096,079 | -18,036 |
| 10/12/2023 | 14,018,347 | -77,732 |

**Source:** Stulz Report, Exhibit-5.
Computations performed by Crowninshield Financial Research.

**Exhibit-3b**

**Cassava Biweekly Short Interest**

13 March 2020 through 31 August 2020

| Date | Short Interest | Change |
|------|---------------|--------|
| 3/13/2020 | 1,098,148 | -- |
| 3/31/2020 | 1,313,875 | 215,727 |
| 4/15/2020 | 1,748,945 | 435,070 |
| 4/30/2020 | 2,377,905 | 628,960 |
| 5/15/2020 | 2,478,299 | 100,394 |
| 5/29/2020 | 2,970,370 | 492,071 |
| 6/15/2020 | 2,843,914 | -126,456 |
| 6/30/2020 | 3,387,297 | 543,383 |
| 7/15/2020 | 3,500,299 | 113,002 |
| 7/31/2020 | 3,106,689 | -393,610 |
| 8/14/2020 | 2,887,098 | -219,591 |
| 8/31/2020 | 3,018,212 | 131,114 |

**Source:** Bloomberg**.**
Computations performed by Crowninshield Financial Research.

**Exhibit-4**

**Cassava Stock *Cammer/Krogman* Factors by Month**

| | September 2020 | October 2020 | November 2020 | December 2020 |
|---|---|---|---|---|
| **Trading Volume** | | | | |
| Avg. Daily Volume | 18,326,590 | 1,919,306 | 5,215,656 | 1,309,551 |
| Avg. Weekly Turnover | 367.61% | 37.52% | 101.95% | 25.35% |
| **Analysts, Institutions, & News Coverage** | | | | |
| Analysts[1] | 2 | 3 | 3 | 3 |
|    Equity Analyst Reports | 2 | 1 | 5 | 0 |
|    Analyst Firms from Reports | 2 | 1 | 3 | 0 |
|    Analysts Contributing to Consensus Estimates | 2 | 3 | 3 | 3 |
| Institutional Investors | 91 | 91 | 92 | 100 |
| News Articles | 62 | 15 | 51 | 17 |
| **Market Makers** | | | | |
| Exchange Listing | Nasdaq | Nasdaq | Nasdaq | Nasdaq |
| Market Makers[2] | 71 | 67 | 50 | 50 |
| **S-3 Eligible** | Yes | Yes | Yes | Yes |
| 12 Months of SEC Filings | Yes | Yes | Yes | Yes |
| Float Range ($)[3] | $64,314,536 - $252,708,311 | $180,255,016 - $268,955,414 | $155,884,362 - $253,366,978 | $149,078,144 - $215,613,332 |
| **Market Capitalization** | | | | |
| Average Market Capitalization | $177,454,774 | $263,204,545 | $226,767,725 | $197,973,636 |
| Market Capitalization Range | $75,256,386 - $294,410,526 | $210,000,905 - $313,338,744 | $181,608,578 - $295,177,886 | $173,679,190 - $240,323,071 |
| Percentile Relative to Exchange-Listed U.S. Companies | 38.00% | 45.00% | 39.60% | 36.40% |
| **Float** | | | | |
| Average Float ($) | $151,706,404 | $225,922,548 | $194,646,875 | $170,355,511 |
| Average Float (shares) | 21,327,601 | 21,955,544 | 21,955,544 | 22,394,604 |
| Average Float as a % of Shares Outstanding | 85.48% | 85.84% | 85.84% | 86.01% |
| Percentile Relative to Exchange-Listed U.S. Companies | 35.60% | 42.50% | 37.00% | 33.90% |
| **Bid-Ask Spread** | | | | |
| Average Bid-Ask Spread ($) | $0.01 | $0.02 | $0.02 | $0.01 |
| Average Market Bid-Ask Spread ($) | $0.23 | $0.23 | $0.17 | $0.19 |
| Average Bid-Ask Spread (%) | 0.22% | 0.17% | 0.17% | 0.13% |
| Average Market Bid-Ask Spread (%) | 0.52% | 0.57% | 0.53% | 0.43% |

**Exhibit-4**

**Cassava Stock *Cammer/Krogman* Factors by Month**

| | January 2021 | February 2021 | March 2021 | April 2021 |
|---|---|---|---|---|
| **Trading Volume** | | | | |
| Avg. Daily Volume | 4,194,462 | 16,260,004 | 2,479,763 | 1,499,986 |
| Avg. Weekly Turnover | 59.52% | 230.72% | 33.78% | 18.75% |
| **Analysts, Institutions, & News Coverage** | | | | |
| Analysts | 3 | 3 | 4 | 5 |
| Equity Analyst Reports | 0 | 4 | 4 | 4 |
| Analyst Firms from Reports | 0 | 3 | 3 | 4 |
| Analysts Contributing to Consensus Estimates | 3 | 3 | 4 | 5 |
| Institutional Investors | 101 | 114 | 164 | 159 |
| News Articles | 10 | 87 | 36 | 34 |
| **Market Makers** | | | | |
| Exchange Listing | Nasdaq | Nasdaq | Nasdaq | Nasdaq |
| Market Makers | 66 | 87 | 72 | 65 |
| **S-3 Eligible** | Yes | Yes | Yes | Yes |
| 12 Months of SEC Filings | Yes | Yes | Yes | Yes |
| Float Range ($) | $224,149,343 - $626,606,486 | $726,825,585 - $2,780,526,761 | $1,372,400,986 - $2,073,984,306 | $1,157,755,065 - $1,713,045,363 |
| **Market Capitalization** | | | | |
| Average Market Capitalization | $430,793,664 | $1,862,346,159 | $1,883,010,680 | $1,603,299,180 |
| Market Capitalization Range | $249,837,328 - $698,416,902 | $810,121,321 - $3,099,180,957 | $1,529,681,016 - $2,304,926,235 | $1,286,278,226 - $1,903,211,671 |
| Percentile Relative to Exchange-Listed U.S. Companies | 49.10% | 71.00% | 71.30% | 68.80% |
| **Float** | | | | |
| Average Float ($) | $386,499,959 | $1,670,861,885 | $1,689,835,724 | $1,443,099,718 |
| Average Float (shares) | 31,614,858 | 31,614,858 | 33,450,507 | 36,011,044 |
| Average Float as a % of Shares Outstanding | 89.72% | 89.72% | 89.74% | 90.01% |
| Percentile Relative to Exchange-Listed U.S. Companies | 47.20% | 69.30% | 69.50% | 67.50% |
| **Bid-Ask Spread** | | | | |
| Average Bid-Ask Spread ($) | $0.03 | $0.09 | $0.08 | $0.05 |
| Average Market Bid-Ask Spread ($) | $0.25 | $0.21 | $0.25 | $0.14 |
| Average Bid-Ask Spread (%) | 0.19% | 0.16% | 0.17% | 0.13% |
| Average Market Bid-Ask Spread (%) | 0.50% | 0.48% | 0.47% | 0.45% |

**Exhibit-4**

**Cassava Stock *Cammer/Krogman* Factors by Month**

| | May 2021 | June 2021 | July 2021 | August 2021 |
|---|---|---|---|---|
| **Trading Volume** | | | | |
| Avg. Daily Volume | 1,385,774 | 2,921,701 | 5,612,970 | 9,630,948 |
| Avg. Weekly Turnover | 17.32% | 36.51% | 70.14% | 120.34% |
| **Analysts, Institutions, & News Coverage** | | | | |
| Analysts | 5 | 5 | 5 | 5 |
|    Equity Analyst Reports | 3 | 6 | 9 | 12 |
|    Analyst Firms from Reports | 3 | 3 | 5 | 5 |
|    Analysts Contributing to Consensus Estimates | 5 | 5 | 5 | 5 |
| Institutional Investors | 170 | 218 | 221 | 222 |
| News Articles | 29 | 50 | 52 | 127 |
| **Market Makers** | | | | |
| Exchange Listing | Nasdaq | Nasdaq | Nasdaq | Nasdaq |
| Market Makers | 67 | 73 | 78 | 86 |
| **S-3 Eligible** | Yes | Yes | Yes | Yes |
| 12 Months of SEC Filings | Yes | Yes | Yes | Yes |
| Float Range ($) | $1,350,054,040 - $2,002,214,046 | $2,054,790,171 - $3,230,910,868 | $2,504,073,167 - $4,872,732,625 | $1,918,269,947 - $4,414,614,108 |
| **Market Capitalization** | | | | |
| Average Market Capitalization | $1,796,108,504 | $2,974,001,321 | $4,055,891,375 | $3,824,859,187 |
| Market Capitalization Range | $1,499,924,438 - $2,224,481,162 | $2,282,893,797 - $3,589,576,437 | $2,782,026,990 - $5,413,609,258 | $2,131,182,656 - $4,904,601,166 |
| Percentile Relative to Exchange-Listed U.S. Companies | 70.50% | 76.90% | 81.30% | 80.50% |
| **Float** | | | | |
| Average Float ($) | $1,616,643,798 | $2,676,844,433 | $3,650,665,071 | $3,442,742,184 |
| Average Float (shares) | 36,011,044 | 36,011,191 | 36,014,284 | 36,017,085 |
| Average Float as a % of Shares Outstanding | 90.01% | 90.01% | 90.01% | 90.01% |
| Percentile Relative to Exchange-Listed U.S. Companies | 69.10% | 75.70% | 80.00% | 79.30% |
| **Bid-Ask Spread** | | | | |
| Average Bid-Ask Spread ($) | $0.10 | $0.11 | $0.14 | $0.14 |
| Average Market Bid-Ask Spread ($) | $0.26 | $0.15 | $0.17 | $0.15 |
| Average Bid-Ask Spread (%) | 0.23% | 0.15% | 0.14% | 0.14% |
| Average Market Bid-Ask Spread (%) | 0.40% | 0.38% | 0.44% | 0.41% |

**Exhibit-4**

**Cassava Stock *Cammer/Krogman* Factors by Month**

| | September 2021 | October 2021 | November 2021 | December 2021 |
|---|---|---|---|---|
| **Trading Volume** | | | | |
| Avg. Daily Volume | 9,436,223 | 3,313,927 | 8,093,867 | 3,433,555 |
| Avg. Weekly Turnover | 117.91% | 41.41% | 101.13% | 42.90% |
| **Analysts, Institutions, & News Coverage** | | | | |
| Analysts | 5 | 5 | 4 | 4 |
|    Equity Analyst Reports | 4 | 1 | 5 | 2 |
|    Analyst Firms from Reports | 3 | 1 | 4 | 2 |
|    Analysts Contributing to Consensus Estimates | 5 | 5 | 4 | 4 |
| Institutional Investors | 245 | 244 | 243 | 235 |
| News Articles | 164 | 131 | 84 | 29 |
| **Market Makers** | | | | |
| Exchange Listing | Nasdaq | Nasdaq | Nasdaq | Nasdaq |
| Market Makers | 77 | 73 | 52 | 53 |
| **S-3 Eligible** | Yes | Yes | Yes | Yes |
| 12 Months of SEC Filings | Yes | Yes | Yes | Yes |
| Float Range ($) | $1,505,153,982 - $2,468,250,835 | $1,553,507,320 - $2,179,880,895 | $1,660,844,482 - $3,274,503,836 | $1,324,425,322 - $1,800,238,716 |
| **Market Capitalization** | | | | |
| Average Market Capitalization | $2,114,535,120 | $2,008,709,569 | $2,502,078,503 | $1,798,900,316 |
| Market Capitalization Range | $1,672,214,104 - $2,742,207,048 | $1,725,924,239 - $2,421,816,252 | $1,845,174,279 - $3,637,926,561 | $1,471,417,442 - $2,000,039,264 |
| Percentile Relative to Exchange-Listed U.S. Companies | 73.80% | 72.80% | 76.60% | 72.50% |
| **Float** | | | | |
| Average Float ($) | $1,903,286,178 | $1,808,042,872 | $2,252,125,083 | $1,619,193,210 |
| Average Float (shares) | 36,017,185 | 36,019,182 | 36,019,182 | 36,019,182 |
| Average Float as a % of Shares Outstanding | 90.01% | 90.01% | 90.01% | 90.01% |
| Percentile Relative to Exchange-Listed U.S. Companies | 72.30% | 71.40% | 75.40% | 71.30% |
| **Bid-Ask Spread** | | | | |
| Average Bid-Ask Spread ($) | $0.06 | $0.07 | $0.09 | $0.09 |
| Average Market Bid-Ask Spread ($) | $0.14 | $0.17 | $0.21 | $0.13 |
| Average Bid-Ask Spread (%) | 0.11% | 0.15% | 0.15% | 0.20% |
| Average Market Bid-Ask Spread (%) | 0.44% | 0.44% | 0.54% | 0.47% |

**Exhibit-4**

**Cassava Stock *Cammer/Krogman* Factors by Month**

| | January 2022 | February 2022 | March 2022 | April 2022 |
|---|---|---|---|---|
| **Trading Volume** | | | | |
| Avg. Daily Volume | 2,204,575 | 1,787,653 | 1,042,008 | 2,550,402 |
| Avg. Weekly Turnover | 27.55% | 22.34% | 13.02% | 31.86% |
| **Analysts, Institutions, & News Coverage** | | | | |
| Analysts | 4 | 4 | 4 | 5 |
|    Equity Analyst Reports | 1 | 4 | 3 | 5 |
|    Analyst Firms from Reports | 1 | 3 | 3 | 3 |
|    Analysts Contributing to Consensus Estimates | 4 | 4 | 4 | 5 |
| Institutional Investors | 237 | 237 | 222 | 221 |
| News Articles | 7 | 32 | 11 | 36 |
| **Market Makers** | | | | |
| Exchange Listing | Nasdaq | Nasdaq | Nasdaq | Nasdaq |
| Market Makers | 76 | 78 | 71 | 76 |
| **S-3 Eligible** | Yes | Yes | Yes | Yes |
| 12 Months of SEC Filings | Yes | Yes | Yes | Yes |
| Float Range ($) | $1,308,576,882 - $1,787,992,194 | $1,380,615,246 - $1,910,817,605 | $1,174,225,333 - $1,463,099,173 | $662,027,179 - $1,375,914,942 |
| **Market Capitalization** | | | | |
| Average Market Capitalization | $1,756,337,001 | $1,844,731,988 | $1,519,443,589 | $1,017,034,700 |
| Market Capitalization Range | $1,453,810,053 - $1,986,433,555 | $1,533,843,637 - $2,122,890,816 | $1,304,547,419 - $1,633,885,617 | $740,978,993 - $1,540,003,342 |
| Percentile Relative to Exchange-Listed U.S. Companies | 73.50% | 74.30% | 72.00% | 67.80% |
| **Float** | | | | |
| Average Float ($) | $1,580,881,898 | $1,660,446,375 | $1,362,627,148 | $908,668,964 |
| Average Float (shares) | 36,019,182 | 36,019,182 | 35,891,758 | 35,765,920 |
| Average Float as a % of Shares Outstanding | 90.01% | 90.01% | 89.69% | 89.34% |
| Percentile Relative to Exchange-Listed U.S. Companies | 72.10% | 73.10% | 70.40% | 66.30% |
| **Bid-Ask Spread** | | | | |
| Average Bid-Ask Spread ($) | $0.10 | $0.08 | $0.06 | $0.03 |
| Average Market Bid-Ask Spread ($) | $0.14 | $0.19 | $0.16 | $0.32 |
| Average Bid-Ask Spread (%) | 0.24% | 0.18% | 0.15% | 0.13% |
| Average Market Bid-Ask Spread (%) | 0.52% | 0.56% | 0.51% | 0.56% |

**Exhibit-4**

**Cassava Stock *Cammer/Krogman* Factors by Month**

| | May 2022 | June 2022 | July 2022 | August 2022 |
|---|---|---|---|---|
| **Trading Volume** | | | | |
| Avg. Daily Volume | 1,500,576 | 918,947 | 1,575,615 | 4,475,216 |
| Avg. Weekly Turnover | 18.72% | 11.46% | 19.65% | 55.80% |
| **Analysts, Institutions, & News Coverage** | | | | |
| Analysts | 4 | 4 | 4 | 4 |
|    Equity Analyst Reports | 3 | 1 | 1 | 7 |
|    Analyst Firms from Reports | 3 | 1 | 1 | 4 |
|    Analysts Contributing to Consensus Estimates | 4 | 4 | 4 | 4 |
| Institutional Investors | 221 | 213 | 215 | 215 |
| News Articles | 28 | 7 | 25 | 56 |
| **Market Makers** | | | | |
| Exchange Listing | Nasdaq | Nasdaq | Nasdaq | Nasdaq |
| Market Makers | 70 | 71 | 73 | 77 |
| **S-3 Eligible** | Yes | Yes | Yes | Yes |
| 12 Months of SEC Filings | Yes | Yes | Yes | Yes |
| Float Range ($) | $616,740,844 - $1,095,950,628 | $811,934,665 - $1,104,904,473 | $585,145,656 - $949,921,086 | $614,886,678 - $1,053,118,850 |
| **Market Capitalization** | | | | |
| Average Market Capitalization | $903,286,277 | $1,115,393,651 | $917,741,075 | $908,113,217 |
| Market Capitalization Range | $690,190,343 - $1,226,470,644 | $908,630,376 - $1,236,490,829 | $654,798,985 - $1,062,995,780 | $688,080,256 - $1,178,477,781 |
| Percentile Relative to Exchange-Listed U.S. Companies | 66.40% | 70.80% | 67.20% | 67.40% |
| **Float** | | | | |
| Average Float ($) | $807,159,281 | $996,696,806 | $820,117,648 | $811,513,940 |
| Average Float (shares) | 35,815,380 | 35,816,198 | 35,832,557 | 35,832,557 |
| Average Float as a % of Shares Outstanding | 89.36% | 89.36% | 89.36% | 89.36% |
| Percentile Relative to Exchange-Listed U.S. Companies | 65.00% | 69.30% | 65.60% | 65.80% |
| **Bid-Ask Spread** | | | | |
| Average Bid-Ask Spread ($) | $0.06 | $0.06 | $0.03 | $0.03 |
| Average Market Bid-Ask Spread ($) | $0.23 | $0.18 | $0.13 | $0.21 |
| Average Bid-Ask Spread (%) | 0.25% | 0.22% | 0.12% | 0.15% |
| Average Market Bid-Ask Spread (%) | 0.63% | 0.65% | 0.61% | 0.61% |

**Exhibit-4**

**Cassava Stock *Cammer/Krogman* Factors by Month**

| | September 2022 | October 2022 | November 2022 | December 2022 |
|---|---|---|---|---|
| **Trading Volume** | | | | |
| Avg. Daily Volume | 4,558,157 | 1,231,473 | 1,422,253 | 1,276,711 |
| Avg. Weekly Turnover | 56.84% | 15.37% | 17.75% | 15.93% |
| **Analysts, Institutions, & News Coverage** | | | | |
| Analysts | 4 | 4 | 4 | 4 |
| Equity Analyst Reports | 1 | 1 | 5 | 0 |
| Analyst Firms from Reports | 1 | 1 | 4 | 0 |
| Analysts Contributing to Consensus Estimates | 4 | 4 | 4 | 4 |
| Institutional Investors | 237 | 237 | 238 | 224 |
| News Articles | 25 | 23 | 35 | 13 |
| **Market Makers** | | | | |
| Exchange Listing | Nasdaq | Nasdaq | Nasdaq | Nasdaq |
| Market Makers | 74 | 68 | 71 | 61 |
| **S-3 Eligible** | Yes | Yes | Yes | Yes |
| 12 Months of SEC Filings | Yes | Yes | Yes | Yes |
| Float Range ($) | $884,347,507 - $1,829,610,360 | $1,191,229,445 - $1,515,882,422 | $1,167,553,113 - $1,473,315,260 | $996,054,205 - $1,581,083,885 |
| **Market Capitalization** | | | | |
| Average Market Capitalization | $1,431,571,914 | $1,474,514,407 | $1,409,099,262 | $1,436,317,063 |
| Market Capitalization Range | $989,616,592 - $2,047,399,642 | $1,333,180,626 - $1,696,520,418 | $1,306,646,503 - $1,648,834,824 | $1,114,716,520 - $1,769,442,182 |
| Percentile Relative to Exchange-Listed U.S. Companies | 74.80% | 74.40% | 73.30% | 74.00% |
| **Float** | | | | |
| Average Float ($) | $1,279,282,313 | $1,317,514,629 | $1,259,094,676 | $1,283,420,156 |
| Average Float (shares) | 35,830,728 | 35,794,154 | 35,802,191 | 35,803,530 |
| Average Float as a % of Shares Outstanding | 89.36% | 89.35% | 89.35% | 89.35% |
| Percentile Relative to Exchange-Listed U.S. Companies | 73.50% | 72.80% | 71.90% | 72.60% |
| **Bid-Ask Spread** | | | | |
| Average Bid-Ask Spread ($) | $0.04 | $0.04 | $0.04 | $0.03 |
| Average Market Bid-Ask Spread ($) | $0.23 | $0.23 | $0.21 | $0.19 |
| Average Bid-Ask Spread (%) | 0.10% | 0.10% | 0.13% | 0.09% |
| Average Market Bid-Ask Spread (%) | 0.70% | 0.69% | 0.72% | 0.75% |

**Exhibit-4**

**Cassava Stock *Cammer/Krogman* Factors by Month**

| | January 2023 | February 2023 | March 2023 | April 2023 |
|---|---|---|---|---|
| **Trading Volume** | | | | |
| Avg. Daily Volume | 1,986,446 | 1,046,248 | 785,474 | 488,370 |
| Avg. Weekly Turnover | 23.80% | 12.53% | 9.41% | 5.85% |
| **Analysts, Institutions, & News Coverage** | | | | |
| Analysts | 4 | 3 | 3 | 3 |
|    Equity Analyst Reports | 3 | 1 | 2 | 0 |
|    Analyst Firms from Reports | 3 | 1 | 2 | 0 |
|    Analysts Contributing to Consensus Estimates | 4 | 3 | 3 | 3 |
| Institutional Investors | 222 | 221 | 215 | 214 |
| News Articles | 30 | 14 | 15 | 8 |
| **Market Makers** | | | | |
| Exchange Listing | Nasdaq | Nasdaq | Nasdaq | Nasdaq |
| Market Makers | 66 | 61 | 59 | 52 |
| **S-3 Eligible** | Yes | Yes | Yes | Yes |
| 12 Months of SEC Filings | Yes | Yes | Yes | Yes |
| Float Range ($) | $1,020,688,166 - $1,365,413,979 | $925,513,866 - $1,181,060,609 | $888,085,596 - $1,012,629,569 | $817,595,791 - $934,990,276 |
| **Market Capitalization** | | | | |
| Average Market Capitalization | $1,296,285,533 | $1,141,533,382 | $1,046,796,761 | $977,606,967 |
| Market Capitalization Range | $1,136,876,573 - $1,520,843,697 | $1,030,868,258 - $1,315,504,757 | $979,116,167 - $1,116,426,150 | $901,370,302 - $1,030,793,550 |
| Percentile Relative to Exchange-Listed U.S. Companies | 71.40% | 70.20% | 69.40% | 68.70% |
| **Float** | | | | |
| Average Float ($) | $1,163,805,584 | $1,024,869,051 | $944,774,228 | $886,746,923 |
| Average Float (shares) | 37,470,197 | 37,470,197 | 37,671,729 | 37,869,189 |
| Average Float as a % of Shares Outstanding | 89.78% | 89.78% | 90.26% | 90.71% |
| Percentile Relative to Exchange-Listed U.S. Companies | 70.10% | 68.90% | 68.10% | 67.50% |
| **Bid-Ask Spread** | | | | |
| Average Bid-Ask Spread ($) | $0.03 | $0.03 | $0.03 | $0.02 |
| Average Market Bid-Ask Spread ($) | $0.17 | $0.17 | $0.19 | $0.19 |
| Average Bid-Ask Spread (%) | 0.10% | 0.11% | 0.13% | 0.09% |
| Average Market Bid-Ask Spread (%) | 0.62% | 0.71% | 0.68% | 0.72% |

**Exhibit-4**

**Cassava Stock *Cammer/Krogman* Factors by Month**

| | May 2023 | June 2023 | July 2023 | August 2023 |
|---|---|---|---|---|
| **Trading Volume** | | | | |
| Avg. Daily Volume | 838,650 | 562,967 | 1,125,633 | 976,046 |
| Avg. Weekly Turnover | 10.04% | 6.74% | 13.43% | 11.63% |
| **Analysts, Institutions, & News Coverage** | | | | |
| Analysts | 3 | 2 | 2 | 2 |
|     Equity Analyst Reports | 3 | 2 | 2 | 2 |
|     Analyst Firms from Reports | 2 | 1 | 2 | 2 |
|     Analysts Contributing to Consensus Estimates | 3 | 2 | 2 | 2 |
| Institutional Investors | 212 | 216 | 217 | 217 |
| News Articles | 37 | 12 | 18 | 26 |
| **Market Makers** | | | | |
| Exchange Listing | Nasdaq | Nasdaq | Nasdaq | Nasdaq |
| Market Makers | 55 | 57 | 56 | 55 |
| **S-3 Eligible** | Yes | Yes | Yes | Yes |
| 12 Months of SEC Filings | Yes | Yes | Yes | Yes |
| Float Range ($) | $839,938,612 - $1,055,792,989 | $852,814,136 - $969,072,547 | $762,307,191 - $963,154,595 | $639,145,971 - $831,880,096 |
| **Market Capitalization** | | | | |
| Average Market Capitalization | $1,021,855,376 | $1,013,695,958 | $909,653,736 | $794,263,889 |
| Market Capitalization Range | $926,002,468 - $1,163,974,248 | $940,197,276 - $1,068,368,042 | $840,067,321 - $1,061,402,424 | $704,256,499 - $916,624,669 |
| Percentile Relative to Exchange-Listed U.S. Companies | 69.60% | 68.70% | 66.50% | 65.50% |
| **Float** | | | | |
| Average Float ($) | $926,882,827 | $919,500,215 | $825,452,398 | $720,831,920 |
| Average Float (shares) | 37,869,189 | 37,877,289 | 38,039,281 | 38,089,748 |
| Average Float as a % of Shares Outstanding | 90.71% | 90.71% | 90.74% | 90.75% |
| Percentile Relative to Exchange-Listed U.S. Companies | 68.20% | 67.40% | 65.20% | 64.40% |
| **Bid-Ask Spread** | | | | |
| Average Bid-Ask Spread ($) | $0.03 | $0.03 | $0.03 | $0.02 |
| Average Market Bid-Ask Spread ($) | $0.18 | $0.16 | $0.09 | $0.20 |
| Average Bid-Ask Spread (%) | 0.11% | 0.12% | 0.11% | 0.09% |
| Average Market Bid-Ask Spread (%) | 0.71% | 0.65% | 0.63% | 0.74% |

**Exhibit-4**

**Cassava Stock *Cammer/Krogman* Factors by Month**

| | September 2023 | October 2023 |
|---|---|---|
| **Trading Volume** | | |
| Avg. Daily Volume | 730,113 | 1,924,574 |
| Avg. Weekly Turnover | 8.70% | 22.84% |
| **Analysts, Institutions, & News Coverage** | | |
| Analysts | 2 | 2 |
|   Equity Analyst Reports | 1 | 3 |
|   Analyst Firms from Reports | 1 | 2 |
|   Analysts Contributing to Consensus Estimates | 2 | 2 |
| Institutional Investors | 208 | 207 |
| News Articles | 13 | 42 |
| **Market Makers** | | |
| Exchange Listing | Nasdaq | Nasdaq |
| Market Makers | 54 | 60 |
| **S-3 Eligible** | Yes | Yes |
| 12 Months of SEC Filings | Yes | Yes |
| Float Range ($) | $633,813,407 - $804,074,580 | $483,474,337 - $786,793,285 |
| **Market Capitalization** | | |
| Average Market Capitalization | $795,939,951 | $718,293,906 |
| Market Capitalization Range | $698,380,700 - $885,986,573 | $532,520,647 - $866,609,945 |
| Percentile Relative to Exchange-Listed U.S. Companies | 66.50% | 66.20% |
| **Float** | | |
| Average Float ($) | $722,353,026 | $652,137,475 |
| Average Float (shares) | 38,089,748 | 38,249,552 |
| Average Float as a % of Shares Outstanding | 90.75% | 90.79% |
| Percentile Relative to Exchange-Listed U.S. Companies | 65.30% | 65.00% |
| **Bid-Ask Spread** | | |
| Average Bid-Ask Spread ($) | $0.02 | $0.03 |
| Average Market Bid-Ask Spread ($) | $0.16 | $0.14 |
| Average Bid-Ask Spread (%) | 0.09% | 0.15% |
| Average Market Bid-Ask Spread (%) | 0.81% | 0.85% |

**Sources:** Bloomberg, CRSP, Factiva, LSEG (London Stock Exchange Group) Workspace, SEC Filings.

**Notes:** [1] Analyst count is equal to the greater of Analyst Firms from Reports and Analysts Contributing to Consensus Estimates.

[2] Data sourced from Bloomberg when available. When Bloomberg data was unavailable, CRSP data was used.

[3] As of 9/14/2020, Cassava's float was $165.0 million, and thereafter always exceeded $75 million.

**Exhibit-5**

**Difference between Cassava Stock and Synthetic Stock Prices**

| Dollar Difference | | | Percent Difference | | |
|---|---|---|---|---|---|
| Decile | | | Decile | | |
| 90th | | $1.11 | 90th | | 3.60% |
| 80th | | $0.81 | 80th | | 2.49% |
| 70th | | $0.56 | 70th | | 1.83% |
| 60th | | $0.42 | 60th | | 1.38% |
| 50th (Median) | | $0.33 | 50th (Median) | | 1.09% |
| 40th | | $0.25 | 40th | | 0.84% |
| 30th | | $0.18 | 30th | | 0.61% |
| 20th | | $0.11 | 20th | | 0.36% |
| 10th | | $0.06 | 10th | | 0.21% |
| Mean | | $0.49 | Mean | | 1.51% |

**Sources:** OptionMetrics and Computations performed by Crowninshield Financial Research, Inc.

**Notes:** Daily synthetic stock price computed from the put and call options with at least 30 days to expiration and strike price closest to the money. Each day's difference is the absolute value of the synthetic stock price minus the actual stock price divided by the actual stock price.