**FILED**

August 26, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: ___Christian Rodriguez___
DEPUTY

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| In re CASSAVA SCIENCES, INC. SECURITIES LITIGATION | § § § § | Master File No. 1:21-cv-00751-DAE CLASS ACTION |
| This Document Relates To: ALL ACTIONS | § § § § § § | |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF
MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................1

II.     DEFENDANTS DID NOT REBUT PLAINTIFFS' SHOWING THAT THE *BASIC*
        PRESUMPTION OF RELIANCE APPLIES .....................................................2

        A.      The Relevant Factors Are Met for Cassava Common Stock .......................2

                1.      Cassava's NASDAQ Listing Gives Rise to a Presumption of Efficiency
                        that Defendants Did Not Refute.......................................................3

                2.      The *Cammer* and *Krogman* Factors Are Met, and Defendants Did Not
                        Show Otherwise ...............................................................................4

                3.      Defendants' "Meme" Stock Argument Is a Sideshow ....................6

                        a.      The Supreme Court Has Already Rejected the Types of
                                Arguments Defendants Are Peddling..................................7

                        b.      Defendants' "Meme" Stock Criticisms Are Inaccurate ....................11

                        c.      Speculation About Short-Selling Constraints Does Not Defeat
                                Market Efficiency ..............................................................14

        B.      Cassava Options Also Traded in an Efficient Market ................................16

III.    DEFENDANTS DID NOT REBUT PLAINTIFFS' SHOWING THAT THE
        SCHEME CLAIMS ARE ALSO ENTITLED TO THE *AFFILIATED UTE*
        PRESUMPTION OF RELIANCE ..................................................................17

IV.     DEFENDANTS HAVE NOT MET THEIR BURDEN TO PROVE THE ABSENCE
        OF PRICE IMPACT .........................................................................................19

        A.      Defendants Failed to Disprove "Front-End" Price Impact.........................20

        B.      Defendants Conceded Corrective Disclosures Impacted Cassava's Stock Price
                on the "Back-End".....................................................................................20

        C.      Defendants Failed to Prove an Absence of Price Impact for the Remaining
                Corrective Disclosures ..............................................................................21

        D.      There Is No "Mismatch" Between the Alleged Misstatements and Omissions
                and the Corrective Disclosures ..................................................................23

V.      DEFENDANTS DO NOT DISPUTE THAT PLAINTIFFS HAVE PROVIDED A
        COMMON DAMAGES METHODOLOGY CONSISTENT WITH THEIR
        THEORY OF LIABILITY .............................................................................27

**Page**

VI.     DEFENDANTS DO NOT SHOW PLAINTIFFS FAILED TO SATISFY RULE
        23(a)(3)'s STRAIGHTFORWARD TYPICALITY REQUIREMENTS ...............................31

VII.    CONCLUSION.....................................................................................................................35

4894-6865-3272.v2

# TABLE OF AUTHORITIES

**Page**

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
 406 U.S. 128 (1972)................................................................ *passim*

*Akin v. Q-L Invs., Inc.*,
 959 F.2d 521 (5th Cir. 1992) ...............................................19

*Am. Express Co. v. Italian Colors Rest.*,
 570 U.S. 228 (2013)..................................................................3

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
 568 U.S. 455 (2013)...........................................................24, 26

*Aranaz v. Catalyst Pharm. Partners Inc.*,
 302 F.R.D. 657 (S.D. Fla. 2014) ..........................................20

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
 77 F.4th 74 (2d Cir. 2023) ....................................................20

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
 955 F.3d 254 (2d Cir. 2020)..................................................22

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988)................................................... *passim*

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
 2023 WL 2932485 (D. Conn. Apr. 13, 2023).......................21, 22, 25

*Burges v. BancorpSouth, Inc.*,
 2017 WL 2772122 (M.D. Tenn. June 26, 2017)....................19

*Cannon v. BP Prod. N. Am., Inc.*,
 2013 WL 5514284 (S.D. Tex. Sep. 30, 2013) .......................7

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
 310 F.R.D. 69 (S.D.N.Y. 2015) .....................................6, 14, 15

*Cavalier Carpets, Inc. v. Caylor*,
 746 F.2d 749 (11th Cir. 1984) ..............................................19

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*,
 322 F. Supp. 3d 676 (D. Md. 2018) ......................................20

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
 2022 WL 1459567 (N.D. Cal. May 9, 2022)..........................31

4894-6865-3272.v2

**Page**

*Cobalt Int'l Energy, Inc. Sec. Litig.*,
   2017 WL 2608243 (S.D. Tex. June 15, 2017) ........................................................24

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ................................................................... *passim*

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
   2023 WL 6300569 (S.D. Tex. Sept. 27, 2023),
   *leave to appeal denied*, 2023 WL 8794620 (5th Cir. Nov. 17, 2023) ........................22, 23, 25

*Dougherty v. Esperion Therapeutics, Inc.*,
   2020 WL 6793326 (E.D. Mich. Nov. 19, 2020) ......................................................30

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011) ..........................................................................28

*Feder v. Elec. Data Sys. Corp.*,
   429 F.3d 125 (5th Cir. 2005) ...........................................................31, 34

*Fine v. Am. Solar King Corp.*,
   919 F.2d 290 (5th Cir. 1990) ..................................................................33

*Finkel v. Docutel/Olivetti Corp.*,
   817 F.2d 356 (5th Cir. 1987) ..................................................................10

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   903 F.2d 176 (2d Cir. 1990) ..................................................................35

*George v. China Auto. Sys., Inc.*,
   2013 WL 3357170 (S.D.N.Y. July 3, 2013) ......................................................6, 10

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
   594 U.S. 113 (2021) ................................................................... *passim*

*Griffin v. GK Intelligent Sys., Inc.*,
   196 F.R.D. 298 (S.D. Tex. 2000) ...............................................................33

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ................................................................... *passim*

*Holwill v. AbbVie Inc.*,
   2021 WL 7366274 (N.D. Ill. Sept. 23, 2021) ......................................................26

4894-6865-3272.v2

**Page**

*Homyk v. ChemoCentryx, Inc.*,
2024 WL 1141699 (N.D. Cal. Mar. 6, 2024),
*leave to appeal denied*, 2024 WL 2745788 (9th Cir. May 23, 2024) .....................................25

*IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*,
2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ...................................................................6, 35

*In re Accredo Health, Inc. Sec. Litig.*,
2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006).......................................................3, 7, 9, 10

*In re Apache Corp. Sec. Litig.*,
2024 WL 532315 (S.D. Tex. Feb. 9, 2024) .....................................................................21, 22

*In re Apple Inc. Sec. Litig.*,
2023 WL 2763952 (N.D. Cal. Mar. 28, 2023).........................................................................17

*In re BancorpSouth, Inc.*,
2017 WL 4125647 (6th Cir. Sept. 18, 2017) ..........................................................................20

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
337 F.R.D. 193 (D. Minn. 2020).................................................................................21, 26

*In re CMS Energy Sec. Litig.*,
236 F.R.D. 338 (E.D. Mich. 2006) ..........................................................................................32

*In re Comput. Scis. Corp. Sec. Litig.*,
288 F.R.D. 112 (E.D. Va. 2012) ..............................................................................................34

*In re Conduent Inc. Sec. Litig.*,
2022 WL 17406565 (D.N.J. Feb. 28, 2022) ...........................................................................29

*In re Connetics Corp. Sec. Litig.*,
257 F.R.D. 572 (N.D. Cal. 2009).............................................................................................35

*In re Countrywide Fin. Corp. Sec. Litig.*,
273 F.R.D. 586 (C.D. Cal. 2009).............................................................................................34

*In re DVI, Inc. Sec. Litig.*,
249 F.R.D. 196 (E.D. Pa. 2008),
*aff'd*, 639 F.3d 623 (3d Cir. 2011) ..........................................................................................9

*In re Dynegy, Inc. Secs. Litig.*,
226 F.R.D. 263 (S.D. Tex., 2005)............................................................................................31

**Page**

*In re Elec. Data Sys. Corp. Sec. Litig.*,
226 F.R.D. 559 (E.D. Tex. 2005),
*aff'd sub nom.*, 429 F.3d 125 ...............................................................................35

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) ........................................................... *passim*

*In re EQT Corp. Sec. Litig.*,
2022 WL 3293518 (W.D. Pa. Aug. 11, 2022) ..............................................22, 28

*In re Fed. Home Loan Mortg. Corp.* (*Freddie Mac*) *Sec. Litig.*,
281 F.R.D. 174 (S.D.N.Y. 2012) ..............................................................6, 30, 31

*In re FirstEnergy Corp. Sec. Litig.*,
2023 WL 2709373 (S.D. Ohio Mar. 30, 2023).....................................................19

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
2006 WL 8429110 (S.D.N.Y. June 21, 2006) .....................................................33

*In re Groupon, Inc. Sec. Litig.*,
2015 WL 1043321 (N.D. Ill. Mar. 5, 2015),
*objections overruled*, 2015 WL 13628131 (N.D. Ill. May 12, 2015).....................8, 14, 15, 16

*In re HealthSouth Corp. Sec. Litig.*,
213 F.R.D. 447 (N.D. Ala. 2003)..........................................................................33

*In re Interbank Funding Corp. Sec. Litig.*,
629 F.3d 213 (D.C. Cir. 2010) ..............................................................................18

*In re JPMorgan Chase & Co. Sec. Litig.*,
2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015)........................................3, 6, 28

*In re Mattel, Inc. Sec. Litig.*,
2021 WL 4704578 (C.D. Cal. Oct. 6, 2021).......................................................25

*In re NIO, Inc. Sec. Litig.*,
2023 WL 5048615 (E.D.N.Y. Aug. 8, 2023)..................................................... *passim*

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017).....................................................................................3

*In re Petrobras Sec. Litig.*,
312 F.R.D. 354 (S.D.N.Y. 2016),
*aff'd in part, vacated in part*, 862 F.3d 250 (2d Cir. 2017) .................................10

**Page**

*In re PolyMedica Corp. Sec. Litig.*,
　　453 F. Supp. 2d 260 (D. Mass. 2006) ....................................................................16

*In re SandRidge Energy, Inc. Sec. Litig.*,
　　2019 WL 4752268 (W.D. Okla. Sept. 30, 2019) ....................................................26

*In re Synchrony Fin. Sec. Litig.*,
　　2023 WL 1503032 (D. Conn. Feb. 3, 2023) ...........................................................3

*In re Teva Sec. Litig.*,
　　2021 WL 872156 (D. Conn. Mar. 9, 2021) ............................................................11

*In re Vale S.A. Sec. Litig.*,
　　2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) ..........................................................30

*In re Vale S.A. Sec. Litig.*,
　　2022 WL 969724 (E.D.N.Y. Mar. 31, 2022) ..............................................6, 17, 30

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
　　2 F.4th 1199 (9th Cir. 2021) .................................................................................18

*Jiang v. Chirico*,
　　2024 WL 967084 (S.D.N.Y. Mar. 5, 2024) ...........................................................33

*Johnston v. HBO Film Mgmt., Inc.*,
　　265 F.3d 178 (3d Cir. 2001)............................................................................18, 19

*Joseph v. Wiles*,
　　223 F.3d 1155 (10th Cir. 2000),
　　*abrogated by Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*,
　　582 U.S. 497 (2017)..............................................................................................18

*Junge v. Geron Corp.*,
　　2022 WL 1002446 (N.D. Cal. Apr. 2, 2022) .........................................................28

*KB Partners I, L.P. v. Barbier*,
　　2013 WL 2443217 (W.D. Tex. June 4, 2013) ............................................. *passim*

*Krogman v. Sterritt*,
　　202 F.R.D. 467 (N.D. Tex. 2001) ............................................................. *passim*

*Lehocky v. Tidel Techs., Inc.*,
　　220 F.R.D. 491 (S.D. Tex. 2004).............................................................5, 6, 31, 35

**Page**

*Levine v. SkyMall, Inc.*,
  2001 WL 37118873 (D. Ariz. May 24, 2001) ....................................................6, 9

*Loritz v. Exide Techs.*,
  2015 WL 6790247 (C.D. Cal. July 21, 2015) ........................................................33

*Lumen v. Anderson*,
  280 F.R.D. 451 (W.D. Mo. 2012) ....................................................................3, 9

*Malriat v. QuantumScape Corp.*,
  2022 WL 17974629 (N.D. Cal. Dec. 19, 2022) .......................................................4

*Marcus v. J.C. Penney Co.*,
  2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) .........................................17, 24, 26

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014) ....................................................................15

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019) ................................................................. *passim*

*Mullen v. Treasure Chest Casino, LLC*,
  186 F.3d 620 (5th Cir. 1999) ................................................................................31

*O'Neil v. Appel*,
  165 F.R.D. 479 (W.D. Mich. 1996) ......................................................................10

*Pearlstein v. BlackBerry Ltd.*,
  2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) .......................................3, 23, 30, 32

*Pelletier v. Endo Int'l PLC*,
  338 F.R.D. 446 (E.D. Pa. 2021) ......................................................................4, 35

*Petrie v. Elec. Game Card, Inc.*,
  308 F.R.D. 336 (C.D. Cal. 2015) ................................................................6, 9, 11

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) ............................................................................30

*Plymouth Cnty. Ret. Sys. v. Patterson Cos.*,
  2020 WL 5757695 (D. Minn. Sept. 28, 2020) .....................................28, 29, 30, 34

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
  2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ..........................................................31

4894-6865-3272.v2

**Page**

*Pub. Emps. Ret. Sys. of Miss., P.R. Teachers Ret. Sys. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ...................................................................23, 26, 31

*Rocco v. Nam Tai Elecs., Inc.*,
245 F.R.D. 131 (S.D.N.Y. 2007) ...........................................................35

*Rooney v. EZCORP, Inc.*,
330 F.R.D. 439 (W.D. Tex. 2019) ............................................................21, 22, 29

*Rougier v. Applied Optoelectronics, Inc.*,
2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ........................................16, 27, 28

*Schueneman v. Arena Pharms., Inc.*,
2011 WL 3475380 (S.D. Cal. Aug. 8, 2011) ...........................................32

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
119 F. Supp. 3d 1213 (C.D. Cal. 2015) ...................................................10

*Serfaty v. Int'l Automated Sys., Inc.*,
180 F.R.D. 418 (D. Utah 1998) ...............................................................10

*Set Cap. LLC v. Credit Suisse Grp. AG*,
2023 WL 2535175 (S.D.N.Y. Mar. 16, 2023) .........................................26

*Shannon v. Allstate Ins. Co.*,
2024 WL 1080915 (W.D. Tex. Jan. 31, 2024) ........................................33

*Sicav v. James Jun Wang*,
2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ............................................30

*Sklar v. Amarin Corp. PLC*,
2014 WL 3748248 (D.N.J. July 29, 2014) ...............................................32

*Smith v. Ayres*,
845 F.2d 1360 (5th Cir. 1988) .................................................................18, 19

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*,
2022 WL 4598044 (M.D. Tenn. Sept. 30, 2022) ....................................21, 22

*Strougo v. Tivity Health, Inc.*,
606 F. Supp. 3d 753 (M.D. Tenn. 2022),
*vacated & remanded sub nom.*, *In re Tivity Health, Inc.*,
2022 WL 17243323 (6th Cir. Nov. 21, 2022) ........................................21

4894-6865-3272.v2

Page

*Turnbow v. Life Partners, Inc.*,
   2013 WL 3479884 (N.D. Tex. July 9, 2013) .........................................................................29

*Utesch v. Lannett Co.*,
   2021 WL 3560949 (E.D. Pa. Aug. 12, 2021),
   *aff'd sub nom. Univ. of P.R. Ret. Sys. v. Lannett Co.*,
   2023 WL 2985120 (3d Cir. Apr. 18, 2023) ....................................................................29, 30

*Vale S.A. Sec. Litig.*,
   2019 WL 11032303 (S.D.N.Y. Sept. 27, 2019) .....................................................................11

*Vervaecke v. Chiles, Heider & Co.*,
   578 F.2d 713 (8th Cir. 1978) .................................................................................................19

*Villella v. Chem. & Mining Co. of Chile Inc.*,
   333 F.R.D. 39 (S.D.N.Y. 2019) .............................................................................................31

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
   2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ............................................................................4

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ...............................................................................................11, 18

*Weiner v. Tivity Health, Inc.*,
   334 F.R.D. 123 (M.D. Tenn. 2020) .......................................................................................27

*Willis v. Big Lots, Inc.*,
   2017 WL 1074048 (S.D. Ohio Mar. 17, 2017) .................................................................11, 28

*Wilson v. LSB Indus., Inc.*,
   2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ............................................................11, 29, 30

*Xcelera.com Sec. Litig.*,
   430 F.3d 503 (1st Cir. 2005) .....................................................................................4, 9, 10, 15

Federal Rules of Civil Procedure
   Rule 23 ......................................................................................................................................3
   Rule 23(a)(3) ...........................................................................................................................31
   Rule 23(b)(3) ...........................................................................................................................27

17 C.F.R.
   §240.10b-5 ..............................................................................................................................33
   §240.10b-5(a) ....................................................................................................................18, 19
   §240.10b-5(b) ..........................................................................................................................18
   §240.10b-5(c) ....................................................................................................................18, 19

4894-6865-3272.v2

## I.      INTRODUCTION

Since Plaintiffs filed their class certification motion, the case against Defendants has only grown stronger.[1]  On June 28, 2024, the U.S. Department of Justice ("DOJ") criminally charged Defendants' primary scientific consultant, Dr. Wang, with fabricating scientific data in connection with Cassava's simufilam research and then covering it up in a scheme involving Defendants.  Ex. 1.[2]  Wang's indictment was followed in quick succession with resignations by defendants Barbier and Burns (Ex. 2) and the Company's amendment of SEC disclosures due to ongoing SEC and DOJ investigations.  Ex. 3.  Desperate to find an off-ramp in this case, Defendants oppose class certification, but their claims fall apart under the slightest scrutiny and have been repeatedly rejected by courts, including this one.

*First*, Defendants dispute the applicability of the *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) presumption of reliance, contesting market efficiency on the ground that Cassava is a so-called "meme" stock.  At his recent deposition, however, Defendants' expert, Dr. Stulz, admitted he does not actually opine that the market for Cassava securities was *in*efficient or that Cassava is a "meme" stock.  Nor does Stulz dispute that the *Cammer* and *Krogman* factors are met here for Cassava's stock, which also assures the efficiency of the market for Cassava options.  Defendants' argument is thus a hollow one.

*Second*, Defendants dispute the applicability of the *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) presumption of reliance on the basis this is a "misrepresentations" case.  But Defendants ignore Plaintiffs' scheme-liability claims, which are admittedly entitled to the presumption.

*Third*, Defendants' *Basic* rebuttal bid fails because they do not attempt to disprove front-end price impact (price impact at the time the misrepresentations were made) and concede back-end price

---

[1]    Unless otherwise noted, all capitalized terms are the same as in Plaintiffs' Motion for Class Certification (ECF 148) ("Motion" or "Mot.").

[2]    Unless otherwise noted, all "Ex.__" references are to the exhibits attached to the Affidavit of Kevin Lavelle in Support of Plaintiffs' Reply in Further Support of Motion to Certify Class.

impact (price impact at the time the misrepresentations were corrected) for a number of corrective disclosures. Further, courts have found Defendants' argument that certain corrective disclosures did not result in statistically significant price movements at the 95% confidence level ***insufficient*** to carry Defendants' burden to prove the complete lack of price impact. And while Defendants invoke *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113 (2021), they do not identify a mismatch between the misleading statements and omissions and their corrective disclosures. Instead, Defendants rehash merits-based falsity and loss causation arguments that this Court already rejected at the motion-to-dismiss stage, which, in any event, must be resolved at summary judgment or trial, not on class certification.

***Fourth***, Defendants criticize Plaintiffs' proposed class-wide damages methodology. But they do not seriously dispute that Dr. Feinstein's methodology, which has been accepted by dozens of courts, satisfies *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) because it is consistent with Plaintiffs' theory of liability. Instead, Defendants complain that Plaintiffs have not yet actually undertaken a loss causation analysis and proven damages, which courts hold are merits issue for another day.

***Last***, Defendants challenge Plaintiffs' typicality. They do not contend Plaintiffs' claims are atypical of the Class, however. Defendants instead claim that Plaintiffs are subject to "unique" defenses related to reliance and their transactions in Cassava securities. But Plaintiffs are entitled to presumptions of reliance under both *Basic* and *Affiliated Ute*. And courts, including this one, have rejected Defendants' arguments regarding post-class-period purchases and their mischaracterizations of Plaintiffs as short-term or in-and-out traders. Each of Defendants' arguments fails, and the Class must be certified.

## II.   DEFENDANTS DID NOT REBUT PLAINTIFFS' SHOWING THAT THE *BASIC* PRESUMPTION OF RELIANCE APPLIES

### A.   The Relevant Factors Are Met for Cassava Common Stock

Based on Supreme Court precedent, courts have repeatedly emphasized that the *Basic* test for

market efficiency is "not . . . onerous." *In re Petrobras Sec.*, 862 F.3d 250, 278 (2d Cir. 2017).[3]  As Plaintiffs explained in their Motion and further below, each of the relevant factors is undeniably met, and Defendants present no evidence showing otherwise.  Mot. at 12-17.[4]  Thus, the Court should find the *Basic* presumption of reliance applies in this case.

### 1.     Cassava's NASDAQ Listing Gives Rise to a Presumption of Efficiency that Defendants Did Not Refute

First, Cassava's stock traded on the NASDAQ during the Class Period, and "the overwhelming case authority holds that securities listed on the NASDAQ trade in an efficient market." *In re Accredo Health, Inc. Sec. Litig.*, 2006 WL 1716910, at *8 (W.D. Tenn. Apr. 19, 2006) (collecting cases); Mot. at 12-13.  Even if its NASDAQ listing is not dispositive, it is "at least entitled to a **presumption** of efficiency – making it incumbent upon Defendants to rebut the presumption." *Lumen v. Anderson*, 280 F.R.D. 451, 459-60 (W.D. Mo. 2012).  Defendants did not even attempt to do so.

At his recent deposition, Defendants' expert Dr. Stulz admitted he is ***not*** opining that the market for Cassava stock was ***in***efficient.  Ex. 4 ("Stulz Tr.") 38:18-23 ("Q.  You're not offering an affirmative opinion that the market for Cassava stock was inefficient during the class period, are you?  [objection] A.  That's correct.").  This admission is fatal to Defendants' Opposition.  Without any finding of ***inefficiency***, there is no real dispute here.  *See In re NIO, Inc. Sec. Litig.*, 2023 WL 5048615, at *13 (E.D.N.Y. Aug. 8, 2023) (defendants "did not submit any expert opinion showing an inefficient

---

[3]     Defendants claim that Rule 23 "'in practice exclude[s] most claims.'"  ECF 179, Exhibit B ("Opposition" or "Opp.") at 7 (quoting *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013)).  That does not apply to securities claims; in securities cases class certification is "'especially'" appropriate.  Mot. at 1 (quoting *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 670 (S.D. Tex. 2006)).  Unless otherwise noted, citations are omitted, and emphasis is added.

[4]     Courts routinely accept Dr. Feinstein's *Cammer/Krogman* analysis, even over defendants' criticisms. *See, e.g., In re Synchrony Fin. Sec. Litig.*, 2023 WL 1503032, at *9-*11 (D. Conn. Feb. 3, 2023); *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *16-*17 (S.D.N.Y. Jan. 26, 2021); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 385-86 (N.D. Ga. 2019); *In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *6-*7 (S.D.N.Y. Sept. 29, 2015).

market"); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *13 (E.D. Pa. Aug. 4, 2016) (finding plaintiffs "have the better of this battle of the experts" where defendants' strategy "appears to call into question [p]laintiffs' expert's conclusions," but defendants "have not tried to show that the market for [the company's] stock was inefficient").

## 2.    The *Cammer* and *Krogman* Factors Are Met, and Defendants Did Not Show Otherwise

Second, Defendants concede the *Cammer* and *Krogman* factors are the factors that courts consider and cite no case in which these factors were met but efficiency was still found lacking.  Opp. at 9.  Significantly, at his deposition, Stulz admitted he did ***not*** find any of these factors unmet.  *See, e.g.*, Stulz Tr. 49:2-8; *see, e.g.*, *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 481-82 (E.D. Pa. 2021) (market efficiency shown where "[d]efendants' expert failed to make any *Cammer*-specific findings").

Drilling down to the individual factors, Defendants do not dispute *Cammer* factors 1, 3, and 4, and the *Krogman* factors, providing another "'***strong presumption***'" of market efficiency.  Mot. at 13-17.  *Cammer* factor 2 is also not up for debate as it is undisputed that six analysts covered Cassava during the Class Period, and it received significant media coverage throughout.  *Id.* at 14; ECF 148-7 ("Feinstein Rpt."), ¶¶84-93; Ex. 5 ("Feinstein Reply"), ¶¶197-198.  Defendants try to chop up the Class Period to claim Cassava was only covered by two to four analysts during discrete chunks (Opp. at 19), but courts have rejected this piecemeal approach.  *See KB Partners I, L.P. v. Barbier*, 2013 WL 2443217, at *6-*7 (W.D. Tex. June 4, 2013) ("There is no requirement proposed class periods be analyzed in discrete chunks."); *Malriat v. QuantumScape Corp.*, 2022 WL 17974629, at *8 (N.D. Cal. Dec. 19, 2022) ("defendants do not point to a case that says the number of analysts covering the stock must stay above a certain level throughout the class period, nor could I find one").

Even accepting Defendants' erroneous premise, two to four analysts is sufficient for market efficiency.  *See Barbier*, 2013 WL 2443217, at *6-*7, *13 (one to three analysts plus media coverage); *QuantumScape*, 2022 WL 17974629, at *8 (two analysts); *Xcelera.com Sec. Litig.*, 430 F.3d 503, 515

- 4 -

(1st Cir. 2005) (one analyst plus media coverage); Feinstein Reply, ¶¶26, 187, 202 (published research says two analysts is sufficient); Feinstein Rpt., ¶86 (same).  That three to four analysts contributed to consensus estimates on nearly 70% of Cassava's Class-Period trading dates bolsters the conclusion of market efficiency here.  *See* Feinstein Reply, ¶202; Mot. at 14 (citing cases with 3-4 analysts sufficient).[5]

With *Cammer* 1-4 and the *Krogman* factors established, the Court need not reach *Cammer* 5.  *See, e.g.*, *Enron*, 529 F. Supp. 2d at 750 ("[T]he plaintiff need not satisfy all the *Cammer/Unger/Bell* factors to establish an efficient market."); *S. Co.*, 332 F.R.D. at 385 n.8 ("district courts around the country routinely find market efficiency regardless of the fifth *Cammer* factor"); Mot. at 15-16.  Still, *Cammer* 5 is also met here, as Plaintiffs' expert, Dr. Feinstein, proved with statistically significant event-study evidence that Cassava's stock price reacted to new, material information.  Mot. at 16; *see S. Co.*, 332 F.R.D. at 386 (finding Dr. Feinstein's *Cammer* 5 analysis is "strong evidence of market efficiency"); *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 507 (S.D. Tex. 2004) ("statistically significant cause and effect relationship between disseminated information and market price" "sufficient" for class certification).  Importantly, Defendants ***do not dispute Feinstein's results*** that Cassava's stock price reacted significantly more frequently on news dates than on non- or lesser-news dates or claim that Cassava's stock did not react to Company-specific information.  *See* Feinstein Reply, ¶¶16, 33, 55.

Instead, Stulz nitpicks Dr. Feinstein's analysis as "incomplete" (Stulz Tr. 119:24), even as he conceded at his deposition that Cassava's stock price reacted to Company-specific news during the Class Period.  *See id.* 328:18-330:12 ("Cassava had information on that day . . . that was positive about Phase~2b of the development of its drug and . . . ***the market reacted to that***."); *id.* 318:15-320:20

---

[5]   Contrary to Defendants' bare assertion that "information about Cassava became more difficult to acquire and assess" at Class-Period end (Opp. at 19), the opposite was true.  Feinstein Reply, ¶¶3, 54-55, 197, 199-202.  In any event, this Court should be skeptical of Defendants' strategic attempt to benefit from the decision of certain analysts to pause coverage due to the uncertainty ***caused by their fraud***.  *Id.*, ¶¶200-201.

(agreeing stock price declined "by a fairly large amount" after corrective disclosure about DOJ's criminal investigation); *id.* 321:7-322:9 (agreeing stock price "declined on those days" when Quanterix corrected Cassava's response to the Citizen Petition); Feinstein Reply, ¶¶27, 206-208.  And because "Defendants' expert offers no opinion on market efficiency through an event study of his own, the fifth *Cammer* factor can only weigh ***against Defendants*** or be neutral."  *JPMorgan*, 2015 WL 10433433, at \*6.

The showing that *Cammer* factor 5 is met, along with the other *Cammer* and *Krogman* factors, is all this Court needs to find efficiency.  *Levine v. SkyMall, Inc.*, 2001 WL 37118873, at \*8 (D. Ariz. May 24, 2001) (*Cammer* 5 analysis "weighs heavily in favor of finding that Plaintiff has sufficiently established that [the company's] stock was traded on an efficient market").  Yet, even a far lesser showing would suffice.  *See Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 358 (C.D. Cal. 2015) (finding market efficiency based on just three *Cammer* factors, including a "weak[]" cause and effect showing); *Tidel Techs.*, 220 F.R.D. at 509 (just two factors clearly weighing in favor of efficiency sufficient).[6]

### 3.  Defendants' "Meme" Stock Argument Is a Sideshow

As they are forced to concede the *Cammer/Krogman* factors are met, Defendants try to diminish them "in the meme stock context" (Opp. at 16) without ***any*** legal authority for jettisoning decades of precedent.[7]  Moreover, their argument has no factual basis.  First, Defendants contend that the

---

[6]   Defendants' out-of-Circuit cases, *IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at \*15, \*20 (S.D.N.Y. Oct. 29, 2013), and *In re Fed. Home Loan Mortg. Corp.* (*Freddie Mac*) *Sec. Litig.*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012), involving "flawed" analysis by "unqualified" and "unreliable" experts, are not only non-binding, but have been distinguished by courts as involving unique securities, different than common stock as is at issue here.  *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81-82 (S.D.N.Y. 2015).  And *Deutsche Bank*, *Freddie Mac*, and *George v. China Auto. Sys., Inc.*, 2013 WL 3357170 (S.D.N.Y. July 3, 2013), are now "out of step" with Second Circuit precedent regarding the weight of *Cammer* factor 5.  *See, e.g.*, *In re Vale S.A. Sec. Litig.*, 2022 WL 969724, at \*4 (E.D.N.Y. Mar. 31, 2022) (noting that the argument that the first four *Cammer* factors cannot demonstrate efficiency "is out of step with Second Circuit precedent, so it is not persuasive").

[7]   Defendants claim that the *Cammer/Krogman* factors are "not conclusive" when it comes to purported "meme" stocks because "GameStop, AMC, and other meme stocks check the *Cammer/Krogman* boxes."  *Id.*  But Defendants' expert neither analyzed the market for other companies nor opined that they were inefficient.  Stulz Tr. 131:5-7 ("I don't have an analysis of the efficiency of GameStop's market."); *id.*

*Cammer/Krogman* factors are of "limited value" when "retail traders coordinate in trading." Opp. at 16.

Yet Defendants provide **zero evidence** that any such thing occurred to Cassava here. *See* Stulz Tr. 174:5-

11 ("Q. Now, did you find any evidence of a coordinated short squeeze amongst traders for Cassava

during the class period? [objection] A. I did not go looking for it."); Feinstein Reply, ¶¶34, 114-116,

123-124.

Second, the premise of Defendants' argument – that Cassava was a "meme" stock – is illusory,

as their expert made no such finding. *Id.*, ¶¶30-32, 59-60. At his deposition, Stulz admitted: "***I don't***

***have a report saying that Cassava is a meme stock***." Stulz Tr. 174:14-16; *id.* 134:2-7 ("Q. So you

yourself do not have an affirmative opinion that Cassava was a meme stock throughout the class period?

[objection] A. No."). Aside from this stunning admission, Defendants' argument fails for the additional

reasons below.[8]

### a.  The Supreme Court Has Already Rejected the Types of Arguments Defendants Are Peddling

Defendants argue that, as a purported "meme" stock, Cassava's stock price was "divorced from

the value of the underlying company" and "'def[ied] conventional market wisdom.'" Opp. at 1, 10. In

other words, Defendants argue that the market incorrectly valued Cassava stock in claiming that this so-

called "irrationality" is a "gamechanger for the issue of reliance." *Id.* at 1.

But what Defendants now call a "gamechanger" is an argument the Supreme Court rejected a

decade ago in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ("*Halliburton II*").

There, defendants similarly urged the Supreme Court to overrule *Basic* due to purportedly new evidence

---

131:17-18 ("I did not do a specific study for AMC."). Their argument falls apart.

[8]    Defendants' cases cited to criticize Dr. Feinstein's analysis are inapplicable. *Cannon v. BP Prod. N. Am., Inc.*, 2013 WL 5514284, at *6-*17 (S.D. Tex. Sep. 30, 2013), is not a securities case and did not concern market-efficiency analysis. And *In re Northfield Lab'ys, Inc. Sec. Litig.*, involved a different expert who "made decisions about [an event] study that tend[ed] to skew it toward a conclusion that the market was efficient," an argument Defendants do not make here. 267 F.R.D. 536, 548 (N.D. Ill. 2010).

that markets are not efficient, *i.e.*, that public information is often not incorporated "rationally" into stock prices. *Id.* at 270-71. Yet, as the Supreme Court noted, this "debate among economists about the degree to which the market price of a company's stock reflects public information about the company" is ***not*** new. *Id.* at 271-72. *See* Feinstein Reply, ¶72. Instead of accepting defendants' argument, the Supreme Court reaffirmed *Basic*'s "fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" *Id.* at 272 (quoting *Basic*, 485 U.S. at 246 n.24). In reaffirming *Basic*, the *Halliburton II* court observed that even "critics of the efficient-capital-markets hypothesis acknowledge that public information generally affects stock prices." 573 U.S. at 272. Accordingly, even if a stock is incorrectly priced or "inaccurate," as Defendants contend here, that "'does ***not*** detract from the fact ***that false statements affect it, and cause loss,' which is 'all that Basic requires***.'" *Id.* "Debates about the precise ***degree*** to which stock prices ***accurately reflect*** public information are thus ***largely beside the point***." *Id.*

What *Basic* requires is precisely what Dr. Feinstein proved with his *Cammer/Krogman* analysis, including with event-study evidence that new, material information affected Cassava's stock price during the Class Period. Feinstein Reply, ¶¶32, 61-62, 203-205; *Barbier*, 2013 WL 2443217, at *5 ("The relevant legal question is whether the market price responds to publicly available information quickly . . . ."); *In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *9 (N.D. Ill. Mar. 5, 2015) ("Dr. Feinstein's methodology established that the price of Groupon stock was affected by false statements, ***which is all that Basic requires***."), *objections overruled*, 2015 WL 13628131 (N.D. Ill. May 12, 2015). Defendants, importantly, ***do not dispute the results of Dr. Feinstein's event study***. Feinstein Reply, ¶¶33, 55; Stulz Tr. 255:16-256:2.

Instead, Defendants point to isolated instances of Cassava's stock price purportedly moving without new, value-relevant information. Opp. at 16, 18. But in doing so, they run headlong into *Halliburton II*, *Basic*, and decades of precedent – including another securities fraud case against

defendant Barbier – that reject the same type of arguments Defendants make here. *See Barbier*, 2013 WL 2443217, at *9, *13 (rejecting defendant's criticism that plaintiff's expert "did not account for specific days where [Cassava's] stock price moved but there was no new information introduced into the market"). Indeed, as courts have aptly noted, "only a third of abnormally large stock price movements are typically associated with news events." *Elec. Game Card, Inc.*, 308 F.R.D. at 353; *Barbier*, 2013 WL 2443217, at *9, *13 (crediting evidence that "there are many days on which even large stocks traded on efficient markets experience significant changes in price despite an absence of major news events"); Feinstein Reply, ¶125. Defendants' arguments that "the price moved on [some "high . . . social-media" (Opp. at 17)] days where no company-specific news was announced" and that "such movements occurred on days as frequently as days when news about [the company] was disseminated to the market" are, therefore, "***not legally relevant***." *See Lumen*, 280 F.R.D. at 460-61.[9]

In *SkyMall*, for example, the court rejected market-efficiency arguments, similar to the ones Defendants make here, that a stock "was merely the 'hype of the day' for daytraders which caused the stock price increase rather than any information release" and "was not responding to firm-specific information, but was merely trading in the 'Internet bubble.'" 2001 WL 37118873, at *8. Likewise, in *Xcelera*, the First Circuit affirmed class certification over arguments that "irrational investors" were "'not basing their decisions on analysis . . . of the fundamental value of the stock in light of all currently available information'" and that "Xcelera's stock price behaved irrationally – reaching levels 'that were orders of magnitude too high'" and "'fluctuat[ing] wildly' throughout the Class Period." 430 F.3d at

---

[9]   *See In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 211 (E.D. Pa. 2008) (rejecting argument that "there were a large number of days during which [the company's] stock experienced a significant change despite no identifiable public disclosures" negated market efficiency showing), *aff'd*, 639 F.3d 623 (3d Cir. 2011); *Accredo*, 2006 WL 1716910, at *9 (rejecting argument "that the market for [the company's] stock was inefficient because there were 'days with significant changes in the price of [the company's] stock in the absence of news'"); *SkyMall*, 2001 WL 37118873, at *8 (rejecting argument that SkyMall "'stock's wild gyrations during the two-and-a-half trading days of the putative Class Period when no new fundamental-relevant information entered the market'" defeats plaintiffs' evidence of market efficiency).

4894-6865-3272.v2

517.  In affirming, the court emphasized that, "for purposes of establishing the fraud-on-the-market presumption of reliance, market efficiency does *not* require that a market be 'rational.'"  *Id.*

Defendants' cases, which primarily concern over-the-counter ("OTC") securities unsupported by *Cammer* factors, are inapt.  *See Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 360 (5th Cir. 1987) (OTC security at motion-to-dismiss stage; pre-dating *Basic* and *Halliburton II*); *Krogman v. Sterritt*, 202 F.R.D. 467, 474, 478 (N.D. Tex. 2001) (OTC security where "most of the factors identified by *Cammer* . . . weigh against a finding of market efficiency"); *Serfaty v. Int'l Automated Sys., Inc.*, 180 F.R.D. 418, 421-23 (D. Utah 1998) (OTC security did not meet *Cammer* factors); *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1252 (C.D. Cal. 2015) (OTC security at motion to dismiss stage); *O'Neil v. Appel*, 165 F.R.D. 479, 486, 504 (W.D. Mich. 1996) (market exhibited "***none*** of the attributes of an 'efficient' market")*.*  As to *China Auto*, in addition to being "out of step" with the law (*see supra* §II.A.2.n.6), the court did not find volatility or price movements without news to be proof of inefficiency standing alone.  2013 WL 3357170, at *12.  Rather, the court's decision turned on a different expert's inability to show the stock reacted to value-relevant information (*id.*) in contrast to here, where it is undisputed that Cassava's stock reacted to new information.  *See supra* §II.A.2.

Next, Defendants claim that, on just one day of a two-plus-year Class Period, Cassava's stock price went down when Defendants say it should have gone up.  Opp. at 14-15.  This does not rebut efficiency.  "Whether the market, upon receiving new information, moved in the precise way analysts or experts would expect it to move ***is not the key to unlocking Basic's presumption of reliance***."  *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 370 (S.D.N.Y. 2016), *aff'd in part, vacated in part*, 862 F.3d 250 (2d Cir. 2017).  Rather, "[w]hat is essential," and *not* disputed here as shown above, "is evidence that, when the market received new information, it 'generally affect[ed]' the price."  *Id.* (quoting *Halliburton II*, 573 U.S. at 272); *see, e.g.*, *Accredo*, 2006 WL 1716910, at *9 (stock movements with "neutral" news and declines with "positive news" did not refute market efficiency).  Indeed, event studies

are not required to find a stock moved in the "correct" direction because it is a subjective exercise that "may be virtually impossible" to discern in certain circumstances. *See Elec. Game Card*, 308 F.R.D. at 354-55 ("[T]he same new information might be 'good' news to one investor but 'bad' to another.").[10]

### b.    Defendants' "Meme" Stock Criticisms Are Inaccurate

In addition to being legally defective, Defendants' arguments are factually incorrect. ***First***, though Defendants say "Plaintiffs ignore the meme-stock dynamics of this case" (Opp. at 2), Dr. Feinstein did consider this issue, and found that it did not implicate efficiency based on his *Cammer/Krogman* factor analysis. Feinstein Reply, ¶¶13-14, 61-62, 203-205. Nor is it clear why the Court should consider the issue at all, given Stulz's failure to opine that Cassava is a "meme" stock. Stulz Tr. 174:14-16, 134:2-7. Indeed, there is no reliable methodology for determining if a stock is a "meme" stock, as Stulz conceded there is no accepted definition for a "meme" stock, which is a colloquial term. *See* Feinstein Reply, ¶¶63-65; Stulz Tr. 89:14-18 ("Q. So I'm reading [from] your [Rocket Mortgage] report: 'There's no single formal or technical definition of a meme stock.' Did you write that or not? A. Yeah."). In fact, Stulz could not identify ***a single threshold criteria*** for defining "meme" stocks. Feinstein Reply, ¶¶73-75, 88-89, 94-96. Even if Cassava were a "meme" stock – whatever that is – Stulz admitted that "meme" stocks can ***still*** trade in efficient markets. *See* Stulz Tr. 107:20-108:10 (noting "[i]t depends"); *id.* at 112:13-17 (same). These concessions coupled with the fact Stulz did not opine the market for Cassava stock was inefficient render Defendants' arguments meaningless.[11]

---

[10]    *See, e.g.*, *In re Teva Sec. Litig.*, 2021 WL 872156, at *29 (D. Conn. Mar. 9, 2021) ("[n]umerous other courts have also credited non-directional event studies"); *Vale S.A. Sec. Litig.*, 2019 WL 11032303, at *12 (S.D.N.Y. Sept. 27, 2019) ("the lack of a directional consistency check does not undermine [plaintiff's expert's] conclusions"); *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017) (noting that courts have "rejected the argument that 'directional' direct evidence of price impact was required by *Cammer* 5"); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *14 (S.D.N.Y. Aug. 13, 2018) (finding directionality analysis unnecessary); *Willis v. Big Lots, Inc.*, 2017 WL 1074048, at *5 (S.D. Ohio Mar. 17, 2017) (same; collecting cases).

[11]    Defendants indicated Stulz may submit yet another report related to class certification. Thus, Plaintiffs reserve the right to move to exclude his opinions on these and other grounds later.

*Second*, Defendants' claim that Cassava's stock price moved on seven days of "high . . . social-media attention" in the absence of new information (Opp. at 17) is not only irrelevant but also incorrect. On those days, there either *was* identifiable Cassava-related information that the market was reacting to, or the movements are otherwise explainable. Feinstein Reply, ¶¶17-22, 35, 127-129, 136-175. And while Defendants suggest that social-media mentions drove the stock price changes on these days, it is far more likely that the inverse is true, *i.e.*, that news and large stock price movements drove social-media commentary. *Id*., ¶¶23, 122, 177-179. Indeed, Defendants' argument is unreliable, as Stulz's metrics for measuring "high social media days" includes "impressions" and "mentions" from *after* trading closed on those days, which could not have caused Cassava's stock price to move. *Id*., ¶¶23, 176-180.

*Third*, on the single day that Defendants contend Cassava's stock price moved down when it should have gone up following purportedly "positive" scientific news, commenters noted that the news was "overblown, inappropriate, uninterpretable" (*id.*, ¶¶161-163) – in other words, hardly "good" news.

*Fourth*, setting aside relevance, Cassava stock did not trade irrationally. During the Class Period, Defendants represented to investors that: (i) Cassava's research was *unprecedented*;[12] and (ii) it continued to meet key development milestones.[13] As a result, analysts believed that the drug could be a potential blockbuster worth billions. *See* Feinstein Reply, ¶¶90, 107, 144. Likewise, throughout the Class Period, there was great uncertainty about Cassava both because the drug had not yet been approved and later because there were allegations of wrongdoing. *See id.*, ¶¶36-38, 90-93. That the stock was subject to volatility during the Class Period is, therefore, unsurprising and not indicative of inefficiency

---

[12] *See, e.g.*, Ex. 6 at 1 (Sept. 14, 2020 press release saying improvement of multiple biomarkers "has *never* been shown before"); Ex. 7 at 1 (Nov. 4, 2020 press release saying "[t]he ability of a drug candidate to decrease HMGB1 and improve BBB integrity in patients with Alzheimer's disease *has not been previously reported* in the science literature"); Opp., Exhibit 30 (Feb. 2, 2021 press release: pronouncing "[t]oday's data once again suggests simufilam could be a *transformative*, novel therapeutic").

[13] *See, e.g.*, Ex. 8 (Feb. 8, 2021 press release "Cassava Sciences Announces *Significant Program Progress* and *Expected Key Milestones* in 2021"); Ex. 9 (Feb. 22, 2021 press release "Cassava Sciences Announces *Positive End-of-Phase 2 Meeting with FDA* and Outlines Pivotal Phase 3 Program").

or irrationality.  *See id.*, ¶¶90-93.  In fact, Cassava's stock price traded between \$6.79 and \$135 per share during the Class Period, essentially ***within*** analysts' price targets, which ranged from \$8 to \$215 per share based on the uncertainty surrounding the Company.  *See id.*, ¶¶120-121.

***Fifth***, Defendants' claim that "academics and market participants have found evidence that the markets for meme stocks are inefficient" (Opp. at 1) is misleading.  ***No*** scientific study has found markets for "meme" stocks are *per se* inefficient.  Feinstein Reply, ¶68.  And ***none*** of the papers Stulz cited calls Cassava a "meme" stock, let alone one with an inefficient market.  *Id.*, ¶¶66-71.  In fact, besides admitting he was not opining that Cassava is a "meme" stock, Stulz also admitted that even so-called "meme" stocks ***can still trade in efficient markets***.  *See* Stulz Tr. 107:20-108:10 (noting "[i]t depends").

***Sixth***, Defendants' other "evidence" profits them nothing.  Opp. at 11.  Stulz's report cited: (i) an informal interview with a well-known economist who suggested a ***different*** company (GameStop) may have traded inefficiently "for a couple of days" (Expert Report of Rene M. Stulz, Ph.D. ("Stulz Rpt.") at 24) due to a coordinated short squeeze, which did not happen with Cassava (*compare* Stulz Tr. 157:5-16 ("Q.  And that couple of days that he was referring to, that was a short squeeze that precipitated a trading ban, correct?  A.  That's correct."), *with id.* 174:5-11 (Stulz "did not go looking for" evidence of a coordinated short squeeze for Cassava); Feinstein Reply, ¶¶114-118; (ii) articles discussing "meme" stocks that never say Cassava traded inefficiently; and (iii) a reference to the Roundhill stock index, which, as Stulz conceded at his deposition, is ***not*** determinative of whether a stock is a "meme" stock, "wasn't available in 2021" – the year Defendants focus on, and only sporadically included Cassava.  Stulz Tr. 220:2-221:1; *id.* 223:19-224:11; Feinstein Reply, ¶¶98-101.

This non-scientific conjecture is a far cry from disproving market efficiency.  In fact, Defendants' own articles note that Cassava's stock price reacted to both positive clinical trial updates from the Company and negative news calling those results into question.  *See* Feinstein Reply, ¶¶107-109. Moreover, contrary to Defendants' suggestion, Cassava was rarely described as a "meme" stock.  Of the

1,440 articles published about Cassava during the Class Period, only 0.35% (five articles) are cited by Defendants as referring to Cassava as a "meme" stock, and Cassava was not even in the top 100 of most mentioned companies in articles discussing "meme" stocks during the Class Period. *Id*., ¶¶102-106.[14]

In sum, none of Defendants' so-called "hallmarks" of "meme" stocks (Opp. at 11-12) indicate market inefficiency here, and some even support market efficiency, including social media coverage that helps disseminate information to the public. Feinstein Reply, ¶¶73-74, 84-87, 93, 96; Stulz Tr. 129:19-130:21 (agreeing social media can promote efficiency). Short interest is, likewise, supportive of market efficiency. Feinstein Rpt., ¶¶99-101. But even assuming *arguendo* that Cassava's stock-price behavior calls efficiency into question on the eight days Defendants highlight during the two-plus-year Class Period (and it does not), that does not negate the overwhelming evidence of market efficiency for the entire Class Period, especially because *Basic* does not require "perfect[]" efficiency. *See Groupon*, 2015 WL 1043321, at *11 (citing *Halliburton II*, 573 U.S. at 272). And, again, Defendants' expert does ***not*** opine the market was inefficient. *See supra* §II.A.1. None of this rebuts Plaintiffs' showing of efficiency.

### c.      Speculation About Short-Selling Constraints Does Not Defeat Market Efficiency

Defendants also speculate that short-selling "constraints" ***may*** have hampered market efficiency at certain points. Opp. at 18-19. However, Defendants do not cite ***a single case*** endorsing such "constraints" as a reason to scrap market efficiency. Courts, rather, have rejected similar arguments, even in far more extreme situations where, unlike here, outright short-selling ***bans*** existed.[15] *See* Stulz Tr.

---

[14]   The discussion around Cassava in online forums was also far less than other purported "meme" stocks. For example, Rocket Companies, Inc., a company Stulz actually opined ***is*** a "meme" stock, average 2,999 Reddit mentions per day during a 69-day class period, a per-day average ***100 times greater*** than Cassava's 29 average per-day Reddit mentions during the Class Period. Feinstein Reply, ¶¶76-80. And Rocket's per-day mentions average on Twitter was more than three times greater than Cassava's. *Id*., ¶¶81-83.

[15]   *See Barclays*, 310 F.R.D. at 94 ("While the global financial crisis created market volatility and limited arbitrage opportunities which thereby decreased efficiency, defendants are holding plaintiffs to far too high a standard of proof. Plaintiffs' evidence is sufficient to prove market efficiency by a

- 14 -

173:13-18 ("Q.  At any point in time was Cassava trading banned by retail broker-dealers?  [objection]
A.  I'm not aware of a ban.").

That the cost of short selling may have been above average does not negate efficiency.  *See*
*Groupon*, 2015 WL 1043321, at *9, *11 (rejecting "concern about the high cost of short selling Groupon
shares" because markets need not be "***perfectly*** efficient" under *Basic*) (citing *Halliburton II*, 573 U.S.
at 271-73) (emphasis in original).  This is especially true where, as here, Defendants do not claim the
market was ***in***efficient.  *See Barclays*, 310 F.R.D. at 94 ("Plaintiffs' evidence is sufficient to prove market
efficiency . . . notwithstanding defendants' evidence that the market ***may have been*** inefficient" due to a
short selling ban.).  Further, Stulz did ***not*** analyze the purported short-selling "constraints" to determine
whether they actually impacted Cassava's stock price.  *See* Stulz Tr. 204:25-205:12 ("A. [T]he
limitations of short selling, would imply that the stock is inflated . . . .  Q.  Did you make any findings
about [inflation]?  A.  I did not – [objection]  A.  I did not make findings about inflation . . . .").  Instead,
Stulz points to "potential" frictions, which is insufficient.  *See Barclays*, 310 F.R.D. at 94 n.168 (rejecting
argument that a short sale ban is indicative of inefficiency where defendants' expert "did not analyze the
impact of the short selling ban on [the company's security] during the [c]lass [p]eriod").

In fact, in this case, short selling was never "constrained."  Defendants concede there was
"***consistently high levels of short interest during the class period***" (Opp. at 12) and cite articles that short
sellers made over $100 million in profits after the Citizen Petition.  *See* Opp., Exhibit 10.  Indeed, the
market for shorting Cassava stock was not constrained, but instead active, during the Class Period.
Feinstein Reply, ¶187.  Just as in *Groupon*:

---

preponderance of the evidence . . . ."); *Xcelera*, 430 F.3d at 517 (affirming district court decision that
rejected the argument that "constraints on short sales in the Xcelera market prevented arbitrageurs from
acting on analyses"); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 432 (S.D.N.Y.
2014) ("The Court is not persuaded that short-selling constraints had a sufficiently corrosive effect on
the market for CCME shares as to render it inefficient.").

> (1) millions of shares shorted every day, (2) [Cassava] shares were shorted both before and during the [Class] period, (3) short interest grew during the [Class] period, (4) traders were able to bet against [Cassava] in the options market if they desired, and (5) no actual traders were identified who were unable to short [Cassava] stock.

2015 WL 1043321, at *9; Feinstein Reply, ¶¶187-189.  Such facts doom Defendants' argument here, too.  *Groupon*, 2015 WL 1043321, at *9.[16]

### B.    Cassava Options Also Traded in an Efficient Market

As Plaintiffs showed in their opening motion, "[c]ourts in the Fifth Circuit routinely have held that a finding of market efficiency for common stock also applies to options, because the price for the option is derivative of the price of the stock."  *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *14 (S.D. Tex. Nov. 13, 2019), *R&R adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019); Mot. at 12.  Here, even Stulz agrees that options prices are derivative of common stock prices.  *See* Stulz Tr. 225:3-5 ("Q.  And you'll agree that options are derivative?  A.  Yeah.."); *id*. 233:10-13 ("[T]he value of options doesn't depend on whether the stock is overvalued or undervalued, it just depends on the stock price.").  Thus, "applying the *Cammer/Unger/Bell* factors **to the stock**, is sufficient to trigger the fraud-on-the-market presumption for Plaintiffs' §10(b) claims based on the options."  *Enron*, 529 F. Supp. 2d at 754.  Because the market for Cassava common stock is efficient under the *Cammer* and *Krogman* factors, so too is the market for Cassava options.  Mot. at 12; Feinstein Reply, ¶¶5-6, 210, 223.

Defendants, nevertheless, accuse Dr. Feinstein of "largely ignor[ing] the *Cammer/Krogman* factors when it comes to the markets for Cassava options."  Opp. at 19.  But because options are derivative, the *Cammer/Krogman* factors are not pre-requisites to efficiency, as they do not fully translate to other securities like options or bonds.  *See Enron*, 529 F. Supp. 2d at 768 ("The Court concludes that denying application of fraud on the market to the bond market because it does not operate in the same

---

[16]    Defendants' lone case, *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 275 (D. Mass. 2006), is inapt.  That case was primarily based not on short-selling constraints, but on a deficient event study, which are not issues here.  *PolyMedica*, 453 F. Supp. 2d at 277.

way as a national exchange or trade in the same volume, frequency, or manner as equity on those exchanges is throwing out oranges because they are not apples."); *Vale*, 2022 WL 969724, at *5 ("[T]he *Cammer* and *Krogman* factors were designed to test market efficiency for equity securities" and "are considered less instructive" for other markets.); Feinstein Reply, ¶224.

Indeed, a recent case found the ***same analysis*** for options that Dr. Feinstein conducted here is sufficient for class-certification purposes. *See In re Apple Inc. Sec. Litig.*, 2023 WL 2763952 (N.D. Cal. Mar. 28, 2023). And, as Dr. Feinstein explains here, there are reasons why Defendants' *Cammer*-based criticisms regarding trading volume, bid-ask spread his event study do not apply in this case. *See* Feinstein Reply, ¶¶212-218; *Apple*, 2023 WL 2763952, at *2 (crediting plaintiffs' expert that "direct application of these [*Cammer* and *Krogman*] criteria to options is not a useful measure of efficiency").

Nevertheless, the *Cammer* factors ***do*** support a finding of market efficiency for options here. *Compare Marcus v. J.C. Penney Co.*, 2016 WL 8604331, at *9 (E.D. Tex. Aug. 29, 2016) (market efficient for options where, like here, over $200 million of options traded, the company was S-3 eligible, had analyst coverage, and a cause-and-effect relationship existed between new material information and option prices), *R&R adopted*, 2017 WL 907996 (E.D. Tex. Mar. 8, 2017), *with* Feinstein Reply, ¶¶211, 225-230 (finding same). Importantly, the court in *J.C. Penney* also rejected the same arguments Defendants make here that options efficiency cannot be considered "in the aggregate," especially because Stulz "does not actually conclude that the options market is inefficient." 2016 WL 8604331, at *8-*9; Stulz Tr. 39:12-17 (Q. "Are you offering an affirmative opinion that the Cassava options were inefficient during the class period? [objection] A. I am not."). In contrast, Defendants cite ***no legal authority*** for their arguments, and Dr. Feinstein refutes them. Feinstein Reply, ¶¶40-46, 231-261.

The Court should find that the market for Cassava options was efficient.

## III.  DEFENDANTS DID NOT REBUT PLAINTIFFS' SHOWING THAT THE SCHEME CLAIMS ARE ALSO ENTITLED TO THE *AFFILIATED UTE* PRESUMPTION OF RELIANCE

As shown in their opening motion, Plaintiffs' scheme claims are entitled to the *Affiliated Ute* presumption of reliance.  Mot. at 18-19.  Defendants' Opposition ignores that Plaintiffs not only allege false and misleading statements under Rule 10b-5(b), but also scheme and deceptive acts claims under Rule 10b-5(a) and (c).  *See, e.g.*, ¶522 (alleging Defendants violated Rule 10b-5(a) and (c) by "employ[ing] devices, schemes, and artifices to defraud" and "engag[ing] in acts, practices, and a course of business that operated as a fraud"); ECF 104 (upholding claims); *see also* Stulz Tr. 35:18-20 ("I understand that the plaintiffs also allege the existence of a scheme . . . .").

It is well established that Rule 10b-5(a) and (c) claims trigger the *Affiliated Ute* presumption of reliance.  *See* 406 U.S. at 153-54; *Enron*, 529 F. Supp. 2d at 682 (observing Rule 10b-5(a) and (c) claims may give rise to *Affiliated Ute* presumption).  To their credit, Defendants concede this point.  Opp. at 26 ("Under *Affiliated Ute*, courts may presume reliance in scheme-liability cases . . . .").[17]

Here, Plaintiffs allege a scheme "to promote the continued development of an experimental drug using manipulated pre-clinical and clinical data."  ¶509; Mot. at 18.  Defendants implemented their scheme by first publishing "scientific data in peer-reviewed journals" to support the development of simufilam.  ¶¶85-88; Mot. at 18.  Then, under false pretenses, Defendants obtained NIH grants and began clinical testing of simufilam.  ¶¶87-88; *see also* Ex. 1, ¶¶10-12, 16, 18-20, 22, 24, 25, 27; Mot. at 18.  Even after the journals began their own independent investigations and the truth began to emerge, Defendants continued to advance their scheme by, *inter alia*, providing doctored data to journals in order to obtain false exonerations.  *See, e.g.*, ¶¶338-362, 386-407, 423-424; Supp., ¶¶1-5; Ex. 1, ¶¶14.e-f, 27; Mot. at 18.  Therefore, Defendants' cases are inapposite as they do not involve scheme claims.[18]

---

[17]   Defendants' own cases likewise support the applicability of *Affiliated Ute* here.  *See Smith v. Ayres*, 845 F.2d 1360, 1363 (5th Cir. 1988) (the *Affiliated Ute* presumption applies to Rule 10b-5(a) and (c)).

[18]   *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2 F.4th 1199, 1206 (9th Cir. 2021); *Barclays*, 875 F.3d at 96; *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 220 (D.C. Cir. 2010); *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 193 (3d Cir. 2001); *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000), *abrogated by Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582

Contrary to Defendants' suggestion (Opp. at 26), the *Basic* and *Affiliated Ute* presumptions are not mutually exclusive.  For example, in *Enron*, the court applied both the *Affiliated Ute* and *Basic* presumptions, even though there were "a large number of alleged material misrepresentations or omissions" because, like here, the plaintiffs' case "primarily aims at wrongful conduct by key participants that allegedly employed a device, scheme or artifice to defraud or engaged in an act, practice or course of business that operated as a fraud, under Rule 10b-5(a) and (c)."  529 F. Supp. 2d at 739; *see also In re FirstEnergy Corp. Sec. Litig.*, 2023 WL 2709373, at*20 (S.D. Ohio Mar. 30, 2023) (also applying "the *Basic* presumption to the extent this case involves misstatements").  Even "[w]here plaintiffs' claims are based on a combination of omissions and misstatements, courts have acknowledged the applicability of the *Affiliated Ute* presumption as to the element of reliance with regard to alleged omissions."  *Burges v. BancorpSouth, Inc.*, 2017 WL 2772122, at *10 (M.D. Tenn. June 26, 2017).[19]  Accordingly, the *Affiliated Ute* presumption applies to Plaintiffs' scheme-liability and deceptive-practices claims here.[20]

## IV.    DEFENDANTS HAVE NOT MET THEIR BURDEN TO PROVE THE ABSENCE OF PRICE IMPACT

To rebut the *Basic* presumption at the class-certification stage, Defendants bear the burden of proving, by a preponderance of the evidence, the complete "absence of price impact."  *Halliburton II*, 573 U.S. at 278.  In other words, Defendants must show the fraud did not affect the market price of

---

U.S. 497 (2017); *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 757 (11th Cir. 1984); *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 717 (8th Cir. 1978).  Moreover, *Abell v. Potomac Ins. Co.*, supports Plaintiffs' position, as that case noted that "claims based upon omissions are founded upon parts 1 and 3 of the rule," and thus, the *Affiliated Ute* presumption may apply in those cases – and this one.  858 F.2d 1104, 1119 n.14 (5th Cir. 1988), *vacating judgment sub nom.*, *Fryar v. Abell*, 492 U.S. 914 (1989).

[19]    Defendants provide ***no*** support for their assertion that "the two positions are mutually exclusive and one (or both) must fail."  Opp. at 26 n.19.  None of the cases cited by Defendants states that a plaintiff may not rely on both presumptions.  *See e.g.*, *Smith*, 845 F.2d at 1363; *Akin v. Q-L Invs., Inc.*, 959 F.2d 521, 529 (5th Cir. 1992); *Johnston*, 265 F.3d at 191 n.6.

[20]    Thus, to the extent that Plaintiffs' statements claims are not entitled to the *Basic* presumption (they are), their scheme-liability and deceptive-practices claims still can proceed under *Affiliated Ute*.

Cassava's securities. *Id.* at 280; *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 103 (2d Cir. 2023). This is a "daunting task" (*Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 673 (S.D. Fla. 2014)) requiring Defendants to prove that their fraud caused "no price impact whatsoever." *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 687 (D. Md. 2018). Defendants cannot meet this heavy burden merely by disputing whether the fraud affected the price. *See Goldman*, 594 U.S. at 126 ("[T]he defendant must '***in fact***' 'seve[r] the link' between a misrepresentation and the price paid by the plaintiff – and a defendant's mere production of some evidence relevant to price impact would ***rarely*** accomplish that feat."). Defendants failed to meet their heavy burden here.

## A.     Defendants Failed to Disprove "Front-End" Price Impact

Defendants mischaracterize this case as solely about price maintenance (Opp. at 21) and ignore that their false and misleading statements caused statistically significant ***increases*** in Cassava's stock price on: (i) September 14, 2020, when Defendants announced the "final" Phase 2b results; (ii) February 2, 2021, when Defendants reported the results of an interim analysis from an open-label study extension of its Phase 2b trial; and (iii) November 4, 2021, when Defendants claimed *The Journal of Neuroscience* found no evidence of data manipulation. ¶¶268-279, 289-290, 339-342; Feinstein Reply, ¶317; Stulz Rpt., Exhibit 17. Defendants' price-impact arguments flop because they fail to rule out ***both*** front-end and back-end price impact. *See In re BancorpSouth, Inc.*, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017) ("[P]rice impact may be demonstrated either at the time that the alleged misrepresentations were ***made***, *or* at the time of their correction.").

## B.     Defendants Conceded Corrective Disclosures Impacted Cassava's Stock        Price on the "Back-End"

Additionally, Defendants' "back-end" price-impact arguments fail. First, Defendants ***do not attempt*** to prove a lack of price impact on two corrective disclosure dates – August 25, 2021 and April 18, 2022. Opp. at 22. Defendants have, therefore, conceded the issue, and the Court need go no further. *See*

- 20 -

*S. Co.*, 332 F.R.D. at 395-96 ("[N]umerous courts addressing class certification have refused to shorten class periods by dismissing subsequent corrective disclosures where some but not all of the stock price declines following the alleged corrective disclosures were statistically significant."); *Strougo v. Tivity Health, Inc.*, 606 F. Supp. 3d 753, 766 (M.D. Tenn. 2022) ("To the extent Tivity believes it is entitled to shorten and limit the class period without showing a complete lack of price impact, the Court disagrees."), *vacated & remanded sub nom.*, *In re Tivity Health, Inc.*, 2022 WL 17243323 (6th Cir. Nov. 21, 2022).

Second, Defendants do ***not*** dispute that the corrective disclosures on August 27, 2021; November 17, 2021; July 27, 2022; and October 12, 2023 were followed by statistically significant stock drops. Stulz Rpt., Exhibit 17. These "statistically significant price adjustment[s] following a corrective disclosure is evidence the original misrepresentation did, in fact, affect the stock price." *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 450 (W.D. Tex. 2019). Defendants' "concession dooms [their] attempt to rebut the presumption of reliance because the inquiry is whether Defendants have proven ***a complete lack of price impact*** during the Class Period." *S. Co.*, 332 F.R.D. at 395.[21] Defendants' rebuttal bid fails for this reason, as well.

### C. Defendants Failed to Prove an Absence of Price Impact for the Remaining Corrective Disclosures

Defendants also failed to prove the absence of price impact as to the remaining corrective disclosures.[22] Importantly, Defendants do ***not*** dispute that these disclosures contained new information.[23] Opp. at 23-24. Their contention is ***solely*** that the price drops were not statistically

---

[21] *See also, e.g.*, *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at *12 (D. Conn. Apr. 13, 2023) (failure "to prove an absence of price impact" where defendants "conceded that there are statistically significant decreases in the [share price] with respect to at least some of the alleged corrective disclosures"); *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, 2022 WL 4598044, at *5 (M.D. Tenn. Sept. 30, 2022) (same); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 210-11 (D. Minn. 2020) (same).

[22] These occurred on August 30, 2021; September 3, 2021; November 10, 2021; November 15, 2021; December 9, 2021; December 17, 2021; December 20, 2021; and June 1, 2022.

[23] Defendants' reliance on *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *10 (S.D. Tex. Feb. 9,

significant at the 95% level.  *Id.*

But courts repeatedly hold "the absence of a statistically significant price adjustment does ***not*** show the stock price was unaffected by the" fraud.  *Rooney*, 330 F.R.D. at 450; *Alexion*, 2023 WL 2932485, at *12 ("lack of statistical significance does not prove an absence of price impact because 'the failure of an event study to disprove the null hypothesis with respect to an event does not prove that the event had no impact on the stock price'").  Thus, "courts routinely reject the argument that a non-statistically significant stock price decline proves an absence of price impact." *S. Co.*, 332 F.R.D. at 394; *id.* at 395 (collecting cases); *Acadia*, 2022 WL 4598044, at *6 (same); *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 2023 WL 6300569, at *8 (S.D. Tex. Sept. 27, 2023) (statistical non-significance does not prove a lack of price impact), *leave to appeal denied*, 2023 WL 8794620 (5th Cir. Nov. 17, 2023).[24] "Defendants' reliance on arguments that . . . Defendants' expert[] failed to reach a statistically significant conclusion as to price impact is [therefore] not a basis to deny class certification." *In re EQT Corp. Sec. Litig.*, 2022 WL 3293518, at *16 (W.D. Pa. Aug. 11, 2022).

Nor do Defendants attempt to prove a complete lack of price impact, as they provide no alternative explanation for the stock price declines on the alleged corrective disclosure dates, which is required in order "to erase the inference that the corrective disclosure . . . played ***some role*** in the price decline." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 270, n.18 (2d Cir. 2020), *vacating & remanding* 594 U.S. 113 (2021).

---

2024) is misplaced.  Unlike *Apache*, the alleged disclosures at issue here continually revealed new information, which Defendants do not dispute.  Opp. at 23-24; *Apache*, 2024 WL 532315, at *9-*10 (finding later disclosures "did not shed any new light" on the alleged fraud or "repeat[ed] old news").  Moreover, Defendants do ***not*** provide an alternative explanation for the stock price declines on any of the challenged dates, further distancing these disclosures from those in *Apache*.  *Id.* at *10-*11.

[24]   Defendants mischaracterize Dr. Feinstein's report in claiming "there is no basis to conclude that the [stock] declines were anything other than random variation in the stock price."  Opp. at 22.  As Dr. Feinstein has explained, "'while a statistically significant positive price reaction in response to misrepresentations may demonstrate price impact, a nonsignificant reaction . . . does not prove there was no price impact.'" *Cabot Oil*, 2023 WL 6300569, at *8; Feinstein Reply ¶¶321-323.

**D.    There Is No "Mismatch" Between the Alleged Misstatements and Omissions and the Corrective Disclosures**

Defendants improperly invoke *Goldman* to rehash arguments rejected by the Court regarding the purported "mismatch" between the alleged misstatements and omissions and four corrective disclosures.[25]  Defendants' expert, however, conceded he offered no opinion on this issue.  *See* Stulz Tr. 309:12-16 ("I'm not having a statement saying something to the effect that an alleged curative disclosure is unrelated to the misstatements or something like that.").

Moreover, under *Goldman*, misstatements and omissions "need ***only*** be 'related' or 'relevant'" to their corrective disclosures.  *Cabot Oil*, 2023 WL 6300569, at *7 (quoting *Pub. Emps. Ret. Sys. of Miss., P.R. Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014)); *see BlackBerry Ltd.*, 2021 WL253453, at *18 ("Accordingly, "[a]t this stage of the litigation – when Plaintiffs are not required to show loss causation – the alleged disclosure need only 'relate[] to,' 'concern,' or be 'linked' to a specific alleged misrepresentation.").  Defendants, however, do ***not*** dispute that the misstatements and corrective disclosures are related, thus ending the inquiry.

Nor could Defendants dispute this point, as the Court already found the corrective disclosures to be "relevant" at the pleading stage.  *See* ECF 104 at 30-31 (finding the "Citizen Petitions, news articles, Quanterix's press release, and Dr. Bik's postings" were "partial disclosure[s]" that when "[v]iewed collectively . . . 'gradually informed the market of the relevant truth'"); ECF 175 at 10-12 (*Science* article disclosure related to scientific misconduct allegations).   These facts, coupled with Defendants' concession that each of these corrective disclosures resulted in a large, statistically significant price drop, "dooms [their] attempt to rebut the presumption of reliance."  *See supra* §IV.B.; *see also S. Co.*, 332

---

[25]   The challenged corrective disclosures are: (i) August 27, 2021 Quanterix statement that it "did not interpret the Company's clinical data or prepare the . . . July 26, 2021 AAIC presentation"; (ii) November 17, 2021 disclosure of SEC and NIH investigations; (iii) July 27, 2022 disclosure of DOJ investigation; and (iv) October 12, 2023 *Science* article revealing CUNY Report.  Opp. at 25-26.

F.R.D. at 395-96 (The "existence of a price decline and analyst commentary highlighting the negative news is, 'of course . . . evidence of price impact.'").

Undaunted, Defendants simply repeat arguments previously rejected by this Court that their statements were true, thereby leaving nothing to correct. *Compare* Opp. at 25-26 (October 25, 2021 statement "unequivocally true"; November 15, 2021 statement "also true"; September 3, 2021 statement "true and . . . consistent with the alleged 'corrective' disclosure"), *with* ECF 104 at 21-22 (rejecting arguments that August 25, 2021 statement was not "remotely contradict[ed]" by Quanterix's statement (ECF 81 at 19-20) and November 15, 2021 statement was "accura[te]" (*id.* at 20)); *id.* at 29 (rejecting argument that the corrective disclosures did not "reveal a 'truth'" (*id.* at 31)); ECF 175 at 11 (October 12, 2023 *Science* article revealed "additional details about the extent of the alleged fraudulent practices by Dr. Wang and Cassava" and "new" information that "Dr. Wang could not provide any original data for any of the foundational Cassava research"). The Court should reject them again.

In addition to the reasons this Court relied on in rejecting these arguments at the pleading stage, there are additional reasons to scrap them at the class-certification stage. First, by challenging only four disclosures, Defendants concede the lack of mismatch for the remaining disclosures. *See* Opp. at 24-26. Second, Defendants do not argue a "mismatch," but instead deny that the statements were misleading in the first place. Yet, the Supreme Court has held "loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions [to the class] that need not be adjudicated before a class is certified." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 475 (2013); *see also, e.g.*, *Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at *6 n.2 (S.D. Tex. June 15, 2017) ("Resolution of the dispute regarding whether the statements were corrective 'is an issue that is common to all members of the class and thus does not defeat predominance.'"); *J.C. Penney*, 2016 WL 8604331, at *8 ("Defendants' arguments about whether the disclosures were actually corrective . . . has no bearing on the predominance inquiry of class certification.").

- 24 -

*Goldman* did not overrule this long-standing precedent, but merely clarified the "generic nature of an alleged misrepresentation" (*e.g.*, the statement "'we have faith in our business model'") may be a factor in assessing price impact. 594 U.S. at 121-23. Loss causation, falsity, and other common merits issues are still inappropriate at the class-certification stage. *See id.* at 122 n.2 ([W]hile a court may use evidence to "decide the price impact issue," it must "'resist[] the temptation to draw what may be obvious inferences for the closely related issues that must be left for the merits.'").[26] Here, given that Defendants do ***not*** claim the misstatements are "generic," *Goldman* is largely inapplicable. *See NIO*, 2023 WL 5048615, at *14-*15 (holding *Goldman*'s mismatch theory applies only to "generic" statements).

And while Defendants suggest vaguely that corrective disclosures "fail to address those specific alleged misstatements" (Opp. at 24), they do not identify which statements and, in any case, *Goldman* does ***not*** require corrective disclosures to "'mirror'" the misstatements and omissions. *Cabot Oil*, 2023 WL 6300569, at *7; *In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *5-*6 (C.D. Cal. Oct. 6, 2021) ("This Court does not read Goldman to contradict that a 'corrective disclosure need not be a "mirror image" disclosure . . . .'").

Yet, even if Defendants' argument that certain disclosures are not corrective was relevant to rebutting *Basic* at class-certification (it is not), it would still fail. ***First***, discovery has confirmed that, contrary to Defendants' claim, Quanterix's August 27, 2021 release was to "***correct[] the public record***" as to Cassava's misleading press release. Ex. 10 at 12; Ex. 11 at 3303 (██████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████).

***Second***, Defendants mischaracterize the November 17 and July 27 disclosures as correcting ***only***

---

[26]   *See Alexion*, 2023 WL 2932485, at *11 ("'class certification is not the proper procedural stage for the Court to determine, as a matter of law, whether the relevant disclosures were corrective'"); *Homyk v. ChemoCentryx, Inc.*, 2024 WL 1141699, at *4 (N.D. Cal. Mar. 6, 2024) (an "attack on falsity" is "procedurally improper"), *leave to appeal denied*, 2024 WL 2745788 (9th Cir. May 23, 2024).

Cassava's November 15, 2021 misstatements (Opp. at 25) when, in fact, they more broadly revealed Defendants' fraud, in part.  As this Court previously found, these two corrective disclosures "'***gradually*** informed the market of the relevant truth' regarding Cassava's clinical trial results and published research, 'and, thus, ***collectively*** constitute a corrective disclosure that adequately pleads loss causation.'" ECF 104 at 31; *see also Amedisys*, 769 F.3d at 323-24 (like here, disclosure of SEC and DOJ investigations form part of a collective corrective disclosure).  Moreover, the November 15, 2021 statements remain false and misleading for the same reasons as stated at the motion to dismiss stage.  *See* ECF 86 at 12, 21-22.

***Third***, Defendants again falsely claim there was nothing "new" in the October 12, 2023 *Science* article because Barbier said on September 3, 2021 that "Cassava did not have 'the original films or images for the Western blots.'"  Opp. at 25-26.  This fails for myriad reasons: (i) the Court already rejected this argument (ECF 175 at 9); (ii) such "'truth-on-the-market'" defenses are for trial (*Amgen*, 568 U.S. at 481-82)[27]; (iii) even if investors knew the relevant truth, it would not defeat predominance (*In re SandRidge Energy, Inc. Sec. Litig.*, 2019 WL 4752268, at *7 (W.D. Okla. Sept. 30, 2019))[28]; (iv) Barbier's September 3 statement said Cassava did not have the original data, ***not*** that it didn't exist (ECF 175 at 11); (v) Barbier's statement does not concern the later November and December 2021 misleading claims that original data was in fact provided to journals investigating the alleged data manipulation, even though there was ***no*** original data to provide (¶¶338-356, 386-407; Supp., ¶2)[29]; and (vi) the *Science*

---

[27]   *See J.C. Penney*, 2016 WL 8604331, at *8 (finding the "'truth on the market defense' . . . has no bearing on the predominance inquiry of class certification"); *Holwill v. AbbVie Inc.*, 2021 WL 7366274, at *2 (N.D. Ill. Sept. 23, 2021) ("Courts routinely hold, however, that the truth-on-the-market defense is not appropriately resolved at the class certification stage.") (collecting cases).

[28]   *See also CenturyLink*, 337 F.R.D. at 211 (whether "the market already was aware" is a "common question[] that can be adjudicated on a class-wide basis at summary judgment or trial"); *Set Cap. LLC v. Credit Suisse Grp. AG*, 2023 WL 2535175, at *10 (S.D.N.Y. Mar. 16, 2023).

[29]   Wang's indictment confirms the CUNY Report – and Plaintiffs' allegations here.  *See* Ex. 1 at 6, 10 (Wang "provided materially false, fraudulent, and misleading images and statements to various scientific journals after publication to substantiate the statements about his scientific research made in articles he

article revealed "*additional details* about the extent of the alleged fraudulent practices by Dr. Wang and Cassava," as this Court has already found. ECF 175 at 10-11.[30] Defendants thus failed to disprove price impact for these remaining corrective disclosures as well.

**V.    DEFENDANTS DO NOT DISPUTE THAT PLAINTIFFS HAVE PROVIDED A COMMON DAMAGES METHODOLOGY CONSISTENT WITH THEIR THEORY OF LIABILITY**

As explained in their opening motion, Plaintiffs and their expert, Dr. Feinstein, provided a standard "out-of-pocket" damages model consistent with the theory of liability. *See* Mot. at 19; Feinstein Rpt., ¶¶219-232; Feinstein Reply, ¶¶262-273. This satisfies Rule 23(b)(3)'s requirements in securities cases post-*Comcast*. *See, e.g.*, *Rougier*, 2019 WL 6111303, at *15 (*Comcast* only "requires that the method for calculating class damages be consistent with the theory of liability asserted in the case."). Indeed, "[t]he *Comcast* requirement is *easily satisfied* in securities fraud cases invoking the *Basic* presumption and seeking out-of-pocket damages." *Id.*; *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 137 (M.D. Tenn. 2020) ("[O]ut-of-pocket damages model . . . 'is the *standard* measurement of damages in Section 10(b) securities cases' . . . [and] *Comcast* did not change this, or render the model improper.").

In fact, at *least 20* class certification opinions post-*Comcast* have accepted Dr. Feinstein's out-of-pocket damages methodology submitted here. *See* Ex. 12; *S. Co.*, 332 F.R.D. at 398 ("Professor Feinstein's proposed damages model has been accepted in securities fraud class actions in cases like this one, where Plaintiffs seek out-of-pocket damages to recover artificial inflation caused by Defendants' misrepresentations.") (collecting cases). "Thus, Plaintiffs have demonstrated an accepted method for calculating Class Members' out-of-pocket damages that are consistent with a fraud on the market theory

---

authored to conceal his involvement in the scheme.").

[30]   These additional details included, *inter alia*, that "the CUNY investigating committee allegedly found 'evidence highly suggestive of deliberate scientific misconduct' in Cassava's foundational research, including 'numerous signs that images were improperly manipulated'" and "that defendant Burns shared 'responsibility' in the misconduct." *Id.* at 10.

of liability." *Rougier*, 2019 WL 6111303, at \*15.

Here, Defendants do ***not*** dispute that Dr. Feinstein's out-of-pocket methodology is consistent with Plaintiffs' theory of liability.  Instead, Defendants nitpick Dr. Feinstein for not detailing every possible way he could account for ***potential*** issues that may or may not arise during the computation of damages at a later stage of this litigation.  Opp. at 30-34; *see* Stulz Tr. 309:9-12, 311:16-23 ("In my damages sections, I am raising issues" regarding potential issues that may arise "***at the merit stage***"); Feinstein Reply, ¶¶274-276.  Thus,

> Defendants' argument is not really that [Dr. Feinstein's] damages opinion is . . . not tied to Plaintiffs' theory of liability but rather that his opinion "fails to account for the facts of this case" in the sense that he has not already performed the damage calculation specific to this case.  ***But that is not required at this stage of the litigation***.

*Big Lots*, 2017 WL 1074048, at \*7.  After all, Defendants do not contend an event study is incapable of measuring damages in this case.  *See* Stulz Tr. 311:3-9 ("Q.  So are you saying an event study is incapable of measuring damages in this case?  Is that your position?  [objection]  A.  I am – didn't say that.").  As such, Defendants effectively ***concede*** Plaintiffs satisfy *Comcast* here.

Defendants' critiques do not preclude class certification.  Rather, "[a]ll of [Defendants'] criticisms go to the accuracy of the damages model and loss causation, but do not prevent class certification because all of these alleged obstacles for accurate calculation of the damages are the same if there is one plaintiff or one million plaintiffs."  *Plymouth Cnty. Ret. Sys. v. Patterson Cos.*, 2020 WL 5757695, at \*15 (D. Minn. Sept. 28, 2020); *JPMorgan*, 2015 WL 10433433, at \*7 (same); *see Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011) ("*Halliburton I*") ("[P]laintiffs [are not required to] prove loss causation in order to obtain class certification.").

Indeed, "'[a]t this stage of litigation, Plaintiffs are not required to produce a detailed damages model.'"  *EQT*, 2022 WL 3293518, at \*27-\*28; *Junge v. Geron Corp.*, 2022 WL 1002446, at \*6 (N.D. Cal. Apr. 2, 2022) (rejecting Stulz's objections to plaintiffs' damages approach because they "boil[ed] down to loss causation" issues, "which plaintiffs need not show at this stage").  Instead, Plaintiffs

- 28 -

"propos[ing] a method of calculating damages on a class-wide basis" and "summariz[ing], albeit in general terms, the steps" for calculating out-of-pocket losses is sufficient at this stage. *See Utesch v. Lannett Co.*, 2021 WL 3560949, at \*16 n.13 (E.D. Pa. Aug. 12, 2021), *aff'd sub nom. Univ. of P.R. Ret. Sys. v. Lannett Co.*, 2023 WL 2985120 (3d Cir. Apr. 18, 2023); Feinstein Rpt., ¶¶225-230 (detailing out-of-pocket damages methodology in this case); Feinstein Reply, ¶¶266-267 (same). "[H]ow Lead Plaintiff will ultimately prove loss causation (*i.e.*, distinguish the impact of [the corrective] disclosure from other disclosures, news, and inflation) is a merits question that need not be answered at class certification." *In re Conduent Inc. Sec. Litig.*, 2022 WL 17406565, at \*5 (D.N.J. Feb. 28, 2022).

Contrary to Defendants' claim (Opp. at 29), Dr. Feinstein need not specify exactly which valuation tools he may or may not deploy at the merits stage. *See S. Co.*, 332 F.R.D. at 399 (finding proposed methodology complied with *Comcast* even though expert "ha[d] not yet specified which valuation tools . . . he [would] ultimately use"); *Wilson*, 2018 WL 3913115, at \*17 (rejecting argument that Dr. Feinstein was required to specify "'valuation tools'" because "such specificity is not required at this stage"). All that matters is that standard valuation tools are available to adjust the event-study model and regression analysis to account for specific merits-related issues, should they arise, and Dr. Feinstein has shown that they exist here. Feinstein Rpt., ¶¶227-229; Feinstein Reply, ¶¶268-271; ¶¶277-316. Nothing more is required. *See Rooney*, 330 F.R.D. at 451 (rejecting similar arguments where an event study "can be used to calculate damages on a classwide basis using the 'out-of-pocket' method").[31]

Likewise, Defendants' suggestion that inflation may change during the class period (Opp. at 30) goes to the "accuracy of the damages model and loss causation, but do[es] not prevent class certification." *Plymouth Cnty.*, 2020 WL 5757695, at \*15; *id.* at \*14 ("Defendants' concerns that [plaintiff] has not yet

---

[31]   Defendants' cases are inapposite. In *In re BP p.lc. Sec. Litig.*, 2013 WL 6388408, at \*16 (S.D. Tex. Dec. 6, 2013), unlike here, plaintiffs alleged **four** theories of liability. Similarly, *Turnbow v. Life Partners, Inc.*, 2013 WL 3479884, at \*15-\*18 (N.D. Tex. July 9, 2013), was not a securities case and plaintiffs sought to establish class-wide contractual damages and disgorgement of fees.

calculated an inflation ribbon . . . are loss causation disputes that are not appropriate for resolution at class certification."); *Wilson*, 2018 WL 3913115, at *17 (rejecting claim that "'Dr. Feinstein must propose a model capable of measuring changing levels of inflation'" at class-certification). "*Comcast* does not require Plaintiffs to account for variations in inflation throughout the class period at the class certification stage." *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 47-48 (S.D.N.Y. 2018).[32]

Similarly, Defendants' contention that Dr. Feinstein's model fails to disaggregate the effects of unspecified "other forces" (Opp. at 31-32) "is really a merits inquiry into loss causation" that "is not required for class certification" and, in any event, "is an issue common to all class members." *Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 6793326, at *7 (E.D. Mich. Nov. 19, 2020); *Plymouth Cnty.*, 2020 WL 5757695, at *14 ("[C]oncerns that [plaintiff] has not yet . . . adequately addressed disaggregation" is a "loss causation dispute[]" "not appropriate for resolution at class certification.").

Finally, Defendants' speculation that Dr. Feinstein must estimate damages for "each category of alleged misrepresentations" because some statements may later be eliminated is meritless.  Opp. at 32. Dr. Feinstein "need not support his opinion with a damages model specifying precisely how Plaintiffs will measure the price impact of the various misrepresentations and corrective disclosures alleged." *Utesch*, 2021 WL 3560949, at *16, n.14; *see BlackBerry*, 2021 WL 253453, at *22-*23 (accepting Dr. Feinstein's damages model and rejecting argument "that a damages model must isolate the amount of price impact attributable to each specific misstatement").[33]  Plaintiffs have satisfied *Comcast*.

---

[32]  Defendants' reliance on *Sicav v. James Jun Wang*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015), and *Vale* is misplaced.  Unlike here, *Sicav* was not a "typical securities fraud class action," and alleged "an unusual theory of classwide injury" based on trading mechanics, not a stock price drop.  2015 WL 268855, at *2.  In *Vale*, the court upheld Dr. Feinstein's damages model and granted class certification. *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *18-*19, *22 (E.D.N.Y. Jan. 11, 2022); *Vale*, 2022 WL 969724, at *6-*7.  Moreover, the basis of the court's criticism in *Vale* was Dr. Feinstein's use of a **different** event study than the typical "'collective event study'" used here, which, unlike here, relied on a "'subjective'" and unspecified event date selection process.  *Vale S.A.*, 2022 WL 122593, at *10-*13. Defendants do not claim his event selection criteria here was subjective.

[33]  Courts have declined to follow Defendants' *Freddie Mac* case, noting that "although [the expert] has

## VI.   DEFENDANTS DO NOT SHOW PLAINTIFFS FAILED TO SATISFY RULE 23(a)(3)'s STRAIGHTFORWARD TYPICALITY REQUIREMENTS

As explained in Plaintiffs' opening motion, each of the proposed Class Representatives clear the typicality threshold, which is "not demanding." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999); *Tidel Techs.*, 220 F.R.D. at 500.  The rule is not intended "'to shield defendants from potentially meritorious suit.'" *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 55 (S.D.N.Y. 2019).  Here, Defendants do ***not*** dispute that Plaintiffs' claims are "based on conduct that . . . injured all members of the putative class" (*In re Dynegy, Inc. Secs. Litig.*, 226 F.R.D. 263, 287-88 (S.D. Tex., 2005)), or that Plaintiffs suffered substantial losses as a result of the alleged fraud.  *See* ECF 176 at 181 of 184, 184 of 184; ECF 68-3.  Plaintiffs' claims are, therefore, typical of the Class.  *See* Mot. at 8.

Nevertheless, Defendants raise a host of meritless "defenses" that courts routinely reject.  ***First***, despite their rhetoric, Defendants identify no valid defense unique to a Plaintiff, let alone one that "threatens to become the focus of the litigation." *Tidel Techs.*, 220 F.R.D. at 500.  In fact, the Fifth Circuit has rejected the argument that "the presence of an arguable unique defense necessarily destroys typicality." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 137 (5th Cir. 2005).

***Second***, while Defendants argue Plaintiffs "did not purchase Cassava stocks or options in reliance on Defendants' representations" (Opp. at 35) – *i.e.*, direct reliance – they need ***not*** have done so, as reliance is presumed under *Basic* and *Affiliated Ute*.  Mot. at 12-19; *Barbier*, 2013 WL 2443217, at *12 ("Even in the absence of direct reliance, however, investors may rely on the fraud-on-the-market

---

not yet specified . . . valuation tools – an input into the damages model – he will ultimately use, such specification is not required at this stage." *S. Co.*, 332 F.R.D. at 399.  Further, *Freddie Mac* "involved testimony from defendants' expert affirmatively supporting that a class-wide damages model could not be constructed – which is not at issue in the present case" (*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2022 WL 1459567, at *10 (N.D. Cal. May 9, 2022)); Stulz Tr. 311:3-9 (testifying he is ***not*** opining that an event study cannot measure damages in this case), as well as incongruent theories of liability and damages.  *See Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *9 n.8 (N.D. Ill. Feb. 26, 2020).

4894-6865-3272.v2

theory to establish the reliance element."); *NIO*, 2023 WL 5048615, at *7 (Where *Basic* applies, "a lack of individual reliance on the alleged misstatements or omissions is not a defense.").

**Third**, Defendants mischaracterize Plaintiffs as "short-term" or in-and-out traders.  Opp. at 35-39.  The facts, however, show otherwise, and the Court has already held plaintiff Bozorgi did not engage in "in-and-out trading," as he "never completely liquidated his stock in Cassava."  ECF 59 at 9.  *See Sklar v. Amarin Corp. PLC*, 2014 WL 3748248, at *9 n.8 (D.N.J. July 29, 2014) ("In-and-out traders are those who both purchase and sell all of their shares prior to a corrective disclosure.").  Indeed, Mr. Bozorgi held shares through the release of the Citizen Petition – the first corrective disclosure when the truth began to be revealed – and he suffered losses as a result.  ECF 176 at 181.  The Court also concluded that "Mr. Bozorgi is clearly not a day trader," finding that "Mr. Bozorgi's [27] trades do not show that he purchased stock for reasons other than the integrity of the market price of the shares."  ECF 59 at 9-10.[34]

The Court's ruling applies equally to Plaintiffs Calderone and Rao, who likewise held shares through the first corrective disclosure and suffered losses as a result.  *See* ECF 176 at 184 of 184; ECF 68-3.  And both Mr. Calderone and Mr. Rao also had similarly few transactions in Cassava stock during the Class Period.[35]  In short, none of the Plaintiffs is an in-and-out or "short-term" trader.

**Fourth**, Defendants suggest, without any support, that Plaintiffs' purportedly "risky" trading strategy undermines typicality.  Opp. at 35-40.  It doesn't.  "[T]he fact that [Plaintiffs] did not independently evaluate [Cassava] securities' risk before investing in [Cassava] has no bearing on whether

---

[34]   Mr. Bozorgi made a total of 32 Cassava trades during the Class Period, less than one trade per month on average for that period.  *See* ECF 176 at 181.  Even if a plaintiff was a "day trader" (they are not), it would be irrelevant to their typicality.  *See BlackBerry*, 2021 WL 253453, at *10 ("'courts in this Circuit have generally rejected the argument that a day trader is barred from representing a class in a securities actions for reasons of atypicality'"); *Schueneman v. Arena Pharms., Inc.*, 2011 WL 3475380, at *7 (S.D. Cal. Aug. 8, 2011) (collecting cases); *In re CMS Energy Sec. Litig.*, 236 F.R.D. 338, 343 (E.D. Mich. 2006) ("day traders are adequate class members and representatives").

[35]   During the Class Period Mr. Calderone had 28 trades in Cassava stock, which is less than one trade per month on average during that period, and Mr. Rao had 48 trades – less than two per month, on average, during that same period.  *See* ECF 176 at 184 of 184; ECF 68-3.

[they] relied on [Cassava]'s securities' prices as an accurate and adequate expression of its value." *Loritz v. Exide Techs.*, 2015 WL 6790247, at *5 (C.D. Cal. July 21, 2015).  Defendants, indeed, do not dispute that Plaintiffs purchased Cassava securities at the market price; thus, their "'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action.'" *Halliburton II*, 573 U.S. at 268.  Nor do Defendants attempt to rebut that presumption by showing, for example, "that the Plaintiffs would have purchased the stock at the ***same*** price had they ***known*** the information that was not disclosed." *Fine v. Am. Solar King Corp.*, 919 F.2d 290, 299 (5th Cir. 1990).[36]  Defendants' reliance-based arguments thus miss the mark.[37]

Defendants' other scattershot attacks on typicality fare no better.  Defendants argue Mr. Bozorgi is atypical because he sold shares in Cassava pursuant to a margin call.  Opp. at 36.  But a margin call has no bearing on typicality, especially where it was triggered, as here, by a stock drop following revelation of the alleged fraud.  *See Barbier*, 2013 WL 2443217, at *13 ("[Cassava] cites no legal authority indicating selling at a margin call renders a lead plaintiff atypical, and other courts have held it does not."); *Jiang v. Chirico*, 2024 WL 967084, at *12 (S.D.N.Y. Mar. 5, 2024) (holding that the "weight

---

[36]   Rather, each Plaintiff testified that he purchased Cassava securities because he believed the company was a good investment that would appreciate in value.  *See* Ex. 13 ("Bozorgi Tr.") 197:18-24; 198:14; 198:24-199:5; Ex. 14 ("Calderone Tr.") 136:6-10; Ex. 15 ("Rao Tr.") 240:14-241:4; 217:12-17.  And investors, like Plaintiffs, that rely on the integrity of the market and are entitled to the *Basic* presumption. *See Halliburton II*, 573 U.S. at 273-74 ("value" investors who believe a stock is "undervalued" rely on the integrity of the market).  Defendants' reference to transactions in other companies (*see* Opp. at 35-36) is irrelevant.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2006 WL 8429110, at *2 (S.D.N.Y. June 21, 2006) (finding transactions involving other companies irrelevant to the typicality assessment).

[37]   Defendants' cases are again inapposite.  *See Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 301 (S.D. Tex. 2000) (finding plaintiff atypical because, unlike here, "she realized a net gain" on stock trades and purchased her shares "over-the-counter" prior to its listing on a major exchange); *In re HealthSouth Corp. Sec. Litig.*, 213 F.R.D. 447, 459 (N.D. Ala. 2003) (plaintiffs, unlike here, suffered from unique defenses as to reliance because they directly communicated with the individual defendants as employees of the acquired company); *Shannon v. Allstate Ins. Co.*, 2024 WL 1080915, at *8 (W.D. Tex. Jan. 31, 2024) (non-securities case where there was "a myriad of differences between the approximately 1,300,000 putative class members" due to the individualized nature of insurance premiums).

of authority" is against Defendants' argument).[38]

Defendants also argue Mr. Calderone is atypical because he purchased additional Cassava stock after the Complaint was filed when Cassava's stock price traded at a significant discount. Opp. at 38; ¶¶497, 499, 501, 503, 505; Supp., ¶5. But in this Circuit, "[r]eliance on the integrity of the market prior to disclosure of alleged fraud (*i.e.*[,] during the class period) is unlikely to be defeated by post-disclosure reliance on the integrity of the market," and, like here, "seems particularly so after the stock price has been 'corrected' by the market's assimilation of the new information." *Elec. Data Sys.*, 429 F.3d at 138. "That [Calderone] chose to purchase additional stock after the corrective disclosure . . . the related drop in stock price simply shows that with full information, [Calderone] was willing to invest in [Cassava] at a lower price, not that the fraud was irrelevant . . . ." *NIO*, 2023 WL 5048615, at *7. "For exactly this reason, many cases have found typicality despite a plaintiff's post-corrective disclosure purchases." *Id.* at *8. *See Plymouth Cnty.*, 2020 WL 5757695, at *6 ("[T]he great weight of the authority provides that purchasing shares after a disclosure does not destroy typicality.").

Indeed, Mr. Calderone specifically testified that he made those purchases in order to "average down," a common investment strategy that does not impact typicality. Calderone Tr. 169:7-10, 170:13-25, 217:16-20, 278:7, 279:24; *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 602 n.36, 603 (C.D. Cal. 2009) ("[P]urchasing stock subsequent to a materially adverse disclosure, 'averaging down,' is a common technique used to decrease the average cost of an investment and which cannot be used to defeat a proposed class representative's typicality."); *In re Comput. Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 123-24 (E.D. Va. 2012) ("The purchase of the stock at the lower post-corrective disclosure price in no way indicates that plaintiff would have purchased the stock at the pre-disclosure, inflated price absent

---

[38] Defendants' suggestion that Mr. Bozorgi does not have "[20] years of investment experience" (Opp. at 35 n.26) ignores his testimony regarding his experience in his construction and real estate businesses. *See* Bozorgi Tr. 61:2-4.

the allegedly fraudulent statements."). Thus, Mr. Calderone's post-Complaint purchases do not render

him atypical. *See Tidel Techs.*, 220 F.R.D. at 501-02 ("[C]ourts have ruled that purchases of stock by

the class representatives after negative announcements during the class period or even after the close of

the class period do not destroy typicality."); *Pelletier*, 338 F.R.D. at 476 (same).[39]

None of Defendants' so-called defenses defeats Plaintiffs' typicality here.[40]

## VII.    CONCLUSION

This case, like nearly all securities class actions, is perfectly suited to class certification.

Accordingly, the Court should certify the Class, appoint Plaintiffs as Class Representatives, and appoint

Robbins Geller Rudman & Dowd LLP as Class Counsel.

DATED: August 23, 2024                Respectfully submitted,

ROBBINS GELLER RUDMAN & DOWD LLP
DANIEL S. DROSMAN (admitted *pro hac vice*)
RACHEL JENSEN (admitted *pro hac vice*)
KEVIN A. LAVELLE (admitted *pro hac vice*)


*/s/ Kevin A. Lavelle*
KEVIN A. LAVELLE

---

[39]   Contrary to Defendants' assertions (Opp. at 38), Mr. Calderone correctly testified, repeatedly, that the initial cause of his damages was the "Citizen's Petition." *See* Calderone Tr. 213:1; 223:15-16; 270:2-7; 274:2-3 (calling the "citizen's petition" the "nail in the coffin").

[40]   Defendants' remaining cases are inapplicable. Unlike plaintiffs in *Deutsche Bank AG*, this Court has already determined Plaintiffs are not "in-and-out traders." 2013 WL 5815472, at *19, *22. *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 903 F.2d 176, 180 (2d Cir. 1990), is not only contrary to controlling Fifth Circuit authority, but it involved CDs, not common stock, and has been distinguished on those grounds and others, including because, unlike here, the plaintiff continued to purchase the CDs at the ***same price*** after learning of the fraud. *See In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 565 (E.D. Tex. 2005) ("*Gary* is not analogous to the present situation."), *aff'd sub nom.*, 429 F.3d 125; *NIO*, 2023 WL 5048615, at *7 (*Gary* "wholly inapposite"). Similarly, in *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007), unlike here, the plaintiff was atypical because he purchased stock after becoming aware of the alleged fraud and ***before*** any public disclosure of correction caused the stock price to fall. Additionally, *Rocco* is against "the weight of authority" and is "'not generally accepted.'" *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 577 (N.D. Cal. 2009). Last, *Ellis v. Costco Wholesale Corp.*, is another non-securities case that does not involve any of the purported defenses raised here. 657 F.3d 970, 985 (9th Cir. 2011).

MEGAN A. ROSSI (admitted *pro hac vice*)
HEATHER GEIGER (admitted *pro hac vice*)
JEREMY W. DANIELS (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dand@rgrdlaw.com
rachelj@rgrdlaw.com
klavelle@rgrdlaw.com
mrossi@rgrdlaw.com
hgeiger@rgrdlaw.com
jdaniels@rgrdlaw.com

Local Counsel for Lead Plaintiff and Additional
Plaintiff Ken Calderone

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)
3811 Turtle Creek Blvd., Suite 825
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

Lead Counsel for Lead Plaintiff and Additional
Plaintiff Ken Calderone

GLANCY PRONGAY & MURRAY LLP
CHARLES H. LINEHAN (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
Telephone:  310/201-9150
310/201-9160 (fax)
clinehan@glancylaw.com

Counsel for Additional Plaintiff Manohar K. Rao