IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re CASSAVA SCIENCES INC. | § | |
| SECURITIES LITIGATION | § | Master File No. 1:21-cv-00751-DAE |
| | § | |
| | § | CLASS ACTION |
| This Document Relates to: | § | |
| | § | |
| ALL ACTIONS | § | |
| | § | |

**DEFENDANTS' SURREPLY IN OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION; REQUEST FOR EVIDENTIARY HEARING**

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................... 1

ARGUMENT .......................................................................................................... 2

I.     Plaintiffs Fail to Establish Market Efficiency Under *Basic* .................................... 2

    A.     Plaintiffs Still Fail to Account for Cassava Being Impacted by the Meme Stock Phenomenon ........................................................................... 3

    B.     Plaintiffs Cannot Explain How Cassava's Wild Price Swings in the Absence of News Could Be Consistent with an "Efficient" Market .......... 6

    C.     Plaintiffs' Expert's Asserted Definition of Market Efficiency Is Fatally Flawed and Circular ...................................................................... 9

II.    Even If the Relevant Market Was Efficient, Defendants Have Demonstrated Lack of Price Impact ....................................................................... 11

    A.     Plaintiffs' Assertions About "Front-End" Impact Fail ............................ 12

    B.     Defendants Have Not "Conceded" That Alleged Corrective Disclosures Impacted Cassava's Stock Price on the "Back-End" ............ 12

    C.     Defendants Have Established an Absence of Price Impact for the Remaining Corrective Disclosures .......................................................... 13

    D.     There Is a "Mismatch" Between the Alleged Misrepresentations and the Corrective Disclosures ................................................................ 15

III.   Plaintiffs Are Not Entitled to a Presumption of Reliance Under *Affiliated Ute* ...................................................................................................................... 16

IV.    Plaintiffs Fail to Provide a Classwide Damages Methodology Consistent with Their Theory of Liability ............................................................................... 17

V.     The Named Plaintiffs Were Meme Traders Who Did Not Rely on Any Representation of the Company, Undermining Typicality ................................... 20

CONCLUSION ...................................................................................................... 20

REQUEST FOR EVIDENTIARY HEARING ............................................................. 21

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Abell v. Potomac Ins. Co.*,
  858 F.2d 1104 (5th Cir. 1988), *cert. granted, judgment vacated on other
  grounds sub nom. Fryar v. Abell*, 492 U.S. 914 (1989)....................................................16, 17

*Akin v. Q-L Invs., Inc.*,
  959 F.2d 521 (5th Cir. 1992) ..................................................................................16, 17

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)...............................................................................................1, 3, 4, 11

*In re Apache Corp. Sec. Litig.*,
  2024 WL 532315 (S.D. Tex. Feb. 9, 2024) .........................................................12, 13, 14, 15

*Basic, Inc. v. Levinson*,
  485 U.S. 224 (1988)...........................................................................................1, 3, 4, 5, 10, 11

*Bell v. Ascendant Sols., Inc.*,
  422 F.3d 307 (5th Cir. 2005) ...............................................................................2, 3, 10, 11

*Binder v. Gillespie*,
  184 F.3d 1059 (9th Cir. 1999) ..............................................................................16

*Bratya SPRL v. Bed Bath & Beyond Corp.*,
  2024 WL 4332616 (D.D.C. Sept. 27, 2024) ....................................................1, 3, 4, 5, 6, 9, 14

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)..............................................................................................2, 18, 19

*Desai v. Deutsche Bank Sec. Ltd.*,
  573 F.3d 931 (9th Cir. 2009) ...............................................................................16, 17

*Edwards v. McDermott Int'l, Inc.*,
  2024 WL 1769325 (S.D. Tex. Apr. 24, 2024) .........................................................21

*In re Enron Corp. Sec.*,
  529 F. Supp. 2d 644 (S.D. Tex. 2006) .....................................................................10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D. Tex. 2015) ...........................................................................8, 21

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
  281 F.R.D. 174 (S.D.N.Y. Mar. 27, 2012)................................................................7, 10

*Finkel v. Docutel/Olivetti Corp.*,
  817 F.2d 356 (5th Cir. 1987) ................................................................................16

*George v. China Auto. Sys., Inc.*,
  2013 WL 3357170 (S.D.N.Y. July 3, 2013) ............................................................9

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
   99 F.4th 770 (5th Cir. 2024) ...................................................................................21

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
   594 U.S. 113 (2021)..........................................................2, 11, 12, 13, 15, 16

*Greenberg v. Crossroads Sys., Inc.*,
   364 F.3d 657 (5th Cir. 2004) ......................................................................7, 8, 10

*Grigsby v. BofI Holding, Inc.*,
   979 F.3d 1198 (9th Cir. 2020) ........................................................................8

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)..........................................................................................4

*Johnston v. HBO Film Mgmt., Inc.*,
   265 F.3d 178 (3d Cir. 2001)..........................................................................17

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
   2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ............................................14

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ..............................................................9, 10

*Levine v. SkyMall, Inc.*,
   2001 WL 37118873 (D. Ariz. May 24, 2001) ..............................................6

*Marcus v. J.C. Penney Co., Inc.*,
   2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) ............................................21

*O'Neil v. Appel*,
   165 F.R.D. 479 (W.D. Mich. 1996) ..............................................................9

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ....................................17, 20

*Petrie v. Elec. Game Card, Inc.*,
   308 F.R.D. 336 (C.D. Cal. 2015) ..............................................................5, 6

*In re PolyMedica Corp. Sec. Litig.*,
   432 F.3d 1 (1st Cir. 2005)..............................................................................7

*Ramirez v. Exxon Mobil Corp.*,
   2023 WL 5415315 (N.D. Tex. Aug. 21, 2023)..........................................13

*Regents of Univ. of California v. Credit Suisse First Bos. (USA), Inc.*,
   482 F.3d 372 (5th Cir. 2007) ..................................................................16, 17

*In re Res. Am. Sec. Litig.*,
   202 F.R.D. 177 (E.D. Pa. 2001)..................................................................10

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
   119 F. Supp. 3d 1213 (C.D. Cal. 2015) ......................................................9

*Serfaty v. Int'l Automated Sys., Inc.*,
    180 F.R.D. 418 (D. Utah 1998) ...................................................................................9

*Shannon v. Allstate Ins. Co.*,
    2024 WL 1080915 (W.D. Tex. Jan. 31, 2024) .......................................................21

*Shupe v. Rocket Companies, Inc.*
    2024 WL 4349172 (E.D. Mich. Sept. 30, 2024)................................................5, 15

*Sicav v. James Jun Wang*,
    2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ...........................................................20

*In re Teva Sec. Litig.*,
    2021 WL 872156 (D. Conn. Mar. 9, 2021) ...........................................................10

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) ....................................................................1, 3, 7, 21

*In re Vale S.A. Sec. Litig.*,
    2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) ...........................................................20

*In re Xcelera.com Sec. Litig.*,
    430 F.3d 503 (1st Cir. 2005)......................................................................................6

## INTRODUCTION

Plaintiffs' Reply and the Rebuttal Report of Plaintiffs' expert, Dr. Steven Feinstein, do nothing to address the fatal flaws raised in Defendants' Opposition and in the expert report of Dr. Rene Stulz. *See* ECF 214 (Reply); ECF 209-5 (Feinstein Rebuttal Report). Rather than engage with the meme-stock dynamics central to this case, Plaintiffs attempt to sidestep those issues, continuing to assert this case is "like nearly all securities class actions." Reply at 1, 35.[1] But this is unlike any shareholder class action this Court or the Fifth Circuit has ever considered.

Plaintiffs and Dr. Feinstein dismiss entirely the meme stock phenomenon's impact on the market for Cassava's stock, despite a district court recognizing just days ago the phenomenon's implications for class certification. *See Bratya SPRL v. Bed Bath & Beyond Corp.*, 2024 WL 4332616 (D.D.C. Sept. 27, 2024) (denying class certification, concluding market was inefficient due to meme stock phenomenon's impact on stock). Instead, Plaintiffs blithely rehash their rote analysis of the *Cammer/Krogman* factors. *See* Reply at 3-6. But these factors are not a "checklist." *Unger v. Amedisys Inc.*, 401 F.3d 316, 325 (5th Cir. 2005). "Nor are they a guarantee of market efficiency." *Bratya*, 2024 WL 4332616, at *11, 14. Rather, the ultimate question is whether it is "reasonable to presume" that class members relied "on the integrity of the price set by the market" for Cassava stock during the class period. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 462 (2013) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 245 (1988)). In this case, it clearly is not. *See* Opp. at 1-16; *Bratya*, 2024 WL 4332616, at *12-19.

Plaintiffs effectively ask the Court to ignore the realities of this case, including market observers' characterization of Cassava as a meme stock, the stock's extreme volatility divorced from value-relevant news, and Plaintiffs' own erratic trading histories. Despite these obvious red

---

[1] Since the developments that Plaintiffs assert make their claims "stronger" and Defendants "[d]esperate to find an off-ramp," Reply at 1, Cassava's stock price has **risen by over 40%**.

flags, Plaintiffs reassert their argument that the Court should conclude the market was efficient simply because Cassava actively traded on the Nasdaq. If the Court applies the "rigorous" analysis required by law, however, such analysis quickly reveals that Plaintiffs' arguments are fatally flawed, the evidence Plaintiffs offer is meaningless, and Dr. Feinstein's definition of "efficiency" is without basis and entirely circular.

Instead of confronting the holes in their arguments and evidence, Plaintiffs set up and rebut strawman arguments Defendants do not make. Plaintiffs also repeatedly seek to avoid their burden to demonstrate efficiency by shifting that burden to Defendants, pretending that Defendants must affirmatively demonstrate *inefficiency* to defeat class certification. But that is not the law.

Separately, Defendants have demonstrated a lack of price impact. *See Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 126-27 (2021). Plaintiffs *do not dispute* that the bulk of their alleged "corrective disclosures" are not associated with *any* statistically significant impact on Cassava's price whatsoever. Reply at 19-23. Thus, even if the market were efficient, the *Basic* presumption would be rebutted.

Plaintiffs also still fail to show how damages can be calculated on a classwide basis, offering nothing but the bare, insufficient assertions from Dr. Feinstein's original report. *Id.* at 27-30; *see Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35 (2013). The market forces impacting Cassava's stock raise obvious difficulties in reliably calculating classwide damages, which Plaintiffs and Dr. Feinstein have done *nothing* to address. Plaintiffs' Motion should be denied.

<u>**ARGUMENT**</u>

### I.      Plaintiffs Fail to Establish Market Efficiency Under *Basic*

When "considering the certification of securities class actions dependent on the 'fraud on the market' theory" articulated in *Basic*, "a careful certification inquiry is required and findings must be made based on adequate admissible evidence to justify class certification." *Bell v.*

*Ascendant Sols., Inc.*, 422 F.3d 307, 312 (5th Cir. 2005) (quoting *Unger*, 401 F.3d at 319). Courts must "consider the nature of the market on a case-by-case basis to decide whether the totality of the circumstances supports a finding of market efficiency." *Bratya*, 2024 WL 4332616, at *11 (citation omitted). "Because this inquiry can prove decisive for class certification," courts must apply a "rigorous" standard when evaluating proffered proof of efficiency. *Unger*, 401 F.3d at 322.

Plaintiffs' Reply seeks to escape that obligation and assert the burden somehow was on *Defendants*' expert to affirmatively prove market *inefficiency*. Reply at 3-4, 13. This is false. "Plaintiffs bear the burden of proving market efficiency—defendants do not." *IBEW*, 2013 WL 5815472, at *21 (noting that "questions asked of defendants' experts…as to whether they conducted their own analysis of market efficiency [were thus] beside the point"); *see, e.g.*, *Bell*, 422 F.3d at 314-16. If Plaintiffs' "proffered proof of market efficiency falls short of the mark," market efficiency is not proven, and the *Basic* presumption cannot apply. *IBEW*, 2013 WL 5815472, at *21; *see Bell*, 422 F.3d at 312; *Unger*, 401 F.3d at 319-22.

Plaintiffs fail to carry their burden here. Among other failures, Plaintiffs' purported evidence of efficiency continues to ignore the meme-stock dynamics that plagued Cassava's stock throughout the class period, cannot account for the wild swings in Cassava's price divorced from any news, and relies upon a circular and flawed definition of "efficiency." Plaintiffs thus fail to demonstrate market efficiency under *Basic*, and their Motion must be denied.

## A.  Plaintiffs Still Fail to Account for Cassava Being Impacted by the Meme Stock Phenomenon

The *Basic* presumption "springs from the very concept of market efficiency." *Amgen*, 568 at 462 (citing *Basic*, 485 U.S. at 245-47). *Basic*'s underlying premise is that "[i]f a market is generally efficient in incorporating publicly available information into a security's market price," then "it is reasonable to presume that most investors…will rely on the security's market price as

an unbiased assessment of the security's value in light of all public information." *Id.* "Thus, courts may presume that investors trading in efficient markets indirectly rely on public, material misrepresentations through their 'reliance on the integrity of the price set by the market.'" *Id.* (quoting *Basic*, 485 U.S. at 245); *see Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 273 (2014) ("*Halliburton II*") (same).

Given the unique dynamics of this case, there is no reason to presume that investors relied "on the integrity of the price set by the market" for Cassava stock. *Basic*, 485 U.S. at 245; *see Bratya*, 2024 WL 4332616, at *12-14. Rather than reflect new information, Cassava's stock price swung wildly throughout the class period based on retail trading activity that characterized the meme stock phenomenon. *See* Opp. at 11-16; Stulz Rpt. ¶¶ 41-94.

Plaintiffs do not genuinely dispute that Cassava's stock demonstrated extreme volatility during the class period, untethered to material information in the market. Nor do they credibly dispute that market observers attributed these swings to retail meme-stock traders, rather than forces commonly at work in efficient markets. Instead of grappling with these realities, however, Plaintiffs obfuscate the issues and criticize strawman arguments Defendants did not make.

*First*, contrary to Plaintiffs' assertions, Defendants do not argue "that markets are not efficient" generally, that "public information is often not incorporated 'rationally' into stock prices" across markets, or that *Basic*'s underlying premise is incorrect. Reply at 7-8.[2] Nor do Defendants argue that the market for Cassava's stock was inefficient because the stock was "incorrectly priced" or "incorrectly valued." *Id*. Defendants' argument is more modest, meeting the reality relevant to Plaintiffs' proposed class: Given the unique dynamics surrounding Cassava's

---

[2] If, as Plaintiffs assert, *Basic* somehow requires that the market for every stock actively traded on the Nasdaq be deemed efficient (it does not), this case would present a perfect example of a need for a change in the law.

stock, Plaintiffs' robotic march through the *Cammer/Krogman* factors fails to demonstrate efficiency throughout the years-long class period Plaintiffs propose.

*Second*, Defendants do not argue that "meme stock" status automatically renders a market inefficient. Reply at 7, 11; Feinstein Rebuttal ¶ 12; *see Shupe v. Rocket Companies, Inc.* 2024 WL 4349172, at *22 (E.D. Mich. Sept. 30, 2024) (rejecting that argument). Rather, Defendants have identified numerous actual consequences of the meme stock phenomenon on Cassava's stock during the class period, consequences which undermined "the integrity of the price set by the market." *Basic*, 485 U.S. at 245; *see also Bratya*, 2024 WL 4332616, at *9-10. Despite Plaintiffs' pleas to the contrary, "the Court cannot simply ignore these dynamics…in determining whether [the] market was efficient." *Bratya*, 2024 WL 4332616, at *14.

*Third*, Plaintiffs try to dismiss the relevance of the meme stock phenomenon because academics have yet to arrive at a single, consensus definition of "meme stock." Reply at 11, 13. But Defendants' argument does not depend on Cassava satisfying any particular, technical definition of "meme stock." As Dr. Stulz explains, the meme stock phenomenon is relatively new, and the academic literature surrounding the phenomenon is developing. Stulz Rpt. ¶¶ 55-68. Numerous academics and market observers, however, have recognized that the meme stock phenomenon raises serious implications for market efficiency, concluding that affected stocks often behave in a manner inconsistent with efficiency. *Id.* ¶¶ 55-59. Dr. Stulz examined whether Cassava's stock demonstrated such behavior during the class period. *Id.* ¶¶ 60-69. He concluded it did. *Id.* ¶¶ 65-69.

*Fourth*, Plaintiffs attempt to sidestep Cassava stock's obvious departures from efficiency by noting that some courts have allowed "non-directional event studies." Reply at 10-11. But as Plaintiffs' own case recognizes, "certain news can be reasonably expected to drive the price only in one direction." *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 355 (C.D. Cal. 2015). "Thus,

while lack of evidence about the direction of the price impact is not necessarily fatal to an event study, it can be relevant to how much weight the study is given." *Id.*

*Fifth*, Plaintiffs try to dismiss the impact of the extreme costs of shorting Cassava stock during the class period, noting that short-selling was never "banned." Reply at 14-15. Plaintiffs cannot dispute, however, that the costs of short-selling were indeed extreme, impacting arbitrageurs' ability to correct market inefficiencies. *See* Opp. at 18-19; Stulz Rpt. ¶¶ 96-108; *Bratya*, 2024 WL 4332616, at *16 (concluding high costs to short-sell weighed against efficiency).

*Sixth*, Plaintiffs suggest that Cassava's stock movements were "rational" because the price "traded between $6.79 and $135 per share during the class period, essentially within analysts' price targets, which ranged from $8 to $215 per share." Reply at 12-13. This makes no sense. Indeed, Plaintiffs and Dr. Feinstein seem to suggest that *any* movement in Cassava's price should be considered "rational," regardless of its relation to new information, so long as the price remained between $8 and $215.[3]

Despite Plaintiffs' attempts to wave them away, the meme-stock dynamics impacting Cassava's stock are obvious. Reliance cannot be presumed based on the evidence offered here.

### B.   Plaintiffs Cannot Explain How Cassava's Wild Price Swings in the Absence of News Could Be Consistent with an "Efficient" Market

During the class period, Cassava's stock price frequently experienced massive swings in the absence of any new information about the company. *See* Opp. at 11-16. Plaintiffs cannot explain how such swings can be reconciled with the workings of an efficient market.

---

[3] Plaintiffs also try to dismiss the relevance of "rationality" altogether. Reply at 8, 12. But as the cases Plaintiffs cite recognize, "the presence of irrational investors" is relevant to the efficiency inquiry. *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 517 (1st Cir. 2005); *see also Levine v. SkyMall, Inc.*, 2001 WL 37118873, at *8 (D. Ariz. May 24, 2001).

Consistent with the meme stock phenomenon, many swings in Cassava's price were associated with high levels of social media activity, divorced from any news about the company. For example, Dr. Stulz's report identified 34 days during the class period that (1) Dr. Feinstein characterized as "non- or lesser-news days" in his first report, but (2) on which Cassava received extremely high levels of social media attention. Stulz Rpt. ¶¶ 71-74. The rate at which Cassava's stock experienced statistically significant price swings on these days is "indistinguishable" from the "news" dates Dr. Feinstein relied upon in his event study. *Id.* ¶ 75. Indeed, on at least seven of these days, Cassava's price experienced huge swings in the absence of any new information whatsoever. *Id.* ¶¶ 82-94.

In a strained effort to explain away this evidence indicating inefficiency, Dr. Feinstein's rebuttal report attempts to identify "economically material information" released on these dates, despite his earlier description of the dates as "non- or lesser-news days." Feinstein Rebuttal ¶¶ 19, 138-75. Dr. Feinstein's post hoc attempt to explain these wild price swings fails.

- **February 3, 2021 (45.89% increase):** Dr. Feinstein attributes this massive price increase to the market's supposed need for multiple days to process the news announced by Cassava on February 2, 2021, which he claims required "examination of complex biomedical test results." Feinstein Rebuttal ¶ 149. Dr. Feinstein provides no basis to conclude the February 2 news was more "complex" than Cassava's announcements of any other results. In any event, and more importantly, massive price swings that occur for days in the absence of new information are fundamentally inconsistent with market efficiency, which requires the "prompt" incorporation of news. *E.g.*, *Unger*, 401 F.3d at 324 ("In an efficient market, …material misstatements alter a stock's price almost immediately."); *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 12 (1st Cir. 2005) ("[A]n 'efficient' market [is] a market in which prices incorporate rapidly or promptly all publicly available information." (citation omitted)); *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 182 (S.D.N.Y. Mar. 27, 2012) ("Without evidence of the prompt effect of unexpected news on market price, the market cannot be called efficient."); *see also Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 662 n. 6 (5th Cir. 2004).[4]

---

[4] In his original report, Dr. Feinstein examined only *one-day* returns for all "news days" he identified, including February 2, 2021. *See* Feinstein Rpt., Exs. 16-18.

- **February 4, 2021 (34.00% decrease):** Dr. Feinstein identifies *no* new information to explain the dramatic price reversal on this date, again claiming, with no further explanation, this was somehow part of the market still "processing" the news released on February 2. Feinstein Rebuttal ¶¶ 149-50.

- **February 5, 2021 (35.22% decrease):** In addition to claiming this was part of the market "processing" the February 2 news, Dr. Feinstein attributes this 35% decline to a single analyst from Citi Bank expressing "caution" about Cassava's clinical results. Feinstein Rebuttal ¶ 150. But similar cautionary views were expressed on February 2, during the dramatic price increase. Dr. Feinstein fails to acknowledge this fact. In an efficient market, a single analyst's reiteration of known information should not impact prices *at all*, let alone cause a dramatic price decline. *See, e.g.*, *Greenberg*, 364 F.3d at 663, 665-66; *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020); *cf. Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 272 (N.D. Tex. 2015) (finding no price impact where information in alleged corrective disclosure was already known to the market).

- **June 11, 2021 (15.30% increase):** Dr. Feinstein fails to identify *any* purported news on this date, instead attributing this 15% swing to "random chance." Feinstein Rebuttal ¶ 152.[5]

- **July 21, 2021 (24.51% increase):** Dr. Feinstein attempts to attribute this price swing to the disclosure of the title of a presentation Cassava would be making at an upcoming AAIC conference. Feinstein Rebuttal ¶¶ 156-57. As Dr. Feinstein admits, however, the scheduling of the presentation was disclosed on June 21, 2021. *Id.* ¶ 155. Nevertheless, Dr. Feinstein contends the presentation's *title* revealed "blockbuster news" about simufilam, justifying the nearly 25% increase in Cassava's price. *Id.* ¶¶ 156-57. This assertion cannot withstand the slightest scrutiny. Indeed, Dr. Feinstein cannot cite a *single public source* discussing the supposed importance of the presentation's title.[6] In fact, only one analyst released a report about the AAIC conference after July 21 (on July 22, 2021), which neither discussed the title nor changed the evaluation contained in the same analyst's last report issued two weeks prior.

- **November 2, 2021 (21.60% increase):** Dr. Feinstein again fails to identify *any* purported news on this date, attributing this nearly 22% swing to "random chance." Feinstein Rebuttal ¶¶ 165-66.

---

[5] Despite attributing this swing to "random chance," Dr. Feinstein references an announcement by Biogen concerning its drug, Aduhelm, from June 7, 2021. Feinstein Rebuttal ¶ 153. But Dr. Feinstein makes no attempt to explain why Cassava's stock would jump over 15% on June 11 in response to Biogen's June 7 announcement. This is unsurprising, as there was *no* statistically significant movement in Cassava's stock on June 8, 9, or 10, under any of Dr. Feinstein's three event study models. Feinstein Rpt., Exs. 16-18.

[6] Dr. Feinstein's search from his original report identified only four articles on July 21, 2021, none of which mention the supposed import of the presentation's title.

- **September 22, 2022 (31.87% increase):** Dr. Feinstein attempts to attribute this price swing to a single article posted on the forum *Seeking Alpha*, which he asserts (i) revealed that the SEC had "closed its case" against Cassava and (ii) "issued a 'Strong Buy' recommendation." Feinstein Rebuttal ¶ 171. In reality, however, the article merely (i) reposted a screenshot of the SEC's response to a FOIA request that had been posted days before, and (ii) "maintained" the same recommendation the author had in place since November 18, 2021. This lone article contained *no* new information, let alone information capable of justifying a nearly 32% jump in price.[7]

Plaintiffs cannot escape the fact that Cassava's "price movements were random and volatile," and the stock often fluctuated wildly "in the absence of news." *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001); *see also* Stulz Rpt. ¶ 34; *Bratya*, 2024 WL 4332616, at *12-19. This undermines any finding of efficiency. *See, e.g.*, *Krogman*, 202 F.R.D. at 477; *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1257 (C.D. Cal. 2015); *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013); *Serfaty v. Int'l Automated Sys., Inc.*, 180 F.R.D. 418, 423 (D. Utah 1998); *O'Neil v. Appel*, 165 F.R.D. 479, 503 (W.D. Mich. 1996).[8]

**C.   Plaintiffs' Expert's Asserted Definition of Market Efficiency Is Fatally Flawed and Circular**

In their efforts to sidestep obvious indicators of inefficiency, Plaintiffs and Dr. Feinstein further err by advancing a flawed, circular definition of "efficiency."

---

[7] Dr. Feinstein's other attempts to explain massive swings in Cassava's price fare no better. For example, Dr. Feinstein attempts to attribute a 34.67% increase in Cassava's price on September 18, 2020, to Cassava filing a Form 4 with the SEC, indicating a Cassava executive had purchased some stock. Feinstein Rebuttal ¶ 142. But Dr. Feinstein cannot explain why this Form 4, as opposed to the *many* other Form 4s filed throughout the class period, would result in such a massive price increase in an efficient market. Indeed, the bulk of Cassava's Form 4 filings during the class period were not followed by *any* statistically significant price movement whatsoever. *See* Feinstein Rpt., Exs. 16-18.

[8] Plaintiffs' strained attempt to distinguish these cases fails. Reply at 10. Applying *Basic*, these courts recognized and applied the bedrock premise that when a stock's price is not correlated with the release of value-relevant information, the impact of disclosures or omissions cannot be presumed. *Krogman*, 202 F.R.D. at 477; *ScripsAmerica*, 119 F. Supp. 3d at 1257; *George*, 2013 WL 3357170, at *12; *Serfaty*, 180 F.R.D. at 423; *O'Neil v. Appel*, 165 F.R.D. at 503.

"When discussing 'market efficiency' in the context of the *Basic* presumption, courts agree that semi-strong-form efficiency is the relevant form." *In re Teva Sec. Litig.*, 2021 WL 872156, at *7 (D. Conn. Mar. 9, 2021) (collecting cases); *see also, e.g.*, *Freddie Mac*, 281 F.R.D. at 177 (same); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 745 (S.D. Tex. 2006) (same); *In re Res. Am. Sec. Litig.*, 202 F.R.D. 177, 189 n.12 (E.D. Pa. 2001) (same). The concept of "semi-strong-form efficiency" is well-established in financial economics, and it is the definition Dr. Stulz relied upon in his report. *See* Stulz Rpt. ¶¶ 31-35. In a semi-strong efficient market, the stock price quickly incorporates all new, value-relevant public information. Stulz Rpt. ¶ 31; *see, e.g.*, *Basic*, 485 U.S. at 246 (reasoning that the "market price" of shares traded in an "efficient" market "reflects all publicly available information, and, hence, any material misrepresentations"); *Bell*, 422 F.3d at 313-14 (explaining that "the hallmark of an efficient capital market" is the extent to which "the current price reflects all available information" (citation omitted)); *Greenberg*, 364 F.3d at 662 n.6 ("[W]here securities are traded in an efficient market, it is assumed that all public information concerning a company is known to the market and reflected in the market price of the company's stock."). Accordingly, a pattern of significant price changes disconnected from any new public information is inconsistent with market efficiency. Stulz Rpt. ¶¶ 34-35; *see Krogman*, 202 F.R.D. at 477 ("[I]n an efficient market, a stock's price remains relatively stable in the absence of news.").

Rather than evaluate whether the market for Cassava's stock satisfied this well-established standard, Dr. Feinstein advances his own flawed, unsupported interpretation of "informational efficiency." According to Dr. Feinstein, "[i]nformational efficiency…requires that the stock respond to and impound new information *the market deems to be relevant*." Feinstein Rebuttal ¶ 112 (emphasis added); *see also id.* ¶ 16 ("[I]f a market reacts to new information rather than ignores that information, that market is informationally efficient."); *id.* ¶¶ 181-85 ("efficient stocks may respond to factors other than fundamental cash flow information"). Thus, if the stock *fails* to

10

react to value-relevant information, Dr. Feinstein can simply assert the information was "deemed irrelevant" by the market. Conversely, if the stock reacts to stale information or information wholly unrelated to value, Dr. Feinstein can assert the information was "deemed relevant" by the market.

Indeed, Dr. Feinstein asserts that *any* price movement following the publication of information shows efficiency—regardless of whether the information was value-relevant, regardless of the direction or magnitude of the price change, and regardless of how long the price continues to swing following the publication. *E.g.*, Feinstein Rebuttal ¶¶ 16, 72, 112. Such a strained, unreliable concept of "efficiency" has zero basis in financial economics. Stulz Rpt. ¶¶ 31-35. It also has zero value in demonstrating efficiency under *Basic*. Under Dr. Feinstein's flawed approach, the market is always "right," *no* price movement can *ever* be scrutinized, *every* market is efficient, and *Basic's* presumption will *always* apply. That is not the law. *See, e.g.*, *Amgen*, 568 U.S. at 462; *Basic*, 485 U.S. at 245; *Bell*, 422 F.3d at 313-14.

Because Plaintiffs fail to meet their burden to prove that the market for Cassava's stock or the markets for Cassava's options were efficient, *Basic*'s limits must be respected. The *Basic* presumption cannot apply here.[9]

## II.   Even If the Relevant Market Was Efficient, Defendants Have Demonstrated Lack of Price Impact

When considering whether defendants have demonstrated lack of price impact, "[t]he district court's task is simply to assess *all* the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman*, 594 U.S. at 126-27 (emphasis added). Yet, Plaintiffs now encourage the Court to *ignore*,

---

[9] Plaintiffs and Dr. Feinstein continue to tie the efficiency of the markets for Cassava options to the efficiency of the market for Cassava stock. Reply at 16-17; Feinstein Rebuttal ¶¶ 209-61. They also continue to lump all Cassava options into a single "market," thus ignoring the radical differences between the different options. Reply at 16-17; Feinstein Rebuttal ¶¶ 209-61. Their options arguments thus fail for all the reasons already discussed. *See* Opp. at 19-20.

rather than assess, Defendants' proffered evidence and instead credit their evidence alone as dispositive proof of price impact. To that end, Plaintiffs advocate for a significantly higher burden for Defendants than the preponderance-of-the-evidence standard the governing Supreme Court precedent prescribes. The Court should not be fooled: When the market learned about the supposed fraud alleged by Plaintiffs, it did not react. And to the extent Plaintiffs point to market downturns in response to alleged corrective disclosures, those disclosures were not corrective, or the downturns are more likely explained by other market factors. Thus, even assuming the market for Cassava's stock was efficient during the proposed class period, *Basic*'s presumption cannot apply.

### A.     Plaintiffs' Assertions About "Front-End" Impact Fail

Plaintiffs identify three dates on which there were statistically significant increases in Cassava's stock price and argue that "Defendants' price-impact arguments flop because they fail to rule out both front-end and back-end price impact." Reply at 20. Plaintiffs therefore argue that "evidence of front-end price impact," has rendered "each of Defendants' back-end price impact arguments irrelevant." *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *7 (S.D. Tex. Feb. 9, 2024). But that is "an extraordinary argument" that "would render *Goldman* essentially meaningless." *Id.* Indeed, it makes little sense that a stock's price would increase on the front end due to a misrepresentation, but then fail to decrease on the back end once the misrepresentation was corrected. That is: the lack of a back-end price drop provides "less reason to infer front-end price inflation." *Goldman*, 594 U.S. at 123.

### B.     Defendants Have Not "Conceded" That Alleged Corrective Disclosures Impacted Cassava's Stock Price on the "Back-End"

Plaintiffs argue that their evidence of price impact is, without consideration of anything else, dispositive. They argue that because Defendants did not "attempt to prove a lack of price impact on two corrective disclosure dates" Defendants have "conceded the issue, and the Court

need go no further." Reply at 20. They also argue that because four of the alleged corrective disclosures were followed by a statistically significant stock drop, Defendants cannot rebut *Basic's* presumption because they have not demonstrated a "complete lack of price impact." *See id.* at 21 (citation omitted). Thus, according to Plaintiffs, if *any* alleged corrective disclosure is followed by a statistically significant stock drop, Defendants fail to rebut *Basic's* presumption.

But "that is not the law." *Apache,* 2024 WL 532315 at *6. The Court "must consider Defendants' analysis to comply with *Goldman Sach's* directive that the Court be 'open to all probative evidence' when assessing price impact." *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *13 (N.D. Tex. Aug. 21, 2023) (quoting *Goldman,* 594 U.S. at 122). Indeed, "[c]onsistent with *Goldman Sachs*, the Court considers all evidence of price impact for each of the…alleged Corrective Disclosures.'" *Id.* at *15. Thus, Defendants need not contest *every* corrective disclosure for the Court to conclude that price impact is lacking. Nor do Defendants have "to prove that their alleged misstatements had *no* price impact whatsoever during the *entire* Class Period." *Apache,* 2024 WL 532315 at *6 (emphasis in original). That would be antithetical to the analysis of the *cumulative* evidence the Court is required to undertake.

### C.     Defendants Have Established an Absence of Price Impact for the Remaining Corrective Disclosures

As Defendants explained in their Opposition, eleven of the seventeen corrective disclosures Plaintiffs identify—which relate to the exact research Plaintiffs allege Defendants misrepresented—are ***not associated with any*** statistically significant decline in the price of Cassava's stock. Opp. at 22-24. Plaintiffs do not contest this, but instead argue that such evidence cannot disprove price impact. *See* Reply at 21-22. They quote their expert in support, who claims that "while a statistically significant positive price reaction in response to misrepresentations may demonstrate price impact, a nonsignificant reaction…does not prove there was no price impact.'"

*Id.* (quoting Feinstein Reply ¶¶321-323). But "a fact can be relevant without being dispositive." *Apache,* 2024 WL 532315, at *11. Accordingly, the fact that none of the eleven alleged collective disclosures "showed statistically significant price declines—even if not dispositive of price impact—is nevertheless a relevant fact to consider alongside Defendants' other evidence concerning price impact." *Id.*; *see also Bratya*, 2024 WL 4332616, at *20 (noting the lack of a statistically significant price reaction meant there was "no evidence" that misrepresentation impacted stock price); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *10 (S.D.N.Y. Mar. 29, 2024) (criticizing Dr. Feinstein's position on statistical significance).

Plaintiffs claim that Defendants have no other evidence. They contend that Defendants' "contention is ***solely*** that the price drops were not statistically significant." Reply at 21-22 (emphasis in original). But that's not true. For instance, Defendants have explained that Cassava's stock price frequently underwent massive swings in the absence of any new, value-relevant information about the company; was just as likely to change significantly due to increased social media discussion as it was in response to any actual new information; and often reacted in bizarre ways that sophisticated market analysts did not anticipate. *See* Opp. at 11-16; Stulz Rpt. ¶¶ 51-94. Indeed, in July 2020 Cassava's share price fell more 50% on news that analysts universally considered *positive*, and following the public release of the Citizen Petition, neither JonesTrading, H.C. Wainwright, or Maxim Group changed their price targets for Cassava, notwithstanding the price decline. *See* Opp. at 31. It is likely that meme-stock infused market volatility, rather than value-relevant or "corrective" news, was responsible for *both* drops.

This evidence, bolstered by the lack of statistically significant declines in Cassava's stock price following most of Plaintiffs' alleged corrective disclosures, strongly suggest that the misrepresentations Plaintiffs allege did *not* impact the price of the stock. And the declines that did follow alleged corrective disclosures are more likely associated with Cassava's consistent and

extreme market volatility than with some random reaction to largely duplicative "corrective" news by the market. *E.g.*, *Rocket*, 2024 WL 4349172, at *24 (concluding that "broader context" supplied evidence to find a lack of price impact).

**D.    There Is a "Mismatch" Between the Alleged Misrepresentations and the Corrective Disclosures**

Plaintiffs ask the Court to disregard Defendants' arguments that there are mismatches between the misrepresentations and corrective disclosures Plaintiffs alleged, *see* Opp. at 24-26, because *Goldman* did not overrule the "long-standing precedent" that "loss causation, falsity, and other common merits issues are still inappropriate at the class-certification stage." Reply at 25. But Defendants are not opposing the certification of the proposed class *because of* merits issues. Defendants instead are relying on evidence to demonstrate a lack of price impact, evidence that *may also apply* to those issues. Specifically, Defendants argue that certain alleged corrective disclosures were not corrective at all because the statements they purport to correct were evidently true. And so, it follows that any decline in Cassava's stock price following those disclosures is not probative of the price impact of any misrepresentation. Evidence relevant to class certification, including evidence demonstrating a lack of price impact, cannot be ignored merely because it is also relevant to other, merits-related issues. *See Goldman*, 594 U.S. at 122.

Plaintiffs contend that "Defendants do not argue a 'mismatch,' but instead deny that the statements were misleading in the first place" and that "arguments that certain disclosures are not corrective" is not "relevant to rebutting *Basic*." Reply at 24, 25. Not so. These are perfectly appropriate arguments at this stage. *See, e.g., Apache*, 2024 WL 532315, at *10, *13 (rejecting Plaintiffs' argument that how an alleged disclosure "corrected any alleged misstatements" is an "improper loss causation argument."). Defendants are asking the Court to conclude there was a lack of price impact, in part, *because Plaintiffs' evidence of price impact is unreliable*, not because

of the falsity (or lack thereof) of the misrepresentations Plaintiffs allege. This is a crucial distinction Plaintiffs ignore. As the Supreme Court has "repeatedly explained," "a court has an obligation before certifying a class to determine that Rule 23 is satisfied, even when that requires inquiry into the merits." *Goldman*, 594 U.S. at 122.

In sum, if the Court weighs *all* the evidence, as it must, it should conclude the alleged misrepresentations more than likely did *not* impact Cassava's stock price. Defendants therefore have carried their burden to rebut *Basic's* presumption.

## III.    Plaintiffs Are Not Entitled to a Presumption of Reliance Under *Affiliated Ute*

"The *Ute* presumption…operates only in omissions cases, not where plaintiffs assert positive misrepresentations of material information." *Akin v. Q-L Invs., Inc.*, 959 F.2d 521, 529 (5th Cir. 1992). The "presumption should not be applied to cases that allege both misstatements and omissions unless the case can be characterized as one that primarily alleges omissions." *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999) (citing *Finkel v. Docutel/Olivetti Corp.,* 817 F.2d 356, 359 (5th Cir. 1987)). Thus, even in cases alleging a "scheme" or deceptive practices, the *Ute* presumption can apply *only* if "the plaintiffs have based their complaint primarily upon alleged omissions." *Abell v. Potomac Ins. Co*., 858 F.2d 1104, 1119 (5th Cir. 1988) (concluding *Ute* presumption did not apply in case alleging fraudulent scheme), *cert. granted, judgment vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914 (1989); *see also Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 941 (9th Cir. 2009) (citation omitted) (concluding *Ute* presumption did not apply to claims under Rule 10b-5(a) and 10b-5(c)); *Regents of Univ. of California v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 384 (5th Cir. 2007) (same, noting the *Ute* presumption applies only where plaintiffs "allege a case primarily based on omissions or non-disclosure").

Plaintiffs suggest that because they cite Rules 10b-5(a) and (c) in their Complaint, this case somehow is one based "primarily upon alleged omissions." *Abell*, 858 F.2d at 1119; *see* Reply at

18-19. It is not. Plaintiffs' entire theory of fraud is based on alleged misleading statements about the pre-clinical and clinical research underlying simufilam. *See, e.g.*, Compl. ¶¶ 268-315; *see also* Reply at 18 ("Defendants implemented their scheme by first publishing 'scientific data in peer-reviewed journals' to support the development of simufilam."); *id.* ("Defendants continued to advance their scheme by…providing doctored data to journals in order to obtain false exonerations."). Having based their claims on Defendants' alleged misstatements, Plaintiffs cannot now invoke the *Ute* presumption merely by alleging those statements were part of a broader "scheme." *See Credit Suisse*, 482 F.3d at 384; *Abell*, 858 F.2d at 1119; *Akin*, 969 F.2d at 529.[10] The *Ute* presumption does not apply.

## IV.    Plaintiffs Fail to Provide a Classwide Damages Methodology Consistent with Their Theory of Liability

Plaintiffs' and Dr. Feinstein's promise to calculate "out-of-pocket" damages "is vague, indefinite, and unspecific, [and] simply asserts" that "there are unspecified 'tools' available to measure damages" without providing any details whatsoever for how those "tools" will be used to measure damages *in this case*. *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018) (granting motion to exclude Dr. Feinstein's testimony). In fact, the *only* thing in Dr. Feinstein's proposed damages model that is specific to this case is a conclusory statement that his methodology is "consistent in this case with these Plaintiffs' theory of liability." Ex. 2 at 237:7 14; 238:16-20. That plainly cannot satisfy Plaintiffs' burden under *Comcast* to assure the Court that there is an available damages model that reliably

---

[10] "Any fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself." *Desai*, 573 F.3d at 941 (citation omitted). The "mere fact of this concealment," however, cannot "transform the alleged malfeasance into an omission rather than an affirmative act." *Id.* Otherwise, "the *Affiliated Ute* presumption [would] swallow the reliance requirement almost completely." *Id.*; *see also, e.g.*, *Johnston v. HBO Film Mgmt., Inc.,* 265 F.3d 178, 193 (3d Cir. 2001) (same).

can measure "only those damages attributable to [Plaintiffs'] theory" of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); *see also* Opp. at 28-34.

In their Reply, Plaintiffs assert that "Defendants do not dispute that Dr. Feinstein's out-of-pocket methodology is consistent with Plaintiffs' theory of liability" and thus "concede Plaintiffs satisfy *Comcast* here." Reply at 28. It is *Plaintiffs' burden* to demonstrate that they have proposed a workable damaged methodology in this case. The Court should reject Plaintiffs' repeated attempts to shift their burden to Defendants.

In any event, Defendants most certainly *do dispute* that Dr. Feinstein's proposed "methodology" is consistent with Plaintiffs' theory of liability. Plaintiffs' theory is that Defendants misrepresented highly technical details in certain disclosures of pre-clinical and clinical research during the early stages of a drug candidate's development. In their Opposition, Defendants explain at length that measuring "only those damages attributable to that theory" of liability is potentially impossible given the wild swings and market forces bearing on Cassava's stock during the proposed class period. *See* Opp. at 28-34. Given Cassava's massive volatility, including during the period in which Cassava was labeled a meme stock, Dr. Feinstein has not established that residual price declines on alleged corrective disclosure dates reliably can be used to measure damages. *See* Stulz Rpt. ¶¶ 196, 204.

Plaintiffs do not attempt to grapple with any of these issues or pretend that Dr. Feinstein offers anything more than a boilerplate summary of a collection of vaguely described "valuation tools." Reply at 29. Nor do Plaintiffs pretend that Dr. Feinstein has specified which of these "valuation tools he may or may not deploy" in this case. *Id.* Rather, Plaintiffs contend he doesn't have to. "All that matters" at this stage, according to Plaintiffs, is that those "standard valuation tools" simply "exist." *Id.* Plaintiffs appear to contend that in *every case*, regardless of the details of the theory of liability, all that is required to satisfy *Comcast* is merely to vaguely describe these

"valuation tools" that can, *depending on the facts*, be used to calculate "out-of-pocket" damages. *See generally id.* at 27-30; *see also* Ex. 2 at 239:4-18 (testifying that for "10b5 claims" the vague out-of-pocket damages model he proposes is "*always*" appropriate). Thus, according to Plaintiffs, the "rigorous analysis" that "courts must conduct" under *Comcast* is simply a search for the phrase "out of pocket damages" in a plaintiff's class certification briefing, paired with a blind trust in the purported expert's ability to measure them. *Comcast*, 569 U.S. at 35.

Plaintiffs and Dr. Feinstein justify their position by contending that the out-of-pocket "model" is the "standard" one in these cases, and that other proposed classes have been certified based upon it in the past. *See, e.g.*, Reply at 27-28; Ex. 2 at 239:4-18 ("I mean, it's a commonly used methodology."). But Plaintiffs' burden under *Comcast* is not to educate the Court about the most common measure for damages. It is to demonstrate to the Court that the proposed damages methodology is workable *in the specific case at hand* before the Court makes the important decision to certify the proposed class. That requires Plaintiffs to supply more than a general metric for damages and a cookie-cutter explanation of a bundle of tools.

Plaintiffs also repeatedly argue that Defendants are demanding that Dr. Feinstein conduct something akin to a loss-causation analysis before the proposed class can be certified. For example, they contend that Defendants would require Dr. Feinstein to "produce a detailed damages model," "specify exactly which valuation tools he may or may not deploy at the merits stage," "account for variations in inflation throughout the class period," "disaggregate the effects of unspecified other forces," and "estimate damages for each category of alleged misrepresentations" to satisfy *Comcast*. Reply at 28-30. That is a strawman argument that Defendants have never made.

Instead, Defendants are arguing that Plaintiffs have supplied *no information whatsoever* that could allow the Court to determine that Dr. Feinstein is even capable of doing any of those things at a later stage. That is *Plaintiffs' burden* and they have *not* met it.

In sum, as other courts have determined, Dr. Feinstein must do more to satisfy *Comcast* than assert a "vague, indefinite, and unspecific" damages methodology, as that "amounts to no damages model at all." *Ohio Pub. Emps. Ret. Sys.*, 2018 WL 3861840, at *19; *see also In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *12 (E.D.N.Y. Jan. 11, 2022), *report and recommendation adopted*, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022) (rejecting Dr. Feinstein's opinion as "black box-like, unverifiable, standardless, and subjective"); *Sicav v. James Jun Wang*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015) (similar). But that precisely is what Dr. Feinstein has done here.

## V.   The Named Plaintiffs Were Meme Traders Who Did Not Rely on Any Representation of the Company, Undermining Typicality

Plaintiffs dispute neither (i) the named Plaintiffs' trading history, which was characterized by high-volume trading in meme stocks throughout the class period, nor (ii) that none of the named Plaintiffs relied on *any* of Defendants' alleged misrepresentations. Reply at 31-35. Instead, Plaintiffs assert these facts are irrelevant to the typicality analysis. *Id.* But courts have recognized that evidence of erratic trading behavior can "raise individualized questions" defeating typicality. *E.g.*, *IBEW*, 2013 WL 5815472, at *22; *see* Opp. at 34-35. As explained in Defendants' Opposition, such individualized questions are present here. *See* Opp. at 34-40.

If the named Plaintiffs *are* typical of the class, however, that is telling. As the record makes clear, each named Plaintiff was a meme stock trader seeking to profit from short-term volatility in Cassava's stock. *See id.* at 35-49. Such reckless retail trading, disconnected from any disclosure by the company, epitomizes the very phenomenon that rendered the market for Cassava' stock inefficient during the class period.

## <u>CONCLUSION</u>

For these reasons and the reasons explained in Defendants' Opposition, the Court should deny Plaintiffs' Opposed Motion for Class Certification.

## REQUEST FOR EVIDENTIARY HEARING

These class certification proceedings raise novel, complex issues that would benefit from an evidentiary hearing. Such hearings are common in this context.[11] The parties have submitted hundreds of pages of expert reports, with numerous exhibits and appendixes. The Court would benefit from hearing from the parties' experts directly, with each side permitted to cross-examine the other side's expert. Accordingly, Defendants request that an evidentiary hearing be set on Plaintiffs' Opposed Motion for Class Certification.

In that vein, Defendants' expert, Dr. Stulz, prepared a further report responding to the criticisms and inaccuracies introduced in Dr. Feinstein's rebuttal report. Defendants also deposed Dr. Feinstein regarding the contents of his rebuttal report. Consistent with the Court's order dated September 19, 2024, which instructed that Defendants' surreply not introduce "any new evidence," Defendants have not cited that report or deposition transcript in their brief. *See* ECF 219. Defendants submit, however, that Dr. Stulz's response to Dr. Feinstein's rebuttal report would aid the Court's consideration of these issues. *See Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 99 F.4th 770, 773 (5th Cir. 2024) (holding district court abused its discretion by denying motion for leave to file surreply and accompanying expert report). Dr. Stulz's report is attached as Exhibit A to the accompanying Affidavit of Scott Campbell.

---

[11] *E.g.*, *Edwards v. McDermott Int'l, Inc.*, 2024 WL 1769325 (S.D. Tex. Apr. 24, 2024); *Shannon v. Allstate Ins. Co.*, 2024 WL 1080915 (W.D. Tex. Jan. 31, 2024); *Marcus v. J.C. Penney Co., Inc.*, 2016 WL 8604331 (E.D. Tex. Aug. 29, 2016); *Erica P. John Fund, Inc.*, 309 F.R.D. 251; *see also Unger*, 401 F.3d at 322-23.

Dated: October 4, 2024                    Respectfully submitted,

/s/ *Gregg Costa*
Gregg Costa (Tx. Bar No. 24028160)
Trey Cox (Tx. Bar No. 24003722)
GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, TX 77002
Telephone: 346.718.6600
gcosta@gibsondunn.com
tcox@gibsondunn.com

Monica K. Loseman (admitted *pro hac vice*)
Scott Campbell (admitted *pro hac vice*)
John Turquet Bravard (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1801 California Street
Denver, CO 80202-2642
Telephone: 303.298.5700
mloseman@gibsondunn.com
scampbell@gibsondunn.com
jturquetbravard@gibsondunn.com

Mary Beth Maloney (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
mmaloney@gibsondunn.com

*Counsel for Defendants Cassava Sciences, Inc. and
Eric J. Schoen*

Douglas W. Greene
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212.847.7090
dgreene@bakerlaw.com

C. Shawn Cleveland
BAKER & HOSTETLER LLP
2850 N. Harwood Street, Suite 1100
Dallas, TX 75201
Telephone: 214.210.1200
scleveland@bakerlaw.com

*Counsel for Defendants Remi Barbier and
Lindsay Burns*

22

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 4, 2024, a true and correct copy of the foregoing was

served electronically upon each attorney of record.

/s/ *Gregg Costa*_____
Gregg Costa