UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| In re CASSAVA SCIENCES, INC. SECURITIES LITIGATION | § § § § | Master File No. 1:21-cv-00751-DAE CLASS ACTION |
| This Document Relates To: ALL ACTIONS | § § § § § § | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE CLASS CERTIFICATION TESTIMONY OF DR. STEVEN FEINSTEIN**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...............................................................................................1

II.   LEGAL STANDARD.........................................................................................3

III.  DEFENDANTS DO NOT DISPUTE FEINSTEIN'S QUALIFICATIONS OR THE RELEVANCE OF HIS OPINIONS ......................................................................3

IV.   FEINSTEIN'S MARKET EFFICIENCY OPINION IS RELIABLE....................................4

      A.   Feinstein Properly Relied upon the Definition of Market Efficiency Used by Economists and the Supreme Court...........................................................5

      B.   Feinstein's Methodology Complies with *Basic*, and Defendants' Baseless Attacks on His Market Efficiency Conclusions Fail...................................7

      C.   Defendants' Meme Stock Argument Is Legally and Factually Inaccurate, and Does Nothing to Undermine the Reliability of Feinstein's Opinion.........................10

      D.   Defendants' Other Criticisms of Feinstein's Market Efficiency Opinion Are Also Meritless .............................................................................11

      E.   Feinstein's Price Impact Opinions Regarding Statistical Significance Are Well Supported .............................................................................13

V.    FEINSTEIN'S OUT-OF-POCKET METHODOLOGY FOR CALCULATING DAMAGES IS RELIABLE ...............................................................................14

      A.   Feinstein's Out-of-Pocket Methodology Complies with *Comcast* and Has Been Widely-Accepted by Courts .........................................................14

      B.   Feinstein's Proposed Methodology for Calculating Damages Is Sufficiently Detailed .....................................................................................16

VI.   CONCLUSION ................................................................................................20

4909-2267-7253.v1

# TABLE OF AUTHORITIES

Page

## CASES

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988)................................................................5, 7, 8

*Bocanegra v. Vicmar Servs., Inc.*,
 320 F.3d 581 (5th Cir. 2003) ..............................................................8

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
 2023 WL 2932485 (D. Conn. 2023) ....................................................13

*Carpenters Pension Fund of St. Louis v. Barclays PLC*,
 310 F.R.D. 69 (S.D.N.Y. 2015) .........................................................10

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*,
 322 F. Supp. 3d 676 (D. Md. 2018) ....................................................15

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
 2022 WL 1459567 (N.D. Cal. May 9, 2022) .......................................19

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013)......................................................14, 15, 16, 18

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993)...........................................................1, 3, 8, 10

*Dougherty v. Esperion Therapeutics, Inc.*,
 2020 WL 6793326 (E.D. Mich. Nov. 19, 2020) ..................................18

*In re Barrick Gold Sec. Litig.*,
 314 F.R.D. 91 (S.D.N.Y. 2016) .........................................................15

*In re BP p.l.c. Sec. Litig.*,
 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013).......................................7, 16

*In re EQT Corp. Sec. Litig.*,
 2022 WL 3293518 (W.D. Pa. Aug. 11, 2022) ......................................18

*In re Groupon, Inc. Sec. Litig.*,
 2015 WL 1043321 (N.D. Ill. Mar. 5, 2015)...........................................7

*In re Petrobras Sec.*,
 862 F.3d 250 (2d Cir. 2017)..............................................................7

**Page**

*In re Vale S.A. Sec. Litig.*,
  2022 WL 122593 (E.D.N.Y. Jan. 11, 2022),
  *report and recommendation adopted*,
  2022 WL 969724 (E.D.N.Y. Mar. 31, 2002) ....................................................................19, 20

*Junge v. Geron Corp.*,
  2022 WL 1002446 (N.D. Cal. Apr. 2, 2022) ...........................................................................18

*KB Partners I, L.P. v. Barbier*,
  2013 WL 2443217 (W.D. Tex. June 4, 2013) ................................................................. *passim*

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019).................................................................................14, 18, 19

*Petrie v. Elec. Game Card, Inc.*,
  308 F.R.D. 336 (C.D. Cal. 2015) ..............................................................................................9

*Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*,
  2020 WL 5757695 (D. Minn. Sept. 28, 2020) .........................................................................18

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
  2020 WL 919249 (N.D. Ill. Feb. 26, 2020) .............................................................................19

*Puga v. RCX Sols., Inc.*,
  922 F.3d 285 (5th Cir. 2019) ...............................................................................................3, 8

*Rooney v. EZCORP, Inc.*,
  330 F.R.D. 439 (W.D. Tex. 2019) .....................................................................................13, 15

*Rougier v. Applied Optoelectronics, Inc.*,
  2019 WL 6111303 (S.D. Tex. Nov. 13, 2019),
  *report and recommendation adopted*,
  2019 WL 7020349 (S.D. Tex. Dec. 20, 2019).....................................................................15, 16

*Shupe v. Rocket Cos., Inc.*,
  2024 WL 4349172 (E.D. Mich. Sept. 30, 2024)...................................................................9, 10

*Sicav v. James Jun Wang*,
  2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) .............................................................................19

*Spence v. Am. Airlines, Inc.*,
  2024 WL 3092453 (N.D. Tex. June 20, 2024) ...........................................................................7

4909-2267-7253.v1

**Page**

*Utesch v. Lannett Co., Inc.*,
   2021 WL 3560949 (E.D. Pa. Aug. 12, 2021),
   *aff'd sub nom. Univ. of P.R. Ret. Sys. v. Lannett Co., Inc.*,
   2023 WL 2985120 (3d Cir. Apr. 18, 2023) ............................................................................18

*Weiner v. Tivity Health, Inc.*,
   334 F.R.D. 123 (M.D. Tenn. 2020) ........................................................................................15

*Willis v. Big Lots, Inc.*,
   2017 WL 1074048 (S.D. Ohio Mar. 17, 2017) ......................................................................10

*Wilson v. LSB Indus., Inc.*,
   2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ........................................................................18

## STATUTES, RULES AND REGULATIONS

Federal Rule of Evidence
   Rule 702 ................................................................................................................... *passim*
   Rule 702(a) ......................................................................................................................4

## I.    INTRODUCTION

Nearly three months *after* Dr. Steven P. Feinstein ("Feinstein") submitted his rebuttal report in support of class certification, and *after* Magistrate Judge Hightower had ***already issued*** a Report and Recommendation (ECF 254) ("R&R") to certify the Class, Defendants[1] belatedly moved to exclude certain of Feinstein's expert opinions.  *See* Defendants' Motion to Exclude the Class Certification Testimony of Dr. Feinstein (ECF 268) ("Motion" or "Mot.").  Given Defendants' unjustifiable delay in filing their Motion, and their blatant and repeated defiance of Magistrate Judge Hightower's prior order that "***[t]he parties should not file any new evidence***" (ECF 219 at 3), Lead Plaintiff Mohammad Bozorgi and additional plaintiffs Ken Calderone and Manohar K. Rao (collectively, "Plaintiffs") moved to strike Defendants' Motion in its entirety.  *See* Plaintiffs' Opposed Motion to Strike Defendants' Motion to Exclude the Class Certification Testimony of Dr. Steven Feinstein, filed concurrently herewith.  However, if the Court decides to consider Defendants' belatedly filed Motion, it must be denied, as there is no valid basis to exclude any of Feinstein's expert opinions under Federal Rule of Evidence 702.

To determine whether Feinstein's expert opinions should be excluded under Rule 702, the Court must assess whether the opinions offered are relevant and reliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594-95 (1993).  Here, Defendants do not dispute that Feinstein is qualified to offer opinions on market efficiency and damages.  Nor do they dispute the relevance of his opinions.  Defendants' *sole* contention here is that certain of Feinstein's expert opinions are purportedly unreliable.  But in recommending that the Court certify the Class, Magistrate Judge Hightower has already considered and rejected the exact same reliability challenges Defendants simply repeat here, explaining

---

[1]    "Defendants" refers to Cassava Sciences, Inc. ("Cassava"), Remi Barbier ("Barbier"), Eric Schoen, and Lindsay Burns.

that "'[t]he Court need not exclude expert testimony simply because another expert claims to be able to poke holes in his opponent's methods.'" R&R at 27.[2]

For example, though Defendants have relentlessly attacked the reliability of Feinstein's conclusion that the market for Cassava securities was efficient during the Class Period, Magistrate Judge Hightower has already considered these criticisms and rejected them. Indeed, the Court disagreed that "Feinstein's 454-page Expert Report, 155-page Rebuttal Report, and detailed event studies therein are cursory" (*id.*), as Defendants have repeatedly and erroneously claimed. Instead, Magistrate Judge Hightower recognized that "Courts have found similar event studies by Feinstein reliable to show a causal relationship between the release of company-specific news and movement in the company's stock price," and concluded that "Feinstein's events studies are sufficient evidence at this stage . . . to show a causal relationship between the release of Cassava news and movement in its stock price." *Id.* at 27-28.

Likewise, Magistrate Judge Hightower rejected Defendants' arguments – which they dredge up again here – that Feinstein's proposed out-of-pocket damages methodology is "'vague, indefinite and unspecific.'" *Id.* at 33. Rather, Magistrate Judge Hightower acknowledged that "[m]any courts [have] recognized out-of-pocket damages models as an accepted way to calculate damages," and concluded that "'[i]t [was] sufficient for class certification that Professor Feinstein has specified a damages model that can be used to establish damages using a common methodology for all class members, even though certain of the inputs to that model are not yet ascertainable.'" *Id.* at 33-34.

In short, Defendants made these same arguments at class certification, but were dissatisfied with the outcome. Now, in an attempt to have the last word on Plaintiffs' motion for class certification, and to effectively have a second bite at the apple, Defendants raise the exact same arguments again here, hoping to achieve a better result. Defendants' gamesmanship should not be tolerated, and their Motion should be denied.

---

[2]    Unless otherwise noted, all emphasis is added and citations are omitted.

4909-2267-7253.v1

## II.    LEGAL STANDARD

This Court has "'wide latitude in determining the admissibility of expert testimony,'" and "the court's main focus should be on determining whether the expert's opinion will assist the trier of fact." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019).  When evaluating expert testimony under Rule 702, "the overarching concern is generally whether the testimony is relevant and reliable." *Id.*  On a motion to exclude, the Court's focus is ***not*** on the expert's conclusions, but on the "principles and methodology." *Daubert*, 509 U.S. at 594-95.

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility." *Puga*, 922 F.3d at 294.  This is because "[a]t no point should the trial court replace the adversary system." *Id.*  As Magistrate Judge Hightower explained in her R&R to certify the Class, "'[t]he Court need not exclude expert testimony simply because another expert claims to be able to poke holes in his opponent's methods.'"  R&R at 27. Accordingly, "while the district court must act as a gatekeeper to exclude all irrelevant and unreliable testimony, the rejection of expert testimony, 'is the exception rather than the rule.'" *Puga*, 922 F.3d at 294.

## III.    DEFENDANTS DO NOT DISPUTE FEINSTEIN'S QUALIFICATIONS OR THE RELEVANCE OF HIS OPINIONS

Defendants do not dispute that Feinstein is a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" under Rule 702.  Nor could they.  Feinstein brings a wealth of expertise to the subjects addressed in his opening and rebuttal reports.  Feinstein holds Ph.D. and Master's degrees in Economics from Yale University, and is currently an Associate Professor of Finance at Babson College.  ECF 148-7 ("Feinstein Rpt."), ¶¶6-7.  Feinstein has been a Chartered Financial Analyst for more than 26 years, and has published extensively in the field of finance. *Id.*, ¶11 & Ex. 2 at 84-89.

Likewise, Defendants do not dispute that Feinstein's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" under Rule 702(a). This is unsurprising, given that courts throughout the country routinely rely upon Feinstein's opinions on market efficiency and common damages methodology at the class certification stage. *See* Ex. 1 (chart identifying cases where Feinstein's market efficiency analysis was admitted); Ex. 2 (chart identifying cases where Feinstein's out-of-pocket damages methodology was admitted).[3]

## IV.    FEINSTEIN'S MARKET EFFICIENCY OPINION IS RELIABLE

As Magistrate Judge Hightower noted in her R&R to certify the Class, "[t]he parties have submitted thousands of pages of briefing and evidence on the issue of class certification." R&R at 7. In their voluminous class certification briefing, Defendants vigorously contested the reliability of discrete portions of Feinstein's market efficiency opinions. *See, e.g.*, ECF 241 ("Opp.") at 11 (arguing that Feinstein's opinions are "unreliable and cannot support certification"); *id.* at 2 (arguing that Plaintiffs' market efficiency arguments are "supported only by a basic, rinse-and-repeat expert report that is unreliable"); ECF 227 ("Sur-Reply") at 11 (arguing that Feinstein's "strained, unreliable concept of 'efficiency' has zero basis in financial economics"). In recommending that the Class be certified, the Court carefully considered the various reliability concerns Defendants raised, but ultimately determined that: "Dr. Feinstein's analysis of the *Cammer/Krogman* factors [were] sufficient to show that Cassava was traded in an efficient market during the Class Period." R&R at 23. Disappointed with the Court's ruling, Defendants now seek a second bite at the apple through their belated Motion, which simply rehashes the same unreliability arguments the Court already considered and rejected. Defendants' blatant gamesmanship, and disregard for the previous time and efforts put in by Magistrate Judge Hightower, should not be tolerated, much less, rewarded.

---

[3]    Unless otherwise noted, all "Ex. ___" references herein are to the Affidavit of Jessica T. Shinnefield in Support of Plaintiffs' Opposition to Defendants' Motion to Exclude the Class Certification Testimony of Dr. Steven Feinstein, filed concurrently herewith.

Notably, however, Defendants do not challenge the reliability of Feinstein's *Cammer/Krogman* methodology, including his event study methodology, which constitutes the bulk of Feinstein's analysis in his opening report. Nor do they assert that his *Cammer/Krogman* methodology is unsupported by the data. Indeed, while they frame their Motion as one to exclude Feinstein's opinions in their entirety, they do not really challenge the reliability of all, or even most, of his opinions, which span two reports and hundreds of pages long. For the opinions they do challenge, Defendants' arguments boil down to nothing more than disputes regarding Feinstein's conclusions, which provide no valid basis to exclude his opinions.

### A.    Feinstein Properly Relied upon the Definition of Market Efficiency Used by Economists and the Supreme Court

The first of Defendants' wholly resurrected arguments is their quibble over Feinstein's definition of market efficiency, which they claim is "fatally flawed" because it purportedly has "no basis in financial economics." *Compare* Mot. at 5-10, *with* Sur-Reply at 9-11. Defendants' assertions are ***still*** meritless. As expressly described in his opening report, Feinstein relied on the definition of market efficiency used by leading economists and endorsed by the Supreme Court: "An efficient market, as defined and discussed by *Cammer*, *Basic*, *Amgen*, *Halliburton II*, Alan Bromberg and Lewis Lowenfels, Professor Fama, and other leading scholars, is *a market in which publicly available information is incorporated into the price of a security such that the trading price reflects publicly available information with reasonable promptness*." Feinstein Rpt., ¶¶57-66. Feinstein relied on the same definition in his rebuttal report. ECF 209-5 ("Feinstein Rebuttal"), ¶16. And Feinstein testified at his depositions that his opinions were based on the definition of market efficiency contained in his opening report. *See, e.g.*, Ex. 3 at 20:9-26:14.

Yet, to attack portions of Feinstein's market efficiency opinion here, Defendants inexplicably ignore the definition that Feinstein repeatedly and explicitly stated that he used. Mot. at 6. Instead, Defendants attack a strawman by cherry-picking a statement from Feinstein's rebuttal report where he

- 5 -

responds to Dr. René M. Stulz's ("Stulz") argument concerning the so-called "meme stock phenomenon" (discussed *infra* at §IV.C.), and disingenuously claim that this isolated statement is Feinstein's "definition" of market efficiency. Mot. at 6. In reality, though Defendants now attempt to make it appear otherwise, their expert actually ***agrees*** with Feinstein on the correct definition for market efficiency. *See* ECF 242, Ex. 1 ("Stulz Rpt."), ¶31 ("In a semi-strong form efficient market, security prices react quickly and fully to new, unexpected, value-relevant public information, so that security prices reflect all public information fully and quickly."); *id.* ("Dr. Feinstein's definition of efficiency seems to most closely correspond to the semi-strong form of market efficiency."). In short, Defendants' manufactured quibble over Feinstein's market efficiency definition remains much ado about nothing, and provides no basis for exclusion of his market efficiency opinion.

Nor does Defendants' factually incorrect assertion that Feinstein "could not identify . . . an inefficient market under his approach" undermine the reliability of his opinions. Mot. at 6. As Feinstein explained at his deposition, given "how efficient markets are," it is rare to find a stock that is inefficiently priced – "so rare that they're usually labeled as anomalies, and the people that find them are renowned for it." Ex. 3 at 58:23-59:11. Feinstein acknowledged that while he has not "published an article about finding an anomaly of that sort," contrary to Defendants' incorrect assertion, he ***has*** encountered examples of "anomalously priced stock." *Id.* at 59:9-11, 60:10-15. But, as Feinstein further testified, unlike here, these anomalous stocks did not satisfy the *Cammer/Krogman* factors – they were "small stock, micro cap, no analyst coverage, not listed on an exchange, no volume." *Id.* at 61:3-16. In any event, it is hard to take Defendants' criticism of Feinstein seriously when their own expert, Stulz, has never opined that the market for a particular stock was efficient (Ex. 4 at 20:1-21:19), despite the fact that preeminent economist have concluded "it would be an exception to a generally prevailing rule for a market for a publicly traded security to be informationally inefficient rather than efficient." Feinstein Rpt., ¶66.

**B.    Feinstein's Methodology Complies with *Basic*, and Defendants' Baseless Attacks on His Market Efficiency Conclusions Fail**

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988), requires a showing that new, material information affected a stock's price during the Class Period.  *Id.* at 246-47; *KB Partners I, L.P. v. Barbier*, 2013 WL 2443217, at *5 (W.D. Tex. June 4, 2013) ("The relevant legal question is whether the market responds to publicly available information quickly . . . .").  Based on Supreme Court precedent, courts have repeatedly emphasized that the *Basic* test for market efficiency is "not . . . onerous."  *In re Petrobras Sec.*, 862 F.3d 250, 278 (2d Cir. 2017).  Here, Defendants do not assert Feinstein's *Cammer/Krogman* methodology is unreliable or unsupported by the data.  Indeed, Feinstein's *Cammer/Krogman* analysis fully complies with *Basic*, including his event study evidence showing that new, material information affected Cassava's stock price during the Class Period.  Feinstein Rebuttal, ¶¶61-62, 132, 203-205; *see also In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *9 (N.D. Ill. Mar. 5, 2015) (some emphasis in original) ("Dr. Feinstein's methodology established that the price of Groupon stock was ***affected*** by false statements, ***which is all that Basic requires***.").

Importantly, the Fifth Circuit has acknowledged that event studies such as the one Feinstein conducted here are a well-established method for establishing market efficiency.  *See Spence v. Am. Airlines, Inc.*, 2024 WL 3092453, at *17 (N.D. Tex. June 20, 2024) (holding that "an event study, is a widely accepted form of evidence to show the impact of a particular event on a stock price"); *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *15 (S.D. Tex. Dec. 6, 2013) ("Event studies are commonly used in securities fraud class actions.").  And, as Magistrate Judge Hightower recognized in recommending that the Class be certified in this case, "many district courts have accepted Feinstein's *Cammer/Krogman* analysis to show market efficiency."  R&R at 21; *see also* Ex. 1.  Thus, it is also no surprise that "[c]ourts have found similar event studies by Feinstein reliable to show a causal relationship between the release of company-specific news and movement in that company's stock price."  R&R at 27 (citing cases).  As

- 7 -

such, Defendants' argument that "Feinstein's theory rests on an incorrect legal standard," and is therefore unreliable, is completely meritless.  Mot. at 10-11.

Because Defendants cannot credibly challenge the reliability of Feinstein's event study methodology, they try – yet fail – to attack his conclusions.  *Id.* at 7.  But as the Supreme Court established in *Daubert*, on a motion to exclude expert opinions "the focus, of course, must be ***solely*** on principles and methodology, not on the conclusions that they generate."  *Daubert*, 509 U.S. at 594-95.  And under Fifth Circuit law, "[t]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are reliable, but need not show that the expert's findings and conclusions are correct."  *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 585 (5th Cir. 2003).  "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."  *Puga*, 922 F.3d at 294.

Nonetheless, here, just as they did in their class certification briefing, Defendants point to isolated instances of Cassava's stock price purportedly moving without new, value-relevant information in an attempt to undermine Feinstein's market efficiency conclusions.  *Compare* Opp. at 7-8, *with* Mot. at 7.  But in doing so, they again run headlong into *Halliburton II*, *Basic*, and decades of precedent – including another securities fraud case against defendant Barbier – that reject the same arguments Defendants make here.

For example, in *Barbier*, Pain Therapeutics (before it was renamed Cassava) and Barbier sought to exclude plaintiffs' expert's *Cammer* factor 5 event study as unreliable under *Daubert* and Rule 702 because the expert purportedly "did not account for specific days where [Cassava's] stock price moved but there was no new information introduced into the market."  2013 WL 2443217, at *9.  That is the exact argument Cassava and Barbier again make here.  The Honorable Sam Sparks, however, rejected it, noting: "The Court need not exclude expert testimony simply because another expert claims to be able to poke holes in his opponent's methods."  *Id.*

- 8 -

Indeed, as courts have aptly noted, "only a third of abnormally large stock price movements are typically associated with news events." *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 353 (C.D. Cal. 2015); *Barbier*, 2013 WL 2443217, at *9, *13 (crediting evidence that "there are many days on which even large stocks traded on efficient markets experience significant changes in price despite an absence of major news events"). And courts have rejected Stulz's argument as "ignor[ing] binding Supreme Court precedent which compels the conclusion that [defendants'] purported meme-stock status is inapposite to this Court's market-efficiency analysis." *Shupe v. Rocket Cos., Inc.*, 2024 WL 4349172, at *19 (E.D. Mich. Sept. 30, 2024).

Further, Defendants' improper attempts to undermine Feinstein's market efficiency conclusions fail for other reasons, too. For example, Defendants' expert, Stulz, attempts to discredit Feinstein's market efficiency conclusions by opining that Cassava's stock price rose on September 18, 2020, despite this purportedly being a "no-news" days. Stulz Rpt., ¶79 n.157. But Stulz incorrectly assumed there was no news on these days.[4] Indeed, contrary to Stulz's baseless criticisms, Feinstein found that, after the close of trading on September 17, 2020, news actually ***was*** disseminated that could have caused the stock price to rise. Feinstein Rebuttal, ¶140. Yet, Defendants insist that Feinstein failed to explain "why such a price reaction is consistent with market efficiency." Mot. at 7. This is simply not true. Feinstein specifically explained in his rebuttal report that, "[a]ccording to finance literature, insider buying is a positive signal to market participants." Feinstein Rebuttal, ¶140; *see also* Ex. 3 at 104:19-21 ("And when a signal comes out that the insiders are buying, that's going to send the stock up."). Feinstein further explained that in response to this positive signal, Cassava's stock price rose 42%. Feinstein Rebuttal, ¶141. Feinstein then explained precisely ***why*** these facts provide an example of market efficiency:

---

[4]    As Feinstein pointed out in his rebuttal report, he did not find that there was no news these days, only that they did not meet his objective threshold criteria to be considered a "news" day for the purposes of his event study test. Feinstein Rebuttal, ¶¶130-133.

> What happened on 18 September 2020 was an example of Cassava stock trading in an efficient market. Important valuation-relevant news broke; the news was distributed broadly by well-developed, information-dissemination infrastructure; investors traded on the information; and the price rose accordingly. This is not an example of Cassava stock moving on no new information.

*Id.*, ¶142. In short, though Defendants may disagree with Feinstein's conclusion that Cassava's September 18, 2020 stock price movement actually supports a finding of market efficiency, this disagreement between the experts provides absolutely no basis for excluding Feinstein market efficiency opinions under Rule 702. *Daubert*, 509 U.S. at 594-95; *see Barbier*, 2013 WL 2443217, at *9 ("Disagreement does not equal unreliability"); *id.* at *7 n.7 ("If disagreement alone indicates unreliability, *Daubert* ought to have simply required all expert evidence to be excluded in every case, as each party can always find an expert to disagree with another expert.").

### C.    Defendants' Meme Stock Argument Is Legally and Factually Inaccurate, and Does Nothing to Undermine the Reliability of Feinstein's Opinion

Defendants also attack the reliability of Feinstein's market efficiency opinion by claiming that he ignored "glaring indicators of inefficiency," including that Cassava was purportedly a "meme stock." But it is Defendants who are guilty of ignoring. Magistrate Judge Hightower's R&R to certify the Class explicitly determined: (i) "***Defendants' meme stock argument to be legally and factually inaccurate***" (R&R at 21); and (ii) "Defendants' contention that Feinstein ignored whether Cassava stock was a meme stock or traded in an inefficient market is inaccurate" (*id.* at 22). Accordingly, these same "inaccurate" arguments cannot now be credibly used to undermine the reliability of Feinstein's opening report.

First, Magistrate Judge Hightower recognized: "Defendants identify no Fifth Circuit case law stating that courts should not apply the *Cammer/Krogman* factors in securities fraud cases when the defendant argues that the stock was a meme stock or that the market was inefficient." *Id.* at 21. The Court further noted that "courts have specifically rejected this argument." *Id.* (citing *Shupe*, 2024 WL 4349171, at *20, *Willis v. Big Lots, Inc.*, 2017 WL 1074048, at *3-*4 (S.D. Ohio Mar. 17, 2017); *Carpenters Pension Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 82 (S.D.N.Y. 2015)). Thus, the

- 10 -

reliability of Feinstein's market efficiency analysis cannot be questioned on this basis. Further, the Court's R&R actually bolstered the reliability of Feinstein's analysis by acknowledging that "many district courts have accepted Feinstein's *Cammer/Krogman* analysis to show market efficiency." *Id.*

Second, Magistrate Judge Hightower found it significant that, "while Stulz point[ed] out that some market participants characterized Cassava as a meme stock, he never state[d] that Cassava stock indeed was one." *Id.* at 22. The Court elaborated that Defendants' criticisms of Feinstein's analysis was not persuasive because Stulz did not offer "'an affirmative opinion that the market for Cassava stock was inefficient during the class period,'" and "[h]e also admitted that he has no evidence Cassava was a meme stock." *Id.*; *see also* Ex. 4 at 38:18-23; *id.* at 174:14-16 ("I don't have a report saying that Cassava is a meme stock."). Given the Court's prior ruling and Stulz's admissions, Feinstein's market efficiency analysis can hardly be deemed unreliable for failing to exclude the possibility that Cassava was a meme stock when Defendants' own expert offered no evidence that it was.

Third, as the Court recognized, Feinstein did not, in fact, ignore whether "Cassava stock was a meme stock or traded in an inefficient market." R&R at 22. Rather, "[i]n both of his expert reports, Feinstein addresse[d] the meme stock argument but ***conclude[d]*** that Cassava was traded in an efficient market." *Id.*; Feinstein Rebuttal, ¶¶59-126. Again, because Defendants' complaints are about Feinstein's conclusions rather than the reliability of his methodology, there are no grounds for exclusion under Rule 702.

### D.    Defendants' Other Criticisms of Feinstein's Market Efficiency Opinion Are Also Meritless

Defendants' other scattershot criticisms of Feinstein's market efficiency analysis were also already raised in their class certification briefing and rejected, and do nothing to call into question the reliability of Feinstein's market efficiency opinion. *See* Mot. at 14-15. And, as with Defendants' other attacks, they are devoid of factual basis and improperly dispute Feinstein's conclusions rather than the reliability of his methodologies.

- 11 -

4909-2267-7253.v1

First, Defendants argue, as they did unsuccessfully in their class certification briefing, that "Cassava's stock demonstrated enormous volatility during the class period, untethered to any information in the market," which Defendants claim calls into question the reliability of Feinstein's conclusion that Cassava stock traded in an efficient market. *Compare id.* at 13-14, *with* Sur-Reply at 4-6.  Defendants further claim that Feinstein ignored this volatility in his market efficiency analysis. *Compare id.* at 13-14, *with* Sur-Reply at 4-6.  Neither assertion is correct.  In reality, Feinstein explained the bases for his conclusions that Cassava's stock did not trade irrationally and that its volatility during the Class Period was not surprising.  Feinstein Rebuttal, ¶¶90-93.  Defendants simply disagree with those well-reasoned conclusions.

Indeed, during the Class Period, Defendants represented to investors that: (i) Cassava's research was ***unprecedented***; and (ii) it continued to meet key development milestones. *Id.*  Feinstein explained that, as a result, analysts believed that the drug could be a potential blockbuster worth billions. *Id.*, ¶¶90, 107, 144.  Likewise, throughout the Class Period, there was great uncertainty about Cassava both because the drug had not yet been approved and later because there were allegations of wrongdoing. *See id.*, ¶¶36-38, 90-93.  Given this "controversy and uncertainty, the range of reasonable valuations for Cassava stock was extraordinarily wide." *Id.*, ¶93.  Thus, Feinstein concluded that it was "neither surprising nor inconsistent with market efficiency for these factors to generate stock price volatility." *Id.*  In fact, as Feinstein explained, "[t]his volatility is a ***result of market efficiency***, not an indication of inefficiency." *See id.*  Though Defendants disagree with Feinstein's conclusion, he has demonstrated a reasonable basis for his analysis, which is all that is required for it to be admissible under Rule 702.

Second, Defendants take issue with Feinstein's conclusion that Cassava's stock price traded "within 'rational bounds.'"  Mot. at 14.  But Feinstein has a reliable basis for this conclusion, which he explains in his rebuttal report.  Feinstein Rebuttal, ¶¶120-121.  As Feinstein described:

> At times Cassava's stock price was elevated to reflect the positive prospects that
> Simufilam, the Company's drug under development, would prove efficacious, receive
> FDA approval, and become commercially successful.  At other times the stock price fell
> to low levels, reflecting criticism of the Company's research and alleged wrongdoing,
> and the prospect that the drug would not prove efficacious, and would consequently fail
> to receive FDA approval.  The range between these two possibilities is dramatic, and
> therefore so was the range of rational valuation.

*Id.*, ¶120.  Feinstein explained that "[o]ver the course of the Class Period, equity analysts covering Cassava set price targets that ranged between $8 per share and $215 per share." *Id.*, ¶121.  Cassava's highest stock price during the Class Period was $135 per share; its lowest was $6.79.  *Id.*  Based on this data, Feinstein concluded that Cassava's stock price movements were never "wild or irrational," as Stulz erroneously claimed.  *Id.*  On the contrary, never during the Class Period did Cassava stock trade at a price above what equity analysts computed the fair price to be, and at its lowest price during the Class Period, Cassava stock traded near analysts' lowest price target.  *Id.*  Thus, Feinstein has demonstrated a reliable basis for his conclusion that Cassava stock traded within rational bounds during the Class Period, and exclusion of his opinion is unwarranted.

### E.     Feinstein's Price Impact Opinions Regarding Statistical Significance Are Well Supported

Defendants dispute the reliability of Feinstein's opinions that the fact that a disclosure does not result in a statistically significant price movement at the 95% level is not evidence by itself of a lack of price impact.  Mot. at 15-16.  But Magistrate Judge Hightower rejected this same argument in her recommendation to certify the Class.  R&R at 31.  In doing so, the Court relied upon the Honorable Sam Sparks opinion in *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439 (W.D. Tex. 2019), which held that: "the absence of a statistically significant price adjustment does ***not*** show the stock price was unaffected by the misrepresentation.  Nor does it indicate that what price adjustment did occur must be attributed to 'random chance.'"  *Id.* at 450.  Courts routinely find the same.  *See, e.g.*, *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at *12 (D. Conn. 2023) ("lack of statistical significance does not prove an absence of price impact because 'the failure of an event study to disprove the null hypothesis with

respect to an event does not prove that the event had no impact on the stock price'"). Thus, Feinstein's opinion is well supported, not unreliable.

As Feinstein explained, "statistically significant stock price decline following a disclosure provides proof that the disclosure caused a loss, but non-significance of the stock price decline does not prove that the disclosure caused no loss." Feinstein Rebuttal, ¶321. Accordingly, "[i]f a price movement is not statistically significant, one cannot rule out random volatility, but neither can one rule out that company information (a misrepresentation, omission, or a corrective disclosure) was the cause of the price movement or at least a contributing factor." *Id.*, ¶322.

Moreover, as Magistrate Judge Hightower astutely recognized: "The questions of what causes the stock price to decline following corrective disclosures and increase due to misrepresentations 'are ultimately questions for the trier of fact on the merits.'" R&R at 31 (quoting *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 393 (N.D. Ga. 2019)). The Court further explained: "'The Court need not exclude expert testimony simply because another expert claims to be able to poke holes in his opponent's methods.' That experts disagree on how to conduct studies or what factors to consider does not show that Feinstein's event studies are unreliable." *Id.* at 27-28. Defendants' attempts to re-litigate this exact same issue, simply because the Court did not side with them, is not an efficient use of the Court and Plaintiffs' counsel's time, and should be rejected (again). This is especially true because Defendants ***do not dispute*** that ***all*** six alleged corrective disclosures were followed by statistically significant stock drops. Sur-Reply at 7-9.

## V.    FEINSTEIN'S OUT-OF-POCKET METHODOLOGY FOR CALCULATING DAMAGES IS RELIABLE

### A.    Feinstein's Out-of-Pocket Methodology Complies with *Comcast* and Has Been Widely-Accepted by Courts

Defendants' attacks on Feinstein's out-of-pocket methodology for calculating damages are simply a repeat of the arguments they made in opposing Plaintiffs' motion for class certification.

- 14 -

*Compare* Mot. at 16-204, *with* Sur-Reply at 17-20.  They fare no better with repetition, and provide no

basis for exclusion under Rule 702.

As Magistrate Judge Hightower stated in recommending certification of the Class:

> Many courts recognize out-of-pocket damages models as an accepted way to calculate damages on a classwide basis in securities fraud class actions.  *See Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 137 (M.D. Tenn. 2020) ("Use of the out-of-pocket damages model . . . is the standard measurement of damages in Section 10(b) securities cases'"); *Rougier*, 2019 WL 6111303, at *15 ("Plaintiffs have demonstrated an accepted method for calculating Class Members' out-of-pocket damages that are consistent with a fraud on the market theory of liability"); *Rooney*, 330 F.R.D. 439 at 451 (finding that plaintiffs established that calculation of damages based on an out-of-pocket model could be measured on a classwide basis).

R&R at 33; *see also* Ex. 2.[5]

In spite of the out-of-pocket damages methodology's wide acceptance in courts throughout the

country, Defendants continue to speculate that it cannot be reliably applied here.  Defendants recycle

their class certification argument that "Feinstein's . . . damages opinion is vague, indefinite, and

unverifiable," and complain that Feinstein fails to explain how he will calculate the damages and account

for various factors, such as that Cassava was a meme stock.  *Compare* Mot. at 17-18, *with* Sur-Reply at

17-19.  However, after considering these same arguments, Magistrate Judge Hightower rejected them,

holding that Feinstein's proposed out-of-pocket damages methodology is "consistent with [Plaintiffs']

theory of liability and capable of calculating damages on a classwide basis."  R&R at 34.  In so holding,

the Court determined that the "level of specificity" demanded by Defendants "is not required at the class

certification stage," and "'[i]t is sufficient for class certification that Professor Feinstein has specified a

---

[5]   *See also City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 693 (D. Md. 2018) ("The Court similarly finds that Lead Plaintiffs' proposal of an event study to measure out-of-pocket per share damages meets their burden to show that damages can be calculated on a classwide basis."); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105-06 (S.D.N.Y. 2016) ("[A]s required by *Comcast*, plaintiffs' actual theory of damages (out-of-pocket damages) is entirely consistent with their theory of Section 10(b) liability and would be measurable on a class-wide basis.").

damages model that can be used to establish damages using a common methodology for all class members, even though certain of the inputs to that model are not yet ascertainable.'" *Id.*

Magistrate Judge Hightower's findings are in accord with the Supreme Court's seminal ruling in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), which holds that to satisfy Federal Rule of Civil Procedure 23's predominance requirement, plaintiffs need only present a model demonstrating that damages can be calculated on a classwide basis consistent with their theory of liability. *Id.* at 34-35; *see also Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *15 (S.D. Tex. Nov. 13, 2019) (noting that *Comcast* requires only that "the method for calculating class damages be consistent with the theory of liability asserted in the case," a requirement "easily satisfied" where, as here, Plaintiffs rely on the "out-of-pocket" method), *report and recommendation adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019).[6]

Here, Defendants **do not claim** that Plaintiffs' theory of liability is inconsistent with its proffered damages model or that the out-of-pocket methodology is **un**reliable, and Feinstein's methodology has satisfied *Comcast* in **dozens** of securities cases. *See* ECF 214 ("Reply") at 27. Nothing more is required.

### B.    Feinstein's Proposed Methodology for Calculating Damages Is Sufficiently Detailed

Far from being "vague and indefinite," as Defendants baselessly assert, Feinstein's reports specifically detail **how** he would apply the out-of-pocket methodology in this case, as well as identify the particular valuation tools he would use in his analysis:

- First, Feinstein will use "valuation tools, which would include [an] event study analysis," to measure the artificial inflation in the security due to the alleged misrepresentations and omissions, as well as the corresponding dissipation caused by corrective disclosures to establish if the alleged corrective disclosures caused Cassava's security to fall. Feinstein Rpt., ¶230(i). "This analysis would apply on a Class-wide basis." *Id.*

---

[6]    Just as they did when opposing class certification, Defendants rely on *BP* to argue that Feinstein's damages methodology fails to comply with *Comcast*. 2013 WL 6388408, at *16. But that case is completely inapposite, because, unlike here, plaintiffs alleged four theories of liability in *BP*.

- Second, Feinstein will construct an "inflation ribbon" (*i.e.*, "a time series of the difference between a security's actual price observed in the marketplace, and the estimated price that the security would have traded at each day had there been full disclosure" from the outset of the Class Period) to determine the extent artificial inflation in the security's price on each day of the Class Period. *Id.*, ¶230(ii).

- Third, Feinstein will calculate per share damages for each Class member by determining "the difference between the inflation on the date the securities were purchased and the inflation on the date those same securities were subsequently sold." *Id.*, ¶230(v). Feinstein will also limit per share damages to be no greater than the decline in share price over the holding period. *Id.*, ¶230(vi).

Defendants' expert, Stulz, does not dispute that the out-of-pocket damages methodology is widely used to compute damages in virtually all class action securities fraud cases, and that it is approved in published legal scholarship. Feinstein Rebuttal, ¶262. And Stulz even acknowledges that Feinstein's description of the methodology addresses how it can accommodate and overcome potential complexities of precisely the sort he suggests may theoretically be encountered in this case. *Id.* Rather, Defendants' and Stulz's criticism is that Feinstein's description of the out-of-pocket damages methodology must be ***more detailed*** as to how the valuation analysis could address ***potential*** damages issues associated with different categories of allegations, potentially confounding information, the stock price in the but-for scenario, and time-varying inflation, that may or ***may not*** arise. *See, e.g.*, ECF 231 at 9-10; Reply at 28. However, as Feinstein explains in his rebuttal report, their argument is fatally flawed because:

> Dr. Stulz does not identify a single factor that cannot be addressed using one or more of the generally accepted valuation tools, which include those referenced in the Feinstein Report. As stated in the Feinstein Report (and summarized again below), such valuation tools are commonly employed to construct an inflation ribbon in the course of implementing the out-of-pocket damage methodology. Indeed, Dr. Stulz's criticism disregards that market participants routinely arrive at valuations for virtually any type of publicly traded security in real time using the same valuation tools that are readily applicable to estimate but-for prices in a securities class action such as this.

Feinstein Rebuttal, ¶263. Importantly, Stulz "does not dispute that these valuation tools exist, and that these tools can supplement the event study, if necessary, to construct an artificial inflation ribbon in this case." *Id.*, ¶269.

- 17 -

Moreover, "'[a]t this stage of litigation, Plaintiffs are not required to produce a detailed damages model.'" *In re EQT Corp. Sec. Litig.*, 2022 WL 3293518, at \*27-\*28 (W.D. Pa. Aug. 11, 2022); *Junge v. Geron Corp.*, 2022 WL 1002446, at \*6 (N.D. Cal. Apr. 2, 2022) (rejecting Stulz's objections to plaintiffs' damages approach because they "boil[ed] down to loss causation" issues, "which plaintiffs need not show at this stage"). Instead, Plaintiffs "propos[ing] a method of calculating damages on a class-wide basis" and "summariz[ing], albeit in general terms, the steps" for calculating out-of-pocket losses is sufficient at this stage. *Utesch v. Lannett Co., Inc.*, 2021 WL 3560949, at \*16 n.13 (E.D. Pa. Aug. 12, 2021), *aff'd sub nom. Univ. of P.R. Ret. Sys. v. Lannett Co., Inc.*, 2023 WL 2985120 (3d Cir. Apr. 18, 2023); *see Monroe*, 332 F.R.D. at 399 (finding Feinstein's proposed methodology complied with *Comcast* even though expert "ha[d] not yet specified which valuation tools . . . he [would] ultimately use"); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at \*17 (S.D.N.Y. Aug. 13, 2018) (rejecting argument that Feinstein was required to specify "'valuation tools'" because "such specificity is not required at this stage").[7]

Also significant is that Stulz "does not dispute that the out-of-pocket damage methodology is appropriate in the instant case," and even "implicitly accepts that this damage methodology . . . can be implemented correctly to compute damages commonly for all Class members." Feinstein Rebuttal, ¶274. In short, Stulz's "criticism amounts to misdirected, erroneous, and unsupported speculation that this generally accepted and appropriate methodology might not be executed correctly if the but-for security prices and artificial inflation are valued incorrectly." *Id.* Because Stulz's and Defendants' true

---

[7]    Defendants' contention that Feinstein has not yet disaggregated losses from potential non-fraud related "volatility" and unspecified "other forces" on corrective disclosure dates (Mot. at 18) is speculative and premature merits questions left to summary judgment or trial. *See* Reply at 30; *Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 6793326, at \*7 (E.D. Mich. Nov. 19, 2020) (disaggregation "is really a merits inquiry into loss causation" that "is not required for class certification"); *Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, 2020 WL 5757695, at \*14 (D. Minn. Sept. 28, 2020) ("[C]oncerns that [plaintiff] has not yet . . . adequately addressed disaggregation" is a "loss causation dispute[] . . . not appropriate for resolution at class certification.").

quarrel is with the ***conclusions*** regarding damages that Feinstein might ultimately reach at trial – and not with the reliability of the damages model he has proposed for class certification – Feinstein's opinions are admissible under Rule 702.  R&R 254 ("That experts disagree on how to conduct studies and what factors to consider does not show that Feinstein's [methods] are unreliable" and require exclusion.).

None of the cases that Defendants dredge up here ***again*** say otherwise.  For example, courts have declined to follow Defendants' *Freddie Mac* case, noting that "although [the expert] has not yet specified . . . valuation tools – an input into the damages model – he will ultimately use, such specification is not required at this stage."  *Monroe*, 332 F.R.D. at 399.  Further, *Freddie Mac* "involved testimony from defendants' expert affirmatively supporting that a class-wide damages model could ***not*** be constructed – which is not at issue in the present case" (*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2022 WL 1459567, at *10 (N.D. Cal. May 9, 2022) (emphasis in original); Ex. 4 at 311:3-9 (testifying he is not opining that an event study cannot measure damages in this case)), as well as incongruent theories of liability and damages.  *See Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *9 n.8 (N.D. Ill. Feb. 26, 2020).

And Defendants' continued reliance on *Sicav v. James Jun Wang*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015), and *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *6 (E.D.N.Y. Jan. 11, 2022), *report and recommendation adopted*, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2002), remains misplaced.  Unlike here, *Sicav* was not a "typical securities fraud class action," and alleged "an unusual theory of classwide injury" based on trading mechanics, not a stock price drop.  2015 WL 268855, at *2.  And Defendants are simply wrong that the court in *Vale* "rejected Dr. Feinstein's damages opinion."  Mot. at 17; *Vale*, 2022 WL 122593, at *18-*19, *22.  Quite the opposite is true actually – the court ***upheld*** Dr. Feinstein's damages model and granted class certification.  Moreover, the basis of the court's criticism in *Vale* was Dr. Feinstein's use of a different event study than the typical "'collective event study'" used here, which, unlike here, relied on a "'subjective'" and unspecified event date selection

- 19 -

process. *Vale*, 2022 WL 122593, at *10-*13.  Defendants do not claim his event selection criteria here was subjective.

Because Feinstein's proposed out-of-pocket methodology for calculating damages is widely-accepted by courts and is sufficiently detailed, it is therefore reliable, and should not be excluded.

## VI.    CONCLUSION

For all the reasons stated herein, Plaintiffs respectfully request that Defendants' Motion be denied.

DATED:  December 11, 2024                Respectfully submitted,

                                         ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                         DANIEL S. DROSMAN (admitted *pro hac vice*)
                                         JESSICA T. SHINNEFIELD (admitted *pro hac vice*)
                                         KEVIN A. LAVELLE (admitted *pro hac vice*)
                                         MEGAN A. ROSSI (admitted *pro hac vice*)
                                         HEATHER GEIGER (admitted *pro hac vice*)
                                         JEREMY W. DANIELS (admitted *pro hac vice*)


                                                 */s/ Jessica T. Shinnefield*
                                         JESSICA T. SHINNEFIELD

                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)
                                         dand@rgrdlaw.com
                                         jshinnefield@rgrdlaw.com
                                         klavelle@rgrdlaw.com
                                         mrossi@rgrdlaw.com
                                         hgeiger@rgrdlaw.com
                                         jdaniels@rgrdlaw.com

                                         Lead Counsel for Lead Plaintiff and Additional Plaintiff
                                         Ken Calderone

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)
3811 Turtle Creek Blvd., Suite 825
Dallas, TX 75219
Telephone: 214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

Local Counsel for Lead Plaintiff and Additional
Plaintiff Ken Calderone

GLANCY PRONGAY & MURRAY LLP
CHARLES H. LINEHAN (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: 310/201-9150
310/201-9160 (fax)
clinehan@glancylaw.com

Counsel for Additional Plaintiff Manohar K. Rao

- 21 -

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 11, 2024, a true and correct copy of the foregoing was served electronically upon each attorney of record.

*/s/ Jessica T. Shinnefield*
_____
JESSICA T. SHINNEFIELD
