UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| In re CASSAVA SCIENCES, INC. SECURITIES LITIGATION | § § § § | Master File No. 1:21-cv-00751-DAE CLASS ACTION |
| This Document Relates To: ALL ACTIONS | § § § § § § | |

**PLAINTIFFS' RENEWED OPPOSED MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     STATEMENT OF THE CASE................................................................................3

III.    CLASS DEFINITION .............................................................................................5

IV.     LEGAL STANDARD..............................................................................................5

        V.      RULE 23(a) IS SATISFIED .........................................................................6

                1.      The Class Is Sufficiently Numerous ...............................................6

                2.      Questions of Law and Fact Are Common to the Class.................7

                3.      Plaintiffs' Claims Are Typical of the Class ...................................8

                4.      Plaintiffs and Class Counsel Are Both Adequate and Class Counsel
                        Satisfies Rule 23(g)..........................................................................9

VI.     THE PROPOSED CLASS SATISFIES RULE 23(b)(3)....................................10

        A.      Common Questions of Law and Fact Predominate .................................11

                1.      Common Questions About Defendants' Scheme Will Predominate ........11

                2.      Common Issues of Reliance Predominate Based on the "Fraud-on-
                        the-Market" Presumption Under *Basic* ...................................12

                        a.      Cassava's Common Stock Traded on the NASDAQ, a
                                Presumptively Efficient Market......................................12

                        b.      The *Cammer* Factors Are Met ......................................13

                                (1)     High Weekly Trading Volume..........................13

                                (2)     Media and Analysts Coverage ..........................14

                                (3)     Market Makers...................................................14

                                (4)     SEC Form S-3 Eligibility...................................15

                                (5)     Cause-and-Effect Relationship Between Cassava-
                                        Specific News and the Stock Price ...................15

                        c.      The *Krogman* Factors Also Confirm Market Efficiency ...............16

                                (1)     Market Capitalization........................................16

**Page**

(2)    Public Float ..................................................................17

(3)    Bid-Ask Spread..............................................................17

3.    Plaintiffs Are Also Entitled to a Presumption of Reliance Under *Affiliated Ute* ...........................................................................18

B.    Damages Will Be Calculated According to a Common Methodology.................19

C.    A Class Action Is Superior to Any Other Method of Adjudication.......................19

VII.    CONCLUSION..................................................................................20

4932-6532-3343.v2

# TABLE OF AUTHORITIES

**Page**

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)................................................................................2, 18, 19

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997)..........................................................................................11

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013).............................................................................6, 11, 19

*Aranaz v. Catalyst Pharm. Partners, Inc. et al.*,
302 F.R.D. 657 (S.D. Fla. 2014)......................................................................14

*Baker v. Cassava Scis., Inc., Remi Barbier, & Eric J. Schoen*,
No. 1:24-cv-00977 (N.D. Ill. Feb. 2, 2024) ...................................................20

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....................................................................................2, 12

*Buettgen v. Harless*,
2011 WL 1938130 (N.D. Tex. May 19, 2011) ............................................8, 10

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ............................................................ *passim*

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)............................................................................................19

*Crocker v. Cassava Scis., Inc.*,
No. 1:24-cv-01525 (W.D. Tex. Dec. 12, 2024) ..............................................20

*Erica P. John Fund, Inc. v. Halliburton, Co.*,
563 U.S. 804 (2011)....................................................................................11, 19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)..........................................................................................12

*In re Anadarko Petroleum Corp. Sec. Litig.*,
2022 WL 4544235 (S.D. Tex. Sept. 28, 2022) ................................................17

*In re BP p.l.c. Sec. Litig.*,
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013).....................................................1

4932-6532-3343.v2

**Page**

*In re DVI, Inc. Sec. Litig.*,
    249 F.R.D. 196 (E.D. Pa. 2008), *aff'd* 639 F.3d 623 (3d Cir. 2011) ...............................14, 16

*In re Dynegy, Inc. Sec. Litig.*,
    226 F.R.D. 263 (S.D. Tex. 2005) .......................................................................................6, 8

*In re Elec. Data Sys. Corp. Sec. Litig.*,
    226 F.R.D. 559 (E.D. Tex. 2005) ........................................................................7, 11, 19, 20

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006) ....................................................................... *passim*

*In re Facebook, Inc., IPO & Sec. & Derivative Litig.*,
    986 F. Supp. 2d 428 (S.D.N.Y. 2013) ....................................................................................18

*In re Groupon, Inc. Sec. Litig.*,
    2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) ............................................................................17

*In re Reliant Sec. Litig.*,
    2005 WL 8152605 (S.D. Tex. Feb. 18, 2005) ..........................................................................6

*KB Partners I, L.P. v. Barbier*,
    2013 WL 2443217 (W.D. Tex. June 4, 2013) ............................................................. *passim*

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ..............................................................................13, 16, 17

*Lehocky v. Tidel Techs., Inc.*,
    220 F.R.D. 491 (S.D. Tex. 2004)............................................................................... *passim*

*Lorenzo v. SEC*,
    587 U.S. 71 (2019)..................................................................................................................18

*Ludlow v. BP, P.L.C.*,
    800 F.3d 674 (5th Cir. 2015) ................................................................................................19

*Lumen v. Anderson*,
    280 F.R.D. 451 (W.D. Mo. 2012).........................................................................................13

*Marcus v. J.C. Penney Co.*,
    2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) ........................................................................7

*Mullen v. Treasure Chest Casino, LLC*,
    186 F.3d 620 (5th Cir. 1999) ..................................................................................................7

Page

*Pederson v. La. State Univ.*,
  213 F.3d 858 (5th Cir. 2000) ..................................................7

*Ret. Sys. v. Dell Inc.*,
  2018 WL 1558571 (W.D. Tex. Mar. 29, 2018) ..................................9

*Rooney v. EZCORP, Inc.*,
  330 F.R.D. 439 (W.D. Tex. 2019) ..................................8, 13, 19

*Rougier v. Applied Optoelectronics, Inc.*,
  2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ..................... *passim*

*Shaw v. Toshiba Am. Info. Sys., Inc.*,
  91 F. Supp. 2d 942 (E.D. Tex. 2000) ..................................1

*Torres v. S.G.E. Mgmt., LLC*,
  838 F.3d 629 (5th Cir. 2016) ..................................11

*Unger v. Amedisys Inc.*,
  401 F.3d 316 (5th Cir. 2005) ..................................13, 16

*Vinh Nguyen v. Radient Pharms. Corp.*,
  287 F.R.D. 563 (C.D. Cal. 2012) ..................................17

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
  2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ..................................15

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ..................................13, 15

*Zeidman v. J. Ray McDermott & Co.*,
  651 F.2d 1030 (5th Cir. 1981) ..................................7

**STATUTES, RULES, AND REGULATIONS**

Private Securities Litigation Reform Act of 1995 ..................................20

Securities Exchange Act of 1934
  §10(b)..................................3
  §20(a)..................................3

Page

Federal Rules of Civil Procedure
    Rule 23 ........................................................................................................2, 5, 6
    Rule 23(a)....................................................................................................*passim*
    Rule 23(a)(2) ......................................................................................................7
    Rule 23(b) ...........................................................................................................5
    Rule 23(b)(3)...............................................................................................*passim*
    Rule 23(c)(2)(B).................................................................................................20
    Rule 23(g) ...............................................................................................3, 9, 20

4932-6532-3343.v2

Lead plaintiff Mohammad Bozorgi and additional plaintiffs Ken Calderone and Manohar K. Rao (collectively, "Plaintiffs") refile their Motion for Class Certification according to the Court's May 21, 2025 Order. *See* ECF 317.[1]  Pursuant to Federal Rule of Civil Procedure ("Rule") 23, Plaintiffs respectfully move for an order: (i) certifying the Class, as defined in §III below; (ii) appointing them to serve as Class Representatives; and (iii) appointing Lead Counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller") to serve as Class Counsel.[2]

## I.    INTRODUCTION

It is well established that class certification is "especially" appropriate in private securities fraud class actions, such as this. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 670 (S.D. Tex. 2006); *see, e.g.*, *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *18 (S.D. Tex. Dec. 6, 2013) (In securities fraud cases, a "class action is vastly superior to the pursuit of hundreds of thousands of individual actions.").  Consequently, "[c]lass certification in securities cases is practically routine." *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 958 (E.D. Tex. 2000).  This case is no different, as common questions of law and fact about Defendants' scheme and common course of conduct will yield the same answers for all Class members based on the same evidence.  In fact, a court in this District previously certified another securities fraud class action against Cassava and CEO Barbier when the Company was still Pain Therapeutics, Inc. *See KB Partners I, L.P. v. Barbier*, 2013 WL 2443217 (W.D. Tex. June 4, 2013).

Here, too, the proposed Class satisfies the requirements of Rules 23(a) and 23(b)(3).  With respect to Rule 23(a), numerosity and commonality are met because the Class is comprised of

---

[1]    The Court ordered that "[n]o new arguments, evidence, or non-existing briefing shall be filed." *Id.* at 13.  Plaintiffs first filed their Motion for Class Certification on March 13, 2024. ECF 148.

[2]    Pursuant to L.R. CV-7(g), Plaintiffs met and conferred with Defendants on March 12, 2024, but Defendants would not stipulate to class certification.

4932-6532-3343.v2

thousands of investors with identical claims arising under the federal securities laws based on Defendants' alleged fraudulent scheme.[3]  Typicality is also satisfied because, like all other Class members, Plaintiffs suffered damages as a result of purchasing Cassava Securities (defined in §III, *infra*) at prices artificially inflated by Defendants' material omissions regarding Cassava's primary drug-candidate, simufilam.  And Rule 23's adequacy requirement is met because: (i) Plaintiffs understand their fiduciary duties to the Class; (ii) have diligently prosecuted this case; and (iii) have acted, and will continue to act, in the best interests of all Class members.  *See* Exs. A, B, C.[4]  Plaintiffs have, moreover, retained adequate counsel with extensive experience in securities fraud class litigation and have no conflicts with other Class members.  *See* Ex. D.

Rule 23(b)(3)'s predominance and superiority requirements are likewise satisfied.  The Class members' claims will be proven with common proof, and common questions will predominate over any individual issues.  For example, class-wide reliance is presumed under the fraud-on-the-market doctrine because, as demonstrated by Plaintiffs' expert financial economist, Cassava Securities traded in an efficient market during the Class Period.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988).  And because this case is primarily premised on a failure to disclose, the Class is also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  Last, a class action is superior to other methods of adjudicating Class members' claims because it will conserve judicial resources, prevent inconsistent rulings, and include Class members whose individual claims are too small for individual litigation to be economically feasible.  *See* Fed. R. Civ. P. 23(b)(3).

---

[3]     "Defendants" are Cassava Sciences, Inc. ("Cassava" or the "Company"), together with the Individual Defendants Remi Barbier, Eric Schoen, and Lindsay Burns.

[4]     Unless otherwise noted, all "Ex. __" references are to the Affidavit of Kevin A. Lavelle in Support of Plaintiffs' Renewed Opposed Motion for Class Certification.

Accordingly, Plaintiffs respectfully request that the Court certify the Class, appoint them as Class Representatives, and appoint Robbins Geller as Class Counsel pursuant to Rule 23(g).

## II.    STATEMENT OF THE CASE

This securities fraud class action alleges violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 against Cassava and three of its top executives: CEO Barbier, CFO Schoen, and Senior VP Burns.  Plaintiffs allege that, between September 14, 2020 and October 12, 2023, inclusive (the "Class Period"),[5] Defendants engaged in a fraudulent scheme to promote their experimental Alzheimer's drug, simufilam, by concealing facts that undermined the integrity of Cassava's research.

Specifically, Defendants used research tainted by extensive data manipulation to obtain National Institutes of Health ("NIH") grants and publish "in peer-reviewed journals" as part of a "strategy" (*i.e.* scheme) to "validat[e]" Cassava's "unique scientific approach."  ¶¶85-88, 144-222.[6]  Defendants then exploited their relationship with the NIH and academic journals to entice the market, telling investors "[y]ou don't have to take our word for it.  The underlying science is published in a number of peer reviewed journals and benefits from multiple recent clinical and non-clinical research grants from the NIH."  ¶280; *see* ¶¶253-256.

Throughout the Class Period, Defendants carried out their scheme, repeatedly assuring investors of simufilam's results, while failing to disclose that Cassava's research was built upon concealed data manipulation, significant anomalies, and intractable conflicts of interest.  ¶¶1-3,

---

[5]    On February 22, 2024, Plaintiffs moved to supplement the Consolidated Complaint for Violation of the Federal Securities Laws (the "Complaint") (ECF 68) to add an October 12, 2023 corrective disclosure that occurred after the filing of the Complaint and to extend end of the putative Class Period accordingly.  ECF 129.  That motion was granted.  ECF 175.

[6]    All "¶__" or "¶¶__" references are to the Complaint, unless otherwise noted.  All "Supp. ¶__" or "Supp. ¶¶__" references are to the Second Supplemented Consolidated Complaint for Violations of the Federal Securities Laws.  ECF 320.

268-315.  In particular, on September 14, 2020, at the start of the Class Period, the Company made a surprise announcement that an "outside lab" conducted a "reanalysis" of Cassava's previously failed Phase 2b clinical trial and found significant improvement in Alzheimer's biomarkers – the exact opposite of the initial analysis.  ¶¶9, 268-271, 275-276.  Defendants then declared the original (unsuccessful) results invalid due to "anomalous data."  *Id*.

Defendants concealed, however, that the Phase 2b "reanalysis" results were themselves anomalous and built on flawed "science" in order to capture cash payments tied to short-term increases in Cassava's stock price provided for in a bonus plan Barbier recently enacted.  ¶¶98-104, 227-231, 287(d), 429.  Moreover, the Phase 2b do-over was not conducted by an "outside lab," but rather by Dr. Hoau-Yan Wang, a highly conflicted member of Cassava's own product development team on the Company's payroll.  ¶¶57-58, 80, 106-111, 287(f).

Then, on July 26, 2021, Defendants presented the Phase 2b trial results at an Alzheimer's Association International Conference ("AAIC").  ¶218.  The presentation, authored by Burns and Wang, concealed the removal of a "key" biomarker data point (¶¶219, 287(c)), a "serious and intentional action" that inflated the significance of the results.  ¶¶220-222, 315, 336.  Soon thereafter, however, Defendants' scheme began to unravel.

After market close on August 24, 2021, reports emerged that the FDA had received a Citizen Petition raising "grave concerns about the quality and integrity of the laboratory-based studies surrounding" simufilam.  ¶¶12-13, 105-109, 143-251.  Cassava, without conducting any investigation of the allegations, responded immediately, issuing a release the morning of August 25, 2021 denying all wrongdoing and calling the Citizen Petition "fiction."  ¶¶14, 316-317, 485. Among the claims made, the release stated that the allegedly manipulated plasma p-tau data from the AAIC presentation "was generated by [Quanterix]."  ¶¶316-317.

Despite these denials, Cassava's stock price fell 39.9% between August 25-26 in response

to the Citizen Petition.  ¶¶15, 497.  Then, on August 27, 2021, Quanterix issued a press release clarifying that it "did not interpret the test results or prepare the data charts presented by Cassava" in the AAIC presentation.  ¶¶16, 323.  On this news, Cassava's share price fell 17.66%.  ¶¶17, 499.

With Cassava's stock price in free fall, Defendants sought to stem the losses, and again provided doctored data to the scientific journals investigating the misconduct allegations in order to obtain exonerations that Defendants then disseminated to the market.  *See, e.g.*, ¶¶338-362, 386-407, 423-424; Supp. ¶¶1-4.  After reports surfaced questioning whether Cassava had actually provided those journals with "original" data, on October 12, 2023, an article in *Science* magazine released the results of a City University of New York ("CUNY") investigation into the alleged misconduct at Wang's lab, which revealed that no original data had been provided by Burns or Wang in the investigation, thus revealing not only that Defendants could not have provided original data to the journals, as Cassava claimed, but that there was no original data for any of the Cassava research at issue.  Supp. ¶¶1-4.  As a result, Cassava's stock price again fell over 30%, further damaging Class members and ending the Class Period.  Supp. ¶¶5-7.

## III.    CLASS DEFINITION

The proposed Class includes all purchasers or acquirers of Cassava common stock or call options on Cassava common or sellers of put options on Cassava common stock ("Cassava Securities") between September 14, 2020 and October 12, 2023, inclusive.  Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which any of the Defendants have or had a controlling interest.

## IV.    LEGAL STANDARD

To proceed on a class basis, claims must satisfy the prerequisites of Rule 23(a) and one of the criteria under Rule 23(b), here, for a damages class under Rule 23(b)(3).  *See* Fed. R. Civ. P.

23.  Courts routinely certify classes for claims brought under the federal securities laws.  *See, e.g.*, *Enron*, 529 F. Supp. 2d at 670 ("'Rule 23 is a remedial rule which should be construed liberally to permit class actions, especially in the context of securities fraud suits, where the class action device can prove effective in deterring illegal activity.'").[7]  Thus, in making a determination on a motion for class certification under Rule 23, "[i]n securities fraud cases, . . . 'when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward.'"  *In re Reliant Sec. Litig.*, 2005 WL 8152605, at *3 (S.D. Tex. Feb. 18, 2005).

While the Rule 23 analysis "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013).  Instead, "'the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.'"  *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 268 (S.D. Tex. 2005).  Here, the requirements of Rule 23 are satisfied, and thus the Class should be certified.

## V.    RULE 23(a) IS SATISFIED

Rule 23(a) requires that: (i) "the class is so numerous that joinder of all members is impracticable"; (ii) "there are questions of law or fact common to the class"; (iii) "the claims or defenses of the representative parties are typical of those of the class"; and (iv) "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  These requirements are readily satisfied here.

### 1.    The Class Is Sufficiently Numerous

First, numerosity is met.  Numerosity "'is generally assumed to have been met in [a] class

---

[7]         Unless otherwise noted, emphasis is added and citations are omitted throughout.

action suit[] involving nationally traded securities,'" since the putative class is likely sufficiently numerous, geographically dispersed, and difficult to identify. *Barbier*, 2013 WL 2443217, at *11 (quoting *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981)). Plaintiffs "need not allege the exact number and identity of the class members, but rather must establish that joinder is impracticable through 'some evidence or reasonable estimate of the number of purported class members.'" *In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 564 (E.D. Tex. 2005) (quoting *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000)), *aff'd sub nom. Feder v. Elec. Data. Sys. Corp.*, 429 F.3d 125 (5th Cir. 2005). Indeed, courts are "'quite willing to accept common sense assumptions in order to support findings of numerosity.'" *Marcus v. J.C. Penney Co.*, 2016 WL 8604331, at *2 (E.D. Tex. Aug. 29, 2016), *R&R adopted*, 2017 WL 907996 (E.D. Tex. Mar. 8, 2017).

Here, during the Class Period, Cassava common stock traded on the NASDAQ with an average weekly trading volume of 17.2 million shares and at least 443 institutional shareholders. Ex. E, Expert Report of Steven Feinstein, Ph.D., CFA (the "Report" or "Rpt."), ¶¶80, 89, 100. These facts establish numerosity. *See Barbier*, 2013 WL 2443217 at *11 ("two million shares" traded weekly suggested "a potentially massive class of individual investors"); *Enron*, 529 F. Supp. 2d at 672 (finding the numerosity requirement met, and "not . . . seriously challenged," where the class was "'composed of the sellers of a nationally traded security'").

### 2.    Questions of Law and Fact Are Common to the Class

Second, commonality is met where, as here, "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Notably, "[t]he test for commonality is not demanding and is met 'where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.'" *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999). "The presence of some plaintiffs having different claims or claims that require some

individualized analysis does not defeat commonality." *Dynegy*, 226 F.R.D. at 269.

Here, virtually all the questions of law and fact in this case are common to Plaintiffs and the Class, including: (i) whether Defendants violated the Exchange Act; (ii) whether Defendants omitted or misrepresented material facts; (iii) whether the price of Cassava Securities was artificially inflated during the Class Period; and (iv) whether the Class members suffered damages. Likewise, the answers to these common questions will be determined based on common evidence. *See, e.g.*, *Barbier*, 2013 WL 2443217, at *11 (commonality satisfied where "every class member's allegations of securities fraud arise from the same basic set of facts"); *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 445 (W.D. Tex. 2019) (finding commonality in securities fraud case).

### 3. Plaintiffs' Claims Are Typical of the Class

Third, typicality is met. Like commonality, the test for typicality is "not demanding," and is "satisfied where the representative plaintiffs' claims arise out of the same event or course of conduct as the other members' claims and are based on the same legal theory." *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 500 (S.D. Tex. 2004). In securities fraud cases, this requirement is satisfied when all claims are "based on conduct that . . . injured all members of the putative class" or where the "same alleged misrepresentations and omissions" are common to all class members. *Dynegy*, 226 F.R.D. at 287-88. So long as those fundamental requirements are satisfied, "factual differences [among the claims] will not defeat typicality." *See, e.g.*, *Buettgen v. Harless*, 2011 WL 1938130, at *4 (N.D. Tex. May 19, 2011).

Here, Plaintiffs' claims arise from the same fraudulent scheme and common course of conduct as other Class members and are based on the same legal theories. *Lehocky*, 220 F.R.D. at 500. Like all Class members, Plaintiffs purchased Cassava securities during the Class Period when Defendants' alleged fraudulent scheme was artificially inflating the stock price and were allegedly damaged thereby. ECFs 68; 129-5 at 182 of 185, 185 of 185; 320. Thus, typicality is satisfied.

### 4. Plaintiffs and Class Counsel Are Both Adequate and Class Counsel Satisfies Rule 23(g)

Finally, adequacy is met. The "'long-established standard' for the adequacy determination . . . requires "'an inquiry into [1] the zeal and competence of the representative[s'] counsel and . . . [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees."'" *Feder*, 429 F.3d at 130. In addition, courts in this circuit consider "the risk of 'conflicts of interest between the named plaintiffs and the class they seek to represent.'" *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *7 (S.D. Tex. Nov. 13, 2019), *R&R adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019).

Here, Plaintiffs selected highly qualified counsel, Robbins Geller, to prosecute the Class' claims. *See* Ex. D; *see e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*, 2018 WL 1558571, at *4 (W.D. Tex. Mar. 29, 2018) (adequacy established where the representative plaintiff retained Robbins Geller as counsel); *Enron*, 586 F. Supp. 2d at 797 (The "experience, ability, and reputation" of Robbins Geller attorneys "is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country.").

Further, since the Court appointed Robbins Geller to serve as Lead Counsel (ECF 59), the firm has vigorously prosecuted the Class claims by, among other things, launching a thorough investigation into Defendants' misconduct, filing a comprehensive 169+ page consolidated class action complaint, defeating Defendants' motion to dismiss, retaining experts, moving for class certification, and pursuing wide-ranging document discovery from each of the Defendants and over 38 third parties. *See Rougier*, 2019 WL 6111303, at *7 (finding class counsel adequate where plaintiff's counsel was experienced in class action securities lawsuits and "served and obtained discovery from [d]efendants and third parties; retained experts; and filed the instant Motion to

- 9 -

Certify the Class").[8]

Second, Plaintiffs understand their fiduciary duties to the Class and have demonstrated their commitment to actively monitor and direct this action for the benefit of the class. *See* Exs. A, B, C. Plaintiffs have maintained regular contact with counsel regarding the status of this action, responded to Defendants' discovery requests, produced documents, and intend to continue to perform activities throughout this action, including testifying at trial. *See id.*; *Lehocky*, 220 F.R.D. at 502-03 (adequacy established where plaintiffs were committed to the action, reviewed court papers, and understood the complaint's allegations).[9]

Moreover, Plaintiffs do not have a conflict with the Class; on the contrary, they share the *same* interests and suffered the same injury as the Class. Plaintiffs, like all Class members, purchased Cassava Securities during the Class Period at inflated prices, and they suffered losses due to Defendants' misconduct. *See* Exs. A, B, C; ¶¶52-54. Thus, there are no "'[d]ifferences between the named plaintiffs and class members'" that "'create conflicts between the named plaintiffs' interests and the class members' interest.'" *Buettgen*, 2011 WL 1938130, at*5. Adequacy is thus met. Accordingly, all of Rule 23(a)'s requirements are readily met here.

## VI.    THE PROPOSED CLASS SATISFIES RULE 23(b)(3)

In addition to Rule 23(a)'s requirements, the Class' claims satisfy Rule 23(b)(3)'s requirements that common questions of law or fact predominate over individual questions and that a class action is the superior method of adjudicating this dispute. *See* Fed. R. Civ. P. 23(b)(3).

---

[8]    Pursuant to L.R. CV-23 and the referenced Appendix A attached hereto, Plaintiffs further state that the claims do not require subclasses and that Robbins Geller has represented plaintiffs in hundreds of securities class actions and are now prosecuting dozens of such actions on behalf of plaintiffs.

[9]    In addition, through counsel, Plaintiffs understand the potential advantages and disadvantages of proceeding as a class action rather than individually, and do not intend on settling their claims on an individual basis. *See* Exs. A, B, C. Private mediations occurred in November 2023 and May 2025 between the parties, but no settlement was reached.

### A.    Common Questions of Law and Fact Predominate

First, common questions will predominate at trial. "Predominance does not require all questions of law or fact to be common, but only that common questions predominate over individual questions." *Elec. Data Sys.*, 226 F.R.D. at 570. Even where some "important matters" in the case "'"will have to be tried separately,"'" the predominance requirement is met if "'"one or more of the central issues in the action are common to the class."'" *Torres v. S.G.E. Mgmt., LLC*, 838 F.3d 629, 645 n.74 (5th Cir. 2016). Thus, Rule 23(b)(3) "does ***not*** require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (emphasis and alterations in original). Nor does predominance require a showing that common questions "will be answered, on the merits, in favor of the class." *Id*. at 459. In fact, "[p]redominance is a test readily met in certain cases alleging . . . securities fraud" claims. *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). This case is no exception.

### 1.    Common Questions About Defendants' Scheme Will Predominate

The "essential element[s]" of a Rule 10b-5 claim are subject to common proof. *Amgen*, 568 U.S. at 460, 468-69, 475. In securities fraud cases, such as this one, the elements of falsity, materiality, scienter, and loss causation all raise exclusively common questions of law and fact that support a finding of predominance. *See id*. at 468, 475; *Erica P. John Fund, Inc. v. Halliburton, Co.*, 563 U.S. 804, 805, 813 (2011) ("*Halliburton I*") (because it is a common question, a plaintiff is not required to "show loss causation as a condition of obtaining class certification"); *Rougier*, 2019 WL 6111303, at *9 (predominance met because issues of law and fact concerning falsity, materiality, scienter, and loss causation are common to all class members).

Finally, control under §20(a) is a common question, as it turns on the Individual Defendants' status as control persons and is predicated on the same underlying legal and factual

- 11 -

basis as the alleged §10(b) direct violations.  Thus, common questions about Defendants' liability

will predominate over any individual issue and are fundamental to the entire Class claims.

### 2. Common Issues of Reliance Predominate Based on the "Fraud-on-the-Market" Presumption Under *Basic*

The "fraud-on-the-market" presumption of reliance established in *Basic*, 485 U.S. 224, and

reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ("*Halliburton II*")

applies in this case.  This presumption routinely applies in securities cases, recognizing that "a

public, material misrepresentation will distort the price of stock traded in an efficient market, and

that anyone who purchases the stock at the market price may be considered to have done so in

reliance on the misrepresentation."  *Id.* at 283-84.

As demonstrated below and in Dr. Feinstein's Report, Cassava Securities traded in an

efficient market throughout the Class Period.  *See* Rpt., ¶¶17-22, 186, 218; *see, e.g., Rougier*, 2019

WL 6111303, at *14 ("Courts in the Fifth Circuit routinely have held that a finding of market

efficiency for common stock also applies to options, because the price for the option is derivative

of the price of the stock.").  This, all of the relevant factors are met, the class is entitled to rely on

the presumption of reliance.  *See Halliburton II*, 573 U.S. at 279; ¶¶269-286 (alleged

misstatements made publicly); ECFs 68; 129-5 at 182 of 185 and 185 of 185; 320 (Plaintiffs

purchased Cassava Securities after the misstatements were made.).[10]

#### a. Cassava's Common Stock Traded on the NASDAQ, a Presumptively Efficient Market

Importantly, throughout the Class Period, Cassava common stock traded on the NASDAQ

Stock Market, one of the largest and most developed markets in the world.  Rpt., ¶95.  This fact

alone creates a presumption that Cassava Securities traded in an efficient market.  *See, e.g.*,

---

[10]    Materiality under *Basic* need not be demonstrated at the class-certification stage.  *See Halliburton II*, 573 U.S. at 276.

*Rooney*, 330 F.R.D. at 445 ("EZCORP's stock traded in the NASDAQ Stock Market, one of the largest markets in the world, and perhaps for this reason, Defendants have not contested that EZCORP stock trades in an efficient market."); *see also Barbier*, 2013 WL 2443217 at *13 (finding that Cassava, when named Pain Therapeutics, traded in an efficient market). Indeed, as courts have observed, "[i]t would be remarkable for a court to conclude NASDAQ is ***not*** an efficient market." *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012). Thus, the baseline for this Court's analysis starts with a presumption of efficiency.

### b.    The *Cammer* Factors Are Met

Courts also look to the widely-accepted factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), in considering whether the stock at issue trades in an efficient market. *See Rooney*, 330 F.R.D. at 449. The *Cammer* factors are: "(1) the stock's average trading volume; (2) the number of analysts that followed and reported on the stock; (3) the number of market makers; (4) eligibility to file an S-3 Registration Statement; and (5) the reaction of the stock price to unexpected news." *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001) (citing *Cammer*, 711 F. Supp. at 1286-87). A plaintiff need not demonstrate that all of the *Cammer* factors are satisfied to demonstrate market efficiency because, as numerous circuits have explained, these factors are an "'analytical tool,'" not a "'checklist.'" *Waggoner v. Barclays PLC*, 875 F.3d 79, 99 n.30 (2d Cir. 2017) (collecting cases); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) (Each of the *Cammer* factors "represent[] a distinct facet of market efficiency" and must be "weighed analytically, not merely counted."). Each of the *Cammer* factors is met here.

### (1)    High Weekly Trading Volume

*Cammer* factor 1 is met, given the high weekly trading volume of Cassava common stock. A large weekly trading volume "suggests there is an efficient market . . . because it implies significant investor interest in the company." *Cammer*, 711 F. Supp. at 1286; *see also* Rpt., ¶¶78-

81.  As the *Cammer* court explained, "'[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a ***strong presumption*** that the market for the security is an efficient one; 1% would justify a substantial presumption.'"  711 F. Supp. at 1293; *see also Lehocky*, 220 F.R.D. at 508 (Courts in this Circuit have recognized "a ***substantial presumption*** of an efficient market if the securities' average weekly trading volume is 1% or more of the total outstanding shares and an even greater presumption of market efficiency if the percentage is 2%.").  "The average trading volume [in a Company's stock] is one of the most important factors in determining whether the market for a particular stock is efficient." *Enron*, 529 F. Supp. 2d at 692 n.69.  Cassava common stock's average weekly trading volume during the Class Period was 17.2 million shares, or 48.99% of the shares outstanding.  Rpt., ¶80.  This trading volume justifies a "strong presumption" of market efficiency. *Id*.; *Cammer*, 711 F. Supp. at 1293.

### (2)    Media and Analysts Coverage

*Cammer* factor 2 is also met, given the media and analyst coverage of Cassava Securities during the Class Period.  "The number of securities analysts following [a] company's stock during the class period may offer 'persuasive' evidence of market efficiency." *Barbier*, 2013 WL 2443217, at *5.  At least five securities analysts covered Cassava during the Class Period, which, along with significant media coverage and institutional ownership, is indicative of market efficiency.  Rpt., ¶¶82-84.  This factor thus supports market efficiency. *See Barbier*, 2013 WL 2443217, at *7, *13 (one to three analysts, along with media coverage, supports efficiency); *In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 209-10 (E.D. Pa. 2008) (coverage by three securities analysts), *aff'd* 639 F.3d 623 (3d Cir. 2011); *see also Aranaz v. Catalyst Pharm. Partners, Inc. et al.*, 302 F.R.D. 657, 669 (S.D. Fla. 2014) (coverage by four securities analysts).

### (3)    Market Makers

*Cammer* factor 3 is satisfied where, as here, there are market makers and arbitrageurs,

because such market participants "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."  711 F. Supp. at 1286-87. According to *Cammer*, "'[t]en market makers for a security would justify a substantial presumption that the market for the security is an efficient one.'"  *Id*. at 1293; *see, e.g.*, *Lehocky*, 220 F.R.D. at 509 (20-25 market makers "tip[s] towards a finding of market efficiency").  During the Class Period, there were 122 market makers trading Cassava Securities.  Rpt., ¶96. Additionally, there were 443 institutional investors, 100% of which changed the number of shares held during the Class Period, a hallmark of arbitrage activity.  *Id.*, ¶94.  Thus, this factor supports a "substantial presumption" of market efficiency.  *Cammer*, 711 F. Supp. at 1293.

### (4)    SEC Form S-3 Eligibility

*Cammer* factor 4 is met due to Cassava's eligibility to file a Form S-3 during the Class Period.  Companies that are "entitled to issue new securities using SEC Form S-3 would almost ***by definition*** involve stocks trading in an 'open and developed' market."  *Cammer*, 711 F. Supp. at 1276-77.  Therefore, eligibility for SEC Form S-3 registration also indicates market efficiency. *Enron*, 529 F. Supp. 2d at 693 n.72 ("'Generally speaking[,] it is the largest and most well[-]known companies which register equity securities on Form S-3.'").  Cassava was eligible to file a Form S-3 throughout the Class Period and, in fact, did so twice on February 10, 2021 and May, 1, 2023. *See* Rpt., ¶¶105-108.  As such, this factor weighs in favor of finding market efficiency.  *See id.*

### (5)    Cause-and-Effect Relationship Between Cassava-Specific News and the Stock Price

*Cammer* factor 5 is also met.  This factor examines whether a plaintiff can illustrate "over time, a cause and effect relationship between company disclosures and resulting movements in stock price."  711 F. Supp. at 1291.  However, "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies."  *Waggoner*, 875 F.3d at 97; *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *12

- 15 -

(E.D. Pa. Aug. 4, 2016) ("Courts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency.").  Plaintiffs, nevertheless, have done so here.

As set forth in his expert report, Dr. Feinstein conducted an event study of Cassava common stock, examining the causal relationship between the release of Cassava-specific news and the response in Cassava's stock price.  Rpt., ¶¶20, 123-169.  Event studies, like the one Dr. Feinstein performed, are the "gold standard" for establishing the cause-and-effect relationship contemplated by the fifth *Cammer* factor.  *See, e.g.*, *Rougier,* 2019 WL 6111303, at *15 ("Event studies are commonly used in securities fraud class actions.").  Based on his event study, Dr. Feinstein found a cause-and-effect relationship between Cassava disclosures and resulting in movements in the price of Cassava's common stock, evidencing that it traded in an efficient market during the Class Period.  Rpt., ¶¶20, 166-167, 170-181.  Accordingly, all of the *Cammer* factors are satisfied here.

### c.    The *Krogman* Factors Also Confirm Market Efficiency

In addition to the *Cammer* factors, many courts "analyze the three *Krogman* factors, which include: (1) the company's market capitalization; (2) the bid-ask spread for stock sales; and (3) float, which is the stock's trading volume without counting insider-owned stock."  *Rougier*, 2019 WL 6111303, at *10 (citing *Unger*, 401 F.3d at 323).  The *Krogman* factors also confirm that Cassava Securities traded in an efficient market throughout the Class Period.  *See Rougier*, 2019 WL 6111303, at *10.

### (1)    Market Capitalization

During the Class Period, Cassava's average market capitalization was $1.43 billion and ranged from $173.7 million to $5.41 billion.  Rpt., ¶111.  This supports market efficiency.  Rpt., ¶112, s*ee Rougier*, 2019 WL 6111303, at *13 (finding efficient market where company "peaked at $1.9 billion" and "averaged over $1.0 billion throughout the Class Period"); *DVI*, 249 F.R.D. at

- 16 -

212 (finding market capitalization ranging between $12 million to $300 million, a "rather high market capitalization as compared to the broader survey of publicly traded companies," weighed in favor of a finding of market efficiency); *In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *10 (N.D. Ill. Mar. 5, 2015) ($800 million market capitalization "far exceed[ed] the $75 million threshold" indicative of efficiency).

### (2) Public Float

During the Class Period, there were 38.7 million shares outstanding, 89.5% of which were not held by insiders. Rpt., ¶114. These facts further support a finding of market efficiency. *Id.*, ¶110; s*ee Enron*, 529 F. Supp. 2d at 752-53 (public float of 92% "strongly" supported efficiency).

### (3) Bid-Ask Spread

The small bid-ask spread also confirms efficiency here. "The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Krogman*, 202 F.R.D. at 478. A small bid-ask spread "is indicative of higher trading volume and courts consider it as a factor" weighing in favor of finding a market efficient. *Rougier*, 2019 WL 6111303, at *13. Here, Cassava's bid-ask spread during the Class Period averaged 0.14%. Rpt., ¶117. This narrow spread supports a finding of market efficiency. *Id.*, ¶114; *see In re Anadarko Petroleum Corp. Sec. Litig.*, 2022 WL 4544235, at *6 (S.D. Tex. Sept. 28, 2022) (0.2% bid-ask spread weighed in favor of market efficiency); *Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, at 574-75 (C.D. Cal. 2012) (same for 0.58% bid-ask spread). All of the *Cammer* and *Krogman* factors support a finding of market efficiency here. Thus, the Class may invoke the fraud-on-the-market doctrine in this case.[11]

---

[11]    Should the putative Class Period be shortened, market efficiency would still be demonstrated for that shorter period, as it is subsumed by Dr. Feinstein's current analysis of the market for Cassava Securities through October 12, 2023. *See* Rpt., ¶21.

**3.    Plaintiffs Are Also Entitled to a Presumption of Reliance Under *Affiliated Ute***

In *Affiliated Ute*, the Supreme Court held that "positive proof of reliance is not a prerequisite to recovery" for Rule 10b-5 claims involving primarily a failure to disclose by one with a duty to disclose.  406 U.S. at 153.  This doctrine reflects that, for omissions, "'reliance as a practical matter is impossible to prove.'"  *In re Facebook, Inc., IPO & Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013).  The Supreme Court, moreover, explicitly referenced Rule 10b-5 scheme-liability and deceptive business practice claims under subsections (a) and (c) as the types of claims that trigger the presumption.  *Affiliated Ute,* 406 U.S. at 153-54; *see Lorenzo v. SEC*, 587 U.S. 71, 81 (2019) (*Affiliated Ute* "described the 'defendants' activities' as falling 'within the very language of one or the other of those subparagraphs, a "course of business" or a "device, scheme, or artifice" that operated as a fraud.'"); *Enron*, 529 F. Supp. 2d at 682 (observing Rule 10b-5(a) and (c) claims may give rise to *Affiliated Ute* presumption).

While the Complaint contains allegations of misstatements, the misconduct is primarily premised on the omission of a scheme "to promote the continued development of an experimental drug using manipulated pre-clinical and clinical data."  ¶509; *see also* ¶522 (alleging Defendants violated Rule 10b-5(a) and (c) by "employ[ing] devices, schemes, and artifices to defraud" and "engag[ing] in acts, practices, and a course of business that operated as a fraud").  Specifically, prior to any alleged misstatement, Defendants' "business strategy" (*i.e.* scheme) for developing simufilam involved first "validating" their "unique scientific approach" under false pretenses by obtaining NIH grants and publishing "scientific data in peer-reviewed journals" (¶¶85-88) and using research that contained rampant manipulation.  ¶¶144-222.  Later, after the truth had begun to leak out, Defendants repeated this scheme, providing doctored data to journals investigating the misconduct allegations in order to obtain false exonerations.  *See, e.g.*, ¶¶338-362, 386-407, 423-424; Supp. ¶¶1-5.  Defendants, however, never disclosed these facts to investors.  Plaintiffs' claims

- 18 -

are thus primarily premised on, and flow from, Defendants' initial fraudulent scheme, and the Class is thus entitled to a presumption of reliance under *Affiliated Ute*.

### B.      Damages Will Be Calculated According to a Common Methodology

Proof of loss causation or damages is not a prerequisite to class certification. *Amgen*, 568 U.S. at 475 ("[T]his Court has held that loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified."); *Halliburton I*, 563 U.S. at 813 (loss causation is a common question and is not a pre-condition for class certification). Further, it is well established that any damages model submitted at the class-certification stage "'need not be exact.'" *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683 (5th Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)).

Specifically, damages will be measured using the well-settled "out-of-pocket" methodology – a class-wide methodology that fits with Plaintiffs' theory of liability and is used to calculate damages in virtually every securities class action. *See* Rpt., ¶¶219-232. *See, e.g.*, *Rougier,* 2019 WL 6111303, at *15 ("[C]ourts recognize event studies . . . as an accepted method for determining artificial inflation and out-of-pocket damages in suits involving fraud on the market liability."); *Rooney*, 330 F.R.D. at 451 (rejecting objections where plaintiffs' expert proposed event study and regression analysis to calculate damages). Damages are no barrier to class certification here.

### C.      A Class Action Is Superior to Any Other Method of Adjudication

Courts in this Circuit have long recognized the advantages of resolving securities fraud cases through class actions. *See, e.g.*, *Enron*, 529 F. Supp. 2d at 697-98; *Elec. Data Sys.*, 226 F.R.D. at 570-71. In considering superiority under Rule 23(b)(3), courts analyze four factors: (i) the class members' interest in individually controlling their separate actions; (ii) the extent and nature of existing litigation by class members concerning the same claims; (iii) the desirability of

concentrating the litigation in a particular forum; and (iv) the likely difficulties of managing a class action.  *See Elec. Data Sys.*, 226 F.R.D. at 570.  Each of these factors is satisfied here.

First, Class members' interests in individually controlling the prosecution of separate actions are minimal, as their losses are relatively small and the hurdles to bringing a suit in the context of the PSLRA are high.  *See id.* at 570-71.  Second, Plaintiffs are not aware of any pending individual actions related to the claims alleged here.[12]  Third, concentrating litigation in this forum has many benefits, including eliminating the risk of inconsistent adjudications and judicial economy.  *See Lehocky*, 220 F.R.D. at 510-11 ("[T]he value of concentrating litigation in [a particular] forum is great" when that "[c]ourt has already made several rulings in th[e] case.").  Finally, there are no apparent management difficulties precluding class certification.  *See Enron*, 529 F. Supp. 2d at 698 ("'"[A]ny administrative difficulties in handling this class action are [still] preferable to duplicating judicial resources in several individual lawsuits and denying access to the courts for class members."'").  Thus, the class action device is the superior method for fairly and efficiently adjudicating this action.  Accordingly, all of Rule 23(b)(3)'s requirements are met.

**VII.    CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully requests that the Court: (i) certify this action as a class action; and (ii) appoint Plaintiffs as Class representative pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3); and (iii) appoint Robbins Geller as Class Counsel pursuant to Rule 23(g).[13]

---

[12]    Pursuant to Plaintiffs' Notice of Related Case (ECF 142), *Baker v. Cassava Scis., Inc., Remi Barbier, & Eric J. Schoen*, No. 1:24-cv-00977 (N.D. Ill. Feb. 2, 2024) was a putative class action filed in the Northern District of Illinois. *Crocker v. Cassava Scis., Inc.*, No. 1:24-cv-01525 (W.D. Tex. Dec. 12, 2024), a putative class action alleging violations of §§10(b) and 20(a) of the Exchange Act, is currently pending before this Court.

[13]    Should the Class be certified, Plaintiffs will submit to the Court for its approval a notice plan for the Class that complies with Rule 23(c)(2)(B).  The cost of the notice will be borne by Plaintiffs, subject to reimbursement as part of any settlement or judgment in their favor.

DATED:  June 20, 2025         Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN (admitted *pro hac vice*)
RACHEL JENSEN (admitted *pro hac vice*)
KEVIN A. LAVELLE (admitted *pro hac vice*)
MEGAN A. ROSSI (admitted *pro hac vice*)
HEATHER GEIGER (admitted *pro hac vice*)


          */s/ Kevin A. Lavelle*
          KEVIN A. LAVELLE

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dand@rgrdlaw.com
rachelj@rgrdlaw.com
klavelle@rgrdlaw.com
mrossi@rgrdlaw.com
hgeiger@rgrdlaw.com

Lead Counsel for Lead Plaintiff and Additional
Plaintiff Ken Calderone

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)
3811 Turtle Creek Blvd., Suite 825
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

Local Counsel for Lead Plaintiff and Additional
Plaintiff Ken Calderone

GLANCY PRONGAY & MURRAY LLP
CHARLES H. LINEHAN (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
Telephone:  310/201-9150
310/201-9160 (fax)
clinehan@glancylaw.com

Counsel for Additional Plaintiff Manohar K. Rao

- 21 -

**Cross Reference of Information Required by Local Rule 23**
**Appendix A to Plaintiffs' Renewed Opposed Motion for Class Certification**

| | |
|---|---|
| (1) A brief statement of the case. | §II |
| (2) A statement defining the class plaintiff seeks to have certified including its geographical and temporal scope. | §III |
| (3) A description of plaintiff's particular grievance and why that claim qualifies plaintiff as a member of the class as defined. | §§II, V.3 |
| (4) Whether the plaintiff contends that the action may be maintained under Rule 23(b)(1), 23(b)(2), or Rule 23(b)(3) and why. | §VI |
| (5) A statement respecting the four prerequisites of Federal Rule of Civil Procedure 23(a).  The statement shall set forth:<br><br>(a) The anticipated number of class members and how this number was determined.<br>(b) The common questions of law and fact involved.<br>(c) The reasons why plaintiff's claim is typical of those of the other class members.<br>(d) The reason why representation by the named plaintiff is adequate to protect the interests of the class. This part of the statement shall specifically answer the following questions:<br>(i) Is the claim of the named plaintiff presently or potentially in conflict with that of any members of the class?<br>(ii) Will the claims of the class require subclasses presently or in the future?<br>(iii) What is the prior experience of counsel for the plaintiff that would indicate capability to handle the lawsuit?<br>(iv) Is counsel presently representing or has he at any time represented, a class in any other class action, and if so, when, and how many instances?<br>(v) How many cases is plaintiff's counsel now handling in which class allegations are made? | §§V, V.4; Page 10 n.8 |
| (6) A statement describing any other pending actions in any court against the defendants alleging the same or similar causes of action. | Page 20 n.12 |
| (7) A statement that the attorney for the named plaintiff has discussed and thoroughly explained to the plaintiff the nature of a class action and potential advantages and disadvantages to the named plaintiff by proceeding in a class action rather than individually. | §V.4;<br><br>Page 10 n.9 |

| | |
|---|---|
| (8) A statement of the proposed notices to the members of the class and how and when the notices will be given, including a statement regarding security deposit for the cost of notices. | Page 20 n.13 |
| (9) A description of the extent of any settlement negotiations that have taken place and the likelihood of settlement with the named plaintiff on an individual basis. If such settlement is likely, include a statement specifying:<br><br>　(a) Whether or not counsel have any knowledge of any person who has relied on the fact that this suit was initially filed a class action.<br>　(b) The manner in which counsel will protect the class in the event of settlement with the named plaintiff on an individual basis. | Page 10 n.9 |
| (10) A statement of any other matters that the plaintiff deems necessary and proper to the expedition of a decision on the motion and the speedy resolution of the case on the merits. | Page 3 n.5 |

4906-4532-5135.v2